# TOWN OF WESTBOROUGH, MASSACHUSETTS

# REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

1.  **REQUEST FOR PROPOSALS**

The Town of Westborough, acting by and through its Select Board, is offering for sale, through the Request for Proposal ("RFP") process in accordance with Massachusetts General Laws Chapter 30B, Section 16, the parcel of land with a building and other improvements thereon located at 231 Turnpike Road, containing 29 acres, more or less, currently known as the former Regal Cinema property, identified on Assessor's Map 32 as Parcel 48, and shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, a copy of which plan is attached as <u>Attachment A</u> (the "Property").

For the purposes of this RFP, the term "Town" shall mean the Town of Westborough, and the term "Select Board" shall mean the Town of Westborough Select Board, and shall be interchangeable and synonymous with "Select Board" or "Board." The awarding authority is the Select Board. The aforementioned terms shall include the Select Board's designee.

Sealed proposals must be received by the Chief Procurement Officer/Grants Administrator at the Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581 on or before <u>Monday, July 25, 2022 at 11:00 a.m.</u>, at which time and place the proposals will be publicly opened in the Memorial Hall at Town Hall. Proposals become public information when opened. The Submission Requirements are set forth in Section 8, the Evaluation Criteria in Section 9, the Selection Process in Section 10, and the Instructions to Buyers in Section 12. Proposals received after this time will be deemed non-responsive and will not be accepted.

All proposals must be accompanied by a certified or bank check or bid bond, in the amount of $10,000 as bid security, which will be returned to any unsuccessful proposer.

All inquiries or questions regarding this RFP must be in writing and received by the Town no later than <u>Thursday, June 30, 2022 at 4:00 p.m.</u> Questions should be directed to Shab Khan, Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581 or email skhan@town.westborough.ma.us

The successful proposer must enter into a purchase and sale agreement materially on the same terms as set forth the Purchase and Sale Agreement attached hereto as <u>Attachment C</u> and incorporated herein (the "P&S") within 30 days from the date the sale of the Property is awarded to the proposer. The terms and conditions applicable to the sale of the Property are also set forth in Section 11. A deposit of 10% of the purchase price shall be paid upon the execution and the remaining amount shall be paid in full at the closing. The closing shall occur no later than ninety (90) days from the date the parties enter into the P&S or such other date as is acceptable to both parties.

No proposer may withdraw his or her proposal for a period of one hundred fifty (150) days after the date set for the opening thereof.

The Town reserves the right to reject any and all proposals, to negotiate any and all non-mandatory contract terms with the successful proposer, or to cancel this procurement at any time if it is in the Town's best interest to do so.

While the Town believes that the information provided in this RFP, including all exhibits and addendums, if any, is accurate, **the Town makes no representation or warranty, express or implied, as to the accuracy and completeness of the information in this RFP**. The proposer assumes all risk in connection with the use of the information, and releases the Town from any liability in connection with the use of the information provided by the Town. Further, the Town makes no representation or warranty with respect to the Property, including without limitation, the value, quality or character of the Property or it fitness or suitability for any particular use and/or the physical and environmental condition of the Property. The Property will be sold in its "AS-IS" condition.

Each proposer shall undertake its own review and analysis (due diligence) concerning the physical and environmental condition of the Property, applicable zoning and other land use laws, required permits and approvals, and other development, ownership, and legal considerations pertaining to the Property, and the use of the Property, and shall be responsible for applying for and obtaining any and all permits and approvals necessary or convenient for the proposer's use of the Property. All costs and expenses of purchasing and developing the Property, including without limitation, all costs of permitting and improvements, shall be the sole responsibility of the successful proposer.

2.    **DESCRIPTION OF THE PROPERTY**

The property consist of a parcel of land with the building thereon located at 231 Turnpike Road, Westborough, currently known as the former Regal Cinema property, identified on Assessor's Map 32, parcel 48, and shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, a copy of which plan is attached as Attachment A (the "Property").

The Town acquired the Property by Foreclosure in Tax Lien Case dated January 5, 2022 and recorded with the Registry in Book 66983, Page 53. Proposers are advised that the Property is subject to the former owner's rights of redemption, which rights shall terminate if they are not exercised within one (1) year from the date of the judgment that, is on January 4, 2023.

The Property, as surveyed in 2017, consists of approximately 29.336 acres of land, improved by an approximately 49,000 square foot building consisting of 12 individual theaters built in 1997 with brick veneer and a tar and gravel roof, with six (6) bathrooms, an elevator and snack stand, and is connected to Town water and sewer. The building on the Property has suffered extensive damage from vandalism since 2017, when Regal Cinema closed, including destruction of bathroom fixtures, walls, drop ceilings and glass. The building has also suffered water damage in several areas due to burst pipes in the sprinkler system, which needs to be repaired.

Proposers are advised that they may not be able to use the building without extensive renovations. The Town believes the gas and electricity was turned off in 2021.  Before utilities can be turned back on, all systems, including water, gas, electrical and HVAC, will need to be examined and repaired as needed. The fire escapes will also need to be inspected and certified prior to any occupancy. Photographs showing the current condition of the building and the Property are attached hereto as Attachment H.

It should be noted that it is not just the actual structure that is in disrepair, but also the exterior supporting components of the Property, such the pavement, landscaping, stormwater management, signs, and lighting.

The Property is subject to use limitations, rights and obligations, including cost-sharing arrangements, set forth more particularly in the Declaration of Reciprocal Covenants, Easements and Restrictions (the "Declaration") recorded with the Worcester South District Registry of Deeds in Book 18745, Page 313 and attached hereto as to as Attachment D.  Proposers are advised to review the Declaration to ascertain the cost-sharing arrangements and sum due under said Declaration.

Proposers are advised that the Town may reserve trail easements in, on, under, and across a portion or portions of the Property for use by the Town and members of the public, the approximate location of which is shown on the sketch plan attached hereto as Attachment G. The Town anticipates that exact locations of the easements, and the terms of the easement, shall be determined in consultation with the successful proposer and shown on plans prepared by the proposer and acceptable to the Town.  The Town expects to convey the trail easements before the Property is conveyed to the successful proposer.

The Property, including any and all buildings and other improvements thereon, shall be conveyed in their **"AS-IS" condition**, without any representations or warranties of any kind whatsoever.  The Town shall have no obligation to make any repairs or improvements to the Property or to deliver it in broom-clean condition.

3.     **ZONING**

The Property are currently zoned BA Highway Business (see Attachment B for Highway Business Zoning Regulations). All proposals must indicate the proposed use for the Property. The successful proposer will be responsible for acquiring all necessary permits and zoning relief/changes.

4.     **TOWN MEETING APPROVAL**

The Westborough Town Meeting authorized the Select Board to sell the Property pursuant to the vote taken under Article 20 of the March 19, 2022 Annual Town Meeting.

5.     **PRICE**

The purchase price is a significant criteria to the Town, and proposers are advised to offer the highest price. However, the Town reserves the right to make an award to a proposal that offers a price other than the highest price. The Town will consider the overall value of the offer based on the selection criteria set forth herein.

## 6.   READINESS TO PROCEED

The Town is interested in selling the Property to a proposer who is ready to put the Property to productive use soon after the closing. Proposers are required to identify their proposed use of the Property and provide a schedule of permitting, financing, and rehabilitation of the Property, as well as a detailed description of how the proposer intends to finance the project. The Town will give preference to proposers who have the financial and operational wherewithal or are otherwise ready to proceed with the development of the Property. Proposers are to include with their proposals a development schedule from the time they enter into the P&S with the Town to the closing, addressing permits and approvals required for development and anticipated financial closings.

## 7.   PROPOSAL PROCESS AND SCHEDLE OF EVENTS

A.   Availability of RFP Packages. This project is being Electronically Bid (E-Bid). You can register to become a bidder (for free) online at www.BidNetDirect.com. For assistance, contact BidNetDirect.com at 800-835-4603.

RFP Documents will be available online beginning at **8 AM on May 26, 2022** at https://www.bidnetdirect.com/massachusetts/townwestborough. All plan holders must have an active online account on www.bidnetdirect.com to acquire documents, receive project notifications, download plan holders list and receive addenda. It is the responsibility of prospective proposers to check www.BidNetDirect.com for new information via any addenda to this solicitation. **Any addenda issued will be emailed to all plan holders registered with BidNetDirect.**

B.   Site Visit; Pre-Submittal meeting. There will be a site visit on location on **June 16, 2022, at 1:00 p.m.** Proposers are to meet at the site at 231 Turnpike Road, following which a meeting will be held at the Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581, where Town representatives will respond to questions about the Property, the selection process, and related issues. Proposers are advised to do their own due diligence, and neither the Town nor any of its agents or representatives is responsible for representations made regarding the site view or pre-submittal meeting.

C.   Deadline for Submission of Questions. **The deadline for written questions is Thursday, June 30, 2022 at 4:00 p.m.**

All inquiries and questions pertaining to this RFP must be in writing and should be emailed to Shab Khan, Chief Procurement Officer, at skhan@town.westborough.ma.us. Answers to all questions will be posted via addenda online at https://www.bidnetdirect.com/massachusetts/townwestborough. All plan holders must be

registered with BidNet to receive addenda.  Questions asked at the Site visit on June 16, 2022 will also be emailed to all Plan holders via an addendum through BidNetDirect.com.

In the sole discretion of the Town, written responses to questions raised during the view of the Property or at the pre-submittal meeting may be similarly distributed.  The Select Board is not obligated, in any way, to waive RFP requirements or create exceptions for proposers who choose not to attend the pre-submittal meeting or the site view.

D.    <u>Submission Deadline</u>.  Sealed Proposals shall be submitted **by 11:00 AM on Monday, July 25, 2022 to the following address.**

**All applicants must provide one (1) signed original and five copies with all Bid Forms with their proposal.** Hard copy submittals are to be sealed and identified on the outer envelope as:

**Sale of Property at 231 Turnpike Rd, Westborough (Former Regal Cinema)**
**RFP 22-0080**
**Westborough Town Hall**
**Attn: Shab Khan, CPO**
**34 West Main St.**
**Westborough MA 01581**

No submittals will be accepted after the time and date noted above.

The Town reserves the right to accept any submittal in whole or in any part and to reject any or all submittals if it is deemed in the best interest of the Town.

E.    <u>Withdrawal; Effectiveness</u>.  Proposals may be withdrawn upon written request to the Office of the Town Manager prior to the submission deadline.  After the date scheduled for the opening of the proposals, proposals shall not be modified, amended or withdrawn for a period of one hundred and fifty (150) days.

F.    <u>Summary of RFP Schedule</u>

| Activity | Date |
| --- | --- |
| Posted in Central Register and advertised | Wednesday, June 1, 2022 |
| Site Visit and Pre-Submittal Meeting | Thursday, June 16, 2022, at 1:00 p.m. |
| Deadline for Questions/Inquiries | Thursday, June 30, 2022 at 4:00 p.m. |
| Response to RFP Due at Town Hall | Monday, July 25, 2022 at 11:00 a.m. |

**8.    <u>SUBMISSION REQUIREMENTS</u>**

Parties interested in responding to this RFP are invited to submit a proposal in accordance with the following terms and conditions.  With submission of a response to this RFP, the proposer acknowledges that he or she has read and understands the requirements and conditions herein.

Sealed Proposals shall be submitted by **Monday, July 25, 2022 at 11:00 a.m. to the following address.**

All applicants must provide one (1) signed original and five copies with all Bid Forms in the Attachment D of this RFP with their proposal. Hard copy submittals are to be sealed and identified on the outer envelope as:

> **Sale of Property at 231 Turnpike Rd, Westborough (Former Regal Cinema)**
> **RFP 22-0080**
> **Westborough Town Hall**
> **Attn: Shab Khan, CPO**
> **34 West Main St.**
> **Westborough MA 01581**

No submittals will be accepted after the time and date noted above.

The Town reserves the right to accept any submittal in whole or in any part and to reject any or all submittals if it is deemed in the best interest of the Town.

A.    Cover Letter; References. A letter signed by the principal(s) of the proposer who is authorized to submit its RFP response, including a statement of interest, the identity of the proposer, and name of the purchaser of the Property (if other than proposer), and the name, address and contact information of all interested parties.  At least three (3) references shall be included.

B.    Price Proposal.  Proposers must insert the price offered for the Property by filling in the blank spaces in the Price Proposal Form attached hereto in both words and figures (form attached as Attachment E).

C.    Proposal Security.  Proposal security in the form of a certified check, cashier's check or bid bond payable to the "Town of Westborough" in the amount of $10,000.00 must accompany the proposal package.  The proposal security of parties not selected will be returned within a reasonable time after the date of an award.  Proposal packages that fail to include this security, or those of responding parties who fail to provide the aforementioned security by the submission deadline, will be rejected as non-responsive.  In the event that the successful proposer and the Town fail to enter into a purchase and sale agreement ("P&S") within 30 days of the date of the award or such later date as the Town may agree to, the Town shall retain the proposal security.  Otherwise, the proposal security shall be credited to the purchase price, as set forth in the P&S.

D.    Forms 1 through 4.  Proposers are required to fill out and sign Forms 1 through 4 (the "Required Forms") attached hereto as Attachment F:

- *Form 1, Certificate of Tax Compliance*: required under G.L. c. 62C. §49A, in which the proposer certifies that he or she has complied with all laws of the Commonwealth of Massachusetts relating to taxes.

6

- *Form 2, Certificate of Non-Collusion*: required under G.L. c. 30B, §10, in which the proposer states that this proposal is made in good faith without fraud or collusion or connection with any other person submitting a proposal signed and dated by the proposer.

- *Form 3, Certificate of Authority*: in which the proposer, if an entity, identifies the names and addresses of the managers, directors, officers, and/or other parties authorized to act on behalf of the entity.

- *Form 4, Real Property Disclosure Statement*: required under G.L. c. 7C, §38, in which the proposer identifies the parties who will have a legal or beneficial interest in the Property and whether any such party is a state or local employee.

E.    <u>Financing Information and, if applicable, Loan Commitment</u>.  Each proposer must provide evidence of the proposer's ability to meet the financial obligations of the acquisition and development of the Property.  Financial statements and background information must be attached to the proposal.  If a proposer intends to purchase the Property with a purchase money mortgage, the proposer must specify how much is to be borrowed and submit, in its proposal package, a pre-approval or commitment letter from an institutional lender acknowledging that the proposer has sufficient financial resources to obtain a loan commitment, subject to prevailing terms and conditions.  <u>If the proposer provides a pre-approval letter, the proposer must deliver a firm letter of commitment to the Town within thirty (30) days from the date the P&S is fully executed.</u>

F.    <u>Development Plan and Schedule; Closing Date.</u>  Each proposer must submit narrative on the proposer's proposed use of the Property, the impact of the proposer's use of the Property on Town infrastructure, including water, sewer, drainage, parking, public safety, and roads, and the economic benefit to the Town in tax revenue and in local job creation.  Proposers must include a development schedule for permitting and financing their projects, and demonstrate their readiness to commence their projects shortly following the closing.

G.    <u>Other.</u>  The proposer should include in this section any other information which the proposer believes the Town should know in order to fully evaluate the proposal.

H.    <u>Instructions to Proposers</u>.  The instructions to proposers are set forth in Section 12 of this RFP.

Failure to meet the submittal requirements will be sufficient cause to reject a proposal. Proposers are solely responsible for reviewing all the provisions of this RFP and any attachments prior to submitting the proposal.  Proposals that are incomplete, not properly endorsed, or are otherwise in conflict with the requirements of this RFP, will be rejected.

## 9.    <u>EVALUATION CRITERIA</u>

A.    <u>Minimum Evaluation Criteria</u>.  All responsive proposals must meet the following minimum threshold criteria:

- Complete conformance with all submission requirements set forth in Section 8, including submission of all required forms, including the Price Proposal Form, and

- Statement of proposed use of the Property.

B.     Comparative Evaluation Criteria.  Proposals meeting the minimum threshold criteria will also be judged on the following comparative evaluation criteria:

- A Highly Advantageous rating will be given to a proposal that in the judgment of the evaluators exceeds the requirements of the RFP.

- An Advantageous rating will be given to a proposal that in the judgment of the evaluators meets the requirements of the RFP.

- A Least Favorable rating will be given to a proposal that in the judgment of the evaluators falls short of meeting the requirements of the RFP.

**(1)     Purchase Price.**

- A Highly Advantageous rating will be given to a proposal that offers a price above the fair market value of the Property.

- An Advantageous rating will be given to a proposal that offers the fair market value of the Property.

- A Least Favorable rating will be given to a proposal that offers less than the fair market value of the Property.

Notwithstanding the foregoing, the Town shall not be required to convey the Property to the proposer offering the highest price.

**(2)     Other Financial Benefits.**

- A Highly Advantageous rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has the most favorable financial impact on the community, including taxes, fees, and job growth.

- An Advantageous rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has an average financial impact on the community.

- A Least Favorable rating will be given to a proposal that, in the judgment of the evaluators, presents a plan that has a below average financial impact on the community.

**(3)     Financial Resources.**

- A Highly Advantageous rating will be given to a proposal that is not contingent on financial approval for the purchase and/or development of the Property and the proposer has demonstrable funds to purchase the Property;

- An Advantageous rating will be given to a proposal that is contingent on financial approval, but the proposer has provided a firm commitment from institutional mortgagees to purchase the Property for the offered price.

- A Least Favorable rating will be given to a proposal that, in the judgment of the evaluators, is contingent on financing and the proposer has not provided a firm commitment from institutional mortgagees to purchase the Property for the offered price.

**(4)** **Ability to Proceed.**

- A Highly Advantageous rating will be given to a proposal that contains the fewest contingencies to closing, and the parties are able to complete the transaction promptly after the parties enter into a P&S.  The sale cannot be contingent on the sale or purchase of other property.

- An Advantageous rating will be given to a proposal that contains contingencies to closing, but which can be reasonably satisfied, and the parties are able to complete the transaction, within a reasonable period of time after the date the parties enter into the P&S.  The sale cannot be contingent on the sale or purchase of other property.

- A Least Favorable rating will be given to a proposal which is contingent on the satisfaction of contingencies that cannot be reasonably be satisfied within a reasonable period of time after the date the parties enter into the P&S and/or is contingent on the sale or purchase of other property.

**(5)** **Sustainability.**

- An Advantageous rating will be given to a proposal that the development design includes elements of green, sustainable, climate resilient design and promotes conservation of energy resources consistent with Westborough's Climate Action Plan. Site layout and design addresses environmental issues e.g. wetlands, stormwater management.

- A Least Favorable rating will be given to a proposal that fails to articulate a thoughtful design concept that incorporates green, sustainable, and climate resilient design and does not promote energy conservation.

After evaluating a proposal on the foregoing factors, the evaluators will provide an overall ranking for the proposal as compared to other proposals.  For example, a proposal which achieves "Highly Advantageous" and/or "Advantageous" rankings in several categories will not necessarily be disqualified simply because it received a "Least Favorable" ranking in one or more other categories if, in the judgment of the evaluators, the proposal on the whole is "Advantageous" or "Highly Advantageous" to the Select Board.  Any notice of award, however, could be contingent upon the potential proposer and the Select Board mitigating any "Least Favorable" criterion ranking prior to the execution of the P&S.

10.   **SELECTION PROCESS**

A.   All proposals submitted by the proposal filing deadline set forth under Section 7 above will be opened in public and recorded.  All information contained in the proposals is public.

B.   Each proposer must include sufficient supporting material to allow a meaningful and comprehensive evaluation of its proposal.  The Town reserves the right to disqualify any proposal or response due to insufficient supporting or explanatory information, or to request additional supporting information.  The Select Board may request additional information of one or more respondents relative to a proposal or qualifications.  Requests shall be in writing with the expectation of a written response within a specified time.  Proposers may also be invited to appear before the Select Board.  Failure to comply with this request will result in a rejection of the proposal at issue.  The right to an interview does not automatically extend to all whose proposals are accepted for review, but is granted in the sole discretion of the Select Board.

C.   Following the interviews and the receipt of any additional information requested of the proposers by the Town, if any, proposals will be evaluated and rated by the Town according to the comparative evaluation criteria set forth in this RFP.  The Select Board will select the most advantageous proposal, taking into consideration all of the evaluation criteria set forth in this RFP.  The Select Board is the awarding authority and will notify all proposers in writing of its decision.

D.   The proposer selected by the Select Board will be given exclusive rights to negotiate with the Town the terms of the P&S of the Property.  If, at any time, such negotiations are not proceeding to the satisfaction of the Town, it its sole discretion, then the Town may choose to terminate said negotiations.  The Select Board may select the next most advantageous proposer with whom to initiate negotiations.

E.   The selected proposer and the Town shall enter into the P&S within thirty (30) days from the date the proposer is notified of the award unless the Town extends the same, in its discretion.

F.   The selected proposer shall, if it intends to obtain financing to purchase the Property, provide the Town with a firm commitment letter from an institutional mortgagee on standard terms and conditions within thirty (30) days of the parties entering into the P&S.

11.     **AWARD, TERMS AND CONDITIONS OF SALE**

The Property shall be awarded to the proposer selected in accordance with Section 10 above.  The Select Board shall send a letter to the successful proposer, informing the proposer of such award.

The Select Board and the selected proposer (referred to as "Buyer") shall, within 30 days of date of the award, enter into a purchase and sale agreement **materially on the same terms as those set forth in** the Purchase and Sale Agreement attached thereto as <u>Attachment C</u> and incorporated herein (the "P&S").  In the event the successful proposer fails to enter into the P&S with the Town within said 30-day period, the Town may rescind the award and retain any proposal security as liquidated damages.

The P&S shall contain, in addition to the usual provisions, the following terms:

A.     At time of execution of the P&S, Buyer shall pay a deposit, which, with the $10,000 proposal security paid with the submission of the proposal, will equal ten percent (10%) of the purchase price.  The deposit submitted by Buyer shall be held in escrow by the Treasurer of the Town of Westborough in a non-interest bearing account, and shall be duly accounted for at the time for performance of the P&S.  In the event that Buyer fails to fulfill its obligation to purchase the Property, the Town shall retain the deposit as liquidated damages.  In the event of any disagreement between the parties, the escrow agent may retain all deposits made under the P&S pending instructions mutually given by the Town and Buyer.

B.     If the acquisition of the Property is financed by a lending institution, Buyer must deliver a firm letter of commitment to the Town <u>within thirty (30) days from the date the P&S is fully executed</u>.

C.     No broker's commission shall be paid by the Town, and Buyer shall indemnify and hold harmless the Town from any claims for such commission.

D.     A payment in lieu of taxes shall be paid in accordance with G.L. c. 44, §63A as of the day of performance of the P&S and the net amount thereof shall be added to the purchase price payable by Buyer at the time of delivery of the deed.

E.     Buyer shall pay the monetary consideration for the Parcel by certified, treasurer's, or bank check or by wire transfer.

F.     Buyer acknowledges that Buyer has not been influenced to enter into this transaction and that Buyer has not relied upon any warranties or representations not set forth in the P&S.  Buyer represents and warrants that it will accept the Property "AS IS", provided however Buyer shall have the right to terminate this P&S if Buyer finds Hazardous Materials on the Property in amounts required to be reported to the Department of Environmental Protection. Buyer acknowledges that the Town has no responsibility for hazardous waste, oil, hazardous material or hazardous substances, as those terms are defined by any applicable law, rule or regulation, including, without limitation, the Massachusetts Oil and Hazardous Materials Release Prevention and Response Act, M.G. L. c. 21E, the Massachusetts Hazardous Waste Management

Act, M.G.L. c. 21C, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601 et seq. and the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901 et seq. (herein collectively referred to as "Hazardous Materials") on, in, under or emitting from or onto the Property or for any other condition or defect on the Property.  The provisions of this paragraph shall survive the delivery of the deed.

G.      The Property is subject to rights and obligations, including cost-sharing arrangements, set forth more particularly in the Declaration of Reciprocal Covenants, Easements and Restrictions (the "Declaration") attached hereto as to as <u>Attachment D</u>.

H.      In the event that the Town defaults under the P&S, Buyer shall be entitled to terminate the P&S and receive a refund of the deposit.  The foregoing shall be Buyer's sole and exclusive remedy at law and equity for any breach of the P&S by the Town.

I.      The purchase of the Property shall not be contingent on the sale of any other property.

J.      The closing shall occur within thirty (30) days from the date on which the Buyer obtains permits necessary to construct and operate its project on the Property and has financing in place to undertake the project shortly following the closing, provided that the closing occurs no later than January 30, 2023.

K.      Buyer acknowledges that Buyer has not been influenced to enter into this transaction nor has Buyer relied upon any warranties or representations not set forth or incorporated in this P&S, except for the following additional warranties and representations, if any, made by the Town: NONE.

L.      In the event that the proposer's obligations under the P&S are contingent on financing, permitting, inspection and/or other contingencies, the Town shall have the right to set forth deadlines by which some or all of the contingencies must be met, depending on when the closing is to occur and other factors.

**12.**      <u>**INSTRUCTIONS TO PROPOSERS**</u>

A.      Each proposer shall submit one (1) original proposal and five (5) copies of the proposal on or before **Monday, July 25, 2022 at 11:00 a.m** to:

**Sale of Property at 231 Turnpike Rd, Westborough (Former Regal Cinema)**
**RFP 22-0080**
**Westborough Town Hall**
**Attn: Shab Khan, CPO**
**34 West Main St.**
**Westborough MA 01581**

B.      The proposals will be opened and recorded at this time. No proposals submitted after this time will be accepted.  Proposals must be submitted in writing in a sealed envelope

clearly marked "Purchase of Former Regal Cinema Property."  Responses to the RFP must include all required documents, completed, and signed per the instructions and attached forms included in this RFP package.  Electronically mailed (e-mailed) proposals will not be accepted and will be deemed non-responsive and will not be evaluated.

C.      If any changes are made to this RFP, an addendum will be issued.  Each addendum will be emailed to all plan holders via BidNet.  Failure of any proposer to receive any such addendum or interpretation shall not relieve such proposer from the obligation to comply with the terms of such addenda.  All addenda so issued shall become part of this RFP.

D.      At the time of the opening of bids, each proposer will be presumed to have inspected the Property and to have read and be thoroughly familiar with the RFP (including all addenda).  The failure or omission of any proposer to examine any form, instrument, or document shall in no way relieve any proposer from any obligation to comply with the RFP.

E.      Proposers are cautioned that it is the responsibility of each individual proposer to assure that his/her proposal is in the possession of the responsible official or his designated alternate prior to the stated time and at the place of proposal by the due date.  The Town is not responsible for proposals delayed by mail and/or delivery service of any nature. Late responses will not be accepted nor will additional time be granted to individual respondents unless the Select Board extend the required submittal date for all proposers.

F.      Proposals may be corrected, modified, or withdrawn prior to the deadline for submission of proposals by submitting the required number of copies of such correction, modification, withdrawal or a new submission, clearly marked on the outside envelope with the appropriate heading, by the deadline listed above.

G.      Proposals cannot be withdrawn, modified or amended for a period of 150 days from the deadline for submission of proposals.

H.      All proposals submitted to the Town must include all forms included within the contents of this RFP and they must all be filled out and properly executed.  Failure to submit all forms properly filled out and executed will be grounds for rejection of the proposal.

I.      All signatures must be handwritten and in ink by the person(s) seeking to purchase the Property.  All other words and figures submitted on the proposal shall be neatly written in ink or typed. Proposals that are conditional, obscure, or which contain additions not called for in the specifications, erasures, alteration, or irregularities may be rejected.

J.      All proposals become the property of the Town.  All proposals are deemed to be public records within the meaning of MA General Law Chapter 4, Section 7(26).

K.      The Town will not be liable for any costs incurred by any respondents in the preparation and presentation of responses to this RFP or in the participation in views, interviews, negotiations or any other aspect of this RFP process.

13.     **RESERVATIONS BY THE TOWN**

A.      This RFP does not represent any obligation or agreement whatsoever on the part of the Town to sell the Property described in this RFP.

B.      The Town reserves the right, in its sole discretion, to reject at any time any or all proposals, to withdraw the RFP, to select finalists to submit and negotiate a more fully-developed response, to negotiate with one or more applicants, and/or negotiate and dispose of the Property on terms that are not materially different from those set forth herein.  The Town also reserves the right, at any time and to waive strict compliance with terms and conditions of this RFP or to entertain reasonable modifications or additions to selected proposals provided the same are not materially different from the terms set forth herein.

C.      The Town makes no representations or warranties, express or implied, as to the accuracy and/or completeness of the information provided in this RFP. This RFP (including all attachments and supplements) is made subject to errors, omissions, prior sale, withdrawal without prior notice, and changes to, additions to, and different interpretations of laws and regulations.

D.      Selection of a proposer's proposal will not create any rights on the proposer's part, including, without limitation, rights of enforcement, equity or reimbursement, until the P&S and all related documents are approved by the Select Board and fully executed.

E.      All determinations as to the completeness or compliance of any proposals, or as to the eligibility or qualification of any proposer, will be within the sole discretion of the Select Board.


**Attachments**:

Attachment A:        Plan of the Property
Attachment B:        Highway Business (HA) Zoning Bylaw
Attachment C:        Purchase and Sale Agreement
Attachment D:        Declaration of Reciprocal Covenants, Easements and Restrictions
Attachment E:        Price Proposal
Attachment F:        Required Forms
Attachment G:        Easements
Attachment H:        Interior Photographs


800924/WBOR/0027

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

### ATTACHMENT A

PLAN OF PREMISES



# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

### ATTACHMENT B

HIGHWAY BUSINESS (BA) ZONING BYLAWS

# ZONING BYLAWS

# ADOPTED MARCH 5, 1990, ARTICLE 19

# AMENDED THROUGH JUNE 20, 2020

ARTICLE 1 ADMINISTRATION AND PROCEDURE.................................................................10

(Adopted March 5, 1990) .........................................................................................................10

  1100.  PURPOSE.........................................................................................................................10

  1200.  ADMINISTRATION ..........................................................................................................10

    1210.  Building Commissioner........................................................................................10

    1220.  Permits Required. ...............................................................................................11

    1230.  Permit Application. ..............................................................................................11

    1240.  Site Plan Review. ................................................................................................11

    1241.  Design Requirements..........................................................................................11

    1242.  Drawing Requirements........................................................................................12

    1243.  Submission of Plans............................................................................................12

    1244.  Procedures of the Board of Selectmen................................................................13

    1245.  Design Review For the Downtown Westborough....................................................14

    1250.  Penalty..................................................................................................................16

    1260.  Enforcement..........................................................................................................17

  1300.  BOARD OF APPEALS......................................................................................................17

    1310.  Appeals................................................................................................................17

    1320.  Variances. ............................................................................................................17

    1350.  Filing of Decisions................................................................................................19

    1360.  Repetitive Petitions. .............................................................................................19

  1400.  AMENDMENTS ...............................................................................................................19

  1500.  SEPARABILITY ...............................................................................................................19

  1600.  APPLICABILITY ...............................................................................................................19

  1700.  EFFECTIVE DATE ...........................................................................................................19

ARTICLE 2  DISTRICT REGULATIONS .................................................................................20

(Adopted March 5, 1990) .........................................................................................................20

  2100.  ESTABLISHMENT OF DISTRICTS ..............................................................................20

1

2110. ............................................................................................................................................20

2120. Official Zoning Map. ...........................................................................................................20

2130. Dimension Lines. ...............................................................................................................21

2140. Split Lot. .............................................................................................................................21

2150. ............................................................................................................................................21

2151. ............................................................................................................................................21

2152. ............................................................................................................................................21

2153. ............................................................................................................................................21

2200. USE REGULATIONS.........................................................................................................22

2210. Classification of Use.........................................................................................................22

2420. Abandonment.....................................................................................................................25

2430. Restoration. .......................................................................................................................26

2440. Changes.............................................................................................................................26

2500. DIMENSIONAL REGULATIONS.......................................................................................26

2510. Exemptions. .......................................................................................................................26

2520. Changing Nonconforming Lot Dimensions. ......................................................................27

2530. Average of Building setbacks. ..........................................................................................27

2540. Multiple Uses. ...................................................................................................................27

2600. DIMENSIONAL SCHEDULE.............................................................................................27

2610. ............................................................................................................................................27

2620. ............................................................................................................................................29

2621. ............................................................................................................................................30

ARTICLE 3  GENERAL REGULATIONS......................................................................................32

(Adopted March 5, 1990) ..............................................................................................................32

3100. PARKING AND LOADING REQUIREMENTS....................................................................32

3110. General. .............................................................................................................................32

3120. Schedule of Parking Area Requirements..........................................................................32

3130. Parking Area Design. ........................................................................................................32

3131. ............................................................................................................................................33

3132. ............................................................................................................................................33

3133. ............................................................................................................................................33

3134. ............................................................................................................................................33

3135. Parking Garage. ................................................................................................................33

3140. Loading Requirements. .....................................................................................................33

3200. ENVIRONMENTAL CONTROLS ......................................................................................33

3210. Disturbances......................................................................................................................33

3220.  Roadside and Parking Area Trees...................................................................33

3300.  SIGN REGULATIONS ...........................................................................................34

3310.  General Sign Regulations ....................................................................................35

3311 ..............................................................................................................................35

3312 ..............................................................................................................................35

3313 ..............................................................................................................................35

3314 ..............................................................................................................................35

3315 ..............................................................................................................................35

3316.  Projecting Signs. ................................................................................................35

3317.  Wall Signs. .........................................................................................................35

3318.  Ground Signs. .....................................................................................................35

3319.  Roof Signs. .........................................................................................................36

3320.  Temporary Accessory Signs...............................................................................36

3330.  Permanent Accessory signs. ..............................................................................37

3331 ..............................................................................................................................37

3332 ..............................................................................................................................37

3333 ..............................................................................................................................38

3334 ..............................................................................................................................38

3335 ..............................................................................................................................38

3336 ..............................................................................................................................38

3337.  Historical Districts and/or National Register Properties....................................38

3340.  Off-Premises Signs. ...........................................................................................39

3350.  Non-Conforming Signs. ......................................................................................39

ARTICLE 4  SPECIAL REGULATIONS..............................................................................41

(Adopted March 5, 1990) ....................................................................................................41

4100.  EARTH MOVING AND CLEARING OF PROPERTY REGULATIONS .......................41

4110.  General. ..............................................................................................................41

4111 ..............................................................................................................................41

4112 ..............................................................................................................................41

4113 ..............................................................................................................................41

4114 ..............................................................................................................................41

4120.  Special Permit or Approval. ...............................................................................41

4121 ..............................................................................................................................41

4122 ..............................................................................................................................41

4123 ..............................................................................................................................42

4126.  Inspection and Compliance. ...............................................................................42

4131 .................................................................................................................42

4132 .................................................................................................................42

4133 .................................................................................................................42

4134 .................................................................................................................42

4135 .................................................................................................................42

4136 .................................................................................................................42

4137 .................................................................................................................42

4138 .................................................................................................................42

4141 .................................................................................................................43

4142 .................................................................................................................43

4143 .................................................................................................................43

4144 .................................................................................................................43

4145 .................................................................................................................43

4150.  Restoration .........................................................................................43

4151 .................................................................................................................43

4152 .................................................................................................................43

4153 .................................................................................................................43

4154 .................................................................................................................43

4160.  Additional Conditions .........................................................................44

4170.  Renewal or Revocation of Permit. .....................................................44

4200.  MULTI-FAMILY DWELLINGS .................................................................44

4210.  Units Below Grade. .............................................................................44

4220.  Bedrooms. ...........................................................................................44

4230.  Business in High-Rise Apartments. ...................................................44

4231 .................................................................................................................44

4300.  OPEN SPACE COMMUNITIES ...............................................................44

4350 .................................................................................................................45

4400.  ACCESSORY USES AND STRUCTURES ............................................46

4410.  Home Occupations ..............................................................................46

4411 .................................................................................................................46

4412 .................................................................................................................46

4413 .................................................................................................................47

4414 .................................................................................................................47

4415 .................................................................................................................47

4416 .................................................................................................................47

4417 .................................................................................................................47

4418. ...........................................................................................................47

4421. ...........................................................................................................47

4422. ...........................................................................................................47

4431. ...........................................................................................................47

4432. ...........................................................................................................47

4433. ...........................................................................................................47

4434. ...........................................................................................................48

4440.  Unregistered Vehicles. .......................................................................48

4451.  Structures-Non-Residential Areas. .....................................................48

4452.  Structures Residential Areas. .............................................................48

4460.  ACCESSORY DWELLING UNITS ...........................................................48

4500.  FLOOD PLAIN DISTRICT. ......................................................................51

4600.  PLANNED PARCEL DEVELOPMENT. ......................................................51

4700.  AQUIFER AND WATERSHED PROECTION DISTRICT. ...........................51

4710.  Purpose of District. .............................................................................51

4720.  Scope and Authority. ...........................................................................51

4730.  Establishment and Delineation of Aquifer and watershed Protection District. ..........51

4731.  District. ...............................................................................................51

4732.  Overlay Map. ........................................................................................52

4733.  Split lot Provisions. .............................................................................52

4734.  Recoverable water yield criteria. ........................................................52

4741.  Permitted uses. ...................................................................................53

4750. ..........................................................................................................55

4753.  Approval criteria. ................................................................................56

4760.  Violations. ...........................................................................................57

4800.  SPECIAL PERMITS FOR ADULT USES. .................................................57

4810.  Definitions ..........................................................................................57

4823. ..........................................................................................................59

4824.  Existing Adult Entertainment Enterprises ...........................................59

4900.  DOWNTOWN PLANNING OVERLAY DISTRICT (DPOD) ...........................60

4910.  Purpose. ..............................................................................................60

4920.  Scope and Authority. ...........................................................................60

4931.  Overlay Map. ........................................................................................60

4940.  Permitted Uses. ...................................................................................60

4950.  Rules and Regulations. ........................................................................60

5000.  TRANSIT-ORIENTED VILLAGE BY SPECIAL PERMIT IN INDUSTRIAL C ZONE. ...63

5010.  Purpose.................................................................................................................63

5020.  Applicability.........................................................................................................63

5030.  Mixed Uses..........................................................................................................63

5040.  Review Requirements. ........................................................................................63

5050.  General Standards. .............................................................................................63

5060.  Dimensional Requirements. ................................................................................64

5070.  Application. ..........................................................................................................65

5080.  Action on Application...........................................................................................65

5090.  Density Bonus for the Preservation of Open Space.............................................65

5100.  GATEWAY 2 DISTRICT .......................................................................................68

5110.  Purpose................................................................................................................68

5120.  Scope and Authority.............................................................................................68

5130.  Establishment and Delineation of Gateway 2 District...........................................68

5140.  Permitted Uses.....................................................................................................68

5150.  Rules and Regulations. ........................................................................................68

5151.  Public Hearing and Approval................................................................................68

5152.  Design Review Requirements. .............................................................................69

5200.  MULTI-FAMILY HOUSING IN THE HIGHWAY BUSINESS DISTRICT.....................69

5210.  Purpose................................................................................................................69

5220.  Scope and Authority.............................................................................................69

5230.  Establishment of District.......................................................................................69

5240.  Permitted Uses.....................................................................................................70

5250.  Rules and Regulations. ........................................................................................70

5251.  Public Hearing and Approval................................................................................70

5252.  Findings. ..............................................................................................................70

5252.1...........................................................................................................................70

5252.2...........................................................................................................................70

5252.3...........................................................................................................................70

5252.4...........................................................................................................................70

5252.5...........................................................................................................................70

5252.6...........................................................................................................................70

5252.7...........................................................................................................................70

5252.8...........................................................................................................................71

5252.9...........................................................................................................................71

5261...............................................................................................................................71

5261.2  Development Statement. .....................................................................................71

5261.3...................................................................................................................71

5262.  Affordable Housing..................................................................................71

5263.  Parking............................................................................................72

5300.  SENIOR OVERLAY DISTRICT.....................................................................72

5310.  Purpose.............................................................................................72

5320.  Scope and Authority.............................................................................72

5330.  Applicability........................................................................................73

5340.  Establishment of District......................................................................73

5350.  Permitted Uses....................................................................................73

5360.  Dimensional Requirements. ................................................................73

5370.  Rules and Regulations. ........................................................................73

5371.  Public Hearing and Approval. ..............................................................73

5372.  Findings. ............................................................................................73

5381.4...................................................................................................................74

5382.1...................................................................................................................74

5382.2...................................................................................................................74

5382.3...................................................................................................................75

5382.4...................................................................................................................75

5382.5...................................................................................................................75

5400.  INDUSTRIAL D (ID) OVERLAY DISTRICT .................................................76

5410.  Purpose................................................................ **Error! Bookmark not defined.**

5420.  Scope and Authority.............................................................................76

5430.  Establishment of District......................................... **Error! Bookmark not defined.**

5440.  Permitted Uses...................................................... **Error! Bookmark not defined.**

5450.  Rules and Regulations. ........................................................................76

5451.  Public Hearing and Approval. .................................. **Error! Bookmark not defined.**

5452.  Findings. .............................................................. **Error! Bookmark not defined.**

5452.1...................................................................................................................76

5452.2.................................................................................... **Error! Bookmark not defined.**

5452.3.................................................................................... **Error! Bookmark not defined.**

5452.4.................................................................................... **Error! Bookmark not defined.**

5452.5.................................................................................... **Error! Bookmark not defined.**

5461.......................................................................................... **Error! Bookmark not defined.**

5461.2  Development Statement. ....................................... **Error! Bookmark not defined.**

5461.3.................................................................................... **Error! Bookmark not defined.**

5461.4.................................................................................... **Error! Bookmark not defined.**

5462.  Parking...........................................................................**Error! Bookmark not defined.**

5500.  MIXED USE DISTRICT (MUD). .....................................................................77

5510.  Purpose............................................................................................77

5520.  Scope and Authority. ..........................................................................77

5530.  Establishment and Delineation of Mixed Use District...............................78

5531.  Mixed Use Zoning Map. .....................................................................78

5540.  Permitted Uses...................................................................................78

5550.  Rules and Regulations.........................................................................78

5551.  Public Hearing and Approval. ..............................................................78

5552.  Density Requirements. ........................................................................78

5553.  Multiple Buildings. ..............................................................................78

5554.  Signage..............................................................................................78

5560.  Site Plan Approval of a Mixed Use District. ...........................................78

5600.  LARGE-SCALE GROUND-MOUNTED SOLAR PHOTOVOLTAIC INSTALLATIONS.79

5630.........................................................................................................80

5651.  As-of-Right Siting. ..............................................................................82

5652.  Large-Scale Ground-Mounted Solar Photovoltaic Installation....................83

5700.  Marijuana establishments, MEDICAL MARIJUANA TREATMENT AND DISPENSING
FACILITIES AND MARIJUANA CULTIVATION. ...................................................83

5721.........................................................................................................83

5722.........................................................................................................83

5723.........................................................................................................83

5751.........................................................................................................84

5752.  Separation. ........................................................................................84

5753.  No Entitlement or vested rights to permitting. ........................................85

5754.........................................................................................................85

5755.  Signage..............................................................................................85

5756.  Visibility. ............................................................................................85

5757.  Manufacturing. ....................................................................................85

5758.  Cultivation Activities. ...........................................................................85

5761.  Notification. ........................................................................................85

ARTICLE 5 DEFINITIONS ................................................................................88

(Adopted March 5, 1990) ................................................................................88

Westborough Zoning By-law Appendix ..............................................................96

# ARTICLE 1 ADMINISTRATION AND PROCEDURE
## (ADOPTED MARCH 5, 1990)

## 1100.  PURPOSE

The purpose of this bylaw is to promote the health, safety, convenience, amenity and general welfare of the inhabitants of the Town of Westborough, through encouraging the most appropriate use of land, as authorized by Chapter 40A of the General Laws; and in particular, lessen congestion in the streets to conserve health, secure safety from fire, flood panic and other dangers; to provide adequate light and air; to prevent overcrowding of land; to avoid undue concentration of population to encourage housing for people of diverse income levels; to facilitate the adequate provision of transportation, water, water supply, drainage, sewerage, schools, parks, open space and other public requirements; to conserve the value of land and buildings, including the conservation of natural resources and  the  prevention of blight and pollution of the environment; and to preserve and increase amenities by the promulgation of regulations  to fulfill said objectives. Said regulations may include but are not limited to restricting, prohibiting, permitting or regulating: (Amended 3/2/1992, Article 20)

1.     Uses of land, including wetlands and lands deemed subject to seasonal or periodic flooding;

2.     Size, height, bulk,  location and use of structures, including buildings and signs except that billboards, signs and other advertising devices are also subject to the provisions of Sections 29 through 33, inclusive, of Chapter 93 (General Laws), and to Chapter 93D;

3.     Uses of bodies of water, including water courses;

4.     Noxious uses;

5.     Areas and dimensions of land and bodies of water to be occupied or unoccupied by uses and structures, courts, yards and open spaces;

6.     Density of population and intensity of use;

7.     Accessory facilities and uses, such as vehicle parking and loading, landscaping and open space; and

8.     The development of the natural, scenic and aesthetic qualities of the community.

## 1200.  ADMINISTRATION

1210.  BUILDING COMMISSIONER.  This bylaw shall be administered by the Selectmen through a Building Commissioner.  His duties shall consist of obtaining all routine information, issuing zoning and occupancy permits, and, in general, administering this bylaw under the control and direction of the Board of Selectmen.  The Building Commissioner shall be notified by the Board of Selectmen as to the granting or refusal of any application over which he may have jurisdiction. (Amended 5/14/2011, Article 19)

1220.  PERMITS REQUIRED.  No structure shall be erected or externally altered without a Building Permit having been issued by the Building Commissioner.  No land or buildings shall be occupied or changed from one use category of Section 2300 to another without an occupancy permit having been issued by the Building Commissioner.  No such permits shall be issued for construction or use in violation of any provision of this Bylaw. (Amended 5/14/2011, Article 19)

1230.  PERMIT APPLICATION.  Applications for permits for construction shall be accompanied by two prints of a plan of the lot, drawn to scale, showing the actual dimensions of the lot, exact location and size of any existing or proposed buildings, and streets and ways adjacent to the lot.  Where such are involved, any parking areas for six or more cars and their means of egress, and any required screening or landscaping, shall also be shown.

1240.  SITE PLAN REVIEW.  Findings - Procedures. The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall review site plans for development prior to approval of application for Building Permits for all uses specified in Section 2300, Use Regulations Schedule, and which involve six (6) or more parking spaces; to make findings and determinations in regard to such cases in conformity with Section 1241 of this Bylaw.  In such cases, the permitted use shall be allowed only if the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board make a finding and determination that the placement of existing and proposed buildings, existing and proposed topography, structure, parking spaces, loading areas, driveway openings, driveway, service areas, other open uses, park or recreation area and screening, all facilities for water, sewage, refuse and other waste disposal and for surface water drainage, storm drainage and all landscape features (such as walks, fences, walls, planting areas and greenbelts) will constitute a suitable development and will not result in substantial detriment to the neighborhood. (Amended 5/14/2011, Article 20; Amended 3/16/2019, Article 33)

No building located in any district, except residential districts, within 2500 feet of the Rotary, or no building, if involving six (6) or more parking spaces, shall be erected or externally enlarged, and no area for roadways, parking, loading or open space shall be established or changed on land developed under the provisions of this Section except in conformity with a·site plan bearing the endorsement of approval of the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board.  No certificate of zoning compliance shall be issued for any such building or buildings, unless the same conforms in all respects to such site plan and unless all facilities included in the site plan have been in accordance therein. (Amended 3/17/1997, Article 27; Amended 3/16/2019, Article 33)

No building in any district, except in residential districts, within 2500 feet of the Rotary shall be erected except as provided in Section 1245 of this bylaw.  No building in any district except residential districts, within 2500 feet of the Rotary shall be externally altered except in conformance with Design Review approval prior to issuance of any required permits.

Single and two family residential uses shall be exempt from this Bylaw. Buildings where external changes are not proposed are exempt from the provisions of this Bylaw. (Amended 3/15/1997, Article 26)

1241.  DESIGN REQUIREMENTS.  The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall only approve a site plan upon a determination that, at a minimum, the following have been satisfied.  In addition to these items, the Selectmen shall establish, after a public hearing, rules and regulations concerning the

procedure for and content of an application for Site Plan Review.  These rules and regulations shall be effective on the date the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board files them with the Town Clerk. (Amended 5/14/2011, Article 20; Amended 3/15/2014, Article 22; Amended 3/16/2019, Article 33)

a.      Internal circulation and egress are such that traffic safety is protected, and access via minor streets servicing single-family homes is minimized and the convenience and safety of vehicular and pedestrian movement in relation to adjacent streets and intersections are protected;

b.      Visibility of parking areas from public ways is minimized;

c.      Adequate access to each structure for fire and service equipment is provided, based on the functional standards of the Planning Board's Subdivision Regulations;

d.      Utilities and drainage in the vicinity either are or will be made adequate, based on the functional standards of the Planning Board's Subdivision Regulations;

e.      Lighting of parking areas avoids glare on adjoining properties;

f.      Major topographic changes or removal of existing trees are minimized;

g.      In or abutting Residential Districts, effective use is made of topography landscaping and building placement to maintain, to the degree feasible, the character of the neighborhood;

h.      Parking requirements of Section 3100 have been satisfied;

i.      Provisions of the Wetland Protection Act (Massachusetts General Laws Chapter 131) will be satisfied if applicable;

j.      All other requirements of the Zoning Bylaws have been satisfied;

k.      Estimated waste water effluent in gallons per day and type of effluent is provided with the Site Plan application.

1242.  DRAWING REQUIREMENTS.  Plans subject to site plan review shall show the boundaries of the lot, existing and proposed topography, existing buildings and proposed buildings, structure, parking, park or recreation area, screening, water, sanitary sewage, storm drainage, loading areas, driveway openings, driveways, service area and landscape features (such as walls, fences, walks, planting area and greenbelts).

1243.  SUBMISSION OF PLANS.  A person applying for site plan review shall file with the Building Commissioner eight (8) plans of the lot.  He shall forward one (1) each to the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board, the Planning Board, the Westborough Treatment Plant Board, the DPW Manager, the Fire Department, the Conservation Commission and the Board of Health for this review.  Such application and site plan shall include the elements on which the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board is to make a finding and determination, as provided in Section 1240 and shall also include information as to the nature and extent of the proposed use of buildings, and such further information in respect to such elements and use required in Sections 2200, 2300, 2500 and 2600, if applicable.  In

subsequent application concerning the same subject matter, the Board may waive the filing of plans and documents to the extent they duplicate those previously filed. (Amended 5/14/2011, Article 19; Amended 3/16/2019, Article 33)


1244.  PROCEDURES OF THE SPECIAL PERMIT GRANTING AUTHOTIRY (SPGA), OR WHERE THERE IS NO SPECIAL PERMIT REQUIRED, THE PLANNING BOARD. The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall not make a finding and determination upon an application until it has received the final reports of the different Boards listed in Section 1243 or until thirty (30) days shall have elapsed since the transmittal of said copies of the application and site plans to the Boards, etc., without such report being submitted. The applicant for a Site Plan Review shall make a presentation to the Board of Selectmen, prior to the public hearing with the Special Permit Granting Authority (SPGA), or where there is no Special Permit required, the Planning Board.  Following the presentation to the Board of Selectmen, the Selectmen shall submit their report to the Special Permit Granting Authority (SPGA), or where there is no Special Permit required, to the Planning Board. The report shall be included in the final determination of Site Plan Review. (Amended 3/16/2019, Article 33)

The Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall hold a public hearing within sixty-five (65) days of the Building Commissioner accepting a completed application which meets all of the criteria required by the Zoning Bylaws, including the payment of any fees established by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board, and shall take action within thirty (30) days of the hearing, it nonetheless being the intention of this Bylaw that the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board shall act as expeditiously as is practical on such application. Such final action shall consist of either: (Amended 5/14/2011, Article 21)

a.     A finding and determination that the proposed construction, reconstruction, substantial exterior alteration, or addition will constitute a suitable development and will not result in substantial detriment to the neighborhood, or

b.     A written denial of the application for such finding and determination, stating the reasons for such denial, which reasons shall include a statement of the respect in which any elements in and particular features of the proposal are deemed by the Board to be unsuitable or detrimental to the neighborhood.

c.     A finding and determination may be made subject to such reasonable conditions, modifications and restrictions set forth therein as the Board may deem necessary to ensure that the proposed construction, reconstruction, substantial exterior alteration or addition will constitute a suitable development and will not result in substantial detriment to the neighborhood.

d.     In the event that no action is taken by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board on or before the thirty (30) day period, it shall be deemed that the site plan is approved.

In the event that the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board approves a site plan under these provisions, any

construction, reconstruction, substantial exterior alteration or addition shall be carried on only in conformity with any conditions, modifications and restrictions subject to which the Board shall have made its findings and determination, and only in conformity with the application and site plan on the basis of which the finding and determination are made.

1245.  DESIGN REVIEW FOR THE DOWNTOWN WESTBOROUGH:  (Added 3/15/1997, Article 26; Amended 5/14/2011, Article 19):

A.    Purpose

It is the intent of this section to provide detailed review of exterior structural design and/or exterior alterations having substantial impact on any district, except residential districts, within 2500 feet of the Rotary, to prevent blight; to enhance the natural and aesthetic qualities of the Town; to preserve the value of land and buildings; and to protect and preserve the historic and cultural aspects and heritage of the Town.

Within (the) Downtown Westborough, Design Review approval shall be by the Design Review Board and its procedural requirements and design criteria of Section 1245 D.

B.    Design Review Board

The Design Review Board shall be appointed annually by the Planning Board and shall consist of five (5) residents of the Town with the following credentials, if possible:

1.    Chairman of the Planning Board or his/her designee;

2.    One person qualified by training and experience in architecture or landscape design;

3.    One person owning business property in the area governed by this bylaw;

4.    One person qualified by training and experience in the graphic arts or design professions;

5.    One member of the Historic Commission.

The Planning Board may also appoint up to two (2) voting alternate members who shall be citizens at large.  At least one (1) of these alternates shall be a business owner in the area governed by this bylaw.

C.    Applicability and Authority

The Design Review Board shall review applications for Design Review, as appropriate, submitted pursuant to Section 1200.  It shall evaluate such requests based on Design Criteria in Section D below.  Its written findings shall be submitted to the applicant along with any recommendations and conditions required for approval with 30 days from the request for design revisions.  Such findings shall contain explanation and rationale as appropriate.  Conditions of approval shall be to the appropriate permitting advisory authority.

1.    Organization and Proceedings – The Design Review Board shall elect from among its members a Chairman, Vice-Chairman and clerk.  The Design Review Board shall adopt such rules and guidelines as are considered necessary to the conduct of its responsibilities which shall be a matter of public record.

14

The Board shall keep records of its proceedings and the final decision of the Board. Records shall also be kept of all plans, photographs and any other documents pertaining to each case, as well as all examinations, findings determinations, and any other official action, including all reasons for all decisions and conditions prescribed; and all such items shall be a matter of public record. Decisions of the Design Review Board shall be by a simple majority and no final action shall be taken without the concurrence of at least a majority of the members.

2.    Duties and Procedures of Design Review Board – Whether or not requested by the applicant, the Design Review Board shall review applications for building permits, site plan review, special permits or variances for all proposals for any district except residential districts within 2500 feet of the Rotary if involving new construction or exterior alteration. A copy of all usual submittals required for such proposals shall be provided through the Building Commissioner. The Design Review Board review shall preferably be done in consultation with the applicant or their designer. The Design Review Board shall make (an advisory) a report in writing to the applicant as follows:

(a)    Building Permits: To the Building Commissioner regarding any exterior design changes.

(b)    For Site Plan Review: To the Site Plan Review authority regarding the effect of the design on abutters and the neighborhood.

(c)    For Special Permits: To the Special Permit Granting authority regarding effect of the amenity on the neighborhood.

(d)    For Variances: To the Board of Appeals regarding possible detriment to the public good or derogation from the intent or purpose of the bylaw.

Lack of a report from the Design Review Board shall not be sufficient reason to delay action on a proposal which otherwise could be acted upon by the Building Commissioner, Site Plan Review Authority, Special Permit Granting Authority, or Board of Appeals.

D.    Design Criteria

The Design Review Board shall review requests for external alterations and new construction. Designs shall comply with all the requirements of the appropriate permitting authority. In addition, where appropriate designs, as required by the permitting authority, shall comply with the following criteria:

1.    Plans. Submittals shall include structural footprint and architectural elevations of all proposed buildings. Plans shall provide details responding to all elements outlined in item 3, below, and all other elements of the proposal as shall be requested by the Design Review Board.

2.    Preservation and enhancement of landscaping. The landscape shall be preserved in its natural state, insofar as practicable, by minimizing tree and soil removal, and any grade changes shall be in keeping with the general appearance or neighboring development area.

Scenic views, if any, visible from public ways should be preserved to the degree reasonably consistent with the given type and scale of use.

15

3. Relation of buildings to environment. The proposed development shall be related harmoniously to the terrain and to the design, scale, and architecture of existing buildings in the surrounding area that have visual relationship to the proposed buildings, in so far as practical. Proposed buildings shall be related to their surroundings with respect to:

(a) Street façade and exterior walls visible from public ways.

(b) Variations and breaks in wall and/or roof planes.

(c) Materials, textures and color

(d) Roof slopes and materials

The appearance of primary wall and roof materials should match, to a degree reasonably consistent, that of materials commonly found on existing buildings within the Westborough downtown.

(e) Scale

Domestic scale should be produced through massing devices such as breaks in wall and roof planes and through design of architectural features.

(f) The building should not be made, in effect, a sign, through painting with bold patterns, checks, logos or other graphic devices, use of lighting or use of unconventional building form.

(g) External lighting

(h) External windows

4. Open Space. All open space, landscaped and usable, shall be designed to add to the visual amenities of the area by maximizing, in so far as practical, its visibility for persons passing the site or overlooking it from nearby properties.

5. Heritage. Proposals to remove or disrupt historic or traditional structures, or architectural elements shall be minimized.

6. Cost. The Design Review Board shall be obligated to be sensitive to potential financial burden to the applicant.

E. Design Guidelines

The Design Review Board shall make available to the public as part of the building permit package, a booklet of guidelines based on the specific Design Criteria cited above to carry out the purposes of this section.

The Design Review Board shall adopt such recommendations and guidelines as are considered necessary to the conduct of its responsibilities which shall be a matter of public record.

1250.  PENALTY.  Whoever violates any provision of this Bylaw, or any of the conditions under which a building or occupancy permit is issued, or any decision rendered by a Permit

Granting Authority or Special Permit Granting Authority under the provisions of this Bylaw, shall be liable to a fine of not more than one hundred dollars ($100.00) for each violation.  Each day that such violation continues shall constitute a separate offense.

1260.  ENFORCEMENT.  If the Board of Selectmen shall be informed, or have reason to believe that any provision of this Bylaw or of any permit or decree thereunder has been, is being, or is 1ikely to be violated, they shall make or cause an investigation to be made of the facts, including an inspection of the property where the violation may exist, and, if they find any violation, they shall give immediate notice in writing to the owner or his duly authorized agent and to the occupant of the premises and shall order that any violation of the provisions of this Bylaw shall immediately cease.  If, after such notice and order, such violation continues, or if any owner, agent or occupant fails to obey any lawful order of the Board of Selectmen with respect to any violation or any use contrary to the provisions of this Bylaw, the Board of Selectmen shall forthwith revoke any permit issued for the occupation of the premises, may make complaint to the Superior Court or any court of competent jurisdiction for an injunction or order restraining the further use of the premises, and shall take such other action as is necessary to enforce the provisions of this Bylaw.  In the event the Building Commissioner is requested in writing to enforce the Zoning Bylaw and he declines to do so, he shall notify in writing the party requesting such enforcement of any action or refusal to act and the reasons therefor within fourteen (14) days of receipt of the request. (Amended 5/14/2011, Article 19)

## 1300.  BOARD OF APPEALS

A  Zoning Board of Appeals is hereby established under the provision of Section 12 of Chapter 40A as amended (General Laws) consisting of three (3) members and two (2) associate members who shall be appointed and act in all matters under this Bylaw in the manner prescribed by Chapter 40A of the General Laws powers:[1]

1310.  APPEALS.  To hear and decide appeals taken by any person aggrieved by reason of his inability to obtain a permit from any administrative official under the provisions of Chapter 40A, General Laws, or taken by any officer or Board of the Town, or taken by any person aggrieved by any order or decision of the Building Inspector or other administrative official in violation of any provision of Chapter 40A, General Laws, or by this Bylaw; and, in any case, in accordance with Section 8 of Massachusetts General Laws Chapter 40A.

1320.  VARIANCES.  To authorize upon appeal, or upon petition with respect to particular land or structures a variance from the terms of the applicable zoning ordinance or Bylaw where such permit granting authority specifically finds that owing to circumstances relating to said conditions, - shape or topography of such land or structures and especially affecting such land or structures, but not affecting generally the zoning district in which it is located, a literal enforcement of the provisions of the ordinance of Bylaw would involve substantial hardship, financial or .otherwise, to the petitioner or appellant and that desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of such ordinance or Bylaw.  Except where local ordinances or Bylaws shall expressly permit variances for use, no variance may authorize a use or activity not otherwise permitted in the district in which the land or structure is located; provided however, that such variances properly granted prior to January first, nineteen hundred and seventy-six but

---

[1] Except that a Highway Business District BA and BA(f), SLO, ID & MUD (ATM 2010) Special Permits and Appeals shall be heard and decided by the Planning Board unless stated elsewhere in these zoning bylaws.

17

limited in time, may be extended on the same terms and conditions that were in effect for such variance upon said effective date.  The Board of Appeals is hereby authorized to grant use variances conditioned upon the satisfaction of the criteria for the granting of variances in this section.

The permit granting authority may impose conditions, safeguards and limitations, both of time and use, including the continued existence of any particular structures but excluding any condition, safeguards or limitations based upon the continued ownership of the land or structures to which the variance pertains by the applicant, petitioner or any owner.

If the rights authorized by a variance are not exercised within one year of the date of grant of such variance, they shall lapse, and may be re-established only after notice and a new hearing pursuant to this section.

## 1330.  SPECIAL PERMITS.

A.     To hear and decide applications for Special Permits for exceptions as provided in this Bylaw, subject to any general or specific rules therein contained, and subject to appropriate conditions or safeguards "and limitations on time or use," imposed by the Board.  Special Permits may be granted unless, because of conditions peculiar to the particular case but not generally true for similar permitted uses on other sites in the same district, it appears that nuisance, hazard or congestion will be created, or for other reasons there will be substantial harm to the neighborhood or derogation from the intent of the bylaw.  In the event any Special Permit required under this Bylaw or amendment thereto requires specific findings of the Board as described in Section 9 of General Laws Chapter 40A, such a finding is mandatory to the granting of such exception. (Amended 3/29/1994, Article 41)

B.     A Special Permit granted under these Bylaws pursuant to Section 9 of General Laws Chapter 40A as amended, shall lapse within six (6) months, subject however to the provisions of said Section 9 of General Laws Chapter 40A, if a substantial use thereof has not sooner commenced except for good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

C.     The Board of Appeals shall hold a public hearing on any appeal, application or petition within sixty-five (65) days after the filing of an application with the Board of Appeals.

## 1340. PRESCRIBED TIME FOR ACTION AND PROCEDURE.

If the special permit granting authority shall fail to take final action within ninety (90) days of the required public hearing, or the permit granting authority (variances) shall fail to act within seventy-five (75) days after the date of the filing of an appeal, application or petition, then the petition shall be deemed approved subject to the following requirements:

The petitioner, after the expiration of the aforesaid period shall file with the Town Clerk a copy of his petition and an affidavit stating the date of the public hearing and the failure of the authority to render a decision within the required time.

Upon receipt of the petition and affidavit, the Town Clerk shall give notice of the filing to those persons entitled to a notice of the decision under Chapter 40A, Section 15, General Laws.  The filing of a petition and affidavit in the office of the Town Clerk shall be deemed the equivalent of

the filing of a decision for purposes of judicial appeals provided for under Chapter 40A, Section 17, General Laws.

If no appeal is taken within the required statutory period, then the Town Clerk shall furnish the petitioner with a certified copy of the petition and affidavit together with a certificate that no appeal has been filed; all of which shall be recorded in the manner prescribed under Chapter 40A, Section 15, General Laws, in lieu of the documents required to be recorded under that Section.

1350.  FILING OF DECISIONS.  Variances and Special Permits must be recorded in the Registry of Deeds with the conditions imposed thereon prior to any construction or use thereunder.

1360.  REPETITIVE PETITIONS.  Repetitive appeals, applications or petitions to the Board of Appeals or other applicable Special Permit Granting Authority shall be limited and subject to the provisions of Section 16 of Chapter 40A as amended, General Laws.

## 1400.  AMENDMENTS

This Bylaw may from time to time be changed by amendment, addition or repeal by the Town Meeting in the manner provided in Section 5 of Massachusetts General Laws Chapter 40A, as amended, and Massachusetts General Laws Chapter 40, Section 32, as amended.

## 1500.  SEPARABILITY

The invalidity of any section or provisions of this Bylaw shall not invalidate any other section or provisions of this Bylaw.  Where there exists any conflict between the provisions of this Zoning Bylaw and Chapter 40A as amended, General Laws, the provisions of Chapter 40A shall control.

## 1600.  APPLICABILITY

Where the application of this Bylaw imposes greater restrictions than those imposed by any other regulations, permits, restrictions, easements, covenants or agreements, the provisions of this Bylaw shall control.

## 1700.  EFFECTIVE DATE

The effective date of the adoption of this zoning Bylaw or any amendments to it, shall be the date on which such adoption or amendments were voted upon by Town Meeting.  Upon its effective date, this Bylaw shall supersede the Zoning Bylaw and all amendments to it previously in effect.

NOTE: All Bylaws and amendments to it still must be submitted to the Attorney General for approval and said approval must be made public pursuant to General Laws Ch. 40, § 32.

# ARTICLE 2  DISTRICT REGULATIONS
## (ADOPTED MARCH 5, 1990)

**2100.  ESTABLISHMENT OF DISTRICTS** (Amended 3/12/1996, Article 66, Amended 3/13/2004, Article 38; 10/18/04, Article 10; 5/15/2010, Article 31 and 32; Amended 3/16/2019, Article 35)

2110.  For the purposes of this Bylaw, the Town of Westborough is hereby divided into the following zoning districts:

Residential
| | |
|---|---|
| Single Residential | R |
| Garden Apartment | AA |

Business
| | |
|---|---|
| Highway Business | BA |
| Downtown Business | BB (1) |
| Gateway 2 | G2 (6) |
| Mixed Use District | MUD (8) |
| Adult Entertainment | AE (3) |

Industrial,
Governmental
| | |
|---|---|
| Exclusive Industrial | IA |
| General Industrial | IB |
| Mixed Use Industrial | IC (5) |
| Industrial D Overlay | ID (9) |
| Conservation | C (2) State, MDC and Municipal     M Town-owned |
| Property | M-1 |

Overlay Districts
Downtown Planning Overlay
DPOD (4) Senior Living
Overlay

SLO (7)

(1)   All areas zoned Business lying within 2,500 feet of the intersection of the center lines of Milk, Main and South Streets.

(2)   To be established by vote of Town Meeting only on land owned by the Commonwealth  of Massachusetts, the Town of Westborough, one of their agencies, or land on which the  Conservation Commission hold a Conservation Restriction under Section 31-33, Chapter 184,  General Laws.

(3)   Adult uses in accordance with Section 4800 Special Permits for Adult Uses:

(4)   In accordance with Section 4900, Special Permits for Downtown Planning Overlay Districts  shall be issued by the Planning Board.

20

(5)     In accordance with Section 5000, Transit Oriented Village by Special Permit in Industrial C District shall be issued by the Planning Board.

(6)     In accordance with Section 5100 Special Permits in the Gateway 2 District.

(7)     In accordance with Section 5300, Special Permits for the Senior Housing Overlay district shall  be issued by the Planning Board.

(8)     In accordance with Section 5500 Special Permits for Mixed Use District.

(9)     In accordance with Section 5400 Industrial D Overlay District.

In accordance with Section 5400 Industrial D Overlay District. 2120.  OFFICIAL ZONING MAP.  The boundaries of these districts are defined and bounded on the latest adopted revision of the "Zoning Map of the Town of Westborough, Massachusetts" being hereby declared to be a part of this Bylaw.

2130.  DIMENSION LINES.  Except when labelled to the contrary, boundary or dimension lines shown approximately following or terminating at street, railroad, or utility easement center or layout lines, boundary of lot lines, or the channel of a stream, shall be construed to be actually at those lines; when shown approximately parallel, perpendicular, or radial to such lines shall be construed to be actually parallel, perpendicular, or radial thereto.  When not locatable in any other way, boundaries shall be determined by scale from the Zoning Map.

2140.  SPLIT LOT.  Where a district boundary line divides any lot existing at the time such line is adopted, the regulations for any district in which the lot has frontage on a street may be extended not more than thirty feet into the other district.

2150.  In the Town of Westborough the subdivision of land in a residential district shall be completed as follows: (Amended 3/5/1990, Article 59)

2151.  Where major residential development is proposed, the developer shall prepare two sets of concept plans for the parcel of land to be subdivided.  One plan shall describe a conventional subdivision while the second shall describe an open space community according to section 4300 of this Bylaw. (Amended 3/5/1990, Article 59)

2152.  In accordance with Chapter 40A, the Planning Board will hold a public hearing to review these conceptual plans.  The Board will render a decision within sixty (60) days from the date of the closing of the public hearing as to which development plan the developer shall design.  The action of the Board may create a special permit for an open space community in the residential district, if the Board determines that the plan is more beneficial to the Town than the conventional plan.  The Open Space Community plan must be, in the judgement of the Planning Board, superior to a conventional plan in, preserving open space for conservation, agricultural, or recreation, utilizing natural features of the land, and allowing more efficient provision of public service.  The special permit shall be recorded at the Worcester Registry of Deeds.  (Amended 3/5/1990, Article 59)

2153. The developer may then submit a preliminary plan and then a final definitive plan to the Board for their consideration.  For conventional subdivisions the Subdivision Rules and Regulations, and the dimensional use regulations as set forth in Section 2600 shall apply.  For open space subdivisions, the subdivision Rules and Regulations, and the requirements of section 4300 shall apply.  (Amended 3/5/1990, Article 59)

2154. General:  It is the intent of this bylaw to increase the range of housing options for people of different income levels and at different life stages while providing for a variety of housing needs.  All residential subdivisions creating lots or dwelling units shall meet the requirements of this Section regarding affordable housing.

Except as otherwise provided herein, when applying for a residential subdivision consisting of five (5) or more lots or units, the proposed project shall include 10% of the total units as affordable units under the Massachusetts Department Housing and Community Development G.L.c.40B Regulations and Guidelines.

For the purpose of determining the appropriate number of affordable units actually constructed, fractional units shall be rounded up to the nearest whole number.

Segmentation: In determining whether a subdivision contains at least five (5) lots and is therefore subject to this affordable requirement the Planning Board shall consider the entirety of the project, including any likely future expansion, and not separate phases or segments thereof. During or prior to Preliminary Subdivision review, in conformance with the Rules and Regulations Governing the Subdivision of Land in Westborough, the proponent shall submit a sketch plan showing all adjacent parcels of land, in their entirety, labeled with their current ownership and the owner as of the adoption of this regulation (March, 2019), and showing a conceptual layout which utilizes available adjacent land to maximize the number of lots. If the Board determines that the proposed subdivision is part of a larger potential development that could contain five (5) or more lots, then the proposed subdivision will be subject to above affordable housing requirements. (Section Added 3/16/2019, Article 31)

## 2200.  USE REGULATIONS

No lot or land shall be used, no building or structure shall be erected or used except as set forth in Section 2300, Use Regulation Schedule, or as exempted by this Bylaw or statute.  Symbols employed shall mean the following:

Y – A permitted use

N – An excluded or prohibited use

S – A use authorized by issuance of a Special Permit from the Board of Appeals as provided for in Section 1330 herein

SP – Special Permit to be issued by the Planning Board

2210.  CLASSIFICATION OF USE.  Where an activity might be classified under more than one of the following uses, the more specific classification shall determine permissibility; if equally specific the more restrictive shall govern.

## 2300. USE REGULATION SCHEDULE

AE Added 3/12/1996, Article 66; DPOD added 3/13/2004, Article 38; IC Added 10/18/2004, Article 10; G2 Added 5/14/2005, Article 41; ID Added 5/15/2010, Article 30; MUD Added 5/15/2010, Article 32; Amended 10/21/2013, Article 26

22

**2300. Use Regulation Schedule**

AE Added 3/12/1996, Article 66; DPOD added 3/13/2004, Article 38; IC Added 10/18/2004, Article 10; G2 Added 5/14/2005, Article 41; ID Added 5/15/2010, Article 30; MUD Added 5/15/2010, Article 32; Amended 10/21/2013, Article 26 Amended 6/20/2020, Article 26

| RESIDENTIAL USES [1] | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Single Family dwelling: | N | Y | Y | SP | Y | Y | N | N | Y | N | N | N | SP | Y | SP | N[7] | |
| Two-family dwelling: | N | S | Y | SP | SP | Y | N | N | Y | N | N | N | SP | S | SP | N[7] | |
| Conversion of existing structure to more than two-family dwelling: | N | N | S | SP | SP | S | N | N | SP | S | N | N | SP | N | SP | N[7] | |
| Boardinghouse: | N | S | S | SP | SP | S | N | S | SP | S | N | N | SP | S | SP | N | |
| Multi-family dwelling (See Section 4200): | N | N | Y | SP [5] | SP | N | N | N | N | N | N | N | N | N | SP | N[7] | Amended 5/13/2006, Article 30 |
| Open Space Communities (See Section 4300): | N | SP | N | N | N | N | N | N | N | N | N | N | N | N | SP | N[7] | Amended 3/5/1990, Article 52A |
| Mobile Home: | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | |
| Campground, mobile home park: | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | |
| Mixed Use Residential/Commercial with Industrial Components (see Section 5000) | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | Added 10/18/2004, Article 10 |
| Senior Living Overlay (see Section 5300) [6] | N | SP | SP | N | SP | SP | SP | SP | N | N | N | N | SP | SP | SP | | Added 5/15/2010, Article 31 |

| OPEN USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Farm: With pigs, animals raised for pelts: [2] | N | N | S | SP | SP | S | N | S | S | S | N | N | SP | N | N | | |
| Nursery, greenhouses (commercial): | S | N | Y | Y | SP | Y | N | Y | Y | Y | N | N | SP | N | SP | N | |
| Recreational Camps | S | N | N | SP | SP | Y | N | S | S | S | Y | Y | SP | N | N | N | Amended 3/15/2014, Article 21 |
| Cemetery: | N | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | Y | N | N | | |
| Drive-in Theaters, Amusement Park or similar commercial outdoor recreation: [3] | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | | |
| Outdoor recreation other than the above operated by a governmental agency: | S | Y | Y | Y | Y | Y | N | Y | Y | Y | N | Y | Y | Y | | | |
| Other: [4] | | | | | | | | | | | | | | | | | |
| Sale of Christmas Trees: | S | Y | Y | Y | Y | Y | N | Y | Y | Y | N | Y | Y | Y | | | |

**(1)** Animal keeping may be subject to permit from the Board of Health.

**(2)** But no animals kept closer than 500 feet to any lot line.

**(3)** Temporary carnival sponsored by a non-profit organization permitted upon approval by the Board of Selectmen. (Added 3/2/1992, Article 23)

**(4)** As determined by the zoning enforcement officer.

**(5)** Multi-Family dwellings are allowed in the Highway Business (BA) District upon grant of a Special Permit by the Planning Board in accordance with Section 5200 (Added 5/13/2006, Article 30)

**(6)** In accordance with the requirements and restrictions of Section 5300

**(7)** These uses are prohibited except when proposed as part of a Senior Living Overlay Project in conformance with Section 5300

**(8)** Only one dwelling unit shall be allwed per residential lot unless otherwise specifically allowed in this bylaw

| INSTITUTIONAL USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Religious, sectarian, denominational or public educational uses, religious purposes: | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | |
| Other educational uses: [3] | S | N | N | Y | Y | N | S | S | S | Y | Y | Y | N | SP | SP | | |
| Municipal use voted at Town Meeting (not more specifically cited in Section 2300): | S | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | | |
| Hospital, sanitarium, convalescent, nursing or rest home, congregate housing: | N | S | Y | SP | SP | Y | N | S | Y | S | Y | Y | SP | S | SP | SP | |
| Patriotic, fraternal or social clubs if not conducted for profit; other philanthropic institution or club: | N | N | S | Y | SP | S | N | S | S | S | Y | Y | SP | N | SP | SP | |

| COMMERCIAL USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Motor vehicle service station (See Section 3300): | N | N | N | S[1] | N | S[1] | N | S[1] | S | S[1] | N | N | S[1] | N | N | N | |
| Animal kennel or hospital as licensed under Chapter 140, Sec. 137a, General Laws: | N | N | S | SP | SP | Y | N | Y | N | Y | N | N | SP | N | N | N | |
| Indoor Recreation: | N | N | N | Y | SP | Y | Y | Y | SP | Y | N | N | SP | N | SP | SP | |
| Banks, office space: | N | N | N | Y | SP[4] | Y | Y | Y | SP | Y | N | N | SP | N | SP | SP | |
| Restaurants, Brew Pubs: | N | N | N | Y[2] | N | Y[2] | N | Y[2] | SP | Y[2] | N | N | SP | N | SP | SP | |
| Hotel, motel, motor court: | N | N | N | SP | SP | Y | Y | Y | SP | Y | N | N | SP | N | SP | SP | |
| Other retail sales & services: | N | N | N | SP[5] | Y | N | Y | SP | Y | N | N | SP | N | SP | N | | [6] |
| Display and sale of natural products, a significant portion of which are raised by the proprietor in Westborough: | N | S | S | Y | Y | Y | Y | Y | SP | Y | N | N | Y | S | SP | SP | Amended 3/5/1990, Article 52F |
| Micro/Nano Brewery or Distillery | N | N | N | SP | N | Y | N | Y | SP | Y | N | N | SP | N | SP | SP | |
| Multiple Uses Allowed: All uses shall comply with the underlying zoning | N | N | N | Y | SP | Y | Y | Y | SP | Y | N | N | SP | N | SP | SP | Added 3/16/2019, Article 30, Amended 6/20/2020, Article 26) |

**(1)** Special Permits to be issued by Selectmen rather than the Board of Appeals.
**(2)** Except "SP" where a restaurant involves any drive-up or walk-up window service.
**(3)** Shall not apply to land or structures for religious or educational purposes on land owned or leased by Commonwealth or any of its agencies, subdivisions or bodies, politic or by a
**(4)** Small professional offices in residential style structure limited to a maximum of 4,000 square feet of gross floor area
**(5)** Limited to a maximum of 5,000 square feet of gross floor area
**(6)** Except as an accessory use to a permitted use, and then only by Special Permit

| INDUSTRIAL, UTILITY USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Airport, heliport: | N | N | N | N | N | N | S | S | S | S | N | N | Y | N | N | N | |
| Public/Private utility with outside equipment or storage [2] | | | | | | | | | | | | | | | | | |
| With outside equipment or storage: | N | N | N | Y | N | Y | Y | Y | Y | Y | N | N | Y | N | N | N | |
| With none of above: | S | S | S | Y | Y | Y | Y | Y | Y | Y | N | N | Y | N | S | SP | SP |
| Earth removal (See Sec. 4100): [1] | S | S | S | S | S | S | S | S | SP | S | N | N | S | S | SP | SP | |
| Research laboratory: | N | N | S | Y | N | Y | Y | Y | Y | Y | N | N | Y | N | SP | SP | |
| Trucking terminal, bulk storage contractor's yard: | N | N | N | N | N | N | Y | Y | SP | Y | N | N | N | N | N | N | |
| Manufacturing, Processing and Warehouse: | N | N | N | SP | N | N | Y | Y | Y | Y | N | N | SP | N | N | N | |
| Adult Entertainment Uses | N | N | N | N | N | N | N | N | N | N | N | N | SP | N | N | N | Added 3/12/1996, Article 66 |
| Brewery/Distillery | N | N | N | N | N | N | Y | Y | Y | Y | N | N | N | N | N | N | |
| Multiple Uses Allowed: All uses shall comply with the underlying zoning | N | N | N | Y | Y | Y | Y | Y | Y | Y | N | N | N | N | SP | SP | |

| OTHER PRINCIPAL USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other use having externally observable attributes similar to one of above: | | | | | | as regulated above | | | | | | | | | | |
| All other uses: | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N |

| ACCESSORY USES | C | R | AA AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All Others | DPOD | MUD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Home occupations (See Sec. 4410): | N | Y | Y | Y | S | Y | S | Y | Y | Y | N | N | Y | Y | SP | N | |
| Customary uses & structures (See. 4400): | | | | Shall incur the same use regulations as the principal use listed in this Section | | | | | | | | | | | | | |
| Agriculture, Horticulture or Floriculture. | | | | Insofar as it can be established that the primary purpose of the use of the land falls within the | | | | | | | | | | | | | |
| Large-Scale Ground-Mounted Solar Photovoltaic Installations | N | N | N | N | N | N | Y | Y | Y | Y | Y | N | N | N | N | N | (Added 10/15/2012, Article 16) |
| Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facilities & Marijuana Cultivation | N | N | N | N | N | N | N | N | N | N | N | N | SP[3] | N | N | N | (Added 3/16/2013, Article 16) |

**(1)** Special Permits to be issued by Planning Board rather than the Board of Appeals.
**(2)** Except for Large Scale Ground-Mounted Solar Photovoltaic Installation as defined and in accordance with Section 5600
**(3)** Allowed by Special Permit issued by the Planning Board.

2400.  NONCONFORMING USES

This Zoning Bylaw or any amendment thereto shall not apply to the use of any structure or land uses lawfully in existence or lawfully begun, or to a Building or Special Permit issued before the first publication or notice of the public hearing on such Bylaw required by Section 5 of General Laws Chapter 40A as amended, but shall apply to any change or substantial extension of such use, to a Building or Special Permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent except where alteration, reconstruction, extension or structural change to a single or two-family residential structure does not increase the nonconforming nature of said structure.

2410. PRE-EXISTING NONCONFORMING USES OR STRUCTURES (EXTENSIONS) This section shall not apply to billboards, signs and other advertising devices subject to the provisions of Section 29 through 33, inclusive, of Chapter 93 of Chapter 93D, General Laws.

The Board of Appeals, by Special Permit, may authorize lawfully pre-existing, non-conforming uses or structures to be changed or altered; provided that such extension, alteration or enlargement meets all the following requirements: (Amended 3/17/2018, Article 27)

2410.1 All the special permit guidelines of section 1330;

2410.2 That it will not be substantially more detrimental or objectionable to the neighborhood than the existing non-conforming structure or use to the neighborhood.

2411. Building construction and Special Permits. Construction or operations under a Building or Special Permit obtained in conformity with this Zoning Bylaw or lawful amendments thereto, shall conform to any subsequent amendments of the Zoning Bylaw unless the use or construction is commenced within a period of not more than six (6) months after the issuance of such Permit, and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable.

2412.  Non-conforming Single and Two Family Residential Structures.  Non-conforming single and two family residential structures may be reconstructed, extended, altered, or structurally changed upon a determination by the Zoning Enforcement Officer that such proposed reconstruction, extension, alteration, or change does not increase the non-conforming nature of said structure. The aggregate sum of the gross floor area of all additions to a structure since the date when the structure became non-conforming under the provisions of this subsection shall not be greater than 50% of the gross floor area of the dwelling unit or one thousand (1000) square feet, whichever is smaller, unless a Special Permit is issued by the Zoning Board of Appeals under Section 2410 allowing a larger gross floor area. The following circumstances shall not be deemed to increase the non-conforming nature of said structure:

2412.1  Alteration to a structure which complies with all current setback, yard, building coverage, and building height requirements but is located on a lot with insufficient area, where the alteration will also comply with all of said current requirements.

2412.2  Alteration to a structure which complies with all current setback, yard, building coverage, and building height requirements but is located on a lot with insufficient frontage, where the alteration will also comply with all of said requirements.

25

2412.3  Alteration to a structure which encroaches upon one or more required yard or setback areas, where the alteration will comply with all current setback, yard, building coverage and building height requirements; the provisions of this subsection shall apply regardless of whether the lot complies with current area and frontage requirements.

2412.4  Alteration to the side, front or rear of a structure which encroaches upon a required yard or setback area, where the alteration will not encroach upon such area to a distance greater than the existing structure; the provisions of this subsection shall apply regardless of whether the lot complies with the current area and frontage requirements.

2413. Notwithstanding Section 2412, in the event that the Zoning Enforcement Officer determines that the non-conforming nature of such structure would be increased by the proposed reconstruction, extension, alteration, or change, the Board of Appeals may, by special permit, allow such reconstruction, extension, alteration, or change where the proposed modification will not be substantially more detrimental than the existing non-conforming structure to the neighborhood.

2414. Pre-Existing non-conforming use: Any increase in the area or extent of the non-conforming use of a structure or land made by Special Permit from the Special Permit Granting Authority, is limited to a fifty percent (50%) increase in the non-conforming floor area or land area at the time the use became non-conforming.

2420.  ABANDONMENT.  A nonconforming use which has been abandoned or discontinued for a period of two (2) years, or a nonconforming sign which has been abandoned or discontinued for a period of (6) months, shall not be re-established and any future use shall conform with the Bylaw, except in the case of land used for agriculture, horticulture or floriculture where such non-use shall have existed for a period of five (5) consecutive years.

2430.  RESTORATION.  Any nonconforming building or structure in existence at the time of adoption of the Bylaw or any amendment thereto may be reconstructed on the old foundation area if destroyed by fire or other accidental or natural cause provided such reconstruction takes place within a period of two years (1) from the date of catastrophe, or else such reconstruction must comply with this Bylaw.

2440.  CHANGES.  Premises may be changed from one nonconforming use to another only on Special Permit from the Special Permit Granting Authority.  Such Permit shall be granted only for uses whose externally observable attributes are no more damaging to or inharmonious with the environs than those-of the use being replaced.  See Section 2410 (a) for additional criteria for the granting of Special Permit hereunder.

(1)  Six months in the case of nonconforming signs.

## 2500.  DIMENSIONAL REGULATIONS

All principal buildings hereafter erected in any district shall be located on a lot such that all of the requirements set forth in Section 2600 are conformed to except where specifically exempted by this Bylaw or General Laws.

2510.  EXEMPTIONS.  Certain lots in subdivisions or in separate ownership are exempted from some of these requirements through Section 6 of General Laws, Chapter 40A as

amended.  In addition, lots in non-residential districts and/or to be built upon for non-residential use shall enjoy the same exemption as if being built upon for residential use in a residential district.

2520.  CHANGING NONCONFORMING LOT DIMENSIONS.  No existing lot conforming with the Dimensional Schedule shall be changed in size or shape, except through a public taking, or changed in use, so as to result in violation of the requirements set forth below.  No existing lot already nonconforming shall be changed except through a public taking so as to increase the existing degree of nonconformity. For lots which are currently owned by the Town, or are in an M-1 zone, the Town shall be allowed to seek relief from the Zoning Board of Appeals for lot size, setbacks and parking requirements, and/or from any other applicable provisions of this Bylaw.  Provided that the ZBA finds that the requested relief is consistent with the intent and purpose of this Bylaw. (Amended 10/15/2018, Article 37)

2530.  AVERAGE OF BUILDING SETBACKS.  No building need provide a front yard depth greater than the average of the yards provided by existing buildings on abutting lots fronting on the same street.

2540.  MULTIPLE USES. Not more than one principal use shall be allowed on a lot, except as allowed elsewhere in these Bylaws. (Amended 3/15/2014, Article 23)

2600.  DIMENSIONAL  SCHEDULE.  (Amended 3/29/1994, Article 75, Amended 3/12/1996, Article 64; Amended 5/15/2010, Article 31)

2610.  All building in Residential and Conservation Districts (R, AA, AB, C) and Residential buildings in Other Districts, and Senior Housing in the Senior Living Overlay, shall comply with

the following dimensional regulations.

Amended 3/12/1336, Article 64; Amended 10/21/2013, Ameded 3/29/1994, Article 75; Senior Living Overlay added 5/15/2010, Article 30; Amended 3/17/2018, Article 28; Replaced 3/16/2019, Article 36

| | USE CATEGORY | | |
|---|---|---|---|
| | Garden Apartment (AA) | Senior Living Overlay | All Other |
| Min. lot area: | 2 acres [a] | 5 acres | 50,000 sf [h] [l] |
| Min. lot frontage [d]: | 140 ft | [n] | 200 ft [h] |
| Min. front yard [d]: | 100 ft | 25 feet [n] | 50 ft [f] [i] |
| Min. side yard: | 50 ft | 25 feet [n] [o] | 15 ft [g] [l] |
| Min. rear yard: | 50 ft | 25 feet [n] [o] | 30 ft [g] [l] |
| Min. bldg. separation on same lot: | 50 ft | ~ | ~ |
| Max. bldg. height: | 35 ft | 45 feet | 35 ft [l] |
| Max. bldg. stories: | 3 | 3 | 2 1/2 [l] |
| Max. lot coverage (%): | 30 | ~ | 30 |
| Min. open space per d.u.: | 1,500 sf | ~ | ~ |
| Min. habitable floor area per d.u.: | 600 sf | 600 feet | 720 sf [j] [l] |
| Min. lot width: | ~ | ~ | as required [k] [l] |
| Min. open space (%): | ~ | [n] | 40 [q] |
| Max. lots permitted on a common driveway [m]: | ~ | (5 for independent living, no requirement otherwise, or PB determines via special | 5 |
| Number of affordable unit (%): | 20% [p] [r] | 10% - 20% [p] | |

(a)     But not less than 2,500 square feet (sf) per dwelling unit (d.u.) plus 500 square feet per bedroom.
(b)     *(Footnote deleted Annual Town Meeting 2019)*
(c)     *(Footnote deleted Annual Town Meeting 2019)*
(d)     Corner and through lots shall observe frontage and front yard requirements for each portion of a lot that adjoins a public way. Footnote (d) shall not apply in the Senior Living Overlay.
(e)     *(Footnote deleted Annual Town Meeting 2019)*
(f)     Increase to 75 feet abutting Turnpike Road.
(g)     Reduce to 5 feet for one-story accessory structure not occupying more than 25% of either required or actual yard.
(h)     For two-family dwelling 250 feet; 55,000 square feet area per lot.
(i)     *(Footnote deleted 10/21/2013, Article 23)*
(j)     Shall not apply to single family dwellings.
(k)     Minimum Width of Lot – The required minimum lot frontage extending from the front lot line to the rear building line of the main building. *(Amended 3/12/1996, Article 64)*
(l)     For congregate housing, the minimum lot area is six (6) acres; the minimum side and rear yards and lot width may be reduced or eliminated by Special Permit to allow the construction of congregate housing and a nursing home on contiguous parcels with minimal separation between buildings, the maximum building height is thirty-eight (38) feet; the maximum building stories is four (4); and the minimum habitable floor area per

28

dwelling unit shall not apply. Separate buildings for congregate housing and a nursing home may be erected on the same lot.

(m) In all districts in the Town of Westborough, Common Driveways serving more than two (2) detached single family dwellings shall be required to receive a Special Permit from the Planning Board. In no case will a common driveway serve more than five (5) detached single family dwellings. In granting a Special Permit for a common driveway, the Planning Board shall require that the common driveway meet the standards defined in the Rules and Regulations Governing the Subdivision of Land in the Town of Westborough.

(n) For these yard requirements, in all residential districts, SLO shall be required to conform to Section 2610 of this Bylaw. SLO uses in all non-residential districts shall be required to conform to Section 2620. Except, where abutting a residential district it shall conform to Section 2610.

(o) Except 50 feet if adjacent to residentially zoned land. In the G2 District, a fifty (50) foot buffer strip shall be maintained where abutting a residential district, forty (40) feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.

(p) A range of 10% to 20% of the units, as determined by the Special Permit Granting Authority, that are to be designated affordable must comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

(q) Man-made retention and detention areas shall not be considered open space.

(r) Applicants for affordable housing projects shall be expected to meet the 20% minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10%provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority.

## 2620. NON-RESIDENTIAL BUILDINGS IN NON-RESIDENTIAL DISTRICTS

(BB, IA, IB, IC, ID and G2) (See 2610 for residential buildings) (Amended 10/18/04, Article 10; 5/14/05, Article 41; Amended 5/15/2010, Article 30)

| | BA | BB | G2 | IA, IB | ID (j) | DPOD(g) | MUD (g) |
|---|---|---|---|---|---|---|---|
| Minimum lot area (sf): | 15,000 | 10,000 | 15,000 | 15,000 | 15,000 | 10,000 | 10,000 |
| Minimum lot frontage (ft) (a): | 125 | 100 | 125 | 125 | 125 | 100 | 100 |
| Minimum front yard (ft) (a,b,c, e): | 25 | 25 | 25 | 25 | 25 | 10 | 10 |
| Minimum side yard (ft) (d): | 25 | 0 | 25 | 25 | 25 | 0 | 0 |
| Minimum rear yard (ft) (d): | 25 | 0 | 25 | 25 | 25 | 0 | 0 |
| Maximum building height (ft): | 60 | 35 | 45 | 60 | 95 | 60 | 60 |
| Maximum building stories: | 4 | 2 1/2 | 2 1/2 | 4 | 6 | 4 | 4 |
| Maximum lot coverage (%): | 40 | 100 | 40 | 40 | 60 | ~(h) | ~(h) |
| Minimum distance between edge of curb cut & nearest side lot line or corner (ft): | 20 | ~ | 20 | ~ | ~ | ~(h) | ~(h) |
| Minimum open space (%): | 60 | ~ | 60 | 60 | 40 | ~(h) | ~(h) |
| Max. square foot floor area: | ~ | ~ | (i) | ~ | ~ | ~ | ~(h) |

(Amended 3/5/1990, Article 61; Amended 3/2/1992, Article 19; Amended 3/17/2001, Article 44; DPOD Added 3/15/2004, Article 38; Amended 5/14/2005, Article 38; ID Added 5/15/2010, Article 30; MUD added 5/15/2010, Article 32; Replaced 3/16/2019, Article 37)

(a)   Corner and through lots shall observe frontage and front yard requirements for each portion of a lot that adjoins a public way.

(b)   Increase to 75 feet abutting Turnpike Road.

(c)   But not less than 50 feet measured from the street centerline.

(d)   (1) Decrease to zero (0) feet where abutting a railroad right-of-way.

(2) A one hundred (100) foot buffer strip shall be maintained where abutting a Residential District; seventy-five (75) feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.

(3) In the G2 District, a fifty (50) foot buffer strip shall be maintained where abutting a Residential District, forty (40) feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.

(e)   No building need provide a yard greater than that existing on any abutting parcel on the same street.

(f)   *(Footnote deleted Annual Town Meeting 2019).*

(g)   With Special Permit issued by the Special Permit Granting Authority.

(h)   Determined by the sole discretion of the Special Permit Granting Authority during Special Permit process.

(i)   Newly constructed professional offices shall be in a residential style structure and be limited to a maximum of 4,000 sq. ft. gross floor area;  Newly constructed retail sales and services shall be limited to a maximum of 5,000 sq. ft. gross floor area.

(j)   The Industrial D District (ID) is an overlay district. The maximum dimensional schedule shall be allowed in accordance with Section 5400 of this Zoning Bylaw.  Otherwise, the underlying requirements of the Industrial B District (IB) are applicable.


2621.  Non-Residential buildings in Non-Residential Districts (AE) (see 2610 for residential buildings. (Added 3/12/1996, Article 66)

In the case of Adult Entertainment uses, all the dimensional requirements of Section 4822 shall be met in addition to the applicable requirements of Section 2620, BA and BA (f) Districts;


## 2630.  BUILDING IN M-1 DISTRICT (M-1)

Dimensional regulations for municipal or institutional buildings or structures on land zoned M-1 shall be established for each building or structure by two-thirds vote of Town Meeting. Notwithstanding the foregoing, no vote to establish such dimensional requirements shall be taken until a public hearing has been held by the Planning Board and a report with

recommendations by the Planning Board has been submitted to the Town Meeting pursuant to the provisions of Massachusetts General Laws, Chapter 40A, Section 5, as amended, and further that the Site Plan Review process as defined by Town Bylaws shall apply to any such buildings or structures approved by the Town Meeting (Amended 3/16/2002, Article 42 and Article 43)

## 2640. BUILDINGS IN MUNICIPAL DISTRICT (M)

Dimensional regulations for municipal institutional buildings or structures on land in M zoned Districts shall be established for each building or structure through the issuance Special Permit as provided in Section 1330.

2650. Should any building or structure need be erected in Zoning District M-1, Section 2630 shall not apply provided that the total estimated cost of construction be less than two thousand dollars ($2,000.00).

# ARTICLE 3  GENERAL REGULATIONS
## (ADOPTED MARCH 5, 1990)

## 3100.  PARKING AND LOADING REQUIREMENTS

**3110.  GENERAL.** Except in the Downtown Business (BB) District, which is exempt from these requirements, adequate off-street parking must be provided to service all parking demand created by new construction, whether through new structures or additions to old ones, and by change of use of existing structures.  Such parking shall be either on the same premises as the activity it services, or within three hundred (300) feet on a separate parcel, which may be jointly used with other premises for this purpose.

**3120.  SCHEDULE OF PARKING AREA REQUIREMENTS.**  In applying for a Building or Occupancy Permit, the applicant must demonstrate that the following minimums. will be met unless these are reduced on Special Permit from the Special Permit Granting Authority upon their determination that special circumstances render a lesser provision adequate for all parking needs.  Requirements are additive for multiple uses on the same lot.  Where uses cannot be calculated separately, the use requiring the higher number of spaces shall be used throughout.

- Dwellings: two spaces per dwelling unit
- Motel, motor court, lodging house: one space per guest unit plus one space per eight (8) guest units or fraction thereof
- Offices: three and one-half (3.5) spaces per one thousand (1,000) square feet: (1) (Amended 3/17/2001, Article 45)
- Retail Sales: one space per two hundred (200) square feet (1)
- Wholesale Sales (where the public is not allowed): one space per three hundred (300) square feet (1)
- Research and Development: three and one-half (3.5) spaces per one thousand (1,000) square feet, (1) (Amended 3/17/2001, Article 45)
- Restaurant, place of assembly: one space per four (4) seats
- Lounges: one space per two seats
- Restaurant (take-out): three spaces per each employee
- Bowling Alley: four spaces per lane
- Nursing Home: one (1) space per four (4) beds
- Hospital: one (1) space per bed
- Industrial: one (1) space per each one and one-half (1-1/2) employees per shift
- Congregate housing: one (1) space per two (2) dwelling units
- Others: individually determined by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board upon Site Plan Review

(1)  Square feet shall mean that total floor area enclosed within the outside walls of the building or, if not enclosed, it shall be the area of the smallest quadrangle which can encompass the area in use.

**3130.  PARKING AREA DESIGN.**  No off-street parking area shall be maintained within ten (10) feet of a street line.  For parking areas of six (6) cars or more, the following shall apply:

3131.  Parking area use shall not require backing on a public way.

3132.  There shall be not more than one (1) entrance and one (1) exit from such lots per two hundred (200) feet of street frontage or fraction thereof.  If necessary to meet this requirement, uses shall arrange for shared egress.

3133.  Such parking lots shall be screened from any abutting residential use by densely planted evergreen shrubs or by a stockade-type fence, and shall be paved.  Said shrubs shall be a minimum of four (4) feet in height; variety of shrub, the distance from any lot line, and spacing shall be subject to approval by the Tree Warden.  Said fence shall be a minimum of six (6) feet in height and said paving shall be with generally accepted paving material as approved by the Special Permit Granting Authority (SPGA), or where there is no special permit required, the Planning Board at the time of Site Plan Review. (Amended 3/16/2019, Article 33)

3134.  In a Residential district, no such parking lot shall extend into a required yard, except that such an extension may be permitted by Special Permit for congregate housing.

3135.  PARKING GARAGE.  A parking garage shall conform to Sections 3131 and 3132.  Where a Parking Garage is attached to or part of a structure, it shall be constructed to give the same outward appearance as the structure to which it is attached.  For the purpose of this Bylaw, a Parking Garage shall not be considered an accessory use or structure.

3140.  LOADING REQUIREMENTS.  Adequate off-street loading facilities and space must be provided to service all needs created by new construction, whether through new structures or additions to old ones, and by change of use of existing structures.  Facilities shall be so sized and arranged that no trucks need back onto or off of a public way, or be parked on a public way while loading, unloading, or waiting to do so.

## 3200.  ENVIRONMENTAL CONTROLS

3210.  DISTURBANCES.  No use shall be allowed if it will cause sound, noise, vibration, odor, or flashing (except for warning devices, temporary construction or maintenance work, parades; recreational activities, or other special circumstances) perceptible without instruments more than four hundred (400) feet from the boundaries of the originating premises if in an Industrial District, or more than two hundred (200) feet from the boundaries of the originating premises if in a Business District.

(3220. Pollution Control and 3230. Liquid Waste deleted 10/21/2013, Article 24)

3220.  ROADSIDE AND PARKING AREA TREES. (Amended 3/5/1990, Article 69, Amended 10/21/2013, Article 24)

In all zoning districts, the maintenance, establishment and protection of roadside and parking area trees is to be encouraged.  Roadside trees are to at least meet the requirements of the Subdivision Rules and Regulations.  In all zoning districts, minimum requirements for roadside and parking area trees shall conform to Article 46 of the Town Charter and Bylaws.

A.    Removal of healthy trees over five (5) inches in diameter (at breast height) is to be minimized along roadways and in areas proposed for parking areas.

33

B.   Planting new or replacement trees approximately every thirty-five (35) feet along roads is required.  Such trees should be deciduous hardwoods in order that a stately atmosphere may ultimately be created; and, the placement of said trees is to be as approved by the permit granting authority and based upon recommendations from the tree warden.

C.   Planting new trees in parking areas of a size greater than six (6) parking spaces is required at a ratio of l tree per 12 parking spaces; and placement of said trees is to be as approved by the permit granting authority and based upon recommendations from the tree warden.

D.   Roadside and parking area tree plantings should meet the following criteria:

1.   Cast moderate to dense shade in summer;
2.   Be long-lived, i.e., over 60 years;
3.   Be tolerant of pollution and direct or reflected heat;
4.   Require little maintenance, by being mechanically strong and insect-and disease-resistant;
5.   Be able to survive with no irrigation by two (2) years after establishment.

## 3300.  SIGN REGULATIONS

Signs erected after the adoption of this Bylaw shall be governed by Section 3300.  Signs lawfully existing at the time of the adoption of this Bylaw shall be governed by Section 2400.

The following, however, shall not be considered signs within the context of this Bylaw;

a.   Flags and insignia of any government except when displayed in connection with commercial promotion;

b.   Legal notices or informational signs erected or required by government bodies;

c.   Temporary signs, erected for a maximum of thirty (30) days, for a charitable, non-profit or religious cause, provided that the sign area does not exceed six (6) square feet in a Residential District or twelve (12) square feet in any other zoning district.

d.   Standard fuel pumps bearing thereon in usual size and form the name, type and price of fuel;

e.   Integral decorative or architectural  features of building, except letters, trademarks, moving parts, or parts internally illuminated or employing decorative lighting;

f.   Signs guiding and directing traffic and parking and not exceeding six (6) square feet in area, bearing no advertising matter,

g.   Lettering on approved U.S. Mail Boxes provided: said lettered area shall not exceed two (2) square feet.

h.   Signs posting "No Hunting" or "No Fishing" provided: said sign area shall not exceed two (2) square feet.

(Amended 10/19/2015, Article 5)

## 3310. GENERAL SIGN REGULATIONS

3311.  Signs, any part of which moves or flashes, or of the traveling light or animated type, and all beacons and flashing devices whether a part of, attached to, or apart from a sign, are prohibited. Within the Downtown Business District (BB), Downtown Planning Overlay District (DPOD), Gateway 2 District (G2), Historic District and the Senior Living Overlay District (SLO) only externally illuminated signs or opaque signs that are not illuminated, shall be allowed. Automated Variable Message signage shall be prohibited in the aforementioned Districts. (Amended 10/19/2015, Article 5; Amended 3/16/2019, Article 32)

3312.  No illumination shall be permitted which casts glare onto any Residential District, or onto any portion of a way so as to create a traffic hazard.  Externally light d signs may be illuminated only by a white, steady, stationary light of reasonable intensity shielded and directed solely at the sign.  When lighted from within, a sign may be illuminated only with light of reasonable intensity.  Reasonable intensity of said light shall be determined by the Board of Selectmen based on the use and character of the immediate vicinity.

3313.  No sign shall be placed within or projecting over a public way or on public property except with a permit from the Board of Selectmen.

3314.  All new signs not elsewhere provided for in these Bylaws or qualifying as a nonconforming use under our Zoning Bylaws, having a sign area greater than twelve (12) square feet may only be erected, constructed or altered after a Permit has been issued by the Building Inspector.

3315.  No sign shall be affixed to or painted on any living or natural object such as a tree or rock, and no sign shall be placed on land or affixed to any structure without permission from the owners thereof.

3316.  PROJECTING SIGNS.  Any sign any part of which projects more than ten (10) inches from a supporting wall of any building shall not be permitted.

3317.  WALL SIGNS.  Signs affixed to an exterior wall of any building shall be permitted only if conforming with the following:

a.      All parts of said sign shall be within ten (10) inches from its supporting wall.

b.      Sign area shall not exceed fifteen (15) percent of the wall area with which it is viewed.

c.      Said sign shall not extend beyond the wall dimensions, horizontally or vertically.

d.      not more than one (1) such sign shall be allowed on any building except as allowed or as further restricted elsewhere in this Bylaw. (Amended 10/19/2015, Article 5)

3318.  GROUND SIGNS.  Signs erected on the ground and which are wholly supported from the ground shall be permitted only if conforming with the following:

a.      No part of any such sign shall be within five (5) feet from any building.

b.      All such signs shall have a clear space where required to promote public safety. This shall be demonstrated at the proposed sign location prior to sign approval and sign installation. (Amended 10/19/2015,  Article 5)

c.      No such sign shall have a horizontal dimension greater than fifteen (15) feet.

d.      Sign area shall not exceed fifty (50) square feet except if the lot fronts on Turnpike Road, the sign area shall not exceed one hundred (100) square feet.

e.      No such sign shall have a vertical height greater than twenty (20} feet except if the lot fronts on Turnpike Road, the vertical height shall not be greater than thirty (30} feet.

f.      No part of any such sign shall be less than ten (10} feet from any lot line except if the lot fronts on Turnpike Road, no part of any such sign shall be less than thirty- five (35} feet from any lot line.  Signs within the Downtown Business (BB} District shall be exempt from this provision.

g.      Every sign within twenty-five (25} feet of the curb line of two (2} intersecting streets shall have a clear space, except for necessary structural supports, of not less than eight (8} feet between the ground and the lowest part of the sign.

3319.  ROOF SIGNS.  Signs affixed to a building or roof shall not extend more than twelve (12) feet above the height of the building.  Any sign erected and maintained wholly upon or over the roof of any building with the entire support on the roof structure shall have a clear space, except for necessary structural supports, of not less than four (4) feet between the roof level and the lowest part of the sign.  Said sign shall be more than four (4) feet measured from the inside dimension of the wall toward which the sign faces.

3320.  TEMPORARY ACCESSORY SIGNS.  Any temporary sign is permitted to be erected for up to thirty (30) days if in accordance with limitations set for permanent signs or the following: (Amended 10/19/2015, Article 5)

a.      An unlighted sign of up to twenty (20) square feet indicating parties involved in construction on the premises.

b.      An unlighted sign of up to twelve (12) square feet pertaining to lease, sale or rental of the premises on which the sign is located; except in a Residential District where the sign area shall not exceed six (6) square feet.

c.      A sign of up to ten (10) square feet pertaining to a subdivision while under development only with permission of the Planning Board.

d.      Signs inside display windows covering not more than thirty (30) percent of window area, illuminated by building illumination only.  Temporary Signs inside a display window advertising a specific event or activity or notice to the public shall not be permitted for longer than 30 days, unless approved by the Building Commissioner, and shall be removed immediately upon the conclusion of the event or activity.  Such sign shall not exceed 20% of the window area and shall not be separately list. (Amended 10/19/2015, Article 5)

e.   Signs which are mounted to any motor vehicle or trailer which is parked for the sole purpose of advertising or directing traffic to a business establishment on or off premise are prohibited except by Special Permit issued by the Board of Selectmen, and then only within Business (BA) (BB) and Industrial  (IA) (IB) Districts. (Amended 10/19/2015, Article 5)

f.   Signs naming political issues or political candidates shall not exceed six (6) square feet in area.  Said signs shall be allowed only from sixty (60) days prior to an election until five (5) days following the election. (Amended 10/19/2015, Article 5)

3330.  PERMANENT ACCESSORY SIGNS.  Signs whose content relates exclusively to the premises on which they are located, or to products, accommodations, services or activities on those premises, shall only be allowed if conforming to Sections 3331 through 3335.

3331.  Signs, unlighted unless otherwise provided herein, which may be permitted in any Single Residence (R), Garden Apartment (AA), and High Rise Apartment (AB) Districts:

a.   One (1) identification sign for each dwelling unit provided said sign area shall not exceed two (2) square feet and it shall not be used other than for identifying the occupant and/or address thereof.  Land used for ten (10) or fewer dwelling units may have one (1) sign not to exceed two (2) square feet in area indicating the owners or occupants.  Sign area may be increased by one (1) square foot for each ten (10) additional dwelling units; sign area not to exceed twenty (20) square feet except if the land fronts on Turnpike Road, sign area may increase to forty (40) square feet.

b.   One (1) identification sign for each community facility provided; said sign area shall not exceed twelve (12) square feet, if lighted, it shall be illuminated with white light by indirect method only and it shall be set back from the front lot line by not less than one-half (1/2)  the depth of the front yard.

c.   Signs of the Temporary Accessory type not elsewhere restricted.

d.   One (1) home occupation sign not to exceed two (2) square feet in area.

e.   A business in a High Rise Apartment shall have no sign pertaining to such place of business outside of any building and no illuminated sign pertaining to such place of business visible from a public way.

3332.  Signs which may be permitted in any Business (BA) (BB) or Industrial (IA) (IB) District:

a.   Any sign permitted by Section 3331 subject to the same provisions.

b.   Each commercial or industrial enterprise may only have one (1) Ground Sign and one (1) Roof or two (2) Wall Signs. (Amended 5/14/2011, Article 18)

c.   One (1) additional Wall Sign used as a directory to the occupants or tenants of a building may be affixed to an exterior wall at one (1) entrance of said building. Said directory shall not exceed an area determined on the basis of one (1) square foot for each occupant or tenant; total sign area shall not exceed six (6) square feet.

d.   Each lot in a Business or Industrial District with a building put to commercial or industrial use may have not more than one (1) Ground Sign.  Sign area shall not exceed that

37

allowed for said lot.  Each tenant may share equally in the allowed sign area.  Where an industrial area is removed from a public way by a private access road, one (1) additional Ground Sign not to exceed twenty (20) square feet may be placed within view of said public way, but not within twenty (20) feet of said way.

e.      Information related to specific business operations on the premise, such as proprietors name; contact information, including phone number, hours of operation, web page address, and the like, as defined in the Town of Westborough's Signage Guidelines, shall be allowed on the primary customer entry door.  Such information shall not occupy more than 25% if the door surface area. (Amended 10/19/2015, Article 5)

3333.  Signs which may be permitted in any Conservation (C), State, MDC, Municipal (M) Districts:

a.      One (1) identification sign for each frontage on a public way shall be permitted.

b.      Sign area shall not exceed twelve (12) square feet.

3334.  A farm, institutional or non-commercial recreational use may have one (1) sign not to exceed twelve {12} square feet.  Said sign must be located on the land so used.  Should said land front on more than one public way, a sign shall be allowed for each such lot frontage.

3335.  Signs, whose content relates jointly to "Brand Names" as well as information relating to the premises on which the sign is located, shall have the sign area divided equally between the "Brand Name" and the information relating to the premises.

3336.  When any sign becomes insecure, in danger of falling, or otherwise unsafe, the owner thereof shall, upon written order of the Building Inspector, remove or repair the sign forthwith.

3337.  HISTORICAL DISTRICTS AND/OR NATIONAL REGISTER PROPERTIES (Amended 10/19/2015, Article 5)

a.      Signs erected, altered or relocated within the confines of any National Register of Historic Places District or the Westborough Downtown Business District or any Zoning District within 2500 feet of the Downtown Rotary shall be in keeping with the historic character of that District.  This places additional conditions upon design, materials, lettering and color of signs in these Districts.  In Residential Districts within 2500 feet of the Downtown Rotary signage shall be in conformance with Section 4413 of this Bylaw. (Amended 3/5/90, Article 72; 3/29/1994, Article 39)

b.      The Historical Commission approval is required for any new or revised existing signs which will be located in any Historic District, the Westborough Downtown Business District, or any Zoning District within 2500 feet of the Downtown Rotary.  The Historical Commission shall prepare, and the Planning Board shall approve, guidelines relating to appropriate sign design for Historic Districts.  Where there are overlapping review of building elements required by both the Historic Commission and the Design Review Board, the Design Review Board shall be the approving authority for signage on these buildings.

c.      The Historical Commission Guidelines shall be applied by both the Historical Commission and the Design Review Board, where appropriate, in reviewing and

approving signs.  Copies of these guidelines shall be made available from both the Historical Commission and Building Commissioner. (Amended 3/12/1996, Article 74)

d.      Following signage review Historical Commission or Design Review Board, where appropriate, shall provide a decision to the Building Commissioner.

e.      Neon halo, gas-filled tube type illuminated signs and internally illuminated signs are not in keeping with the historic character of the Districts and shall not be allowed.

f.      Lighting of signs within these Districts shall be limited to shielded light sources.  For sign boards or other wall mounted signs, historically appropriate gooseneck light sources may be used.  The design, material, and location of such light sources shall be reviewed and approved by the Historical Commission or Design Review Board, where appropriate.  Indirect or downward-directed lighting may be used to illuminate projecting signs.

g.      Enforcement of these requirements shall be the responsibility of the Building Commissioner.

3340.  OFF-PREMISES SIGNS.  Billboards or signs, whose content does not relate exclusively to the premises on which they are located, or to products, accommodations, services or activities on those premises, shall not be permitted. (Amended 10/19/2015, Article 5)

Off-Premises Signage may be allowed by the Building Commissioner if the Off-Premises Signage serves to reduce traffic congestion, improve public safety or serves a similar public benefit"; (Added 10/19/2015, Article 5)

"The Building Commissioner may also allow Off-Premises Signage to announce temporary events.  The location and duration of the display of such Off-Premises Signage shall be determined by the Building Commissioner"; (Added 10/19/2015, Article 5)

3350.  NON-CONFORMING SIGNS.  Any sign that was legally erected prior to the adoption of Section 3300 of this Bylaw or has been legally erected since the adoption of this Section may continue to be maintained but shall not be enlarged or altered in any way unless it is brought into conformity with the requirements of this Bylaw.  A non-conforming sign is subject further to the following regulations:

a.      A non-conforming sign shall not be moved or relocated unless it is brought into compliance with the provisions of this Bylaw.

b.      A non-conforming sign which is removed or abandoned for longer than 30 days or destroyed by more than 35% shall not be replaced unless it complies with this Bylaw.

c.      Any modification to a non-conforming sign, other than repainting, refurbishing and/or repairing it to its original condition shall void such non-conformity and any new sign shall comply with this Bylaw;

(Added 10/19/2015, Article 5)

3360.  OUTSIDE DISPLAY.

a.      Display of merchandise or other materials exterior to a building in the Downtown Business District (BB), Downtown Planning Overlay District (DPOD), and the Gateway 2 District (G2) shall be reviewed and approved by the Design Review Board.

39

b.     Umbrellas serving outdoor seating or related activities in the Downtown Business District (BB), Downtown Planning Overlay District (DPOD), and the Gateway 2 District (G2) shall be considered an architectural feature and shall be reviewed and approved by the Design Review Board";

(Added 10/19/2015, Article 5)

# ARTICLE 4  SPECIAL REGULATIONS
## (ADOPTED MARCH 5, 1990)

**4100.  EARTH MOVING AND CLEARING OF PROPERTY REGULATIONS**
(Replaced 3/16/2002, Article 17)

**4110.  GENERAL.**  Earth moving and/or clearing shall be done only in accordance with Sections 4120 through 4170, except that the following shall be exempted from these provisions:

**4111.**  The removal or addition of less than five hundred (500) cubic yards of such material, or clearing and grading activity which disturbs less than 20,000 square feet of land, within any twelve (12) month period. (Amended 3/2/1992, Article 21; Amended 3/29/1994, Article 43)

**4112.**  Earth moving and/or clearing incidental to construction on a lot where such earth moving is explicitly allowed under a currently valid Building Permit, Special Permit, or Subdivision Approval. (Amended 3/29/1994, Article 43; Amended 10/21/2013, Article 22)

**4113.**  Removal on a parcel for which removal was authorized under a legal permit issued prior to adoption of Section 4100 may continue until the expiration date of said permit, of for eighteen (18) months, whichever is the greater, provided that all bylaws, permits and conditions applicable prior to the adoption of this Section shall be complied with.  Subsequent to that date, full compliance with all the requirements of Section 4100 must be met.

**4114.**  Clearing on property that has received an approved Forest Cutting Plan development by a certified forester and approved by the Massachusetts Department of Environmental Management.

**4120.  SPECIAL PERMIT OR APPROVAL.**  Earth moving and/or clearing shall be allowed only under a Special Permit issued by the Planning Board, following a written application, a copy of which shall be forwarded to the Conservation Commission and Town Engineer.  The following shall be conditions for such issuance:(Amended 10/21/2013, Article 22)

**4121.**  The application shall be accompanied by a plan showing all natural and man-made features, including wetlands, water courses, 100- year flood plain, property lines, names and addresses of all abutters if available from the Assessors, including those across any street or way, topography at two (2) foot contour interval of the site and all land within one hundred (100) feet of the area of the earth moving and/or clearing activity together with any grades below or above which finish surface will now lie, and the proposed cover vegetation and trees.  The application shall include a description of earth moving, clearing or construction activities, in sequence, which specifies the expected date of soil stabilization, vegetation and completion.  If involving more than one (1) acre of clearing, the plan shall be prepared by a registered landscape architect.  If involving more than five hundred (500) cubic yards of materials to be moved, the plan shall be prepared by a Registered Engineer. (Amended 3/29/1994, Article 43)

**4122.**  A performance bond in the amount determined by the Planning Board shall be posted in the name of the Town assuring satisfactory performance in the fulfillment of the requirements of this Bylaw and such other conditions as the Planning Board may impose as conditions to the issuance of its permit.

4123.  Before granting a permit, the Planning Board shall give due consideration to the location of the proposed earth moving and/or clearing, to the general character of the neighborhood surrounding such location, to the protection of water supply, to the general safety of the public on the public ways in the vicinity, and to the recommendations of the Conservation Commission and Town Engineer.  Prior to said consideration the applicant shall notify the abutters as to the time and place of consideration and shall provide the Planning Board with proof of such notification.

(Deleted 4125 10/21/2013, Article 22)

4126.  INSPECTION AND COMPLIANCE.  In order to ensure compliance with a Special Permit or approval granted under this regulation, the Planning Board will require the applicant to perform periodic inspections and submit written reports.  The interval and content of such inspection and reporting shall be determined during review of the application.  Upon satisfactory completion of earth moving, and/or clearing activity, the applicant shall request a certificate of compliance.  The Planning Board, as the case may require, shall perform an inspection prior to granting such certificate and releasing the performance bond or other security. (Added 3/29/1994, Article 43)

## 4130.  EARTH MOVING

4131.  Finish grade shall not lie below a level that would reasonably be considered a desirable grade for the later development of the area, or below the grades specified on the plan accompanying the permit application.  The Planning Board may specify a base grade below which excavation shall in no event take place.  The Planning Board from time to time may require the site be surveyed by a registered land surveyor for compliance with these Bylaws. Cost of survey is to be paid by the permit holder.

4132.  Provision shall be made for safe drainage of water, and for prevention of wind or water erosion carrying material onto adjoining properties.

4133.  The Planning Board may require an undisturbed fifty (50) foot buffer strip be maintained at all boundaries. (Amended 3/29/1994, Article 43; Amended 10/21/2013, Article 22)

4134.  The visibility, sound and airborne particulates from processing equipment shall be screened from adjacent premises through the design and location of such equipment, and through use of natural vegetation planting, overburden piles and surge piles as screening.

4135.  Dust from all earth-moving activities shall be controlled.

4136.  Earth materials shall not be deposited onto public roads.

4137.  Finish grade shall not lie below a level that is ten (10) feet above the natural, seasonal high groundwater table for the site. (Amended 3/29/1994, Article 43)

4138.  Vegetative stabilization measures shall be employed during earth, moving and construction activity as required by the approving authority.  All perimeter dikes and slopes, basin or trap embankments shall be stabilized with sod, seed, anchored straw mulch within seven (7) days of disturbance.  All other disturbed areas shall be stabilized with sod; seed and anchored straw mulch within fourteen (14) days after disturbing activities are ceased.

Topsoil shall be stripped from disturbed areas and stockpiled in an approved area and stabilized with a temporary vegetative cover if left more than fifteen (15) calendar days.

Perimeter sediment controls shall be installed around stockpiled topsoil.

During cold weather months, when seeding and sodding may be impractical, anchored mulch shall be applied as approved.

## 4140.  CLEARING PROCESS

4141.  Provision shall be made for safe drainage of water, and for prevention of wind or water erosion carrying material onto adjoining properties.

4142.  The Planning Board may require an undisturbed fifty (50) foot buffer strip be maintained at all boundaries. (Amended 10/21/2013, Article 22)

4143.  The visibility, sound and airborne particulates from processing equipment shall be screened from adjacent premises through the design and location of such equipment, and through use of natural vegetation planting.

4144.  Dust shall be controlled.

4145.  Vegetative stabilization measures shall be employed during clearing or grubbing activity as required by the Planning Board.  All exposed soils shall be stabilized with sod, seed, anchored straw mulch within seven (7) days of disturbance.  All other disturbed areas shall be stabilized with sod; seed and anchored straw mulch within fourteen (14) days after disturbing activities are ceased.  During cold weather months, when seeding and sodding may be impractical, anchored mulch shall be applied as approved.

4150.  RESTORATION.  Forthwith following the expiration or withdrawal of a permit or upon voluntary cessation of operations, or upon completion of activities to the extent covered by the performance bond (Section 4122), that entire area shall be restored as follows:

4151.  For earth moving activities, all land shall be so graded that no slope exceed one (1) foot vertical rise in three (3) feet horizontal distance and shall be so graded as to safely provide for drainage without erosion.  The Planning Board may require the restored site be surveyed by a registered land surveyor for compliance with these Bylaws.  Cost of survey is to be paid by the permit holder.

4152. For earth-moving activities, all boulders larger than one-half (1/2) cubic yard shall be removed or buried, and all tree stumps removed in compliance with the Westborough Board of Health Regulations.  For clearing activities, all stumps shall be removed in compliance with the Westborough Board of Health Regulations.

4153.  The entire area excepting exposed ledge rock shall be covered with not less than four inches of topsoil, which shall be planted with perennial cover vegetation adequate to prevent soil erosion.

4154.  Any performance bond shall not be released until sufficient time has lapsed to·ascertain that the vegetation planted has successfully been established and that drainage is satisfactory.

4160.  ADDITIONAL CONDITIONS.  The Planning Board may set conditions in addition to the above, including but not limited to: duration of the permit, hours of the day during which earth moving and/or clearing may take place, hours during which vehicles may travel to and from the premises, routes to be used by hauling vehicles and trees to be planted. (Amended 3/29/1994, Article 43)

4170.  RENEWAL OR REVOCATION OF PERMIT.  No Permit or Approval shall be issued under the provisions of Section 4100 to extend for a term of more than one (1) year, but a Permit or Approval may be renewed upon application and after a Public Hearing.  Prior to renewal, inspection of the premises shall be made by the Planning Board to determine that the provisions of this Bylaw are being complied with.  The Planning Board, after a hearing and proof of violation of the Bylaw, shall withdraw the permit, after which the operation shall be discontinued and the area restored in accordance with Section 4150.  Violations of this bylaw, or of any condition of a Special Permit or approval granted under this section, shall be punished by a fine of not more than three hundred ($300) dollars per day.

## 4200.  MULTI-FAMILY DWELLINGS

Multi-family dwellings shall be permitted only subject to the following:

4210.  UNITS BELOW GRADE.  No floor in a dwelling unit except unoccupied basements shall be below grade of the adjoining ground at any place on its perimeter.

4220.  BEDROOMS.  Not more than 5% of all dwelling units in the entire apartment complex shall have more than two (2) bedrooms.

4230.  BUSINESS IN HIGH-RISE APARTMENTS.  Up to 5% of the gross floor area of structures proposed for high-rise apartments may be devoted to retail stores, offices and service outlets exclusively servicing on-site residents, provided that:

4231.  There shall be no entrance to such place of business except from inside a building.

4300.  OPEN SPACE COMMUNITIES (Amended 3/5/1990, Article 59)

4310.  PURPOSE.

Provide for the public interest by the preservation of open space and natural landscape features in perpetuity, and ensure that residential development, to the maximum possible extent, respects the natural features of the land.

Promote housing patterns which are designed to be sensitive to and accommodate a site's physical characteristics.  Such features include wetlands and water bodies, topography, vegetation, wildlife habitats, scenic views & vistas, the integrity of ancient ways, historic sites, and the remaining rural character of the community which is exemplified by its farmlands, open field and orchards.

4315.  APPLICABILITY.

Open Space Communities shall be allowed within the Residential Zoning District subject to the requirements of this Bylaw for that District and in accordance with the additional requirements specified herein and in the Subdivision Rules and Regulations.

## 4320.  GENERAL REQUIREMENTS.

1.      Any parcel of land located within the residential zone containing ten (10) or more acres shall be considered for open community development.

2A.     For major residential development, that is, the potential creation of more than six (6) residential house lots on a property or set of contiguous properties in common ownership, an open space community development is allowed only by Special Permit issued by the Planning Board.

2B.     For minor residential development or a parcel of at least five (5) acres but less than ten (10) acres in size, at the owners option, an application can be made for an Open Space Community Special Permit in preferences to filing a conventional development plan.

## 4330.  MINIMUM REQUIREMENTS.

1.      Size: The total area of the tract or parcel proposed for the Open Space Community shall be at least ten (10) acres, and have a minimum of fifty (50) feet of frontage on an existing Town way.

2.      Density: The total number of lots shall not exceed the number of lots which could reasonably be expected to be developed under a conventional plan in full conformance with zoning, subdivision regulations, and health codes. (Amended 3/29/1994, Article 40)

3.      Intensity Regulations: The Planning Board may grant a reduction of all intensity regulations of the underlying zone regulations for all portions of an open space development if the Board finds that the reduction will result in better design, improved protection of natural and scenic resources, and will otherwise comply with these regulations, provided that in no instance shall any lot deviate from the following table of requirements:

Table of Requirements

| | |
|---|---|
| Maximum Lot Size | 15,000 square feet |
| Minimum Lot Size | 8,000 square feet |
| Minimum Frontage | 50 feet |
| Minimum lot width, at building line | 80 feet |
| Minimum Front Yard Setback | 30 feet |
| Minimum Side Yard | 15 feet |
| Minimum Rear Yard | 15 feet |

4.      The minimum front yard setback requirement contained in this Bylaw may be waived by the Board in order to achieve the purpose of this Bylaw.

4350.  Common Open Space ownership and Management: Common open space in any development under this provision shall be conveyed to:

1.      An Open Space Land Trust, or any other nonprofit corporation, approved by the Planning Board, the principal purpose of which is the land conservation and the preservation of open space; and/or

45

2.     A corporation, trust or association owned or to be owned by the owners of the lots in the development, here-after referred to as the "Homeowners Association", provided that the land shall be conveyed to the "Homeowners Association" subject to covenants, enforceable by the Town, to keep the dedicated common space, open or in a natural state as approved by the Planning Board; and/or

3.     The Town, and may be accepted by it for conservation and/or recreational use; and/or

4.     Owners of the lots within the open space community subject to a conservation restriction acceptable to the Board.

## 4360.  APPLICATION AND REVIEW PROCESS.

The application process for an Open Space Community Development is comprised of two steps. In the first step, the applicant submits a concept plan, as outlined in the Subdivision Rules and Regulations, which describes the overall development plan.  The Planning Board shall grant or deny a Special Permit based upon the information contained in the concept plan.  If the Special Permit is granted, the applicant then submits a preliminary plan based upon the concept plan. The Planning Board reviews the plan and then the applicant submits a definitive subdivision plan which incorporates comments made during the preliminary plan review.  Two separate public hearings, one for the Special Permit and one for the definitive plan must be held.

## 4365. DURATION OF APPROVAL, DEDICATION OF OPEN SPACE AND RECORDING.

Notwithstanding anything to the contrary within/without this Bylaw, any Special Permit granted by the Planning Board for an Open Space Community, shall have a life span equal to that of conventional subdivisions.

All common open space shall be dedicated and recorded, with covenants, at or prior to the time the permit holder receives a Building Permit.

## 4370.  SUBSEQUENT TO APPROVAL.

Subsequent to approval of such Open Space Community, no land therein shall be sold and no lot line shall be changed in such a way as to increase the number of lots or the extent of non-conformity with the provisions of section 2600 of this Bylaw.

## 4400.  ACCESSORY USES AND STRUCTURES

4410.  HOME OCCUPATIONS.  Home occupations are permitted only if conforming to the following conditions:

4411.  Floor area used for the home occupation shall not exceed 25% of the floor area of the dwelling or 30% of the combined floor area of the dwelling plus any accessory structures used in the home occupation.

4412.  Not more than one person not a member of the household shall be employed on the premises in the home occupation.

4413.  There shall be no exterior display, no exterior storage of materials and no other exterior indication of the home occupation or other variation from the residential character of the principal building other than a sign as provided in Section 3331 (d).

4414.  No offensive noise, vibration, smoke, dust, odors, heat or glare shall be produced.

4415.  Traffic generated shall not exceed volumes normally expected in a residential neighborhood.

4416.  Parking generated shall be accommodated off-street, but not more than two (2) spaces shall be in a required front yard.

4417.  Should any home occupation create any variation from the normal activity within the neighborhood, the hours of operation shall be limited to 8:00 A.M. to 9:00 P.M. with Sundays to be days of no operation.

4418.  One-day yard or garage sales are permitted only upon written permit from the Selectmen.  Should any premises be used more frequently than two (2) days in one year for the purpose of a yard or garage sale, the sale shall be considered a home occupation and be governed by the regulation set forth in these Bylaws under Section 4410 through 4417.

## 4420.  MOBILE HOMES AND CAMPERS

4421. A mobile home or camper may be temporarily occupied:

a.      by non-paying guests of the owner of the premises for a period not to exceed two (2) weeks in any calendar year, or

b.      as a temporary office incidental  to construction or development of the premises on which it is located, upon issuance of a permit by the Selectmen, for a period of one (1) year, renewable once.

4422.  Campers may be regularly stored within a structure and a single camper may be regularly stored in the open accessory to a permitted use in any district, provided that it is not within a required front yard or within ten (10) feet of a side or rear lot line, except when loading or unloading.

## 4430.  SWIMMING POOL FENCING.

4431.  Every outdoor swimming pool considered to be a Structure (see definition) or other body of water which constitutes a hazard whether or  not filled with water shall be completely surrounded at all times by a fence or wall not less than four (4) feet in height above grade, which may be the pool wall itself.

4432.  Every such fence or wall shall be so constructed as to not have openings, holes or gaps larger than four (4) inches in any dimension except for doors, gates and picket fences; in the latter case, however, the gaps between pickets shall not exceed four (4) inches.

4433.  All gates or doors opening through such enclosure shall be of not less than four (4) feet in height and shall be equipped with a self-closing and self-latching device located at least four (4) feet above the underlying ground and inaccessible from the outside to small children.  Every

such gate or door shall be kept latched at all times when the swimming pool is not in use, and any ladders removed.

4434.  A natural barrier, hedge, pool cover or other protective device approved by the Building Inspector may be used in lieu of a fence or wall so long as the degree of protection afforded by the substitute device or structure is not less than the protection afforded by the enclosure, gate and latch described herein.

4440.  UNREGISTERED VEHICLES.  No person shall permit more than one unregistered motor vehicle or trailer or major parts thereof, except for farm vehicles, to remain ungaraged on his premises at any time unless under a Class 1 or Class 2 license for sale of motor vehicles (Section 57-69, Chapter 140, General Laws), or unless given written authorization by the Selectmen following an investigation and report thereon by the Board of Health.  Authorization shall be granted only if no hazard to health or safety is involved, and no unsightly condition visible from adjacent property or public ways is created.

4450.  STRUCTURES.

4451.  STRUCTURES-NON-RESIDENTIAL AREAS.  In non-residential areas, no structures (including but not limited to power generation or communication devices) shall be permitted with a height in excess of seventy-five (75) feet, nor shall any such structure be permitted as part of another structure or building with an aggregate height in excess of seventy-five (75) feet.  Structure height is as measured from the ground adjacent to the structure to the highest point of the structure, including any moving parts or whip antennae.

4452.  STRUCTURES RESIDENTIAL AREAS.  In residential areas, no structures (including but not limited to power generation or communication devices) shall be permitted with a height in excess of thirty-five (35) feet, nor shall any such structure be part of a residential structure with an aggregate height in excess of fifty (50) feet.  Holders of valid FCC licenses for 2-way communications of a non-commercial nature shall be permitted structures or aggregate height of a residence plus antenna not to exceed sixty (60) feet.  Structure height is as defined in Section 4451.  In the event of conflict with applicable rules of the FCC, the FCC rules shall apply.

# 4460.  ACCESSORY DWELLING UNITS

Introduction:

Accessory dwelling units (also known as 'accessory apartments', 'in-law apartments', 'family apartments' or 'secondary units') provide units that can be integrated into existing single family neighborhoods to provide alternatives that have little or no negative impact on the character of the neighborhood.  For two-family or multi-family uses refer to section 2300.

4461.  PURPOSE AND INTENT:  THE INTENT OF PERMITTING ACCESSORY DWELLING UNITS IS TO:

1.      Provide older or disabled homeowners with a means of obtaining individual caregiver services, thereby enabling them to stay  more independently in homes and neighborhoods they might otherwise be forced to leave;

48

2.   Develop housing units in single-family neighborhoods that are appropriate for households at a variety of stages in their life cycle.

3.   Protect stability, property values, and preserve the residential character of a neighborhood.

## 4462.  DEFINITIONS:

1.   Accessory Dwelling Unit: An Accessory Dwelling Unit (ADU) is a self-contained housing unit incorporated within a single-family dwelling (not within accessory structures, except with a Special Permit) that is clearly a subordinate part of the single-family dwelling and complies with each of the criteria stated below.

2.   Building, Attached: A building having any portion of one or more walls with more than five feet in common with another building and which contains a common passage between the buildings.

3.   Building, Detached: A building having less than five feet of common walls.

4.   Dwelling, Single-Family: A building designed or used exclusively as a residence and including only one dwelling unit.

5.   Primary Residence: A building in which is conducted the principal use of the lot on which it is located. For residentially zoned lots, such a building would be a dwelling.

## 4463.  PROCEDURAL REQUIREMENTS:

Review procedure: (Refer to section 1200 of this Bylaw)

## 4464. USE AND DIMENSIONAL REGULATIONS:

1.   The Building Commissioner may issue a Building Permit authorizing the installation and use of an attached accessory dwelling unit within an existing or new owner-occupied, single-family dwelling only when the following conditions are met:

   (a)   The unit will be a complete, separate housekeeping unit containing both kitchen and bath.

   (b)   Only one accessory dwelling unit may be created within a single-family dwelling or residential lot.

   (c)   The owner(s) of the residence in which the accessory dwelling unit is created must continue to occupy at least one of the dwelling units as their primary residence, except for bona fide temporary absences.

   (d)   Any new separate outside entrance serving an accessory dwelling unit shall not be allowed, unless a Special Permit is issued by the Zoning Board of Appeals.

   (e)   The gross floor area of an accessory dwelling unit (including any additions) shall not be greater than 50% of the primary dwelling unit or one thousand (1000) square feet, whichever is smaller unless a special permit is issued by the Zoning Board of Appeals allowing a larger gross floor area.

49

(f)     Once an accessory dwelling unit has been added to a single-family residence or lot, the accessory dwelling unit shall never be enlarged beyond the one thousand (1000) square feet allowed by this bylaw/ordinance.

(g)     An accessory dwelling unit structure may be detached from the primary dwelling only by special permit issued by the Zoning Board of Appeals.

(h)     An accessory dwelling unit may not be occupied by more than two (2) people nor have more than two (2) bedrooms, unless a special permit is issued by the Zoning Board of Appeals.

(i)      The construction of any accessory dwelling unit must be in conformity with the State Building Code, Title V of the State Sanitary Code and other local bylaws/ordinances and regulations.

(j)      Off-street parking spaces shall be available for use by the occupant(s).

(k)     An accessory dwelling unit and its primary dwelling unit shall share utility metering.

(l)      An accessory dwelling unit shall be designed to preserve the appearance of the single family dwelling.

(m)    An accessory dwelling unit shall not be held or transferred into a separate ownership from the primary residence either through deed or 'condo' association documents.

(n)     All stairways associated with an accessory dwelling unit leading to an above ground floor shall be enclosed and not visible to the outside.

2.     Approval for an ADU requires that the owner must occupy one of the dwelling units. The zoning approval and the notarized letters required in 4464.3 and 4464.4 below must be recorded in the County Registrar of Deeds or Land Court, as appropriate, in the chain of title to the property, with documentation of the recording provided to the Building Commissioner, prior to the occupancy of the accessory dwelling unit.

3.     Prior to issuance of a permit, the owner(s) must send a notarized letter stating that the owner will occupy one of the dwelling units on the premises as the owner's primary residence, except for bona fide temporary absences.

4.     When a structure, which has received a permit for an accessory dwelling unit, is sold, the new owner(s), if they wish to continue to exercise the Permit, must submit a notarized letter to the Building Commissioner stating that they will occupy one of the dwelling units on the premises as their primary residence, except for bona fide temporary absences.

5.     Prior to issuance of a permit, a floor plan must be submitted showing the proposed interior and exterior changes to the building.

## 4465. ADMINISTRATION AND ENFORCEMENT

1.     It shall be the duty of the Building Commissioner to administer and enforce the provisions of this Bylaw.

2.    The property owner of the dwelling containing the accessory unit shall allow the Building Commissioner to inspect the unit for compliance with this bylaw.

## 4500.  FLOOD PLAIN DISTRICT.  Amended 3/5/1990, Article 74, Amended 6/20/90, Article 12, Deleted 10/21/2013, Article 25)

## 4600.  PLANNED PARCEL DEVELOPMENT. (Amended 9/19/1995, Article 10; Deleted in its entirety 10/17/05, Article 12)

## 4700.  AQUIFER AND WATERSHED PROECTION DISTRICT. (Amended 3/29/1994, Article 42)

4710.  PURPOSE OF DISTRICT.  The purpose of this Aquifer and Watershed Protection District is:

1.    To promote the health, safety and general welfare of the community by promoting an adequate quality and quantity of drinking water for residents, institutions, and businesses of the Town of Westborough;

2.    To preserve and maintain the existing and potential groundwater supplies, aquifers and groundwater recharge areas of the Town and to protect them from adverse development or land use practices;

3.    To preserve and protect present and potential sources of drinking water supply for the public health and safety;

4.    To conserve the natural resources of the Town;

5.    To prevent blight and the temporary or permanent pollution of the environment.

6.    To ensure that only water supply related activities are permitted in the Zone 1 400 foot protective radius of the Town wells (Added 3/12/1996, Article 58)

4720.  SCOPE AND AUTHORITY.  The Aquifer and Watershed Protection District shall be considered as overlaying other Zoning Districts.  This overlay district shall apply to all new construction, reconstruction, or expansion of existing activities or uses permitted in the portion of the District so overlaid shall be permitted, subject to all the provisions of this District, unless expressly prohibited under this overlay District.

4730.  ESTABLISHMENT AND DELINEATION OF AQUIFER AND WATERSHED PROTECTION DISTRICT.  For the purposes of this District, there are hereby established within the Town certain Aquifer and Watershed Protection areas, consisting of aquifer and/or aquifer recharge areas, which are delineated on the overlay map referenced in Section 4732.

4731.  DISTRICT.  The Aquifer and Watershed Protection District includes the aquifer itself, including the land above the most significant recharge areas for these aquifers and consists of:

- Zone I, which includes land within the protective four hundred (400) foot radius around an existing or potential public water supply well or wellfield; and,
- Zone II, which includes that area of an aquifer which contributes water to an existing or potential well under the most severe pumping and recharge conditions that can be realistically anticipated (180 days of pumping at safe yield, with no recharge from

precipitation).  It is bounded by the groundwater divides which result from pumping the well and by the contact of the aquifer with less permeable materials such as till or bedrock.  In some cases, streams or lakes may act as recharge boundaries. In all cases, Zone II shall extend up gradient to its point of intersection with prevailing hydrogeologic boundaries (a groundwater flow divide, a contact with till or bedrock, or a recharge boundary); and,

- Zone III, (Contributing Watershed), which includes that land area beyond the area of Zone II from which surface water and groundwater drain into Zone II.  The surface drainage area as determined by topography is commonly coincident with the groundwater drainage area and is used to delineate Zone III.  In some locations, where surface and groundwater drainage are not coincident, Zone III shall consist of both the surface drainage and the groundwater drainage areas.

4732.  OVERLAY MAP.  The Boundaries of this District are delineated on a map at a scale of one inch equals eight hundred feet entitled Aquifer and Watershed Protection Districts, Town of Westborough, Massachusetts dated January, 2001.  These boundaries reflect the best hydrogeologic information available as of the date of the map.  In the event of a discrepancy between the map and the criteria of Zones I, II and III, above, the criteria shall control. (Amended 3/12/1996, Article 58)

Where the bounds as delineated are in doubt or in dispute, the burden of proof shall be upon the owner(s) of the land in question to show where they should properly be located.  At the request of the owner(s), the Town may engage a professional hydrogeologist or engineer to determine more accurately the location and extent of an aquifer or recharge area or to review information submitted by the owner(s), for all or part of the cost of the investigation.

4733.  SPLIT LOT PROVISIONS.  (Amended 3/17/2001, Article 30)

- Zone I Boundary Line.  Where the Zone I boundary line divides any lot of record, the portion of the lot within Zone I shall remain undeveloped with the exception of the land uses directly related to the operation and maintenance of a public water supply and the uses and regulations pertinent to Zone II shall be applied to the development of the remainder of such lot.
- Zone II Boundary Line.  Where the Zone II District boundary line divides any lot of record, the uses and regulations pertinent to Zone III shall be applied to the development of such lot provided that all structures and waste disposal systems are located in that portion of the lot lying in Zone III.
- Zone III Boundary Line.  Where the Zone III boundary line divides a lot of record in any underlying District, the requirements of the Westborough Zoning Bylaws applicable to the less restrictive District may be applied to the development of such lot, provided that all structures and waste disposal systems are located in that portion of the lot lying in the less restrictive District.

4734.  RECOVERABLE WATER YIELD CRITERIA.  Aquifers and aquifer recharge areas are defined by standard geologic and hydrogeologic investigations which may include drilling observation wells, performing pumping tests, water sampling and geologic mapping.  An aquifer recharge area, to be considered significant for drinking water purposes must generally be comprised of sand and gravel with at least twenty (20) feet of saturated thickness for transmissivity of at least ten thousand five hundred (10,500) gallons per day per foot and/or capable of continuous yield of at least one hundred (100) gallons per minute to a single well.

## 4740.  USE REGULATIONS.

Within the Aquifer and Watershed Protection District, the requirements of the underlying Districts continue to apply as indicated in subsections 4741 and 4742, Use Regulations Schedule, or as exempted by this Bylaw or Statute.

Symbols employed shall mean the following:

Y - A permitted use

N - An excluded or prohibited use

S - A use authorized by the issuance of a Special Permit as provided for in Section 1330 and Section 4750 herein.

## 4741.  PERMITTED USES.  The following uses are permitted within the Aquifer and Watershed Protection district, (provided that all necessary permits, orders, or approvals required by law are also obtained):

- Conservation of soil, water, plants and wildlife;
- Outdoor recreation, native study, boating, fishing, hunting;
- Foot, bicycle and/or horse paths, and bridges;
- Normal operation and maintenance of existing water bodies and dams, splash boards, and other water control, supply and conservation devices;
- Maintenance and repair of existing structures;
- Residential development, subject to Section 4742 (use regulation schedule) and Section 5740 (Special Permits);
- Farming, gardening, nursery, conservation, forestry, harvesting, grazing, subject to 4742 and 4750.
- Construction, maintenance, repair and enlargement of drinking water supply related facilities.

## SECTION 4742.  USE REGULATION SCHEDULE (AMENDED 3/29/1994, ARTICLE 42; AMENDED 3/12/1996, ARTICLE 58; AMENDED 3/17/2001, ARTICLE 30)

District Protection Area

| Principal uses | Zone I | II | III |
|---|---|---|---|
| Disposal or treatment of toxic or hazardous materials or hazardous wastes as a principal activity: | N | N | N |
| Manufacture, use, transport, storage of toxic or hazardous materials or hazardous wastes as a principal activity: | N | N | N |
| Truck terminal: | N | N | S |
| Sanitary landfill, junk yard, open dump, salvage yard, other solid waste disposal: | N | N | N |
| Landfilling of sludge or septage as defined in 310 CMR 32.05 | N | N | S |
| Storage of sludge and septage, unless such storage is in compliance with 310 CMR 32.30 and 310 CMR 32.31; | N | N | S |
| Earth removal to within six (6) feet of high groundwater level, except for excavation for buildings, roads, and utility works: | N | N | S |
| Motor vehicle service, station, car wash: | N | N | S |
| Automobile Service and repair shops, automotive body and paint shops: | N | N | S |
| Disposal of snow from outside District area: | N | N | S |
| Storage of commercial fertilizers and soil conditioners, as defined in MGL c. 128, s. 64, unless such storage is within a structure designated to prevent the generation and escape of contaminated runoff or leachate; | N | N | S |
| Industrial uses which discharge process wastewater on site; any commercial and service uses discharging wastewater on site containing contaminants other than domestic septic waste: | N | N | S |
| Storage of liquid petroleum products, except the following; | | | |
| a. normal household use, outdoor maintenance and heating of a structure: | | | |
| b. waste oil retention facilities required by statute, rule, or regulation; | | | |
| c. emergency generators required by statute, rule or regulation; | | | |
| d. treatment works approved under 314 CMR 5.00 for treatment of ground or surface waters: | | | |
| Provided that storage, listed in items a through d above, is in free-standing containers within buildings or above ground with secondary containment adequate to contain a spill the size of the container's total storage capacity. | N | N | S |
| Storage of deicing chemicals unless such storage, including loading areas, is within a structure designed to prevent the generation and escape of containminated runoff or leacheate; | N | N | S |
| Storage of animal manure unless covered or contained; | N | N | S |
| | | | |
| Accessory Uses or Activities. | | | |
| Disposal or treatment of toxic or hazardous materials as a secondary activity: | N | N | N |
| Manufacture, use, transport, storage of toxic or hazardous materials as a secondary activity. | N | N | S |
| Sanitary landfill, junkyard, open dump, salvage yard, other solid waste disposal: | N | N | S |
| Lanfilling of sludge or septage as defined in 310 CMR 32.05 | N | N | S |
| Storage of sludge and septage, unless such storage is in compliance with 310 CMR 32.30 and 310 CMR 32.31; | N | N | S |
| Storage of liquid petroleum products except the following: | | | |
| a. normal household use, outdoor maintenance, and heating of a structure; | | | |
| b. waste oil retention facilities required by statute, rule, or regulation; | | | |
| c. emergency generators required by statute, rule, or regulation; | | | |
| d. treatment works approved under 314 CMR 5.00 for treatment of ground or surface waters; | | | |
| Provided that storage, listed in items a through d above, is in free-standing containers within buildings or above ground with secondary containment adequate to contain a spill the size of the container's total storage capacity. | N | N | S |
| Underground storage of fuel oil, gasoline or chemicals: | N | N | S |
| Disposal of snow from outside District area: | N | N | S |
| Storage of deicing chemicals unless such storage, including loading areas, is within a structure designed to prevent the generation and escape of contaminated runoff or leachate; | N | N | S |
| Storage of animal manure unless covered or contained; | N | N | S |
| Storage of commercial fertilizers and soil conditioners, as defined in MGL c. 128 s.64, unless such storage is within a structure designated to prevent the generation and escape of containminated runoff or leachate. | N | N | S |
| Land uses that result in impervious surfaces of more than15% or 2,500 square feet, whichever is greater, of any lot unless a means for providing ground water recharge of runoff is provided. Land uses on residential lots where impervious surfaces drain to pervious areas on the same lot do not require special permits in Zone II. | N | SP | Y |

4750.  Special Permits shall be granted if the Special Permit Granting Authority determines that the intent of this Bylaw, as well as the specific criteria of Sections 4751 through 4753 are met. The Special Permit Granting Authority shall be the Zoning Board of Appeals, except that, where a Special Permit is required by Section 2300 (Use Regulation Schedule), the Special Permit Granting Authority authorized by that Section shall also be the Special Permit Granting Authority for the Special Permit required herein.  In making such determination, the Special Permit Granting Authority shall give consideration to the simplicity, reliability and feasibility of the control measures proposed and the degree of threat to surface and groundwater  quality which would result if the control measures were to fail.  The Special Permit granting authority shall not grant a Special Permit under this section unless the application includes, in the Special Permit granting authority's opinion, sufficiently detailed, definite, and credible information to support positive findings in relation to the criteria given in this section.

## 4751.  SPECIAL PERMIT APPLICATION.

1.      Each application for a Special Permit shall be filed with the Special Permit Granting Authority and shall be accompanied by nine (9) copies of the plan and documents;

2.      Said application and plan shall be prepared in accordance with the data requirements of the proposed development (e.g., Site Plan Review, Erosion and Sedimentation Control Plan, etc.);

3.      The following documents shall also be submitted in applying for a Special Permit:

    a.      A complete list of all chemicals, pesticides, herbicides, fertilizers, fuels, and other potentially toxic or hazardous materials to be used or stored on the premises in quantities greater than those associated with normal household use.

    b.      A description of potentially toxic or hazardous wastes to be generated, indicating storage and disposal method.

    c.      For those activities using, storing, or generating such hazardous materials, an Aquifer Protection Management Plan shall be prepared and filed with the Board of Health, Building Department and Fire Chief.

    The Plan shall include:

    - Provisions to protect against the discharge of hazardous materials or wastes to the environment due to spillage, accidental damage, corrosion, leakage, or vandalism, including spill containment and clean-up procedures;
    - Provisions for indoor, secured storage of hazardous materials and waste with impervious floor surfaces;
    - Evidence of compliance with the Regulations of the Massachusetts Hazardous Waste Management Act 310 CMR 30.00, including obtaining an EPA identification number from the Massachusetts Department of Environmental Protection.

    d.      Evidence of approval by the Massachusetts Department of Environmental Protection (DEP) for any industrial waste treatment and disposal system or any wastewater treatment system over fifteen thousand (15,000) gallons per day capacity as regulated by 314 CMR 5.00 Massachusetts Groundwater Discharge Permit Program.

e.    For underground storage of toxic or hazardous materials, evidence of qualified professional supervision of system design and installation.

f.    Analysis by a hydrogeologist or engineer experienced in groundwater evaluation and/or hydrogeology to demonstrate that the proposed activity will not be detrimental to the purpose of the District as set forth in Section 4710.

g.    Proposed and/or existing down-gradient location(s) for groundwater monitoring well(s) should the special permit granting authority deem the proposed activity a potential groundwater threat, together with a monitoring schedule.

## 4752.  PROCEDURES.

The Special Permit Granting Authority shall refer copies of the application to the Board of Health, Planning Board, Board of Selectmen, Building Department, Conservation Commission, Town Engineer, Department of Public Works and Fire Department which shall review, either jointly or separately, the application and shall submit their recommendations to the Special Permit Granting Authority.  Failure to make recommendations within thirty-five (35) days of the referral of the application shall be deemed lack of opposition.

The Special Permit Granting Authority shall hold a hearing, in conformity with the provisions of Massachusetts General Laws Chapter 40A, Section 9 within sixty-five (65) days after the filing of the application with the Special Permit Granting Authority and after the review of the aforementioned Town Boards/Departments.

Notice of Public Hearing shall be given by publication and posting and by first-class mailings to "parties of interest" as defined in Massachusetts General Laws Chapter 40A, Section 11.  The decision of the Special Permit Granting Authority and any extension, modifications or renewal thereof, shall be filed with the Special Permit Granting Authority and Town Clerk within ninety (90) days following the closing of the Public Hearing. Failure of the Special Permit Granting Authority to act within ninety (90) days shall be deemed as a granting of the Permit.  However, no work shall commence until a certification is recorded as required by said Section 11.

## 4753.  APPROVAL CRITERIA.  After notice and Public Hearing, and after due consideration of the reports and recommendations of the Planning Board, the Board of Health, the Conservation Commission, Board of Selectmen, Building Department, the Town Engineer, Department of Public Works and Fire Department, the Special Permit Granting Authority may grant such a Special Permit, only upon finding that the proposed use:

1.    Will not cause groundwater quality to fall below the standards established in 314 CMR 6.00 Massachusetts Groundwater Quality Standards or for parameters where no standard exists, below standards established by the Board of Health and, where existing groundwater quality is already below those standards, upon determination that the proposed activity will result in no further degradation;

2.    Is in harmony with the purpose and intent of this Bylaw and will promote the purposes of the Aquifer and Watershed Protection District;

3.    Will not, during construction or thereafter, have an adverse environmental impact on any aquifer or recharge area in the Town and is designed to avoid substantial disturbance of the soils, topography, drainage, vegetation and other water related natural characteristic of the site to be developed; and,

4.    Will not adversely affect the quality or quantity of an existing or potential water supply.

4760.  VIOLATIONS.  Written notice of any violation shall be provided by the Building Commissioner to the owner of the premises, specifying the nature of the violation and specifying a time for compliance, including cleanup of any spilled materials.  The time allowed shall be reasonable in relation to the public health hazard involved and the difficulty of compliance, but in no event shall more than thirty (30) days be allowed for either compliance or finalizing of the plan for longer-term compliance.  The cost of containment, clean-up or other action of compliance shall be borne by the owner and operator of the premises. (Amended 5/14/2011, Article 19)

NOTE:  The Town voted (at the March, 1986 Annual Town Meeting) to adopt a plan entitled "Aquifer and Watershed Protection Districts, Town of Westborough, Massachusetts", dated January 10, 1986, which plan is on file in the Office of the Town Clerk.

4800.  SPECIAL PERMITS FOR ADULT USES. (Section 4800 Deleted 6/20/1990, Article 11, Added 3/12/1996, Article 66)

A.    Purpose and Intent:

This bylaw is enacted pursuant to MGL, Chapter 40A, Section 9A to serve the compelling Town interests of preventing the clustering and concentration of adult entertainment enterprises as defined herein because of the deleterious effect on adjacent areas and in response to studies demonstrating their effect on generating crime and blight.

B.    General:

Special permits shall be required to authorize the establishment of adult bookstores, adult video stores, adult paraphernalia, adult live entertainment establishments or adult motion picture theaters or establishments which display live nudity for its patrons as hereinafter defined.  Such permit shall require specific improvements, amenities and locations of proposed use for which such permit may be granted. (Amended 11/18/1996, Article 13)

4810.  DEFINITIONS – As used in this section, the following words shall have the following meanings:

Adult Book Store – An establishment having as a substantial or significant portion of its stock in trade, books, magazines, and other matter which are distinguished or characterized by their emphasis sexual depicting, describing, or relating to sexual conduct or excitement as defined in MGL, Chapter 272, Section 31.  For purposes herein, "substantial or significant portion of stock" shall mean more than twenty-five percent (25%) of the subject establishment's inventory or more than twenty-five percent (25%) of the subject premise's gross floor area.

Adult Motion Picture Theater – An enclosed building used for presenting material distinguished by an emphasis on matter depicting, describing or relating to sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31.

Adult Paraphernalia Store – An establishment having as a substantial or significant portion of its stock devices, objects, tools, or toys which are distinguished or characterized by their association with sexual activity, including sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31.  For purposes herein, "Substantial or significant portion of stock"

57

shall mean more than twenty-five percent (25%) of the subject establishment's inventory or more than twenty-five percent (25%) of the subject premise's gross floor area.

Adult Video Store – An establishment having as a substantial or significant portion of its stock in trade, videos, movies, or other film material which are distinguished or characterized by their emphasis depicting, describing, or relating to sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31.  For purposes herein, "Substantial or significant portion of stock" shall mean more than twenty-five percent (25%) of the subject establishment's inventory or more than twenty-five percent (25%) of the subject premise's gross floor area.

Adult Live Entertainment Establishment – Any establishment which displays live entertainment which is distinguished or characterized by its emphasis depicting, describing or related to sexual conduct or sexual excitement as defined in MGL, Chapter 272, Section 31 and which excludes minors by virtue of age.

Establishment Which Displays Nudity For Its Patrons – Any establishment which provides Live entertainment for its patrons which includes nudity, as that term is defined in M.G.L. Ch. 272, Sec. 31. (Added 11/18/1996, Article 13)

## 4820.  RULES AND APPLICATION REQUIREMENTS.

4821.

The special permit granting authority, the Westborough Planning Board, shall adopt and from time to time amend rules relative to the issuance of the permits, and shall file a copy of said rules in the office of the Town Clerk.

4822.

No special permit shall be granted by the Planning Board for an Adult Bookstore, Adult Video Store, Adult Paraphernalia Store, Adult Motion Picture Theater or Adult Live Entertainment Establishment unless the following conditions are satisfied:

A.    When submitting a proposal for a special permit under Section 4800 of these bylaws, the applicant shall obtain a copy of the application and procedures from the Westborough Planning Board, the permit granting authority.  The applicant shall file one copy of the application with the Town Clerk and deliver a second, date stamped copy of the application from to the office of the Planning Board.  All applications shall be accompanied by fifteen copies of the permit applied for.  Special Permits issued by a special permit granting authority shall require a two thirds vote of boards with more than five members, a vote of at least four members of a five member board and a unanimous vote of a three member board.

B.    Dimensional Requirements:

The proposed use shall observe the following minimum distance separations from all property lines of the proposed adult uses:

1.    A minimum of one thousand (1000) feet from any residential district designated by Westborough zoning bylaws;

58

2. A minimum of one thousand (1000) feet from any public school, public library, daycare facility, or religious facility;

3. A minimum of five hundred (500) feet from any public playground, park, or recreational area where large numbers of minors regularly travel or congregate;

4. A minimum of one thousand (1000) feet from any other adult bookstore, adult video store, adult paraphernalia store, adult entertainment establishment, or adult motion picture theater or from any establishment licensed under the provision of MGL, Chapter 138, Section 12.

C. No pictures, publications, videotapes, movies, covers, or other implements, items, or advertising that fall within the definition of adult bookstore, adult video store, adult paraphernalia store, adult motion picture theater or adult live entertainment establishment merchandise or which are erotic, prurient, or related to violence, sadism, or sexual exploitation shall be displayed in the windows of,  or on the building of any adult bookstore, adult video store, adult paraphernalia store, adult live entertainment establishment or adult motion picture theater, or be visible to the public from the pedestrian sidewalks or walkways or from other areas, public or semi-public, outside such establishments.

D. No special permit shall be issued to any person convicted of violating the provisions of MGL, Chapter 119, Section 63 or MGL, Chapter 272, Section 28.

E. Adult use special permits shall only be issued following public hearings held within sixty-five (65) days after filing of an application with the special permit granting authority, a copy of which shall forthwith be given to the city or town clerk by the applicant.  The special permit granting authority shall act within ninety (90) days following a public hearing for which notice has been given by publication or posting as provided in MGL, Chapter 40A, Section 11, and by mailing to all parties in interest.  Failure by a special permit granting authority to take final action upon an application for a special permit within said ninety (90) days following the date of public hearing shall be deemed to be a grant of the permit applied for.  Special Permits issued by a special permit granting authority shall require a two-thirds vote of boards with more than five members, a vote of at least four members of a five member board and a unanimous vote of a three member board.

4823.  A special permit granted under this bylaw shall lapse after six months, and including such time required to pursue or await the determination of an appeal referred to in MGL, Chapter 40A, Section 17, from the grant thereof, if a substantial use thereof has not sooner commenced except for a good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause.

4824.  EXISTING ADULT ENTERTAINMENT ENTERPRISES. (Amended 11/18/1996, Article 13)

Any existing adult bookstore, adult motion picture theater, adult paraphernalia store, adult video store or establishment which displays live nudity for its patrons or adult video store shall apply for such permit with ninety (90) days following the adoption of this zoning bylaw.

4830.  SEVERABILITY.

If any section of this bylaw is ruled invalid by a court of competent jurisdiction, such ruling will not affect the validity of the remainder of the bylaw.

## 4900. DOWNTOWN PLANNING OVERLAY DISTRICT (DPOD) (Added 3/13/2004, Article 38)

4910. PURPOSE. The intent of this Downtown Planning Overlay District, which hereafter may be referred to as DPOD, is to permit greater flexibility and more creative and imaginative design for the development of retail, office, restaurant, residential and open space than is generally possible under conventional zoning provisions. It is further intended to promote and facilitate redevelopment of certain portions of downtown Westborough while providing a harmonious variety of uses, a higher level of amenities, a stimulus to the economic development of the community and providing vitality to the downtown area.

4920. SCOPE AND AUTHORITY. When land within the DPOD area has been approved by action of Town meeting as having a DPOD classification, it may then be developed or redeveloped by the owner either in accord with the underlying zoning district, or in accord with this DPOD Bylaw, at the election of the owner. If an owner, or applicant acting upon permission from the owner, elects to proceed under this bylaw, this Overlay District shall apply to all new construction, reconstruction or expansion of existing buildings and new or expanded uses. When an owner elects to have a Special Permit application considered under the DPOD, the underlying zone remains in place and may always be used as the basis of the new application, even if a Special Permit has been granted under a DPOD. (Amended 10/18/04, Article 8)

## 4930. ESTABLISHMENT AND DELINEATION OF DOWNTOWN PLANNING OVERLAY DISTRICT.

For the purposes of this Bylaw, there is hereby established a Downtown Planning Overlay District (DPOD). This DPOD shall be only within twenty-five hundred (2,500) feet of the inter-section of the centerline of Milk, Main and South Streets. Land in the DPOD area may be considered for classification as a DPOD at Town Meeting only if, at the time of the filing of the Warrant, the underlying zone classification of the land is Non-Residential. (Amended 10/18/04, Article 8)

4931. OVERLAY MAP. No property may be the subject of a Special Permit Application hereunder unless it has been designated, by 2/3 vote at Town Meeting, as having a DPOD zoning classification (In addition to its underlying Zoning). The classification of properties as a DPOD shall be indicated on the official Zoning map of the Town of Westborough. (Amended 10/18/04, Article 8)

4940. PERMITTED USES. Only land with the DPOD classification may be subject of a Special Permit Application under this Bylaw. Each parcel developed within the DPOD shall be designated by the owner either according to the existing underlying Zoning District or Mixed Use by Special Permit. In any Mixed Use development, no building or other structure shall be erected, altered or used and no land shall be used or occupied for any purpose except under a Special Permit issued by the Planning Board in accordance with the provisions and requirements of this Section and the rules and regulations of the Planning Board. (Amended 10/18/04, Article 8)

4950. RULES AND REGULATIONS. The Planning Board shall establish, after a Public Hearing, Rules and Regulations concerning the procedures for and content of an application for

new building or change of use in a Downtown Planning Overlay District.  The Planning Board shall require a filing fee as part of the application, the amount of which shall be prescribed in the Downtown Planning Overlay District Rules and Regulations.  The Downtown Planning Overlay District Rules and Regulations shall be effective on the date the Planning Board files them with the Town Clerk.

## 4951.  PUBLIC HEARING AND APPROVAL.

A public hearing shall be required on any Downtown Planning Overlay District Building or Change of Use before any final action can be taken by the Planning Board on the application. The timing of and form of notice of the hearing shall be as prescribed in Massachusetts General Laws, Ch. 40A, §11 for Special Permits.  After the Public Hearing, the Planning Board shall consider the development for a Special Permit.  In its consideration the Planning Board shall determine whether the application meets the purpose of Section 1100, and of the Downtown Planning Overlay District regulations.  The Planning Board shall specifically determine whether the development will contribute to the orderly and harmonious development of the Downtown Planning Overlay District Area and is consistent with the character of the neighborhood.  The Board may recommend that the developer modify, alter, adjust or amend the development and may recommend such reasonable additional conditions as the Planning Board deems necessary.

## 4952.  DENSITY REQUIREMENTS.

Within the Downtown Planning Overlay District, building lots shall be established by the applicants subject to approval of the Planning Board.

## 4953.  MULTIPLE BUILDINGS.

Notwithstanding §2540 of this Bylaw, multiple buildings may be allowed on a lot in a Mixed Use project by Special Permit issued by the Planning Board.

## 4954.  SIGNAGE.

Notwithstanding Section 3300 of this Bylaw, multiple signs may be allowed on a lot or building in a Mixed Use project by Special Permit issued by the Planning Board.  The number, size and locations of signs shall be based on the nature, size, architecture and location of each building or portion thereof.

## 4955.  AFFORDABLE HOUSING

Mixed-use projects proposed in the Downtown Planning Overlay District shall be required to provide an affordable housing component for all projects containing a residential component. A minimum of 20% of the residential units shall be designated affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

Mixed-use projects containing residential components shall be expected to meet the 20% minimum number of affordable units provided herein. The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10% provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority. (Added 3/17/2018, Article 30)

## 4960.  SITE PLAN APPROVAL OF A DOWNTOWN PLANNING OVERLAY DISTRICT.

A Downtown Planning Overlay District Development, as herein permitted, shall be made only pursuant to a Site Plan Submission. Within a DPOD, the Board of Selectmen shall approve the Site Plan. All requirements as outlined in the Westborough Zoning Bylaws, Sections 1240 through 1245, shall apply.

The Site Plan Submission documentation shall be appropriate to the proposed project to show and convey the level of detail required for review by the Board of Selectmen and shall show at a minimum:

1.  Topography and  grades both existing and proposed for the site and its relation to surrounding areas

2.  Proposed plan and cross sections of all street systems and pedestrian walkways and their relationship to the overall project.

3.  Proposed preliminary layout and routing of storm and sanitary sewer systems, water supply, fire protection and power and communications services.

4.  Proposed lot(s), their layout and areas.

5.  Proposed areas of the site reserved for parks, parkways, playgrounds and other private or public open spaces and their location, use, areas and access.

6.  Proposed location of all buildings, their proposed use, size and height and related parking facilities.

7.  Tabulation of the total number of acres in the proposed project and, if applicable,  the percentage thereof designated for each proposed building and use and related off-street parking, streets, parks and other uses;

8.  Tabulation of all buildings and uses and the over-all and per lot coverage and density (Floor Area Ratio).

9.  Preliminary plans and elevations of the major buildings, their use, location and floor areas.

10.  Environmental issues and mitigation measures if any.

11.  Any other items that may be required by the Board of Selectmen.

## 5000.  TRANSIT-ORIENTED VILLAGE BY SPECIAL PERMIT IN INDUSTRIAL C ZONE. (Added 10/18/04, Article 10)

**5010.  PURPOSE.**  The purpose of this Transit-Oriented Village (T-OV) by Special Permit By-law is to:

a.    encourage the development of new "village oriented" transit development on appropriate properties, now zoned for industrial use, proximate to commercial areas, services and/or public transportation,

b.    foster the development of smaller living units, which by virtue of their size will be more affordable than larger single-family homes.

c.    provide additional housing units which meet the official State definition of affordability.

d.    contribute to the Town's efforts to preserve Open Space.

e.    create realistic incentives that will bring about the re-development of properties that are currently underutilized or on which there are outdated or unattractive non-residential structures.

**5020.  APPLICABILITY.** In any zoning district in which Transit-Oriented Village ("T-OV") is allowed, such use shall be by way of Special Permit issued by the Planning Board and subject to the requirements of this Section 5000.  TOV shall be allowed by Special Permit from the Planning Board in the following zones:

Industrial C (Mixed Use Industrial)

**5030.  MIXED USES.** Development under this By-law may include a mixture of uses, combining those already allowed in the zone and those multi-family housing uses allowed by Special Permit pursuant to this By-law.  The Planning Board shall have broad discretion in determining which uses are compatible and the degree to which various non-residential uses may be mixed with the multi-family housing proposed for a particular site. However, no building shall have industrial uses in the same building as residential uses.

**5040.  REVIEW REQUIREMENTS.**  All applications for a Special Permit under this T-OV regulation shall be subject to design review by the Design Review Board in accordance with Section 1200 of these By-laws, and Site Plan Review, as prescribed in Section 1200 of these By-laws.  These hearings may be combined at the option of the reviewing boards.

**5050.  GENERAL STANDARDS.**  All applications must meet all applicable dimensional, density, design, drainage, safety, parking, signage, lighting, and other land use standards and regulations set forth in these By-laws for the underlined zone, except for those standards that are specifically modified by the Planning Board in its review of the Special Permit application.  In taking action on a T-OV Special Permit application, the Planning Board may wave and or modify such standards, including dimensional standards, upon a finding that to do so will further the purposes listed above without having a detrimental effect on the health, safety and general welfare of the Town's residents and the public.  The Planning Board shall enjoy broad discretion to deny applications, to the extent that the proposed development is found to contain negative attributes which the Planning Board concludes outweigh the positive contribution to the

purposes outlined above. The Planning Board may also approve a Special Permit application under this By-law with reasonable conditions, in keeping with its Special Permit powers.

5060.  DIMENSIONAL REQUIREMENTS.  Except to the extent specifically modified below, all dimensional requirements of the zone shall apply to any T-OV development.  However, the Planning Board may, in accordance with the above paragraph on General Standards 5050, modify the dimensional requirements of the zone or the following special dimensional requirements upon a finding that such modification furthers the purposes of this By-law without detrimental effect.

A.     Special Dimensional Requirements of T-OV:

| # | | |
|---|---|---|
| 1. | Min. lot area (sf) | 10,000 |
| 2. | Min. lot frontage (ft) | 90 |
| 3. | Min. front yard (ft) | 25 [4] |
| 4. | Min. side yard (ft) | 15 [1][4] |
| 5. | Min. rear yard (ft) | 25 [4] |
| 6. | Max. bldg height (ft)/stories | 60/4* [2] |
| 7. | Max. lot coverage (%) | 60 |
| 8. | Max. floor area ratio (FAR) (both res. and non-res.) | 1.2 |
| 9. | Max. building size (sf) | 20,000 |
| 10. | Min. separation of buildings on same lot | 20 |
| 11. | Min. open space (%) | 40 |
| 12. | Base living units per acre | 4 [6] |
| 13. | Maximum units per acre | 14 |
| 14. | Min. habitable floor area per d.u. (sf) | 600 (studio) 750 (1-bdrm) 900 (2-3 bdrm) |
| 15. | Max. number of units with more than 2 bedrooms (%) | 20 |
| 16. | Min. number of affordable units (%) | 20 [3] |
| 17. | In mixed use structures, maximum non-residential floor area ratio | 0.3 |

* Except only 2.5 stories and 35 feet within 100 feet of a recognized watercourse (pond, reservoir, river, etc.), or within 2,500 feet of the rotary in the center of Town or where property under consideration is adjacent to a residential district.

B.     Notes to Dimensional Requirements

1.     It is specifically noted that side yard setbacks may be reduced to zero in cases where the Planning Board determines that joined buildings add to the "village center" atmosphere that is envisioned by this By-law.

2.     Where the Planning Board finds merit, it may allow taller structures where lot coverage on the development parcel is correspondingly reduced.  For example, assuming all others features and characteristics of a Special Permit application comply with this regulation, a four story structure would be allowed with a maximum coverage of 60%. The proponent might suggest an 8-story building with a coverage of 30% (50% increase in allowed height and 50% decrease in coverage).

3.     The minimum of 20% of the units that are to be designated affordable must comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency.  Such units shall have deed restrictions regarding

affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

4.     A 75-foot buffer strip shall be maintained where abutting a Residential District; thirty feet of this to remain undisturbed, except for the planting of additional natural vegetative screening.

5.     No floor of a dwelling unit, except for unoccupied basements, shall be below grade of the adjoining ground at any place on its perimeter.

6.     See Section 9 F below, Density Bonus for Preservation for Open Space by the use of Transfer of Development Rights.

5070.  APPLICATION.  An application for a Special Permit for T-OV shall be submitted to the Planning Board on forms furnished by the Planning Board, accompanied by the filing fee and the information, data and plans required in the Administration and Procedure Section of these By-Laws for other Special Permit applications, or as otherwise determined by the Planning Board.  The Planning Board shall promulgate its own application requirements for the T-OV Special Permits.

5080.  ACTION ON APPLICATION.  The Planning Board, the Design Review Board, and other governmental agencies which are, by these By-laws, given review jurisdiction over applications under this T-OV By-law, shall process and take action on such applications as prescribed for each review board by zoning, other local by-laws or regulations, state statute or regulation.  The Design Review Board shall promulgate its own review standards for T-OV which shall be stated in the Design Review Board Guidelines.

5090.  DENSITY BONUS FOR THE PRESERVATION OF OPEN SPACE.  Recognizing that one of the purposes of this By-law is the preservation of open space, the transfer of development rights ("TDR") to parcels that are the subject of a Special Permit application under this By-law is allowed as follows:

A.     The parcel or parcels to be preserved as Open Space through a TDR shall be referred to as the "Sending Parcel(s)", while the parcel(s) on which the Transit-Oriented Village is proposed under this By-law shall be referred to as the "Receiving Parcel(s)".

B.     Sending and Receiving Parcels do not have to be contiguous or under common ownership, so long as each Sending Parcel is made part of an application for a Special Permit under this By-law.

C.     The Sending Parcel(s) shall provide a legal description (deed) and the Town's GIS description of the property.  Such description shall show property boundaries, area in acres or square feet, wetlands and wetlands setback lines, rivers protection setbacks, flood plain areas, topographical lines and other features and conditions normally included in an existing conditions survey.  The applicant need not show that the land is capable of sustaining septic systems, or provide any geological or soils data.  Once the sending parcel is accepted by the Planning Board, the applicant shall provide a field survey of the parcel by a licensed surveyor.

D.    In order to qualify as a Sending Parcel, the Planning Board in consultation the Open Space Preservation Committee must make a finding that the land to be preserved as Open Space: (1) has unique and/or valuable natural or physical attributes, or (2) that there exists a valid planning reason to preserve the land as Open Space, or (3) that the land is substantially developable, and that the Town would benefit more from the land's permanent preservation as Open Space than from its development.

E.    The applicant must present a plan to treat the sending parcel as preserved Open Space in one of the manners prescribed in Article 4350 of these By-laws, entitled: "Common Open Space Ownership and Management". Upon approval of a T-OV Special Permit, the ownership and management plan for the Open Space must be implemented, and the deed to the property sufficiently restricted, to accomplish the complete and permanent severance of development rights therefrom.

F.    For every acre of preserved land in a Sending Parcel that is in the Single Residence Zone, the Special Permit applicant shall be entitled to a bonus of 10 additional units in the multi-family project. For every acre of preserved land in a Sending Parcel that is in a zone other than the Single Residence Zone, the Special Permit applicant shall be entitled to a bonus of 5 additional units in the multi-family project. However, such density bonuses are usable only to the extent that the proposed project, with the added units, in the discretion of the Planning Board, continues to meet all other requirements of these By-laws including satisfying the goals stated in the Purpose Section herein.

G.    For example, if a parcel in the Industrial C Zone that is the subject of an application under this Transit-Oriented Village By-law meets all requirements for a total of 40 units (4 base units per acre on a 10-acre parcel) and the applicant is preserving 10 acres of acceptable land in the Single Residence Zone, the total possible units in the multi-family housing project would be 140 units (40 base units, 100 bonus units). This assumes that the 140-unit project still meets all requirements of this By-law, including those which are discretionary on the part of the Planning Board.

H.    In the event that a transfer of a partial acre of land from a Sending Parcel, or any other calculation, results in a number of bonus units, or total units per acre, which is a fraction, the total shall be rounded down to the previous whole number.

I.    In approving a T-OV, the Planning Board shall have the power and authority to condition the Special Permit on the fulfillment of reasonable improvements to or near the Sending Parcel, as well as its traditional authority to impose conditions on and near the site to be developed. For example, the Planning Board might condition a T-OV Special Permit on the installation of a certain number of parking spaces on the Sending Parcel to facilitate the Town's use and enjoyment of the preserved land.

## 5091.  SPECIFIC SITE AND CONSTRUCTION STANDARDS.

Unless modified in accordance with the above paragraph on General Standards, the following specific site and construction standards shall be observed in the development of a T-OV project as stated in the T-OV Architectural Guidelines applied by the Design Review Board.

A.    Architectural Standards:

Design characteristics shall be stated in the Special Permit application and shall include, but shall not be limited to: architectural design, building materials, massing, scale, color, roofline,

street furniture, site and building landscaping, lighting and signage as stated in the Architectural Guidelines available from and administered by the Design Review Board.

B.      Roadways/Pedestrian Access

Where intended for dedication and acceptance by the Town, the principal roadway(s) serving the site shall be designed to conform to the standards of the Subdivision Regulations and any other relevant standards of the Town unless otherwise required by the Planning Board Private ways shall be adequate for intended vehicular, including public safety vehicle access, and pedestrian traffic and shall be maintained by an association of unit owners or by the applicant. It is intended that a sidewalk network will be provided throughout the T-OV area that interconnects all dwelling units with other dwelling units, non-residential uses, common open spaces, parking areas, transportation centers and major activity areas adjacent to the zone in which T-OV is permitted.  The Planning Board may require construction of on-site or off-site sidewalks, footpaths or bicycle paths.  Access to off-site areas is required, particularly to permit safe and convenient pedestrian and/or bicycle access to nearby amenities.

## 5092.  AREA CONCEPT PLAN REQUIREMENT

A.      Each Special Permit application filed under this By-law, shall be accompanied by an updated Area Concept Plan ("ACP") covering all properties which are partially or completely within 300 feet of any property line of the site on which the applicant proposes to place a T-OV project.  The ACP does not need to include any land outside the underlying zone in which T-OV is allowed by Special Permit.

B.      The Area Concept Plan (ACP) is not binding on any party, and does not need to meet the technical requirements of a Special Permit application.  The ACP shall show a plan in scale of all existing buildings, as well as all parking lots, streets, sidewalks, bike paths, and other existing conditions in the area covered by the ACP.

C.      The applicant shall show on the Area Concept Plan (ACP) any changes to surrounding properties that it suggests might be made in the future so as to best integrate the applicant's proposed T-OV into the area around the site.  For example, if the applicant's site is within walking distance of, but not adjacent to, an amenity, such as a park, parking lot, watercourse, transportation hub, or local shops, and if the goals of this By-law would be furthered by connecting pathways, streets or other alterations to nearby properties, these should be shown on the ACP.  The applicant need not have the permission of the owner of such nearby property to complete the ACP. However, if the Planning Board, in the course of its review and action on a Special Permit application hereunder, determines that such alteration on a nearby property would greatly enhance the application and further the goals of this By-law, the Planning Board may require that the applicant make a good faith effort to procure such permission.  A failure to obtain permission from such neighboring property owner shall not, however, be the sole basis of denying the application.

D.      If the applicant suggests changes to neighboring properties, it shall also provide renderings or elevations showing the modifications and the "tie-ins" to the applicant's site.

E.    The applicant shall take into consideration any Area Concept Plans (ACP) that has been done by a previous applicant which covers all or part of the area to be covered by the new ACP.

F.    The purpose of the Area Concept Plan (ACP) requirement of this By-law is to encourage the greatest possible integration of the proposed new T-OV project into the surrounding area, recognizing the "village" character that is the objective of this By-law.

## 5100.  GATEWAY 2 DISTRICT  (Added 5/14/05, Article 41)

5110.  PURPOSE.  The portion of East Main Street from Lyman Street to Water Street, herein referred to as Gateway 2, contains a mix of land uses including single family residences, small professional offices, and other commercial uses.  The intent of this Gateway 2 District, is to permit more creative and imaginative design for development in the District.  It will also serve to retain East Main Street's aesthetically pleasing elements and relatively unobtrusive buildings and parking areas.  It is intended to allow for redevelopment and a limited amount of new development without significantly altering the areas character or introducing large amounts of new traffic.

5120.  SCOPE AND AUTHORITY.  The Gateway 2 Regulations shall apply to all new construction, reconstruction or expansion of existing buildings and new or expanded uses.

5130.  ESTABLISHMENT AND DELINEATION OF GATEWAY 2 DISTRICT.  For the purposes of this District, there is hereby established a Gateway 2 District area. Gateway 2 shall consist of those areas delineated on a map and approved at Town Meeting.

5140.  PERMITTED USES.  Each parcel developed within the Gateway 2 shall be approved by Special Permit.  No building or other structure shall be erected, altered or used and no land shall be used or occupied for any purpose except under a Special Permit issued by the Planning Board in accordance with the provisions and requirements of this Section and the rules and regulations of the Planning Board governing Special Permits.

5150.  RULES AND REGULATIONS.  The Planning Board Rules and Regulations governing Special Permits shall apply.  The Planning Board shall require a filing fee as part of the Special Permit application, the amount of which shall be prescribed in the Gateway 2 Special Permit application.

5151.  PUBLIC HEARING AND APPROVAL.  A public hearing shall be required on any Gateway 2 District Building or Change of Use before any final action can be taken by the Planning Board on the application.  The timing of and form of notice of the hearing shall be as prescribed in Massachusetts General Laws, c. 40A, §11 for Special Permits.  After the Public Hearing, the Planning Board shall consider the development for a Special Permit.  In its consideration the Planning Board shall determine whether the application meets the purpose of Sections 5100 and 1100, and of the Gateway 2 District regulations.  The Planning Board shall specifically determine whether the development will contribute to the orderly and harmonious development of the Gateway 2 District and is consistent with the character of the neighborhood. The Board may recommend that the developer modify, alter, adjust or amend the development and may recommend such reasonable additional conditions as the Planning Board deems necessary.

5152.  DESIGN REVIEW REQUIREMENTS.  Design Review Board review and recommendations shall be required as prescribed in Section 1245 of these bylaws.

## 5153.  AFFORDABLE HOUSING

Proposals in the Gateway 2 District that contain a multi-family residential component shall be required to provide an affordable housing percentage.  A minimum of 20% of the residential units shall be designated affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

Projects containing multi-family residential components shall be expected to meet the 20% minimum number of affordable units provided herein.  The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10% provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority. (Added 3/18/2018, Article 31)

## 5200.  MULTI-FAMILY HOUSING IN THE HIGHWAY BUSINESS DISTRICT.
(Added 5/13/2006, Article 30; Amended 10/15/2018, Article 36)

5210.  PURPOSE.  The Highway business district encompasses the majority of land fronting on Route 9 lying west of Connector Road.  The area is highlighted by a series of strip centers, restaurants and other non-residential uses, but residential development is not contained in the mix.  The Westborough Master Plan dated May 2003 identifies a perceived, but unrealized provision for multi-family housing.  Smaller housing units available at prices available to a wider range of family types and incomes is lacking in Westborough.  The purpose of the Multi-family Special Permit in the BA district is to allow residential units to be incorporated to the mix of uses in the highway business district, where residents could benefit from proximity to shopping and services, while maintaining an appropriate mix and scale of development.

5220.  SCOPE AND AUTHORITY.  The Multi-family housing Special Permit is an optional additional use and does not replace, but rather supplements, the uses allowed in the BA district. The Planning Board shall be the Special Permit Granting Authority for any project submitted in accordance with this Section and shall have the authority to approve a project upon grant of a Special Permit in accordance with Section 1300, Site Plan Review in accordance with Section 1240 and further upon a finding that the intent of Sections 1100 and 5200 have been met.  The Planning Board may vary the dimensional and parking requirements of this section, or as noted in Section 2620 dimensional requirements, if, in its opinion, such change will result in a more desirable design of the development than could otherwise be developed without variation of the dimensional or parking requirement.  This authority continues subsequent to occupancy.

5230.  ESTABLISHMENT OF DISTRICT.  The Multi-family housing Special Permit applies to all property within the Highway Business (BA) zoning district as an optional, alternate form of

development where certain criteria specified within this Section 5200 can be satisfied.  Multi-family housing may only be permitted on a parcel(s) of land that can and will be accessed by roadways other than Route 9.

5240.  PERMITTED USES.  Uses shall be permitted as indicated in Section 2300 Use Schedule under the column BA, including multi-family dwellings in accordance with this Section 5200.

5250.  RULES AND REGULATIONS.  The Planning Board may from time to time establish Rules and Regulations governing Special Permits under this section.  The Planning Board shall require a filing fee as a part of the Special Permit application, the amount of which shall be established by the Planning Board.

5251.  PUBLIC HEARING AND APPROVAL.  The Planning Board shall hold a public hearing on any multi-family proposal alleging compliance with Section 5250 in accordance with the public hearing and notice requirements of Massachusetts General Laws c. 40A §9 and §11.  In considering the grant of a Special Permit for the application, the Planning Board shall make a finding that the provisions of this Section 5200 are satisfied.

5252.  FINDINGS.  The Planning Board shall specifically consider the following in determining whether the development will contribute to the orderly and harmonious development of the BA district and whether it creates a mix of uses supported by and consistent with the character of the neighborhood.  Access shall only be allowed from roadways other than Route 9 [unless the Planning Board, in its sole discretion, finds that such access already exists and maintaining such access is in the best interests of the Town]

5252.1  Benefit to the residents and /or public such as dedication of valued open space, active or passive recreational facilities, tot lots if accompanied by other usable undeveloped areas for active or passive recreation.

5252.2  Sidewalks and pedestrian trail connections are made within the site, as well as on existing ways where none exist, in an effort to enhance pedestrian access to buildings and between sites.

5252.3  Curb cuts shall be limited to the extent feasible while maintaining appropriate emergency vehicle access.  The Board may require provisions for off-site pedestrian and vehicular access to adjacent land in order to facilitate pedestrian access and to minimize curb cuts.

5252.4  Project design maximizes the opportunities for walking and bicycling, and integrates residential users with non-residential uses.

5252.5  Where feasible, structures and roadways shall be located so as not to disrupt the existing streetscape.

5252.6  Project incorporates best practices in energy efficient design, environmental protection, stormwater management, LEED (Leadership in Energy and Environmental Design) criteria and low impact development (LID) techniques wherever practicable.

5252.7  Existing mature vegetation is retained wherever possible, including winding of sidewalks and creative siting of structures.

5252.8  Landscape materials used as buffers are native, non-invasive, hardy for New England weather conditions and disease resistant.

5252.9  A mix of trees, shrubs, and perennial or annual flower beds are integrated as appropriate to the proposed use of the site.

## 5260.  SPECIAL PERMIT REQUIREMENTS.

5261.  Application For any use requiring a Special Permit, the applicant shall submit the number of copies of the application and plans in such form as the Planning Board may require by its Rules and Regulations.  In addition, the following shall be provided

## 5261.1  APPLICATION FORM AND FEE.

5261.2  DEVELOPMENT STATEMENT.  A development statement shall consist of a petition, a list of the parties in interest with respect to the land, a list of the development team and a written statement describing the major aspects of the proposed development.

5261.3  Development Plans shall bear the seal of a Massachusetts Registered Architect, Registered Civil Engineer or similar professional as appropriate.  One set of reduced size plans shall be submitted measuring 11 x 17 inches.  The following plans shall be submitted, unless waived by the Planning Board.

(a)     Site plans and specifications showing all site improvements and circulation.

(b)     Site perspective, sections, and elevations at a scale of 1/8 inch = 1 foot.

(c)     Detailed plans illustrating connection to public or private utilities and surface drainage; and

(d)     Detailed landscaping plans.

## 5261.4  ADDITIONAL INFORMATION AS THE BOARD MAY DETERMINE NECESSARY TO EVALUATE THE PROPOSAL.

5262.  AFFORDABLE HOUSING.  It is the intent of this bylaw to increase the range of housing options for people of different income levels and at different life stages.  Multi-family housing projects within the BA zone shall provide a housing type distinct from conventional single-family homes and shall include housing only on upper floors, above non-residential uses. All multi-family residential proposals made in the BA zone shall allocate a minimum of 20% of the total number of dwelling units as housing that is affordable to households earning 80% or less of median income for the Worcester Metropolitan Statistical Area as determined by the most recent calculation of the U.S. Department of Housing and Urban Development. In the event that an approved rental apartment proposal is converted to ownership units at any time then the percentage of affordable units, as described above, shall increase to 20% of the total dwelling units.  The affordable units must be subject to restrictions sufficient to maintain perpetual affordability exclusively to persons with qualifying incomes and to qualify the units as affordable under the Local Initiative Project Unit Application criteria of the Massachusetts Department of Housing and Community Development (DHCD), or successor agency.  The applicant shall be responsible for preparing the marketing plan and obtaining DHCD approval of the affordable units such that they are included in the Town's inventory of affordable housing.

The minimum of 20% of the units that are to be designated affordable must comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units. All such affordable units shall be priced at levels affordable to individuals or families earning no more than 80% of Area Median Income (AMI) as published by the State/US Department of Housing and Urban Development (HUD).

All multi-family residential proposals under this section shall be expected to meet the 20% minimum number of affordable units provided herein.  The Special Permit Granting Authority may, however, in its discretion decrease the minimum 20% affordable housing requirement to no less than 10% provided that other affordable housing contributions are made to the Town which the Special Permit Granting Authority deems sufficient to meet affordable housing needs. Such alternative contributions may include, contributions to the Town's Senior/Disabled Tax Relief Fund, creation of affordable housing units elsewhere in Town, or other alternatives deemed suitable to the Special Permit Granting Authority.  (Amended 3/17/2018, Article 29)

5263.  PARKING.  Parking shall be provided in accordance with Section 3100 except that one and one-half (1.5) spaces shall be provided for each residential unit, and bicycle parking shall be provided in close proximity to multi-unit structures unless individual garages are provided. Bicycle racks shall be provided at all structured common areas such as parks, playgrounds and/or club houses.  The Planning Board shall have the authority to waive parking requirements to allow a lower or higher number of spaces as it deems appropriate to support the type of residential use(s) and/or the incorporation of publicly accessible cultural or recreational amenities and/or the opportunity for shared parking with non-residential occupants of the site. Parking structures and surface parking lots shall be appropriately landscaped to promote pedestrian flow within and between the various uses on the site and public ways.

5300.  SENIOR OVERLAY DISTRICT.  (Added 5/15/2010, Article 31)

5310.  PURPOSE.  The purpose of the Senior Living Overlay (SLO) is to provide the opportunity to diversify the Town of Westborough's housing stock by specifically addressing the needs of its aging population and, to provide an additional level of affordability for these housing units which meet the official Massachusetts definition of affordability.

5320.  SCOPE AND AUTHORITY.  The Senior Living Overlay provides for optional additional uses and does not replace, but rather supplements, the uses allowed in the designated overlay areas by grant of a Special Permit.  The Planning Board shall be the Special Permit Granting Authority (SPGA) for any project submitted in accordance with this Section and shall have the authority to approve a project upon grant of a Special Permit in accordance with Section 1330, Site Plan Review in accordance with Section 1240 and further upon a finding that the intent of Sections 1100 (Purpose) and 5300 have been met.

The Planning Board may modify the density, parking and open space requirements of this Section or Section 2610 or 2620, where applicable, if, in its opinion, such change will result in a more desirable design of the development than could otherwise be developed without variation of the dimensional or parking requirement. This authority continues subsequent to occupancy. This bylaw does not specifically set density standards; however, it is expected that each site, housing type and project design will influence the appropriate number of residential units for any

particular site.  The density of units allowed shall be appropriate to the zone, neighborhood and development capacity of the site.

5330.  APPLICABILITY.  The Senior Living Overlay applies to all property within the Senior Living Overlay district as an optional, alternate form of development where certain criteria specified within this Section 5300 can be satisfied.

5340.  ESTABLISHMENT OF DISTRICT.  The Senior Living Overlay district shall include all land within the Mixed Use District (MUD) and all property located within five thousand (5,000) feet of the intersection of the centerlines of Milk, West Main, Brigham and South Streets, except that the district shall extend to six thousand five hundred (6,500) feet along East Main Street, provided that the land has frontage located within the SLO on one of said streets, SLO proposals shall comply with the dimensional standards of section 5360.  The provisions of Section 2140 (split lots) shall not apply.  The SLO shall not apply to any parcel of land located within a Highway Business (BA) district. (Amended Article 12 of 2016 ATM)

5350.  PERMITTED USES.  Independent Senior Housing, Senior Living Facility, and Continuing Care Retirement Communities shall be permitted in accordance with this Section 5300.  In addition, accessory uses typically associated with these uses may be permitted by the Board, upon a finding that the accessory use is appropriate to the proposed development and not more detrimental to the neighborhood than the senior living use without such accessory uses.

5351. A range of 10% to 20% of the units created in the SLO District, as determined by the Special Permit Granting Authority, are to be designated Affordable and shall comply with the requirements of the Massachusetts Department of Housing and Community Development or a successor agency. Such units shall have deed restrictions regarding affordability which will continue in perpetuity and will allow the units to "count" as State recognized affordable units.

All dwelling units in an SLO Project shall be subject to a restriction requiring that all residents of these units shall be at least the age of 62 (referred to as "Qualified Occupants").  (Added 10/21/2019, Article 17)

5360.  DIMENSIONAL REQUIREMENTS.  All minimum standards in the Senior Housing Overlay district (SLO) shall be consistent with those requirements of the applicable underlying district found in Section 2610 or 2620.

5370.  RULES AND REGULATIONS.  The Planning Board may from time to time establish Rules and Regulations governing Special Permits under this section.  The Planning Board shall require a filing fee as a part of the Special Permit application, the amount of which shall be established by the Planning Board.

5371.  PUBLIC HEARING AND APPROVAL.  The Planning Board shall hold a public hearing on any proposal alleging compliance with Section 5300 in accordance with the public hearing and notice requirements of Massachusetts General Laws c. 40A §9 and §11.  In considering the grant of a Special Permit for the application, the Planning Board shall make a finding that the provisions of this Section 5300 are satisfied.

5372.  FINDINGS.  The Planning Board shall specifically consider whether the development will contribute to the orderly and harmonious development of the neighborhood and the Town

that is consistent with the character of the neighborhood and satisfies community demand for the proposed uses, while responding to the performance standards of Section 5390.

- The Planning Board shall make findings related to the Town's current goals for the proposed type of senior housing.  These findings might include, but are not limited to the following:
- Compatibility with the surrounding neighborhood;
- Consistency with any current planning documents or studies;
- Ability for public infrastructure such as water, roads, drainage or sewer system or any other municipal system to support the proposed development without causing impacts that would adversely affect health, safety or the general welfare;
- Appropriate design and layout of streets and driveways;
- Appropriate project mitigation or enhancement of services typically associated with senior housing.  This mitigation may be provided on site, or at the SPGA's discretion be in the form of a contribution elsewhere in Town.  Strong preference is given to mitigation providing public access and/or that is integrated with other Town services;
- Appropriateness of building architecture, orientation and site design;
- Incorporation of energy efficient and environmentally friendly design criteria;
- Incorporation of pedestrian amenities, appropriate accessory uses, and integration of community benefits (for larger projects);
- Preservation of open space, existing vegetation, natural, historical or archeologically significant features or resources.

## 5380.  SPECIAL PERMIT REQUIREMENTS.

## 5381.  PERMIT APPLICATION.

For any use requiring a Special Permit, the applicant shall submit the number of copies of the application and plans in such form as the Planning Board may require by its Rules and Regulations.  In addition, the following shall be provided:

## 5381.1  APPLICATION FORM AND FEE.

## 5381.2  DEVELOPMENT STATEMENT.

## 5381.3  DEVELOPMENT PLANS.

5381.4  Additional information as the Board may determine necessary to evaluate the proposal.

## 5382.  DECISIONS.

5382.1.  The findings, including the basis of such findings, of the SPGA shall be stated in the written decision of approval, conditional approval, or denial of the application for Special Permit, and shall require a super-majority vote for approval.

5382.2.  The SPGA may also require, in addition to any applicable conditions specified in this Bylaw, such conditions as it finds reasonably appropriate to safeguard the neighborhood, or otherwise serve the purposes of this Bylaw, including, but not limited to the following: front, side, or rear yards greater than the minimum required by this Bylaw; screening buffers or planting strips, fences, or walls, modification of the architectural design and exterior appearance of the structures; lighting, regulation of the number and location of driveways, or other traffic features; off-street parking or loading or any other special features beyond the minimum required by this bylaw.

5382.3.  The SPGA shall specifically require project mitigation and/or enhancement of services, including possible integration with other Town services, as appropriate for the type and scale of development proposed.

5382.4.  Such conditions shall be provided in writing, and the applicant may be required to post a performance guaranty for compliance with said conditions in an amount satisfactory to the SPGA.

5382.5.  The Special Permit is granted for a period of two years and shall lapse if substantial use or construction has not commenced by such date, except for good cause shown as determined by the SPGA.  Once construction has begun, it shall be actively and continuously pursued to completion within a reasonable time.

## 5383.  PARKING REQUIREMENTS

Parking shall be provided in accordance with Section 3100 except as modified or amended by the following:

- Independent senior housing: one and one-half (1.5) spaces per dwelling unit.
- Assisted living: one-half (0.5) space per bedroom unit plus the number of employees expected on the premises at the peak hour of operation.
- Continuing Care Residence Community: 0.75 spaces per bedroom unit.
- Accessory Uses: As the board deems necessary taking into consideration Section 3100 and the potential for shared parking with other proposed uses on site.

Parking structures and surface parking lots shall be appropriately designed and landscaped to promote pedestrian flow within and between the various uses on the site and public ways.

## 5390.  PERFORMANCE STANDARDS

Projects in the Downtown Business district (BB) shall require a positive recommendation of the Design Review Board in accordance with Section 1245.  Projects in the SLO, but outside of the Downtown Business district shall comply with sub-sections 1245. D. 2-5, except that these requirements shall not apply to SLO projects in the Mixed Use District (MUD).  For SLO proposals in the MUD District, the SPGA shall require the Design Review Board to provide a recommendation to the SPGA on the SLO proposal during the plan review process as provided in subsections 1245 D.1 and 3. a-c and f-h of this bylaw. (Amended Article 12 of ATM 2016)

Subdivision Rules & Regulations shall be used as a guideline; however, the Board may waive any of these standards based on a persuasive argument by the applicant that such compliance does not serve the best interests of the project or the public good.

In addition to other minimum requirements stated elsewhere in this bylaw, the following improvements, performance standards and/or conditions are required (insofar as they are applicable to the proposal) to support a grant of a Special Permit in the SLO.

- Natural resources are preserved or improved and cutting of mature and specimen trees is avoided wherever feasible.
- Landscaping and vegetated buffer strips are appropriate for the neighborhood.
- Soil removal is minimized and cuts and fills are balanced to the maximum extent reasonable.

- Pedestrian walks, patios and other amenities support intra- and inter-site access and gathering places for residents.
- Roads and driveways maximize the convenience and safety of vehicular and pedestrian movement within the site and in relation to adjacent ways.
- Architectural details are varied to avoid monotonous or repetitive styles.
- Architectural style shall be in harmony with the prevailing character and scale of buildings in the neighborhood and the Town through the use of appropriate building materials, screening, breaks in roof and wall lines and other architectural techniques.
- Shade trees are provided along internal roadways and pedestrian walks.
- Site lighting is designed to avoid unnecessary glare to abutting properties or the sky. Reflectors and shields provide total cut-off of light at the property boundaries.
- US Green Building Council Leadership in Energy and Environmental Design (LEED) criteria shall be incorporated into project buildings and site design.
- Stormwater Management incorporates Low Impact Design (LID) wherever feasible and appropriate for the context.
- Utilities shall be located underground.

## 5400.  INDUSTRIAL D (ID) OVERLAY DISTRICT (Added 5/15/2010, Article 30; Amended 3/15/2019, Article 34)

5410.  PURPOSE.  The Industrial D (ID) Overlay District encompasses the majority of land fronting on  Route 9 lying east of Connector Road including, Flanders Road (east of Connector Road), Old Flanders  Road, Fruit Street, Gilmore Road, Washington Street, Friberg Parkway, West Park Drive, Computer  Drive, and Technology Drive. This area is highlighted by a series of industrial and office parks and  individual general industrial uses encompassed by the General Industrial (IB) District.  The purpose of  the ID Overlay District is to allow increased land use intensity through increased dimensional standards  more permissive than those provided by the underlying IB District.

5420.  SCOPE AND AUTHORITY.  The Industrial D (ID) Overlay District shall allow for optional  increase in use through expanded dimensional standards subject to Site Plan  Review, and does not replace, but rather  supplements, the uses allowed in the IB district.  Projects in the Industrial D (ID)  Overlay District shall undergo Site  Plan Review in accordance with Section 1240 and shall be  consistent  with the intent of Sections 1100 and 5400. Proposed changes in the use of the site shall require a new Site Plan  Review.

5430.  ESTABLISHMENT OF DISTRICT. The Industrial D (ID) Overlay District includes all property within the Industrial D Overlay (ID) zoning district as an optional,  alternate form of development where certain criteria specified within this Section 5400 can be  satisfied.

5440.  PERMITTED USES.  Uses shall be permitted as indicated in Section 2300 Use Schedule under  the column ID, in accordance with this Section 5400.

5450.  RULES AND REGULATIONS.  The Site Plan Review Authority may from  time to time establish  Rules and Regulations governing this section.  The Site Plan Review Authority shall require a filing fee as a part of the Site Plan Review application, the amount of which shall be established by the Site Plan Review Authority.

5451.  PUBLIC HEARING AND APPROVAL.  The Site Plan Review Authority shall hold a public hearing on any proposal alleging compliance with Section 5450 in accordance with

Section 1244. In considering the grant of a Site Plan Review approval ~~the~~ application, the Site Plan Review Authority shall make a finding that the provisions of this Section 5400 are satisfied.

5452. FINDINGS. The Site Plan Review Authority, pursuant to Section 1200, shall specifically consider the following in determining whether the development will contribute to the orderly and harmonious development of the ID Overlay and underlying IB district.

5452.1 Project design maximizes the opportunities for walking and bicycling

5452.2 Project incorporates best practices in energy efficient design, environmental protection, stormwater management, LEED (Leadership in Energy and Environmental Design) criteria and low impact development (LID) techniques wherever practicable.

5452.3 Existing mature vegetation is retained wherever possible, including winding of sidewalks and creative siting of structures.

5452.4 Landscape materials used as buffers are native, non-invasive, hardy for New England weather conditions and disease resistant.

5452.5 A mix of trees, shrubs, and perennial or annual flower beds are integrated as appropriate to the proposed use of the site.

5460. SITE PLAN REVIEW REQUIREMENTS.

5461. Application for any use in this District shall be governed by the Town Site Plan Review process in conformance with Section 1240 of these Bylaws.

5462. PARKING. Parking shall be provided in accordance with Section 3100 and bicycle parking shall be provided in close proximity to structures where determined by the Site Plan Review Authority. The Site Plan Review Authority shall have the authority to waive parking requirements to allow a lower or higher number of spaces as it deems appropriate to support the permitted use(s) and/or the opportunity for shared parking. Parking structures and surface parking lots shall be appropriately designed and landscaped to promote pedestrian flow within and between the various uses on the site and ways.

5500. MIXED USE DISTRICT (MUD). (Added 5/15/2010, Article 32)

5510. PURPOSE. The intent of this Mixed Use District, which hereafter may be referred to as MUD, is to permit greater flexibility and more creative and imaginative design for the development of retail, office, restaurant, residential and open space than is generally possible under conventional zoning provisions. It is further intended to promote and facilitate redevelopment of certain portions of the former Westborough State Hospital and other State owned properties while providing a harmonious variety of uses, a higher level of amenities, a stimulus to the economic development of the community and vitality to the district.

5520. SCOPE AND AUTHORITY. This Mixed Use District shall apply to all new construction, reconstruction or expansion of existing buildings and new or expanded uses. Any activities or uses permitted in the District shall be permitted, subject to the provisions of this District, unless expressly prohibited. New uses shall only be permitted through the granting a Special Permit from the Planning Board.

5530.  ESTABLISHMENT AND DELINEATION OF MIXED USE DISTRICT.  For the purposes of this District, there is hereby established a Mixed Use District area as shown on the Westborough Zoning Map.

5531.  MIXED USE ZONING MAP.  The boundaries of properties within the Mixed Use District shall be delineated on a Zoning Map approved at Town Meeting.

5540.  PERMITTED USES.  In any Mixed Use development, no building or other structure shall be erected, altered or used and no land shall be used or occupied for any purpose except under a Special Permit issued by the Planning Board in accordance with the provisions and requirements of this Section and the rules and regulations of the Planning Board.

5550.  RULES AND REGULATIONS.  The Planning Board shall establish, after a Public Hearing, Rules and Regulations concerning the procedure for and content of an application for new building use or change of use in the Mixed Use District.  The Planning Board shall require a filing fee as part of the application, the amount of which shall be prescribed in the Mixed Use District Rules and Regulations.  The MUD Rules and Regulations shall be effective on the date the Planning Board files them with the Town Clerk.

5551.  PUBLIC HEARING AND APPROVAL.  A public hearing shall be required on any Mixed Use District Building or Change of Use before any final action can be taken by the Planning Board on the application.  The timing of and form of notice of the hearing shall be as prescribed in Massachusetts General Laws, c. 40A, §11 for Special Permits.  After the Public Hearing, the Planning Board shall consider the development for a Special Permit.  In its consideration the Planning Board shall determine whether the application meets the purpose of Section 1100, and of the Mixed Use District regulations.  The Planning Board shall specifically determine whether the development will contribute to the orderly and harmonious development of the Mixed Use District Area and is consistent with the character of the neighborhood.  The Board may recommend that the applicant modify, alter, adjust or amend the proposed development and may recommend such reasonable additional conditions as the Planning Board deems necessary.

5552.  DENSITY REQUIREMENTS.  Within the Mixed Use District, building lots shall be established by the applicants subject to approval of the Planning Board.

5553.  MULTIPLE BUILDINGS.  Notwithstanding §2540 of this Bylaw, multiple buildings may be allowed on a lot in a Mixed Use Project by Special Permit issued by the Planning Board.

5554.  SIGNAGE.  Notwithstanding Section 3300 of this Bylaw, multiple signs may be allowed on a lot or building in a Mixed Use Project by Special Permit issued by the Planning Board.  The number, size and locations of signs shall be based on the nature, size, architecture and location of each building or portion thereof.

5560.  SITE PLAN APPROVAL OF A MIXED USE DISTRICT.  A Mixed Use District Development, as herein permitted, shall be made only pursuant to a Site Plan Submission.  Within a MUD, the Board of Selectmen shall approve the Site Plan.  All requirements as outlined in the Westborough Zoning Bylaws, Sections 1240 through 1245, shall apply.  The Site Plan Submission documentation shall be appropriate to the proposed project to show and convey the level of detail required for review by the Board of Selectmen and shall show at a minimum:

1.  Topography and grades both existing and proposed for the site and its relation to surrounding areas.

2.  Proposed plan and cross sections of all street systems and pedestrian walkways and their relationship to the overall project.

3.  Proposed preliminary layout and routing of storm and sanitary sewer systems, water supply, fire protection and power and communications services.

4.  Proposed lot(s), their layout and areas.

5.  Proposed areas of the site reserved for parks, parkways, playgrounds and other private or public open spaces and their location, use, areas and access.

6.  Proposed location of all buildings, their proposed use, size and height and related parking facilities.

7.  Tabulation of the total number of acres in the proposed project and, if applicable, the percentage thereof designated for each proposed building and use and related off-street parking, streets, parks and other uses.

8.  Tabulation of all buildings and uses and the over-all and per lot, coverage and density (Floor Area Ratio).

9.  Preliminary plans and elevations of the major buildings, their use, location and floor areas.

10.  Environmental issues and mitigation measures if any.

11.  Any other items that may be required by the Board of Selectmen.

## 5600.  LARGE-SCALE GROUND-MOUNTED SOLAR PHOTOVOLTAIC INSTALLATIONS. (Added 10/15/2012, Article 19)

### 5610.  PURPOSE.

The purpose of this bylaw is to allow the creation of new Large-Scale Ground-Mounted Solar Photovoltaic Installations by providing standards for the placement, design, construction, operation, monitoring, modification and removal of such installations that address public safety, minimize impacts on scenic, natural and historic resources and to provide adequate assurance for the eventual decommissioning of such installations.

### 5620.  APPLICABILITY.

This section applies to Large-Scale Ground-Mounted Solar Photovoltaic installations proposed to be constructed after the effective date of this section.  This section also pertains to physical modifications that materially alter the type, configuration, or size of these installations or related equipment.

Large-Scale Ground-Mounted Solar Photovoltaic Installations shall only be allowed in the Districts as noted below.  These Districts are those listed in Article 2 District Regulations, Section 2100, Establishment of Districts and Section 2200, Use Regulations.

| | C | R | AA<br>AB | BA | G2 | BB | IA | IB | IC | ID | M | M-1 | AE | All<br>Others | DPOD | MUD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Large-Scale Ground-Mounted Solar Photovoltaic Installations with outside equipment or storage: | N | N | N | N | N | N | Y | Y | Y | Y | Y | Y | Y | N | N | N |

5630.  General Requirements For All Large Scale Ground-Mounted Solar Photovoltaic Installations:

The following requirements are common to all Large-Scale Ground-Mounted Solar Photovoltaic Installations to be sited in designated locations.

## 5631.  COMPLIANCE WITH LAWS, ORDINANCES AND REGULATIONS.

The construction and operation of all Large Scale Ground-Mounted Solar Photovoltaic Installations shall be consistent with all applicable local, state and federal requirements, including but not limited to all applicable safety, construction, electrical, and communications requirements.  All buildings and fixtures forming part of a Large-Scale Ground-Mounted Solar Photovoltaic Installation shall be constructed in accordance with the State Building Code.

## 5632.  BUILDING PERMIT AND BUILDING INSPECTION.

No Large Scale Ground-Mounted Solar Photovoltaic Installation shall be constructed, installed or modified as provided in this section without first obtaining a building permit.

## 5633.  FEES.

The application for a building permit for a Large-Scale Ground-Mounted Solar Photovoltaic Installation must be accompanied by the fee required for a building permit.

## 5634.  SITE PLAN REVIEW.

Large-Scale Ground-Mounted Solar Photovoltaic Installations shall undergo Site Plan Review by the Site Plan Review Authority, as specified under Section 1240 of these Zoning Bylaws prior to construction, installation or modification as provided in this section.

## 5635.  GENERAL.

All plans and maps shall be prepared, stamped and signed by a Professional Engineer licensed to practice in Massachusetts.

## 5636.  SETBACKS.

For Large-Scale Ground-Mounted Solar Photovoltaic Installations, front side and rear setbacks shall be as follows:

a.      Front Yard: The front yard shall have a depth of at least 25 feet provided, however, that where the lot abuts a Residential district or residential use within the district allowing Large-Scale Ground-Mounted Solar Photovoltaic Installations, the front yard shall not be less than 100 feet;

b.      Side Yard: Each side yard shall have a depth of at least 25 feet provided, however, that where the lot abuts a Residential district or residential use within the district allowing

Large-Scale Ground-Mounted Solar Photovoltaic Installations, the side yard shall not be less than 100 feet;

c.   Rear Yard: The rear yard shall have a depth of at least 25 feet provided, however, that where the lot abuts a Residential district or residential use within the district allowing Large-Scale Ground-Mounted Solar Photovoltaic Installations, the rear yard shall not be less than 100 feet.

## 5637.  ADDITIONAL CONSIDERATIONS.

a.   Where Large-Scale Ground-Mounted Solar Photovoltaic Installations abut residential uses, there must be increased consideration for mitigating visual impact to the residential use.  For example, such items as increased setbacks, visual screening or sound buffering and the like may be required by the Site Plan Review Authority;

b.   Where the Installation panels could pose sun glare to abutting properties or roadways, additional screening or other public safety measures may be considered;

c.   The Site Plan Review Authority reserves the right to hire independent third party consultants to review Large-Scale Ground-Mounted Solar Photovoltaic Installation proposals in consideration of the proposals impact to surrounding properties or public safety implications.  Fees associated with the hiring of these consultants shall be born solely by the project proponent;

d.   Operation and Maintenance Plan: The project proponent shall submit a plan for the operation and maintenance of the Large-Scale Ground-Mounted Solar Photovoltaic Installation, which shall include measures for maintaining safe access to the Installation, storm water controls, as well as general procedures for operational maintenance of the Installation;

e.   Utility Notification: No Large-Scale Ground-Mounted Solar Photovoltaic Installation shall be constructed until evidence has been given to the Site Plan Review Authority that the utility company that operates the electrical grid where the Installation is to be located has been informed of the Installation owner or operator's intent to install an interconnected customer-owned generator.  Off-grid Installations or systems shall be exempt from this requirement;

f.   Appurtenant Structures: All appurtenant structures to Large-Scale Ground-Mounted Solar Photovoltaic Installations shall be subject to reasonable regulations concerning the bulk and height of structures, building coverage requirements, lot area, setbacks, sound or noise level generated by equipment, open space and parking.  All such appurtenant structures, including but not limited to, equipment shelters, storage facilities, transformers, and substations, shall be architecturally compatible with each other. Whenever reasonable, structures shall be screened from view by vegetation and/or joined or clustered to avoid adverse visual impacts.

## 5638.  DESIGN STANDARDS.

a.   Lighting: Lighting of Large-Scale Ground-Mounted Solar Photovoltaic Installations shall be consistent with local, state and federal law.  Lighting of other parts of the Installation, such as appurtenant structures, shall be limited to that required for safety and operational purposes, and shall be of reasonable height and reasonably shielded from

abutting properties.  Where feasible, light of the Large-Scale Ground-Mounted Solar Photovoltaic Installation and appurtenant structures shall be directed downward and shall incorporate full cut-off fixtures to reduce light pollution.

b.   Signage: Signs on Large-Scale Ground-Mounted Solar Photovoltaic Installations shall comply with Section 3300, Sign Regulations of the Westborough Zoning Bylaws.  A sign that identifies the owner and provides a 24-hour emergency contact phone number shall be required.  Large-Scale Ground-Mounted Solar Photovoltaic Installations shall not be used for displaying any advertising except for reasonable identification of the manufacturer or operator of the Installation.

c.   Utility Connections: Reasonable efforts, as determined by the Site Plan Review Authority, shall be made to place all utility connections for Large-Scale Ground-Mounted Solar Photovoltaic Installations underground on-site, depending on appropriate soil conditions, shape, and topography of the site and any requirements of the utility provider.  Electrical transformers for utility interconnections may be above ground if required by the utility provider.

## 5639.  MODIFICATIONS.

All material modifications to a Large-Scale Ground-Mounted Solar Photovoltaic Installation made after issuance of the required building permit shall require approval by the Site Plan Review Authority.

## 5640.  ABANDONMENT OR DECOMMISSIONING.

## 5641.  REMOVAL REQUIREMENTS:

Any Large-Scale Ground-Mounted Solar Photovoltaic Installation which has reached the end of its useful life or has been abandoned shall be removed.  The owner or operator shall physically remove the Installation no more than 150 days after the date of discontinued operations.  The owner or operator shall notify the Site Plan Review Authority by certified mail of the proposed date of discontinued operations and plans for removal.  The owner shall be responsible for all associated decommissioning activities and associated costs.  Decommissioning shall consist of:

a.   Physical removal of all Large-Scale Ground-Mounted Solar Photovoltaic Installations, structures, equipment, security barriers and transmission lines from the site;

b.   Disposal of all solid and hazardous waste in accordance with local, state, and federal waste disposal regulations;

c.   Stabilization or re-vegetation of the site as necessary to minimize erosion.  The Site Plan Review Authority may allow the owner or operator to leave landscaping or designated below-grade foundations in order to minimize erosion and disruption to vegetation.

## 5650.  DEFINITIONS.

5651.  AS-OF-RIGHT SITING.  As-of Right Siting shall mean that development may proceed without the need for a special permit, variance, amendment, waiver, or other discretionary approval.  As-of-right development shall be subject to Site Plan Review to determine conformance with local zoning bylaws.  Projects cannot be prohibited, but can be reasonably regulated by the Building Commissioner or local inspector, or the Site Plan Review Authority, as provided in Sections 1200 through 1244 of these Zoning Bylaws.

**5652. LARGE-SCALE GROUND-MOUNTED SOLAR PHOTOVOLTAIC INSTALLATION.** A solar photovoltaic system that is structurally mounted on the ground and is not roof-mounted, and has a minimum nameplate capacity of 250 kW DC as measured by the sum of the nameplate ratings at Standard Test Conditions of the solar modules installed at the site or a solar installation that utilizes at least one-thousand (1,000) square feet, including all supporting equipment, appurtenant structures and ground area between solar panels.

**5700. MARIJUANA ESTABLISHMENTS, MEDICAL MARIJUANA TREATMENT AND DISPENSING FACILITIES AND MARIJUANA CULTIVATION.** (Added 3/16/2013, Article 16) (Amended Article 3, 2016 Fall Town Meeting) The zoning of Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and, Marijuana Cultivation uses, including, but not limited to the sale, use, and consumption of marijuana, marijuana accessories, or marijuana products in the Town of Westborough shall be governed in accordance with this section, Section 5700.

**5710. PURPOSE.**

It is the purpose of this section titled "Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation" to establish specific zoning standards and regulations for marijuana establishments, medical marijuana centers (treatment and dispensing facilities), marijuana products, marijuana accessories, manufacturers, and marijuana growing and cultivation;

To provide for the limited establishment of Marijuana Establishments, and Medical Marijuana Treatment and Dispensing Facilities in appropriate places and under strict conditions;

To minimize the adverse impacts of Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation on adjacent properties, residential neighborhoods, schools and other places where children congregate, local historic districts, and other land uses potentially incompatible with said uses;

To regulate the siting, design, placement, safety, monitoring, modification, and removal of Marijuana Establishments Medical Marijuana Treatment and Dispensing Facilities; and Marijuana Cultivation.

**5720. APPLICABILITY.**

The cultivation, production, processing, assembly, packaging, retail or wholesale sale, trade, distribution or dispensing of marijuana for either general or medical use is prohibited unless permitted as a Medical Marijuana Treatment and Dispensing Facility under this Section.

5721. No Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facility or any Marijuana Cultivation use shall be established except in compliance with the provisions of this Section;

5722. Nothing in this Bylaw shall be construed to supersede federal laws governing the sale and distribution of narcotic drugs.

5723. If any provision of this Section or the application of any such provision to any person or circumstance shall be held invalid, the remainder of this Section, to the extent it can be given effect, or the application of those provisions to persons or circumstances other than those to

which it is held invalid, shall not be affected thereby, and to this end the provisions of this Section are severable.

## 5730.  GENERAL.

Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation shall be authorized by Special Permit only in District(s) provided, as set forth in Section 2300, Use Regulation Schedule of the Zoning Bylaws.  Any such Special Permit issued by the Special Permit Granting Authority shall comply with all relevant local, state, and federal laws.

## 5740.  DISALLOWANCE.

No Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities or Marijuana Cultivation Special Permit shall be issued to any person convicted of violating the provisions of Mass General Law, Chapter 119, Section 63, or General Law, Chapter 94C, or similar laws in other jurisdictions.  Any applicant for special permit under this Bylaw must allow for a criminal background check which includes jurisdiction beyond Massachusetts.

## 5750.  ELIGIBLE LOCATIONS.

Any Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facility or Marijuana Cultivation activities permitted under this Section shall be located only in a zoning district that is designated for its use within this Zoning Bylaw.

No Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facilities use or Marijuana Cultivation activities shall be located within five hundred (500) linear feet of a property line where the following Districts or activity or uses occur:

1.     Any Residential District as defined in these Zoning Bylaws;

2.     Any school or child care establishment; or place where minors frequent (e.g. a library, ball field, sports or family recreation facility, religious facility or the like);

3.     Any other Medical Marijuana Treatment or Dispensing Facility or Marijuana Cultivation site; or any other general retail establishment where marijuana is sold, consumed, used or where marijuana is grown, cultivated, produced, processed or refined.

4.     Any drug or alcohol rehabilitation facility;

5.     Any correctional facility, half-way house or similar facility; or

6.     Any establishment licensed under the provisions of General Law, Chapter 138, Section 12.

5751.  No marijuana or marijuana based product shall be sold or grown or cultivated, interior or exterior, of a residential dwelling unit or residential district.  Growing and related cultivation activities shall occur only in districts as permitted in this Bylaw.

5752.  SEPARATION.  Distances shall be calculated by direct measurement from the nearest property line of the land used for school or child care purposes or places where minors frequent or any other use listed above in Section 5750 to the nearest portion of the building in which the medical marijuana dispensary or marijuana establishment is located.

5753.  NO ENTITLEMENT OR VESTED RIGHTS TO PERMITTING.  No person shall be deemed to have any entitlement or vested rights to permitting under this Bylaw by virtue of having received any prior permit from the Town including, by way of example only, any zoning permit or any wholesale food manufacturer's license.  In order to lawfully engage in the business of selling, cultivating marijuana, or manufacturing marijuana for medical or general use, or marijuana products in the Town on and after the date of passage of this Bylaw, any person must qualify for and obtain a special permit in accordance with the requirements of this Bylaw.

5754.  All sales and distribution of medical marijuana by a licensed Medical Marijuana Treatment and Dispensing Facility shall occur only upon the permitted premises.  In addition, the delivery of general retail, non-medical, marijuana to any consumer at any location shall be strictly prohibited unless specifically permitted through the special permit process governed by this Section.

5755.  SIGNAGE.  Any permitted Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facilities site shall comply with the requirements of the Town Sign Bylaws at all times.  In addition, upon penalty of special permit revocation, no permitted Marijuana Establishment, Medical Marijuana Treatment and Dispensing Facility or Marijuana Cultivation Facility shall use any advertising material that is misleading, deceptive, or false, or that is designed to appeal to minors.  Off-site signage or advertising in any form, including billboards shall not be allowed.

5756.  VISIBILITY.  There shall be no visibility of marijuana accessories, activities, products or treatment occurring within or on the premises of a Marijuana Establishment, Medical Marijuana Treatment or Dispensing Facility or Marijuana Cultivation Facility from the exterior of such facility or premises.

5757.  MANUFACTURING.  A local special permit for marijuana or any marijuana product manufacturing may be issued only in locations where Marijuana Establishments, Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation activities are permitted.

5758.  CULTIVATION ACTIVITIES.  Cultivation, as defined in this Bylaw, by any Marijuana Establishment or Medical Marijuana Treatment and Dispensing Facility in any location other than where specifically permitted shall be disallowed.

5760.  TERM OF SPECIAL PERMIT.

Any local special permit issued pursuant to this Section shall be valid for a period of two years from the date of issuance.  Any renewal of the special permit shall be governed by the standards and procedures set forth in this Section and any regulations adopted pursuant thereto by the Planning Board/Zoning Enforcement Officer and/or Licensing Board.

5761.  NOTIFICATION.  Any new applications sought under this Section must be publically advertised for a period of no less than fourteen (14) days, not including the date of the required special permit public hearing.  Abutters and abutters-to-abutters within five hundred (500) feet shall be notified in writing of said application, and include any and all dates and locations of public hearings on said application.

5770.  CONFLICT OF LAWS.

In the event of any conflict between the provisions of this Bylaw and any other applicable state or local law, the stricter provision, as deemed by the Zoning Enforcement Officer, shall control.

DEFINITIONS.

Medical Marijuana Treatment and Dispensing Facilities: a not-for-profit entity, as defined by Massachusetts Law as a "Medical Marijuana Treatment Center", registered under this law, that acquires, cultivates, possesses, processes (including development of related products such as food, tinctures, aerosols, oils, or ointments or marijuana accessories), transfers, transports, sells, material to qualifying patients or their personal caregivers. It shall also include any establishment having as any portion of its stock in trade marijuana or non-FDA approved marijuana based products or its active ingredient, THC (tetrahydrocannabinol); or paraphernalia for the consumption or delivery of marijuana or products containing marijuana as allowed for medical uses under Massachusetts Law, including but not limited to retail distribution, wholesale distribution or growth and/or cultivation of marijuana; production or sale of marijuana (cannabis) seeds; or the refinement or manufacturing or sale of marijuana infused products.

Marijuana: In addition to the Commonwealth's definition under Chapter 94C of Mass General Laws, our definition shall include:  Marijuana, Marihuana, Cannabis, Hashish, Cannabis seeds, THC (tetrahydrocannabinol) and its derivatives and extracts as well as any substances containing THC whether in plant, including its flowers, oil, resin, solid, liquid or aerosol form.

Marijuana Cultivation: the process of propagation, including germination, using soil, hydroponics, or other mediums to generate growth and maturity.  The intended process of bringing a plant or other grown product to maturity for harvesting, sale, refining or use as an ingredient in further manufacturing or processing.  This definition encompasses marijuana cultivation related to Medical Marijuana Treatment and Dispensing Facilities

Consumer:  a person who is at least 21 years of age.

Manufacture:  to compound, blend, extract, infuse or otherwise make or prepare a marijuana product.

Marijuana accessories:  equipment, products, devices or materials of any kind that are intended or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, ingesting, inhaling or otherwise introducing marijuana into the human body.

Marijuana cultivator: an entity licensed to cultivate, process and package marijuana, to deliver marijuana to marijuana establishments and to transfer marijuana to other marijuana establishments, but not to consumers.

Marijuana establishment:  a marijuana cultivator, marijuana testing facility, marijuana product manufacturer, marijuana retailer or any other type of licensed marijuana-related business.

Marijuana product manufacturer:  an entity licensed to obtain, manufacture, process and package marijuana and marijuana products, to deliver marijuana and marijuana products to marijuana establishments and to transfer marijuana and marijuana products to other marijuana establishments, but not to consumers.

Marijuana products:  products that have been manufactured and contain marijuana or an extract from marijuana, including concentrated forms of marijuana and products composed of marijuana and other ingredients that are intended for use or consumption, including edible products, beverages, topical products, ointments, oils and tinctures.

Marijuana testing facility:  an entity licensed to test marijuana and marijuana products, including certification for potency and the presence of contaminants.

Marijuana retailer:  an entity licensed to purchase and deliver marijuana and marijuana products from marijuana establishments and to deliver, sell or otherwise transfer marijuana and marijuana products to marijuana establishments and to consumers.

Process or processing:  to harvest, dry, cure, trim and separate parts of the marijuana plant by manual or mechanical means.

## SECTION 5800.  MARIJUANA NOT MEDICALLY PRESCRIBED

Consistent with MGL Ch. 94G, Section 3(a)(2), all types of marijuana establishments as defined in MGL Ch. 94G, Section 1(j), to include all marijuana cultivators, marijuana testing facilities, marijuana product manufacturers, marijuana retailers or any other types of licensed marijuana-related businesses, shall be prohibited within the Town of Westborough.

## ARTICLE 5 DEFINITIONS
## (ADOPTED MARCH 5, 1990)

In this Bylaw, the following terms shall have the following meanings, unless a contrary meaning is required by the context or is specifically prescribed:

Accessory Building: (Amended 3/15/2014, Article 23; Deleted 10/20/2014, Article 34 )

Accessory Use: A use that constitutes only an incidental or insubstantial part of the total activity that takes place on a lot and is commonly associated with and integrally related to the principal use.  Even though a use may be a principal use in another situation, it may be conducted as an accessory use in conjunction with another principal use. (Added 3/15/2014, Article 23)

Agricultural shall mean the science, art and business of cultivating the soil, producing crops, and raising of livestock, useful to man.  Agricultural shall not include any uses or activities associated with Marijuana Establishments or Medical Marijuana Treatment and Dispensing Facilities or Marijuana Cultivation activities, such as the growing, sale, manufacturing, processing, refinement and consumption of marijuana, marijuana accessories, or marijuana products.  Medical Marijuana Treatment and Dispensing Facilities and Marijuana Cultivation are defined elsewhere in Article 5 Definitions. (Amended 3/16/2013, Article 16) (Amended Article 3, 2016 FTM)

Airport shall mean any area on a lot used for the landing and take-off of aircraft or similar fixed-wing craft on a regular or intermittent basis.

Animal Kennel or Hospital shall mean harboring and/or care of more than three (3) dogs three (3) months old or over, or of other domestic animals, irrespective of the purpose for which they are maintained.

Apartment, Garden shall mean premises not over three (3) stories high, accommodating three (3) or more dwelling units, irrespective of ownership or tenure. Includes town houses.

Apartment, High Rise shall mean premises over three (3) stories high, accommodating three (3) or more dwelling units, irrespective of ownership or tenure.

Aquifer shall mean a geologic formation composed of sand and gravel that contains significant amounts of potentially recoverable potable water. (Amended 3/29/1994, Article 42)

Bedroom shall mean a habitable room in a residence for the purpose of sleeping and that contains a space for the use of a closet. (Amended 10/21/2013, Article 27)

Boardinghouse shall mean a building used for lodging seven (7) or more persons, with or without meals, for compensation with owner resident on premises.

Brewery, Distillery: A facility, licensed under the relevant state and federal statutes, for the large scale production of more r than 15,000 barrels per year (a barrel being equivalent to thirty one (31) gallons) and packaging of malt, wine, hard cider beverages and/or distilled spirits for distribution retail or wholesale, which may include a tap room where beverages produced on the premises may be sold and consumed.  (Added 10/16/2017, Article 12)

Brew Pub: Restaurants, licensed under the relevant state and federal statutes, to produce and sell beer and/or ale and/or distilled spirits at the location and whose primary business is the sale and preparation of food to be consumed on the premises. Beverages including malt, hard ciders, wine or distilled spirits produced on the premises may be sold to other establishments but those sales shall not exceed 25 percent of the establishment's production capacity. (Added 10/16/2017, Article 12)

Buffer Strip shall mean lot area not used for any commercial, business or industrial purposes nor covered by any structure or pavement.  The buffer strip shall be kept stabilized with natural vegetative cover adequate to prevent soil erosion.

Building, Accessory shall mean building that is subordinate and customarily incidental to the principal building and is located on the same lot as the principal building. (Added 10/20/2014, Article 34)

Building Height shall mean the vertical distance from the mean finished grade of the ground adjoining the building to the highest point of the roof or parapet for flat or shed roofs, to the deck line for mansard roofs and to the mean height between eaves and ridge for gable, hip, and gambrel roofs.  Not included are spires, cupolas, TV antennae or other parts of structures which do not enclose potentially habitable floor space.

Building, Principal shall mean that a building's primary purpose is for the furtherance of the functioning of the principal use and is located on the same lot as the principal use. (Added 10/20/2014, Article 34)

Camping, Supervised Amended 10/21/2013, Article 27; Deleted 3/15/2014, Article 21

Clearing: The removal and/or cutting of trees, shrubs, bushes, or brush.  Clearing shall also include grubbing.  Grubbing shall mean the removal of stumps and/or roots from the soil. (Added 3/16/2002, Article 17)

Common Driveway: (Added 3/29/1994, Article 75) The primary means of access and egress, which is not considered a local Town road or way of public access, serving more than two (2) but not more than five (5) detached single family dwellings.

Congregate Housing shall mean a structure providing living accommodations and communal facilities for elderly persons (over age sixty), including those requiring limited medical attention, which is located on the same parcel or on a parcel of land contiguous to a parcel on which a nursing home is located and to which it is attached.  Such a structure may contain retail stores, offices and service outlets provided that such places of business exclusively service on-site residents, and there is no entrance (other than emergency) to any such place of business except from inside a building.

Continuing Care Retirement Community (CCRC) shall mean a senior housing development that is planned, designed and operated to provide a full range of accommodations for older persons, including independent living, congregate care and assisted living facilities, and which shall also include a nursing home or skilled-housing/care facility.  Residents of a CCRC have the ability to move from one level of housing/care to another as their needs change. (Added 5/15/2010, Article 31)

89

Convalescent, Nursing or Rest Home shall mean any institution licensed as a nursing, convalescent or rest home or charitable home for the aged by the Department of Public Health pursuant to Section 71, Chapter III General Laws.

Corner Lot shall mean a continuous parcel of land with legal definable boundaries, and having frontage on at least two streets or recorded ways open to public use.

Density shall mean the number of dwelling units, households or housing structures per unit of land (minimum lot area as defined herein). (Added 5/15/2010, Article 31)

Discharge shall mean the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying or dumping of toxic or hazardous material upon or into any land or waters in the Town of Westborough.  Discharge includes, without limitations, leakage of such materials from failed or discarded containers or storage systems, and disposal of such materials into any on-site sewage disposal system, drywell, catch basin or unapproved landfill. The term, discharge, as used and applied in this Bylaw does not include the following:

1.      Proper disposal of any material in a sanitary or industrial landfill that has received and maintained all necessary legal approvals for that purpose;

2.      Application of road salts in conformance with Section 4700 and the Snow and Ice Control Program of the Massachusetts Department of Public Works; and,

3.      Disposal of "sanitary sewage" to subsurface sewage disposal systems as defined and permitted by Title 5 of the Massachusetts Environmental Code, unless restricted by Section 4700. (Amended 3/29/1994, Article 42)

Dwelling shall mean building or part of a building used exclusively as the living quarters for one (1) or more families.

Dwelling, Single Family shall mean premises accommodating a single dwelling unit.

Dwelling Unit shall mean building or portion of a building providing living quarters for a single family and up to six (6) boarders.

Earth Moving: The moving within, removal from and/or addition to any lot or parcel of topsoil, borrow, rock, sod, loam, peat, humus, clay, sand, or gravel. (Added 3/16/2002, Article 17)

Family shall mean any number of individuals living and cooking together on the premises as a single non-profit housekeeping unit.

Floor Area, Habitable shall mean the total interior floor area of a dwelling, excluding areas where ceiling height is less than five (5) feet, areas with more than half of floor to ceiling height below average grade of the adjoining ground, and excluding community laundries or foyers, utility rooms, communicating corridors, porches or terraces.

Floor Area Ratio (FAR): The ratio of the sum of the gross floor area of all buildings on a lot to the total site area of the lot.  (Amended 3/17/18, Article 26)

Floricultural shall mean the cultivation of flowering plants for sale or otherwise.

Gross Floor Area: The sum, in square feet, of the horizontal areas of a building (or several buildings on the same lot) measured from the exterior face of the exterior walls, or from the

90

center line of a party wall separating two buildings, including garages, basements, covered porches, and half stories. Floors where the headroom is greater than five feet, measured from the top of the floor joists of the top story to the bottom of the roof rafters, is included in the measurement of gross floor area. Gross floor area does not include "crawl spaces" as defined by current building code; "attics"; and "open decks". Where the text of this bylaw refers to the floor area, the term means gross floor area unless the term habitable floor area is used. (Amended 3/17/18, Article 26)

Groundwater shall mean all the water found beneath the surface of the ground.  (Amended 3/29/1994, Article 42)

Heliport shall mean a landing and take-off place for a helicopter on a regular or intermittent basis.

Home Occupation shall mean a business or profession engaged in within a dwelling or its accessory building by a resident thereof as a use accessory thereto.

Horticultural shall mean the science or art of cultivating plants, gardens.

Impervious Surface shall mean a material or structure on, above, or below the ground that does not allow precipitation or surface water to penetrate directly into the soil.  (Added 3/29/1994, Article 42)

Independent Senior Housing shall mean a building or series of buildings containing independent dwelling units intended to provide housing for persons not requiring health or other services, and designed and occupied by individuals or families in which all members are 62 years of age or older (referred to as a "Qualified Occupant"). (Added 5/15/2010, Article 31; Amended Article 12, 2016 ATM; Amended 10/21/2019, Article 17)

Lot shall mean a continuous parcel of land with legally definable boundaries.

Lot Area shall mean the horizontal area of the Lot exclusive of any area in a street or recorded way open to public use. (Amended 10/21/2013, Article 27)

Lot Area – Minimum Buildable shall mean at least 90% of the Lot Area as required for the zoning district as shown in Section 2600, Dimensional Schedule and shall be land exclusive of wetland resource areas as currently defined in the Massachusetts Wetland Protection Act, MGL c. 131 Section 40 and regulations promulgated under 310 CMR 10.00. (Added 10/21/2013, Article 27)

Lot coverage shall mean percentage of the Lot Area as required for the district as shown in Section 2600, Dimensional Schedule, covered by Structures. (Amended 10/21/2013, Article 27)

Lot Frontage shall mean that portion of a lot fronting upon and having access to a street.  Lot frontage shall be measured continuously along one (1) street line between side lot lines.  In the case of a corner lot, lot frontage shall be measured between one (1) side lot line and the midpoint of the arc made by the corner radius.

Major Residential Development Added 3/5/1990, Article 59; deleted 10/21/2013, Article 27

Marijuana: In addition to the Commonwealth's definition under Chapter 94C of Mass General Laws, our definition shall include: Marijuana, Marihuana, Cannabis, Hashish, Cannabis seeds,

THC (tetrahydrocannabinol) and its derivatives and extracts as well as any substances containing THC whether in plant, including its flowers, oil, resin, solid, liquid or aerosol form. (Added 3/16/2013, Article 16)

Marijuana Cultivation: The process of propagation, including germination, using soil, hydroponics, or other mediums to generate growth and maturity. The intended process of bringing a plant or other grown product to maturity for harvesting, sale, refining or use as an ingredient in further manufacturing or processing. This definition encompasses marijuana cultivation related to Medical Marijuana Treatment and Dispensing Facilities. (Added 3/16/2013, Article 16)

Medical Marijuana Treatment and Dispensing Facilities shall mean a not-for-profit entity, as defined by Massachusetts Law as a "Medical Marijuana Treatment Center", registered under this law, that acquires, cultivates, possesses, processes (including development of related products such as food, tinctures, aerosols, oils, or ointments), transfers, transports, sells, material to qualifying patients or their personal caregivers.  It shall also include any establishment having as any portion of its stock in trade marijuana or non-FDA approved marijuana based products or its active ingredient, THC (tetrahydrocannabinol); or paraphernalia for the consumption or delivery of marijuana or products containing marijuana as allowed for medical uses under Massachusetts Law, including but not limited to retail distribution, wholesale distribution or growth and/or cultivation of marijuana; production or sale of marijuana (cannabis) seeds; or the refinement or manufacturing or sale of marijuana infused products. (Added 3/16/2013, Article 16)

Micro-brewery/Micro-distillery: A facility, licensed under the relevant state and federal statutes, for the production and packaging of malt, wine, hard cider beverages and/or distilled spirits for distribution retail or wholesale, on or off the premise, with a capacity of not more than fifteen thousand (15,000) barrels per year, (a barrel being equivalent to thirty one (31) gallons) and which may include a tap room where beverages produced on the premises may be sold and consumed.  May include other uses such as a restaurant, including outdoor dining if otherwise permitted in the zoning district. (Added 10/16/2017, Article 12)

Mining shall mean the removal or relocation of geological materials such as topsoil, sand, gravel, metallic ores or bedrock.  (Added 3/29/1994, Article 42)

Minor Residential Development added 3/5/1990, Article 59; deleted 10/21/2013, Article 27

Mobile Home shall mean a moveable or portable dwelling built on a chassis, designed for connection to utilities when in use, and designed without necessity of a permanent foundation for year-round living.

Motor Vehicle Service Station shall mean premises devoted primarily to retail sale of fuels and lubricants and/or washing of motor vehicles, with any repair services or other sales or services of secondary importance.

Nano-brewery/Nano-distillery: Also considered a craft brewery, a facility, licensed under the relevant state and federal statutes, for the small scale production of malt, wine, hard cider beverages and/or distilled spirits primarily for on premises consumption and sale with limited distribution to retail or wholesale, with a capacity of not more than six thousand (6,000) barrels per year, (a barrel being equivalent to thirty one (31) gallons) and which may include accessory preparation and sale of food for on premises consumption.  (Added 10/16/2017, Article 12)

92

Nursery or Greenhouse shall mean premises used for the propagation of trees, shrubs, vines, flowers, or other plants for transplanting, stock for grafting, or for cut flower, pine needles, bark, or other organic materials.

Open Space shall mean that portion of the Lot Area as required for the district as shown in Section 2600, Dimensional Schedule which is not covered by any Structure and not used for drives, parking or storage.  All Open Space shall be kept stabilized with natural vegetative cover. Biking, walking, recreational and multi-use trails, which are created through an easement accepted by the Town or other entity approved by the Board of Selectmen, for public purposes, any portion of which contains impervious surface, associated land or structures within the easement, shall be considered open space and not be considered lot coverage. (Amended 10/21/2013, Article 27) (Amended 10/16/17, Article 11)

Parking Garage shall mean a structure constructed for the intended purpose of parking and/or the storing of vehicles.

Parking Space shall mean space adequate to park an automobile, not less than nine (9) by twenty (20) feet, plus means of access.  Where spaces are not marked, each space shall be assumed to require three hundred fifty (350) square feet.

Principal Use: The primary use to which the premises are devoted, and the main purpose for which the premises exist as defined in Section 2300: Use Regulation Schedule. (Added 3/15/2014, Article 23)

Recharge Areas shall mean areas composed of permeable porous materials that allow infiltration and collection of precipitation or surface water and thereby transmit this water to aquifers. (Amended 3/29/1994, Article 42)

Recreational Camps shall mean facilities as licensed by the Massachusetts Department of Health under 105 CMR 430.000. (Added 3/15/2014, Article 21)

Senior Living Facility shall mean an assisted living residence as defined by the Massachusetts Executive Office of Elder Affairs pursuant to M.G.L. c. 19D and which provides assistance with activities of daily living, such as assistance with bathing, dressing, eating, toileting and medication reminders and which provides room and board for three or more adult residents. Senior living facilities shall also include senior congregate housing that includes room and board, but without necessity for assistance with activities of daily living. (Added 5/15/2010, Article 31)

Septic Wastes shall mean wastewaters arising from ordinary domestic water use as from toilets, sinks and bathing facilities, etc., and containing such concentrations and types of pollutants as to be considered normal wastes.

Sign shall mean any device located on or off the premises, designed to inform or attract public attention promoting a use or uses; (Amended 10/19/2015, Article 5)

Sign, Area of shall mean the surface area within a single continuous perimeter enclosing all the display area of the sign, but not including structural members not bearing advertising matter unless internally or decoratively lighted.  One side only of flat, back-to- hack signs shall be counted.  For a sign consisting of individual letters, designs, and/or symbols attached to or

painted on a surface, building, wall or window, the area shall be considered to be that of the smallest quadrangle which encompasses all of the letters, designs and symbols.

Sign, Automated Variable Message shall mean a variable message sign that changes its message by programmable electronic or mechanical processes, automatically or by remote control. (Added 3/16/2019, Article 32)

Sign, Externally Illuminated shall mean any sign which is composed of an opaque material and is illuminated only by a static white light source that is located in front of and shines on the face of the sign to be viewed. (Added 3/16/2019, Article 32)

Signs, Non-Conforming shall mean any sign which does not comply with Section 3300 of the Zoning Bylaws. (Added 10/19/2015, Article 5)

Solid Wastes shall mean useless, unwanted or discarded solid material with insufficient liquid content to be free- flowing.  This includes, but is not limited to, rubbish, garbage, scrap materials, junk, refuse, inert fill material and landscape refuse.

Story shall mean that portion of a building between the top of any floor and the top of the floor or roof next above, counting as a half story such portion if more than half its exterior wall area is below grade or if directly under a sloping roof in which more than half the exterior wall perimeter has less than three (3) feet floor-rafters interior dimension, and excluding cellar or attic spaces used solely for utilities and storage.

Street shall mean a way providing legally sufficient frontage for subdivision of land under the requirements of Chapter 41, Section 81L General Laws.

Structure shall mean anything constructed or erected, the use of which requires fixed location on the ground, or attachment to something located on the ground, including swimming pools having capacity of 4,000 gallons or more and mobile homes, but not including walls, pavement or fences.  The construction of walls and fences shall comply with the Massachusetts State Building Code. (Amended 10/21/2013, Article 27)

Town House shall be synonymous with "Garden Apartment".

Toxic or Hazardous Materials shall mean any substance or mixture of physical, chemical, or infectious characteristics posing a significant, actual or potential hazard to water supplies or other hazards to human health or potential hazard to water supplies or other hazards to human health if such substance or mixture were discharged to land or water; and, shall include without limitation synthetic organic chemicals, petroleum products, heavy metals, radioactive or infectious waste, acids and alkalis, and all substances defined as Toxic or Hazardous under MGL, Chapter 21C and 21 E and 310 CMR 30.00, and also include such products as solvents and thinners in quantities greater than normal household use. (Amended 3/29/1994, Article 42)

Trails shall mean biking, walking, recreational and multi-use paths created through an easement accepted by the Town or other entity approved by the Board of Selectmen, for public purpose. (Amended 10/16/17, Article 11)

Yard shall mean a required open space, unoccupied and unobstructed by any structure or portion of a structure, except the following:

a.  fences, walls, poles, posts and other customary yard accessories, ornaments and furniture;

b.  in front yards only, eaves, steps, noncovered porches and signs.

Yard, Front shall mean a yard extending between lot side lines across the front of a lot adjacent to each street the lot adjoins, measured from the street line, assumed to be twenty-five (25) feet from the center of the travelled roadway where no such right-of-way line has been established or can be readily determined.

Yard or Garage Sale shall be considered any offering for sale to the general public any and all items new or used, said sale taking place on premises by the resident thereof.

Yard, Rear shall mean an open space on the same lot as the main building unoccupied except as herein permitted, extending the full width of the lot and situated between the rear line of the lot and the rear line of the main building projected to the side lines of the lot.

Yard, Side shall mean the portion of the yard situated between the building and the side line of the lot and extending from the front yard to the rear yard.

# WESTBOROUGH ZONING BY-LAW APPENDIX

**2020 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| *6/20/2020* | *Replace Section 2300 Use Schedule* | *26* |

**2019 Fall Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| *10/21/2019* | *Amend Section 5300 and Definitions* | *17* |
| *10/21/2019* | *Amend Dimensional Regulations M-1* | *18* |

**2019 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| *3/16/19* | *Section 2300 Outside display of retail merchandise* | *30* |
| *3/16/19* | *Added Section 2154* | *31* |
| *3/16/19* | *Amended Section 3300 and Definitions* | *32* |
| *3/16/19* | *Amended Site Plan Review Authority* | *33* |
| *3/16/19* | *Amend Section 5400* | *34* |
| *3/16/19* | *Replace Section 2100* | *35* |
| *3/16/19* | *Replace Section 2610* | *36* |

**2018 Fall Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| *10/15/2018* | *Amend Section 2520* | *37* |
| *10/15/2018* | *Amend Dimensional Regulations M-1* | *38* |
| *10/15/2018* | *Amend Dimensional Regulations M-1* | *40* |

**2018 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| *3/17/2018* | *Amend Article 5: Definitions* | *26* |
| *3/17/2018* | *Sec 2410: Preexisting, Non-Conforming Use or Structures* | *27* |
| *3/17/2018* | *Sec 2600: Garden and High Rise Apartments* | *28* |
| *3/17/2018* | *Sec 5200: Multi-Family Housing* | *29* |
| *3/17/2018* | *Sec 4955: Downtown Planning Overlay District* | *30* |
| *3/17/2018* | *Sec 5100: Gateway 2 District* | *31* |

**2017 Special Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| *11/27/2017* | *Amend Senior Living Overlay Affordable Housing* | *2* |

**2017 Fall Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| *10/16/2017* | *Amend Dimensional Regulations M-1* | *1* |
| *10/16/2017* | *Amend Dimensional Regulations M-1* | *2* |
| *10/16/2017* | *Amend Dimensional Regulations M-1* | *3* |
| *10/16/2017* | *Amend Section 2300* | *10* |
| *10/16/2017* | *Amend Article 5 Definitions* | *11* |
| *10/16/2017* | *Amend 2300, Article 5: Microbreweries* | *12* |
| *10/16/2017* | *Amend 2610, Senior Living Overlay District* | *13* |

**2017 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/18/17 | Added Sec. 5800: Marijuana Not Medically Prescribed | 33 |
| 3/18/17 | Sec. 4400, 4460: Accessory Dwelling Units | 34 |
| 3/18/17 | Sec. 2300: Highway Business District Amendment | 35 |

**2016 Fall Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 10/17/16 | Amend Zoning Map: Parcels 42, 49, 49A, 41, 41A (Map 33) | 2 |
| 10/17/16 | Sec. 5700: Marijuana Treatment, Dispensing & Cultivation | 3 |

**2016 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/12/16 | Amend the Use Schedule – MUD | 11 |
| 3/12/16 | Amend the SLO Bylaw, Definitions & District Regs. | 12 |
| 3/12/16 | Amend the Zoning Map – Spurr House – 7 Parkman | 39 |

**2015 Fall Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 10/19/15 | Amend Zoning Map: Parcels 53, 55, 56 (Map 21) Parcels 1, 4,176, 177, 180, 181, 182 (Map 28) | 4 |
| 10/19/15 | Sec. 3300: Sign Regulations | 5 |

**2014 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/15/14 | Sec. 2300 and Article 5: Definitions | 21 |
| 3/15/14 | Sec. 1200, 1241: Administration – Design Requirements | 22 |
| 3/15/14 | Sec. 2500, 2540: Dimensional Regulations – Multiple Buildings and Article 5: Definitions | 23 |

**2013 Special Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 10/21/13 | Sec. 4100, 4112, 4120, 4125, 4133, 4142: Earth Moving | 22 |
| 10/21/13 | Sec. 2600: Dimensional Schedule | 23 |
| 10/21/13 | Sec. 3200m 3220, 3230, 3240: Environmental Controls | 24 |
| 10/21/13 | Sec. 4500: Flood Plain District | 25 |
| 10/21/13 | Sec. 2300: Use Regulation Schedule – Residential Uses | 26 |
| 10/21/13 | Article 5: Definitions | 27 |
| 10/21/13 | Zoning Map amendment Country Club | 30 |
| 10/21/13 | Zoning Map amendment Town Hall | 31 |

**2013 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/16/13 | Added Sec. 5700 Medical Marijuana Treatment & Dispensing  Facilities & Marijuana Cultivation | 16 |

**2012 Special Town Meeting**

| Date | By-law | Article |
|------|--------|---------|

| 10/15/12 | *Added Sec. 5600: Large-Scale Ground-Mounted Solar Photovoltaic Installations* | 19 |

## 2012 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 3/17/12 | *Zoning Map Change – 36 West Main St. – to BB* | 27 |
| 3/17/12 | *Zoning Map Change – 44-46 East Main St. – to BB* | 28 |
| 3/17/12 | *Zoning Map Change – Downtown Planning Overlay Dist.* | 29 |

## 2011 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 5/14/11 | *Sec. 3300, Subsection 3332 Sign Regulations* | 18 |
| 5/14/11 | *Delete  Bldg. Inspector & replace Bldg. Commissioner* | 19 |
| 5/14/11 | *Sec. 1240, 1241 Site Plan Review* | 20 |
| 5/14/11 | *Sec. 1200, 1244 Site Plan Review Public Hearing* | 21 |

## 2010 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 5/15/10 | *Amend Zoning Map Parcels 44, 53, &53A (Map 33)* | 18 |
| 5/15/10 | *Sec. 5400 Industrial D (ID) Overlay District* | 30 |
| 5/15/10 | *Sec. 5300 Senior Housing Overlay District* | 31 |
| 5/15/10 | *Sec. 5500 Mixed Use District (MUD)* | 32 |

## 2009 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 5/16/09 | *Amend Zoning Map – R to BA* | 27 |

## 2008 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 5/17/08 | *Amend Zoning Map – Highway Business District* | 29 |

## 2007 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| *No Zoning Bylaws Passed in 2007* | | |

## 2006 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 5/13/2006 | *Sec. 2300: Multi-Family Dwelling* | 30 |
| 5/13/2006 | *Sec. 5200: Multi-Family Housing in (BA)* | 30 |

## 2005 Special Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 10/17/05 | *Sec. 4600: Delete Planned Parcel Development (PPD)* | 12 |

## 2005 Annual Town Meeting
| Date | By-law | Article |
|------|--------|---------|
| 5/14/05 | *Sec. 2620: Non-Residential (District Chart)* | 41 |
| 5/14/05 | *Sec. 2110: Zoning-District Sub.Sec. Business (G2)* | 41 |
| 5/14/05 | *Sec. 2110: Footnote (6)* | 41 |
| 5/14/05 | *Sec.5100: (G2)  Gateway District* | 41 |
| 5/14/05 | *Amend Zoning Map (BA) → (G2)* | 41 |

| | | |
|---|---|---|
| 5/14/05 | *Sec. 2300: Delete "Other" from Use Reg. Schedule* | *41* |
| 5/14/05 | *Amend Zoning Map (Parcel 77, Map 21)* | *42* |
| 5/14/05 | *Replace Zoning Map with GIS Map* | *44* |

## 2004 Annual Town Meeting

| *Date* | *By-law* | *Article* |
|---|---|---|
| 3/15/04 | *Sec. 2100: Sub.Sec. 2110 DPOD (4)* | *38* |
| 3/15//04 | *Sec. 2300: Add DPOD to District Column* | *38* |
| 3/15/04 | *Sec. 2620: Add DPOD to District column* | *38* |
| 3/15/04 | *Sec. 4900: Downtown Planning Overlay District* | *38* |
| 3/15/04 | *Zoning Map: Amend in Accordance with Sec. 4900* | *39* |
| 3/15/04 | *Licenses for Alcohol Sales in DPOD* | *40* |

## 2004 Special Town Meeting

| *Date* | *By-law* | *Article* |
|---|---|---|
| 10/18/04 | *Sec. 4900: DPOD* | *8* |
| 10/18/04 | *Amend Zoning Map: Parcels 23-A, 24-A, 27, 28, 40, 46 and 50 (Map 33); Parcels 48, 49, 51 (Map 33); Parcels 43, 43-A, 47 (Map 33); Parcels 41, 42 (Map 33)* | *9* |
| 10/18/04 | *Sec. 2100: Sub. Sec. 2110 'Mixed-Use Industrial'* | *10* |
| 10/18/04 | *Sec. 2110: Footnote (5)* | *10* |
| 10/18/04 | *Sec. 2300: Add MUI (IC) to Dist. Column* | *10* |
| 10/18/04 | *Sec. 2620: Add MUI (IC) to Sec. 5000* | *10* |
| 10/18/04 | *Amend Zoning Map: Parcels 96, 96B and 96C (Map 19); Parcels 49, 50, 11, 51, 10, 10, 9, 4, 5, 6, 24 and 3 (Map 18)* | *10* |

## 2003 Annual Town Meeting
*No Zoning By-laws Passed in 2003*

## 2002 Annual Town Meeting

| *Date* | *By-law* | *Article* |
|---|---|---|
| 3/18/02 | *Zoning Map: Parcel 113 (Map 34)* | *36* |
| 3/18/02 | *Sec. 2630: Building in M-1 District* | *42* |
| 3/18/02 | *Sec. 2630: Wording of Building in M-1 District* | *43* |
| 3/18/02 | *Sec. 4100: Earth Moving Replacement and Definitions* | *17* |

## 2001 Annual Town Meeting

| *Date* | *By-law* | *Article* |
|---|---|---|
| 3/17/01 | *Sec. 4700- 4733: Split Lot Provisions* | *30* |
| 3/17/01 | *Sec. 4700-4742: Use Regulation Schedule* | *30* |
| 3/17/01 | *Sec.4700-4742: Word Change* | *30* |
| 3/17/01 | *Sec.4700-4732: Updated Overlay Map* | *30* |
| 3/17/01 | *Sec. 2600-2610: Footnote (i): Rejected by AG* | *36* |
| 3/17/01 | *Amend Zoning Map: Route 9* | *40* |
| 3/17/01 | *Amend Zoning Map: Gilmore and Flanders Road* | *41* |
| 3/17/01 | *Zoning Map Label Changes* | *42* |
| 3/17/01 | *Sec. 2620: Non-Res. Buildings in Non-Res. Districts* | *44* |
| 3/17/01 | *Sec. 3120: Schedule of Parking Area Requirements* | *45* |
| 3/17/01 | *Zoning Map: Parcels 60, 60A (Map 27) Parcel 20A (Map 28)* | *46* |

**2000 Annual Town Meeting**
*No Zoning By-laws passed in 2000*

**1999 Annual Town Meeting**

| Date | Bylaw | Article |
|------|-------|---------|
| 3/13/99 | Zoning Map: Parcels 59, 59A, 60 (Map 28) | 47 |

**1998 Annual Town Meeting**
*No Zoning By-laws passed in 1998*

**1997 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/15/97 | Sec. 1241: Add Section 1245 | 26 |
| 3/15/97 | Sec. 1240: Site Plan Review | 27 |
| 3/15/97 | Zoning Map: Parcels 22, 23, 24 (Map 28) | 49 |
| 3/15/97 | Zoning Map: Parcels 62, 254 (Map 27) | 50 |
| 3/15/97 | Zoning Map: Parcel 26 (Map 4) | 51 |

**1996 Annual Town Meeting /Special Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/23/96 | Sec. 4700: Aquifer & Watershed Protection District | 58 |
| 3/23/96 | Sec. 2600 :Dimensional Schedule, District Regulations | 64 |
| 3/23/96 | Sec. 4800: Special Permits for Adult Uses | 66 |
| 3/23/96 | Sec. 3337: Sub. Sec. C- Historical Commission | 74 |

**1996 Special Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 11/18/96 | Special Adult Uses Revision | 13 |

**1995 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/7/95 | Zoning Map: Parcels 25, 27 (Map 28) | 51 |
| 3/7/95 | Zoning Map: Parcel 21 (Map 28) | 25 |
| 3/7/95 | Zoning Map: Parcels 22, 23, 258 (Map 8) → PPD | 48 |

**1995 Special Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 9/19/95 | Special Regulations 4600 (Planned Parcel Development) | 10 |

**1994 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/29/94 | 3337A: Historical Dist. &/or National Reg. of Properties | 39 |
| 3/29/94 | Sec. 4330: Minimum Requirements  (Wording) | 40 |
| 3/29/94 | Sec.1330: Special Permits | 41 |
| 3/29/94 | Sec. 4700: Aquifer & WPD to comply with DEP | 42 |
| 3/29/94 | Sec. 4100: 4111-4137 Earth Moving Changes | 43 |
| 3/29/94 | Sec. 2610: District Reg. and Article 5: Common Driveway | 75 |

**1993 Annual Town Meeting**
*No Zoning By-laws passed in 1993*

**1992 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/2/92 | Sec. 2620: Footnote (d) Revision | 19 |
| 3/2/92 | Sec. 1100: Purpose Revision | 20 |
| 3/2/92 | Sec. 4100: Earth Removal Revisions | 21 |
| 3/2/92 | Sec. 2300: Use Regulation Schedule | 23 |

**1991 Annual Town Meeting**

*No Zoning By-laws passed in 1991*

**1990 Annual Town Meeting**

| Date | By-laws | Article |
|------|---------|---------|
| 3/5/90 | Entire Westborough Zoning Bylaws | 19 |
| 3/5/90 | Addition of Sec. 4800: Critical Resource Protection Dist. | 26 |
| 3/5/90 | Sec. 2300: Open Space Communities | 52A |
| 3/5/90 | Sec. 2300: Use Regulation Schedule: Commercial Uses | 52F |
| 3/5/90 | Sec. 2150-2153 and 4300 | 59 |
| 3/5/90 | Sec. 2600 Sub. Sec. 2620 | 61 |
| 3/5/90 | Sec. 3200 Sub. Sec. 3240 | 69 |
| 3/5/90 | Sec. 3337 Sub. Sec. A | 72 |
| 3/5/90 | Sec. 4500: Changes – Flood Plain District | 74 |

**1990 Special Town Meeting**

| Date | By-laws | Article |
|------|---------|---------|
| 6/20/90 | Deletion of Sec. 4800 – Adult Uses | 11 |
| 6/20/90 | Sec. 4500: Changes at ATM 1990: Nullified | 12 |

**1989 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/21/89 | 3337 Historical Dist &/or National Register Properties | 43 |

**1988 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/14/88 | Article 5 Definition: Parking Garage | 70 |
| 3/14/88 | Sec. 3135: Parking Garage | 71 |
| 3/14/88 | Sec. 4651: Planned Parcel Development | 72 |
| 3/14/88 | Sec. 4653: Planned Parcel Development | 73 |
| 3/14/88 | Sec. 2300: Banks and Office Space | 76 |
| 3/14/88 | Sec. 4320: Replacement - Total Number of Lots | 77 |
| 3/14/88 | Sec. 4300: Lot Dimensional Requirements | 78 |

**1987 Annual Town Meeting**

*No Zoning By-laws were passed in 1987*

**1986 Annual Town Meeting**

| Date | By-law | Article |
|------|--------|---------|
| 3/15/86 | Article 5 Definitions: Airport and Heliport | 67 |
| 3/15/86 | Article 5 Definitions: Aquifer, Discharge, Groundwater, Recharge Areas, Septic Wastes, Solid Wastes, Toxic or Hazardous Materials. | 75 |

101

| 3/15/86 | 4700 Aquifer and Watershed Protection Dist. | 76 |
| 3/15/86 | Article 5 Definitions: Open Space | 86 |
| 3/15/86 | Sec. 2610: Dimensional Schedule | 87 |
| 3/15/86 | Sec. 2300: Customary Accessory Uses and Structures | 88 |
| 3/15/86 | Sec. 2400: Nonconforming Uses – add "uses" | 89 |

## 1985 Annual Town Meeting

| Date | By-law | Article |
|------|--------|---------|
| 3/16/85 | Sec. 2610: Min. Lot Frontage (d) | 19 |
| 3/16/85 | Sec. 4136: Earth Removal – finish grade | 73 |
| 3/16/85 | Sec. 2620: Dimensional Schedule Footnote (a) | 85 |

## 1984 Annual Town Meeting

| Date | By-law | Article |
|------|--------|---------|
| 3/5/84 | Sec. 1240, 1241, 1242, 1243, 1244: Replacement | 14 |
| 3/5/84 | Sec. 3120: Schedule of Parking Area Requirements | 17 |
| 3/5/84 | Sec. 1700: Effective Date Replacement | 26 |
| 3/5/84 | Sec. 2400: Nonconforming Uses – word change | 34 |
| 3/5/84 | Sec. 2300: Institutional Uses | 51 |
| 3/5/84 | Sec. 2600: Footnote L. | 52 |
| 3/5/84 | Sec. 3120: Congregate Housing | 53 |
| 3/5/84 | Sec. 3130: Sub. Sec. 3134 Replacement | 54 |
| 3/5/84 | Article 5 Definition: Congregate Housing | 55 |
| 3/5/84 | Sec. 1210: Building Inspector | 60 |
| 3/5/84 | Sec. 2410: Nonconforming Uses – word change | 66 |

## 1983 Annual Town Meeting

| Date | By-law | Article |
|------|--------|---------|
| 3/7/83 | Sec. 3337: Sign unlawfully installed - deletion | 47 |
| 3/7/83 | Sec. 2620: Min. Open Space Requirements | 50 |
| 3/7/83 | Sec. 4450: Structures | 58 |

## 1982 Annual Town Meeting

| Date | By-law | Article |
|------|--------|---------|
| 3/1/82 | Sec. 4600: Planned Parcel Development | 35 |
| 3/1/82 | Sec. 2620: Min. Side Yard | 37 |
| 3/1/82 | Sec. 2540: Replacement | 46 |
| 3/1/82 | Sec. 1242: Subsection J | 52 |
| 3/1/82 | Sec. 1240: Site Plan Review | 53 |

## 1981 Annual Town Meeting

| Date | By-law | Article |
|------|--------|---------|
| 3/2/81 | Sec. 2300: Open Space Communities | 28 |
| 3/2/81 | Sec. 2650: Dimensional Regulations | 31 |
| 3/2/81 | Sec. 2610: Min. Open Space | 35 |
| 3/2/81 | Sec. 1250: Penalty | 49 |
| 3/2/81 | Sec. 2300: Industrial, Utility Uses | 57 |
| 3/2/81 | Sec. 2300: Motor Vehicle Ser. Stat. and Earth Removal | 64 |
| 3/2/81 | 2410(d), 3120, 2440, 2620(f) | 70 |
| 3/2/81 | Article 5 Definitions: Structure | 71 |
| 3/2/81 | Sec. 1300: Footnote | 74 |
| 3/2/81 | Sec. 2620: Min. Open Space | 75 |

| 3/2/81 | *Article 5 Definitions: Open Space* | 76 |
| 3/2/81 | *Sec. 4540: Footnote* | 79 |

## 1980 Annual Town Meeting

| *Date* | *By-law* | *Article* |
| --- | --- | --- |
| 3/3/80 | *Article 5 Definitions: Lot Frontage* | 20 |
| 3/3/80 | *Article 5 Definitions: Buffer Strip* | 21 |
| 3/3/80 | *Sec. 2620: Footnote (d)* | 22 |
| 3/3/80 | *Sec. 4112: Replacement* | 23 |
| 3/3/80 | *Sec. 2200: Special Permit* | 24 |
| 3/3/80 | *Sec. 2300: Code Symbol 'S' → 'SP'* | 25 |
| 3/3/80 | *Sec. 2300: Use Regulation Schedule* | 26 |

## 1979 Annual Town Meeting

| *Date* | *By-law* | *Article* |
| --- | --- | --- |
| 3/21/79 | *Sec. 2640: Buildings in Municipal Districts* | 11 |

## 1978 Special Town Meeting

| *Date* | *By-law* | *Article* |
| --- | --- | --- |
| 12/21/78 | *Deletion of Sec. 1330, Addition of 4600* | 1 |
| 12/21/78 | *Sec. 2110: Residential Districts* | 2(a) |
| 12/21/78 | *Sec. 2200: Use Regulations: 'S' Substitution* | 2(b) |
| 12/21/78 | *Sec. 2300: Use Regulations Schedule: BA, BB* | 2(c) |
| 12/21/78 | *Sec. 2300: Use Regulations Schedule: R60, R25, R15* | 2(d) |
| 12/21/78 | *Sec. 2300: Use Regulations Schedule: TC* | 2(e) |
| 12/21/78 | *Sec. 2300: Use Regulations Schedule: M* | 2(f) |
| 12/21/78 | *Sec. 2600-2610: Dimensional Schedule* | 2(g) |
| 12/21/78 | *Sec. 2600-2620: Dimensional Schedule: BA, BA(f)* | 2(h) |
| 12/21/78 | *Sec. 2600-2620: Dimensional Schedule* | 2(i) |
| 12/21/78 | *Addition of Sec. 4700 Planned Unit Development* | 3 |
| 12/12/78 | *Zoning Map: IB & BB →BA* | 4 |
| 12/12/78 | *Zoning Map: R25& IB → R60* | 5 |
| 12/12/78 | *Zoning Map: R25→ R15* | 6 |
| 12/12/78 | *Zoning Map: R25→ TC* | 7 |
| 12/12/78 | *Zoning Map: Municipal District 'M'* | 8 |
| 12/12/78 | *Proposed Zoning Map of the town of Westborough* | 9 |

## 1977 Annual Town Meeting

| *Date* | *By-law* | *Article* |
| --- | --- | --- |
| 3/7/77 | *Sec. 2300 Use Regulation Schedule: Res. Uses Footnote* | 22 |
| 3/7/77 | *Sec. 3120: Boarding House* | 23 |
| 3/7/77 | *Sec. 3133 Substitution* | 25 |
| 3/7/77 | *Sec. 1320: Variances* | 37(1) |
| 3/7/77 | *Sec.1360: Repetitive Petitions* | 37(2) |
| 3/7/77 | *Sec. 2510: Exemptions* | 37(3) |
| 3/7/77 | *Sec. 1100: Purpose Replacement* | 37 A |
| 3/7/77 | *Sec. 1250: Penalty* | 37 B |
| 3/7/77 | *Sec. 1260: Enforcement* | 37 C |
| 3/7/77 | *Sec. 1300: Board of Appeals & Subsections Substitution* | 37 D |
| 3/7/77 | *Sec. 1400: Amendments* | 37 E |
| 3/7/77 | *Sec. 1500: Separability Substitution* | 37 F |
| 3/7/77 | *Sec. 2300: Use Regulation Schedule* | 37 G |

| 3/7/77 | Sec. 2300: Agriculture, Horticulture, Floriculture | 37 H |
| 3/7/77 | Sec. 2400: Non-Conforming Uses | 37 I |
| 3/7/77 | Sec. 2510: Exemption | 37 J |
| 3/7/77 | Article 5: Def.- Agricultural, Horticultural, Floriculture | 37 1 |
| 3/7/77 | Sec. 2200: District Regulations | 38 |
| 3/7/77 | Sec. 1240: Site Plan Review | 40 |
| 3/7/77 | Sec. 3311 through 3337 | 67 |
| 3/7/77 | Sec. 3340: Non-Accessory Signs Substitution | 70 |
| 3/7/77 | Article 5 Definitions: Sign, Sign (Area of) | 72 |
| 3/7/77 | Sec. 3110: General | 73 |
| 3/7/77 | Sec. 2600: Dimensional Schedule | 74 |
| 3/7/77 | Sec. 3230: Liquid Waste | 75 |

**1977 Special Town Meeting**

| Date | By-law | Article |
| --- | --- | --- |
| 3/22/77 | Sec. 4232: Special Regulations | 7 |

**1976 Annual Town Meeting**

| Date | By-law | Article |
| --- | --- | --- |
| 3/76 | Sec. 4417: Home Occupation | 25 |
| 3/76 | Sec. 4418: Home Occupation | 26 |
| 3/76 | Article 5 Definitions: Yard or Garage Sale | 28 |
| 3/76 | Zoning Map and Bylaw Addition: Sec. 4500 | 34 |

**1975 Annual Town Meeting**

*No Zoning By-laws were passed in 1975*

**1974 Annual Town Meeting**

| Date | Bylaw | Article |
| --- | --- | --- |
| 3/74 | Sec. 2300: District Reg. Single or 2 Family Dwelling | 82 |
| 3/74 | Sec. 4330: Lot Dimensional Requirements | 83 |
| 3/74 | Sec. 2110 and Sec. 2300: District Regulations | 85 |

**1973 Annual Town Meeting**

| Date | Bylaw | Article |
| --- | --- | --- |
| 3/5/73 | Sec. 2610: Dimensional Schedule | 56 |
| 3/5/73 | Sec. 2620: Non-Res. Building in Non-Res. District | 59 |
| 3/5/73 | Article 5 Definitions: Corner Lot | 61 |
| 3/5/73 | Article 5 Definitions: Lot Frontage | 62 |
| 3/5/73 | Sec. 3220: Pollution Control | 94 |

**1972 Annual Town Meeting**

| Date | Bylaw | Article |
| --- | --- | --- |
| 3/18/72 | Westborough Building Code | 37 |
| 3/18/72 | Entire Zoning Bylaw Deletion | 77 |
| 3/18/72 | Sec. 2300: Multi Family Dwelling | 78 |
| 3/18/72 | Sec. IV Apartment Buildings | 81 |
| 3/18/72 | Zoning Map: Conservation Land: Kelleher/Aubrey | 82 |
| 3/18/72 | Zoning Map: Rozefsky Bros. | 83 |
| 3/18/72 | Zoning Map and Bylaw: Campbell | 84 |
| 3/18/72 | Zoning Map: Tufts/Hickox | 85 |
| 3/18/72 | Zoning Map: S.E. Side of East Main St. | 86 |

| 3/18/72 | *Zoning Map and Bylaw: E. Main and Water St.* | *88* |
| 3/18/72 | *Zoning Map: S.E. Side of  East Main Street* | *89* |

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

### ATTACHMENT C

PURCHASE AND SALE AGREEMENT

1.   **INTRODUCTION**.

(a)   EFFECTIVE DATE:                 _____, 2022.

(b)   PROPERTY:            A parcel of land with the building and other improvements thereon located at 231 Turnpike Road, Westborough, known as the former Regal Cinema property, shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77, and containing 29 acres, more or less, according to said plan.

(c)   SELLER:            Town of Westborough

Address:            Westborough Town Hall, 34 W. Main Street, Westborough, MA 01581

Seller's Attorney:            Shirin Everett, Esq., K.P. Law, P.C., 101 Arch Street, Boston, MA 02110

Phone:            (617) 556-0007      Fax:  (617) 654-1735

Email:            severett@k-plaw.com

(d)   BUYER:

Address:

Buyer's Attorney:

Phone:                     Fax:

Email:

2.   **COVENANT**. Seller agrees to sell and Buyer agrees to buy the Property upon the terms hereinafter set forth.

17

3.     **PURCHASE PRICE**.

(a)     <u>Purchase Price</u>. The purchase price for the Property shall be
_____ and 00100 Dollars ($_____.00) (the "<u>Purchase
Price</u>"), of which _____ and no/100 Dollars shall be paid within two (2)
Business Days of the Effective Date (the "<u>Deposit</u>"). The balance of the Purchase Price, as
adjusted by all prorations as provided for herein, shall be paid to Seller by Purchaser at Closing,
by wire transfer of immediately available federal funds.

(b)     <u>Deposit</u>. (a) Within two (2) Business Days after the Effective Date, Buyer will
deposit the Deposit with the Town Treasurer as escrow agent in a non-interest bearing account.
The Deposit shall be applied to the Purchase Price at Closing or shall be disbursed as otherwise
provided herein. The escrow agent's obligation to return the Deposit to the party entitled thereto
under the terms of this Agreement, as and when provided herein, shall survive the termination of
this Agreement. In the event that this Agreement is terminated solely because of Seller's default,
the Deposit shall be returned to Buyer within fourteen (14) of said termination, regardless of
whether the return of said Deposit is stated elsewhere in this Agreement. The foregoing
obligation shall survive the termination of this Agreement.

4.     **TITLE**.

(a)     <u>Title Report</u>. Buyer shall obtain a title commitment (the "<u>Title Commitment</u>")
issued by a nationally recognized title insurance company, together with a copy of all
instruments creating title exceptions described in the Title Commitment (the "<u>Exception
Documents</u>"), all at its sole cost and expense;

(b)     <u>Title Objection Notice</u>. Buyer shall have until 5:00 p.m. on _____,
2022  (the "<u>Inspection Termination Date</u>" and the period from the Effective Date to the
Inspection Termination Date, the "<u>Inspection Period</u>") to send Seller a letter (the "<u>Title Objection
Letter</u>") setting forth all of Buyer's objections to the Title Report and Exception Documents,
with copies thereof (collectively, the "<u>Title Objections</u>"), and (b) Seller shall have until 5:00
p.m._____, 2022 (the "<u>Seller Response Period</u>"), which date is fifteen (15) days after
Seller receives the Title Objection Letter, to notify Buyer in writing ("<u>Seller's Title Response
Notice</u>") of Seller's election, in its sole and absolute discretion, to either: (i) cure, on or prior to
Closing, any of the Title Objections, or (ii) not cure any or all of the Title Objections (and
Seller's failure to respond by the expiration of the Seller Response Period shall be deemed an
election by Seller not to cure any of the Title Objections). If Seller elects to cure any Title
Objections, Seller shall use good faith efforts to cure such Title Objections at or prior to Closing,
provided, however, that good faith efforts shall not require Seller to expend more than $2,000.00
to effectuate said cure, including attorneys' fees, but excluding monetary liens voluntarily
granted by Seller.

(c)     <u>Title Termination Date</u>. If Seller is unwilling to cure (or is deemed to have elected
not to cure) any of the Title Objections, Buyer will have the option to either: (a) waive
any Title Objections that Seller is unwilling to cure or is deemed to have elected not to cure; or
(b) terminate this Agreement by written notice to Seller sent by 5:00 p.m. on
_____, 2022 (the "<u>Termination Day</u>"), which date is fifteen (15) days after the

Seller Response Period expires.  Upon a timely termination by Buyer, this Agreement shall automatically terminate, the parties shall be released from all further obligations under the Agreement (except for those provisions that, by their terms, survive a termination of this Agreement).

(d)     Waiver.  Buyer's failure to take either one of the actions described in (b) and (c) above shall be deemed to be Buyer's election to acquire the Property notwithstanding the Title Objections under this subsection (d), if any, and Buyer shall have waived its right to terminate this Agreement under this Section.  Buyer shall have been deemed to have approved any title matter that exists as of the date of the Title Commitment and that Seller is not obligated to remove or as to which either Buyer did not object to as provided above or to which Buyer did object, but with respect to which Buyer did not terminate this Agreement.  Nothing herein shall affect Buyer's right to object to title matters occurring after the Inspection Period.

(e)     Permitted Exceptions.  Notwithstanding anything herein to the contrary, Buyer acknowledges and agrees that the Property shall be conveyed subject to the following matters: (i) the rights and obligations, including cost-sharing arrangements, set forth in the Declaration of Reciprocal Covenants, Easements and Restrictions, recorded with the Worcester South Registry of Deeds in Book 18745, Page 313, (ii) any lien to secure payment of special assessments, not delinquent, (iii) any and all applicable laws, ordinances, rules and governmental regulations (including, without limitation, those relating to building, zoning and land use) affecting the development, use, occupancy and/or enjoyment of the Property, (iv) matters set forth in the Title Report and not included in the Title Objections, (v) Title Objections subsequently waived or deemed waived by Buyer in accordance with this Section 4, (iv) such other Title Objections as Buyer's title company shall commit to insure over or omit as exception, without any additional cost to Buyer, (vii) any lien, encumbrance, title exception or defect that are approved or deemed approved by Buyer after the date hereof, and (viii) a trail easement or easements that may be reserved by Seller on portion or portions of the Property at locations reasonably acceptable to Buyer for benefit of the public, to be shown on a plan prepared by Buyer and acceptable to Seller.  The foregoing matters are referred to herein, collectively, as the "Permitted Exceptions."  Notwithstanding anything stated to the contrary herein, Seller covenants and agrees to remove from the Property any lien or encumbrance which is a mortgage, deed of trust and/or other debt instruments to the extent voluntarily executed by Seller or expressly assumed by Seller in writing.

(f)     Title and Practice Standards.  Any matter or practice arising under or relating to this Agreement which is the subject of a title standard or a practice standard of the Massachusetts Real Estate Bar Association at the time for delivery of the deed shall be covered by said title standard or practice standard to the extent applicable.

5.     PLANS.  If said deed refers to a plan necessary to be recorded therewith, Buyer shall prepare and deliver such plan in form adequate for recording or registration to Seller for Seller's approval, not to be unreasonably withheld, at least thirty (30) days prior to the closing date. Buyer shall prepare a survey plan of the easements to be reserved by Seller, if any.

6.     PROPERTY INSPECTIONS.

(a)     Inspections.  During the Inspection Period, Buyer shall have a limited license to enter upon the Property for the purpose of conducting such other inspections, surveys, tests and investigations as Buyer deems reasonably necessary to ascertain the suitability of the Property for the Permitted Uses (including use thereof residential purposes and ability to construct the Project improvements), including, without limitation, ALTA boundary/topographical and/or "as-built" surveys, utility inspections, zoning verifications, examination of flood plain status, to determine the acceptability of soil compaction, examination of water and drainage delineations, and other non-invasive inspections (the "Inspections"), all at Buyer's sole risk and expense. Buyer shall not conduct any subsurface or invasive inspections unless: Buyer's Phase 1 Site Assessment report recommends a Phase 2 Site Assessment and Buyer has notified Seller of the same in writing at least thirty (30) days prior thereto and obtained Seller's prior written approval, including, without limitation, Seller's prior written approval of the location of such invasive inspections, which may not be unreasonably withheld.  Buyer shall use commercially diligent efforts to complete the Inspections as soon as practicable and to minimize any interference with the use of the Property by Seller and others entitled thereto.  All of such other entries upon the Property shall be at reasonable times during normal business hours and after at least forty-eight (48) hours prior written notice to Seller or Seller's agent (which notice may be sent by e-mail to _____ at _____), and Seller or Seller's agent shall have the right to accompany Buyer during any activities performed by or on behalf of Buyer on the Property.  Buyer will promptly provide Seller with a copy of any reports in Seller's possession or control ("Reports") which assesses the presence of any Hazardous Materials (as such term is defined herein) on the Property or any violation of any applicable law. Buyer agrees to keep confidential and not disclose the contents or result of any Reports, except to the extent required by applicable law.

(b)     Repair, Restoration. Except as provided below, if Buyer and/or its agents, employees, representatives, contractors, consultants and/or invitees (with Buyer, the "Buyer Parties") disturb or damage the Property or any other improvements or property of Seller or of others during the Inspection Period or at any other time that Buyer and/or the other Buyer Parties enter the Property, Buyer shall promptly restore or repair the Property and/or the improvements thereon to the same condition as existed prior to such disturbance or damage, it being acknowledged that the failure to repair/restore the Property and/or the other property promptly shall be a material default under this Agreement.  The foregoing obligation shall survive the termination of this Agreement.

(c)     Property Objection Notice.  If Buyer determines that the condition of the Property is not acceptable under this Section, Buyer shall have the right to terminate this Agreement by notifying Seller of such termination no later than the Inspection Termination Date, setting forth therein the reasons for said termination (the "Property Objection Letter").  Upon such timely termination, neither party shall have any further rights or obligations under this Agreement except for such obligations expressly intended to survive termination.  If Buyer fails to so notify Seller of Buyer's termination of this Agreement by the Inspection Termination Date, then Buyer shall have waived its right to terminate this Agreement pursuant to this Section 6, and be deemed to have approved the condition of the Property as of said Inspection Termination Date.   Nothing herein shall affect Buyer's right to object to Hazardous Materials released on the Property after the Inspection Termination Date.

20

7.      INSURANCE.

(a)      Insurance.  Buyer shall procure and maintain, effective as of the date of this
Agreement through and until the Closing: (a) Workers' Compensation Insurance in statutory
limits, and Employer's Liability Insurance in a minimum amount of One Million ($1,000,000.00)
Dollars, and (b) the following insurance coverages with insurance companies reasonably
acceptable to Seller: (i) Commercial General Liability Insurance including Personal Injury,
Death, Contractual, Products/Completed Operations, Independent Contractors, and Property
Damage and Commercial Automobile Liability Insurance covering all automobiles, trucks, and
other vehicles utilized at the Property, all in a minimum amount of One Million ($1,000,000.00)
Dollars combined single limit coverage arising out of any one occurrence, and Two Million
($2,000,000.00) Dollars in the aggregate; and (iii) umbrella insurance in the amount of Five
Million Dollars ($5,000,000).

(b)      General Requirements. Each of the foregoing policies (except workers'
compensation insurance) must include "Town of Westborough, Massachusetts" as an additional
insured.  Upon or prior to execution of this Agreement, Buyer shall deliver to Seller one or more
certificates of insurance evidencing that Buyer has in fact procured the insured required
hereunder.  Buyer will not be permitted to access the Property until Seller receives such
certificates of insurance.  Such policies shall contain a provision whereby the insurer shall give
Seller not less than thirty (30) days' written notice prior to the cancellation or material
modification of such policies.  If such insurance is available only on a claims-made basis, then
the dates of coverage, including the retroactive date and the time period within which any claim
can be filed, shall be stated in the certificate(s) of insurance, and Buyer shall be obligated to
ensure that no gaps in coverage occur.  Such insurance shall not relieve or release Buyer from, or
limit its respective liability as to, any and all obligations arising under this Section.  Buyer shall
immediately notify Seller, initially by telephone, and thereafter in writing, of any and all
accidents arising out of Buyer's activities on the Property.

9.      INDEMNIFICATION; RELEASE.  Buyer shall release, discharge, indemnify,
defend and hold harmless Seller and/or its agents, employees, representatives, board of
commission members, and others acting by and through Seller (collectively, with Seller, the
"Seller Parties") from and against any and all damages, claims, losses, liabilities, costs and
expenses (including reasonable attorneys' fees), which may be brought against, imposed upon
and/or incurred by any of the Seller Parties arising out of or related to the Inspections of the
Property and/or the entry upon and/or activities undertaken by Buyer and/or any of the other
Buyer Parties, except to the extent that the same is directly caused by the gross negligence of any
of the Seller Parties.  The obligations of Buyer pursuant to this Section shall survive the Closing
and/or the termination of this Agreement.

10.      HAZARDOUS MATERIALS.  Buyer acknowledges that Buyer has not been
influenced to enter into this transaction and that she has not relied upon any warranties or
representations not set forth in this Agreement.  Buyer represents and warrants that it or its
agents have conducted a full inspection of the Property, and based upon Buyer's investigation,
Buyer is aware of the condition of the Property and will accept the Property "AS IS", subject to
Buyer's right to terminate this Agreement under Section 5.  Buyer acknowledges that Seller has

21

no responsibility for hazardous waste, oil, hazardous material or hazardous substances, as those terms are defined by any applicable federal, state and/or local law, rule or regulation, including, without limitation, the Massachusetts Oil and Hazardous Materials Release Prevention and Response Act, M.G. L. c. 21E, the Massachusetts Hazardous Waste Management Act, M.G.L. c. 21C, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §§ 9601 et seq. and the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901 et seq. (herein collectively referred to as "Hazardous Materials") on, in, under or emitting from the Property or for any other condition or defect on the Property, and shall defend, indemnify the hold harmless Seller form any and all losses, damages, costs, claims, fines, expenses and liabilities relating to said Hazardous Materials.  The provisions of this Section shall survive delivery of the deed.

11.    BUYER'S ACKNOWLEDGEMENT.  Buyer acknowledges and agrees that Seller has not made, does not make and specifically disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to (a) the nature, quality or condition of the Property, including, without limitation, the water, soil and geology, (b) the income to be derived from the Property, (c) the suitability of the Property for any and all activities and uses which Buyer may conduct thereon, (d) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body, including, without limitation, the Americans with Disabilities Act and any rules and regulations promulgated thereunder or in connection therewith, (e) the habitability, merchantability or fitness for a particular purpose of the Property, or (f) any other matter with respect to the Property, and specifically that Seller has not made, does not make and specifically disclaims any representations regarding the presence, existence or absence of Hazardous Materials, toxic substance or other environmental matters.  Buyer further acknowledges and agrees that, having been given the opportunity to inspect the Property, Buyer is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller.  Buyer further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information.  **Buyer further acknowledges and agrees that, and as a material inducement to the execution and delivery of this Agreement by Seller, the sale of the Property as provided for herein is made on an "AS IS, WHERE IS" CONDITION AND BASIS "WITH ALL FAULTS."**  Buyer acknowledges, represents and warrants that Buyer is not in a significantly disparate bargaining position with respect to Seller in connection with the transaction contemplated by this Agreement; that Buyer freely and fairly agreed to this acknowledgment as part of the negotiations for the transaction contemplated by this Agreement.

12.    POSSESSION AND DELIVERY OF PREMISES.  Full possession of said Property free of all tenants and occupants is to be delivered at the time of the delivery of the deed.

13.    EXTENSION TO PERFECT TITLE OR MAKE PREMISES CONFORM.  If Seller shall be unable to give title or to make conveyance, or to deliver possession of the Property, all as herein stipulated, or if at the time of the delivery of the deed the Property do not conform with the provisions hereof, then any payments made under this Agreement shall be

22

forthwith refunded and all other obligations of the parties hereto shall cease and this Agreement shall be void without recourse to the parties hereto, unless Seller elects, in its sole discretion, to use reasonable efforts to remove any defects in title, or to deliver possession as provided herein, or to make the said Property conform to the provisions hereof, as the case may be, in which event Seller shall give written notice thereof to Buyer at or before the time for performance hereunder. In no event, however, shall reasonable efforts require Seller to expend more than $2,500.00, including attorneys' fees.  Seller's obligations hereunder are subject to the availability and/or appropriation of funds to fulfill Seller's obligations.

14.     FAILURE TO PERFECT TITLE OR MAKE PREMISES CONFORM.  If at the expiration of the extended time Seller shall have failed so to remove any defects in title, deliver possession, or make the Property conform, as the case may be, all as herein agreed, then any payments made under this Agreement shall be forthwith refunded and all other obligations of the parties hereto shall cease and this Agreement shall be void without recourse to the parties hereto.

15.     BUYER'S ELECTION TO ACCEPT TITLE.  Buyer shall have the election, at either the original or any extended time for performance, to accept such title as Seller can deliver to the said Property in their then condition and to pay therefore the purchase price, without deduction, in which case Seller shall convey such title.

16.     USE OF MONETY TO CLEAR TITLE.  To enable Seller to make conveyance as herein provided, Seller may, at the time of delivery of this deed, use the purchase money or any portion thereof to clear the title of any or all encumbrances or interests, provided that all instruments so procured are recorded in accordance with customary Massachusetts conveyancing practices.

17.     ACCEPTANCE OF DEED.  The acceptance of a deed by Buyer shall be deemed to be a full performance and discharge of every Agreement and obligation herein contained or expressed, except such as are, by the terms hereof, to be performed after the delivery of said deed.

18.     ADJUSTMENTS.  Buyer shall make payment in lieu of taxes in accordance with G.L.c.44, §63A as of the day of performance of this Agreement and the net amount thereof shall be added to the purchase price payable by Buyer at the time of delivery of the deed.  Charges for water, sewer, and fuel shall be adjusted as of the day of closing.

19.     BUYER'S DEFAULT; DAMAGES. If Buyer shall fail to fulfill Buyer's Agreements herein, the Deposit made hereunder by Buyer shall be retained by Seller as Seller's sole and exclusive remedy at law and equity for Buyer's breach of this Agreement.  The parties acknowledge and agree that Seller has no adequate remedy in the event of Buyer's default under this Agreement because it is impossible to exactly calculate the damages which would accrue to Seller in such event.  Therefore, acknowledging this fact, the parties agree that: (i) the Deposit hereunder is the best estimate of such damages which would accrue to Seller in the event of Buyer's default, (ii) said Deposit represents damages and not a penalty against Buyer, and (iii) the parties have been afforded the opportunity to consult an attorney with regard to the provisions of this Section.

23

20.   <u>LIABILITY OF SHAREHOLDER, TRUSTEE, FIDUCIARY</u>.  If Seller or Buyer executes this Agreement in a representative or fiduciary capacity, only the principal or the estate represented shall be bound, and neither Seller or Buyer so executing, nor any shareholder or beneficiary of any trust, shall be personally liable for any obligation, express or implied, hereunder.

21.   <u>PERMITS AND FINANCING.</u>

(a)   <u>Permits</u>.   Buyer shall obtain any and all necessary permits, approvals, and licenses from federal, state and local authorities that are necessary or convenient to enable Buyer to undertake, construct and operate the Project for the Permitted Use (collectively, the "Permits"), with appeal periods having expired without any appeal being filed, or if filed, the final adjudication of such appeal pursuant to a final court order without further appeal.  All such Permits shall be obtained at the sole risk and expense of the Buyer, and no work shall be done upon the Property in connection therewith unless and until Buyer has provided Seller with written notice and copies of all applicable Permits.  Seller agrees to cooperate in any reasonable manner in connection with the making of applications for any such Permits, all at Buyer's cost, but Buyer acknowledges that Seller has no control over and cannot guarantee that Permits required from municipal boards or officers within their statutory or regulatory authority will be granted or fees waived.

(b)   <u>Financing</u>.  Buyer shall obtain financing, in an amount sufficient in the reasonable judgment of Buyer and Seller for Buyer to pay the purchase price for the Property and design, construct, operate and maintain the Project as required under the LDA (the "<u>Financing</u>"), and Buyer shall provide Seller with firm project financing commitments, including, but not limited to public funding commitments, construction loan commitments, and/or permanent loan commitment from institutional lenders and/or public or quasi-public entities, on terms and amounts reasonably satisfactory to Buyer and Seller (the "<u>Financing Commitments</u>"), and Buyer shall, prior to or simultaneously with the execution and delivery of the Deeds, close on the Financing, including closing on all financing transactions and admission of the tax credit equity investor(s) to Buyer, whereby Buyer shall have the contractual right to receive funds from institutional lenders, tax credit equity investors and/or public or quasi-public entities (the "<u>Financial Closing</u>").

(c)   <u>Due Diligence</u>.  Buyer shall use commercially diligent and good faith efforts to obtain the Permits and Financing Commitments no later than _____, 2022 (as Seller may extend in writing, in its sole and absolute discretion, the "<u>Initial Permit Period</u>").  If, at the expiration of the Initial Permit Period, the Financing Commitments have not been obtained despite Buyer's good faith and diligent efforts, Buyer may, with Seller's consent, which shall not be unreasonably withheld, extend the Initial Permit Period by no more than _____ (____) days (the "<u>Extended Permit Period</u>" and, with the Initial Permit Period, the "<u>Permit Period</u>"), provided that Buyer gives written notice to Seller requesting the extension at least thirty (30) days prior to the expiration of the Initial Permit Period. In the event that the Financing Commitments cannot be satisfied within the Permit Period, Buyer or Seller shall have the right to terminate this Agreement, whereupon this Agreement shall be null and void, without recourse to the parties, except those provisions that are expressly stated herein to survive said termination.

24

Buyer shall not be liable to Seller for failing to obtain the Permits and/or the Financing unless Buyer failed to use good faith and diligent efforts to satisfy said contingencies.

(d)        Buyer shall provide Seller with written status once every _____ weeks/months from the Effective Date until the Closing, and shall meet with Buyer at such times as Seller may reasonably request, to update Seller of the specific steps taken by Buyer to obtain the Permits and Financing and shall provide such other information as Seller may reasonably request.

22.        <u>CONDITIONS TO CLOSING.</u> The parties acknowledge and agree that Buyer's and Seller's obligations hereunder are contingent on the satisfaction of following conditions (the "<u>Contingencies</u>") on or before the Closing Date or such earlier or later date set forth in this Agreement:

(a)        <u>Permits</u>. Buyer shall have obtained the necessary Permits to construct and operate the Property for its permitted uses (the "Project") by the expiration of the Diligence Period;

(b)        <u>Financing</u>.  Buyer shall obtained the Financing Commitments by the expiration of the Diligence Period, and shall conduct the Financial Closing prior to or simultaneously with the execution and delivery of the Deed to the Property, whereby Buyer shall receive access to funds to undertake and complete the Project;

(c)        <u>Compliance</u>.  Compliance by Buyer and Seller with any other requirements of Massachusetts General or Special laws relative to the disposition of real property by Seller, including G.L. c. 30B, and Buyer and Seller agree to diligently pursue full compliance with said laws; and

(d)        <u>Termination</u>.  In the event that the Closing does not occur within the time set forth in Section _____ because of Buyer's failure to satisfy the Contingencies, despite its good faith and diligent efforts, Buyer or Seller shall have the right to terminate this Agreement, whereupon neither party shall have any further rights or obligations under this Agreement except for such obligations expressly intended to survive termination.  In the event that the Closing does not occur within the time set forth in Section_____ because of Seller's failure to satisfy the condition set forth in Section 22(a) on the date of the Closing, despite its good faith and diligent efforts, Buyer shall have the right to terminate this Agreement, whereupon the Deposit shall be returned to Buyer and neither party shall have any further rights or obligations under this Agreement except for such obligations expressly intended to survive termination.

23.        <u>DELIVERABLES AT CLOSING.</u>

(a)        <u>Items to be Delivered by Seller</u>.  Seller shall execute, acknowledge and deliver, as applicable,  to Buyer's attorney on or prior to the date of Closing, the following: (a) an original, recordable release deed (the "Deed") conveying all of Seller's right, title and interest in and to the Property, subject only to Permitted Exceptions and the other restrictions set forth herein, (b) a settlement statement showing all of the payments, adjustments and prorations provided for in in this Agreement and otherwise agreed upon by Seller and Buyer ("<u>Closing Statement</u>"), and (c) such customary and usual certificates and affidavits as Buyer's title insurance company may reasonably require in order to issue the Title Policy without exception for mechanic's and

25

materialmen's liens, broker's liens, rights of parties in possession, without cost or expense to Seller.

     (b)    <u>Items to be Delivered by Buyer</u>. Buyer shall execute and deliver, as applicable, to the Seller's attorney the following: (a) the Purchase Price, adjusted as provided in this Agreement, which funds shall remain in escrow until the Deed has been recorded; (b) a signed counterpart of the Closing Statement; (c) evidence, reasonably satisfactory to Seller's attorney, of authority of any person or persons executing instruments for or on behalf of Buyer, (d) a signed Disclosure of Beneficial Interest form, as required under G.L. c.7C, §38, and (e) such other documents, instruments and items as may be reasonably required by the Seller's title insurance company and/or Seller to consummate the transaction contemplated by this Agreement.

     24.    <u>CLOSING AND CLOSING COSTS.</u>

     (a)    <u>Closing</u>. The consummation of the purchase and sale of the Property which is the subject of this Agreement (the "<u>Closing</u>") shall be at 11:00 a.m. EST on _____, 2022 (or such later date agreed to by Seller, in its sole and absolute discretion, the "<u>Closing Date</u>"), and shall take place at Westborough Town Hall or a closing by mail, at Seller's option. All documents and funds are to be delivered in escrow subject to prompt rundown of title and recording, and such recording shall take place by 3:45 p.m. on the Closing Date, which recording shall not be unreasonably delayed beyond customary conveyancing practices. All funds shall be held in escrow by Seller's Attorney who shall release the funds to Seller only upon the recording of the Deed. It is agreed that time is of the essence of this Agreement.

     (b)    <u>Closing Costs</u>. At the Closing, (a) Seller will pay and be responsible for (i) the recording charges for any instrument which releases or discharges any monetary encumbrances or liens for which the Seller is responsible as required under this Agreement, (ii) any transfer or Deed stamp taxes, (iii) Seller's counsel's fees and expenses, and (b) Buyer will pay and be responsible for (i) all recording charges other than as are the express responsibility of Seller pursuant to the terms of this Section, (ii) all costs and fees for title examination, title insurance (if obtained) and other title company charges (if applicable), the ALTA survey of the Property (if performed) and all of Buyer's due diligence studies and investigations, and (iii) Buyer's counsel's fees and expenses. Seller and Buyer will each pay all other expenses, charges or costs for which sellers and purchasers, respectively, are customarily responsible in commercial real estate transactions in Massachusetts.

     25.    <u>EMINENT DOMAIN</u>. Notwithstanding anything herein to the contrary, in the event that all or a substantial part of the Property is taken by eminent domain by an entity other than Seller, Seller or Buyer may each, at its option, terminate this Agreement. "<u>Substantial Part</u>" is defined herein as that portion of the Property that would materially and adversely prevent Buyer from undertaking the Project and/or using the Property for the Permitted Use.

     26.    <u>EXTENSIONS</u>. Buyer and Seller hereby authorize their respective attorneys (as the case may be) to execute on their behalf any extensions to the time for performance and any change of location and/or time for delivery of the Deed. Buyer and Seller shall be able to rely

upon the signature of said attorneys as binding unless they have actual knowledge before the execution or other consent to such extensions, that either party has disclaimed the authority granted herein to bind them.  For purposes of this Agreement, facsimile signatures shall be construed as original.

27.    <u>MISCELLANEOUS</u>.

(a)    <u>Assignment</u>.  Buyer shall not assign this Agreement or any of its rights hereunder without prior written consent of Seller, which may be withheld in Seller's sole and absolute discretion.

(b)    <u>Brokers' Commissions</u>.  Seller and Buyer each hereby represent and warrant to each other that it has not dealt with or engaged any broker or finder in respect to the transaction contemplated hereby.  Seller and Buyer each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, damages, awards, costs and expenses resulting from the claims of any broker, finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party.  The provisions of this paragraph shall survive the Closing.

(c)    <u>Waiver; Consent</u>.  Either party may specifically and expressly waive in writing any portion of this Agreement or any breach thereof, but no such waiver shall constitute a further or continuing waiver of any preceding or succeeding breach of the same or any other provision. The consent by one party to any act by the other party for which consent was required shall not be deemed to imply consent or waiver of the necessity of obtaining such consent for the same or any similar acts in the future.  No waiver or consent shall be implied from silence or any failure of a party to act, except as otherwise specified in this Agreement.

(d)    <u>Notices</u>.  Any notice required or permitted to be given under this Agreement shall be in writing and signed by the party or the party's attorney or agent and shall be deemed properly given upon the earlier of: (1) two (2) business days after deposit with the United States Postal Service, if sent by registered or certified mail, return receipt requested, postage prepaid; (ii) one (1) business day after deposit with an express courier service such as Federal Express; (iii) actual receipt, or (iv) electronic transmission, addressed to the parties as set forth in Section 1, with a copy to the party's attorney.  A party may change its address for receipt of notices by service of a notice of such change in accordance herewith.

(e)    <u>Entire Agreement</u>.  This Agreement and its exhibits constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and the final, complete and exclusive expression of the terms and conditions thereof.  All prior agreements, representations, negotiations and understandings of the parties hereto, oral or written express or implied, are hereby superseded and merged herein.

(f)    <u>Captions</u>.  The captions used herein are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions hereof.

(g)    <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the Commonwealth of Massachusetts, and any and all disputes, issues and claims of any

kind or nature relating to this Agreement and/or the Property shall be brought in the courts of the Commonwealth of Massachusetts.

(h)   <u>Invalidity of Provision</u>.  If any provision of this Agreement as applied to either party or to any circumstances shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect (to the maximum extent permissible by law) any other provision of this Agreement, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of the Agreement as a whole.

(i)   <u>Amendments</u>.  No addition to or modification of any provision contained in this Agreement shall be effective unless fully set forth in writing executed by both Buyer and Seller.

(j)   <u>Date of Performance</u>.  All references to "days" in this Agreement shall be construed to mean calendar days unless otherwise expressly provided.  If the date on which any performance required hereunder is other than a Business Day, then such performance shall be required as of the next following Business Day.  The term "<u>Business Day</u>" shall mean a day that is other than a Saturday, Sunday or holiday in which the banks in Massachusetts are authorized to close.  Unless otherwise expressly provided herein, the last day of any period of time described herein shall be deemed to end at 5:00 p.m., Eastern Standard Time.

(k)   <u>Time of Essence</u>.  Time is of the essence of every provision of this Agreement of which time is an element.

(l)   <u>Effective Date of this Agreement</u>.  The Effective Date of this Agreement shall be the last date on which fully-executed Agreements or counterpart signature pages have been delivered.

(m)   <u>Counterparts; PDF Execution; Drafts not an Offer to Enter into a Legally Binding Agreement</u>.  This Agreement may be executed in multiple counterparts (which counterparts may be executed by facsimile) which shall together constitute a single document.  However, this Agreement shall not be effective unless and until all counterpart signatures have been obtained. Delivery of an executed counterpart of this Agreement via electronic mail shall be equally as effective as delivery of an original executed counterpart.  Any party delivering an executed counterpart of this Agreement by electronic mail also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.  Signature and acknowledgement pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

(n)   <u>No Third Party Beneficiaries</u>.  This Agreement is for the sole and exclusive benefit of the parties hereto and their respective permitted successors and assigns, and no third party is intended to, or shall have, any rights hereunder.

[signatures on the following page]

28

Signed by the parties under seal as of this _____ day of _____, 2022.

SELLER:                                          BUYER:

TOWN OF WESTBOROUGH,
By its Select Board


_____      By:_____
                                         Name:
_____      Title:


_____


_____


_____


813628/WBOR/0027

29

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

## ATTACHMENT D

RECIPROCAL PROPERTY MANAGEMENT AGREEMENT

# ATTACHMENT D
# RECIPROCAL PROPERTY MANAGEMENT AGREEMENT

MSS/NRTHSIDE/COREA.5

## DECLARATION OF RECIPROCAL COVENANTS, EASEMENTS AND RESTRICTIONS

THIS DECLARATION OF RECIPROCAL COVENANTS, EASEMENTS AND RESTRICTIONS is made this day of _____, 1997, by LESLIE S. CAREY, as Trustee of Northside Realty Trust under a Declaration of Trust dated January 4, 1994 recorded with the Worcester District Registry of Deeds in Book 15975, Page 213, having a mailing address at 55 New York Avenue, Framingham, Massachusetts 01701 (hereinafter referred to as "Grantor").

### PRELIMINARY RECITALS

A.    Grantor is the owner of certain premises (the "Shopping Center Site") located on Boston-Worcester Turnpike and Milk Street in Westborough, Worcester County, Massachusetts, shown as Lot 1, Lot 2 and Lot 3 on a plan of land entitled "Compiled Plan of Land in Westborough, MA" dated July 14, 1995, with the latest revision date of February 15, 1996 prepared by Beals and Thomas, Inc., recorded with the Worcester District Registry of Deeds in Plan Book 706, Plan 56 (the "Plan"), and as shown on the Site Plan (defined below) attached hereto and made a part hereof as Exhibit A, and as more particularly bounded and described in Exhibit A-1.

B.    Grantor desires to provide for the joint development, operation and use of Lot 1, Lot 2 and Lot 3 as one integrated shopping center.

C.    In order to provide for the integrated development, operation and use of Lot 1, Lot 2 and Lot 3, Grantor desires to provide for the benefit and burden, respectively, of Lot 1, Lot 2 and Lot 3, certain rights, easements, servitudes, charges, restrictions, and privileges, all as hereinafter provided.

NOW THEREFORE, the Grantor, for itself, its successors and assigns, declares that Lot 1, Lot 2 and Lot 3, are and shall be sold, conveyed, occupied and owned, subject to and with the benefit of the covenants, conditions, restrictions, easements, charges and liens hereafter set forth.

### ARTICLE I

### DEFINITIONS

## SECTION 1.1.  TERMS DEFINED.

Whenever used in this Agreement the terms defined in this Article shall have the meanings ascribed to them in this Article:

(a) "Abutting Highways" shall mean Boston-Worcester Turnpike (Route 9) and Milk Street, and any other road, street, avenue, highway or other public way abutting the Shopping Center Site, or replacing in whole or in part said Boston-Worcester Turnpike or Milk Street.

(b)   "Agreement" shall mean this Declaration of Reciprocal Covenants, Easements and Restrictions.

(c)   "Common Areas" shall mean all portions of the Shopping Center Site shown on Exhibit A other than where buildings are located or are permitted to be located, and shall include parking areas, entrances and exits, roadways, walkways, sidewalks, traffic lanes, traffic signs, lighting fixture poles, landscaped areas, and other similar areas and facilities.

(d)   "Condemnation" or "Condemn" shall mean (i) taking or appropriation of any portion of the Shopping Center Site pursuant to an exercise of the power of eminent domain, and (ii) (but only with the consent of the owners of the Shopping Center Site) any conveyance in lieu of condemnation, or under threat thereof, to a grantee having the power of condemnation with respect to the property in question.

(e)   "Driveways" shall mean the areas shown and designated as such on Exhibit A.

(f)   "Easement Plan" shall mean the plan dated _____ prepared by _____ _, a copy of which is attached hereto as Exhibit C, showing the location of the Shopping Center easements.

(g)   "Entrances and Exits" shall mean the portions of the on-site roadways of the Shopping Center Site immediately adjoining and connecting with Abutting Highways.

(h)   "Lot 1" shall mean that portion of the Shopping Center Site designated as Lot 1 on the Plan.

(i)   "Lot 1 Building" shall mean the building now or hereafter constructed on Lot 1 as shown on Exhibit A hereto and designated thereon as "Cinema Building".

(j)   "Lot 1 Owner" or "Owner of Lot 1" shall mean the Owner or Owners (legally and beneficially) of record, at the relevant time, of all or any portions of Lot 1.

(k)   "Lot 2" shall mean that portion of the Shopping Center Site designated as Lot 2 on the Plan.

(l)   "Lot 2 Building" shall mean the building now or hereafter on Lot 2 as shown on Exhibit A hereto and designated thereon as "Restaurant/Retail".

2

(m)    "Lot 2 Owner" or "Owner of Lot 2" shall mean the Owner or Owners (legally and beneficially) or record, at the relevant time, of all or any portions of Lot 2.

(n)    "Lot 3" shall mean that portion of the Shopping Center Site designated as Lot 3 on the Plan.

(o)    "Lot 3 Building" shall mean the building constructed on Lot 3 as shown on Exhibit A hereto and designated thereon as "Lot 3 Building".

(p)    "Lot 3 Owner" or "Owner of Lot 3" shall mean the Owner or Owners (legally and beneficially) or record, at the relevant time, of all or any portions of Lot 3.

(q)    "Common Sidewalk" shall mean the sidewalks (i) connecting the Reserve Parking Area to Milk Street and the parking area to the rear of the Lot 1 Building, (ii) connecting the parking area to the rear of Lot 1 to land now or formerly of Andrew J. Lane Company, and (iii) connecting the parking area on Lot 2 to the parking area on Lot 3, as more particularly shown on Exhibit A.

(r)    "Occupant" shall mean any person legally entitled to the use and occupancy of any improvement on the Shopping Center Site, whether a Party or a tenant, subtenant, licensee or concessionaire in the Shopping Center Site.

(s)    "Operator" shall mean the Owner of Lot 2 from time to time and any successor thereto designated in accordance with the provision of Section 3.1(H) below.

(t)    "Owner" shall mean the owner (legally or beneficially) of record of the fee simple interest in a Parcel or portion of a Parcel.

(u)    "Parcel", "Parcel(s)" or "Parcels" means Lot 1, Lot 2 and/or Lot 3, as the context may appropriately require.

(v)    "Party" and "Parties" means the Owner of Lot 1, the Owner of Lot 2, and the Owner of Lot 3 from time to time, and their successors and assigns, except that:

(A)    successors and assigns of less than a fee simple interest (such as tenants) are not Parties (unless covered by (B) below), and the predecessor or assignor that retains the fee simple title remains a Party;

(B)    a Party that retains possession of a Parcel under a mortgage remains a Party, and the mortgagee is not a Party unless it takes possession after a default under the mortgage, provided however, that a mortgagee which takes possession under a so-called conditional assignment of lease shall not be a Party; and

3

(C)      successors and assigns of less than all of a Parcel or of an undivided interest in a Parcel (such as joint tenants or tenants in common) are not Parties, and the predecessor or assignor remains a Party.

A Party ceases to have rights under this Agreement and shall no longer be a Party after it transfers its interest to an assign that qualifies as a Party.  A former Party who has assigned or transferred its interest to a successor Party, is released from its obligations under this Agreement only after it (i) transfers its Parcel to a Person who qualifies as a Party; and (ii) pays all amounts and performs all obligations owed to the other Parties at the time of the transfer; (iii) notifies the other Parties of the transfer; and (iv) delivers to the other Parcel Owners an instrument in recordable form pursuant to which the transferee covenants to assume and carry out all of the covenants and obligations of the transferor under this Agreement.  Until the transferring Party is so released from its obligations, both the transferring Party and the transferee Party are jointly and severally liable under this Agreement.

(w)     "Permits" shall mean a Special Permit dated December 6, 1995 issued by the Town of Westborough Planning Board and recorded with said Deeds in Book ____, Page ____ ; a Conditional Approval for Definitive Plan dated June 26, 1996 issued by the Town of Westborough Planning Board and recorded with said Deeds in Book ____, Page ___; and a variance issued by the Town of Westborough Board of Zoning Appeals dated October 6, 1996, notice of which is recorded with said Deeds in Book 18341, Page 191.

(x)     "Permittees" shall mean the officers, director, partners, employees, agents, contractors, subcontractors, customers, patrons, clients, visitors, licensees and invitees of an Occupant.

(y)     "Person(s)" shall mean an individual, partnership, firm, association, corporation, trust and any other form of legal entity, and the singular includes the plural.

(z)     "Plan" shall mean that certain subdivision plan entitled "Compiled Plan of Land in Westborough, MA" dated July 14, 1995 prepared by Beals and Thomas, Inc., a copy of which plan is attached hereto and made a part hereof as Exhibit B.

(aa)    "Protected Area" shall mean that portion of Lot 1 designated as "Protected Area" on Exhibit A.

(bb)    "Site Plan" shall mean that certain plan entitled "Stage Coach Plaza Westborough, Massachusetts" dated February 20, 1997, prepared for New England Management & Realty Corp. by Beals and Thomas, Inc., a copy of which is attached hereto as Exhibit A.

(cc)    "Shopping Center Site" shall mean Lot 1, Lot 2 and Lot 3.

4

(dd)    "Termination Date" shall have the meaning given to said term in this Agreement.

(ee)    "Utility Facilities" shall mean utility facilities (excluding laterals) now or hereafter installed in the Shopping Center Site, providing for water, gas, electricity, sanitary sewer, storm sewer, drainage, telephone or other utility service to the buildings and Common Areas from time to time located on the Shopping Center Site.

## SECTION 1.2.  ADDITIONS, REPLACEMENTS OR ALTERATIONS.

Any reference in any definition to any improvement whatsoever shall be deemed also to be a reference to any reconstruction, alteration or replacement thereof, unless the express language or context of such reference shall otherwise indicate.

## ARTICLE II

## GRANT OF EASEMENTS

## SECTION 2.1.  DEFINITIONS AND DOCUMENTATION.

This Article II sets forth the easements and the terms and conditions thereof which shall be binding upon each of the Parcels and the Owners, Occupants and Permittees thereof, and shall run with the land.

As used in this Article II, the word "in", in respect of an easement granted "in" a particular Parcel, shall be deemed to mean, as the context may require "in", "to" "on", "over", "through", "upon"  "across", and/or "under".  As to the easements herein granted:

(A)    A particular easement in a Parcel shall bind and burden such Parcel which shall, for the purpose of this Article, be deemed to be the servient tenement;

(B)    The grant of a particular easement in favor of a Parcel shall benefit such Parcel which shall, for the purposes of this Article, be deemed to be the dominant tenement;

(C)    All easements granted in this Article II shall exist by virtue of this Agreement, without the necessity of confirmation by any other documents.  However, the Owner of a Parcel shall, as to any easement, at the request of the Owner of any other Parcel, upon the submission of an appropriate document in form and substance reasonably acceptable to the Owner(s), execute and acknowledge such a document memorializing the existence, or the extinguishment (in whole or in part), or the release in respect of all or any portion of any Parcel, as the case may be, of any easement, in accordance with the terms and provisions of this Agreement.

5

(D)   All easements hereby granted are, unless limited herein, irrevocable and shall have the duration herein specified.

SECTION 2.2.      EASEMENTS.

(A)   EASEMENTS FOR USE OF PARKING AREAS.

(1)   The Owners, Occupants and Permittees of each Parcel are hereby granted easements to use the parking facilities and walkways in the Common Areas on the Shopping Center Site for the parking and passage of motor vehicles (so long as, with respect to trucks, there is no unreasonable interference with customer and employee parking), and passage by pedestrians.

(2)   The Owners, Occupants and Permittees of each Parcel are hereby granted easements to use those portions of the Lots adjacent to the parking facilities in the Common Areas on the Shopping Center Site designated by the Operator for the storage of snow and ice collected from the removal of snow from the common areas, provided that there is no unreasonable interference with customer and employee parking), the use of the buildings on the Lots and passage by pedestrians.

(3)   Except as otherwise provided in this Section, the easements provided in this Subsection (A) shall be for the joint, non-exclusive use of the Parcel Owners, the Occupants and others included as Permittees of any thereof.

(4)   The easements provided in this Subsection (A) are perpetual.

(5)   The aforesaid easements in the Common Areas on each Parcel for vehicle parking by the Occupants and Permittees of the Parcel(s) to which the easements is (are) appurtenant, are subject to the following limitations:

(a)   Occupants' employees may not use such parking easements on the other Parcel(s), unless any portion of the other Parcel has been designated an employee parking area by the Owner thereof;

(b)   Such parking easements may be used by a Permittee only as long as the Permittee is patronizing or otherwise has business with any of the Occupants of the Shopping Center Site; and

6

(c)     Lot 2 and Lot 3 may use the respective parking easements to satisfy parking requirements imposed by the Town of Westborough Zoning By-Law to the extent of the aggregate building area now shown on Exhibit A.  Without limiting the foregoing, the Owners, Occupants and Permittees of Lot 2 are expressly granted the right and easement to use 15 of the parking spaces located on Lot 3 to satisfy the requirements of the Town of Westborough Zoning By-Law.  At the request of the Lot 2 Owner, the Lot 3 Owner shall designate 15 specific parking spaces on Lot 3 for the exclusive use of the Owner, Occupants and Permittees of Lot 2.

(B)     EASEMENTS FOR ACCESS.

(1)     The Owners, Occupants and Permittees of each Parcel are hereby granted non-exclusive easements in the Driveways and sidewalks of the Common Areas on each Owner's Parcel for access to or from such Parcel by the Owner and the Occupants and Permittees of the Parcel to which such easement is appurtenant; and nonexclusive easements to use the roadways on the Common Areas and the Entrances and Exits on the Shopping Center Site to provide passage by motor vehicles (passenger and truck) and by pedestrians between each Parcel and between the Parcels and the Abutting Highways.

(2)     The easements provided in this Subsection (B) shall be for the joint, non-exclusive use of the Parcel Owners, the Occupants and others included as Permittees of any thereof, except that loading docks located adjacent to any premises shall be for the exclusive use of the Occupant thereof and shall not be subject to the access easement granted hereunder.

(3)     The easements provided in this Subsection (B) are perpetual.

(C)     EASEMENT FOR UTILITY FACILITIES.

(1)     The Owner of each Parcel is hereby granted the following easements in the other Parcels for Utility Facilities:

(a)     easements for all pipe(s) comprising the Utility Facilities for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any of such Utility Facilities, subject to the provisions of Subparagraph (3) below.  The term "pipe(s)", as used in this Subsection (C) shall mean "pipe(s)", and/or "line(s)", and/or "conduit(s)", and/or "wire(s)", and/or

7

"cable(s)", and/or "other means of providing utility facilities", as the context may require.

(b) easements for the purposes of installing therein in the future, other pipe(s) not part of the Utility Facilities, to provide gas, water, fire loops and hydrants therefor, electric power, other forms of energy, signal, telephone, sanitary sewer and storm sewer services, or any of them, to or from any present or future facilities and for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any or all of such pipe(s), to the extent required by the facilities from time to time on the Parcels, subject to the provisions of Subparagraph (3) below; and

(c) easements for the purpose of installing pipe(s) to connect any and all of the pipe(s) comprising the Utility Facilities with any other facilities to the extent that the connection thereof is necessary to service such facility, and after any such connection, for the purpose of using, operating, maintaining, repairing, relocating, replacing or enlarging any or all of such pipe(s), subject to the provisions of Subparagraph (3) below.

(2) For the purpose of exercising the rights granted in Subparagraph (1) above, each Parcel Owner, and its respective employees, agents and contractors, shall have the right to enter upon and use the other Parcel to such extent and as long as reasonably necessary to accomplish such purposes, subject to the provisions of Subparagraph (3) below.

(3) The rights of any Parcel Owner to do any work under Subparagraph (1) above, to the extent that entry on another Parcel or work on pipe(s) which may be located across another Parcel are concerned shall be subject to the following conditions and requirements:

(a) the location of the easement shall be subject to the reasonable approval of the Parcel Owner on whose Parcel the Utility Facilities are to be located;

(b) not less than thirty (30) days prior written notice shall be given to the other Parcel Owner(s) that the Parcel Owner anticipates doing such work, together with notification of the proposed area of such work, and the anticipated date of start and completion of such work; but if the work involved is emergency repair work, only such advance notice, written or oral, as is reasonably practical, needs to be given;

8

(c)    after such work, the pipe(s) in question shall be underground and not beneath or reasonably close to any buildings on the other Parcel, but this Subparagraph (c) shall not require the moving of any pipe(s) installed prior to the date of execution hereof, nor permit any such work, if, as the result thereof, any Person(s) utilizing the Utility Facilities to provide utilities to or from improvements owned by it would be required to relocate any connection between the Utility Facilities and such improvement in order for such Person to continue to be able to utilize the Utility Facilities therefor, or if its ability so to utilize the same is otherwise materially adversely affected unless all such Person(s) shall consent to such work or the Parcel Owner proposing such work shall agree (and place the money therefor in escrow, if reasonably required by such Person[s]) to pay all costs (direct or indirect) which will be incurred by such Person(s) as a consequence of the performance of the work by such Parcel Owner;

(d)    after the completion of such work, the Parcel Owner shall, at its own cost and expense, restore the portion of the other Parcel so used to as good condition as the same was in immediately prior to the commencement of such work; and

(e)    the Parcel Owner shall exercise best efforts to minimize interference with use and enjoyment the other of Parcel by the Owner(s) of such Parcel.

(4)    The easements granted pursuant to this Subsection C shall be located in the areas shown on the Easement Plan but, notwithstanding the foregoing, each Parcel Owner shall have the right to relocate any pipe(s) located on its parcel pursuant to an easement granted by this Subsection (c) within the applicable "Easement Relocation Area" shown on the Easement Plan if reasonably deemed by it to be necessary for the use and enjoyment of its parcel and if it complies with the conditions in Subparagraph (3) above.

(5)    The easements provided in this Subsection (C) are perpetual.

9

(D)    <u>EASEMENT FOR SELF-HELP.</u>

The Owner of each Parcel, its employees, agents and contractors, are hereby granted easements to enter upon the other Parcels for the purpose of performing any obligation which the other Parcel Owner is required to perform on the other Parcel, pursuant to the terms of this Agreement, but which such other Parcel Owner fails or refuses to perform and which the non-defaulting Parcel Owner has the right then so to perform under Section 7.2 hereof, provided that the defaulting Parcel Owner is first served with notice and allowed the period of time set forth in Section 7.2 hereof to cure such default.

The Owner of each Parcel, its employees, agents and contractors, are hereby granted easements to enter upon the other Parcels for the purpose of performing any obligation which the Operator is required to perform pursuant to the terms of this Agreement, but which such Operator fails or refuses to perform and which the other Parcel Owners have the right then so to perform under Section 3.1(I) hereof.

In exercising the easements granted pursuant to this Subsection (D), the Parcel Owners shall use reasonable efforts to minimize any interference with or interruption of business conducted on the other Parcels.

The easements provided in this Subsection (D) are perpetual.

<u>SECTION 2.3.</u>  <u>SIGNS.</u>

(A)    Except as the parties may hereafter agree and as proved in Paragraph (B) below, no free standing signs shall be erected in the Shopping Center Site other than a pylon sign and a box sign at the locations shown therefor on Exhibit A hereto.

(B)    If at any time in the future, necessary approvals and permits are obtained for the construction of a pylon sign at the entrance to Lot 1 on Milk Street listing any tenants (as opposed to a sign merely identifying the Shopping Center Site), then the Owner of Lot 2 and the Owner of Lot 3 shall each have, as appurtenant to their Lot, for the use of the Occupants of Lot 2 and the Occupants of Lot 3, an easement to install illuminated panel signs on such pylon sign at positions thereon located beneath any panel sign(s) installed by any Occupant(s) of Lot 1.  Such signs shall be limited to identifying the Occupants of Lot 2 and Lot 3, and shall conform to all applicable rules, regulations and by-laws of the Town of Westborough.  The panel signs erected on the pylon sign shall be maintained by the Occupants utilizing such signs at the sole cost and expense of such Occupants.

(C)    The Owner of Lot 1 and the Owner of Lot 3 shall each have, as appurtenant to their Lot, for the use of the Occupants of Lot 2 and the Occupants of Lot 3, an easement to install illuminated panel signs on the pylon sign at the entrance to Lot 3 on Boston-Worcester Turnpike (Route 9) at positions thereon located beneath the reader board installed by any Occupant(s) of Lot 1.  Such signs shall be limited to identifying the Occupants of Lot 2 and

10

Lot 3, and shall conform to all applicable rules, regulations and by-laws of the Town of Westborough.  For so long as Lot 1 is used for a cinema, the Owner of Lot 1 shall have as appurtenant to Lot 1 for the use of the Occupants of Lot 1 an easement to use the reader board on such pylon sign for the designation of films showing in the Lot 1 Building and the owner of Lot 1 shall maintain such reader board at its sole cost and expense.

(D)    No exterior signs shall be erected or placed on any premises in the Shopping Center Site except non-flashing and non-moving signs which, in size and number, shall have a reasonable relationship to the premises to which they relate, and which comply with all local zoning and other applicable governmental requirements.  Neither the Parcel Owner nor any tenant or Occupant of the Shopping Center Site shall paint signs on or affix paper signs to any part of the exterior of the buildings in the Shopping Center, or in any windows.  All exterior signs shall be placed upon the marquee or against the parapet of each store. Notwithstanding any of the foregoing provisions of this Section, any national or regional "chain store" tenant may have a reasonable number of signs designating its parcel pick-up stations(s) (if any) and non-moving, non-flashing signs on the exterior of its store of the same number, size, design and degree of illumination as are customarily utilized by it for a majority of its other stores of substantially the same size.  All Parcel Owners shall engage only the sign company or companies designated from time to time by the Operator for the erection and placement of signs in the Shopping Center or shall obtain the prior written approval of the Operator to use any other sign company or companies.

## SECTION 2.4.  AMENDMENT OF EASEMENTS.

Any of the easements, rights or licenses granted hereby may only be released, extinguished, amended, waived or modified by instrument in recordable form, executed by all of the Owners with the written consent of the holders of all mortgages encumbering the Parcels and recorded.

## SECTION 2.5.  CONTROL.

Each Party may, utilizing reasonable means, exclude unauthorized persons or prevent unauthorized acts in the Common Areas.  Each Party may restrict access to its Parcel on any one day that the Occupant(s) of the other Parcel are not open for business as necessary to prevent the acquisition of prescriptive rights by anyone, but shall notify the other Party of its planned closing and shall coordinate the closing with the other Party to minimize interference with the operation of the Shopping Center Site.

11

## ARTICLE III

## MAINTENANCE, MANAGEMENT AND OPERATION OF SHOPPING CENTER COMMON AREA AND COMMON UTILITY FACILITIES

**SECTION 3.1.        COMMON AREA OPERATION AND MAINTENANCE.**

(A)    Commencing on the date that the first Occupant within the Shopping Center Site opens for business (the "Operation Commencement Date"), the Lot 2 Owner (for purposes of this Section 3.1 called the "Operator"), shall, until it shall be removed for cause, elect otherwise, in both cases in accordance with the provisions of Section I below, operate and maintain or cause to be operated and maintained the Common Area of the Shopping Center Site in accordance with, and subject to, the terms and conditions of this Section 3.1. Such operation and maintenance of the Common Area shall include, but not be limited to:

(1)    Maintaining the surfaces of the driveways, entrances and exits, parking areas and common sidewalks in a level, smooth and evenly covered condition with the type of surfacing material originally installed or such substitute as shall in all respects be equal in quality, use, and durability;

(2)    Maintaining the bridge for the driveway connecting Lot 2 to Lot 3;

(3)    Maintaining the sewage pump station located on Lot 3 (unless and until the same shall be maintained by public authority);

(4)    Removing all papers, debris, and refuse and sweeping the Common Area to the extent reasonably necessary to keep the Common Area in a neat, clean, and orderly condition;

(5)    Placing, keeping in repair, and replacing any necessary directional signs, markers, and lines, and operating, keeping in repair, and replacing when necessary such artificial lighting facilities as shall be reasonably required (such lighting to be operated during those hours of darkness when any Occupant is conducting its business within the Shopping Center and until one (1) hour after closing of business; provided, however, that if illumination is required by any Occupant after ten (10) o'clock p.m., such Occupant shall pay for the cost of such illumination on a pro rata basis with any other Occupants also requesting such additional illumination, such pro rata basis to be in accordance with the square footage of the premises of such Occupants);

(6)    Maintaining all Utility Facilities used to provide services to more than one Lot (unless maintained by any public authority);

12

(7)     Paying any utility costs for which the Common Area may be separately metered if such is the case;

(6)     Maintaining all landscaped areas, making such replacements of shrubs, and other landscaping as is necessary, and keeping said areas at all times adequately weeded, mowed and watered, except for such of the same as shall be the responsibility of the Lot Owners pursuant to Section 3.3 hereof;

(8)     Maintaining the box and monument or pylon signs (other than the panels to be maintained by the Lot Owners) located within the Common Area as shown on Exhibit A in good order and condition;

(9)     Snow and ice removal from and the sanding of driveways, parking areas, exits and entrances and Common Sidewalks;

(10)    All costs incurred with respect to, and the perpetual maintenance of, the traffic signal at the intersection of Oak Street and the entrance to the Shopping Center, including, without limitation, any costs or obligations incurred by the Operator pursuant to any traffic signal maintenance agreement between the Operator and the Town of Westborough;

(11)    Providing such off-site services as shall be required by the Permits or as otherwise shall be required by applicable public authority for the use of the Shopping Center Site as a whole, as opposed to such of the same as may be required by the particular use made of the Lots by the Owners, Occupants and Permittees thereof; and

(12)    The employment of such personnel as is reasonably necessary to accomplish the foregoing and securing such insurance as is required in connection with such employment.

(B)     As a part of said operation, the Operator shall obtain and maintain general public liability insurance insuring the Operator and all Parcel Owners, Occupants and the holders of all mortgages encumbering the Parcels, as their respective interest may appear, provided that the Operator is notified in writing of such Occupants and mortgagees, against claims for personal injury, death, or property damage occurring in, upon, or about the Common Area.   The limits of liability of all such insurance shall not be less than Ten Million Dollars ($10,000,000.00) combined single limit for personal injury, death, and damage to property.   Such liability insurance policy shall be primary to any other liability policy carried by any Parcel Owner and shall include blanket contractual liability coverage for the liability assumed under Section 11.3 hereof.   All such insurance shall be maintained in force commencing upon the Operation Commencement Date.   The Parcel Owners may agree on higher limits of insurance consistent with standards for first class shopping centers. All of the insurance required to be maintained pursuant to this Subsection (B) shall be

13

effected under valid and enforceable policies of insurance issued by insurers of recognized responsibility licensed to do business in the Commonwealth of Massachusetts and shall contain an agreement by such insurer to give at least ten (10) days prior written notice to the other Parcel Owners (and any other parties named as insureds therein) in the event of cancellation or material change in the coverage or amount of insurance so provided. A certificate evidencing renewal or replacement of the policies required by this Subsection (B) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) within ten (10) days after the Operation Commencement Date and thereafter a certificate evidencing the renewal or replacement of the policies required by this Subsection (B) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) at least thirty (30) days prior to the expiration thereof.

(C)    The Operator shall, from time to time, but not more often than once each calendar month, send to each Parcel Owner a written statement of the total costs and expenses of operation and maintenance including, but not limited to, those items set forth in Subsections (A) and (B) hereof and any expenses allocated in accordance with Subsection (E) below (said statement to be accompanied by such bills, invoices, and other documentation as shall be necessary for proper analysis of such expenses). The Operator shall also be entitled to a management fee of ten percent (10%) of the total of such costs for the preceding period. Within thirty (30) days after receipt of such statement, each Parcel Owner shall pay, or cause to be paid, to the Operator its pro rata share of the total amount of said costs and expenses as set forth in Subsection (D) below. In the alternative, the Operator may elect to estimate the total costs and expenses of such maintenance and operation and the corresponding management fee on an annual basis and to render to each Parcel Owner a written statement of pro rata share of the same. Until such estimate shall be revised or such method of estimation shall be terminated by the Operator, each Parcel Owner shall pay to the Operator 1/12 of its pro rata on the first day of each month thereafter. At the end of the year chosen by the Operator for billing on an estimated basis, or at such earlier time as the Operator shall elect to cease billing on an estimated basis, Operator shall calculate the actual amount of such costs and expenses incurred during such period and refund any excess to the Parcel Owners or bill the Parcel Owners for their pro rata share of any deficiency and the Parcel Owners shall pay the Operator the same within thirty days after such bill. Notwithstanding the foregoing, for so long as the Owner of Lot 2 is the Operator, the Operator shall be entitled to a minimum management fee of $41,872.00 per annum. Immediately following any calendar year in which the management fee billed to the Parcel Owners in accordance with the foregoing shall be more than $41,872.00, the Parcel Owners shall thereupon pay to the Operator their pro rata share of the difference between the amount billed and $41,872.00.

(D)    In the event that the Operator reasonably shall determine that any item of work for which Operator is responsible will cost more than $25,000.00 in the aggregate, Operator may assess the Lot Owners for their proportionate share thereof prior to the commencement of such work by written notice of assessment to the Lot Owners. Each Lot Owners share of such assessment shall be due and payable to the Operator within 15 days after the receipt of such notice of assessment.

14

(E)    The Common Area maintenance expense, including any assessment therefor, shall be prorated among the Parcel Owners as follows:

> Lot 1  57.6%
> Lot 2  35.8%
> Lot 3   6.6%
> Total  100%

The foregoing percentages shall be each Parcel Owner's "proportionate share" of Common Area maintenance expense.

Notwithstanding the foregoing, certain of the costs and expenses of the operation and the maintenance of the Shopping Center shall be allocated to the various Parcel Owners as follows:

1.    All of the costs of providing police details or traffic control measures required by the Permits or otherwise required on account of the operation of a theatre on Lot 1 will be allocated to the Lot 1 Owner.

2.    The costs of maintaining those portions of the pylon sign identifying the theatre on Lot 1 and the films being exhibited in the Lot 1 building (as opposed to the structure of the same) will be allocated to the Lot 1 Owner.  The costs of those portions of the pylon sign identifying the occupants of Lots 2 and 3 shall be allocated to the Owner of Lots 2 and 3.  The Operator shall include any such changes in the written statements provided for in Subsection (c) above.

F.  If any Parcel Owner shall fail to pay in a timely manner its pro rata share of the Common Area maintenance expenses, the same shall be deemed delinquent, and the amount thereof shall bear interest thereafter at the rate provided in Section 7.1 until paid.  Any and all delinquent amounts with said interest shall be a lien and charge upon all of the property of such Parcel Owner in accordance with Section 7.3 hereof.

G.    Nothing contained in this Section 3.1 shall affect the right of any Parcel Owner to assess its Occupant(s) for Common Area maintenance expenses and for such management fees as the owner deems appropriate, subject, however, to any limitations contained in its rental agreement(s) with any such Occupant(s).

H.    The Operator shall indemnify, defend (if requested), and hold the other Parcel Owners harmless from all claims and losses, and all costs and expenses relating thereto (including reasonable attorney's fees) arising out of or from (a) any occurrence in the Common Area, unless the claim or loss results from the negligence of another Parcel Owner or the Occupants of such other Parcel Owner's Parcel, or (b) any failure by Operator to perform imposed on the Operator under this Agreement, or the breach of such obligation.

15

I.     Notwithstanding any preceding provisions of this Section 3.1 which may be to the contrary, should the Owner of Lot 2 elect to resign as Operator by written notice to either one of the other Parcel Owners, the Parcel Owners shall, within thirty (30) days thereafter, proceed to reach an agreement among themselves as to who shall assume the duties, obligations rights, and remedies of the Operator set forth herein.  In the event that such agreement has not been reached within said thirty (30) day period, then the Parcel Owners shall employ an independent party or entity as the new Operator to assume the rights and obligations provided for hereunder.  Any agreement of the Parcel Owners hereunder shall require the agreement of the owners of not less than sixty percent (60%) of the proportionate share of the Common Area maintenance expense of the Shopping Center, based upon the ground floor area of the buildings on each Parcel Owner's Parcel.

In addition to the foregoing, the Parcel Owners shall have the right to remove the Operator "for cause" pursuant to the following provisions:

1.  The Parcel Owner's owning not less than sixty percent (60%) of the proportionate share of the Common Area maintenance expense of the Shopping Center may remove the Operator upon thirty (30) days prior written notice; and

2.  For so long as Lot 2 and Lot 3 are in common ownership, if the Lot 1 Owner, in its reasonable judgment, feels that Operator's maintenance and operation of the Common Areas does not meet the general shopping center standards prevailing in the market area in which the Shopping Center is located, the Lot 1 Owner shall notify Operator specifying the Lot 1 Owner's reasons.  Operator shall have a period of sixty (60) days after receipt of the Lot 1 Owner's notice within which to attempt to cure the problems set forth in the Lot 1 Owner's notice.  Prior to the end of the sixty (60) day period, Operator and the Lot 1 Owner agree to discuss the corrective actions taken by Operator.  In the event, the Lot 1 Owner, in the Lot 1 Owner's reasonable judgment, still feels that Operator's maintenance and operation of the Common Areas does not meet general shopping center standards, the Lot 1 Owner shall have the right, upon not less than thirty (30) days prior written notice to Operator, to assume the maintenance obligations of Operator pursuant to this Agreement and the Lot 1 Owner must honor, pay and perform all outstanding maintenance contracts (of not more than one year in duration) that Operator had entered into in good faith, unless such maintenance contracts may be terminated without cost to the Operator.

J.     In addition to the foregoing, except to the extent that any such failure is caused by any of the causes set forth in Section 7.5 hereof, if the Operator shall fail to perform its maintenance obligations hereunder or fail to provide the required insurance, then any other Parcel Owner may, upon ten (10) days' prior notice to the Operator, do so, and the curing Parcel Owner may then bill the Operator for the expense incurred.  If immediate remedial action is necessary to protect the interest of a Parcel Owner in the Shopping Center Site or its Parcel, or to prevent the interruption or further interruption of the conduct of business on such Parcel Owner's Parcel or in the Shopping Center Site (including, without limitation, interruption which may result if snow is not removed promptly from the paved parking areas

16

or if burned out or malfunctioning parking lot lighting is not promptly repaired), or to prevent injury to persons or damage to property, than a Parcel Owner may cure a default by the Operator without the requirement of the ten (10) day notice hereunder, but after oral or written notice to the Operator.

If the Operator shall not pay said bill within fifteen (15) days, the curing Parcel Owner shall have a lien on the property of the Operator for the amount of said bill, which amount shall bear interest at the rate set forth in Section 7.1 hereof until paid; provided, however, that such curing Parcel Owner shall also have the right to bill the other Parcel Owners for their pro rata shares of the costs incurred, and provided, further, that any such lien shall be subject to the provisions of Section 7.3 below. The foregoing shall not be construed as preventing the Operator from assessing the other Parcel Owners for their pro rata share of the amounts reimbursed by the Operator to the curing Parcel Owner (except as to any amounts previously paid by the other Parcel Owners directly to the curing Parcel Owner pursuant to the foregoing); provided, however, that the Operator shall not be entitled to a management fee as to such amounts and shall not be entitled to reimbursement for any interest or collection costs paid by the Operator to the curing Parcel Owner.

K.    In the event that an Operator ceases to have an obligation to perform the duties described herein, said Operator shall cease to have any liability or responsibility for any acts, events, or circumstances occurring subsequent to and not as a result of its performance or non-performance of its duties while Operator.

L.    During any period of time when no person is obligated to maintain the entire Common Area, each Parcel Owner shall have the obligation to maintain its own Parcel in accordance with Subsection (A) above.

## SECTION 3.2.    LIABILITY INSURANCE.

Each Parcel Owner shall cause to be maintained general liability insurance against claims of bodily or personal injury and death and property damage occasioned by accident or other event occurring in or upon, or resulting from a condition existing upon, or arising from its Parcel, with limits of at least $10,000,000 (combined single limit). Such liability insurance policy shall be primary to any other liability policy carried by any Parcel Owner and shall include blanket contractual liability coverage for the liability assumed under this Agreement. All such insurance shall be maintained in force commencing upon the date of the execution of this Agreement. The Parcel Owners may agree on higher limits of insurance consistent with standards for first class shopping centers. All of the insurance required to be maintained pursuant to this Subsection (D) shall be effected under valid and enforceable policies of insurance issued by insurers of recognized responsibility licensed to do business in the Commonwealth of Massachusetts and shall contain an agreement by such insurer to give at least ten (10) days prior written notice to the other Parcel Owner (and any other parties named as insureds therein) in the event of cancellation or material change in the coverage or amount of insurance so provided. A certificate evidencing renewal or

17

replacement of the policies required by this Subsection (D) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) within ten (10) days after the date of recording of this Agreement and thereafter a certificate evidencing the renewal or replacement of the policies required by this Subsection (D) shall be delivered to each Parcel Owner (and any other party named as an insured under the then existing policy) at least thirty (30) days prior to the expiration thereof.

**SECTION 3.3.**    **MAINTENANCE OF SHOPPING CENTER SITE.**

Each Parcel Owner, at its sole cost and expense, shall maintain the exterior of the improvements (whether or not occupied) on its Parcel and unimproved areas in a clean and neat condition, including:

(A)    Sidewalks - maintaining the sidewalks other than the common sidewalks;

(B)    Building Landscaping - maintaining the landscaped areas; including mowing, weeding, watering, raking and fertilizing, and promptly replacing unrecoverable diseased or dead plantings;

(C)    Canopy, Gutters - maintaining the canopy and the gutters and downspouts on the buildings; and

(D)    Rear Building and Canopy Lighting - maintaining the rear building and canopy lighting in good working condition and replacing burned-out bulbs promptly.

**SECTION 3.4.**    **OPERATION OF SHOPPING CENTER SITE.**

Each Parcel Owner shall perform or cause to be performed the following obligations on its Parcel:

(A)    Trash - pick up trash and debris daily in and empty trash receptacles and dumpsters serving the Parcel and keep them reasonably free of vermin;

(B)    Rear Building and Canopy Lighting - light the rear building from dusk until at least 12:00 midnight each day of the week, and light the canopy lighting from dusk until at least 10:30 p.m. each day of the week; and

(C)    Sidewalk - sweep the sidewalks, other than the common sidewalks, weekly and promptly remove snow and ice from the sidewalk.

**SECTION 3.5.  ADDITIONAL COVENANTS RESPECTING THE COMMON AREAS.**

18

The Parcel Owner of Lot 2, acting as the Operator, covenants and agrees to construct, or cause to be constructed, the Common Areas shown on Exhibit A, including, without limitation, the Common Sidewalk, the Driveways, the Entrances and Exits, and the Utility Facilities, which construction shall be substantially complete on or before June 1, 1997, subject to delay for causes set forth in Section 7.5 of this Agreement.

Each Parcel Owner covenants and agrees with respect to its Parcel, as follows:

(A)   It will not change, modify or alter the size or location of the Common Areas on its Parcel as shown on Exhibit A hereto, or change the configuration of, alter the location of or reduce the size of, or eliminate any of the parking spaces, driveways, accessways or Entrances and Exits located on its Parcel as shown on Exhibit A.

(B)   It will not use or permit the use of the Common Area(s) on its parcel for any purpose other than the parking and passage of vehicles and movement of pedestrian traffic, landscaping, directional and traffic control signals, and it will not construct or locate, or allow construction or location of, any fence, barricade, structure, building, or other obstruction which would interfere with the intended use thereof, or the free flow of traffic to, across or from the parking areas on its Parcel, except to the extent reasonably required for, or appropriate in connection with:

(1)   the proper exercise of the easements granted pursuant to Article II hereof, or any rights specifically granted to the Parcel Owners under this Agreement, and

(2)   the performance by each Parcel Owner of its maintenance obligations set forth in this Agreement.

(3)   the construction and maintenance of such perimeter fences and barricades as shall be required by public authority.

(C)   The Common Areas of the Parcels shall not be used for sales of advertising purposes or for the operation of amusement devices.

(D)   Each Parcel Owner shall use reasonable efforts to cause its Occupants to cause their employees to park their vehicles in any designated areas on their Parcels, provided that no portion of the Protected Area shall be designated for employee parking.

(E) There shall be no charge made for the use of the Common Areas in addition to the costs to be assessed to the Parcel Owners in accordance with the provisions of this Article IV.

## SECTION 3.6.   NO ENLARGEMENT.

19

There shall be no enlargement to any Parcel such that the Shopping Center Site is enlarged.

### SECTION 3.7.   ADDITIONAL COVENANTS RESPECTING BUILDINGS.

No Parcel Owner shall place or erect any structures or improvements on its Parcel except (i) the present and proposed buildings (in the locations therefor) shown on Exhibit A, containing at most, the amounts of ground floor area designated on Exhibit A; (ii) and additions to stores if and to the extent shown on Exhibit A and (iii) subject to the provisions of this Agreement, the Common Areas and Utility Facilities; provided, however, notwithstanding the foregoing, the operator and owner of Lot 2 and Lot 3 expressly reserve, and shall have, the right to enlarge the present and proposed buildings and to construct additional buildings on Lot 2 and Lot 3 respectively, as long as: (a) such buildings do not materially interfere with the driveways, entrances or exits of the Shopping Center; and (b) the total ground floor area of buildings on Lot 2 or Lot 3, as the case may be, does not exceed the maximum amount of ground floor area permitted to be constructed on such Parcels pursuant to the Special Permit (referenced in the definition of Permits above).

No building or structure constructed in the Shopping Center Site shall contain a basement or floor space above the ground floor level except for mezzanines in the Lot 1 Building, provided that any such mezzanine located in Lot 1 Building shall be used solely for non-selling purposes.  No covered or uncovered outdoor area shall be placed in the Shopping Center Site unless shown on Exhibit A or located within an area where building is permitted.

Each Parcel Owner agrees that all construction performed by it or on its behalf shall be done in a diligent, good, and workmanlike manner with the use of first class materials, and in accordance with all applicable building and zoning laws and all other laws, ordinances, orders, codes, rules, regulations and requirements of all federal, state, municipal, public and governmental agencies and governments.

### SECTION 3.8.   RELEASE OF LIABILITY AND MUTUAL WAIVER OF SUBROGATION.

(A)   Each Parcel Owner (the "Releasing Party") hereby releases each of the other Parcel Owners (the "Released Party") from any liability which the Released Party would, but for this Section, have had to the Releasing Party during the term of this Agreement resulting from the occurrence of any casualty against which the Releasing Party carries insurance, or is required to carry insurance, which casualty may have resulted in whole or in part from any act or neglect of the Released Party, its servants, agents or employees, other than the willful act of the Released Party, its servants, agents or employees; and to the extent permitted by law, each Releasing Party will also release from all such liability any Person holding under the respective Released Party from any such liability

20

to it, as if such Person were expressly a party to this Agreement with the Releasing Party.

(B)     All releases which are the subject of this Section 3.7 shall be effective (i) only for so long as and to the extent that policies (if any) insuring the interest of the Releasing Party hereunder, contain a clause providing in effect that such release will not vitiate or adversely affect such policy or the right of the insured to recover thereunder, and (ii) only for so long as and to the extent that such release is reciprocal as to the Releasing Party. Each Party shall obtain a clause as described in (i) above in each of its policies, if it is available, and if no additional premium is charged therefor. If a Releasing Party maintains insurance and is unable to obtain such a clause, or if a material additional premium is charged therefor, the Releasing Party shall promptly notify the Released Party whereupon the Releasing Party shall have no obligation to obtain such a clause unless, in case a material additional premium is charged therefor, the Released Party agrees to pay the amount of the additional premium within ten (10) business days after notice to the Released Party of the applicability of this sentence and of the additional amount and thereafter promptly pays such amount.

## SECTION 3.9.  CLEARING OF AREA.

If any Parcel Owner shall not be obligated to, and shall elect not to, repair, reconstruct, or replace all or any portion of any improvement on its Parcel damaged by fire or other casualty, such Parcel Owner shall, nevertheless, cause the portion of such improvement not so replaced, reconstructed, repaired or restored to be demolished in its entirety and replaced with paved parking facilities or landscaped area comparable to the paved parking facilities or landscaped area, as the case may be, then existing within the parking areas.

## SECTION 3.10.  MECHANICS' LIENS.

If a mechanic's lien is filed against any Parcel in connection with any work or construction done on another Parcel, the Party permitting or causing the lien to be filed shall take prompt action to protect the Parcel upon which such lien has been filed and the Parcel Owner which owns such Parcel, such action to include removal of such lien if requested by the Parcel Owner of the Parcel upon which such lien has been filed, or if required by any Mortgagee, purchaser or lessee of such Parcel or a portion thereof.

## SECTION 3.11.  EFFECT OF CONSTRUCTION ON SHOPPING CENTER SITE OPERATION.

Each Parcel Owner shall take reasonable necessary safety measures to protect the other Parcel Owner and its Occupants and Permittees from injury or damage by work or

21

construction performed on its Parcel. Each Parcel Owner shall do its work and construction so that it does not unreasonably interfere with the Occupants and Permittees on the remainder of the Shopping Center Site and shall erect protective fences and other safeguards so that businesses on the other Parcel Owner's Parcels can continue operating during work and construction on its Parcel. Each Parcel Owner shall confine its construction activities to an area within a 10' radius of the building lines for the building(s) on its Parcel as shown on Exhibit A, and all materials and equipment used in such construction shall be stored solely within the boundaries of the Parcel on which such construction is being performed, provided that the Lot 1 Owner shall not store any materials or equipment south of the third row of parking on the southerly side of the Lot 1 Building. Each constructing Parcel Owner shall restore all areas it disturbs on any other Parcel Owner's Parcel to their condition prior to construction.

## ARTICLE IV

## EXCULPATION

No Parcel Owner, and no partner, shareholder, fiduciary or disclosed or undisclosed principal of any Parcel Owner and no officers, directors and stockholders of a Parcel Owner or on the part of the officers, directors and stockholders of any corporate successor in interest of a Parcel Owner or on the part of the members of any firm, partnership, or joint venture if any successor in interest be a firm, partnership, or joint venture (all, in this Article IV, being included in the meaning of the expression "Parcel Owner"), shall be under any personal liability with respect to any of the provisions of this Agreement, and if any Parcel Owner is in breach or default with respect to such Parcel Owner's obligations, or otherwise under this Agreement, the other Parcel Owner shall look solely to the interest of the defaulting Parcel Owner in its Parcel for the satisfaction of any monetary obligations of such defaulting party. It is expressly understood and agreed that each Parcel Owner's liability hereunder for monetary obligations shall in no event exceed such Parcel Owner's equity interest in its Parcel.

No provision of this Article shall be deemed to excuse any default or other breach on a Parcel Owner's part nor shall any right or remedy of any other Parcel Owner be thereby otherwise limited or derogated, including, without limitation, the right to injunctive or other equitable relief.

No provision of this Article shall operate to limit or derogate from each Parcel Owner's rights or remedies as to funds accruing from any eminent domain proceeding or the proceeds of any insurance (for which each Parcel Owner(s) shall remain personally liable) nor shall they render one Parcel Owner liable for the obligations or other liabilities of any other Parcel Owner to others.

Notwithstanding the foregoing, no provision of this Article shall be construed to affect the obligation of the Lot Owners to reimburse the Operator for the costs incurred by

22

Operator in the performance of its obligations hereunder or to pay the Operator for the associated management fee as provided herein, which obligation shall remain the unlimited personal liability of each Parcel Owner.

## ARTICLE V

### REAL ESTATE TAXES, WATER AND SEWER RENTS AND OTHER CHARGES

### SECTION 5.1.  COVENANT TO PAY.

Each Parcel Owner respectively covenants to pay, before any penalty may be added thereto for the non-payment thereof, with respect to its respective Parcel, all real estate taxes and assessments thereon, all water and sewer rents thereon, all utility charges for its Parcel, all assessments hereafter made by governmental authorities for improvements on its Parcel, and all other liens, assessments, impositions, or other charges for the non-payment of which a lien could be imposed upon its Parcel (all of the foregoing being herein called a "Tax").

### SECTION 5.2.  RIGHT TO CONTEST OR APPEAL.

Each Parcel Owner, respectively, shall have the right to contest the validity of the amount of any Tax levied against its Parcel by such appellate or other proceedings as may be appropriate in the jurisdiction, and may defer payment of such tax, pay same under protest, or take such other steps as it may deem appropriate; provided, however, such Parcel Owner shall take no action or defer payment beyond such period as shall cause or allow the institution of any foreclosure proceedings or similar action against its Parcel.

23

## ARTICLE VI

## CONDEMNATION/FIRE AND CASUALTY

### SECTION 6.1. RESTORATION.

If any portion of a Parcel is taken by Condemnation, this Agreement shall not be affected thereby, except that the portion of such Parcel so taken shall be relieved and released from the terms of this Agreement, and the Parcel Owner whose Parcel was subject to such Condemnation shall apply the proceeds of the Condemnation Award attributable thereto (subject to the prior rights, ff any, of the Mortgagee of such Parcel) and such additional funds as may be necessary, to the restoration of the remaining parking areas on its Parcel as near as possible to the condition which existed prior to the Condemnation.

### SECTION 6.2. WAIVER OF AWARD.

The provisions of this Article VI are intended to establish the rights as between the Parcel Owners in the event of a Condemnation and such provisions shall not limit, affect or prejudice the claims which may be asserted by the Parcel Owners against the Condemnor. The Condemnation Award in respect of Condemnation, whether before or after the Termination Date, shall, as between the Parcel Owners, belong to the Parcel Owner(s) of the Parcel(s) affected by such Condemnation; provided, however, that each Parcel Owner who enjoys any easement, right or interest created by this Agreement in a Parcel shall be entitled to make its own separate claim against the Condemnor for the value attributable to any such easement, right or interest to the extent that such easement no longer benefits the Parcels not so Condemned, provided that such claim shall not affect the claim of the Parcel Owner of the Parcel affected by such condemnation.

### SECTION 6.3. FIRE INSURANCE.

Each Parcel Owner agrees to maintain fire and extended coverage insurance in "all risk" form on the buildings located on its Parcel in the full amount of their replacement cost, subject to the maintenance of commercially reasonable and customary "deductibles" and co-insurance provisions.

### SECTION 6.4. DAMAGE.

(A)  If any building in the Shopping Center Site is damaged by fire or other casualty, the Parcel Owner on whose Parcel the building is located shall either promptly (i) repair or rebuild the building to at least its prior condition, or (ii) raze the building, fill in any excavation, pave or plant grass in the area affected by the damage, and perform such other work needed to put the area in a sightly condition.

24

(B)    If any parking area, driveway or other Common Area is damaged by fire or casualty, the Parcel Owner on whose Parcel such area is located shall either promptly (i) repair or rebuild the area to at least its prior condition, or (ii) perform such work needed to put the area in a sightly condition.

(C)    Notwithstanding the foregoing, the following provisions will apply to damage to the Lot 1 Building resulting from fire or other casualty:

1.    PARTIAL DAMAGE.  In case the Lot 1 Building shall be partially damaged, but not substantially damaged (as that term is hereinafter defined) by fire, by any hazard included within so-called extended coverage and all risk endorsements, or by casualty, the Lot 1 Owner shall forthwith proceed to repair such damage and restore the Lot 1 Building to substantially its condition at the time of such damage (subject, however, to zoning and building laws then in existence).

2.    SUBSTANTIAL DAMAGE.  In case the Lot 1 Building shall be substantially (as that term is hereinafter defined) damage or destroyed by fire or other casualty, the risk of which is covered by the Lot 1 Owner's Fire Insurance, the Lot 1 Owner shall, proceeding with all reasonable dispatch after such damage and the determination of the net amount of insurance proceeds available to the Lot 1 Owner, expend so much as may be necessary to, repair or rebuild the Lot 1 Building to substantially its condition at the time of such damage or destruction (subject, however, to building and zoning laws then in existence), but the Lot 1 Owner shall not be responsible for any delay which may result from any cause beyond its reasonable control.  so long as the Lot 1 Owner has maintained the insurance coverage required hereunder, should the net amount of insurance proceeds to insufficient to cover the cost of restoration, the Lot 1 Owner shall not be responsible for any such insufficiency and shall not required to complete such restoration.

3.    SUBSTANTIAL DAMAGE AFTER DECEMBER 31, 2007. However, in case the Lot 1 Building shall be substantially damaged or destroyed by fire any hazard included within so-called extended coverage and all risk endorsements, or by casualty, on or after December 31, 2007, the Lot Owner shall have no obligation under this subparagraph to restore the Lot 1 Building.

4.    DEFINITION OF SUBSTANTIAL DAMAGE.  The terms "substantially damaged" and "substantial damage" as used in this paragraph shall have reference to damage of such character that the Lot 1 Building cannot reasonably be expected to be repaired or restored within one hundred twenty (120) days from the time that such repair or restoration work would be commenced.

25

## ARTICLE VII

### DEFAULT, SELF-HELP AND OTHER REMEDIES

**SECTION 7.1.  COSTS.**

Costs to perform an obligation shall be paid by the Parcel Owner obligated to perform.  If a Parcel Owner owes money to another Parcel Owner under this Agreement, the owed Parcel Owner shall submit a bill in reasonable detail to the owing Parcel Owner for its share.  The owing Parcel Owner shall pay the amount owed within thirty (30) days after receiving the bill, and the amounts not paid within the thirty (30) days shall bear interest of two percent (2%) a year over the "Prime Rate") (herein defined as the prime interest rate charged by large U.S. money center commercial banks as published Monday through Friday under "Money Rates" in The Wall Street Journal), but in no event above the maximum rate permitted by law.  Interest shall be calculated daily on the outstanding principal balance, and the interest rate shall change when the Prime Rate changes.  If The Wall Street Journal discontinues publishing the Prime Rate, the Parcel Owners shall agree on a substitute source for the Prime Rate.

**SECTION 7.2.  RIGHTS OF SELF-HELP.**

If any Parcel Owner (hereinafter the "Defaulting Parcel Owner") fails to perform any of the provisions, covenants or conditions of this Agreement on its part to be performed (including, without limitation, the making of any payment to any other Party which the Defaulting Party has agreed herein to make or the payment of any real estate taxes or assessments) at the time and in the manner herein provided for the performance thereof, then any other Parcel Owner (hereinafter the "Non-Defaulting Parcel Owner") may give to the Defaulting Parcel Owner a notice (the "Default Notice") specifying the alleged default.  The provisions of this Section 7.2 shall not apply to the failure of the Operator to perform its obligations under Section 3.1 hereof, which failure shall be governed by the provisions of Section 3.1(I).

In no event may a Parcel Owner terminate this Agreement if another Parcel Owner defaults.  Any Parcel Owner may enjoin a Parcel Owner who defaults or who threatens to default, may enjoin an Occupant who violates or threatens to violate any term of this Agreement, and may seek any other available legal and equitable remedies for the default.  A Parcel Owner may assess the costs of any suit or proceeding (including reasonable attorneys' fees) to prevent or remedy a default against the defaulting Parcel Owner or the violating Occupant.  Any agreement which violates this Agreement shall be void as against this Agreement and may be set aside as it violates this Agreement on the petition of a Parcel Owner.  Upon receipt of the Default Notice, the Defaulting Parcel Owner shall remedy the default, within the time period after the giving of the Default Notice as listed below:

26

| OBLIGATION | TIME PERIOD |
|---|---|
| granting utility easements | 60 days (then the requesting Parcel Owner has power of attorney to execute for the granting Parcel Owner) |
| initial construction of Common Areas | 60 days |
| restoring construction damage | 5 days |
| protecting during construction | 5 days |
| building maintenance | 60 days |
| remove trash from buildings | 3 days |
| rear building and canopy lights | 10 days |
| sidewalk sweeping | 7 days |
| removing ice and snow from sidewalks | 4 hours |
| paying real estate taxes and special assessments | any time after delinquency |
| paying other liens and charges against the Shopping Center Site | within five days before the foreclosure date |
| carrying insurance | 15 days |
| other obligations | 30 days |

A Defaulting Parcel Owner shall be in default ("Default") under this Agreement if, and only if, it shall fail to effect such remedial action within the time so limited. If the Defaulting Parcel Owner shall commence such remedial action within the applicable time but shall fail to complete the same within such time for reasons beyond its control, it shall not be deemed to be in default under this Agreement as long as it shall continue to use due diligence to complete such remedial action.

27

If a Defaulting Parcel Owner is in Default under this Agreement, the Non-Defaulting Parcel Owner may proceed to make payment or take such action as shall be necessary to remedy the Default for the account of the Defaulting Parcel Owner. Thereafter, on demand, the Defaulting Parcel Owner shall reimburse the Non-Defaulting Parcel Owner for the expenses (including counsel fees) incurred by the Non-Defaulting Parcel Owner in paying such sum or taking such action, together with all penalty sums reasonably required to be paid by it, if any, arising from such Default, with interest at the rate provided in Section 7.1. In the case of emergency and if the Defaulting Parcel Owner does not act in an expeditious manner, the Non-Defaulting Parcel Owner may exercise its rights hereunder without the necessity of written notice, as otherwise hereby required (but with telephonic notice, to the extent practicable).

At the time the Non-Defaulting Parcel Owner gives notice to the Defaulting Party as aforesaid, it shall also give notice of such default to all Mortgagee(s) holding a Mortgage(s) encumbering the Parcel owned by the Defaulting Parcel Owner of which the Non-Defaulting Parcel Owner has notice and such Mortgagee(s) shall have the right but not the obligation to cure such default, within the same period of time granted to the Defaulting Parcel Owner to so cure.

## SECTION 7.3.  LIEN.

Any amount due under Section 7.2 from a Defaulting Parcel Owner to a Non-Defaulting Parcel Owner shall, upon recording of a notice of lien, thereafter be deemed to constitute a lien (the "Default Lien") against the Parcel of the Defaulting Parcel Owner.

The Defaulting Parcel Owner shall, at the request of the Non-Defaulting Parcel Owner, execute and acknowledge such instruments as the Non-Defaulting Parcel Owner deems necessary to confirm and record the existence of such Default Lien.  Upon failure or refusal of the Defaulting Parcel Owner to execute and acknowledge any such instrument, the Non-Defaulting Parcel Owner shall have full power of attorney with respect thereto.  Upon the satisfaction of such obligations for which a notice of lien was recorded, the Non-Defaulting Parcel Owner shall record an appropriate release of such notice of lien upon payment by the Defaulting Parcel Owner of the reasonable costs, including reasonable attorney's fees and filing fees, of preparing and recording such release.

28

### SECTION 7.4.  REMEDIES CUMULATIVE.

Subject to any provision in this Agreement which states that a remedy is exclusive, any remedies herein specifically provided for are cumulative and shall be deemed additional to any and all other remedies to which a Parcel Owner may be entitled in law or in equity, and shall include the right of setoff and the right to restrain by injunction any violation or threatened violation by the other Parcel Owner(s) of any of the terms, covenants or conditions of this Agreement, and by decree, to compel performance of any such terms, covenants or conditions, it being agreed that the remedy at law for the breach of any such term, covenant or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate.

### SECTION 7.5.  FORCE MAJEURE.

Parcel Owners are excused from performing an obligation under this Agreement while delayed or prevented from performing that obligation by a cause not within its reasonable control (excluding financial inability to pay amounts due under this Agreement, but including breach of this Agreement by another Parcel Owner resulting in such delay or prevention), acts of God, fire, earthquake, flood, explosion, action of the elements,, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure or general shortage of labor, equipment, facilities, materials, or supplies in the open market (if promptly ordered), failure of transportation, strikes, lockouts, action of labor unions, condemnation, requisition, and governmental prohibition or delay. To be excused under this Section 7.5, a delayed Parcel Owner shall notify the other Parcel Owners of such delay within five (5) days after the start of the delay.

### ARTICLE VIII

### NOTICES

### SECTION 8.1.  PLACE AND MANNER OF NOTICE.

Every notice, demand, request, or other communication which any Parcel Owner is required or desires to give or make or communicate upon or to the other Parcel Owner, shall be in writing and shall be mailed by registered or certified mail, postage prepaid, return receipt requested to such address or addresses as the respective Parcel Owner shall at any time, or from time to time, designate by written notice to the other Parcel Owner(s) with a copy by registered or certified mail, postage prepaid, return receipt requested to the address or addresses of the mortgagee(s) of such Parcel Owner of which the other Parcel Owner(s) are aware.

## SECTION 8.2.  WHEN EFFECTIVE.

Any notice hereunder shall be deemed to have been received on the delivery date endorsed by the Postal Service on the return receipt, except that any notice which is (according to the terms of this Article) correctly addressed but which is returned by the Postal Service as undeliverable shall be deemed to have been received on the earliest date on which the Postal Service attempted delivery as indicated by Postal Service endorsement on the return receipt form.

## ARTICLE IX

### USE RESTRICTIONS

## SECTION 9.1.  INTRODUCTION.

No Parcel or part of a Parcel may be used in violation of any restriction set forth in this Article IX, except as expressly provided as an exception to the restriction in this Article IX.

## SECTION 9.2.  GENERAL.

In order to insure that the parking areas of the Shopping Center Site shall not be overburdened and to preserve the character of the Shopping Center Site as an active center of retail trade offering a variety of goods and services capable of attracting the widest possible spectrum of shoppers, neither Parcel Owner may, while the other Parcel shall be utilized substantially for retail purposes, use or suffer or permit the use of its Parcel for:

(A)    for the conduct of a business operation which regularly or with significant frequency sells merchandise of the types of qualifies now commonly known as "odd lot" , "close out", "clearance", "discontinued" , "cancellation", "second" , "factory reject", "sample", "floor model", "demonstrator", "obsolescent", "over-stock", "distressed", "bankruptcy", "fire sale" or "damaged"; or

(B)    for any purpose other than the conduct of a "retail business", so-called, which term shall mean the include mail-order catalog store operations of the Sears Roebuck and Montgomery Ward type, banks, finance company businesses, service and self-service dry cleaning and laundry businesses, shoe repair shops, barber shops, beauty shops, dance studios, health salons, and real estate brokerage, stock brokerage and insurance brokerage businesses, travel agencies, and private postal service businesses such as that operated by "mailboxes, Etc.", as well as ordinary retail businesses selling merchandise, provided that the Lot 1 Building may be used for the operation of a movie theater; or

30

(C)    for a stand alone alcoholic beverage ("Bar") business of any kind; provided that any portion of Lots 2 and Lot 3 may be used for a Bar as part of a full service sit down restaurant;

(D)    for (a) a "carhop" or "carry-out" restaurant business without reasonably adequate inside seating facilities and which advertises that customers may consume food items while occupying vehicles parked on the parking areas of a Parcel; or (b) a banquet hall business which serves its guests on a special, catered basis as distinguished from a restaurant business open to the public at large on a random basis; or

(E)    for any "amusement operation," so-called, which term shall mean and include any activity consisting wholly or in substantial part of the furnishing of entertainment or amusement facilities, whether or not as a business or as a part or aspect of a business (including, without limitation, off-track betting parlors, "penny arcades," amusement games or devices (electronic or otherwise), strip-shows; and "discos", so-called), and live entertainment of any kind, provided that the foregoing shall not be construed to prohibit the operation of a movie theater in the Lot 1 Building or the use of amusement games or devices as a part thereof; or for a massage parlor, so-called or the business of the sale of so-called "adult" material such as, without limitation, magazines, books and photographs; or

(F)    for any business using a substantial amount of outdoor space in its regular operations, such as lumber yards, boat sales yards and the like; or

(G)    for any office or storage operations except: (a) office and storage operations which are a part of the conduct of a retail business in the shopping Center; and (b) professional offices.

(H)    the operation of a hotel, motel or tourist court; or

(I)    any automobile or truck sales, storage, service, fueling, washing or repair operation; or

(J)    for any propose or business which is noxious or unreasonably offensive because of the regular emission of noise, smoke, dust or odors.

31

## SECTION 9.3.    LOT 1.

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 1 may be used for (a) as a theater and public auditorium for use for telecasts, meetings, presentations of motion pictures, and other public presentations and entertainment as are generally shown in theaters; and in the location shown on the Site Plan as "Dream Machine" as an entertainment center such as, but not limited to, those currently being operated under the trade name "Dream Machine," and (b) for other entertainment uses incidental to the primary use of the Lot 1 Building, including, without limitation, the incidental operation of video games and entertainment and vending machines; and (c) for the incidental retail preparation and sale of food, beverages and refreshments for consumption on the Lot 1 Building; provided, however, that no alcoholic beverages shall be sold unless Tenant at its own expense obtains all governmental licenses and permits required, and (d) for the incidental sale of promotional and related items such as records, audio and video tapes, compact discs, books, magazines, toys and novelties; provided, however, that not more than 200 square feet shall be devoted to such sales without Landlord's consent, which consent may be withheld in Landlord's sole and absolute discretion if such additional sales space would violate the exclusive use clauses of the leases of other tenants in the Shopping Center, and Lot 1 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

## SECTION 9.4.    LOT 2.

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 2 may be used for the operation of a restaurant(s) or for any other lawful retail purposes, and Lot 2 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

## SECTION 9.5.    LOT 3.

Except as specifically provided in Exhibit D attached hereto and made a part hereof, Lot 3 may be used for the operation of a restaurant(s) or for any other lawful retail purposes, and Lot 3 shall be occupied, owned and conveyed subject to the restrictions set forth in Exhibit D attached hereto.

## ARTICLE X

## TERMINATION

### SECTION 10.1. TERMINATION DATE.

Except for the Parking Area Easements under Section 2.2(A), the Access Easements under Section 2.2(B), the Utility Easements under Section 2.2(C), and the Self Help Easements under Section 2.2(D), which are perpetual, and except for the restrictions set forth in Article IX of this Agreement which are governed by Section 10.2 hereof, this Agreement terminates on the Termination Date, which is the date, sixty (60) years from the date this Agreement is recorded or any earlier date as agreed by all Parcel Owners, and shall continue thereafter for successive periods of ten (10) years, unless any Parcel Owner and the Mortgagee holding a mortgage(s) encumbering the Parcel of such Parcel Owner shall give notice to the other Parcel Owner, at least six (6) months prior to the expiration of the initial sixty (60) year period hereunder or any such ten (10) year extension period hereof, as the case may be, that this Agreement shall terminate as of the end of such initial period or extension period, as the case may be.

### SECTION 10.2. NOTICE OF EXTENSION OF RESTRICTIONS.

A notice of extension of the provisions of Article IX of this Agreement shall be recorded in the Worcester District Registry of Deeds prior to the expiration of thirty (30) years from the date of recording of this Agreement, and prior to the expiration of twenty (20) years from the date of recording of the first notice of extension hereunder, and thereafter prior to the expiration of the term of this Agreement. All such notice(s) of extension shall be in the form and contain the information required by M.G.L. c. 184, §27 (as the same may be from time to time amended) and shall be executed by all of the Parcel Owners.

## ARTICLE XI

## MISCELLANEOUS

### SECTION 11.1. NO WAIVER.

No waiver of any default by a Parcel Owner shall be implied from any omission by such Parcel Owner to take any action in respect to such default in the performance of any term, provision or covenant of this Agreement, nor shall such failure be deemed a waiver of any subsequent default in the performance of the same term, provision or covenants, or any other term, provision or covenant of this Agreement.

33

### SECTION 11.2.  NO RELATIONSHIP OF PRINCIPAL AND AGENT.

Neither anything contained in this Agreement nor any act of the Parcel Owner(s) shall be deemed or construed by any Parcel Owner or by any third person to create the relationship of principal and agent, of partnership, of joint venture, or of any association between the Parcel Owners, nor shall anything contained in this Agreement or any act of the parties be construed to render either of the Parcel Owners liable for the debts or obligations of the other Parcel Owners, except as specifically provided herein.

### SECTION 11.3.  INDEMNIFICATION AND MINIMUM INTERFERENCE.

Each Parcel Owner shall indemnify, defend (if requested), and hold the other harmless from all claims and losses, and all costs and expenses relating thereto (including reasonable attorney's fees) connected with the use of its Parcel and the operations of the Occupants of its Parcel, unless the claim or loss results from the negligence of the other Parcel Owner or the Occupants of its Parcel.  In addition, each Parcel Owner shall indemnify and hold the other harmless on account of any damage or injury caused by such Parcel Owner or by the Occupants of its Parcel as a result of exercising any of its rights or in performing any of its obligations hereunder, except to the extent that such other Parcel Owner or the Occupants of its Parcel shall have caused or contributed to any such damage or injury.  Each Parcel Owner shall promptly notify the other Parcel Owner of any claim against the notifying Parcel Owner for which the notifying Parcel Owner intends to seek indemnification as provided herein.  Each Parcel Owner further agrees that in exercising its rights hereunder it will do so in a manner so as to minimize the effect or interference with the rights of the other Parcel Owner in and to its Parcel.  Each Parcel Owner before exercising any rights hereunder in any other Parcel shall first attempt to use its Parcel to accomplish the intended purpose provided such Parcel Owner can do so in a reasonable and financially practical manner.

### SECTION 11.4.  CAPTIONS.

The captions of the Articles and Sections of this Agreement are for convenience only and shall not be considered or referenced to in resolving questions of interpretation and construction.

### SECTION 11.5.  GOVERNING LAW.

This Agreement shall be construed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts.

34

**SECTION 11.6.    AMENDMENT.**

This Agreement may not be altered, modified, amended, renewed, extended or terminated unless by an instrument in writing duly executed by the parties then bound by this Agreement and the holders of all mortgages encumbering the Parcels.

**SECTION 11.7.    COUNTERPARTS.**

Several copies of this Agreement shall be signed, and each shall be deemed an original.

**SECTION 11.8.    NO GIFT OR DEDICATION.**

Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center Site to the general public or for any public purposes whatsoever, it being the intention of the Parties that this Agreement shall be strictly limited to and for the purposes herein expressed.

**SECTION 11.9.    COVENANTS RUN WITH THE LAND.**

It is intended that the covenants and agreements set forth in this Agreement shall be construed as both covenants and conditions, and that they shall run with the land and be affirmatively enforceable against the Parcel Owners (but subject to the provisions of the exculpation clause set forth in Article IV above), the Parcels and any grantee, personal representative, heir, successor and assign thereof, and shall continue to be easements, servitudes, charges and encumbrances appertaining to and upon, and covenants benefiting, binding and running with the land, buildings and improvements now or later existing within the Shopping Center Site.

**SECTION 11.10.    APPROVALS.**

No Parcel Owner may unreasonably withhold or delay its approval under this Agreement unless this Agreement expressly provides that its approval is discretionary. Unless a different time limit is expressly provided in this Agreement, a Parcel Owner's approval shall be given or withheld within thirty (30) days after it receives the item to be approved, or the item is deemed approved by that Parcel Owner. If a time period shorter than thirty (30) days is provided, the shorter period shall be stated in the request for approval. Failure to state the shorter time period means that a Parcel Owner has thirty (30) days to give or withhold its approval.

**SECTION 11.11.    TITLE.**

This Agreement is superior to all liens and encumbrances on the Shopping Center Site except those title exceptions listed in Exhibit F, but the Parcel Owner's rights under Section

35

7.3 (regarding lien rights) are subordinate to any and all mortgages on any Parcel. The Parcel·Owners represent and warrant to each other that the title exceptions listed in Exhibit F do not interfere with or prevent the exercise of the rights and easements granted hereunder, and each Parcel Owner agrees, for the benefit of the other, not to enter into any modification of existing leases or new leases which will permit uses that violate the use restrictions referenced in Article IX hereof.

## SECTION 11.12. ESTOPPEL CERTIFICATE.

At the request of any other Parcel Owner, each Parcel Owner shall certify to the requesting Parcel Owner's prospective mortgagee or prospective assignee or transferee, whether, to the certifying Parcel Owner's knowledge: (i) there is any default under the Agreement (and, ff any, describing the default); (ii) the Agreement has been assigned, modified or amended (and ff so, describing it); and (iii) the Agreement as of that date is in full force. Such certification waives any claim of the certifying Parcel Owner based on facts contrary to those asserted in the certificate against any bona fide encumbrancer or purchaser for value to whom the certification was made, and who acted in reasonable reliance on the certificate and without knowledge of the contrary facts.

## SECTION 11.13. RIGHTS AND OBLIGATIONS OF SUCCESSOR AND ASSIGNS.

The rights in this Agreement are appurtenant to each Parcel and benefit each Person who qualifies as a Parcel Owner under this Agreement. The obligations in this Agreement are equitable servitudes on and covenants running with each Parcel and bind personally each Person who qualifies as a Party under this Agreement (and Article IX regarding use binds the Occupants of the Parcels), except as otherwise provided herein.

## SECTION 11.14. PARTIAL INVALIDITY.

If this Agreement is invalid or unenforceable in part or under certain circumstances, the rest of this Agreement and its application under other circumstances is valid and enforceable to the fullest extent permitted by law.

IN WITNESS WHEREOF, this instrument has been executed as a sealed instrument as of the day and year first above written.

                    TRUSTEES OF NORTHSIDE REALTY TRUST


                    _____
                    Leslie C. Carey, as Trustee of
                    Northside Realty Trust and not
                    individually

                    [acknowledgements]

36

mss\nrthside\restrict.2

## EXHIBIT D

## RESTRICTIONS

The following restrictions shall be applicable to Lot 1, Lot 2, and Lot 3:

1.    Recognizing that certain uses creates extraordinary demands for the parking capacity at the Shopping Center, no portion of the Protected Area shall be operated as or for: (i) a table service restaurant, (ii) any food service facility in excess of 3,500 square fee, or (iii) any facility utilizing an on-premises alcoholic beverage license.  In addition, Landlord shall not permit the operation of a bowling alley, pool hall, skating rink, video store, children's entertainment complex or facility or game room, adult entertainment facility (including, but not limited to an adult bookstore, video store, nude or semi-nude entertainment facility), health club, gym, aerobics or fitness studio in the Shopping Center, or permit the construction of any additional building in any portion of the Protected Area or any expansion of the Shopping Center within the Protected Area. The respective Owners agree  that all tenants of the Shopping Center shall be bound by the terms of this Section.

2.    No sales of merchandise of any kind and no carnivals or Shopping Center promotions shall be permitted in the parking areas of the Shopping Center.

The following restrictions shall be applicable to Lot 2 and Lot 3:

3.  No portion of Lot 2 or Lot 3 shall be used as a movie theater or for the staging of shows for profit.

4.    The Lot 2 Owner and Lot 3 Owner will not sell or permit to be sold popcorn in or from any premises (a) within any so-called food court (or the like) located in the Shopping Center, (b) fronting on the corridors and pathways leading between the Late Lighting Area and the Lot 1 Building, or (c) within two hundred (200) feet of any wall of the Lot 1 Building, or in or from any part of the sidewalks, parking areas, any mall areas, or other common areas of the Shopping Center, which prohibition shall not apply to the incidental sale thereof by the operator of any store or restaurant in the Shopping Center within such store or restaurant if and to the extent permitted by such store's or restaurant's occupancy agreement executed heretofore; and

ATTEST: WORC. Anthony J. Vigliotti, Register

# ATTACHMENT E
# DEED

BOOK 19369 PAGE 75

129560

## QUITCLAIM DEED

LESLIE S. CAREY, as she is Trustee of NORTHSIDE REALTY TRUST under Declaration of Trust dated January 14, 1994 duly recorded with the Worcester District Registry of Deeds on January 14, 1994 in Book 15975, Page 213 having an address c/o New England Management and Realty Corporation, 55 New York Avenue, Framingham, Massachusetts 01701

for consideration paid and in consideration of Nine Million and One Hundred Fifty One Thousand Four Hundred and Forty Nine Dollars and 00/100 ($9,151,449.00)

grants to WESTBOROUGH SPE LLC, a Delaware Limited Liability Company with a principal place of business at c/o Babcock & Brown Administrative Services, Inc., Two Harrison Street, San Francisco, CA 94105

with Quitclaim Covenants, the following described property:

that certain parcel of land, together with any buildings and improvements thereon, located at 231 Turnpike Road, in the Town of Westborough, Worcester County, Massachusetts, which are shown as Lot #1 on a plan entitled "Plan of Land in Westborough, Worcester County,...", dated April 11, 1997, prepared by Beals and Thomas, Inc. recorded with the Worcester District Registry of Deeds, Plan Book 714, Plan 77 and being more particularly bounded and described according to said plan on Exhibit A attached hereto and made a part hereof.

Said Lot 1 contains 1,277,351 square feet more or less, or 29.324 acres, more or less, according to said plan.

Said Premises are conveyed subject to and together with the benefit of easements, restrictions and other matters of record, insofar as in force and applicable.

Without limitation, said premises are conveyed together with the following:

(i) rights and easements set forth in that certain Declaration of Reciprocal Covenants, Easements and Restriction dated April 9, 1997 and recorded with said Deeds in Book 18745, Page 313 as being for the benefit of said Lot 1 and subject to the rights, easements and restrictions set forth therein as the same affect Lot 1, which are reserved for the benefit of Lots 2 and 3 as shown on said Plan, and (ii) Utility Easement "A", Utility Easement "B" and Utility Easement "D" all as shown on Plan Book 710, Plan 91.

**GOULD & ETTENBERG, P.C.**
370 Main Street
Worcester, MA 01608
Tel: (508) 752-5733

GUARANTY ABSTRACT CO
Vol 151 Pg 98

BOOK 19369 PAGE 76

Said Premises are conveyed subject to real estate taxes due the Town of Westborough for the 1998 tax fiscal year, which the Grantee hereof assumes and agrees to pay by the acceptance and recording of this deed.

The undersigned hereby certify that (i) Northside Realty Trust is in full force and effect and has not been amended, rescinded or terminated, (ii) that the undersigned is a trustee of the trust and (iii) that the undersigned has been directed by all of the beneficiaries of said trust to execute, seal, acknowledge and deliver this deed.

Grantor intends to convey and does hereby convey a portion of the premises conveyed to Grantor by Deed of Stanley Miller, Trustee dated April 13, 1994 recorded with the Worcester District Registry of Deeds Book 16210, Page 372.

EXECUTED as a sealed instrument the 31st day of October, 1997.

Leslie S. Carey, TTEE

Leslie S. Carey, Trustee of
Northside Realty Trust,
and not individually

THE COMMONWEALTH OF MASSACHUSETTS

Suffolk
~~Middlesex~~, ss.                                October 31, 1997

Then personally appeared before me the above named Leslie S. Carey as she is Trustee of Northside Realty Trust and acknowledged the foregoing instrument to be his free act and deed, before me,

Kenneth J. Mickiewice, Notary Public
My Commission Expires: 5/19/2000
KENNETH J. MICKIEWICE

DEEDS REG 20
WORCESTER

11/21/97

TAX  41730.84
CASH  41730.84

5932A140 14:02
EXCISE TAX

BOOK 13369 PAGE 77

EXHIBIT A

METES AND BOUNDS DESCRIPTION

Lot 1
Westborough, Massachusetts
W-45.30

A certain parcel of land in the Commonwealth of Massachusetts, County of Worcester, Town of Westborough situated on the northerly side of Boston Worcester Turnpike, Route 9, and shown as Lot 1 on a plan entitled "Plan of Land in Westborough, Worcester County, ...", dated April 11, 1997, prepared by Beals and Thomas, Inc. More particularly bounded and described as follows:

Beginning at a point in the east bank of the Assabet River at Boston Worcester Turnpike, thence running;

N 30 58 22 W 1123.34 feet to a point, said course being by land now or formerly of Brown Realty Trust, thence turning and running;

N 86 07 42 E 1022.91 feet to a point, thence turning and running;

N 03 52 18 W 501.72 feet to a point, thence turning and running;

N 86 07 42 E 627.83 feet to a point, thence turning and running;

N 58 30 39 E 523.55 feet to a point, said four courses being by land now or formerly of P.V. Davis Construction Company, Inc., thence turning and running;

S 18 32 25 E 9.51 feet to a Worcester County Highway bound, thence turning and running;

S 17 00 25 E 69.96 feet to a point, thence turning and running;

S 15 35 25 E 79.20 feet to a Worcester County Highway bound, thence turning and running;

S 11 50 25 E 63.36 feet to a point, thence turning and running;

S 09 15 25 E 67.32 feet to a Worcester County Highway bound point, thence turning and running;

S 06 35 25 E 66.00 feet to a point, thence turning and running;

S 06 25 25 E 74.57 feet to a Worcester County Highway bound, thence turning and running;

S 05 48 30 E 73.06 feet to a Worcester County Highway bound, thence turning and running;

S 04 09 29 E 190.38 feet to a point, thence turning and running;

BEALS AND THOMAS, INC.

BOOK 19369 PAGE 78

Metes and Bounds Description
Lot 1
Westborough, Massachusetts
W-45.30
Page 2 of 2

Southerly        by a curve to the right having a radius of 1000.00 feet and a length of 215.67 feet to a point, said last 10 courses being by the westerly line of Milk Street, thence turning and running;

S 52 34 33 W 376.10 feet to a point, thence turning and running;

S 86 07 42 W 209 07 feet to a point, thence turning and running;

N 49 56 56 W 33.00 feet to a point, thence turning and running;

Northwesterly by a curve to the left having a radius of 335.00 feet and a length of 76.89 feet to a point, thence turning and running;

S 86 07 42 W 213.61 feet to a point, thence turning and running;

N 03 47 36 W 319.22 feet to a point, thence turning and running;

S 86 07 42 W 337.66 feet to a point, thence turning and running;

S 03 52 18 E 112.44 feet to a point, thence turning and running;

S 86 07 42 W 437.86 feet to a point, said last nine courses being by Lot 2, thence turning and running;

S 03 52 18 E 925.00 feet to a point, said course being in part by Lot 2 and in part by land now or formerly of Lillian E. Brown Life Estate, thence turning and running;

S 86 07 42 W 148.31 feet to the point of beginning, said course being by the northerly line of Boston Worcester Turnpike.

Containing 1,277,351 square feet more or less, or 29.324 acres, more or less.

Subject to any and all existing rights and easements of record.

RJB/mb/054330d/8007

The plan referenced herein is recorded herewith as Plan Book 714 Plan 77 .

BEALS AND THOMAS, INC.

ATTEST: WORC. Anthony J. Vigilotti, Register

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

### ATTACHMENT E

PRICE PROPOSAL FORM

PRICE
*Please write your proposal offer:*

_____

Print/Type your proposal amount above in written form

_____

Print/Type your proposal amount above in number form

***Note:*** *Both the written form and the number form should indicate the same total amount. If there is a conflict between the written form and the number form amounts, the written form will control.*

_____

Name of proposer

_____

Name of person signing proposal

_____

Signature of person signing proposal

Date

_____

Title

_____

Address

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

## ATTACHMENT F

## REQUIRED FORMS

### *FORM 1*

### <u>Certificate of Tax Compliance</u>

Pursuant to Chapter 62C, §49A(b) of the Massachusetts General Laws, I,

_____authorized signatory for

      (Name)

_____, do hereby certify under the pains and

      (Name of Proposer)

penalties of perjury that said proposer has complied with all laws of the Commonwealth

of Massachusetts relating to taxes.

Signature:      _____

Printed name:      _____

Title:      _____

Name of Business:      _____

Date:      _____

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

32

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

#### *FORM 2*

#### <u>Certificate of Non-Collusion</u>

The undersigned certifies under the pains and penalties of perjury that this bid or proposal has been made and submitted in good faith and without collusion or fraud with any other person.  As used in this certification, the word "person" shall mean any natural person, business, partnership, corporation, union, committee, club or other organization, entity or group of individuals.

Signature: _____

Printed name: _____

Title: _____

Name of Business: _____

Date: _____

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

*FORM 3*

### <u>CERTIFICATE OF AUTHORITY</u>

Give full names and residences of all persons and parties interested in the foregoing proposal:

(Notice: Give first and last name in full; in case of a corporation, give names of President and Treasurer; in case of a limited liability company, give names of the individual members, and, if applicable, the names of all managers; in case of a partnership or a limited partnership, all partners, general and limited and; in case of a trust, all the trustees)

NAME                          ADDRESS                          ZIP CODE

_____        _____        _____

_____        _____        _____

_____        _____        _____

Kindly furnish the following information regarding the Respondent:

**1)    IF A PROPRIETORSHIP**

Name of Owner: _____

Address: _____

Name of Business: _____

Home: _____

**2)    IF A PARTNERSHIP**

Business Name: _____

Business Address: _____

Names and Addresses of Partners

PARTNER NAME                  ADDRESS                          ZIP CODE

_____        _____        _____

_____   _____   _____

_____   _____   _____

**3)   IF A CORPORATION OR A LIMITED LIABILITY COMPANY**

Full Legal Name: _____

State of Incorporation: _____

Principal Place of Business   _____

Qualified in Massachusetts:         Yes _____         No _____

Place of Business in Massachusetts: _____

**4)   IF A TRUST**

Full Legal Name:   _____

Recording Information:_____

Full names and address of all trustees:

NAME                        ADDRESS                        ZIP CODE
_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

Signature:         _____

Printed name:     _____

Title:             _____

Name of Business:   _____

Date:             _____

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

*FORM 4*

### DISCLOSURE STATEMENT FOR
### TRANSACTION WITH A PUBLIC AGENCY CONCERNING REAL PROPERTY
### M.G.L. c. 7C, s. 38 (formerly M.G.L. c. 7, s. 40J)

The undersigned party to a real property transaction with a public agency hereby discloses and certifies, under pains and penalties of perjury, the following information as required by law:

(1) Real Property:

A parcel of land located at 231 Turnpike Road, Westborough, Massachusetts, with the building and other improvements thereon, containing 29.336 acres of land, more or less, and shown as Lot 1 on a plan recorded with the Worcester South District Registry of Deeds in Book 714, Page 77.

(2) Type of Transaction, Agreement, or Document: Sale of Property by Town

(3) Public Agency Participating in Transaction: Town of Westborough

(4) Disclosing Party's Name and Type of Entity (if not an individual):


(5) Role of Disclosing Party (Check appropriate role):

_____Lessor/Landlord _____Lessee/Tenant

_____Seller/Grantor ___X__Buyer/Grantee

_____Other (Please describe):_____

### DISCLOSURE STATEMENT FOR
### TRANSACTION WITH A PUBLIC AGENCY CONCERNING REAL PROPERTY
### M.G.L. c. 7C, s. 38 (formerly M.G.L. c. 7, s. 40J)

(6) The names and addresses of all persons and individuals who have or will have a direct or indirect beneficial interest in the real property excluding only 1) a stockholder of a corporation the stock of which is listed for sale to the general public with the securities and exchange commission, if such stockholder holds less than ten per cent of the outstanding stock entitled to vote at the annual meeting of such corporation or 2) an owner of a time share that has an interest in a leasehold condominium meeting all of the conditions specified in M.G.L. c. 7C, s. 38, are hereby disclosed as follows (attach additional pages if necessary):

NAME                                          RESIDENCE

_____          _____

_____          _____

_____          _____

(7) None of the above- named persons is an employee of the Division of Capital Asset Management and Maintenance or an official elected to public office in the Commonwealth of Massachusetts, except as listed below (insert "none" if none):

(8) The individual signing this statement on behalf of the above-named party acknowledges that he/she has read the following provisions of Chapter 7C, Section 38 (formerly Chapter 7, Section 40J) of the General Laws of Massachusetts:

> *No agreement to rent or to sell real property to or to rent or purchase real property from a public agency, and no renewal or extension of such agreement, shall be valid and no payment shall be made to the lessor or seller of such property unless a statement, signed, under the penalties of perjury, has been filed by the lessor, lessee, seller or purchaser, and in the case of a corporation by a duly authorized officer thereof giving the true names and addresses of all persons who have or will have a direct or indirect beneficial interest in said property with the commissioner of capital asset management and maintenance. The provisions of this section shall not apply to any stockholder of a corporation the stock of which is listed for sale to the general public with the securities and exchange commission, if such stockholder holds less than ten per cent of the outstanding stock entitled to vote at the annual meeting of such corporation. In the case of an agreement to rent property from a public agency where the lessee's interest is held by the organization of unit owners of a leasehold condominium created under chapter one hundred and eighty-three A, and time-shares are created in the leasehold condominium under chapter one hundred and eighty-three B, the provisions of this section shall not apply to an owner of a time-share in the leasehold condominium who (i) acquires the time-share on or after a bona fide arm's length transfer of such time-share*

*made after the rental agreement with the public agency is executed and (ii) who holds less than three percent of the votes entitled to vote at the annual meeting of such organization of unit owners. A disclosure statement shall also be made in writing, under penalty of perjury, during the term of a rental agreement in case of any change of interest in such property, as provided for above, within thirty days of such change.*

*Any official elected to public office in the commonwealth, or any employee of the division of capital asset management and maintenance disclosing beneficial interest in real property pursuant to this section, shall identify his position as part of the disclosure statement. The commissioner shall notify the state ethics commission of such names, and shall make copies of any and all disclosure statements received available to the state ethics commission upon request.*

*The commissioner shall keep a copy of each disclosure statement received available for public inspection during regular business hours.*

(9) This Disclosure Statement is hereby signed under penalties of perjury.

_____

Print Name of Disclosing Party (from Section 4, above)

_____

Authorized Signature of Disclosing Party                    Date (mm / dd / yyyy)

_____

Print Name & Title of Authorized Signer

813928/WBOR/0027

**(Note: This form must be included in the proposal submission)**

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

### Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)

### ATTACHMENT G

EASEMENT PLAN



**Stage Coach Plaza Theather Trails**

Trails

Trails on Theather Property

Feet

0   200   400   600

# TOWN OF WESTBOROUGH

## REQUEST FOR PROPOSALS (RFP)

**Sale of Property at 231 Turnpike Road, Westborough (Former Regal Cinema)**

## ATTACHMENT H

INTERIOR PHOTOGRAPHS

















