UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) |  |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

RESPONSE TO TRUSTEE'S UPDATED RESPONSE TO ORDER FOR STATUS REPORT
REGARDING RELEASE OF INFORMATION FOR COMPLIANCE WITH THE FINANCIAL
CRIMES ENFORCEMENT NETWORK REQUIREMENTS

NOW COMES Lolonyon Akouete, a creditor of Westborough SPE LLC ("Debtor"), in the above-
captioned case, and hereby submits this response to Trustee Jonathan R. Goldsmith's updated status
report regarding the release of information for compliance with the Financial Crimes Enforcement
Network ("FinCEN") requirements (Docket No. 105).

**1. Background:**

On February 23, 2024, the Court issued an Order (Docket No. 105) requiring Trustee Jonathan R.
Goldsmith to file an updated status report regarding the release of information for compliance with
FinCEN requirements. This followed an earlier order on January 12, 2024 (Docket No. 66), in
response to the motion filed by creditor Lolonyon Akouete seeking clarification and to compel the
release of information necessary for compliance with the Corporate Transparency Act ("CTA").

As detailed in previous communications, Westborough SPE LLC is navigating Chapter 7
bankruptcy proceedings, and the identification of beneficial ownership information is essential for
compliance with FinCEN regulations. The Debtor's sole member is Mignonette Investments
Limited, a British Virgin Islands entity, which complicates the identification process. Despite these
complexities, compliance with the CTA remains a legal obligation.

**2. Need for Immediate Release of Beneficial Ownership Information:**

While we acknowledge that the Trustee has provided an updated status report indicating ongoing
discussions and pending court cases related to the applicability of the CTA reporting requirements
for Chapter 7 Trustees, it is crucial to highlight that the identification of beneficial ownership
information remains essential regardless of the Trustee's obligation to report to FinCEN.

**3. Compliance Obligations:**

As per FinCEN's response to ticket number 00014716 dated March 29, 2024, it is the responsibility
of the reporting company to identify and report its beneficial owners. Even in scenarios where the
Trustee may not be mandated to file the report, the debtor, Westborough SPE LLC, still has an
obligation to comply with FinCEN regulations to avoid potential penalties. Therefore, obtaining the
necessary beneficial ownership information is critical for ensuring compliance with the CTA.

**4. Urgency and Potential Liabilities:**

The deadline for submitting beneficial ownership information is January 1, 2025. As of now, there are only seven months left to meet this deadline. However, delaying the collection of this information could expose the debtor and its stakeholders to substantial compliance risks, including civil penalties and potential criminal liabilities. Moreover, the legal landscape surrounding these requirements could drastically change within the next three months, complicating the process of obtaining beneficial ownership information. Timely action is essential not only for compliance but also for the efficient administration of the bankruptcy estate.

**5. Administration of the Bankruptcy Estate:**

The Trustee has indicated that after paying all claims, there will be funds left over for the beneficial owner of the debtor. However, these funds cannot be distributed if the beneficial owner is not identified. Failure to obtain this information hinders the proper administration of the bankruptcy estate and affects the interests of all parties involved in this case. The Trustee's reluctance to release the necessary information raises concerns about acting in bad faith by trying to prevent the disclosure of this critical information.

**6. Trustee's Breach of Fiduciary Duty and Favoritism:**

Although the Trustee is tasked with administering the bankruptcy, the Trustee's actions reveal a breach of fiduciary duty and favoritism towards the Town of Westborough. This could explain why the Trustee is reluctant to obtain and disclose the beneficial ownership information now. The Town of Westborough fraudulently foreclosed on the debtor's property, claiming they had the right to do so because they could not identify the beneficial owner of the property. This situation underscores the need for full transparency and accountability in identifying the beneficial owners.

**7. Request for Court Intervention:**

Given the urgency and importance of this matter, we respectfully request that the Court compel the Trustee to take immediate action to complete the release of beneficial ownership information. This includes identifying and providing all required information about the beneficial owners of Westborough SPE LLC. Specifically, we request the Court to compel David M. Abramowitz, the former legal counsel for Westborough SPE LLC from Goulston & Storrs PC, to release necessary information to identify the beneficial owner. This includes details on Mignonette Investments Limited, Abraxas International, and their connections with the TMF Group.

**8. Need for Historical Information:**

We understand from prior communications that it has been approximately 25 years since Goulston & Storrs PC's involvement with Westborough SPE LLC ended, and that they do not have current information about its ownership. However, we urgently require specific information regarding the original clients who engaged their services for the formation of Westborough SPE LLC. We believe that this information could potentially help us trace the lineage of ownership to the present day, which is crucial for our compliance with the Beneficial Ownership Information (BOI) report requirements set by FinCEN.

**9. Response to the Argument that the Chapter 7 Trustee is the Party Authorized to Address Compliance Requirements:**

While it is true that the Chapter 7 Trustee is authorized to address compliance requirements with respect to the debtor, the Trustee's actions in this case have demonstrated a breach of fiduciary duty and favoritism towards the Town of Westborough. The Trustee's reluctance to obtain and disclose the beneficial ownership information not only hinders compliance with FinCEN requirements but also obstructs the proper administration of the bankruptcy estate. The Town of Westborough fraudulently foreclosed on the debtor's property, claiming they had the right to do so because they could not identify the beneficial owner. This underscores the necessity of obtaining this information now, both for compliance and to ensure transparency and fairness in the administration of the bankruptcy estate.

**Conclusion:**

In light of the above, it is imperative that the necessary information be released promptly to ensure compliance with FinCEN requirements and to protect the interests of the bankruptcy estate and its creditors. We request the Court's intervention to expedite this process and avoid any potential penalties associated with non-compliance.

DATED: May 27, 2024, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Milles Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276



Lolonyon Akouete <info@smartinvestorsllc.com>

<span style="color:red">EXHIBIT 1</span>

---

## Ticket Resolution: 00014716 - ref:_00D00D820000008fN6._50050082000001yDNl:ref

1 message

---

**Contact Center No-Reply** <noreply.contactcenter@fincen.gov>    Fri, Mar 29, 2024 at 1:45 PM
Reply-To: support_email_service@x-nns3go2tr6sbr3natkkojvty2zw1skhnzlah9f3fug3qedxeo.
82-8fn6eai.na217.apex.salesforce.com
To: "info@smartinvestorsllc.com" <info@smartinvestorsllc.com>

| | |
|---|---|
| **Subject** | Ticket Resolution: 00014716 |
| **Date/Time** | 3/29/2024, 12:45 PM EST |
| **Details** | Dear Lolonyon Akouete,<br><br>**Thank you for contacting FinCEN. You are receiving this response for ticket number 00014716.**<br><br>**We believe your question relates to:**<br><br>It is the responsibility of the reporting company to identify its beneficial owners, and company applicants if applicable, and to report those individuals to FinCEN. FinCEN is cognizant that reporting companies could face difficulties in obtaining beneficial ownership information promptly.  Despite such difficulties, reporting companies must provide all required information to satisfy their reporting obligations under the Corporate Transparency Act (CTA) and FinCEN regulations (31 CFR 1010.380).<br><br>FinCEN does not at this time offer mediative support that might compel or otherwise assist reporting companies in obtaining reportable information and will not opine on any legal remedies that may exist by which a reporting company might potentially compel disclosure of information about its beneficial owners. |

An enforcement action can be brought against an individual who willfully causes a reporting company's failure to submit complete or updated beneficial ownership information to FinCEN.  This would include a beneficial owner who willfully fails to provide required information to a reporting company. You may wish to communicate this aspect of the CTA to any individuals in contact with the beneficial owners of the reporting company at issue.

**In the event your inquiry was not resolved by the provided response, please reply to this email within seven (7) business days from the date of this email and a new ticket will be generated.**

**We do not accept email attachments. If you would like to send an image or screenshot, please include it in the body of your email.**

**If you have additional questions, please open a new case at fincen.gov/contact so we can review your request or inquiry.**

—————————————————————

Thank you,

The Beneficial Ownership Contact Center
Financial Crimes Enforcement Network (FinCEN)
Hours of Operation are 9AM to 5PM EST Monday through Friday

Please note that the reporting requirements for certain individuals and entities have been affected by a federal court ruling.  More information about this ruling and to whom it applies is available on our website (fincen.gov/boi).

The information provided in this response does not, and is not intended to, constitute legal advice. All information, content, and guidance provided by or through the Beneficial Ownership Contact Center is for general informational purposes only, does not supplement or modify any obligations imposed by statute or regulation, and does not supersede more recent guidance issued by FinCEN. FinCEN may revise, clarify or update the information, content, and guidance provided by and through the Beneficial Ownership Contact Center. Any links or references to third party websites are provided only for your convenience and the provision of those links does not, and is not intended to, constitute an endorsement or approval of any third party content. FinCEN is not responsible for the content or privacy practices of third party websites.

FinCEN may monitor or retain this correspondence, and any information provided during this correspondence, to help improve and personalize your experience. For more information, see our Privacy Policy.

**Ticket Information**  Ticket Number: 00014716
Subject: Who, What, or How to Report
Status: Closed



**Lolonyon Akouete <info@smartinvestorsllc.com>**

---

## Westborough SPE LLC (Time-sensitive)                                    <span style="color:red">EXHIBIT 2</span>

---

**Scott A. Schlager** <sas@natgolaw.com>                                    Thu, Aug 24, 2023 at 3:26 PM
To: "Ronan, Gary M." <GRonan@goulstonstorrs.com>
Cc: "Abromowitz, David M." <DAbromowitz@goulstonstorrs.com>, Alvin Nathanson <asn@natgolaw.com>, "Gewurz, Zev
D." <ZGewurz@goulstonstorrs.com>

PROTECTED COMMUNICATION
COMMON INTEREST DOCTRINE

Dear Gary,

David Ambromowitz has requested that we direct all further correspondence to you regarding the Westborough SPE
LLC matter. We have done some Westlaw research and have found case law supporting our position that the identity
of Goulston & Storrs PC's original client (i.e. the person(s)/entities that hired you to form Westborough SPE LLC) is
not subject to the attorney-client privilege.

The cases cited below implicitly or explicitly, without considering the applicability of any exceptions, support the view
that the identity of a client is not protected by the attorney–client privilege. This is true under both Massachusetts,
Delaware, and Federal Common Law. See cases cited below.

In any event, we have been in contact with Terrence Moriarty, former CFO for Hoyts (f/k/a Interstate Theatres) and
also Michael Lewis, Esq. in the General Counsel's office of Regal Cinemas. It is clear that the purpose of the
transaction was a complicated structured finance transaction that likely had tax benefits (positive or nefarious).

Both Mr. Moriarty and Attorney Lewis stated that they had no objection sharing materials if they are found to be the
original client and would be happy to execute a release and authorization. That said, Mr. Moriarty stated that while
Hoyts often used Goulston for its work, he seems to think it did not engage them for the Westborough SPE LLC
transaction and instead used Riemer & Braunstein (although he remembers a referral being made to the Babcock &
Brown folks). He said that Goulston mostly handled transactional work and that Riemer handled mostly lease work.

Moriarty thought that either Phillip Green or F. Jan Blaustein Scholes (whose former husband was Nobel Prize winning
economist Myron Scholes and international tax expert), both affiliated with Westborough SPE LLC's predecessor
manager Babcock & Brown Administrative Services, Inc., were the original formers of the entity but could not be sure.
We are also of the belief that Max Green (brother of Phillip Green) was also involved. Max Green was an Australian
tax lawyer and consummate legal counsel to the wealthiest global families in Australia. We believe that it was more
likely than not that the billionaire Lowy family of Westfield fame in Australia, the Friedmann family, and prominent
Australian businessman David Gonski AC were also involved. Westborough SPE LLC's Member as previously stated
is Mignonette Investments Limited, a British Virgin Islands entity, whose Director was Abraxas International of Hong
Kong. Abraxas International is affiliated with the TMF Group which was acquired by CVC Partners and the Abu Dhabi
Investment Authority.   As you may be aware, Max Green (brother of Babcock & Brown Phil Green) was murdered in
Cambodia in 1998 shortly after this entity was found. We believe that Max Green was involved in this entity and may
have used loan proceeds to buy diamonds in Hong Kong and sell them in Israel, which led to his demise in 1998. Max
Green was found to have orchestrated with David Gonski many complex off shore tax structures for the Lowy family
and other prominent Australians.

The only possible explanation for someone or an entity abandoning real property worth as of 2018 at least $6 Million
dollars and nearly $10 million when originally purchased, as well as abandoning $1.3 Million in a bank account held by
the State Comptroller for California is fraud or other nefarious purpose. Basic economics and common sense dictate
that lawful individuals do not abandon funds of that magnitude.

First Circuit
Gretsky v Miller (1958, DC Mass) 160 F Supp 914, 58-1 USTC ¶ 9471, 1 AFTR 2d 1934.

Third Circuit
Mauch v Commissioner (1940, CA3) 113 F2d 555, 40-2 USTC ¶ 9566, 25 AFTR 417.

Re Philadelphia & Reading Coal & Iron Co. (1939, DC Pa) 27 F Supp 256, (by implication)

Dist Col Circuit

Catalog Ass'n v A. Eberly's Sons, Inc. (1931) 60 App DC 216, 50 F2d 981; National Union Fire Ins. Co. v Aetna Casualty & Surety Co. (1967) 127 App DC 364, 384 F2d 316; Re Wasserman (1961, DC Dist Col) 198 F Supp 564, 61-2 USTC ¶ 9730, 8 AFTR 2d 5808.

In light of the above case law and the crime-fraud exception to the attorney-client privilege, we hereby request the identity of Goulston & Storrs PC's Client that sought to form Westborough SPE LLC.

Thank you for your assistance.

Very truly yours,
Scott

Scott A. Schlager
Partner
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, Massachusetts 02109
(O): (617) 210-4800
(C): (617) 909-4511
(F): (617) 210-4824
sas@natgolaw.com

**************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**************************************************

-----Original Message-----
From: Westlaw@westlaw.com <Westlaw@westlaw.com>
Sent: Thursday, August 24, 2023 1:15 PM
To: Scott A. Schlager <sas@natgolaw.com>
Subject: Gretsky v. Miller

Scott Schlager sent you content from Westlaw Edge.
Please see the attached file.

Item:　　Gretsky v. Miller
Citation:　　160 F.Supp. 914
Sent On:　　Thursday, August 24, 2023
Sent By:　　Scott Schlager
Client ID:　AKOUETE

Note:

----------------------------------------------------------------------------------
Westlaw © 2023 Thomson Reuters. No claim to original U.S. Government Works.

📄 **Gretsky v Miller.pdf**
107K

EXHIBIT 3

## AFFIDAVIT

I, Shirin Everett, Esq., of Boston, and being counsel to the Town of Westborough, Massachusetts, having personal knowledge of the facts herein stated, under oath depose and say that:

1.  My firm, KP Law, P.C., is Town Counsel to the Town of Westborough, Massachusetts (the "Town").

2.  I was contacted on October 31, 2017 by Mr. James Malloy, the then-Town Manager, to discuss the property at 231 Turnpike Road, Westborough, MA and owned of record by Westborough SPE LLC (the "WSPE") by deed recorded with the Worcester South District Registry of Deeds in Book 19369, Page 75 (the "Property").

3.  The Town Manager informed me that the Property was formerly leased to and occupied by Regal Cinemas; that although Regal Cinemas wanted to extend the term of the Lease, Regal was unsuccessful in trying to locate WSPE, and therefore vacated the Property in November, 2017. Since Regal Cinemas paid taxes to the Town, the Town Manager said that taxes were unpaid since November, 2017, and was concerned about the condition of the Property if it fell into disrepair. The Town Manager asked what the Town could do to prevent the empty building on the Property from becoming vandalized and a blight to the neighborhood.

4.  The Town Manager informed me that the Town had made many attempts to locate WSPE. The Chief Assessor reviewed the Secretary of State's records, which showed that WSPE had a principal office c/o Babcock & Brown Administrative Services, Inc. ("Babcock") and that Babcock was WSPE's Manager. The Secretary's records indicated that Dyann Blaine and F. Jan Bluestein, having the same address as Babcock, could sign real estate documents on behalf of the Record Owner. WSPE was registered in Massachusetts as a foreign limited liability company in 1997, filed annual reports until 2006, and withdrew its Massachusetts registration in 2007 "because it is not doing business in the Commonwealth of Massachusetts." Similarly, Babcock was registered to do business in Massachusetts in 1997 and it too filed a Certificate of Withdrawal in 2008, stating that Babcock was no longer transacting business in Massachusetts. The Chief Assessor also learned through an internet search that Babcock Administrative Services may be affiliated to Babcock & Brown LP, an Australian firm, which went through a liquidation in 2009.

5.  The Town, through its Chief Assessor, contacted a representatives of Deloitte Financial Advisory Pvt. Ltd, which acted as a liquidator of Babcock & Brown LP and represented the holding company, who in turn directed the Town to contact Michael Larkin, the CEO

of Babcock & Brown International Pvt. Ltd, who in turn led the Town to Walter Horst, the CFO. These individuals stated that the entities they represented did not have an interest in the Property and they did not know WSPE's successors or assigns.

6.   We advised the Town Manager that if real estate taxes were not being paid, the Town could eventually acquire the title to the Property through a Land Court foreclosure process. We advised the Town as to the steps the Town needs to take to demand payment of WSPE, to record an Instrument of Taking after waiting the statutory 14-day period, and filing a petition to foreclose on the Property in Land Court.

7.   We advised the Town Manager that it could take 1-2 years to foreclose on its tax title and rights of redemption. The Town Manager, the Chief Assessor, and other Town officials were concerned that the building on the Property could suffer significant and immediate damage in the winter if the building was not heated.

8.   The Town considered whether the Town could obtain control of the Property sooner by exercising its eminent domain powers, as an eminent domain taking would vest title to the Town immediately following the recording of an Order of Taking provided that the Order of Taking identified parties who have an interest in the Property and the Order is recorded in the chain of title to the Property. The Town considered the purposes for which the Property would be taken (possibly for economic revitalization purposes) and the damages to be paid by the Town. In July, 2018, the Town retained an appraiser to value the Property. In its report of September 8, 2018, the Town's appraiser stated that the Property was valued at $4,790,000 as of August 3, 2018.

9.   The Town decided it would proceed on parallel tracks, one to acquire the Property through a tax taking and also to seek authorization to obtain the Property by eminent domain.

10.   A vote taken under Article 18 of the March 6, 2018 Annual Town Meeting, , authorized the Board of Selectmen to acquire the Property by eminent domain for economic revitalization and general municipal purposes, and appropriated the sum of $6,000,000 to pay damages for the Property and to pay for costs incidental or related thereto. It was the Town's intent that, should it take the Property by eminent domain rather than through the tax-foreclosure process, it would pay damages to WSPE or to any other entity or person that established that it owned the Property.

11.   On October 10, 2018, the Town Treasurer/Collector sent a letter to WSPE, c/o Babcock, as to the amount of outstanding taxes and informed WSPE that if taxes were not paid by October 26, 2018, the Town will place a lien on the Property.

12.   On January 16, 2019, the Town recorded an Instrument of Taking in Book 59943, Page 371, and the Town Treasurer/Collector promptly sent a demand letter to WSPE, c/o

Babcock, stating that the Town has recorded an instrument of taking, and directed WSPE to turn on the heat, pay outstanding sums to the utility company, and to take other steps to protect the Property from further deterioration.

13. Due to concerns about the condition of the Property, the Town acquired a temporary easement by Order of Taking recorded with the Registry on November 21, 2018 for the purpose of entering the building, turning on the heat, and taking other steps to protect the building from the elements. The Town took another temporary easement on the Property by Order of Taking recorded on January 14, 2019 to enter the property for the purpose of conducting surveys and other property inspections. Both Orders identified the parties having an interest in the Property as WSPE, Babcock, F. Jan Bluestein, and Dyanne Blaine. The Town sent a Notice of Taking dated March 18, 2019 addressed to WSPE and F. Jan Bluestein c/o Babcock at the San Francisco address, and to Dyann Blaine in Orinda, California. The Town did not receive any response.

14. By letter dated March 18, 2019, I informed WSPE of the temporary easements acquired by the Town and expressed the Town's interest in acquiring the Property. The letter, addressed to WSPE c/o Babcock, requested a response by April 3, 2019. No response was received.

15. The Town received a letter dated April 4, 2019 from Mr. Joseph Scarcella, of Johnson Winter & Slattery, a firm located in Sydney, Australia, stating that the firm represented David Howe, the liquidator of Babcock & Brown Limited (In Liquidation), the successor in title to Babcock, and asked if the Town owed the Property. By letter dated April 11, 2019, I informed Mr. Scarcella that the Town does not own the Property but, rather, has a lien on the Property for outstanding taxes. By follow-up letter dated May 6, 2019, I informed Mr. Scarcella of the amount of taxes owed, the Town's lien on the Property, the taking of the temporary easements, and asked that Babcock & Brown Limited (In Liquidation) inform the Town if it had any rights in the Property. By letter dated June 25, 2019, Mr. Scarcella again asked if the Town had acquired the Property.

16. The Town filed a complaint with the Land Court on July 8, 2019 to foreclose on the tax lien, notice of which was recorded with the Registry on July 24, 2019 in Book 60751, Page 221.

17. The Town recorded another Order of Taking on January 31, 2020, taking temporary easements in the Property for the purpose of turning on the heat and taking other steps to protect the Property from the elements.

18. To date, the Town has not heard from WSPE or received notice from any party claiming to own the Property. The Town has not exercised its eminent domain powers.

Signed under the penalties of perjury this 14th day of May, 2020.

_____

Shirin Everett, Esq.
KP Law, P.C., Town Counsel

COMMONWEALTH OF MASSACHUSETTS

_____, ss.

On this 14th day of May, 2020, before me, the undersigned notary public, personally appeared Shirin Everett, who proved to me through satisfactory evidence of identification, which was _personal Knowledge_____, to be the person whose name is listed above, and acknowledged to me that she signed the foregoing instrument voluntarily for its stated purpose as Town Counsel for the Town of Westborough

_____

Notary Public
My Commission Expires:

713726/WBOR/0027



EXHIBIT 4

## AFFIDAVIT OF JONATHAN STEINBERG

I, Jonathan Steinberg, attest and state the following of my own personal knowledge:

1.  I am the Chief Assessor for the Town of Westborough.

2.  On or about October 15, 2017, Mr. Alan Hight came to my office regarding contact information for the owner of the real estate at 231 Turnpike Road.  Mr. Hight represents REO Management who has managed the property on behalf of the property owners.  Regal and Mr. Hight had attempted to contact an owner for renewal of the Regal Cinema lease prior to expiration.

3.  On October 17, 2017, as a result of my research into Westborough SPE and Babcock and Brown Administrative Services, I contacted Deloitte Financial Advisory Pty, LLD, Sydney Australia ("Deloitte").  Deloitte is the appointed liquidator for Babcock and Brown Limited of Australia.

4.  On October 17, 2017, I received a response from Mr. Lombe of Deloitte indicating that all assets outside of the Holding Company were under the control of Michael Larkin, CEO of Babcock and Brown in San Francisco.

5.  On October 17, 2017 I contacted Mr. Larkin regarding any potential ownership in the property.  Mr. Larkin referred me to Walter Horst, CFO of Babcock & Brown.

6.  On October 17, 2017 I received an email from Mr. Horst indicating that Babcock and Brown was simply an administrative manager with no

ownership interest in the property.  They had researched the ownership of

title as well in a "Know Your Customer" compliance procedure and were

unable to identify an owner and therefore resigned.  Mr. Horst referred me

to Chay Besherse, Legal Services Manager for Babcock & Brown, who

had conducted the research.

7.      Ms. Besherse provided the results of her research which mimicked my

results with no success in ultimately identifying any individuals for their

compliance process.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 14TH DAY OF

MAY, 2020.

_____
Jonathan Steinberg

May 14, 2020

Wendy L. Mickel, Notary

On this __14th__ day of __May__, 20_20_, before me,
the undersigned Notary Public, personally appeared
_JONATHAN STEINBERG_ (name of document signer), and
proved to me through satisfactory evidence of identification,
which were _KNOWN TO ME_
to be the person whose name is signed on the preceding
or attached document in my presence.

_____
(official Signature and Seal of Notary)

2

EXHIBIT 5

| To: | Dawn Bloom, Esq. |
|-----|------------------|
| From: | Allen Hight |
| RE: | Westboro SPE |
| Date: | May 18, 2020 |

I have been an owner, developer and manager of real estate for almost forty years. My involvement with the Westborough property began when a development company (Northside Realty Trust (NRT), in which I was a Partner, bought it with the intent was to develop it as a retail strip mall. The property consisted of 3 separate parcels. My role was to lease and manage the property. Hoyts Cinema was interested in the property but required a larger parcel to accommodate their parking needs. Parcel 3 was subsequently expanded to increase the number of non-exclusive parking spaces for which Hoyts agreed that they would be responsible for 57% of the mall's common area maintenance expense. A lease was negotiated in 1976.

I took a sabbatical from NRT at the time construction commenced on the theater. During that time, Hoyts submitted an offer to purchase the property from NRT. Hoyts retained Babcock & Brown (B&B) a San Francisco law firm that was organizing the Hoyt's entity that would subsequently own the property. NRT was told that Hoyts would continue to hold title to the property under Westboro SPE, LLC (WSPE) but that the address would remain the same as Hoyt's (231 Turnpike Road, Westborough, MA). As the property was subdivided into three separate parcels, a Reciprocal Easement Agreement (REA) was executed. A subdivision plan (attached) was drawn and added as an exhibit to the REA. The REA placed use restrictions on all three parcels. The dire financial condition of the mall is primarily due to the inability of the owner of parcels 1 & 2 to underwrite the payment of common expenses and real estate taxes for all three parcels.

In 2007 NRT was informed that Regal Cinema (Interstate Theaters) instead of Hoyts would be operating the theater but, that the ownership was not changing. We did not know at that time that B&B was in Delaware filing 10 years of financial statements to delist WSPE. We also did not know that B&B was somehow involved in the ownership WSPE. For the next 20 years, all correspondence went to WSPE at 231 Turnpike Road, Westborough, MA. That correspondence included billings, maintenance issues and the annual expense reconciliation.

In 2016 parcels 1 & 2 were sold to Mobile Street LLC. I remained managing agent after the ownership change. During that sale, although all correspondence was delivered to WSPE at 231 Turnpike Road, responses we sent from the Regal office which, we thought, had assumed ownership. All invoices for common area expense reimbursements went to the same address and all payments were made by Regal. In fact, when a potential restricted tenant under the REA was interested in Parcel 2, we sent WSPE a request for a waiver at 231 Turnpike Road. That request was followed by a conversation with Regal which denied the request.

In the Spring of 2017, I received a call from a Regal representative (Robbie Pope) requesting a lease extension proposal. Our first response was that they should talk in-house to WSPE. This was when we learned that Regal did not own Parcel 3 and had been paying the Rent to USA Bank and expenses to us. We also tried to determine who actually owned Parcel 3.

Mobil Street LLC, Regal and the Town of Westboro jointly tried to locate anyone related to WSPE. Regal fully intended to extend the lease, and, and we also had investors willing to discuss a purchase option. Westboro Police, Westborough Town Counsel and Chief Assessor participated for the Town. Mobile Street retained an independent attorney, and, along with my staff, diligently searched for the owner. Regal likewise tried networking with people in the industry. It was during these 2007 investigations we learned WSPE had voluntarily delisted and were no longer authorized to do business in Massachusetts. We also discovered WSPE's debt at USA Bank had been fully paid by the last rental check sent by Regal. USA Bank refused to help us find the true owner.

I found the person with whom I negotiated the original Hoyt's lease (1976). He informed me that, although he had left Hoyt's shortly after our dealings but that WSPE and B&B were Australian companies and were involved in a bankruptcy case but still did not admit to owning Parcel 3.

The loss of Parcel 3's share of common area fees and taxes is forcing ownership of parcels 1 & 2 into bankruptcy as they cannot pay their expenses, taxes, or debt. The Town of Westborough decided to take the land by Eminent Domain and began the drawn out process of doing so. During the time of the taking we were told that the Town was contacted by someone claiming equity in Parcel 3. That immediately stopped the Eminent Domain action.

I learned recently that a local private investigator had been retained by a company (Deloitte) that was representing an Australian law firm which has been representing bankruptcy debtors involving B&B. The detective shared with me that B&B and WSPE were essentially the same entity. Moreover, when they leased the theater to Regal (prior to their filing bankruptcy) they expected it to fail and did not list it as an asset on their balance sheet. He also informed me that there are other discrepancies and "issues of law" facing B&B and WSPE in the Australian courts. The Australian law firm is the party that I believe notified the Town that someone might entitled to some relief.

Signed under the pains and penalties of perjury.

Allen Hight

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

May 18, 2020

On May 18, 2020, before me Lenard B. Zide, notary public, personally appeared **Allen E. Hight,** known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within Instrument.

Notary Public
My Commission Expires:

**LENARD B. ZIDE**
**Notary Public**
**Commonwealth of Massachusetts**
**My Commission Expires**
**August 14, 2026**

# Deloitte.

Deloitte Financial Advisory Pty Ltd
ACN 611 749 841

Grosvenor Place
225 George Street
Sydney, NSW, 2000
Australia

Phone: +61 2 9322 7000
www.deloitte.com.au

EXHIBIT 6

## ANNUAL REPORT TO CREDITORS AND NOTEHOLDERS

27 September 2018

Dear Sir/Madam,

**Babcock & Brown Limited (In Liquidation)**
**ACN 108 614 955 (BBL)**

I refer to my appointment as Liquidator of BBL on 24 August 2009. This report should be read in conjunction with our previous annual report dated 16 November 2017 (**2017 Annual Report**).

This report has been prepared **pursuant to Section 508(1)(b)(ii) of the Corporations Act 2001 (the Act)**.

In the interest of minimising cost, I have elected not to convene a meeting of creditors under Section 508(1)(b)(i) of the Act, rather a copy will be lodged with the Australian Securities & Investments Commission (ASIC) pursuant to Section 508(4) of the Act.

This report has been prepared in accordance with Section 508(3) of the Act[1], to update BBL creditors on the progress of the liquidation during the anniversary period 24 August 2017 to 23 August 2018 (**the Period**), and sets out:

1.  an account of my acts and dealings and the conduct of the winding up

2.  a description of the acts and dealings that remain to be carried out in order to complete the winding up, and

3.  an estimate of when the winding up is likely to be completed.

In this Report, "**Subordinated Noteholders**" means registered holders of subordinated notes issued by BBL pursuant to prospectuses issued in Australia dated 9 November 2005 (supplementary prospectus dated 21 November 2005), 9 May 2006, 12 October 2006 (**BBSN**) and investment statements issued in New Zealand dated 9 May 2006, 12 October 2006 (**BBSN2**). I note that Perpetual Corporate Trust acts on behalf of the BBSN and BBSN2 noteholders.

## 1    LIQUIDATOR'S ACTS AND DEALINGS & CONDUCT OF THE WINDING UP DURING THE PERIOD

***Appendix A*** provides a timeline of the key events during the liquation to date. The key acts and dealings during the Period is provided below:-

### 1.1    Update on the declaration and payment of dividend to unsecured creditors

In June 2012, I declared an Intention to Declare a Dividend to Unsecured Creditors (with the proposed dividend date 24 August 2012). Babcock and Brown Recoveries[2] (**BBR**) (a company not related to BBL in any way), represented by Thomas Booler & Co Lawyers, submitted proof of debt (**POD**) forms on behalf of shareholders claiming to be unsecured creditors of BBL. These claims totalled approximately $145.66 million on behalf of 1,028 shareholders (**Applicants**).

---

[1] Pursuant to Section 1603 of Part 10.25 – Transitional provisions relating to the Insolvency Practise Schedule (Corporations)
[2] Babcock & Brown Recoveries is a registered business name owned by Bookarelli Pty Ltd

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee, and its network of member firms, each of which is a legally separate and independent entity. Please see www.deloitte.com/au/about for a detailed description of the legal structure of Deloitte Touche Tohmatsu Limited and its member firms.

The entity named herein is a legally separate and independent entity. In providing this document, the author only acts in the named capacity and does not act in any other capacity.  Nothing in this document, nor any related attachments or communications or services, have any capacity to bind any other entity under the 'Deloitte' network of member firms (including those operating in Australia).

Liability limited by a scheme approved under Professional Standards Legislation.

Member of Deloitte Touche Tohmatsu Limited

**Deloitte.**

I rejected these shareholder POD forms as the claims did not provide sufficient evidence to support their claim as an unsecured creditor of BBL (as distinct from an ordinary shareholder of BBL).

Four sets of legal proceedings were commenced in the Federal Court of Australia under section 1321 of the Act, by BBR on behalf of BBL shareholders in response to my decision to reject each of the shareholder Applicants' POD forms. Therefore, the unsecured creditor dividend process has been delayed due to these proceedings. **If BBR are successful, it is unclear if a dividend will be available for Subordinated Noteholders**.

Below is a summary of the proceedings heard to date:-

| Reference | Proceeding No | Hearing | POD forms submitted | POD value ($'m) | Applicants admitted in proceedings | Estimated value of claim ($'m) |
|---|---|---|---|---|---|---|
| "Grant Taylor Proceedings" | NSD 2070/2012 | Jul-14 | 61 | 12.95 | 61 | 7.80 |
| "Masters Proceedings" | NSD 2525/2013 | Oct-16 | 79 | 14.09 | 17 | 1.16 |
| "Broome Proceedings" | NSD 947/2014 | Oct-16 | 735 | 116.18 | 123 | 5.82 |
| "Wilhelm Proceedings" | NSD 501/2015 | Oct-16 | 153 | 2.44 | 152 | 1.48 |
| | | | **1,028** | **145.66** | **353** | **16.25** |

During the respective hearings, the Applicants' claims were reduced (from $145.66m to $16.25m), due to the lack of substantive information provided by BBR on behalf of the Applicants' in their POD claim forms. An update of the proceedings are provided below.

### 1.1.1  Grant Taylor proceedings

As outlined in our 2017 Annual Report, BBL successfully defended all aspects of the proceedings raised by the shareholder Applicants in the Grant Taylor proceedings. The shareholder Applicants subsequently filed an appeal in the Full Federal Court of Australia and judgement was handed down on 21 April 2016, with the Full Federal Court unanimously dismissing the Applicants' appeal and ordering the Applicants to pay BBL's costs.

The Applicants then filed a further application for special leave to appeal to the High Court, and on 12 October 2016 in reviewing the application, the High Court dismissed the Applicants' application for special leave awarding costs to BBL. The High Court costs hearing was held on 12 March 2018, and BBL were awarded the taxed costs of $9,408.

The recovery of costs in the Federal Court proceedings is unfortunately a prolonged and difficult process. A costs assessor was engaged in October 2017 to review the legal bills and provide both parties with a formal estimate of what costs would be allowed.

On 21 November 2017, we received our cost estimates from the Court being $860,000 for the hearing and $157,000 for the appeal. On 7 December 2017, BBL filed and served an order for costs to the Plaintiffs. The plaintiffs lodged an objection to the Court's cost assessor's estimate, as a result the next step is a court costs conference to resolve the issues, which was set for 26 June 2018.

BBL successfully via negotiation recovered the costs of the Appeal for $155,000. Unfortunately, and despite the registrar's view that BBL's cost estimator was fair in calculating the hearing costs to be $860,000, the plaintiffs maintained their objection and submitted an offer in the range of $400,000 to $450,000. Due to the different positions between the parties, the registrar was unable to settle the hearing costs and ordered the matter to proceed to formal taxation. Unfortunately, the Court has not set a date for this to occur.

### 1.1.2  Masters, Broome and Wilhelm proceedings

Although commenced as three separate proceedings, the plaintiffs subsequently joined the Broome, Masters and Wilhelm proceedings into one proceeding and the three were heard simultaneously before the Federal Court of Australia between 10 October 2016 and 13 October 2016. At this point we are still waiting for judgement to be delivered by Justice Foster.

**Deloitte.**

At the time of preparing our 2017 Annual Report, we had received a notice from the Judge's office associate that the judgment would be delivered in late November 2017.

Subsequently, we received a number of updates from the Judge's associate to the effect that that judgement would be handed down in January 2018, then February 2018, then May 2018, then late August 2018. On 30 August 2018, we were advised that Justice Foster will be unable to finalise his judgment and deliver it for at least two months due to serious illness. Whether further time is required is presently not known and we have been advised that we will be provided an update when possible.

Unfortunately, whilst the judgement in these proceedings remain outstanding, it is not possible to comment upon:-

- the timing of the unsecured creditor dividend process
- the quantum of the return to unsecured creditors (as this depends on whether shareholders are entitled to claim as unsecured creditors), and
- whether there will be any funds that will be available for distribution to Subordinated Noteholders.

If BBL is successful in these three proceedings, then the shareholder plaintiffs will **not** rank as unsecured creditors and as a result there will be funds available to be distributed to unsecured creditors and Subordinated Noteholders.

Pursuant to Regulation 5.6.65 of the Corporations Regulations 2001, I am required to re-advertise my intention to declare a dividend to creditors not more than two months before the intended date of payment. Once all legal proceedings are resolved, I will provide a further update on our website providing guidance as to the timing and quantum of the first dividend payment to unsecured creditors and therefore Subordinated Noteholders. These comments of course do not take into account the initiation of further proceedings by BBR.

## 1.2   Tax Declaration to Subordinated Noteholders

My office have received several enquiries from Subordinated Noteholders for a tax declaration in respect to the likely value of their notes. As discussed above, any future return to Subordinated Noteholders is contingent upon the outcome of the three legal proceedings. **Therefore, I am presently unable to issue a notice declaring that BBL subordinated notes have no value.** I recommend Subordinated Noteholders to obtain their own professional tax advice in respect to their BBL note holdings.

## 1.3   Property located in Massachusetts, USA

In late 2017, I received a number of enquiries in respect to an abandoned property located in Westborough, Massachusetts, USA, which was brought to my attention on the basis that it may be an asset of the Babcock & Brown Group, and therefore may be an asset of the BBL Liquidation.

My appointment as liquidator is only in respect of the holding company BBL, which did not trade or own any physical assets. Notwithstanding, I made enquiries with the CEO of Babcock & Brown International Pty Ltd (**BBIPL**) as well as conducting independent company and real property searches in the state of Massachusetts, USA. Our investigations and enquiries revealed that Babcock & Brown Administrative Services Inc (**BBAS**) managed the property on behalf of a third party and the property is not owned by BBL.

## 1.4   Receipts and payments

A summary of BBL's receipts and payments for the period 24 August 2017 to 23 August 2018 are attached as *Annexure B*.

A summary of the Voluntary Administrators' and Liquidators' remuneration is provided and attached as *Annexure C*.

3

**Deloitte.**

## 2    ACTS & DEALINGS TO BE CARRIED OUT TO COMPLETE THE LIQUIDATION

The next step in the liquidation is to declare a dividend to unsecured creditors. If the shareholder claims are unsuccessful, I estimate funds to be available for a dividend to Subordinated Noteholders. If the shareholder claims are successful then a dividend would be paid to non-subordinated unsecured creditors. However, this process can only commence once the three legal proceedings are resolved.

The below timetable is contingent upon receiving judgement in the Masters, Broome and Wilhelm proceedings **and BBL being successful; no appeal is lodged by the Plaintiffs, and no further legal proceedings are commenced against BBL.**

The timetable starts from when judgement is delivered subject to any appeal:

| | |
|---|---|
| **November 2018** | Update from Federal Court regarding the likely timing of judgement in the Masters, Broome and Wilhelm proceedings which will be posted on our website |
| **Judgement** (say, Jan-19) | Resolution and receipt of judgement regarding the Masters, Broome and Wilhelm proceedings – outcome to be posted on our website subject to any appeal |
| **Judgement + 1 month** (Feb-19) | Liquidator to advertise notice of intention to declare dividend to unsecured creditors (on the basis that BBL is successful in the Broome, Masters and Wilhelm proceedings and assuming there is no appeal by any party)<br><br>Collate, record and adjudicate any further Formal PODs |
| **Judgement + 3 months** (Apr-19) | Declaration and payment of dividend to unsecured creditors<br><br>Post an update on our website regarding the outcome of the above process |
| **Judgement + 6 months** (Jul-19) | If sufficient funds for a distribution to Subordinated Noteholders, Liquidator to advertise notice of intention to declare dividend to Subordinated Noteholders<br><br>Declare and pay dividend to Subordinated Noteholders |
| **Judgement + 13 months** (Feb-20) | Section 544 of the Act requires a period of 6 months to pass before the Liquidator can pay any unclaimed dividend monies to ASIC.<br><br>Finalisation of the liquidation |

Please note the above is an estimate and I will endeavour to complete the various steps as soon as possible after the resolution of the shareholder proceedings.

## 3    ESTIMATED TIMEFRAME FOR COMPLETION OF LIQUIDATION

I estimate that the Liquidation can be finalised by February 2020, on the basis that judgement is received in January 2019 with BBL being successful in the proceedings, BBR does not appeal the decision, and no further legal proceedings are commenced against BBL.

4

**Deloitte.**

## 4    OTHER MATTERS

Please note that this is the last annual report to creditors and noteholders that I am required to issue pursuant to Section 508 of the Act. The Insolvency Law Reform Act 2016, which came into effect on 1 September 2017, repealed annual reports in a liquidation. However, I will continue to provide updates on the liquidation on our website, at www.deloitte.com/au/babcockandbrown

Please note that all previous creditor reports and circulars will continue to be available on our website.

For those who do not have internet access, please note that I will issue BBL's Notice of Declaration of Dividend to creditors in writing, once timing is confirmed.

If you require any further update or have any queries regarding the contents of this report you can contact Jack McGrath of my office on +61 2 8260 4867 or email at bandbltd@deloitte.com.au.

Yours faithfully,

**David J F Lombe**
Liquidator

Encl.

5

**Deloitte.**

**ANNEXURE A**

**BBL Liquidation timeline of the key events**

| Period | Event |
|---|---|
| Mar-09 | Appointed Voluntary Administrator on 13 March 2009 |
| Aug-09 | Liquidator seeks funding from creditors to fund investigations into BBL's affairs to pursue identified causes of actions to recover funds for the benefit of BBL's creditors |
| Aug-09 | Second meeting of creditors held and Liquidators appointed 24 August 2009 |
| Nov-09 | Liquidator successful in raising c$560k funding from creditors to pursue further detailed investigations into BBL's affairs |
| Jul-10 | Liquidator conducts public examinations of former executives of BBL and BBL's auditor |
| Sep-11 | Successful recoveries in relation to actions against the former directors and auditor (actions were possible due to funds received from 'contributing creditors') |
| Feb-12 | Liquidator's Section 564 Court Application successful in seeking priority distribution to Contributing Creditors to be paid 10x their contribution |
| Jun-12 | Liquidator advertises Intention to Declare Dividend to Unsecured Creditors on 26 June 2012 (with proposed dividend date 24 August 2012) |
| Aug-12 | Liquidator issues Notice to Creditors that there will be delay in dividend declaration due to an extension provided to claimants to prove their claims (including complex shareholder claims received to date) |
| Nov-12 | Liquidator issues Notice of Rejection of Claim to BBR Shareholder claims |
| Dec-12 | Andrew Grant Taylor Proceedings commenced in Federal Court on 11 December 2012 following rejection of BBR Shareholder PODs |
| May-13 | Sale campaign commenced on 24 May 2013 for sale of BBIPL shares and Subordinated loan agreement |
| Aug-13 | Sale process completed on 28 August 2013 |
| Dec-13 | Michael Masters proceedings commenced in the Federal Court on 13 December 2013 |
| Feb-14 | Court orders for parties to mediate with Mediation held on 25 & 26 February 2014 but no resolution met |
| Jul-14 | Grant Taylor proceedings heard before Federal Court over 5 days in July 2014 |
| Sep-14 | Bruce Broome proceedings commenced in the Federal Court on 19 September 2014 |
| Mar-15 | Federal Court issues favourable judgement in Grant Taylor proceedings on 4 March 2015 |
| May-15 | Sarah Wilhelm proceedings commenced in Federal Court on 5 May 2015 |
| Aug-15 | Grant Taylor Appeal hearing heard on 24 and 25 August before Full Federal Court |
| Apr-16 | Full Federal Court unanimously dismissed shareholder Applicants' appeal. Applicants filed an application for special leave to appeal in the High Court |
| Oct-16 | Broome, Masters and Wilhelm proceedings joined and hearing in the Federal Court held 10 to 13 October 2016 |
| Oct-16 | High Court dismisses the Applicants' application for special leave to appeal on 12 October 2016 |
| Jun-17 | Review and prepare application to recover Grant-Taylor hearing/s costs from Applicants |
| Aug-17 | BBL's costs consultants prepared the BBL's Bills of Cost to be filed on the Grant-Taylor matter |
| Sep-17 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement end of November 2017 |
| Oct-17 | BBL's Bills of Costs filed and served onto the Grant Taylor proceedings |
| Nov-17 | Federal Court reviewed and issued BBL's costs estimates in the Grant-Taylor proceedings, available to be served to the plaintiffs |
| Nov-17 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement in the second week of January 2018 |
| Nov-17 | Enquiries received regarding property located in Westborough, Massachusetts, USA |
| Jan-18 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement on 30 January 2018 (rather than 16 January 2018) |
| Feb-18 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement on 2 February 2018 |
| Feb-18 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement on 9 February 2018 |
| Feb-18 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement on or about 16 February 2018 |
| Mar-18 | High Court dealt BBL's High Court costs in the Grant Taylor matter and issued a judgment to the plaintiffs for payment |
| Mar-18 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement second half of May 2018 |
| Jun-18 | Advised by the Court that Justice Foster will be delivering the Masters, Broome & Wilhelm judgement mid-August 2018 |
| Jun-18 | Court conference to deal with BBL's Federal Court Hearing and Appeal costs, ordered for formal taxation on the hearing costs due to the Plaintiffs continuing objection |
| Aug-18 | Advised by the Court that Justice Foster that he will be unable to finalise his judgment in the Broome, Masters and Wilhelm proceedings for at least two months |
| TBC | Federal Court's judgement on the Broome, Masters and Wilhelm proceedings expected |

**Deloitte.**

ANNEXURE B

**BBL Receipts and Payments – 24 August 2017 to 23 August 2018**

| Summary of receipts and payments | $ (excl. GST) |
|---|---|
| **Opening cash at bank 24 August 2017** | **23,534,670** |
| **Receipts** | |
| Miscellaneous income | 300 |
| Bank interest | 553,072 |
| Legal cost recoveries | 164,408 |
| **Total receipts** | **717,780** |
| **Payments** | |
| Legal fees | 137,854 |
| Legal disbursements | 24,611 |
| Data loading and hosting | 1,600 |
| Liquidators remuneration | 97,631 |
| Liquidators expenses | 2,517 |
| Storage costs | 1,628 |
| Stationary and printing | 22,179 |
| **Total payments** | **288,021** |
| **Net receipts/(payments)** | **429,760** |
| **GST receivable/(payable)** | **(699)** |
| **Closing cash at bank 23 August 2018** | **23,965,129** |

**Deloitte.**

ANNEXURE C

## BBL Summary of Remuneration

A summary of remuneration of Voluntary Administrators and Liquidators, paid as at 23 August 2018, is provided below. Appropriate information outlining the nature of the remuneration sought was provided to the Committee of Inspection on each occasion when approval was sought.

**Voluntary Administration: 13 March 2009 to 23 August 2009**
**Liquidation: 24 August 2009 to 28 February 2018**

| Period | | | Total Fees $ (excl. GST) | Fee approval received / Date of resolution |
|---|---|---|---|---|
| 13-Mar-09 | to | 22-May-09 | 858,700.50 | 09-Jun-09 |
| 23-May-09 | to | 31-Jul-09 | 595,604.00 | 07-Aug-09 |
| 01-Aug-09 | to | 23-Aug-09 | 300,000.00 | 07-Aug-09 |
| **Voluntary Administrator** | | | **1,754,304.50** | |
| 24-Aug-09 | to | 16-Apr-10 | 658,542.00 | 21-May-10 |
| 17-Apr-10 | to | 19-Nov-10 | 614,083.00 | 15-Dec-10 |
| 20-Nov-10 | to | 19-Feb-11 | 112,461.00 | 28-Feb-11 |
| 20-Feb-11 | to | 31-May-11 | 60,779.00 | 29-Aug-11 |
| 01-Jun-11 | to | 25-Nov-11 | 211,564.50 | 20-Dec-11 |
| 26-Nov-11 | to | 17-Feb-12 | 97,347.50 | 20-Dec-11 |
| 17-Feb-11 | to | 30-Apr-12 | 97,194.50 | 20-Dec-11 |
| 01-May-12 | to | 31-Aug-12 | 325,966.50 | 27-Sep-12 |
| 21-Aug-12 | to | 30-Apr-12 | 21,112.00 | 27-Sep-12 |
| 01-Sep-12 | to | 30-Nov-12 | 158,540.00 | 27-Sep-12 |
| 01-Dec-12 | to | 31-Jan-13 | 58,843.00 | 28-Feb-13 |
| 01-Feb-13 | to | 31-Mar-13 | 70,574.50 | 28-Feb-13 |
| 01-Apr-13 | to | 30-Apr-13 | 28,968.50 | 28-Feb-13 |
| 01-May-13 | to | 30-Jun-13 | 61,355.50 | 22-Jul-13 |
| 01-Jul-13 | to | 31-Jul-13 | 44,104.00 | 22-Jul-13 |
| 01-Aug-13 | to | 19-Sep-13 | 51,867.50 | 22-Jul-13 |
| 20-Sep-13 | to | 31-Oct-13 | 17,566.00 | 10-Dec-13 |
| 01-Nov-13 | to | 30-Nov-13 | 28,091.00 | 10-Dec-13 |
| 01-Dec-13 | to | 31-Jan-14 | 52,434.00 | 10-Dec-13 |
| 01-Dec-13 | to | 31-Jan-14 | 458.00 | 02-Apr-14 |
| 01-Feb-14 | to | 28-Feb-14 | 80,855.50 | 02-Apr-14 |
| 01-Mar-14 | to | 31-Mar-14 | 23,260.00 | 02-Apr-14 |
| 01-Apr-14 | to | 30-Apr-14 | 72,995.00 | 02-Apr-14 |
| 01-Apr-14 | to | 30-Apr-14 | 16,116.50 | 28-Jul-14 |
| 01-May-14 | to | 30-Jun-14 | 49,532.50 | 28-Jul-14 |
| 01-Jul-14 | to | 31-Aug-14 | 109,565.00 | 28-Jul-14 |
| 01-Jul-14 | to | 31-Aug-14 | 8,498.00 | 29-Oct-14 |
| 01-Sep-14 | to | 30-Sep-14 | 40,693.00 | 29-Oct-14 |
| 01-Oct-14 | to | 30-Nov-14 | 72,054.00 | 29-Oct-14 |
| 01-Dec-14 | to | 31-Dec-14 | 27,148.50 | 18-Dec-15 |
| 01-Jan-15 | to | 31-Jan-15 | 15,033.00 | 18-Dec-15 |
| 01-Feb-15 | to | 28-Feb-15 | 37,148.00 | 18-Dec-15 |
| 01-Mar-15 | to | 20-Mar-15 | 25,261.00 | 01-Apr-15 |
| 21-Mar-15 | to | 30-Jun-15 | 78,193.50 | 01-Apr-15 |
| 01-Jul-15 | to | 11-Sep-15 | 39,635.00 | 30-Sep-15 |
| 12-Sep-15 | to | 31-Dec-15 | 69,750.00 | 30-Sep-15 |
| 21-Nov-15 | to | 31-Dec-15 | 403.50 | 17-Feb-16 |
| 01-Jan-16 | to | 31-Jan-16 | 75,179.00 | 17-Feb-16 |
| 01-Feb-16 | to | 30-Apr-16 | 104,555.00 | 17-Feb-16 |
| 01-Feb-16 | to | 08-Apr-16 | 4,160.50 | 02-Jun-16 |
| 09-Apr-16 | to | 13-May-16 | 14,732.50 | 02-Jun-16 |
| 14-May-16 | to | 31-Jul-16 | 69,965.00 | 02-Jun-16 |
| 14-May-16 | to | 31-Jul-16 | 1,167.00 | 09-Nov-16 |
| 01-Aug-16 | to | 21-Oct-16 | 75,714.50 | 09-Nov-16 |
| 22-Oct-16 | to | 16-Dec-16 | 32,043.00 | 09-Nov-16 |
| 17-Dec-16 | to | 31-Jan-17 | 3,622.50 | 09-Nov-16 |
| 01-Feb-17 | to | 01-Dec-17 | 50,341.00 | 15-Dec-17 |
| 02-Dec-17 | to | 28-Feb-18 | 47,290.00 | 15-Dec-17 |
| **Liquidator** | | | **4,016,764.00** | |

8

<u>CERTIFICATE OF SERVICE</u>

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com



Lolonyon Y Akouete