UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

In re:

WESTBOROUGH SPE LLC

DECLARATION OF
JONATHAN STEINBERG

I, Jonathan Steinberg, hereby declare as follows based on my personal knowledge:

1. I am over 18 years of age and could testify to the following in Court.

2. I am the Chief Assessor for the Town of Westborough ("Town"). I have held this position for nine (9) years and have been employed by the Town for twelve (12) years.

3. Prior to serving as the Town's Chief Assessor, I worked for three (3) years as an Assistant Assessor. In addition to my role as Chief Assessor, I also serve as the Chair of the Board of Assessors in Marlborough. Additionally, I am a Certified Residential Appraiser and conduct fee appraisals for lenders and private parties outside of Westborough.

4. I am a licensed real estate assessor in the Commonwealth of Massachusetts.

5. As Chief Assessor, I oversee all activities and operations of the Assessing Office for the Town.

6. The Assessor's Office is tasked with the valuation of all real and personal property throughout the Town.

7. The Massachusetts Department of Revenue requires that all property be valued at "full and fair cash value," in compliance with state and federal law. See G.L. c. 59, § 38 ("The assessors of each city and town shall at the time appointed therefor make a fair cash valuation of

all the estate, real and personal, subject to taxation therein, and such determination shall be the assessed valuation of such estate.").

8.  "Full and fair cash value" is defined as the amount a willing buyer would pay a willing seller on the open market. Boston Gas Co. v. Assessors of Boston, 334 Mass. 549, 566 (1956).

9.  The Town is required to utilize one of the three recognized methods of valuing real property when calculating assessed value: (1) the comparable value approach, based on the sales of similar properties; (2) the income capitalization approach, based on the rate of return a potential purchaser can expect to receive on their investment taking into account a knowledge of current economic conditions such as rental and vacancy rates and current interest rates; or (3) the cost approach, i.e., what the property would cost today to replace.

10.  In some instances, all three approaches may be consulted if a property presents special characteristics and challenges for assessment.

11.  The Town Assessor's Office utilizes "Mass Appraisal," a technique to value real property in accordance with the Massachusetts Department of Revenue's regulations and guidance that involves an analysis of the entire year's sales, looking at assessment to sales ratios, and different property characteristics.

12.  The Assessor's Mass Appraisal analysis compares similar properties using factors such as size, location, style, age, quality, and condition. Utilizing a Computer Assisted Mass Appraisal ("CAMA") system, we apply this analysis equitably across all the properties in Town.

13.  As the Massachusetts Department of Revenue Division of Local Services advises, "[f]air cash valuation is based on the highest and best use of the land, which should reflect the applicable zoning, building, or other land use laws and regulations, as well as the physical

characteristics of the land." See Assessment Administration: Law, Procedures and Valuation, chapter 1 at n.53 (2024), available at https://www.mass.gov/doc/chapter-1-assessment-administration/download.

14. The Assessor's responsibility is to identify changes in the market and to specific properties, which changes are implemented in the CAMA system, and as a result the assessed valuation of properties may change little or significantly from year to year, dependent entirely upon market trends, the relative condition of the property in question, any improvements to the property, interest rates, and numerous other criteria.

15. In my role as Chief Assessor for the Town, I am familiar with the property located at 231 Turnpike Road, Westborough, Massachusetts 01581 (the "Property"). I have personal knowledge of the procedures by which the Property's full and fair cash value has been determined by the Assessor's Office dating back to FY2018.

16. True and accurate copies of the Assessor's Office property cards for the Property for FY2018 through FY2024 are attached hereto as Exhibit A. These records are made contemporaneously, as a regular practice of the Assessor's Office in assessing real property, and are kept by the Assessor's Office in the ordinary course of its business.

17. The assessed full and fair cash value of the Property for FY2024, which has a valuation date of January 1, 2023, is $1,813,300.00. This amount includes an assessed valuation of the land (approximately 29.336 acres) of $712,000.00, a valuation of the buildings on the Property of $585,000.00, and a valuation of the extra features of the Property, which include a canopy, extensive paving, and fencing and signage, of $515,000.00. This assessed value was arrived at in accordance with the process outlined above and through analysis of the Property's

3

size, location, style, age, quality, and condition, in addition to sales of similar properties in the Town.

18. The historical assessed values of the Property are as follows: in FY2023, the Property was assessed at $2,082,000.00; in FY2022, the Property was assessed at $1,994,900.00; in FY2021, the Property was assessed at $2,622,100.00; in 2020, the Property was assessed at $5,239,100.00; in FY2019, the Property was assessed at $5,239,100.00; in FY2018, the Property was assessed at $9,264,800.00.

19. As demonstrated by these historical values, the assessed value of the Property has been consistently decreasing, apart from a slight increase in FY2023, owing in large part to the Property's chronic vacancy, accumulation of damage, mold, deferred maintenance, and the depression of the market for the Property's highest and best use or cost-based alternatives.

20. Among other reasons why the Property has a significantly lower assessed value than it did in FY2018, the Property has aged, has been vacant, and has not been maintained, other than the Town's basic maintenance efforts, for substantial periods of time.

21. Extended vacancy is a significant factor in valuations of land and buildings. Over time, damage, depreciation, and deferred maintenance accumulate and compound one another, and the convergence of these developments often result in decreases in property values. Diminution in property value like the Property at issue in this matter is not uncommon for chronically vacant properties.

22. Since FY2018 and FY2019, the Property has experienced significant water damage, damage caused by break-ins, destructive vandalism, accumulation of graffiti, and mold, despite the Town's efforts to secure the Property, all of which contribute significantly to the Property's depreciation in value.

23. In addition to these material effects, which directly affect the Property's value, the cumulative deterioration of and damage to the Property affects its market value by stigmatizing the Property as chronically vacant and essentially blighted.

24. This history is explicitly reflected in the Town's assessments of the Property. In FY2018, the Property's value was only reduced by 14% of what it might otherwise be worth due to "Depreciation"—a broad category through which physical, functional market-based, and other discounts are factored into a property's valuation—and the physical condition of the Property was rated "Good." See Exhibit A, p. 2.

25. In FY2019, when the Property underwent its first major revaluation, the Property's value was reduced by 79.5%, to $5,239,100.00. See Exhibit A, pp. 5-6. Because the Property remained in "Good" condition, only 18% of its physical value was discounted, while 75% of the "Economic" or market-based value of the Property was reduced, as a result of the expiration of the theater operators lease in November 2017 and the inability of the Property to attract another user thereof. See Exhibit A, pp. 5, 8.

26. Although the Property's value did not decrease in FY2020, by 2021, the Property was assessed at yet another significantly lower value, $2,622,100.00. See Exhibit A, p. 7. At this time, while still 75% of the "Economic" value of the Property was discounted, the physical condition of the Property was rated "Poor," as a result of the accumulation of damage and deferred maintenance, which contributed to a 26% decrease in the physical value of the Property.

27. By FY2024, when the Property was assessed at $2,082,000.00, 75% of the "Economic" value of the Property was discounted, the physical condition of the Property had deteriorated much further—while still rated "Poor," a discount of 59.2% was applied to the Property's assessment. See Exhibit A, p. 14.

5

28. Additionally, the fact that the building on the Property was constructed and used exclusively as a movie theater, and what that building would cost today to replace, bears significantly on the lower assessed value of the Property.

29. Moreover, differences in interest rates between 2018 and 2024 are significant, and the fact that interest rates are substantially higher now contributes to the lower valuation of the Property, mainly through the depression of "Economic" or market-based demand.

30. With respect to the Property at issue here, which is constructed and permitted as a movie theater, the Assessor's Office analyzes the value in the context of a special use property. The Assessor's Office takes into consideration alternate uses because of the nature of the special use where second generation users may be limited. Therefore, the Assessor's Office factored into our "Economic" discount the "cost" approach to renovating or redeveloping the Property less the depreciation of the value.

31. The Assessor's Office also consider that there are investors in the real estate market that might view the Property in the context of substantially different uses.

32. This is where zoning and other restrictions, including the Town's active sewer moratorium, are implicated. With this specific Property, permitting restrictions do substantially affect the value, except within the context of the current highest and best use, a movie theater, because that use complies with zoning and property restrictions and requires no variances or additional special permits.

33. As discussed above, all of this information was considered and value developed using the Town's CAMA system during the applicable fiscal years.

34. Using all of this information, it is my opinion that the full and fair cash value of the Property for FY2024 was correctly assessed at $1,813,300.00.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 10, 2024

_____
Jonathan Steinberg
Chief Assessor,
Town of Westborough