UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

In re:

WESTBOROUGH SPE LLC,

Debtor.

Chapter 7
Case No. 23-40709-CJP

<u>COUNTERCLAIM AND CROSS-MOTION FOR EQUITABLE INTEREST, COLLUSIVE FORECLOSURE, CONSPIRACY TO DEFRAUD, UNJUST ENRICHMENT, AND SANCTIONS AGAINST THE TOWN OF WESTBOROUGH</u>

**COMES NOW** Lolonyon Akouete, by and through himself, as a creditor and interested party in the bankruptcy proceedings of Westborough SPE LLC, and respectfully submits this Counterclaim and Cross-Motion for Sanctions Against the Town of Westborough, and other relief, as follows:

## LEGAL CLAIMS AND SUPPORTING FACTS

I. **Equitable Interest in the Property**

The debtor, Westborough SPE LLC, filed a timely motion to vacate the foreclosure judgment on January 4, 2023, asserting due process violations and lack of proper notice regarding its right to redeem the property located at 231 Turnpike Road, Westborough, MA. This motion was filed within the one-year redemption period pursuant to **Mass. Gen. Laws ch. 60, § 69A**, thereby preserving the debtor's **equitable interest** in the property.

Under **11 U.S.C. § 541(a)** and **4 Collier on Bankruptcy ¶ 541.07[3] (15th ed. 1982)**, the debtor's equitable interest, including the right to redeem the property, becomes part of the bankruptcy estate. The **Supreme Court's ruling in United States v. Whiting Pools, Inc.**, 462 U.S. 198 (1983), holds that both equitable and legal interests in property are included in the bankruptcy estate, enabling the trustee or debtor-in-possession to administer those interests for the benefit of creditors.

The Town of Westborough's claim to absolute title is premature because the foreclosure process remains subject to the debtor's challenge, and the debtor retains significant rights over the property that must be resolved within the bankruptcy process. Until the debtor's right to redeem is fully adjudicated, the property remains part of the bankruptcy estate and subject to administration by the trustee. The debtor's equitable interest is an asset of the estate, and it can be used, sold, or redeemed pursuant to **11 U.S.C. § 363(b)**, as further illustrated in *Ivy Rest. Grp., Inc., No. 10-18394-JNF, 2011 WL 282758, at 3 (Bankr. D. Mass. Jan. 25, 2011)* and **Ford v. Duggan (In re Duggan), 571 B.R. 1, 12–13 (Bankr. D. N.H. 2017)**.

II. **Collusive Foreclosure and Constructive Fraud**

The foreclosure of the property at 231 Turnpike Road involves clear signs of **collusion**. Collusion is defined as "[a]n agreement to defraud another or to do or obtain something forbidden by law."

**Black's Law Dictionary (11th ed. 2019)**. Courts have defined a collusive foreclosure as one involving "bid rigging or some other form of price fixing." See **In re Bennett**, 154 B.R. 140, 147 (Bankr. N.D.N.Y. 1992). In this case, collusion is evidenced by the actions of the Town of Westborough and Lax Media, who have conspired to suppress the value of the property.

**Lax Media** previously offered $5 million for the property in 2018, yet the current deal is structured to sell the property for $2.5 million, a significant underpricing that suggests **bid rigging** or price manipulation. As stated in **In re Hitzel**, 2004 Bankr. LEXIS 1036, at *4 (Bankr. W.D.N.Y. Jul. 20, 2004), collusion occurs when the debtor and lienholder conspire to arrange the foreclosure in a way that benefits a specific buyer, thereby depriving the estate and its creditors of full recovery.

The **Supreme Court's decision in BFP v. Resolution Trust Corp.**, 511 U.S. 531 (1994), held that non-collusive foreclosures are generally not subject to avoidance under **11 U.S.C. § 548**. However, in this case, **collusion** is present, as evidenced by the substantial undervaluation and manipulation of the sale price, warranting avoidance of the foreclosure. The Court in **In re Bennett** clarified that the focus of the inquiry must be on the sale itself, and here, the collusion between the Town and Lax Media is clearly designed to rig the foreclosure sale to benefit a third-party buyer while defrauding creditors.

Additionally, this scheme constitutes **constructive fraud** under **11 U.S.C. § 548(b)(i)-(ii)**, which allows the avoidance of transfers made with intent to hinder, delay, or defraud creditors, or for less than reasonably equivalent value. Massachusetts law mirrors this in **Mass. Gen. Laws ch. 109A, § 5(a)(2)**. The evidence of price suppression and collusion to sell the property for far less than its fair market value establishes the grounds for a finding of constructive fraud.

III. **Conspiracy to Defraud**

The Town of Westborough has engaged in a deliberate conspiracy, in collaboration with Lax Media, to defraud the bankruptcy estate and creditors. By obstructing the marketing and sale of the property, manipulating the price, and suppressing competitive offers, the Town and Lax Media are acting in concert to devalue the property. As explained in **In re Hitzel**, 2004 Bankr. LEXIS 1036, collusion between the lienholder and a third party to manipulate foreclosure proceedings amounts to fraud and warrants relief.

The actions of the Town and Lax Media violate the fiduciary duty owed to the estate to maximize value and represent an intentional effort to unjustly enrich third-party buyers at the expense of creditors.

IV. **Unjust Enrichment**

The Town of Westborough stands to gain **unjust enrichment** through its collusive and fraudulent actions, turning an original tax debt of **$391,541.93** into a claim of **$1,165,000**. By artificially inflating the debt and orchestrating the foreclosure process to benefit third-party buyers, such as **Lax Media**, the Town seeks to profit at the expense of the bankruptcy estate and its creditors.

In addition, the Town is assisting **Lax Media** in purchasing the property for **$2.5 million**, well below the fair market value. Lax Media has been given four months to close on the property, during which time it could potentially find a new buyer and sell the property for **$10 million**, resulting in a **substantial windfall**. This manipulation of the process reflects a clear intent to unjustly benefit both the Town and Lax Media while depriving the estate and creditors of rightful recovery.

Under both **Massachusetts law** and **bankruptcy principles**, unjust enrichment occurs when a party benefits unfairly at another's expense. Here, the Town's inflated claims and collaboration with Lax Media to secure a below-market sale constitute a clear case of unjust enrichment, which warrants relief from the Court.

V. **Sanctions for Bad Faith Conduct**

The Town's repeated bad faith conduct, including collusion in the foreclosure sale, price manipulation, and conspiracy to defraud, warrants sanctions under the **inherent powers of the Bankruptcy Court**. Courts, including the First Circuit in **In re Charbono**, 790 F.3d 80 (1st Cir. 2015), have recognized that sanctions are appropriate for bad faith actions or contempt of court. Here, the Town's actions have materially impaired the administration of the bankruptcy estate, obstructing the ability of the trustee and creditors to secure maximum value for the property.

While Mr. Akouete does not request attorney fees for himself, the Court should hold the Town responsible for any attorney's fees incurred by other creditors and the trustee moving forward, as their bad faith actions have unnecessarily increased legal expenses for all parties involved.

---

## PRAYER FOR RELIEF

WHEREFORE, Mr. Akouete respectfully requests that this Court:

1. Deny the Town of Westborough's Motion for Injunction and Sanctions;
2. Find and declare that the bankruptcy estate retains an equitable interest in the Property at 231 Turnpike Road, Westborough, MA, subject to the debtor's motion to vacate the foreclosure judgment;
3. Issue sanctions against the Town of Westborough for its bad faith conduct and collusion in the foreclosure process;
4. Hold the Town of Westborough responsible for any attorney's fees incurred by other creditors and the trustee as a result of its obstructive conduct moving forward;
5. Enjoin the Town of Westborough from interfering with the marketing of the Property and solicitation of offers until a final determination on the motion to vacate is made;
6. Preclude the Town of Westborough from introducing any evidence obtained through bad faith actions;
7. Award damages for unjust enrichment, collusive foreclosure, constructive fraud, and conspiracy to defraud; and
8. Grant such other and further relief as this Court deems just and proper.

DATED: October 7, 2024, Respectfully submitted:

By creditor,

_____
Lolonyon Akouete
800 Red Milles Rd
Wallkill NY 12589
info@smartinvestorsllc.com (443) 447-3276

**Westborough MA**
**Contract: RFP 22-0080**
**Sale of 231 Turnpike Road, Westborough**

# Addendum 2

Ques 1: Is the town selling the fee simple interest?
Ans:  **No**

Ques 2: If not how long until the previous owners right of redemption expires via tax title?
Ans: **1/5/2023 – one year from foreclosure.**

Ques 3: What was the tax title amount?
Ans: **$391,541.93 (includes EverSource bills)**

Ques 4**:** Do you know what the ceiling height of the building is? Also, what is the column spacing?
Do you have a floor plan of the building?
Ans:  The Building Commissioner has responded that old building permits can be found on the following link and searching under 231 Turnpike Rd*   https://portal.laserfiche.com/Portal/Welcome.aspx?repo=r-6c8eaee8

**End of Addendum 2**

Westborough MA
RFP 22-0080
Sale of Property at 231 Turnpike Rd

# Addendum 4

**Questions and answers from the Site Visit and Pre-Bid Conference on June 16, 2022**

Ques 1:   What is the timeline for Proposal evaluation?

Ans 1:  There is no set time limit for evaluations but the Town would like to dispose the property as soon as possible.

Ques 2. If this project is redeveloped, will the build permits be grandfathered in as far as conservation commission?

Ans 2: This site has special comprehensive Permit coverage and existing limits will be sustained provided that any redevelopment is within the latitude of the existing comprehensive permit. Redevelopment of the site may require a Notice of Intent or other wetland permitting. All proposed development will need to meet today's standards for the Wetlands Protection Act and the local By-law. However, existing the limits of the developed property are grandfathered with regard to wetlands.

Ques 3. Comprehensive special Permit is for the whole area?

Ans: Yes it is for the whole area.

Ques 4. Do I need a special permit if I want to operate as a Cinema?

Ans: No special permit is not needed for same use. Just building permits and an occupancy permit.

Ques 5. Will the closing happen after the redemption period expires?

Ans: The Town is willing to consider closing on the property after the redemption period has expired, provided the closing occurs no later than January 30, 2023, and, further, that the Town may give preference to proposers who are willing to close on the property prior to the expiration of the redemption period.

Ques 6. What is the Select Board's preference for the use of the property?

Ans:  Bidders should refer to the RFP evaluative criteria. These were discussed by the Board in several meetings.

Ques 7.  Who is responsible for expenses until closing?

Ans:  The Town of Westborough is responsible for costs associated with the Property until the Property is conveyed to the successful proposer at the closing.

Ques8. Any Liens on the Property?

Ans:  No, there are no known liens on this property

Ques 9: Does current zoning allow use of property as Sports facility?

Ans:  Yes, it should be allowed. We will have to look at your proposal and review current permitting.

Ques 10. How  can I get building plans of the property?

Ans:  Please review Addendum 2 on Bidnet. You can use the link in addendum 3 to access building plans for Regal Cinema.

Ques 11. Has Bankruptcy of former owner been reviewed?

Ans:  No, it has not been reviewed but historically, parties related to the ownership and bankruptcy have indicated no ownership interest in the property.

Ques 12. Did  Eversource have a lien on this property?

Ans:  Town had to pay the utilities expenses to Everesource but there was no lien. There are no liens currently on this property to the best of our knowledge.

**End of Addendum 4**



← **Boston Bar Journal**

VOICE OF THE JUDICIARY

# Going Beyond Equality and Striving Toward Equity: Addressing Systemic Racism and Bias in the Courts

June 14, 2022 DEI Special Edition 2022



**By: Chief Justice Paula M. Carey**

State court systems must provide services and deliver justice in a manner that inspires public trust and confidence. All individuals must be treated fairly and impartially in every interaction with the court system. To achieve public trust and confidence, the existence of systemic racism in the courts must be acknowledged. Specifically, courts must recognize that Black and other individuals of color who have contact with the legal system are often not treated equitably or with the same dignity and respect as their white counterparts. A compelling illustration of this idea is that "Equality is giving everyone a shoe, equity is giving everyone a shoe that fits." The Massachusetts Trial Court has embarked on an intentional journey to address issues related to diversity, equity, and inclusion.

Over the last decade, numerous studies have documented how racial disparities and high rates of incarceration in our nation's criminal justice system have had a devastating impact on communities of color. Massachusetts has one of the lowest overall incarceration rates in the nation, but some of the highest rates of disparity in incarceration. As the late Supreme Judicial Court Chief Justice Ralph Gants noted in his 2016 State of the Judiciary speech, data collected by the Sentencing Commission showed that while the national rate of imprisonment for African Americans was 5.8 times greater than for whites, in Massachusetts, it was nearly

eight times greater. Moreover, as a nation, in 2014 the rate of imprisonment for Hispanics was 1.3 times greater than for whites; in Massachusetts, it was nearly five times greater. After acknowledging these disparities, Chief Justice Gants announced that he had asked Harvard Law School to convene a team of independent researchers to analyze the data and "find out why."

After four years of research and review, in September 2020, Harvard released the results of its study in a report entitled "Racial Disparities in the Massachusetts Criminal Justice System." Based on available data from 2014 to 2016, the researchers found that "Black and Latinx people sentenced to incarceration receive longer sentences than their White counterparts, with Black people receiving sentences that are an average of 168 days longer, and Latinx people receiving sentences that are an average of 148 days longer." The researchers also concluded that defendants of other races, including Asian, Cape Verdean, Native Hawaiian/Pacific Islander, American Indian/Alaskan, and Other Race/Multi-Race received longer sentences than their white counterparts. Furthermore, the regression analysis utilized in the study "indicates that even after accounting for factors such as criminal history and demographics, charge severity, court jurisdiction, and neighborhood characteristics, Black and Latinx people are still sentenced to 31 and 25 days longer than their similarly situated White counterparts." While the Harvard study was limited in scope due to obstacles relating to data, the overall conclusion was anticipated, and led the Trial Court to further prioritize its efforts to address systemic racism.

Even before the publication of the Harvard report, the Massachusetts Trial Court engaged in comprehensive efforts to address issues of bias impacting both criminal and civil cases within the court system. These efforts have resulted in a systematic and transparent approach to our work that includes data collection, experiential training, and accountability.

The Trial Court began its intentional journey to address issues related to diversity, equity, and inclusion in 2013, after a survey reflected that judges of color and female judges had been treated differently based upon their race or gender. In examining these issues, we now understand that disparities did exist, and this conclusion led to the reflection that, if judges experienced this treatment, our employees and court users were likely having similar experiences.

In September 2015, the Trial Court held a conference to open a dialogue among Massachusetts judges about implicit bias in the work they do every day across the Commonwealth. Following the conference, each of the seven Trial Court departments developed and provided implicit bias bench cards to all judges and magistrates.

In 2016, the Trial Court established a Race and Implicit Bias Advisory Committee (TRIBAC) to address bias issues related to race and gender within the organization. The Trial Court also

established a Trial Court Office of Diversity, Equity, Inclusion & Experience (ODEIE), which works to create an inclusive culture and support continuous systemic improvement within our system. In connection with these efforts, the Trial Court retained two nationally recognized consultants from Columbia Law School's Center for Institutional and Social Change (CISC) to help develop strategies for the Trial Court to address racial bias and construct a leadership curriculum. Working together, Trial Court leadership, TRIBAC, ODEIE, and CISC sought to transform Trial Court culture by integrating diversity, equity, and inclusion efforts into all aspects of court operations, including recruitment, hiring, training, conflict resolution, and strategic planning. The Trial Court developed and implemented a system-wide, evidence-based curriculum and methodology that brings together employees with different roles and identities and builds the capacity to engage and address issues related to diversity, equity, and inclusion of employees throughout the court system. Our objective is to build a self-sustaining infrastructure, so that issues surrounding race and bias remain at the forefront for all Trial Court employees and leadership. Court leaders and staff also collaborated to create a video urging everyone inside and outside the court system to be an "Upstander" – to stand up against acts or words reflecting conscious or unconscious bias.

The Trial Court has implemented strategies to eliminate racism and bias through several programs administered by ODEIE. Our Leadership Capacity Building Workshops are designed to support judges and court staff in leading difficult conversations on race and identity and addressing issues involving diversity, equity, and inclusion. Additionally, nearly all Trial Court personnel have completed the Signature Counter Experience training – a program centered around customer service and designed to ensure that all court users are treated respectfully and professionally. ODEIE's program Beyond Intent: Understanding the Impact of Our Words and Actions educates court personnel about the impact of words and actions on the development of a safe, healthy, and inclusive workplace, and identifies actionable steps to embed more inclusive practices into daily practices. ODEIE's Cultural Awareness and Racial Empathy (CARE) program is an opportunity for all Trial Court employees to engage in safe discussion and dialogue with each other to gain a greater understanding of the history of the marginalization of communities and individuals of color, and to reflect on their personal identity and the identity of others.

In 2019, the Trial Court established the Trial Court Office of Workplace Rights & Compliance (OWRC) to address and investigate concerns and complaints of discrimination, harassment, or retaliation involving protected classes including race, gender, and disability. OWRC is also responsible for enforcing the Trial Court's Policy Prohibiting Discrimination, Harassment and Retaliation, which was promulgated in 2019, and applies to employees and court users.

In the summer of 2021, the Trial Court convened the Committee to Eliminate Racism and Other Systemic Barriers. The committee is taking a different approach to address critical issues that impact racism, and its members are reviewing court systems and processes

through the lens of racism and other barriers to ensure justice and fairness throughout the court system. The committee is charged with advising the Chief Justice of the Trial Court and the Court Administrator regarding policies and initiatives to address institutional racism and systemic barriers based on race, ethnicity, gender, gender identity, sexual orientation, mental or physical disability, age, socioeconomic status, or other matters of identity that may give rise to inequity among Trial Court users, judicial officers, or court personnel. The committee's nine working groups are working on several initiatives, including data collection for civil matters, employee mentoring, an updated social media policy, an affinity group for employees, and proposed jury data collection changes. This collaborative approach, with internal and external stakeholders to study and review, is essential to moving the system forward.

Another means of addressing racial and ethnic inequity in our legal system is by increasing the diversity of court personnel. A more diverse workforce brings a broader range of perspectives into the courts and helps to educate us all about the experiences of those who are different from us in race and ethnicity, as well as in gender identification, sexual orientation, or class background. A court workforce that mirrors the diversity of our Commonwealth also promotes litigants' trust in the equity of our judicial system. As stated in the Trial Court's Strategic Plan 3.0, "we want our workforce to reflect the diversity of our users and to be culturally competent and welcoming." Accordingly, we have made it a strategic priority to increase the diversity of our workforce through recruitment, outreach, career development, and promotion. To measure progress toward this goal, the Trial Court instituted an Annual Diversity Report. These reports show an overall increase in Trial Court employees who are members of racially/ethnically diverse groups from the publication of the initial Diversity Report, issued for Fiscal Year 2017. The Trial Court has also made improvements in the percentage of racially and ethnically diverse employees in its managerial ranks. Each year, we celebrate our increased diversity with our annual cultural appreciation events that encourage court staff to share and learn more about each other's cultural heritage.

Notwithstanding these efforts, there is still much work to do to root out bias in all aspects of our court operations. After the release of a 2021 report from the Supreme Judicial Court's Committee on Lawyer Well-Being, summarizing a series of Town Hall meetings with Affinity Bar members, we learned of the negative experiences of many attorneys of color when engaging with our court system. In response, we began meeting with Affinity Bar leaders to engage in open dialogue to collaborate on strategies the Trial Court could undertake to address the issues raised. We have taken steps to facilitate discussions on how to best interact with court users in a more respectful and culturally proficient manner.

We recognize the importance of open communication and direct outreach to communities of color, so that we can better understand the experience of these communities in our courts and can work to address their concerns. Massachusetts was among six states chosen by the National Center for State Courts (NCSC) to participate in a pilot community engagement

program to collectively expand gateways to substance use treatment in the courts. Additionally, ODEIE has worked with local court and community leaders to hold a variety of public engagements designed to increase public trust and confidence in the courts by providing the opportunity for communities of color to share their experiences with the justice system and provide feedback on how we can become more equitable and just. Our Access to Justice coordinator, along with ODEIE organized several virtual Town Hall sessions which engaged local court leaders and officials to share information on court operations during the COVID-19 pandemic. Additionally, the Trial Court conducted listening sessions at houses of correction, in which judges and staff from the Massachusetts Probation Service and Trial Court Security Department met with detainees and heard about their experience with the justice system. The Trial Court also provided forums for internal listening sessions where employees shared their experiences working in the courts.

The Trial Court continues to collaborate with Harvard on issues related to race. One example is Harvard's work on a quantitative analysis of the impact of the diversion and non-prosecution policy of the Suffolk County District Attorney's Office. Additionally, the Trial Court maintains several public interactive dashboards that contain demographic and case information. The dashboards allow users to filter information using different data points. The Trial Court is also working with the NCSC to perform a diversity, equity, and inclusion analysis to estimate the demographic makeup of parties involved in select civil case types. Civil case types include Pathways in case types such as evictions, civil asset forfeiture, tax lien, debt collection and mortgage foreclosure.

As leaders of state court systems, we hold unique positions and need to be comfortable with being uncomfortable, because this work is not easy. We need to be more introspective about the fact that what we do, and what we fail to do, impacts the lives of others who have experienced the indignities of racism and injustice throughout their lives. We need to listen to the experiences of diverse populations as we work to change our systems. The time is now, and it will take all our collective efforts to eradicate racism in our justice system and beyond. Failure is not an option. As a nation, and as a system of state courts committed to equitable justice for all, we must not rest until we have eliminated these barriers.

Paula M. Carey retired as Chief Justice of the Trial Court in January 2022. She continues to work on issues involving Diversity, Equity, Inclusion in the Trial Court, which was a major focus of her work before her retirement.

## SHARE

   

## Related Links

**VOICE OF THE JUDICIARY**

Interview with Massachusetts Commissioner of Probation Pamerson Ifill

**VOICE OF THE JUDICIARY**

Federal Judicial Roundtable: Getting to Know Judges Kelley, Guzman, and Joun Part II

**VOICE OF THE JUDICIARY**

Federal Judicial Roundtable: Getting to Know Judges Kelley, Guzman, and Joun

## More to Explore

Judge Paula M. Carey: A Lifetime of Service

The Inevitable Disclosure Doctrine In Employment Litigation: Two Perspectives

Addressing Hate Crimes: Massachusetts Can Do Better

Mentoring the Next Generation

16 Beacon Street
Boston, MA 02108
(617) 742-0615

**QUICK LINKS**

**Manage My Membership**

**Join the BBA**

Calendar

**Boston Bar Journal**

**ABOUT**

**About the Boston Bar Association**

**About the Boston Bar Foundation**

**Work at the BBA**

**Contact Us**

Find a Lawyer

**CONNECT**

© 2024 Boston Bar Association. All rights reserved.

Terms of Service    Privacy Policy    Cancellation Policies    Home    Website by 829

## CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

| | |
|---|---|
| Stephen F. Gordon, Attorney of the Petitioners (Email: sgordon@gordonfirm.com) The Gordon Law Firm LLP River Place 57 River Street Wellesley, MA 02481 | Paul W. Carey, Attorney of Creditor FERRIS DEVELOPMENT GROUP, LLC (Email: pcarey@mirickoconnell.com) Mirick, O'Connell, DeMallie & Lougee, LLP 100 Front Street, Worcester, MA 01608 |
| Scott A. Schlager on behalf of, Nathanson & Goldberg, P.C., a creditor. (Email: sas@natgolaw.com) 183 State Street, 5th Floor Boston, MA 02109 | Brian W. Riley, Attorney of Creditor Jeffrey T. Blake, Attorney of Creditor Roger L. Smerage, Attorney of Creditor TOWN OF WESTBOROUGH (Email: briley@k-plaw.com) (Email: jblake@k-plaw.com) (Email: rsmerage@k-plaw.com) KP Law, P.C. 101 Arch Street, 12th Floor Boston, MA 02110 |
| Assistant U.S. Trustee Richard King Office of US. Trustee 446 Main Street 14th Floor Worcester, MA 01608 USTPRegion01.WO.ECF@USDOJ.GOV | |
| Jonathan R. Goldsmith Chapter 7 Trustee trusteedocs1@gkalawfirm.com Goldsmith, Katz & Argenio P.C. 1350 Main Street, 15th Floor. Springfield, MA 01103 | Gary M Ronan David M Abromowitz Goulston&storrs GRonan@goulstonstorrs.com DAbromowitz@goulstonstorrs.com 400 Atlantic Avenue Boston, MA 02110 |
| Dyann Blaine 20 Queensbrook Place Orinda, CA 94563 dyann.blaine@gmail.com | Peter Blaustein 950 Vista Road Hillsborough, CA 94010 pblaustein@gmail.com |
| Jan Blaustein Scholes 7501 E Thompson Peak Pkwy Scottsdale, AZ 85255 jan.scholes2@gmail.com | Walter Horst Babcock & Brown 1264 Rimer Drive Moraga, CA 94556 walter.horst@babcockbrown.com |
| Mark S. Lichtenstein AKERMAN LLP 1251 Avenue of the Americas, 37th Flr. New York, New York 10020 mark.lichtenstein@akerman.com | Samual A. Miller, Esq. AKERMAN LLP 420 South Orange Avenue Suite 1200 Orlando, FL 32801 samual.miller@akerman.com sharlene.harrison-carera@akerman.com |



_____
Lolonyon Y Akouete