UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 7 |
|  | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) ) |  |
|  | ) |  |
| Debtor. | ) ) |  |

## **AFFIDAVIT OF LOLONYON Y. AKOUETE**

I, **Lolonyon Akouete**, (the "Akouete"), depose and say that:

1. I am a creditor in the above-captioned case and a party to the contested matters involving my claim and related issues. I make this declaration based on my personal knowledge, my review of the documents attached as exhibits, and records maintained in my possession, custody, or control.

2. **Exhibit Handling.** Unless otherwise stated, each exhibit attached hereto is a **true and correct copy** of the described document. Where I added Bates labels, page numbers or Exhibit numbers for ease of reference, I note that explicitly; otherwise the documents are unaltered.

3. Exhibit 1 — **Certified Delaware Records for Westborough SPE LLC (File No. 2811561).** On **April 8, 2025**, in response to my subpoena, I received from the Delaware Secretary of State certified copies for Westborough SPE LLC consisting of: (1) the Certificate of Formation filed Oct. 22, 1997 (9:00 a.m.); (2) a Certificate to Restore to Good Standing filed July 13, 1999 (signed F. Jan Blaustein Scholes); (3) a Certificate of Revival filed Nov. 22, 2022 (executed Denise Edwards); and (4) a current status certificate noting the company ceased good standing on June 1, 2024 for non-payment of annual tax, while remaining a Delaware domestic LLC. The Secretary's cover certificates are signed by Charuni Patibanda-Sanchez with authentication nos. 203387906, 203387905, 203387904, and 203387767. These are true and correct certified copies as received

4. Exhibit 2 — Unanimous Consent of Directors of Babcock & Brown Administrative Services, Inc. (October 1997). Attached as Exhibit 2 **is a** true and correct copy of the Unanimous Consent of Directors of Babcock & Brown Administrative Services, Inc. ("BBAS Inc."), which I obtained from Babcock & Brown in response to my subpoena. The document (footer GS2-136623-1, timestamp 10/28/97 7:47 PM, Bates BB001086) states that BBAS Inc. is the sole manager of Westborough SPE LLC and authorizes the LLC to: (i) assume Interstate Theatres Corporation's Contract of Sale for the Westborough property; (ii) close on that acquisition; and (iii) obtain financing from The Northwestern Mutual Life Insurance Company. It further authorizes F. Jan Blaustein ("Authorized Officer") to execute any and all documents, in her sole discretion, including the Participation Agreement, Lease Agreement, Mortgage, Lease Assignment, and Assignment of Lease Guaranty. I keep this document in my files as produced.

5. Exhibit 3 — **Massachusetts Foreign Corporation Filings for Babcock & Brown Administrative Services, Inc. (with Delaware Certificate; Access & Foundation).** Attached as Exhibit 3 are true and correct copies of the Massachusetts foreign corporation filings for Babcock & Brown Administrative Services, Inc. that I obtained from the Massachusetts Secretary of the Commonwealth, Corporations Division website; the packet consists of the Foreign Corporation Certificate filed in October 1997 for Babcock & Brown Administrative Services, Inc. (FEIN 94-3285178), listing the principal office at 2 Harrison Street, 6th Floor, San Francisco, CA 94105, the initial Massachusetts resident agent Shelly G. Widoff, 4 Faneuil Hall Marketplace, 4th Floor, Boston, MA 02109, and officers/directors including F. Jan Blaustein (President), Monique Belkin (Secretary), James D. Jaworski (Director), and David G. Crane (Director); an Amended Foreign Corporation Certificate (2003) identifying Corporation Service Company, 84 State Street, Boston, MA 02109, as resident agent; and an attached Delaware Secretary of State certificate dated October 24, 1997 (signed by Edward J. Freel) confirming BBAS Inc. was duly incorporated and in good standing as of that date; as of September 7, 2025, this filing remains publicly available online at https://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx , where it can be located by searching the Identification Number 943285178 and opening the "Foreign Corporation Certificate" filed 10/27/1997 (Filing No. 020502975689; PDF "020502975689_1.pdf," 5 pages); these are true and correct copies as downloaded.

6. Exhibit 4 — **Delaware Secretary of State Certified Records for Babcock & Brown Administrative Services (Inc./LLC)** (File No. 2811627). Attached as Exhibit 4 are true and correct certified copies I received on April 8, 2025 from the Delaware Secretary of State in response to my subpoena, arranged chronologically as follows: the Certificate of Incorporation of Babcock & Brown Administrative Services, Inc. filed October 23, 1997 at 9:00 a.m. (Auth. 203387797), the Certificate of Amendment filed November 21, 1997 at 9:00 a.m. (Auth. 203387796), the Certificate of Conversion converting the corporation to Babcock & Brown Administrative Services LLC filed January 3, 2000 at 9:00 a.m. (Auth. 203387794**)** and signed by F. Jan Blaustein Scholes, the Certificate of Formation creating BBAS LLC filed January 3, 2000 at 9:00 a.m. (Auth. 203387795**)** and signed by F. Jan Blaustein Scholes as the executing/authorized person, and the Certificate of Merger merging BBAS LLC into Babcock & Brown Parallel Member LLC filed August 29, 2011 at 2:33 p.m. (Auth. 203387793**)**, together with a Secretary's certification listing these as the only certificates of record for BBAS LLC (Auth. 203387818**,** SR# 20251460210) and signed by Charuni Patibanda-Sanchez, Secretary of State; these certified records demonstrate that Ms. Scholes executed both the conversion and formation instruments, evidencing continuity of her corporate authority across the transition from BBAS Inc. to BBAS LLC.

7. Exhibit 5 — **Limited Liability Company Agreement of Babcock & Brown Administrative Services LLC (Dec. 31, 1999) (Foundation).** Attached as Exhibit 5 is a true and correct copy of the Limited Liability Company Agreement of Babcock & Brown Administrative Services LLC**,** dated December 31, 1999, which I obtained from Babcock & Brown in response to my subpoena; the agreement organizes the company under the Delaware Limited Liability Company Act (Art. II §2.1), identifies Babcock & Brown Inc. as the sole Member (100%) (Schedule I), sets the principal office at 2 Harrison Street, San Francisco, CA 94105 and the registered agent/office at CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, DE 19901 (§2.4), states the company's purpose in connection with the Westborough property transaction (Art. II §2.3), and, critically, lists the initial officers (§5.1.2), including F. Jan Blaustein Scholes as President (and also as a Vice President**),** James D. Jaworski as Chief Financial Officer, and Monique Belkin as Secretary; the

agreement further authorizes the officers—each of them—to execute and deliver instruments on behalf of the Company (§5.1.3), and the execution page reflects Babcock & Brown Inc., Member, **by** Jan Blaustein Scholes, Vice President

8. Exhibit 6 — **Resignation Letter of Jan Blaustein Scholes (Oct. 1, 2007) (Foundation).** Attached is a true and correct copy of a resignation letter dated October 1, 2007, which I obtained from Babcock & Brown in response to my subpoena in this contested matter; the letter, sent "To Whom It May Concern" at 2 Harrison Street, 6th Floor, San Francisco, CA 94105, states: "I hereby resign as a Vice President of each of the companies listed on Schedule I attached hereto with immediate effect," and the attached Schedule I lists multiple entities but does not include Babcock & Brown Administrative Services, Inc. or Babcock & Brown Administrative Services LLC; the document therefore reflects a resignation limited to the Vice President role and only as to the entities specifically listed on Schedule I; the letter bears Ms. Scholes's name and Atherton, California address (34 Stern Lane, Atherton, CA 9402**7**)

9. Exhibit 7**—** **Notice of Resignation (Apr. 30, 2011) (Foundation).** Attached is a true and correct copy of a Notice of Resignation I obtained from Babcock & Brown in discovery in this contested matter; the letter appears on Babcock & Brown LP letterhead (One Letterman Drive, Bldg. D, San Francisco, CA) and is dated April 30, 2011, addressed to Westborough SPE LLC, c/o Equity Trust, 31/F The Center, 99 Queen's Road Central, Hong Kong, Attn: Serena Kwok, General Manager, Trade Support**,** re: Westborough SPE LLC; it states, **"**Pursuant to Section 1(e) of the LLC Agreement and Section 18-602 of the Delaware Limited Liability Company Act, this letter serves as notice to the Member of the Manager's intent to resign as Manager of the Company effective as of May 30, 2011," and is executed on behalf of Babcock & Brown Administrative Services LLC by its Treasurer.

10. Exhibit 8 — **Mignonette Investments Limited (BVI) Corporate Records (Obtained via Dato Capital, Mar. 9, 2023) (Foundation).** Attached are true and correct copies of British Virgin Islands corporate records for Mignonette Investments Limited (BVI Co. No. 243736) that I obtained on March 9, 2023 through Dato Capital, a commercial service that retrieves and provides official filings and registry extracts from government registries (including the BVI FSC/VIRRGIN system); the packet includes the 1997 Certificate of Good Standing, name-reservation and Memorandum & Articles of Association from incorporation in August 1997, registry profile/transaction history pages reflecting a 2011 restoration, annual fee submissions, a 2017 registered-agent intent to resign and Register of Directors filing, and the status change to "Struck off – Non Payment of Annual Fee" in May 2017, and it shows that while the registered agent name changed over time (Integro → Equity Trust/TMF), the registered office consistently remained P.O. Box 438, Road Town, Tortola, BVI; these are true and correct copies as provided.

11. Exhibit 9 — **Affidavit of David Abromowitz, Esq. (Apr. 4, 2025) (Foundation).** Attached is a true and correct copy of the Affidavit of David Abromowitz, Esq. of Goulston & Storrs PC, executed April 4, 2025, which I received in this case and maintain in my files; in it, Mr. Abromowitz—Massachusetts attorney, Of Counsel at Goulston & Storrs, and counsel on the 1997–1998 formation/lease matter for Westborough SPE LLC—identifies the client representatives with whom the firm communicated, including F. Jan Blaustein and Monique Belkin at Babcock & Brown Administrative Services, 2 Harrison Street, 6th Floor, San Francisco, CA 94105 (Tel. 415-512-1515; Fax 415-267-1500), and Derek Andrews (Mignonette) at Integro Trust (BVI) Limited, P.O. Box 438, Tropic Isle Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands (Fax 1-809-494-2704**)**; the

affidavit is signed under the pains and penalties of perjury, and is offered to authenticate the firm's contemporaneous contact records and to corroborate Mignonette's BVI registered office/agent details used during the 1997–1998 transaction period

12. Exhibit 10 — Attached hereto as **Exhibit 10** is a true and accurate copy of the "**Participation Agreement**" dated October 30, 1997, among Interstate Theatres Corporation, certain Hoyts entities, Westborough SPE LLC, Mignonette Investments Limited, and The Northwestern Mutual Life Insurance Company, which I obtained by subpoena to Babcock & Brown and which Babcock & Brown produced in connection with this Contested Matter; Section 10.5 of that Agreement states that Mignonette Investments Limited irrevocably appointed Corporation Service Company, 84 State Street, Fifth Floor, Boston, Massachusetts 02109, as its agent for service of process in the Commonwealth of Massachusetts.

13. Exhibit 11 — Attached hereto as **Exhibit 11** is a true and correct copy of IRS Letter 147C, dated December 23, 2022, issued from the IRS Ogden, Utah office, confirming EIN 94-3286768 for Westborough SPE LLC and addressed "c/o F. Jan Blaustein," 1241 Deer Park Ave., Ste. 1 No. 1051, North Babylon, NY 11703; I together with Denise Edward, obtained this letter by calling the IRS, providing a power of attorney, and requesting EIN verification and an address update, after which the IRS mailed the letter. This document reflects that, as of that date, the IRS listed Westborough SPE LLC's account under the care-of name F. Jan Blaustein in connection with this Contested Matter.

14. Exhibit 12— Attached as **Exhibit 12** is a true and correct copy of docket materials I downloaded from the Massachusetts Land Court in Town of Westborough v. Westborough SPE, LLC, No. 19 TL 000768, showing that in September 2021—during the Town's tax-foreclosure proceeding—service of process was directed to and/or attempted upon "F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E., Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Administrative Services, Inc." at 34 Stern Lane, Atherton, CA 94027, including the Land Court Citation, certified-mail labels/envelope marked "Return to Sender—Attempted—Not Known," a Sheriff's Return of Service, and a process server affidavit reflecting substitute service; I obtained these documents directly from the Land Court docket for use in this Contested Matter.

15. Exhibit 13— Attached hereto as **Exhibit 13** is a true and correct copy of the relevant portions of the deposition transcript of Denise Edwards, taken on March 31, 2025, in this case (In re Westborough SPE LLC, No. 23-40709-CJP). I obtained the transcript directly from the Chapter 7 Trustee's attorney, Christine Devine, Esq., of Nicholson Devine LLC. For ease of reference, I have excerpted only the pertinent pages and omitted the remaining pages to reduce length; the text on the included pages has not been altered. The full certified transcript is 204 pages and is available from counsel or the court reporter.

16. Exhibit 14— **August 13–14, 2024 Emails Between Lenard B. Zide and Trustee Jonathan Goldsmith (Foundation).** Attached hereto as Exhibit 14 is a true and correct copy of an email chain I obtained from the Chapter 7 Trustee's counsel in response to my subpoena in this Contested Matter. The chain consists of (i) an August 13, 2024, 8:09 a.m. email from Jonathan Goldsmith (jgoldsmith@gkalawfirm.com), subject "AI," stating, among other things, that he had "called in some reinforcements," that there was "a good possibility" I would "get nothing," and that he "already [has] a legal fee escrow … in the tune of 1.2 million dollars remitted to me from the State of California"; and (ii) Mr. Zide's August 14, 2024, 7:35 a.m. reply "Re: AI," relaying a ChatGPT statement about a trustee's ability to distribute uncontested funds subject to court approval. The exhibit preserves the

sender/recipient addresses, dates/times, and subject lines as produced; I have not altered the wording and removed only non-substantive footer material for brevity.


_09/9/25_

Date

_[signature]_

LOLONYON Y AKOUETE


## STATE OF NEW YORK

County of Ulster

On this _9TH_ day of _September_, 20_25_, the undersigned notary public, personally appeared Frances Lolonyon Y. Akouete, proved to me through satisfactory evidence of identification, which was _Drivers License_, to be the person whose name is signed on the preceding document, and acknowledged to the undersigned that he signed it voluntarily for its stated purpose.

Official Signature of Notary: _Joel Vozzo_

Notary's Printed or Typed Name: _Joel Vozzo_

My Commission Expires: _11/09/2025_

JOEL VOZZO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01VO6213484
Qualified in Ulster County
Commission Expires 11/09/2025

# EXHIBIT 1

Certified Delaware Records – Westborough SPE LLC (File No. 2811561)

# Delaware

Page 1

### The First State

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE
STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND
CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "WESTBOROUGH
SPE LLC", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF
OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.



Charuni Patibanda-Sanchez, Secretary of State

2811561  8100

SR# 20251460210

You may verify this certificate onli.

Authentication: 203387906

Date: 04-08-25

CERTIFICATE OF FORMATION

OF

WESTBOROUGH SPE LLC

This Certificate of Formation of Westborough SPE LLC (the "LLC") is being duly executed and filed by Eleanor M. Coleman, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.Code Ann. §18-101, et seq.)

FIRST.  The name of the limited liability company formed hereby is:

Westborough SPE LLC

SECOND.  The address of the registered office of the LLC in the State of Delaware is c/o Corporation Service Company, 1013 Centre Road, Wilmington, Delaware  19805.

THIRD.  The name and address of the registered agent for service of process on the LLC in the State of Delaware is Corporation Service Company, 1013 Centre Road, Wilmington, Delaware  19805.

IN WITNESS WHEREOF, the undersigned, an authorized person of the LLC, has caused this Certificate of Formation to be duly executed as of the 22nd day of October, 1997.

Name:  Eleanor M. Coleman
Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/22/1997
971357275 - 2811561



# Delaware

Page 1

### The First State

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE

STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND

CORRECT COPY OF THE CERTIFICATE OF RESTORATION OF "WESTBOROUGH

SPE LLC", FILED IN THIS OFFICE ON THE THIRTEENTH DAY OF JULY,

A.D. 1999, AT 9 O`CLOCK A.M.

Charuni Patibanda-Sanchez, Secretary of State

2811561  8100
SR# 20251460210
You may verify this certificate online          .ml

Authentication: 203387905
Date: 04-08-25

001078 SOSRL2

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 09:00 AM 07/13/1999*
*991290319 - 2811561*

FILE NO.: ___2811561___

# STATE OF DELAWARE
# CERTIFICATE TO RESTORE TO GOOD STANDING
# A DELAWARE LIMITED LIABILITY COMPANY

1. Name of Limited Liability Company:

   WESTBOROUGH SPE LLC

2. Date the limited liability company was formed: _____ OCTOBER 22, 1997 _____ .

3. The limited liability company is paying all sums due under Section 18-1107.

4. This filing will permit the limited liability company to be restored to good standing.

IN WITNESS WHEREOF, the undersigned have executed Certificate on the _6th_

day of ___July___ , 19_99_ .

By: _____
                    Authorized Person(s)

Name: _JAN BLAUSTEIN SCHOLES_
                    Type or Print



# Delaware

## The First State

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE

STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND

CORRECT COPY OF THE CERTIFICATE OF REVIVAL OF "WESTBOROUGH SPE

LLC", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF

NOVEMBER, A.D. 2022, AT 5 O`CLOCK P.M.



Charuni Patibanda-Sanchez, Secretary of State

2811561  8100
SR# 2025146O210
You may verify this certificate onli                    tml

Authentication: 203387904
Date: 04-08-25

# STATE OF DELAWARE
## CERTIFICATE OF REVIVAL OF
## A DELAWARE LIMITED LIABILITY COMPANY
## PURSUANT TO TITLE 6, SEC. 18-1109

1. Name of the Limited Liability Company   WESTBOROUGH SPE LLC

2. Date of the original filing with the Delaware Secretary of State:

   10/22/1997

3. The name and address of the Registered Agent is

   THE INCORPORATORS LTD.
   300 CREEK VIEW ROAD, SUITE 209
   NEWARK, DE 19711

4. (Insert any other matters the members determine to include herein).

5. This Certificate of Revival is being filed by one or more persons authorized to Execute and file the Certificate of Revival.

In witness whereof, the above name Limited Liability Company does hereby certify that the Limited Liability Company is paying all annual Taxes, penalties and interest due to the State of Delaware.

BY: _____
                 Authorized Person

Name: Denise Edwards
                 Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:00 PM 11/22/2022
FILED 05:00 PM 11/22/2022
SR 20224086804 - File Number 2811561

# Delaware

Page 1

## The First State

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE CERTIFICATE OF FORMATION OF "WESTBOROUGH SPE LLC", WAS RECEIVED AND FILED IN THIS OFFICE THE TWENTY-SECOND DAY OF OCTOBER, A.D. 1997.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID LIMITED LIABILITY COMPANY CEASED TO BE IN GOOD STANDING ON FIRST DAY OF JUNE, A.D. 2024, BY REASON OF NEGLECT, REFUSAL, OR FAILURE TO PAY AN ANNUAL TAX, BUT REMAINS A DOMESTIC LIMITED LIABILITY COMPANY FORMED UNDER CHAPTER 18 OF TITLE 6.

Charuni Patibanda-Sanchez, Secretary of State

Authentication: 203387767

Date: 04-08-25

2811561  8300X

SR# 2025146021 0

You may verify this certificate o... ...r.shtml

# EXHIBIT 2

Unanimous Consent of Directors – Babcock & Brown Administrative Services, Inc. (Oct. 1997)

October __, 1997

## UNANIMOUS CONSENT OF DIRECTORS

## BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

The undersigned, being all of the Directors of Babcock & Brown Administrative Services, Inc., a Delaware corporation (the "Corporation"), in lieu of holding a formal meeting on the above date, hereby consent to the adoption of, and adopt, in accordance with the By-Laws of the Corporation, the following resolutions:

WHEREAS, the Corporation is the sole manager of Westborough SPE LLC, a Delaware limited liability company (the "LLC"); and

WHEREAS, Interstate Theatres Corporation, a Massachusetts corporation ("Interstate"), has entered into a certain Contract of Sale dated _____, 1997 (the "Contract of Sale") with Northside Realty Trust, established under declaration of trust dated January 14, 1994, and recorded with the Worcester County Registry of Deeds in Book 15975, Page 213 ("Northside"), for the acquisition of the land, buildings and other improvements thereon located in Westborough, Worcester County, Massachusetts as more specifically described in the Contract of Sale (the "Property"); and

WHEREAS, Interstate desires to assign its rights under the Contract of Sale to the ~~Corporation~~ LLC in consideration for the assumption of Interstate's obligations under the Contract of Sale by the ~~Corporation~~ LLC; and

WHEREAS, the LLC will enter into a Lease of the Property with Interstate upon the acquisition of the Property (the "Lease"); and

WHEREAS, the Corporation, as manager of the LLC, desires to cause the LLC to (i) assume the obligations of Interstate as Buyer under the Contract of Sale, (ii) close on the acquisition of the Property pursuant to the Contract of Sale, and (iii) borrow funds from Northwestern Mutual Life Insurance Company (the "Lender") for the acquisition of the Property (the "Loan") and execute any and all documents necessary in the sole discretion of F. Jan Blaustein ("Authorized Officer") to evidence, govern and secure the Loan.

NOW, THEREFORE, it is:

RESOLVED:  That the Corporation, in its capacity as manager of LLC, be and hereby is authorized to cause the LLC to assume Interstate's obligations as Buyer under the Contract of Sale by executing such an assignment agreements and such other documents in connection therewith as Authorized Officer

-1-

GS2- 136623-1
10/28/97 7:47 PM

BB001082

deems appropriate, in each case in such form as the Authorized Officer
may approve in her sole discretion, the execution thereof by the
Authorized Officer to constitute conclusive evidence of such approval

RESOLVED:   That the Corporation, in its capacity as manager of the LLC, be and hereby
is authorized to cause the LLC to purchase the Property from Northside in
accordance with the terms of the Contract of Sale;

RESOLVED:   That the Corporation, in its capacity as manager of the LLC, be and hereby
is authorized to undertake the borrowing represented by the Loan and to
execute the documents evidencing, governing and securing the Loan
including, without limitation, the Participation Agreement, the Lease
Agreement, the Mortgage, the Lease Assignment, the Assignment of Lease
Guaranty, and such other documents as the Authorized Officer may deem
appropriate, in each case in such form as the Authorized Officer may
approve in her sole discretion, the execution thereof by the Authorized
Officer to constitute conclusive evidence of such approval;

RESOLVED:   That the Corporation, in its capacity as Manager of the LLC, cause the
LLC to enter into the Lease Agreement with Interstate;

RESOLVED:   That the Corporation in its own capacity, and as ~~general partner~~ Manager of the
LLC, execute such document and take such other actions as may be
required in furtherance of any of the transaction described in the foregoing
resolutions as approved by the Authorized Officer, the execution of any
such document or the taking of any such action to constitute conclusive
evidence of such approval;

RESOLVED:   That the Authorized Officer is hereby authorized Manager to execute on behalf of
the Corporation in its own capacity, or as ~~general partner~~ of the LLC, any
document contemplated in any of the foregoing resolutions;

RESOLVED:   That the Corporation hereby ratifies, confirms and adopts all other actions
heretofore taken as of the date hereof by or on behalf of the Corporation,
in its own capacity, or as ~~general partner~~ Manager of the LLC, as the case may be,
in connection with the transactions authorized by the foregoing
resolutions;

RESOLVED:   That these resolutions be filed with the records of the Corporation.

-2-

GS2- 136623-1
10/28/97 7:47 PM

BB001083

This Consent of Directors may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

_____
F. Jan Blaustein

_____
David G. Crane

_____
James D. Jaworski

-3-

GS2- 136623-1
10/28/97 7:47 PM

**BB001084**

This Consent of Directors may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

_____
F. Jan Blaustein

_____
David G. Crane

_____
James D. Jaworski

GS2- 135828-1
10/30/97 9:19 AM

-3-

BB001085

This Consent of Directors may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.

F. Jan Blaustein

David G. Crane

James D. Jaworski

GS2- 136623-1
10/28/97 7:47 PM

**BB001086**

# EXHIBIT 3

Massachusetts Foreign Corporation Filings – Babcock & Brown
Administrative Services, Inc. (incl. Delaware Certificate)

**FEDERAL IDENTIFICATION**
NO. 94-3285178

# The Commonwealth of Massachusetts

**William Francis Galvin**
Secretary of the Commonwealth

ONE ASHBURTON PLACE, BOSTON, MASSACHUSETTS 02108

## FOREIGN CORPORATION CERTIFICATE

We, F. Jan Blaustein, President/~~Vice President~~

and Monique Belkin, ~~Clerk/Assistant Clerk or~~

Secretary/~~Assistant Secretary~~ of Babcock & Brown Administrative Services, Inc.
, in compliance with the provisions
of General Laws, Chapter 181, Section 4, certify that:

1. The exact name of the corporation, including any words or abbreviations indicating incorporation or limited liability is:
**Babcock & Brown Administrative Services, Inc.**

2. The corporation is organized under the laws of: **Delaware**

3. The date of its organization is: **October** (Month) **23** (Day) **1997** (Year)

4. The location of its principal office is:
2 Harrison Street, 6th Floor
San Francisco, CA  94105

5. A brief description of the activities of the corporation within the Commonwealth of Massachusetts is as follows:
administrative service provider

97300056

6. The location of its local office in the Commonwealth of Massachusetts, if any, is:
N/A

7. The name and address of its resident agent in the Commonwealth of Massachusetts, if any, is:
Shelly G. Widoff, 4 Faneuil Hall Marketplace
Fourth Floor, Boston, MA 02109

8. The date on which the corporation's fiscal year ends is: March (Month) 31 (Day)

9. If the corporation's existence is other than perpetual, state the duration of existence: _____

Examiner

Name
Approved

C.
M.
R.A.

5
P.C.

10. The **NAME** and **RESIDENTIAL ADDRESSES** of the following officers and directors are as follows:

|  | <u>NAME</u> | <u>RESIDENTIAL ADDRESSES</u> |
|---|---|---|
| President: | F. Jan Blaustein | 2334 Corona Court, Berkeley, CA 94708 |
| * Vice President: |  |  |
| Treasurer: | Geri Stukel | 4706 Edgewood Ave., Oakland, CA 94602 |
| Clerk or Secretary: | Monique Belkin | 200 10th Ave. #5, San Francisco, CA 94118 |
| * Assistant Clerk or Assistant Secretary: |  |  |
| Board of Directors: | F. Jan Blaustein | Same as above. |
|  | James D. Jaworski | 1715 Easton Drive, Burlingame, CA 94010 |
|  | David G. Crane | 2485 Broadway, San Francisco, CA 94115 |

* Please provide the name and residence of the Vice President and Assistant Clerk/Assistant Secretary if they are executing this certificate.

PAGE   1

## State of Delaware
## Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-FOURTH DAY OF OCTOBER, A.D. 1997.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." WAS INCORPORATED ON THE TWENTY-THIRD DAY OF OCTOBER, A.D. 1997.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE NOT BEEN ASSESSED TO DATE.



Edward J. Freel, Secretary of State

2811627   8300

971360676

AUTHENTICATION:   8721838

DATE:   10-24-97

11. Please indicate the fees for which a Massachusetts corporation would be required to pay to register to do business in your State of incorporation:

$100

12. Attached to this certificate shall be a certificate of Legal Existence of such foreign corporation issued by an officer or agency properly authorized in the state or country in which such foreign corporation was organized or other evidence of legal existence acceptable to the Secretary. If such certificate or other evidence of such legal existence is in language other than English, a translation thereof, under oath of the translator, shall also be attached.

The corporation hereby appoints the Secretary of the Commonwealth of Massachusetts and his successor in office to be its attorney in and for Massachusetts, upon whom all lawful process in any judicial or administrative proceeding in Massachusetts may be served as long as any liability incurred in the Commonwealth of Massachusetts while it was doing business in said Commonwealth shall remain outstanding.

IN WITNESS WHEREOF AND UNDER THE PENALTIES OF PERJURY, we hereto sign our names this    23rd    day of    October    , 19 97 .

President, Vice President

Clerk/Assistant Clerk
or
Secretary/Assistant Secretary

# THE COMMONWEALTH OF MASSACHUSETTS

## FOREIGN CORPORATION CERTIFICATE
### (General Laws, Chapter 181, Section 4)

I hereby approve the within Certificate and, the filing fee in the amount of $ *300*      having been paid, said Certificate is deemed to have been filed with me this *27th* day of *October*, 19 *97*

**William Francis Galvin**
Secretary of the Commonwealth

## TO BE FILLED IN BY CORPORATION
### Photo Copy of Certificate to be Sent

To: __CorpAmerica, Inc.__

__Rose L. Redman__

__30 Old Rudnick Lane__

__Dover, DE 19901__

Telephone: __302-736-5510__

FEDERAL IDENTIFICATION
NO. 943285178
Fee: $100.00

# The Commonwealth of Massachusetts

### William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

## AMENDED FOREIGN CORPORATION CERTIFICATE
(General Laws, Chapter 181, Section 4)

We, _Jan Blaustein Scholes_ , (*President)/ *Vice President,

and _Monique **Belkin**_ , *Clerk / *Assistant Clerk or (Secretary/) *Asst. Secretary,

of BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC. ,
(Exact name of corporation)

in compliance with the provisions of General Laws, Chapter 181, Section 4, certify that:

1. The name of the corporation has been changed to:

2. The location of its principal office has been changed to:

3. The location of its local office in the Commonwealth of Massachusetts has been changed to:

4. The activities of the corporation within the Commonwealth of Massachusetts have been changed to:

5. The date of the corporation's fiscal year end has been changed to:

6. The name and street address of the resident agent of the corporation in the Commonwealth of Massachusetts is: Corporation Service Company   84 State Street   Boston, MA 02109

7. The jurisdiction under the laws of which the corporation is organized or governed has been changed to:

8. Other:

SIGNED UNDER THE PENALTIES OF PERJURY, this 22nd day of October , 20 03 ,

_____ , *President / *Vice President

_____ , *Clerk / *Assistant Clerk or *Secretary/*Asst. Secretary.

*Delete the inapplicable words.
Note: If this amendment involves a change of name or jurisdiction, a certificate of such change issued by an officer or agency properly authorized in the state or country in which such foreign corporation is organized must be attached to this amended certificate. If such certificate is in a language other than English, a translation thereof under the oath of the translator must be attached.

180afcc 4/5/00

Examiner

Name
Approved

C  ☐
M  ☐
R.A.  ☑

P.C.

*090 6558*

# THE COMMONWEALTH OF MASSACHUSETTS

## AMENDED FOREIGN CORPORATION CERTIFICATE
(General Laws, Chapter 181, Section 4)

I hereby approve the within Amended Foreign Corporation Certificate and, the filing fee in the amount of $ _____ having been paid, said certificate is deemed to have been filed with me this _____ day of _____ 20___.

**WILLIAM FRANCIS GALVIN**
*Secretary of the Commonwealth*

**TO BE FILLED IN BY CORPORATION**
Photocopy of document to be sent to:

**CSC**
Corporation Service Company
84 State Street, 5th Floor
Boston, MA 02109

Telephone: _____

# EXHIBIT 4

Delaware Certified Records – Babcock & Brown Administrative
Services (Inc./LLC) (File No. 2811627)

# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE

OF DELAWARE, DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND

CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE

CORPORATION UNDER THE NAME OF "BABCOCK & BROWN ADMINISTRATIVE

SERVICES, INC." TO A DELAWARE LIMITED LIABILITY COMPANY, CHANGING

ITS NAME FROM "BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC." TO

"BABCOCK & BROWN ADMINISTRATIVE SERVICES  LLC", FILED IN THIS

OFFICE ON THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O'CLOCK A.M.

Charuni Patibanda-Sanchez, Secretary of State

2811627 8100V
SR# 20251460210
You may verify this certificate online at  html

Authentication: 203387794
Date: 04-08-25

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 09:00 AM 01/03/2000*
*001001228 – 2811627*

# STATE OF DELAWARE

## CERTIFICATE OF CONVERSION

### FROM A CORPORATION TO A LIMITED LIABILITY COMPANY

### PURSUANT TO SECTION 266 OF THE

### DELAWARE GENERAL CORPORATION LAW

(1)    The name of the corporation immediately prior to filing this Certificate is **Babcock & Brown Administrative Services, Inc.**

(2)    The date the Certificate of Incorporation was filed on is October 23, 1997.

(3)    The original name of the corporation as set forth in the Certificate of Incorporation is Babcock & Brown Administrative Services, Inc.

(4)    The name of the limited liability company as set forth in the formation is **Babcock & Brown Administrative Services LLC.**

(5)    The conversion has been approved in accordance with the provisions of Section 266.

By: Jan Blaustein Scholes, Authorized Officer

Dated: December 31, 1999



# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE

STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND

CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "BABCOCK &

BROWN ADMINISTRATIVE SERVICES  LLC", FILED IN THIS OFFICE ON

THE THIRD DAY OF JANUARY, A.D. 2000, AT 9 O`CLOCK A.M.



Charuni Patibanda-Sanchez, Secretary of State

2811627  8100
SR# 20251460210
You may verify this certificate onli

Authentication: 203387795
Date: 04-08-25

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 09:00 AM 01/03/2000*
*001001228 – 2811627*

## CERTIFICATE OF FORMATION

### OF

### BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

This Certificate of Formation of Babcock & Brown Administrative Services LLC, a Delaware limited liability company (the "Company"), dated as of December 31, 1999, is being duly executed and filed by Babcock & Brown Inc., a California corporation, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. §18-101, et seq.) (the "Delaware Act").

FIRST:    The name of the limited liability company formed hereby is **Babcock & Brown Administrative Services LLC.**

SECOND:   The address of the registered office of the Company in the State of Delaware is c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD:    The name and address of the registered agent for service of process on the Company in the State of Delaware is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

IN WITNESS WHEREOF, the undersigned, an authorized person as described in the Delaware Act, has executed this Certificate of Formation as of the date first above written.

Authorized Person:

Babcock & Brown Inc.,
a California corporation

By: Jan Blaustein Scholes
Its: Vice President

# Delaware

Page 1

## The First State



I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE

STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND

CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "BABCOCK &

BROWN ADMINISTRATIVE SERVICES  LLC", FILED IN THIS OFFICE ON

THE TWENTY-THIRD DAY OF OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.

Charuni Patibanda-Sanchez, Secretary of State

2811627  8100
SR# 2025146 0210

You may verify this certificate online a. ...ml

Authentication: 203387797
Date: 04-08-25

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 09:00 AM 10/23/1997*
*971358220 - 2811627*

# CERTIFICATE OF INCORPORATION

## OF

## BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

FIRST. The name of the Corporation is Babcock & Brown Administrative Services, Inc.

SECOND. Its registered office in the State of Delaware is to be located at 30 Old Rudnick Lane, in the City of Dover, County of Kent. The Registered Agent in charge thereof is CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901.

THIRD. The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

FOURTH. The total number of shares of stock which this corporation is authorized to issue is Five Thousand (5,000) shares at One Dollar ($1.00) per share, for a total authorized capital of Five Thousand Dollars ($5,000.00).

FIFTH. The name and mailing address of the incorporator is as follows:

CorpAmerica, Inc.
30 Old Rudnick Lane
Dover, DE 19901

SIXTH. The Board of Directors shall have the power to adopt, amend or repeal the by-laws.

SEVENTH. No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article Seventh shall apply to or have any effect on the liability or alleged liability of any director of the Corporation for or with respect to any acts or missions of such director occurring prior to such amendment.

I, THE UNDERSIGNED, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this 23rd day of October, 1997.

CorpAmerica, Inc., Incorporator

By:  Rose L. Redman, Assistant Secretary



# Delaware

The First State

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE
STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND
CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "BABCOCK &
BROWN ADMINISTRATIVE SERVICES  LLC", FILED IN THIS OFFICE ON
THE TWENTY-FIRST DAY OF NOVEMBER, A.D. 1997, AT 9 O`CLOCK A.M.

*C. P. Sanchez*

Charuni Patibanda-Sanchez, Secretary of State

2811627  8100
SR# 20251460210
You may verify this certificate online .html

Authentication: 203387796
Date: 04-08-25

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 11/21/1997
971400696 - 2811627

# CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
## OF
## BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

Babcock & Brown Administrative Services, Inc., a corporation duly organized and existing under and by virtue of the General Corporation Law of the State of Delaware, DOES HEREBY CERTIFY:

FIRST:   The following amendment was adopted by the directors and sole stockholder in the manner prescribed by the Delaware General Corporation Law:

Article FOURTH of the Certificate of Incorporation is hereby amended to read in its entirety as follows:

"THIRD. The Corporation is formed for the sole purpose of, and the nature of the sole business to be conducted by the Corporation is, to own interest in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of any interest in any entity holding direct or indirect interests in the real property generally described in Exhibit A attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and in connection with all of the above, the Corporation may engage in any lawful act or activity for which corporations may be formed under the laws of the State of Delaware and in any and all activities necessary, advisable, convenient or incidental thereto. Additionally, the Corporation may engage in similar activities with respect to any entity or entities holding direct or indirect interests in real property to be later identified, which property shall be purchased in a transaction involving The Northwestern Mutual Life Insurance Company, as Lender, Hoyts Cinemas Corporation, and/or its affiliates, the Corporation, and any others. The purposes of the Corporation may not be broadened if such would violate or cause a default under any agreement to which the Corporation is a party or by which it is bound."

IN WITNESS WHEREOF, Babcock & Brown Administrative Services, Inc. has caused this Certificate of Amendment of the Certificate of Incorporation to be duly executed by its Secretary this 21st day of November, 1997.

Monique Belkin, Secretary

EXHIBIT A

METES AND BOUNDS DESCRIPTION

Lot 1
Westborough, Massachusetts
W-45.30

A certain parcel of land in the Commonwealth of Massachusetts, County of Worcester, Town of Westborough situated on the northerly side of Boston Worcester Turnpike, Route 9, and shown as Lot 1 on a plan entitled "Plan of Land in Westborough, Worcester County,...", dated April 11, 1997, prepared by Beals and Thomas, Inc. More particularly bounded and described as follows:

Beginning at a point in the east bank of the Assaber River at Boston Worcester Turnpike, thence running:

N 30 58 22 W   1123.34 feet to a point, said course being by land now or formerly of Brown Realty Trust, thence turning and running:

N 86 07 42 E   1022.91 feet to a point, thence turning and running;

N 03 52 18 W   501.72 feet to a point, thence turning and running;

N 86 07 42 E   627.83 feet to a point, thence turning and running;

N 58 30 39 E   523.55 feet to a point, said four courses being by land now or formerly of P.V. Davis Construction Company, Inc., thence turning and running;

S 18 32 25 E   9.51 feet to a Worcester County Highway bound, thence turning and running;

S 17 00 25 E   69.96 feet to a point, thence turning and running;

S 15 35 25 E   79.20 feet to a Worcester County Highway bound, thence turning and running;

S 11 50 25 E   63.36 feet to a point, thence turning and running;

S 09 15 25 E   67.32 feet to a Worcester County Highway bound point, thence turning and running;

S 06 35 25 E   66.00 feet to a point, thence turning and running;

S 06 25 25 E   74.57 feet to a Worcester County Highway bound, thence turning and running;

S 05 48 30 E   73.06 feet to a Worcester County Highway bound, thence turning and running;

S 04 09 29 E   190.38 feet to a point, thence turning and running;

Metes and Bounds Description
Lot 1
Westborough, Massachusetts
W-45.30
Page 2 of 2

| | |
|---|---|
| Southerly | by a curve to the right having a radius of 1000.00 feet and a length of 215.67 feet to a point, said last 10 courses being by the westerly line of Milk Street, thence turning and running; |
| S 52 34 33 W | 376.10 feet to a point, thence turning and running; |
| S 86 07 42 W | 209.07 feet to a point, thence turning and running. |
| N 49 56 56 W | 33.00 feet to a point, thence turning and running; |
| Northwesterly | by a curve to the left having a radius of 335.00 feet and a length of 76.89 feet to a point, thence turning and running; |
| S 86 07 42 W | 213.61 feet to a point, thence turning and running; |
| N 03 47 36 W | 319.22 feet to a point, thence turning and running; |
| S 86 07 42 W | 337.66 feet to a point, thence turning and running; |
| S 03 52 18 E | 112.44 feet to a point, thence turning and running; |
| S 86 07 42 W | 437.86 feet to a point, said last nine courses being by Lot 2, thence turning and running; |
| S 03 52 18 E | 925.00 feet to a point, said course being in part by Lot 2 and in part by land now or formerly of Lillian E. Brown Life Estate, thence turning and running; |
| S 86 07 42 W | 148.31 feet to the point of beginning said course being by the northerly line of Boston Worcester Turnpike. |

Containing 1,277,351 square feet more or less, or 29.324 acres, more or less.

Subject to any and all existing rights and easements of record.

The plan referenced herein is recorded herewith as Plan Book 714 Plan 77.



# Delaware

The First State

Page 1

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE
STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND
CORRECT COPY OF THE CERTIFICATE OF MERGER, WHICH MERGES:

"BABCOCK & BROWN ADMINISTRATIVE SERVICES  LLC", A DELAWARE
LIMITED LIABILITY COMPANY,

WITH AND INTO "BABCOCK & BROWN PARALLEL MEMBER LLC" UNDER
THE NAME OF "BABCOCK & BROWN PARALLEL MEMBER LLC", A LIMITED
LIABILITY COMPANY ORGANIZED AND EXISTING UNDER THE LAWS OF THE
STATE OF DELAWARE, AS RECEIVED AND FILED IN THIS OFFICE ON THE
TWENTY-NINTH DAY OF AUGUST, A.D. 2011, AT 2:33 O`CLOCK P.M.

*Charuni Patibanda-Sanchez, Secretary of State*

2811627  8100M
SR# 2025146021O
You may verify this certificate on

Authentication: 203387793
Date: 04-08-25

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:33 PM 08/29/2011*
*FILED 02:33 PM 08/29/2011*
*SRV 110960806 - 4370415 FILE*

## DELAWARE
## CERTIFICATE OF MERGER
### OF
### BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC
### WITH AND INTO
### BABCOCK & BROWN PARALLEL MEMBER LLC

August 28, 2011

Pursuant to Section 18-209 of the Delaware Limited Liability Company Act (the "DLLCA"), Babcock & Brown Parallel Member LLC, a Delaware limited liability company (the "Company"), in connection with the merger (the "Merger") of Babcock & Brown Administrative Services LLC, a Delaware limited liability company ("Target"), with and into the Company, hereby certifies as follows:

FIRST:  The respective names and states of formation or incorporation of the constituent companies to the Merger are as follows:

| Name | State of Formation or Incorporation |
|---|---|
| Babcock & Brown Parallel Member LLC | Delaware |
| Babcock & Brown Administrative Services LLC | Delaware |

SECOND:  An Agreement and Plan of Merger, dated as of August 29, 2011, between the Company and Target (the "Merger Agreement"), setting forth the terms and conditions of the Merger, has been approved, adopted, certified, executed and acknowledged by each of the Company and Target.

THIRD:  The Company shall be the surviving limited liability company (the "Surviving Company") of the Merger.  The name of the Surviving Company is "Babcock & Brown Parallel Member LLC".

FOURTH:  The Merger shall become effective upon the filing of this Certificate of Merger with the Secretary of State of the State of Delaware.

FIFTH:  An executed copy of the Merger Agreement is on file at the office of the Surviving Company located at 50 California Street, Suite 3610, San Francisco, California 94111. A copy of the Merger Agreement will be furnished by the Surviving Company, on request and without cost, to any member of the Surviving Company or any member of Target.

[Signature page follows.]

The undersigned is signing this Certificate of Merger as of the date first written above.

BABCOCK & BROWN PARALLEL MEMBER
LLC

By: _____

Name:  Chaye Besherse
Title:    Secretary

*Signature page to Delaware Certificate of Merger*

# Delaware

## The First State

I, CHARUNI PATIBANDA-SANCHEZ, SECRETARY OF STATE OF THE STATE

OF DELAWARE, DO HEREBY CERTIFY THAT "BABCOCK & BROWN ADMINISTRATIVE

SERVICES  LLC" HAS FILED THE FOLLOWING DOCUMENTS:

CERTIFICATE OF INCORPORATION, FILED THE TWENTY-THIRD DAY OF

OCTOBER, A.D. 1997, AT 9 O`CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-FIRST DAY OF

NOVEMBER, A.D. 1997, AT 9 O`CLOCK A.M.

CERTIFICATE OF CONVERSION, CHANGING ITS NAME FROM "BABCOCK &

BROWN ADMINISTRATIVE SERVICES, INC." TO "BABCOCK & BROWN

ADMINISTRATIVE SERVICES  LLC", FILED THE THIRD DAY OF JANUARY, A.D.

2000, AT 9 O`CLOCK A.M.

CERTIFICATE OF FORMATION, FILED THE THIRD DAY OF JANUARY, A.D.

2000, AT 9 O`CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE TWENTY-NINTH DAY OF AUGUST,

A.D. 2011, AT 2:33 O`CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID

CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE

AFORESAID LIMITED LIABILITY COMPANY, "BABCOCK & BROWN

ADMINISTRATIVE SERVICES  LLC".

Charuni Patibanda-Sanchez, Secretary of State

Authentication: 203387818

2811627  8340

SR# 2025146210

You may verify this certificate online at ... .shtml

Date: 04-08-25

# EXHIBIT 5

LLC Agreement – Babcock & Brown Administrative Services LLC
(Dec. 31, 1999)

# BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

## LIMITED LIABILITY COMPANY AGREEMENT

This LIMITED LIABILITY COMPANY AGREEMENT, dated as of December 31, 1999 is entered into by and among **Babcock & Brown Inc.**, a California corporation ("BBI"), and any and all Persons who hereafter become "Members." Each Member, in consideration of the agreements of the other Members contained in this Agreement, agrees as follows:

## ARTICLE I
## DEFINITIONS

The following terms shall have the following meanings, unless otherwise clearly indicated to the contrary.

*"Additional Member"* means a Person admitted to the Company as a Member pursuant to Section 11.2.

*"Affiliate"* with respect to any Person means any Person that directly or indirectly Controls, is Controlled by, or is under common Control with the Person in question.

*"Agreement"* means this Limited Liability Company Agreement, as it may be amended, supplemented or restated from time to time.

*"Assignee"* has the meaning specified in Section 10.3.

*"Capital Account"* means an account to be maintained for each Member, the balance of which shall equal the amount of Capital Contributions made by such Member plus allocations to such Member of Net Profit pursuant to Article 4 and other additions made in accordance with generally accepted accounting principles, decreased by the amount of cash and the fair market value of property distributed to such Member by the Company, allocations to such Member of Net Loss pursuant to Article 4 and other deletions made in accordance with generally accepted accounting principles; provided, however, that in the event of a redemption or other purchase by the Company of less than all of the Percentage Interest of any Member, the Capital Account of such Member shall be reduced in proportion to the portion of its Percentage Interest redeemed or purchased.

*"Capital Contributions"* shall mean, with respect to any Member, the amount of money and the net fair market value of property contributed by such Member to the Company pursuant to this Agreement.

**BB001014**

*"Certificate of Formation"* means the Certificate of Formation of the Company, as filed on December 31, 1999 with the Secretary of State of Delaware, as such Certificate of Formation may be amended, supplemented or restated from time to time.

*"Code"* means the United States Internal Revenue Code of 1986, as amended.

*"Company"* means the limited liability company organized pursuant to the Certificate of Formation.

*"Control"* means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

*"Delaware Act"* means the Delaware Limited Liability Company Act, 6 Del. Code Ann. tit. 6, §§18-101, et seq., as it may be amended from time to time, and any successor thereto.

*"Distribution"* means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise.

*"Event of Withdrawal"* means, with respect to any Person, the occurrence of any event described in subsection (4) of Section 18-801 of the Delaware Act.

*"Fair Market Value"* means, with respect to any asset as of any date, the price a willing buyer would pay a willing seller in an arm's-length transaction, determined using any reasonable valuation method.

*"Fiscal Period"* means any interim accounting period within a Taxable Year which is permitted or required by Code Section 706.

*"Fiscal Year"* means the Company's annual accounting period established pursuant to Section 7.2.

*"Indemnified Person"* has the meaning specified in Section 13.1.1.

*"Limited Liability Company Interest"* has the meaning specified for such term in the Delaware Act.

*"Liquidator"* has the meaning specified in Section 14.3.

*"Member"* means each of the members named on Schedule I attached hereto and any Person admitted to the Company as a Substituted Member or Additional Member; but only so long as such Person is shown as a Member on the Company's books and records.

BB001015

*"Membership Interest"* means a Member's rights in the Company, collectively, including the Member's Percentage Interest, Limited Liability Company Interest, any right to vote or participate in management, and any right under the Delaware Law to information concerning the business and affairs of the Company.

*"Net Profit"* and *"Net Loss"* shall mean, for each Fiscal Year or other period, an amount equal to the Company's income or loss for such year or period (including any gain or loss realized on the sale or other disposition of assets), determined in accordance with generally accepted accounting principles.

*"Percentage Interest,"* with respect to any Member, means the percentage interest of that Member set forth in the column "Member's Percentage Interest" in Schedule I hereto, as such percentage interest may be adjusted from time to time pursuant to the terms of this Agreement.

*"Person"* means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trusts companies, land trusts, business trusts and other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

*"Securities Act"* means the United States Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

*"Substituted Member"* means a Person that is admitted as a Member of the Company pursuant to Section 11.1.

*"Taxable Year"* means the Company's accounting period for federal income tax purposes determined pursuant to Section 8. 1.

*"Tax Matters Member"* has the same meaning as "Tax Matters Partner" set forth in Code Section 6231.

*"Transfer"* means a transaction by which a Member assigns all or any portion of its Membership Interest to another Person, and includes a sale, conveyance, assignment, transfer, gift, pledge, encumbrance, hypothecation, mortgage, exchange or any other disposition, whether voluntary or involuntary.

*"Treasury Regulations"* means the income tax regulations promulgated under the Code and effective as of the date hereof, including any future amendments to such regulations and any corresponding provisions of succeeding regulations which (a) are mandatory or (b) call for an election by

–4–

**BB001016**

the Company as to the application of the amendment or succeeding regulation to the Company if the Members so elect; provided that any such amendments and succeeding regulations do not adversely affect the economic interests of the Members hereunder.

## ARTICLE II
## ORGANIZATIONAL MATTERS

**2.1 Organization of Company.** The Company was organized as a limited liability company pursuant to the provisions of the Delaware Act on December 31, 1999. Except as expressly provided herein to the contrary, the rights and obligations of the Members, and the administration and termination of the Company, shall be governed by the Delaware Act.

**2.2 Name.** The name of the Company shall be **Babcock & Brown Administrative Services LLC.** The Members may change the name of the Company at any time and from time to time. Notification of any such change shall be promptly given to all Members. The Company's business may be conducted under such name or names as the Members deem advisable.

**2.3 Purpose.** The Corporation is formed for the sole purpose of, and the nature of the sole business to be conducted by the Corporation is, to own interest in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of any interest in any entity holding direct or indirect interests in the real property generally described in Exhibit A attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and in connection with all of the above, the Corporation may engage in any lawful act or activity for which corporations may be formed under the laws of the State of Delaware and in any and all activities necessary, advisable, convenient or incidental thereto. Additionally, the Corporation may engage in similar activities with respect to any entity or entities holding direct or indirect interests in real property to be later identified, which property shall be purchased in a transaction involving The Northwestern Mutual Life Insurance Company, as Lender, Hoyts Cinemas Corporation, and/or its affiliates, the Corporation, and any others. The purposes of the Corporation may not be broadened if such would violate or cause a default under any agreement to which the Corporation is a party or by which it is bound.

**2.4 Principal Office; Registered Office.** The principal office of the Company shall be at 2 Harrison Street, San Francisco, CA 94105, or at any other place designated by the Members from time to time. The records of the Company shall be maintained at the principal executive office of the Company or at such other location determined by the Members. The address of the registered office of the Company in the State of Delaware shall be c/o CorpAmerica, Inc., 30 Old Rudnick Lane, Dover, Delaware 19901 and the registered agent for service of process on the Company in the State of Delaware at such registered office shall be CorpAmerica, Inc. The

–5–

Company may maintain offices at such other place or places as the Members may determine.

**2.5   Term.** The Company shall continue in existence until 11:59 p.m. Delaware time, on March 31, 2050 or until the earlier termination of the Company in accordance with the provisions of Article XIV.

## ARTICLE III
## CAPITAL CONTRIBUTIONS

**3.1   Members.** Each Member named on Schedule I attached hereto has made the Capital Contribution set forth opposite that Member's name on Schedule I in exchange for that Member's Percentage Interest listed on Schedule I. No Member shall be required to make any additional Capital Contributions to the Company (other than in connection with a voluntary purchase of additional Membership Interests of the Company).

**3.2   Capital Accounts.** The Company shall maintain a separate Capital Account for each Member.

**3.3   Interest.** The Company shall not pay interest on Capital Contributions or on balances in Capital Accounts.

**3.4   No Withdrawal.** No Member shall be entitled to withdraw any part of his Capital Contribution or Capital Account or to receive any Distribution from the Company, except as expressly provided herein.

**3.5   Loans from Members.** Loans by Members to the Company shall not be considered Capital Contributions or result in any increase in the amount of the Capital Account of that Member. The amount of any such loan shall be a debt of the Company to such Member, payable or collectible in accordance with the terms and conditions upon which such loan is made; _provided_ that the terms of any such loan shall not be less favorable to the Company than would be available to the Company from unrelated lenders.

**3.6   Issuance of Memberships.** If Company capital and revenues are insufficient to meet the Company's cash requirements and the Company is unable to obtain loans on terms the Members deem acceptable, the Company may issue additional Membership Interests in exchange for additional contributions to the capital of the Company, on such terms as are determined by the Members, which may include priority over existing Membership Interests as to Limited Liability Company Interests, voting rights and/or participation in management. Membership Interests shall be offered first to all existing Members in proportion to their Percentage Interests and, in the event that any Member fails to purchase any or all of his, her or its respective share, the Company may offer the remaining unsold Membership Interests to other Persons, including other Members, and any Person

**BB001018**

who purchases any such Membership Interest shall be admitted as a Member. Notwithstanding any provision in this Agreement to the contrary, this Agreement shall be amended to reflect the sale of the additional Membership Interests, and the addition of additional Members and any other changes in allocations of Percentage Interests, voting rights and participation in management.

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

### 4.1   Distributions of Cash.

**4.1.1 Tax Distributions.** The Company shall distribute to the Members prior to June 15 of each Fiscal Year an amount equal to the lesser of (a) the amount of cash held by the Company that the Company can then distribute to its Members without violating any restrictions imposed by law or by any contractual covenants of the Company, or (b) the amount by which the sum of the Members' Cumulative Estimated Tax Liabilities exceeds the aggregate amount of Distributions previously made to the Members pursuant to this Section 6.1. For purposes of this paragraph, a Member's "Cumulative Estimated Tax Liability" means the product of (i) the aggregate amount of taxable income and gain (net of or offset by items of deduction, loss, and credit) of the Company that has been recognized for income tax purposes and allocated to such Member for all Fiscal Years of the Company through the end of the preceding Fiscal Year times (ii) the highest marginal combined federal and state income tax rate applicable to any of the Members (determined after giving effect to the deduction, if allowable, of state income taxes for federal income tax purposes), as reasonably determined by the Tax Matters Member. All cash required to be distributed pursuant to this Section 4.1.1 shall be allocated among the Members in proportion to the respective amounts by which each Member's Cumulative Estimated Tax Liability exceeds the aggregate amount of distributions previously made to such Member pursuant to this Section 4.1.1.

**4.1.2   Current Distributions.** All cash of the Company derived from operations and not required to be distributed pursuant to Section 4.1.1 may be distributed at such times and in such amounts as the Members shall determine. All Distributions of cash pursuant to this Section 4.1.2 shall be allocated to the Members in accordance with their respective Percentage Interests.

**4.1.3  Liquidating Distributions.** After the payment of the debts and liabilities of the Company and the establishment of reserves, as provided in Article 14, any property or assets of the Company, including proceeds from the liquidation thereof, remaining upon the dissolution and liquidation of the Company shall be distributed among the Members in proportion to such Members' Capital Accounts. Such Distributions shall be made after allocating all items of Net Profit or Net Loss to the Members as provided in this Agreement.

–7–

**BB001019**

**4.2    Allocations of Net Profit and Net Loss.**

**4.2.1    Allocation of Net Profit.**  Net Profit for each Fiscal Year (or portion thereof) shall be allocated first to Members who have been previously allocated Net Loss in proportion to such allocations of Net Loss, and thereafter to Members in accordance with their Percentage Interests.

**4.2.2    Allocation of Net Loss.**  Except as provided in Section 4.2.3, Net Loss for each Fiscal Year (or portion thereof) shall be allocated to Members in accordance with their Percentage Interests.

**4.2.3    Loss Limitation.**  Notwithstanding Section 4.2.2, Net Loss shall not be allocated to any Member to the extent such allocation would case such Member to have a deficit balance in its Capital Account that exceeds the amount the Member is obligated to restore to the Company pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), less the amount of any item described in paragraph (d)(4), (d)(5) or (d)(6) of Treasury Regulations Sections 1.704-1(b)(2)(ii), and any Net Loss that cannot be allocated to a Member by virtue of this Section 4.2.3 shall be allocated to other Members in accordance with Section 4.2.2.

**4.3    Tax Allocations.**  Items of income, deduction, gain, loss, or credit that are recognized for income tax purposes shall be allocated among the Members in such manner as to reflect equitably the amounts credited to or debited against each member's Capital Account (or which will be so credited and debited), whether in such year, in prior years, or in subsequent years.  The Company shall establish and maintain records that indicate the extent to which the Capital Account of each Member, as of the last day of each Fiscal Year, includes amounts that have and have not been reflected in the taxable income of such Member.  Taxable income and gain in each Fiscal Year shall be allocated among the Members whose Capital Accounts have been allocated the related credits, and items of deduction, loss, and credit in each fiscal Year shall be allocated among the Members whose Capital Accounts have been allocated the related debits.

**4.3.1    Allocation Rules.**  In performing the allocations under Section 4.3, the following rules shall apply unless manifestly unreasonable:

(a)    Items of income and gain of the Company shall be allocated to the Members in a manner that complies with the gain chargeback requirements of Treasury Regulations Section 1.704-2(f) and 1.704-2(i)(4).

(b)    If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)

**BB001020**

(d)(6), items of Company gross income and gain shall be specially allocated to such Member for tax purposes in an amount and manner sufficient to eliminate as quickly as possible any deficit balance created by such adjustments, allocations, or distributions in the Member's capital account maintained for tax purposes. Any special allocation under this Section 4.3.1(b) shall be taken into account in computing subsequent allocations of income, deduction, gain, loss, and credit so that the net amount of allocations of income, deduction, gain, loss, and credit shall, to the extent possible, be equal to the net amount that would have been allocated if the unexpected adjustment, allocation, or distribution had not occurred.

(c)     The Company shall take into account the allocations in Sections 4.3.1(a) and 4.3.1(b) (the "Regulatory Allocations") in computing subsequent allocations pursuant to Section 4.3 so that the net amount of any items so allocated and all other items allocated to each Member pursuant to this Section 4.3.1(c) shall, to the extent possible, be equal to the amount that would have been allocated to each Member had the Regulatory Allocations not been in this Agreement.

**4.3.2. Daily Determination.** For purposes of determining the tax items allocable to any period, such items shall be determined on a daily basis, using any permissible method under Code Section 706 and the Regulations thereunder.

**4.3.3. Contributed Property.** In accordance with Code Section 704(b) and Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company or revealed by the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its value as reflected on the books of the Company. Any elections or other decisions relating to such allocations shall be made in any mariner that reasonably reflects the intent of this Agreement.

**ARTICLE V**
**MANAGEMENT**

**5.1     In General.**

**5.1.1 Management by Members.** The Members may exercise all powers of the Company and do all lawful acts and things as they may determine to be necessary or appropriate in the ordinary course of the trade or business of the Company. Unless the Act or this Agreement requires a greater vote or consent, all matters requiring the vote, consent, approval, authorization or determination by the

–9–

**BB001021**

Members shall require the vote or consent of Members holding a majority of Percentage Interests outstanding. The members shall have the power and authority to appoint officers and to delegate to such officers such authority and duties as the Members may determine.

**5.1.2 Officers.** The officers of the Company shall include a chairman, president, secretary, and chief financial officer and may include one or more vice presidents, assistant secretaries and assistant financial officers. The officers shall serve at the pleasure of the Members. Any individual may hold any number of offices. If any Member is not an individual, such Member's directors, officers, partners, members and employees may serve as officers of Company. The officers shall exercise such powers and perform such duties as specified in this Agreement and as shall be determined from time to time by the Members. Subject to the rights, if any, of an officer under a contract of employment, any officer may be removed, either with or without cause, by the Members at any time. Any officer may resign at any time by giving written notice to the Members, which resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. A vacancy in any office because of death, resignation, removal disqualification or any other cause shall be ruled by the Members. The salaries of officers and agents of the company shall be fixed by the Members. The initial officers of the Company shall be as follows:

| | |
|---|---|
| **President:** | **Jan Blaustein Scholes** |
| **Chief Financial Officer:** | **James D. Jaworski** |
| **Secretary:** | **Monique Belkin** |
| **Vice Presidents:** | **Jan Blaustein Scholes**<br>**David G. Crane**<br>**Jay David Gayner**<br>**Robert S. Tomczak** |

**5.1.3 Execution of Documents.** With respect to all of its obligations, powers and responsibilities under this Agreement, the officers of the Company, and each of them, is authorized to execute and deliver, for and on behalf of the Company, such promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, contracts, agreements, assignments, documents, deeds, leases, loan agreements, mortgages, security agreements, guaranties, certificates, registrations, applications, notices and other documents, instruments and agreements ("Agreements") on such terms and conditions as the Members deem proper. Notwithstanding the foregoing, any officer, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the company's accounts. All checks, drafts, and other instruments obligating the Company to pay money in an

–10–

BB001022

amount equal to or less than $10,000 may be signed by any one officer acting alone. All checks, drafts, and other instruments obligating the Company to pay money in an amount greater than $10,000 shall be signed on behalf of the Company by any two officers acting together.

**5.2    Company Qualifications and Filings.**  The officers shall cause to be filed such Agreements as may be necessary or appropriate for the continuation, qualification and operation of a limited liability company in the State of Delaware and any other jurisdiction in which the Company may elect to do business, including California.  Subject to applicable law, any and all filings in and reports to any state, and all amendments thereto may omit the names and addresses of the Members, information relating to the Members' Capital Contributions and shares of Net Profits and Net Losses and information relating to compensation of the Members, or may state such information in the aggregate rather than with respect to each individual Member.  The Company shall not be required to deliver or mail a copy of the Certificate of Formation or any amendment thereto to any Member.

**5.3    Compensation and Reimbursement of Members.**

**5.3.1  Compensation.**  Except as provided in this Section 5.3 or elsewhere in this Agreement, no Member shall be compensated for its services to the Company.

**5.3.2  Reimbursement.**  Each Member shall be reimbursed on a monthly basis for all reasonable actual out-of-pocket expenses, disbursements and advances it pays or incurs in connection with the formation and business of the Company, including all expenses, disbursements and advances for legal, accounting, printing and banking matters, consultants and other third parties, reasonable travel expenses, and filing fees.

**5.4    Outside and Competing Activities.**  Subject to the application of general common law principles of Delaware corporate law, (a) each Member, their respective Affiliates and their respective stockholders, directors, partners, managers, members, officers, controlling persons, partners and employees may engage or invest in, independently or with others, any business activity of any type or description, including those that might be the same as or similar to, or in direct or indirect competition with, the Company's business.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom; (b) no Member shall be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company; and (c) each Member shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Members and their Affiliates may own and/or manage other businesses, including businesses that may compete with the Company's business and may compete for the Member's time; each Member hereby waives any and all rights

**BB001023**

and claims which it may otherwise have against any Member and its officers, directors, shareholders, partners, members, managers, agents, employees, and Affiliates as a result of any such ownership or management. The Members shall devote to the management of the Company only such time as may reasonably be required to cause the affairs of the Company to be conducted in an efficient and businesslike manner.

### 5.5   Conflicts of Interest.

**5.5.1   In General.**   Notwithstanding that a conflict of interest may exist, any Member or any Affiliates of any Member may engage in any transaction (including the purchase, sale, lease, or exchange of any property or the rendering of any service, or the establishment of any salary, other compensation, or other terms of employment) with the Company so long as (a) such transaction is not expressly prohibited by this Agreement, and (b) the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from Persons capable of similarly performing them and in similar transactions between parties operating at arm's length.

**5.5.2   Determination of Reasonableness.**   Any such transaction shall be conclusively determined to be fair and reasonable to the Company and at least as favorable to the Company as similar transactions between parties operating at arm's length if the Members holding a majority of the Percentage Interests (excluding the Percentage Interest of any Member having an interest (other than solely as a Member) in such transaction) affirmatively vote or consent in writing to approve the transaction. Unless otherwise expressly provided herein, whenever this Agreement provides that any Person shall act in a manner which is, or provide terms which are, fair and reasonable to the Company or any Member, any determination of fairness and reasonableness shall consider the relative interests of each party to such agreement, transaction or situation and the benefits and burdens relating to such interests, any customary or accepted industry practices, and any applicable United States generally accepted accounting practices or principles.

**5.5.3   Acts in Good Faith.**   So long as a Member acts in good faith, the resolution, action or terms so made, taken or provided by the Member shall not constitute a breach of this Agreement. Whenever in this Agreement any Person is permitted or required to take any action or to make a decision in its "good faith" or under another express standard, that Person shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein. Whenever in this Agreement any Person is permitted or required to take any action or to make a decision in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, that Person shall be entitled to consider only such interests and factors as it wishes, provided that, except as provided in Section 11.1, that Person shall act in good faith.

**BB001024**

**5.6    Purchase of Memberships.** The Members may cause the Company to purchase or otherwise acquire Membership Interests or may purchase or otherwise acquire Membership Interests on behalf of the Company. As long as such Membership Interests are owned by or on behalf of the Company, such Membership Interests shall not be considered outstanding for any purpose.

**5.7    Reliance on Advisors.** The Members may consult with counsel, accountants or other independent consultants in respect of Company affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel, accountants or other independent consultants, provided that they shall have been selected with reasonable care.

**5.8    Member Authority.** Unless expressly and duly authorized in writing to do so by the Members, no Member shall have any power or authority to bind or act on behalf of the Company in any way to pledge its credit or to render it liable for any purpose.

## ARTICLE VI
## NO RIGHT OF PARTITION

No Member shall have the right to seek or obtain partition by court decree or operation of law of any Company property, or the right to own or use particular or individual assets of the Company.

## ARTICLE VII
## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**7.1    Records and Accounting.** The officers shall keep, or cause to be kept, appropriate books and records with respect to the Company's business, including all books and records necessary to provide any information, lists and copies of documents required to be provided pursuant to Section 7.3 or pursuant to applicable laws.

**7.2    Fiscal Year.** The Fiscal Year of the Company shall be the 12-month period ending on December 31 of each year or such other annual accounting period as may be established by the Members.

**7.3    Reports.**

**7.3.1    Annual Reports.** Within 120 days after the end of each Fiscal Year, the Company shall deliver to each Member an annual report containing a Company balance sheet as of the end of such Fiscal Year, and Company statements of income, changes in cash flows and changes in Members' equity for such Fiscal

-13-

**BB001025**

Year, each of which shall be prepared according to United States generally accepted accounting principles.

**7.3.2 Tax Reports.** The Company shall use reasonable efforts to deliver or cause to be delivered, as early as possible each year, to each Person who was a Member at any time during the previous Taxable Year all information necessary for the preparation of such Person's United States federal income tax returns and any state, local and foreign income tax returns which such Person is required to file as a result of the Company being engaged in a trade or business within such state, local or foreign jurisdiction, including a statement showing such Person's share of income, gains, losses, deductions and credits for such year for United States federal income tax purposes (and, if applicable, state, local or foreign income tax purposes) and the amount of any Distributions made to or for the account of such Person pursuant to this Agreement. Upon the written request of any such Person made not later than 30 days after the end of each Fiscal Year and at the sole expense of such Person, the Company shall use reasonable efforts to deliver or cause to be delivered any additional information necessary for the preparation of any state, local and foreign income tax returns which must be filed by such Person.

## ARTICLE VIII
## TAX MATTERS

**8.1 Tax Elections.** The Taxable Year shall be the Fiscal Year set forth in Section 7.2, unless the Members shall determine otherwise in compliance with applicable laws. The Members shall determine whether to make or revoke any available election pursuant to the Code. Each Member will upon request supply the information necessary to give proper effect to such election.

**8.2 Tax Controversies.** BBI is designated the Tax Matters Member, and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with BBI and to do or refrain from doing any or all things reasonably requested by BBI with respect to the conduct of such proceedings. The Tax Matters Member shall have sole discretion to determine whether the Company (either in its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) shall be paid by such Member, and if paid by the Company, shall be recoverable from such Member.

–14–

**BB001026**

## ARTICLE IX
## VOTING; AMENDMENTS

**9.1  Action Without Meeting.** Any action that may be taken at a Members' meeting may be taken without a meeting if written consents to the action are solicited, and if within 90 days after delivery of the request for written consents, such consents are received from Members owning not less than the minimum Percentage Interests that would be necessary to authorize or take such action at a meeting.  A written consent to the taking of any action shall have no force and effect if it is received more than 90 days after the date of the delivery of the written request soliciting consents to such action.  The Company shall promptly provide notice of any action taken pursuant to this Section 9.1 to all the Members.

**9.2  Amendments.** This Agreement may be amended upon the affirmative vote of the Members holding not less than a majority of the Percentage Interests; provided, that without the consent of each Member directly affected thereby, no amendment shall modify the limited liability of a Member, increase the liabilities or responsibilities of (including requiring additional future capital contributions of Members or otherwise obligating any Member as to any matter not otherwise covered by this Agreement), or diminish the rights or protections of, a Member under this Agreement, or modify the method provided in this Agreement for determining allocations and Distributions and the definitions relating thereto.  This Section 9.2 may be amended only with the approval by written consent or affirmative vote of all Members.  As promptly as practicable following the execution and delivery of any amendment to this Agreement, the Company shall provide all of the Members with written notice and a copy of such amendment.

## ARTICLE X
## TRANSFER AND CONVERSION OF
## LIMITED LIABILITY COMPANY INTERESTS

**10.1  Transfer in General.** A Membership Interest, or any part thereof, may not be Transferred to any Person other than a Member.  Any Transfer or purported Transfer which is not permitted under this Section 10.1 shall be void and shall not bind or be recognized by the Company and the Company shall recognize the purported Transferor as continuing to be the owner of the Membership Interest purported to be Transferred.

**10.2  Opinion of Counsel.** Except as may otherwise be agreed by the Members, no Transfer shall be made if, in the opinion of counsel for the Company, (a) such Transfer would violate the Act or any applicable state securities or "blue sky" laws, or any other applicable provision of law in any respect, (b) such Transfer would require registration of the Membership Interest (or any part thereof) Transferred under the Act, (c) such Transfer would result in the Company having to register as an investment company under the Investment Company Act of 1940, as

–15–

**BB001027**

amended, or in the assets of the Company being considered plan assets within the meaning of the Employee Retirement Income Security Act of 1974, as amended, (d) such Transfer would cause the Company to be treated as an association taxable as a corporation for purposes of the federal income tax laws, (e) such Transfer would cause a default under the terms of any material agreement to which the Company is a party or (f) such Transfer would cause a termination of the Company under Section 708 of the Code.

**10.3  Assignee's Rights.** A Transfer permitted under this Agreement shall be effective as of the date determined by the Members. Net Profits, Net Losses and other Company items shall be allocated between the Transferor and the assignee (the "Assignee") according to Code Section 706. Distributions made before the effective date of such Transfer shall be paid to the Transferor, and Distributions made after such date shall be paid to the Assignee. Unless and until an Assignee becomes a Member pursuant to Article XI, the Assignee shall not be entitled to any of the rights granted to a Member hereunder or under applicable law, other than the rights (a) to receive allocations of Net Profits and Net Losses and Distributions as if such Assignee were a Member, (b) to Transfer the Assignee's Limited Liability Company Interest (subject to the conditions of this Article X), and (c) to receive reports and information as specified in Section 7.3. Further, such Assignee shall be bound by any limitations and obligations contained herein with respect to Members.

## ARTICLE XI
## ADMISSION OF MEMBERS

**11.1  Substituted Members.** An Assignee may request admission as a Substituted Member on the form prescribed by the Members. No Assignee shall become a Substituted Member without the prior written consent of Members, other than the assigning Member, holding at least a majority of the Percentage Interests, which consents may be withheld in the sole discretion of any Member for any reason or for no reason.

**11.2  Death, Incompetency or Bankruptcy of a Member.** If any Member who is a natural person dies or if a court of competent jurisdiction adjudges such a Member to be competent, that Member's executor, administrator, guardian, conservator or other legal representative will have the rights conferred under Section 18-705 of the Act. Upon the bankruptcy of any Person who is a Member, that Person will cease to be a Member as provided in Section 18-304 of the Act.

**11.3  Additional Members.** A Person may be admitted to the Company as an Additional Member only upon furnishing to the Company (a) a letter of acceptance, in form satisfactory to the Members, of all the terms and conditions of this Agreement, and (b) such other documents or instruments as may be reasonably necessary or appropriate to effect his admission as a Member. Such admission shall become effective on the date on which Members holding at least a majority of the

BB001028

Percentage Interests consent (in their sole discretion) thereto and the conditions set forth above have been satisfied.

**11.4   Representations of New Members.**   Each Person admitted to the Company as a Substituted or Additional Member shall become a party to, and agree, to be bound by, this Agreement.

# ARTICLE XII
# WITHDRAWAL OF MEMBERS

No Member shall have any right to withdraw from the Company without the prior written consent of the Members.

# ARTICLE XIII
# INDEMNIFICATION; LIABILITY

**13.1   Indemnification.**

**13.1.1 In General.**   The Company shall, to the full extent permitted by law, indemnify, defend and hold harmless each Member, each officer of the Company and each of their respective Affiliates, officers, directors, controlling persons, partners, members, employees and shareholders, together with their respective successors and assigns, heirs, executors and administrators (each, an "Indemnified Person") from and against any and all losses, claims, costs, damages, liabilities, expenses (including legal fees and expenses), judgments, fines, settlements and other amounts arising from or incurred or imposed upon such Indemnified Person in connection with any and all claims, demands, actions, suits or other proceedings, whether civil, criminal, administrative or investigative, which relate to the status or activities as a Member, or officer or to the Company's property, business or affairs ("Claims").   An Indemnified person's expenses paid or incurred in investigating, preparing or defending itself against any Claim shall be reimbursed as paid or incurred.   This Section 13.1 shall not apply with respect to any Indemnified Person for that portion of any Claim determined by the final decision (from which an appeal cannot be taken or is not timely taken) of a court of competent jurisdiction to have been caused by his gross negligence, will or wanton misconduct or knowing violation of law.   Any payments made to or on behalf of a Person who is later determined not to be entitled to such payments shall be refunded to the Company promptly following such determination.

**13.1.2 Non-Exclusive.**   The   right   to   indemnification   and   the advancement of expenses conferred in this Section 13.1 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, vote of the Members or otherwise.

BB001029

**13.1.3 Insurance.** The Company may maintain insurance, at its expense, to protect any Person against any expense, liability or loss, to the extent that the Company would have the power to indemnify such Person against such expense, liability or loss under the Delaware Act.

**13.2   Limitation on Liability.** Each Member may exercise any of the powers granted to it by this Agreement either directly or by or through its agents, and such Member shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Member (so long as such agent was selected in good faith and with due care). Any duties (including fiduciary duties) of, and liabilities relating thereto imposed by law upon, any Member shall, to the extent permitted by law, be modified by the terms of this Agreement. No Person who is a Member and/or officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Member and/or officer of the Company. The Members shall have no liability under this Agreement except as otherwise provided in the following sentence or in the Delaware Act. A Member's liability for Company liabilities and losses shall be limited to the Company's assets; provided that a Member shall be required to return to the Company any Distribution made to it in error.

## ARTICLE XIV
## DISSOLUTION AND LIQUIDATION

**14.1   Dissolution.** The Company shall not be dissolved by the admission of Additional Members or Substituted Members. The Company shall dissolve, and its affairs shall be wound up, upon: (a) the agreement of all of the Members to dissolve the Company, (b) the expiration of the term set forth in Section 2.5; or (c) any other event which would cause the dissolution of the Company under the Delaware Act. Each Member hereby waives any right, to the extent permitted by law, to any action for dissolution other than pursuant to rights set forth in this Agreement.

**14.2   Selection of Liquidator.** Upon dissolution of the Company, the Members shall select a Member to be the Liquidator. The Liquidator shall agree not to resign at any time without 30 days' prior written notice. The Liquidator may be removed at any time, with or without cause, by notice of removal and appointment of a successor Liquidator approved by Members which own at least a majority of the Percentage Interests. Within 30 days following the occurrence of any Event of Withdrawal with respect to the Liquidator, a successor Liquidator may be elected by Members which own at least a majority of the Percentage Interests. The successor Liquidator shall succeed to all rights, powers and duties of the former Liquidator. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor

–18–

BB001030

or substitute Liquidator appointed in the manner herein provided.   Except as expressly provided in this Article XIV, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the Members under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Company as provided for herein.

**14.3   Liquidation.**   The Liquidator shall liquidate the assets of the Company, and apply and distribute the proceeds of such liquidation, in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

(a)   first, to the payment of the Company's debts and obligations to its creditors, including sales commissions and other expenses incident to any sale of the assets of the Company;

(b)   second, to the establishment of and additions to such reserves as the Liquidator may deem necessary or appropriate; and

(c)   third, to the Members, in accordance with their relative Capital Accounts.

The reserves established pursuant to subparagraph (b) shall be paid over by the Liquidator to a bank or other financial institution, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the Liquidator deems advisable, such reserves shall be distributed to the Members in the priorities set forth in this Section 14.3.   The allocations and distributions provided for in this Agreement are intended to result in the Capital Account of each Member immediately prior to the distribution of the Company's assets pursuant to this Section 14.3 being equal to the amount distributable to such Member pursuant to this Section 14.3.   The Company shall make appropriate adjustments in the allocation of Net Profits and Net Losses as necessary to cause the amount of each Member's Capital Account immediately prior to the distribution of the Company's assets pursuant to this Section 14.3 to equal the amount distributable to such Member pursuant to this Section 14.3.

**14.4   Distribution in Kind.**   The provisions of Section 14.3 which require the liquidation of the assets of the Company notwithstanding, but subject to the order of priorities set forth therein, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss to the Members, the Liquidator may, in its sole discretion, defer for a reasonable time the liquidation of any assets except those necessary to satisfy Company liabilities (other than loans to the Company by

**BB001031**

Members) and reserves, and may, in its absolute discretion, distribute to the Members, in Lieu of cash, as tenants in common and in accordance with the provisions of Section 14.3, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. The Liquidator shall determine the Fair Market Value of any property distributed in accordance with the valuation procedures set forth in Article XIV.

**14.5 Cancellation of Certificate of Formation.** Upon the completion of the distribution of Company property as provided in this Article, the Company shall be terminated, and the Liquidator (or the Members, if necessary) shall cause the cancellation of the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

**14.6 Reasonable Time for Winding Up.** A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets in order to minimize any. losses otherwise attendant upon such winding up. Distributions upon liquidation of the Company (or any Member's interest in the Company) and related adjustments shall be made by the end of the Taxable Year of the liquidation (or, if later, within 90 days after the date of such liquidation) or as otherwise permitted by Treasury Regulation Section 1.704-1(b)(2)(ii)(b), including requirements (2) and (3) thereof.

**14.7 Return of Capital.** The Liquidator shall not be personally liable for the return of Capital Contributions or any portion thereof, it being understood that any such return shall be made solely from Company assets.

## ARTICLE XV
## GENERAL PROVISIONS

**15.1 Addresses and Notices.** Any notice, demand, request or report required or permitted to be given or made to any Person under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class mail, overnight courier, confirmed facsimile, electronic mail, or by other commercially reasonable means of written communication to the Person at his address as shown on the Company's books and records. An affidavit or certificate of mailing executed on behalf of the Company shall be conclusive (but not exclusive) evidence of the date and fact of mailing of any such notice, demand, request or report. Any notice to the Company shall be deemed given if received by the Company at its principal office designated pursuant to Section 2.4.

**BB001032**

**15.2   Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assigns.

**15.3   Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

**15.4   Counterparts.**  This Agreement may be executed in separate counterparts, each of which will be an original and all of which together shall constitute one and the same agreement binding on all the parties hereto.

**15.5   Applicable Law.**  The limited liability company law of the State of Delaware will govern all issues concerning the relative rights of the Company and its Members.  All other questions concerning the construction, validity and interpretation of this Agreement will be governed by the internal law, and not the law of conflicts, of the State of Delaware.

**15.6   Invalidity of Provisions.**  If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby.

**15.7   Interpretation.** This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.  If any provision of this Agreement shall be held to be invalid, the remainder of this Agreement shall not be affected.  The titles of the Articles and Sections in this Agreement are for convenience only and shall not be considered in construing this Agreement.  Pronouns shall be construed to refer to the feminine, neuter, singular and plural as the identity of the individual or entity referred to may require.  In interpreting the meaning of this Agreement: (a) "includes" and "including" are not limiting, (b) "or" is not exclusive, (c) each reference to any gender shall include reference to all other genders, as appropriate, and (d) "all" includes "any" and "any" includes "all."

**15.8   Further Action.**  The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**15.9   Integration.**  This Agreement and the other agreements executed as of the date hereof constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

**BB001033**

**15.10 Taxation as a Partnership.** It is the intent of the Company and its Members that the Company be treated as a partnership for income tax purposes, and the terms of this Agreement shall be construed so as to accomplish that goal and the Members will use their best efforts to cause the Company to be so treated.

**ARTICLE XVI**
**REPRESENTATIONS OF MEMBERS**

Each Member represents and warrants to the Company as follows:

**16.1   Investment.** The Membership Interest issued to the Member is being acquired for investment for the Member's own account, not as a nominee or agent, and not with a view to or for sale in connection with the distribution thereof. The Member has not been contacted concerning the acquisition of Membership Interest by means of any advertisement.

**16.2   Sophistication.** The Member has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the Member's investment in the Membership Interest; the Member has the ability-to bear the economic risks of such investment; the Member has the capacity to protect its own interests in connection with the transactions contemplated by this Agreement; and the Member has had an opportunity to ask questions and to obtain such financial and other information regarding the Company as the Member deems necessary or appropriate in connection with evaluating the merits of the investment in the Membership Interest. Member acknowledges that the Membership Interests have not been and will not be registered under the Securities Act of 1933 or under any state securities act and may not be transferred except in compliance with the Securities Act of 1933 and all applicable state laws.

**16.3   Accredited Investor.** The Member qualifies as an Accredited Investor within the meaning of Regulation D promulgated under the Securities Act of 1933.

**BB001034**

**IN WITNESS WHEREOF,** the undersigned have executed or caused to be executed on its behalf this Limited Liability Company Agreement as of the date first above written.

BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

BY:  **BABCOCK & BROWN INC.,**
a California corporation

ITS:  Member

By:  Jan Blaustein Scholes
Its:  Vice President

–23–

BB001035

## SCHEDULE I

### BABCOCK & BROWN ADMINISTRATIVE SERVICES LLC

LIMITED LIABILITY COMPANY AGREEMENT

MEMBERS

*As of December 31, 1999*

| Members | Initial Contribution | Percentage Interest |
|---|---|---|
| Babcock & Brown Inc.<br>2 Harrison Street, 6th Floor<br>San Francisco, CA 94105 | N/A | 100% |

BB001036

# EXHIBIT 6

Resignation Letter – Jan Blaustein Scholes (Oct. 1, 2007)

**JAN BLAUSTEIN SCHOLES**
34 Stern Lane
Atherton, CA 94027

October 1, 2007

To Whom It May Concern
2 Harrison Street, 6th Floor
San Francisco, CA 94105

Dear Sirs:

I hereby resign as a Vice President of each of the companies listed on Schedule I attached hereto with immediate effect.

Sincerely,

_____
Jan Blaustein Scholes

sf_legal 24038v1

**BB001247**

**SCHEDULE I**

Alliance PP2 FX1 GP, L.L.C.
Alliance PP2 FX1, L.L.C.
Alliance PP2 FX2 GP, L.L.C.
Alliance PP2 FX2, L.L.C.
Alliance PP2 FX3 GP, L.L.C.
Alliance PP2 FX3, L.L.C.
Alliance PP2 FX4 GP, L.L.C.
Alliance PP2 FX4, L.L.C.
Alliance PP2 FX5 GP, L.L.C.
Alliance PP2 FX5, L.L.C.
Alliance PP2 Holdings, L.L.C.
Babcock & Brown Blue Canyon 1 LLC
Babcock & Brown Combine Hills 1 LLC
Babcock & Brown Commercial Realty Development LLC
Babcock & Brown GP LLC
Babcock & Brown Holdings Inc.
Babcock & Brown Ireland Holdings LLC
Babcock & Brown Kumeyaay LLC
Babcock & Brown PFI L.L.C.
Babcock & Brown Power Operating Partners LLC
Babcock & Brown Sweetwater 1 LLC
Babcock & Brown Sweetwater 2 LLC
Babcock & Brown Sweetwater 3 LLC
Babcock & Brown Wind Park Jersey LLC
BBPOP Wind Equity LLC
Caprock Wind Investments LLC
Harrison Partners LLC
J&J Wharf Co. LLC
Marelda Bel Air Mall LLC
Marelda Glynn Place Mall LLC
Marelda Greenville Mall LLC
Marelda Myrtle Beach Mall LLC
Marelda Retail Development LLC
Marelda Retail Holdings LLC
Marelda TRS LLC
Marelda University Village Mall LLC
Marelda Valdosta Mall LLC
Trans Bay Holdings LLC

sf_legal 24038v1

**BB001248**

# EXHIBIT 7

Notice of Resignation – Babcock & Brown Administrative Services
LLC (Apr. 30, 2011)

## BABCOCK & BROWN

Babcock & Brown LP
One Letterman Drive · Bldg D · San Francisco CA 94129 USA
T +1 415 512 1515 · F +1 415 267 1500 · www.babcockbrown.com



### NOTICE OF RESIGNATION

April 30, 2011

Westborough SPE LLC
c/o Equity Trust
31/F, The Center
99 Queen's Road Central, Hong Kong

Attention: Serena Kwok, General Manager, Trade Support

RE: Westborough SPE LLC (the "Company")

Dear Ms. Kwok:

We refer to the Company's Limited Liability Company Agreement dated as of October 22, 1997 (the "LLC Agreement") between Mignonette Investments Limited (the "Member") and Babcock & Brown Administrative Services LLC, as successor to Babcock & Brown Administrative Services, Inc. (the "Manager").

Pursuant to Section 1(e) of the LLC Agreement and Section 18-602 of the Delaware Limited Liability Company Act, this letter serves as notice to the Member of the Manager's intent to resign as Manager of the Company effective as of May 30, 2011.

Sincerely,

Babcock & Brown Administrative
Services LLC

By: Walter Horst
Title: Treasurer

sf_legal 34887v1

**BB000085**

# EXHIBIT 8

BVI Corporate Records – Mignonette Investments Limited (Dato
Capital, Mar. 9, 2023)


Societé de Finance

23 October 1997

RECEIVED

OCT 23 1997

COMMERCIAL
REGISTRARS OFFICE
British Virgin Islands

526004

The Registrar of Companies
Registrar's Office
Road Town, Tortola
British Virgin Islands

Dear Madam,

**MIGONETTE INVESTMENTS LIMITED - IBC NO:243736**
**NOVA OVERSEAS HOLDINGS LIMITED - IBC NO: 252452**
**Everlight (BVI) Co., Ltd. - IBC NO: 162608**

The above companies have been incorporated under the International Business Companies Act, Cap. 291

We shall be grateful if you will forward to ourselves certificates of good standing, containing the particulars required by section 114 of the Act.

A cheque in the sum of $75.00 in payment of our fees is enclosed.

Yours faithfully,

Claudette Francis
Authorised Signatory

Enc.

INTEGRO TRUST (BVI) LIMITED
(formerly P.M.M. Services (B.V.I.) Limited)

P.O. BOX 438, TROPIC ISLE BUILDING, WICKHAMS CAY, ROAD TOWN, TORTOLA, BRITISH VIRGIN ISLANDS
TELEPHONE (809) 494-2616 • TELEFAX (809) 494-2704




# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP. 291)

**CERTIFICATE OF GOOD STANDING**          (Section 114)

No. 243736 MIGNONETTE INVESTMENTS LIMITED

The Registrar of Companies of the British Virgin Islands
**DO HEREBY CERTIFY:**

1. The above company was duly incorporated under the provisions of the International Business Companies Act, (Cap.291) on the 11th day of August, 1997 as Company No. 243736 of the register of International Business Companies.

2. The name of the Company is still on the register of International Business Companies and the company has paid all fees, licence fees, and penalties due and payable under the provisions of sections 104 and 105 of the said Act.

3. The company has not submitted to me articles of merger or consolidation that have not yet become effective.

4. The company has not submitted to me articles of arrangement that have not yet become effective.

5. The company is not in the process of being wound up and dissolved.

6. No proceedings have been instituted to strike the name of the company off the said register.

7. In so far as is evidenced by the documents filed with me the company is in good legal standing.



Given under my hand and seal
at Road Town, Tortola in the
Territory of the British Virgin Islands
this 23rd day of October, 1997



CRTI0043                    REGISTRAR OF COMPANIES




**VIRRGIN**

Page 1 of 2

## POST-INCORPORATION TRANSACTIONS

## GENERAL FILING

| | | |
|---|---|---|
| BVI Company No. | : | 243736 |
| Company Name | : | MIGNONETTE INVESTMENTS LIMITED |
| Processing on behalf of: | : | Integro Trust (BVI) Limited |
| Foreign Character Name | : | |
| Transaction Description | : | IBC Request for Certificate of Goodstanding/Certified Certificates |
| Date of Change | : | |
| Change Description | : | |
| Remark | : | |
| Attachment (in English) | : | 20180419143902ifmw3ovs1fnvzwxngqhbp5lrdi.pdf |
| Attachment (Foreign Language) | : | |
| Translator's Certificate | : | |
| Agent | : | |

We, Financial Services Commission, processing on behalf of Integro Trust (BVI) Limited, hereby confirm that information provided is true and correct to our knowledge.

| | | |
|---|---|---|
| Authorised Signatory Name | : | Financial Services Commission on behalf of Integro Trust (BVI) Limited |

## POST-INCORPORATION TRANSACTIONS

| | | |
|---|---|---|
| Name | : | SuperUser 7, FSC |
| User No. | : | 23 |
| User Name | : | Integro Trust (BVI) Limited |
| User Address | : | |
| User Voice No. | : | |
| User Email | : | |

| | | |
|---|---|---|
| BVI Company No. | : | 243736 |
| Date of Filing | : | 23/10/1997  0:00:00 |
| Transaction No. | : | T970007040 |
| Receipt No. | : | |

**VIRRGIN**

Page 1 of 1

## POST-INCORPORATION TRANSACTIONS

## ANNUAL FEE SUBMISSION

| | | |
|---|---|---|
| Company Name | : | MIGNONETTE INVESTMENTS LIMITED |
| BVI Co. No. | : | 243736 |
| Previous Bearer Fee | : | 0.00 |
| Current Bearer Fee | : | 0.00 |
| Previous Renewal Fees | : | 0.00 |
| Current Renewal Fee | : | 350.00 |
| Restoration Charges | : | 0.00 |
| Total Amount | : | 350.00 |

**List of fees paid by year**

| Year | Licence Fee | Penalty Fee | Bearer Fee |
|---|---|---|---|
| 2014 | 350.00 | 0.00 | 0.00 |

I / We, Francis, Claudette, hereby confirm that information provided is true and correct to our knowledge.

| | |
|---|---|
| Authorised Signatory Name | Francis, Claudette |

| | | | | | |
|---|---|---|---|---|---|
| Name | : | Francis, Claudette | BVI Company No. | : | 243736 |
| Agent No. | : | 23 | Date of Filing | : | 10/11/2014   18:37:07 |
| Agent Name | : | TMF Corporate Services (BVI) Limited | Transaction No. | : | T140760598 |
| Agent Address | : | Palm Grove House | Receipt No. | : | RCS00000001806818 |
| | | P.O. Box 438 | | | |
| | | Road Town | | | |
| | | Tortola | | | |
| | | VG1110 | | | |
| | | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : | 284-494-2616 | | | |
| Agent Email | : | infovg@equitytrust.com | | | |

**VIRRGIN**

Page 1 of 1

## POST-INCORPORATION TRANSACTIONS

## ANNUAL FEE SUBMISSION

| | | |
|---|---|---|
| Company Name | : | MIGNONETTE INVESTMENTS LIMITED |
| BVI Co. No. | : | 243736 |
| Previous Bearer Fee | : | 0.00 |
| Current Bearer Fee | : | 0.00 |
| Previous Renewal Fees | : | 0.00 |
| Current Renewal Fee | : | 350.00 |
| Restoration Charges | : | 0.00 |
| Total Amount | : | 350.00 |

**List of fees paid by year**

| Year | Licence Fee | Penalty Fee | Bearer Fee |
|---|---|---|---|
| 2015 | 350.00 | 0.00 | 0.00 |

I / We, Francis, Claudette, hereby confirm that information provided is true and correct to our knowledge.

| | | |
|---|---|---|
| Authorised Signatory Name | | Francis, Claudette |

| | | | | | |
|---|---|---|---|---|---|
| Name | : | Francis, Claudette | BVI Company No. | : | 243736 |
| Agent No. | : | 23 | Date of Filing | : | 10/11/2015  11:54:24 |
| Agent Name | : | TMF Corporate Services (BVI) Limited | Transaction No. | : | T150768924 |
| Agent Address | : | Palm Grove House | Receipt No. | : | RCS00000002052141 |
| | | P.O. Box 438 | | | |
| | | Road Town | | | |
| | | Tortola | | | |
| | | VG1110 | | | |
| | | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : | 284-494-2616 | | | |
| Agent Email | : | infovg@equitytrust.com | | | |

## POST-INCORPORATION TRANSACTIONS

## Registered Agent Intent to Resign

| | | |
|---|---|---|
| BVI Company No.: | : | 243736 |
| Company Name: | : | MIGNONETTE INVESTMENTS LIMITED |

(Please note the 90 days period starts from date specified in notice)

| | | |
|---|---|---|
| Date specified in notice: | : | 29/03/2017 |
| Email Address of a director of the company: | : | serena.kwok@tmf-group.com |

### Attachment:(attach the following)

| | | |
|---|---|---|
| Notice of Intention to resign given to the company under section93(2)(In English) | : | 20170329224632rpmxdck4gu5opgeijrqfg.pdf |
| Notice of Intention to resign given to the company under section93(2)(Foreign Language) | : | |
| Translator's Certificate | : | |

| | | |
|---|---|---|
| Agent: | : | TMF Corporate Services (BVI) Limited |
| | | Palm Grove House |
| | | P.O. Box 438 |
| | | Road Town |
| | | Tortola |
| | | VG1110 |
| | | VIRGIN ISLANDS, BRITISH |

**Remarks:**

Please note that these comments will have no legal implications, nor form any part of the Company's Profile

I / We, TMF Corporate Services (BVI) Limited, hereby confirm that information provided is true and correct to our knowledge.

| | | |
|---|---|---|
| Authorised Signatory Name | : | Frett, Tamisha |



BVI Financial Services Commission, Registry of Corporate Affairs

## Register of Companies Search Report

Print

**Date of Search :**  09/03/2023
This search is accurate as at the Search Date above.

| | |
|---|---|
| **Company Name :** | MIGNONETTE INVESTMENTS LIMITED |

| | |
|---|---|
| **Company Number :** | 243736 |

| **Company Type :** | BC Re-registration | **Date of Incorporation / Registration :** | 11/08/1997 |
|---|---|---|---|

**Current Status :**

| | |
|---|---|
| Status Description: | Struck off - Non Pmt A/Fee |
| Status Date: | 02/05/2017 |
| Re-registration Type: | Automatic |
| Re-registration date: | 01/01/2007 |
| Current Registered Agent: | TMF (B.V.I.) LTD. |
| Current Registered Agent Address: | Palm Grove House<br>P.O. Box 438<br>Road Town<br>Tortola<br>VIRGIN ISLANDS, BRITISH |
| Current Registered Agent Phone Number: | 284-494-4997 |
| Current Registered Agent Fax Number: | 284-494-4999 |
| Current Registered Office : | Palm Grove House<br>P.O. Box 438<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |
| Telephone: | |
| Agent Fax: | |
| Register of Directors Filed : | Yes |
| First Registered Agent: | TMF Corporate Services (BVI) Limited |
| First Registered Office: | Palm Grove House<br>P.O. Box 438<br>Road Town<br>Tortola<br>VG1110<br>VIRGIN ISLANDS, BRITISH |

**Share/Capital Information:**

| | | |
|---|---|---|
| Authorized Capital: | 50,000.00 | United States of America, Dollars |
| Ability to Issue Bearer Shares: | No | |

**Previous Names History**

| | | | Date Range or Cease Date | |
|---|---|---|---|---|
| S.No | Previous Name | Foreign Character Name | From | To |
| 1 | MIGNONETTE INVESTMENTS LIMITED | | 11/08/1997 | |

**Transaction History**

| S.No | Date | Transaction Number | Description | Status | Eforms/Attachments |
|---|---|---|---|---|---|
| 1 | 11/08/1997 | T970007039 | Application for Incorporation (IBC) | Approved | General Filing |

|   |   |   |   | General Filing - General Filing |
|---|---|---|---|---|
| 2 | 23/10/1997 T970007040 | IBC Request for Certificate of Goodstanding/Certified Certificates | Approved | General Filing |
|   |   |   |   | General Filing - General Filing |
| 3 | 17/03/2008 T080144830 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 4 | 17/11/2008 T080766540 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 5 | 27/06/2011 T110479651 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 6 | 21/11/2012 T120824356 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 7 | 11/11/2013 T130747395 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 8 | 10/11/2014 T140760598 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 9 | 10/11/2015 T150768924 | Annual Fee Submission (BC) | Approved | Annual Submission |
| 10 | 29/03/2017 T170521455 | Registered Agent intent to Resign | Approved | Registered Agent Intent To Resign |
|   |   |   |   | Notice of intention to resign given to the company under section 93(2) |
| 11 | 31/03/2017 T170568523 | Register of Members or Directors | Approved | Register of Directors |

**Certificate History**

| S.No | Transaction No. | Type of Certificate | Date of Filing |
|---|---|---|---|
| 1 | T110479651 | Certificate of Restoration | 27/06/2011 |

**DISCLAIMER:**

Although care has been taken to ensure the accuracy, completeness and reliability of the information provided through the use of this service ("the Information"), neither the Registrar of Corporate Affairs ("the Registrar") nor the Financial Services Commission ("the Commission") assumes any responsibility for the accuracy, completeness and reliability of the Information. This report does not reflect any transactions that may be submitted and not yet registered, or other changes for which the Registrar has not received notice. The user of the Information agrees that the Information is subject to change without notice, and neither the Registrar nor the Commission is responsible for any discrepancies that may result if a transaction is approved for filing after the issuance of this report. Neither the Registrar nor the Commission assumes any responsibility for the consequences of use of the Information, nor for any infringement of third party intellectual property rights which may result from its use. In no event shall the Commission or the Registrar be liable for any direct, indirect, special or incidental damage resulting from, arising out of or in connection with the use of the Information.

## POST-INCORPORATION TRANSACTIONS

### Registered Agent Intent to Resign

| | | | | | |
|---|---|---|---|---|---|
| Name | : | Frett, Tamisha | BVI Company No. | : | 243736 |
| Agent No. | : | 23 | Date of Filing | : | 29/03/2017  22:46:51 |
| Agent Name | : | TMF Corporate Services (BVI) Limited | Transaction No. | : | T170521455 |
| Agent Address | : | Palm Grove House | Receipt No. | : | |
| | | P.O. Box 438 | | | |
| | | Road Town | | | |
| | | Tortola | | | |
| | | VG1110 | | | |
| | | VIRGIN ISLANDS, BRITISH | | | |
| Agent Voice No. | : | 284-494-2616 | | | |
| Agent Email | : | infovg@equitytrust.com | | | |

```
11-08-97                                                          IN0015
 8.47.42                Commercial Registry                       A#23
    23                                                            Page   1
                Company Name Reservation Confirmation


                 Agent: Integro Trust (BVI) Limited


   Date                                               Res   Exp.
Reserved           Name Reserved                      Days  Date       Ref #

 7-08-97    I    MIGNONETTE INVESTMENTS LIMITED       10 17-08-97   357976


            Name reserved by Riggall, Murray



     Please submit a copy of this receipt with incorporation documents
```

IBC No. 243736



territory of the british virgin islands

the international business companies act, cap. 291

MEMORANDUM AND ARTICLES OF ASSOCIATION OF

**MIGNONETTE INVESTMENTS LIMITED**

INCORPORATED THE      **11th**      DAY      OF **August, 1997**





TERRITORY OF THE BRITISH VIRGIN ISLANDS

THE INTERNATIONAL BUSINESS COMPANIES ACT, CAP. 291

MEMORANDUM OF ASSOCIATION

OF

**MIGNONETTE INVESTMENTS LIMITED**

1.      The Name of the Company is   **MIGNONETTE INVESTMENTS LIMITED.**

2      The Registered Office of the Company will be situate at Tropic Isle Building, P O Box 438, Road Town, Tortola, British Virgin Islands or at such other place within the British Virgin Islands as the directors may from time to time determine

3      The Registered Agent of the Company will be Integro Trust (BVI) Limited, Tropic Isle Building, P O. Box 438, Road Town, Tortola, British Virgin Islands or such other person or company being a person or company entitled to act as a registered agent as the directors may from time to time determine

4.      The Objects for which the Company is established are.

(1)     To buy, sell, underwrite, invest in, exchange or otherwise acquire, and to hold, manage, develop, deal with and turn to account any bonds, debentures, shares (whether fully paid or not), stocks, options, commodities, futures, forward contracts, notes or securities of governments, states, municipalities, public authorities or public or private limited or unlimited companies in any part of the world, precious metals, gems, works of art and other articles of value, and whether on a cash or margin basis and including short sales, and to lend money either unsecured or against the security of any of the aforementioned property

(2)     To buy, own, hold, subdivide, lease, sell, rent, prepare building sites, construct, reconstruct, alter, improve, decorate, furnish, operate, maintain, reclaim or otherwise deal with and/or develop land and buildings and otherwise deal in real estate in all its branches, to make advances upon the security of land or houses or other property or any interest therein, and whether erected or in course of erection and whether on first mortgage or charge or subject to a prior mortgage or mortgages or charge or charges, and to develop land and buildings as may seem expedient but without prejudice to the generality of the foregoing

(3)     To borrow or raise money by the issue of debentures, debenture stock (perpetual or terminable), bonds, mortgages, or any other securities founded or based upon all or any of the assets or property of the Company or without any security and upon such terms as to priority or otherwise as the Company shall think fit

(4)     To guarantee loans and to lend money with or without guarantee or security to any

1

persons, firms or corporations

(5)    To engage in any other business or businesses whatsoever, or in any acts or activities, which are not prohibited under any law for the time being in force in the British Virgin Islands

(6)    To do all such other things as are incidental to or the Company may think conducive to the attainment of all or any of the above objects

And it is hereby declared that the intention is that each of the objects specified in each paragraph of this clause shall, except where otherwise expressed in such paragraph, be an independent main object and be in nowise limited or restricted by reference to or inference from the terms of any other paragraph or the name of the Company

5    (1)    The Company has no power to

(a)    carry on business with persons resident in the British Virgin Islands,

(b)    own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subsection (2),

(c)    carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990,

(d)    carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorizing it to carry on that business,

(e)    carry on the business of company management unless it is licensed under the Company Management Act, 1990, or

(f)    carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands

(2)    For purposes of paragraph (a) of subsection (1), the company shall not be treated as carrying on business with persons resident in the British Virgin Islands by reason only that

(a)    it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands,

(b)    it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands,

(c)    it prepares or maintains books and records within the British Virgin Islands,

(d)    it holds, within the British Virgin Islands, meetings of its directors or members,

(e)    it holds a lease of property for use as an office from which to communicate with members or where books and records of the company are prepared or maintained,

(f)    it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Act or under the Companies Act, or



2

(g)    shares, debt obligations or other securities in the company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act or under the Companies Act

6.    The shares in the Company shall be issued in the currency of the United States of America

7.    The authorised capital of the Company is US$50,000 divided into 50,000 shares with a par value of US$1.00 each. The directors shall have the authority to determine by resolution at their discretion whether shares are to be issued as registered shares or to bearer

8.    The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

9    The directors shall by resolution have the power to issue any class or series of shares that the Company is authorised to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions

10.    Shares issued as registered shares may be exchanged for shares issued to bearer, and shares issued to bearer may be exchanged for registered shares

11.    Where shares are issued to bearer, the bearer, identified for this purpose by the number of the share certificate, shall be requested to give to the Company the name and address of an agent or attorney for service of any notice, information or written statement required to be given to members, and service upon such agent or attorney shall constitute service upon the bearer of such shares. In the absence of such name and address being given it shall be sufficient for purpose of service for the Company to publish the notice, information or written statement in one or more newspapers published or circulated in the British Virgin Islands and in a newspaper in the place where the Company has its principal office.

12    The Company shall by resolution of the directors have the power to amend or modify any of the conditions contained in this Memorandum of Association and to increase or reduce the authorised capital of the Company in any way which may be permitted by law



3

WE, the undersigned Registered Agent, subscribe our name to this Memorandum of Association

---

### NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER

---

Integro Trust (BVI) Limited
Tropic Isle Building
P O. Box 438
Road Town, Tortola
British Virgin Islands

_____
Authorised Signatory

Registered Agent

---

DATED this **11th**   day of  **August, 1997**

WITNESS to the above signature:

N. Hull
Road Town
Tortola
British Virgin Islands

Secretary



4

# EXHIBIT 9

Affidavit of David Abromowitz, Esq. (Apr. 4, 2025)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 7 |
| WESTBOROUGH SPE LLC, | ) Case No. 23-40709-CJP |
| | ) |
| Debtor. | ) |
| | ) |

### <u>AFFIDAVIT OF DAVID ABROMOWITZ, ESQ.</u>
### <u>OF GOULSTON & STORRS PC</u>

I, David Abromowitz, being duly deposed and sworn, aver as follows:

1.      I am an attorney in good standing licensed to practice law in the Commonwealth of Massachusetts and have been for over forty years.

2.      Since September 1983, I have worked as a lawyer at Goulston & Storrs PC in Boston (the "Firm"), first as an Associate, then as a Director and Shareholder, and currently as Of Counsel.

3.      In 1997 and 1998, I worked on a matter pertaining to the formation of Westborough SPE LLC (the "LLC") and the negotiation of a lease to which the LLC was a party (the "Matter).

4.      Based upon my best memory and my review of the Firm's readily available records concerning the Matter, the following table identifies (a) the client representatives with whom the Firm communicated in connection with the Matter, and (b) the contact information evident from the Firm's records for each person:

4919-1264-3634, v. 4

| Name | Contact Information |
|------|---------------------|
| James B. McCaffrey | Telephone: 212-935-7800; Fax: 212-935-8949 |
| F. Jan Blaustein | Telephone: 415-512-1515; Fax: 415-267-1500 |
| | Babcock & Brown Administrative Services<br>2 Harrison Street<br>San Francisco, CA 94105 |
| Phillip Green | Telephone:  011.612.9233.4033;<br>Fax:    011.612.9231.5619 |
| | Level 37, The Chifley Tower<br>2 Chifley Square<br>Sydney, Australia NSW 2000 |
| Monique Belkin | Telephone: 415-512-1515; Fax: 415-267-1500 |
| | Babcock & Brown Administrative Services<br>2 Harrison Street<br>San Francisco, CA 94105 |
| Derek Andrews<br>(Mignonette) | Fax: 1-809-494-2704 |
| | Integro Trust (BVI) Limited<br>P.O. Box 438<br>Tropic Isle Building<br>Wickhams Cay, Road Town,<br>Tortola, British Virgin Islands |

Signed under the pains and penalties of perjury this 4th day of April 2025.


/s/ David Abromowitz
David Abromowitz, Esq.

4919-1264-3634, v. 4

# EXHIBIT 10

Participation Agreement (Oct. 30, 1997)

CONFORMED COPY

PARTICIPATION AGREEMENT

Dated as of October 30, 1997

RE:
Leveraged Lease of Theater Premises

Among

INTERSTATE THEATRES CORPORATION

Tenant

HOYTS CINEMAS CORPORATION

Lease Guarantor

HOYTS CINEMAS LIMITED

Lease Guarantor

HOYTS CINEMAS AMERICA LIMITED

Lease Guarantor

WESTBOROUGH SPE LLC

Company

MIGNONETTE INVESTMENTS LIMITED

Equity Investor

and

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

Note Purchaser

620497.08.00.B
1452358

**BB000811**

TABLE OF CONTENTS

| SECTION | HEADING | PAGE |
|---|---|---|
| Parties | | 1 |
| Recitals | | 1 |
| SECTION 1. | COMMITMENTS OF THE PARTICIPANTS | 2 |
| Section 1.1. | Issue and Sale of Notes | 2 |
| Section 1.2. | Investments and Payments by the Equity Investor | 3 |
| Section 1.3. | The Closing Date | 3 |
| Section 1.4. | Expiration of Commitments | 3 |
| Section 1.5. | Several Commitments | 3 |
| SECTION 2. | TRANSACTIONAL EXPENSES | 3 |
| Section 2.1. | Transactional Expenses to Be Borne by the Company on Behalf of the Equity Investor | 3 |
| Section 2.2. | Transactional Expenses to Be Borne by the Tenant | 4 |
| Section 2.3. | Transactional Expenses to Be Borne by the Company | 4 |
| SECTION 3. | WARRANTIES AND REPRESENTATIONS | 4 |
| Section 3.1. | Warranties and Representations of the Company | 4 |
| Section 3.2. | Warranties and Representations of the Tenant | 7 |
| Section 3.3. | Warranties and Representations of the Guarantors | 10 |
| Section 3.4. | Private Offering | 14 |
| Section 3.5. | Representations and Covenants of the Participants; Transfer of Beneficial Interest and Notes | 15 |
| SECTION 4. | CONDITIONS | 19 |
| Section 4.1. | Conditions Precedent to Investment by Each Participant | 19 |
| Section 4.2. | Additional Conditions Precedent to Note Purchase | 23 |
| SECTION 5. | SPECIAL RIGHTS OF NOTE PURCHASER | 24 |
| SECTION 6. | COMPANY COVENANTS | 25 |
| Section 6.1. | Office for Notices | 25 |
| Section 6.2. | Maintenance of Existence, Rights | 25 |
| Section 6.3. | Maintenance of Property | 25 |
| Section 6.4. | Insurance | 25 |
| Section 6.5. | Payment of Taxes and Other Charges; Compliance with Laws | 26 |
| Section 6.6. | Negative Covenants | 26 |

BB000812

Section 6.7.     Mergers and Consolidations ................................................. 27
Section 6.8.     Financial Information and Reports ........................................ 27
Section 6.9.     Repurchase of Notes ........................................................... 28
Section 6.10.    Transactions with Affiliates ................................................. 28
Section 6.11.    Post Closing Undertaking of the Company ........................... 28

SECTION 7.       COVENANTS OF THE GUARANTORS .................................... 28

Section 7.1.     Corporate Existence, Etc. .................................................... 28
Section 7.2.     Insurance ............................................................................ 28
Section 7.3.     Taxes, Claims for Labor and Materials; Compliance with
                 Laws ................................................................................... 29
Section 7.4.     Maintenance, Etc ................................................................. 29
Section 7.5.     Nature of Business .............................................................. 29
Section 7.6.     Limitations on Consolidated Total Debt ............................... 29
Section 7.7.     Fixed Charges Coverage Ratio ............................................. 30
Section 7.8.     Sale of Assets ..................................................................... 30
Section 7.9.     Mergers and Consolidations ................................................. 31
Section 7.10.    Limitations on Restrictive Agreements ................................. 32
Section 7.11.    HCL's Shareholders' Equity ................................................. 32
Section 7.12.    Reports and Rights of Inspection ......................................... 32
Section 7.13.    Consummation of Second Transaction ................................... 35
Section 7.14.    Post Closing Undertaking .................................................... 36

SECTION 8.       TENANT'S INDEMNITIES ....................................................... 36

SECTION 9.       INDEMNITIES OF THE COMPANY AND THE EQUITY INVESTOR ............. 36

SECTION 10.      MISCELLANEOUS ................................................................. 37

Section 10.1.    Amendments ........................................................................ 37
Section 10.2.    Notices ................................................................................ 37
Section 10.3.    Survival ............................................................................... 37
Section 10.4.    Successors and Assigns ........................................................ 37
Section 10.5.    Governing Law .................................................................... 38
Section 10.6.    Counterparts ....................................................................... 38
Section 10.7.    Headings and Table of Contents ........................................... 38
Section 10.8.    Conditions to Purchase of Beneficial Interest by Tenant ........ 38
Section 10.9.    Rent Payment Instructions ................................................... 39
Section 10.10.   Certain Rights of Tenant and Guarantor Reserved ................. 39
Section 10.11.   Note Purchaser Consent ...................................................... 40

**BB000813**

SCHEDULE I    —    Financial Statements

EXHIBIT A    —    Lease Agreement
EXHIBIT B    —    First Mortgage, Security Agreement and Fixture Filing
EXHIBIT C    —    Lease Guaranty
EXHIBIT D    —    Assignment of Lease
EXHIBIT E    —    Assignment of Guaranty
EXHIBIT F    —    Officer's Certificate of the Company Manager

SCHEDULE 7.10 — List of Restrictive Agreements

ANNEX I      —    Definitions
ANNEX II     —    Schedule of Amortization
ANNEX III    —    Form of 10.25% Senior Secured Note due November 21, 2017
ANNEX IV     —    Forms of Opinions of Counsel

BB000814

## PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT dated as of October 30, 1997 is among INTERSTATE THEATRES CORPORATION, a Massachusetts corporation (the *"Tenant"*), HOYTS CINEMAS CORPORATION, a Delaware corporation (*"HCC"*), HOYTS CINEMAS LIMITED, an Australian corporation (*"HCL"*), HOYTS CINEMAS AMERICA LIMITED, a Barbados company (*"HCA"*, HCA, together with HCC and HCL being hereinafter sometimes individually referred to as a *"Guarantor"* and collectively as the *"Guarantors"*), WESTBOROUGH SPE LLC, a Delaware limited liability company (the *"Company"*), MIGNONETTE INVESTMENTS LIMITED, a British Virgin Islands limited liability company (the *"Equity Investor"*) and THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY (the *"Note Purchaser"*). The Equity Investor and the Note Purchaser are herein sometimes referred to collectively as the *"Participants"* and individually as a *"Participant"*.

## RECITALS

A.    The capitalized terms used in this Participation Agreement shall have the respective meanings specified in Annex I attached hereto, unless otherwise herein defined.

B.    It is intended by the parties hereto that, on the Closing Date, title to the Premises shall pass to the Company pursuant to a Quitclaim Deed between Northside Realty Trust, as seller (the *"Developer"*), and the Company, as purchaser, providing for the sale by the Developer of the Premises to the Company for the consideration specified therein.

C.    The Company has entered into or proposes to enter into:

(1)    a Lease Agreement (the *"Lease"*) substantially in the form attached hereto as Exhibit A between the Company, as lessor, and the Tenant, as lessee, providing for the lease of the Premises; and

(2)    a First Mortgage, Security Agreement and Fixture Filing (the *"Mortgage"*) substantially in the form attached hereto as Exhibit B between the Company and the Note Purchaser, as beneficiary and secured party.

D.    Concurrently with the execution and delivery of this Agreement, the Guarantors will enter into a Lease Guaranty (the *"Lease Guaranty"*) substantially in the form attached hereto as Exhibit C under which the Guarantors will absolutely and unconditionally guarantee the payment of all Basic Rent, Additional Rent and all other amounts due and to become due under the Lease and the performance of all obligations of the Tenant under the Lease.

BB000815

SECTION 1.     COMMITMENTS OF THE PARTICIPANTS.

*Section 1.1.   Issue and Sale of Notes.*

(a)   *The Notes.*  In order to finance 90% of the Acquisition Cost of the Premises, the Company proposes to issue and sell its 10.25% Senior Secured Notes due November 20, 2017 (the *"Notes"*) in an aggregate principal amount of $9,406,742.40.  The Notes are to be issued hereunder and secured by the Mortgage, to be dated the date of issue, to bear interest at the rate of 10.25% per annum prior to maturity and to bear interest on overdue principal and premium, if any, and (to the extent legally enforceable) on any overdue installment of interest at the rate of 12.25% per annum until paid, to be expressed to be payable as follows:

(i)   seventy-nine (79) consecutive quarterly installments of interest and principal payable in accordance with the amortization schedule set forth in Annex II hereto, payable on February 21, 1998 and on the twenty-first day of each May, August, November and February thereafter to and including August 21, 2017; followed by

(ii)   a final installment on November 21, 2017 in an amount equal to the entire principal and interest remaining unpaid as of said date;

and to be otherwise substantially in the form attached hereto as Annex III.  Interest shall be computed on the basis of a 360-day year of twelve consecutive 30-day months.

(b)   *Commitment of Note Purchaser.*  Subject to the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth, the Company agrees to issue and sell to the Note Purchaser, and the Note Purchaser agrees to purchase from the Company, on the Closing Date hereinafter provided for, Notes of the Company at a price of 100% of the principal amount thereof and in an aggregate principal amount equal to $9,406,742.40, which shall equal 90% of the Acquisition Cost.  The Notes delivered to the Note Purchaser on the Closing Date will be in the form of a single Note, in a principal amount equal to 100% of the aggregate principal amount of the Note and registered in the name of the Note Purchaser or its nominee.

(c)   *Failure to Deliver.*  If on the Closing Date the Company fails to tender to the Note Purchaser the Notes to be purchased by the Note Purchaser or if the conditions to the obligation of the Note Purchaser specified in **Section 4** have not been fulfilled, the Note Purchaser may thereupon elect to be relieved of all further obligations under this Agreement.

(d)   *Security for the Notes.*  The Notes will be entitled to the benefits of and will be secured by (1) the Mortgage, (2) an Assignment of Lease (the *"Lease Assignment"*) substantially in the form attached hereto as Exhibit D, among the Company, the Tenant and the Note Purchaser, pursuant to which the Company will grant a valid and perfected first Lien on the Premises and create a valid and perfected first Lien on the right, title and interest of the Company in and to the Lease, including, without limitation, a present

-2-

**BB000816**

assignment and right to receive payment of all Basic Rent, Additional Rent and other amounts payable thereunder, and (3) an Assignment of Guaranty (the *"Guaranty Assignment"*) substantially in the form attached hereto as Exhibit E, among the Company, the Guarantors and the Note Purchaser, pursuant to which the Company shall assign to the Note Purchaser all of its right, title and interest in and to the Lease Guaranty.

(e)   *Prepayment.* Except to the extent otherwise provided for in the Mortgage, the Notes shall not be subject to prepayment or redemption in whole or in part prior to the expressed maturity date thereof.

*Section 1.2.   Investments and Payments by the Equity Investor.* (a) Subject to the terms and conditions hereof and on the basis of the representations and warranties hereinafter set forth, on the Closing Date the Equity Investor will advance to the Company an amount equal to 10% of Acquisition Cost.

(b)   If on the Closing Date the conditions to the obligations of the Equity Investor specified in **Section 4.1** have not been fulfilled, the Equity Investor may thereupon elect to be relieved of its obligation to make the investment provided for in paragraph (a) of this **Section 1.2**.

*Section 1.3.   The Closing Date.* The equity investment by the Equity Investor pursuant to **Section 1.2(a)** will be made, and the Notes will be delivered to the Note Purchaser hereunder, on such date (the *"Closing Date"*), not later than the expiration of the commitments of the Participants as set forth in **Section 1.4**, as the Tenant shall designate to each Participant by not less than one Business Day's prior written notice. The payment by the Equity Investor pursuant to **Section 1.2(a)** and payment for the Notes shall be made available for the account of the Company, at 10:00 A.M., Boston time on the Closing Date in Federal Reserve or otherwise immediately available funds current in Boston, Massachusetts, at such account as shall be specified in writing by the Company (or the Tenant, as the case may be), at least one Business Day prior to the Closing Date.

*Section 1.4.   Expiration of Commitments.* The commitment of the Equity Investor under **Section 1.2(a)** and the commitment of the Note Purchaser hereunder shall expire at the close of business on November 21, 1997.

*Section 1.5.   Several Commitments.* The obligations hereunder of the Participants shall be several and not joint and no Participant shall be liable or responsible for the acts or defaults of any other Participant.

SECTION 2.     TRANSACTIONAL EXPENSES.

*Section 2.1.   Transactional Expenses to Be Borne by the Company on Behalf of the Equity Investor.* If the Company shall have purchased the Premises from the Developer in accordance with the provisions of **Section 4**, the Company will pay all reasonable out-of-pocket expenses relating to the transactions contemplated by this Agreement, including but not limited to:  (a) the cost of producing the Operative Documents; (b) the reasonable fees

-3-

**BB000817**

and expenses of counsel for the Company; (c) the reasonable fees and expenses of Chapman and Cutler, special counsel for the Note Purchaser; (d) all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any of the Operative Documents and in connection with any financing statements or other documents filed to perfect, maintain and protect the rights of the parties under the Operative Documents; (e) the premium for the title insurance, the cost of the survey and the cost for the appraisal required by **Section 4.1**; (f) the cost of delivering to the main office of the Note Purchaser, insured to the satisfaction of the Note Purchaser, the Notes purchased by the Note Purchaser on the Closing Date; and (g) the reasonable fees and expenses of each of the counsel for the Tenant and the Guarantors named in **Section 4.1(i)** but excluding any other expenses incurred by the Tenant or the Guarantors; *provided, however,* that the aggregate amount of all fees and expenses described in clause (g) of this **Section 2.1** to be paid by the Company and included in the Acquisition Cost of the Premises may not exceed $100,000.

*Section 2.2. Transactional Expenses to Be Borne by the Tenant.* The Tenant will pay the amount of all fees and expenses described in **Section 2.1** in the event the Company does not purchase the Premises from the Developer in accordance with **Section 4**. Without limiting the foregoing, the Tenant will pay as Additional Rent pursuant to the Lease: (a) the cost of delivering to or from the home office of any holder of a Note from or to the Company, insured to the satisfaction of such holder, any Notes surrendered pursuant to the Mortgage and any Note issued in substitution or replacement for the surrendered Notes; and (b) the reasonable out-of-pocket expenses of the Equity Investor, the Company and the holders of the Notes, including reasonable fees and expenses of their counsel, in connection with any amendments, waivers, consents or modifications requested with respect to any of the Operative Documents by any party other than the Company or the Equity Investor and all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any such amendments, waivers, consents or modifications and in connection with any continuation statements or other documents filed to maintain and protect the rights of the parties under the Operative Documents.

*Section 2.3. Transactional Expenses to Be Borne by the Company.* The Company will pay the reasonable out-of-pocket expenses of the holders of the Notes, the Tenant and the Guarantors, including reasonable fees of their counsel, in connection with any amendments, waivers, consents or modifications requested by the Company or the Equity Investor with respect to any of the Operative Documents and all recording and filing fees, stamp taxes and other recording or filing taxes in connection with the recordation or filing of any such amendments, waivers, consents or modifications and in connection with any continuation statements or other documents filed to maintain and protect the rights of the parties under the Operative Documents.

SECTION 3.  WARRANTIES AND REPRESENTATIONS.

*Section 3.1. Warranties and Representations of the Company.* The Company represents and warrants on and as of the Closing Date that:

BB000818

(a)   The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the power and authority and all necessary entity qualifications to enter into and perform its obligations under the Operative Documents to which it is a party.  The Company is duly licensed, qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party.  The Company has no Subsidiaries.

(b)   The Company has no Indebtedness other than the Notes.

(c)   The Operative Documents to which the Company is a party have been duly authorized, executed and delivered by the Company and constitute legal, valid and binding obligations of the Company enforceable against the Company in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d)   The execution and delivery by the Company of the Operative Documents to which the Company is a party and the sale of the Notes and compliance by the Company with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Company or contravene the provisions of, or constitute a default under, or result in the creation of any Lien (other than Permitted Encumbrances) upon the Property of the Company under, its charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which the Company is a party or by which it or any of its Property may be bound or affected.

(e)   There are no proceedings pending or threatened, nor is there any existing basis for any such proceedings, against or affecting the Company in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, could materially and adversely affect the Properties, business, profits or condition (financial or otherwise) of the Company or impair the ability of the Company to perform its obligations under the Operative Documents to which the Company is a party.  The Company is not in default with respect to any order of any court or governmental authority or arbitration board or tribunal.

(f)   The Company is not in violation of any law, including, without limitation any Environmental Law, ordinance, franchise, governmental rule or regulation to which it is subject; and the Company has not failed to obtain, any license, permit, franchise or other governmental authorization necessary to the ownership of the Premises, which violation or failure to obtain would materially adversely affect the Properties, business, profits or condition (financial or otherwise) of the Company, or impair the ability of the Company to perform the obligations contained in the Operative Documents to which the Company is a party.

**BB000819**

(g)   The Premises are free and clear of any Liens or encumbrances which result from claims against the Company not arising out of or directly related to the transactions contemplated by the Operative Documents. The Company has not conveyed any interest in the Premises to any Person or subjected the Premises to any Lien not arising out of or relating to the transactions contemplated by the Operative Documents. The Company has full right, power and authority to grant, warrant, pledge, assign, demise, convey, transfer and mortgage the Premises pursuant to the Mortgage. Other than the Premises, the Company owns no Property.

(h)   No Mortgage Default or Mortgage Event of Default has occurred and is continuing. The Company is not in violation of any Operative Document to which it is a party.

(i)   No approval, consent or withholding of objection on the part of any regulatory body, state, Federal or local, is necessary in connection with the execution, delivery and performance by the Company of the Operative Documents to which it is a party or compliance by the Company with any of the provisions of such Operative Documents, which has not been obtained and furnished to the Note Purchaser, the Tenant and the Guarantors.

(j)   The proceeds from the sale of the Notes and the Beneficial Interest will be applied to the Acquisition Cost of the Premises, and to pay certain costs and expenses incurred in connection with the transactions contemplated by the Operative Documents. None of the transactions contemplated in the Operative Documents (including without limitation thereof, the use of proceeds from the issuance of the Notes) will violate or result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulation issued pursuant thereto, including, without limitation, Regulations G, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II. The Company does not own or intend to carry or purchase any *"margin security"* within the meaning of said Regulation G. None of the proceeds from the sale of the Notes will be used to purchase or carry (or refinance any borrowing, the proceeds of which were used to purchase or carry), any *"security"* within the meaning of the Securities Exchange Act of 1934, as amended.

(k)   The consummation of the transactions provided for in this Agreement and in the Operative Documents to which the Company is a party and compliance by the Company with the provisions of the Operative Documents to which the Company is a party, including the Notes issued thereunder, will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The Company does not maintain or contribute to an *"employee pension benefit plans"*, as defined in ERISA. The Company does not maintain, contribute to or have any direct or indirect liability or contingent liability with respect to any "employee pension benefit plan" under Title IV of ERISA.

(l)   The Company is not an *"investment company"*, or a company *"controlled"* by an *"investment company"*, as such terms are defined in the Investment Company Act of 1940, as amended.

BB000820

*Section 3.2.    Warranties and Representations of the Tenant.* The Tenant warrants and represents on and as of the Closing Date that:

(a)    The Tenant is a wholly-owned Subsidiary of HCC.

(b)    The Tenant is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts and has the corporate power and authority and all necessary licenses and permits (1) to carry on its present business and operations, (2) to own or lease its Properties, and (3) to enter into and perform its obligations under the Operative Documents to which it is a party, except where the failure to have any such license or permit for the items described in the preceding clauses (1) and (2) would not have a Tenant Material Adverse Effect. The Tenant is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein the nature of the business transacted by it or the nature of the Property owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not have a Tenant Material Adverse Effect.

(c)    The Operative Documents to which the Tenant is a party have been duly authorized, executed and delivered by the Tenant and constitute legal, valid and binding obligations of the Tenant enforceable against the Tenant in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d)    The execution and delivery by the Tenant of the Operative Documents to which the Tenant is a party and compliance by the Tenant with all of the provisions thereof do not contravene any existing law or any existing order of any court or governmental authority or agency applicable to or binding on the Tenant or contravene the provisions of, or constitute a default under, or result in the creation of any Lien upon the Property of the Tenant under, its charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which the Tenant is a party or by which it or any of its Property may be bound or affected.

(e)    There are no proceedings pending or (to the Tenant's knowledge, after due inquiry) threatened, nor (to the Tenant's knowledge, after due inquiry) is there any existing basis for any such proceedings, against or affecting the Tenant in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, would have a Tenant Material Adverse Effect. The Tenant is not (to the Tenant's knowledge, after due inquiry) in default with respect to any order of any court or governmental authority or arbitration board or tribunal which default would have a Tenant Material Adverse Effect.

(f)    The Tenant is not in violation of any term of any charter instrument, by-law or other agreement or instrument to which it is a party or by which it may be bound, except in the case of any such agreement or instrument, a violation of which would not have a Tenant Material Adverse Effect. The Tenant is in compliance with all laws, ordinances,

-7-

**BB000821**

governmental rules and regulations to which it is subject, failure to comply with which would have a Tenant Material Adverse Effect, and has obtained all licenses, permits, franchises and other governmental authorizations material to the conduct of its business, including, without limitation, the leasing and operation of the Premises, except where failure to obtain any such license, permit, franchise or other governmental authorization pertaining to the leasing and operation of the Premises would not have a Tenant Material Adverse Effect.

(g)   The written statements furnished to any Participant by the Tenant, the Guarantors and any Person authorized or employed by the Tenant or the Guarantors as agent, broker, dealer or otherwise in connection with the negotiation of the transactions contemplated by this Agreement, do not, when taken as a whole, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading.  There is no fact known to the Tenant or any Guarantor which the Tenant or the Guarantors have not disclosed to each Participant in writing which would have a Tenant Material Adverse Effect.

(h)   The Company has good and marketable title in fee simple to the Premises free and clear of all Liens, other than Permitted Encumbrances and Liens which are the responsibility of the Company or the Equity Investor pursuant to **Section 9**.  Without limiting the foregoing, there are no taxes (including, without limitation, stamp taxes), fees or assessments due, assessed or levied against the Premises as contemplated by this Agreement by any Australian, Barbados or United States Federal, state or local governmental or public authority or agency (including any taxing authority) which are unpaid on and as of the Closing Date.

(i)   (1) Assuming the accuracy of the Company's representations and warranties contained in **Section 3.1**, the Lease is in full force and effect and has not been modified or amended.  No offset exists with respect to any Rent or other sums payable or to become payable to the Company, as landlord under the Lease.  The Company holds no deposit or other security for performance by the Tenant under the Lease and no Rent payable to the Company as landlord under the Lease has been paid in advance.

(2)   To the Tenant's knowledge, after due inquiry, the Company, as landlord under the Lease, has no unsatisfied obligations to the Tenant arising out of or incurred in connection with the lease of the Premises to the Tenant pursuant to the Lease.

(3)   To the Tenant's knowledge, after due inquiry, no Lease Event of Default or Lease Default has occurred and is continuing.

(j)   The amount of each installment of Basic Rent payable under the Lease on each Payment Date on which such payments are due during the Primary Term equals or exceeds the sum of the interest payments and the payments or prepayments of principal due on each such date on the Notes.  The amount of the Termination Value Purchase Price under the Lease payable on any date equals or exceeds the sum of the principal amount of the Notes

-8-

**BB000822**

which will remain unpaid on such date plus accrued interest thereon, assuming all scheduled payments of principal and interest have been previously made.

(k)   The Premises is covered by the insurance required by Section 12 of the Lease and all premiums due in respect of such insurance have been paid.

(l)   No approval, consent or withholding of objection on the part of any regulatory body, state, Federal or local, which has not been obtained is necessary in connection with the execution, delivery and performance by the Tenant of the Operative Documents to which it is a party or compliance by the Tenant with any of the provisions of such Operative Documents.

(m)   To the Tenant's knowledge, after due inquiry, all tax returns and reports required by law to be filed by Tenant have been duly filed, and no taxes, assessments, contributions, fees or other governmental charges upon it or any of its assets or income which are due and payable thereon are delinquent, except to the extent that (1) such taxes, assessments, contributions, fees or charges are being contested in good faith and by proper proceedings and against which appropriate reserves are being maintained or (2) the failure to file any such returns or pay any such tax, assessment, contribution, fee or charge would not have a Tenant Material Adverse Effect.

(n)   Assuming the accuracy of the representations and warranties of the other parties hereto contained in **Sections 3.4** and **3.5**, none of the transactions contemplated by the Operative Documents (including, without limitation, the use of the proceeds from the sale of the Notes) will result in a violation of Section 7 of the Securities Exchange Act of 1934, as amended, or any regulations issued pursuant thereto, including, without limitation, Regulations G, T and X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II.

(o)   To the Tenant's knowledge, after due inquiry, the consummation of the transactions provided for in this Agreement and in the other Operative Documents to which the Tenant is a party and compliance by the Tenant therewith will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The representation by the Tenant in the preceding sentence is made in reliance upon and subject to the accuracy of the representations of the Participants in **Section 3.5(c)** and disclosures pursuant thereto as to the source of the funds used by the Participants to make their respective investments pursuant to this Agreement. Neither the Tenant nor any ERISA Affiliate thereof has incurred or could be reasonably expected to incur in connection with the withdrawal from any Multiemployer Plan, the termination of a Plan or any other Reportable Event, any liability which would have a Tenant Material Adverse Effect.

(p)   The Premises has not suffered damage or destruction which renders it inoperable and, under applicable zoning, use, Environmental Laws and other laws, ordinances, rules and regulations, such Property may be used as a movie theater. Without limiting the foregoing, no portion of the real property constituting a portion of the Premises is located in an *"area of special flood hazard,"* as that term is defined in the regulations of

–9–

**BB000823**

the Federal Insurance Administration, Department of Housing and Urban Development, under the National Flood Insurance Act of 1968, as amended (24 C.F.R. §1909.1).

(q) To the Tenant's knowledge, after due inquiry, (1) the Premises has been constructed in a good and workmanlike manner in conformity with good construction and engineering practice, and the Premises conforms in all material respects to the description thereof contained in the Lease, and (2) such construction has been in accordance with all laws, ordinances, rules, regulations or orders applicable thereto, including, without limitation, any thereof relating to matters of health, safety or environmental protection, other than immaterial violations that would not, in any case or in the aggregate, prevent or interfere with the continued satisfactory operation of the Premises, result in the imposition of material penalties on any Participant, or involve material costs of correction.

(r) To the Tenant's knowledge, after due inquiry, and except as reflected in the environmental report referred to in Section 4.1(g), the operations of Tenant at the Premises comply in all material respects with all Environmental Laws to which Tenant is subject, none of the operations of Tenant are subject to any judicial or administrative proceedings alleging the violation of any Environmental Laws, none of the operations of Tenant are the subject of any federal, state or local investigation evaluating whether any remedial action is needed to respond to a release of any Hazardous Substance into the environment, which remedial action may materially and adversely affect the Premises, the Tenant has not filed any notice under any federal, state or local law indicating past or present treatment, storage or disposal of a Hazardous Substance at the Premises or reporting a spill or release of a Hazardous Substance at the Premises into the environment, and the Tenant does not have any contingent liability in connection with any release of any Hazardous Substance at the Premises into the environment, which contingent liability if liquidated would not be adequately covered by insurance or other indemnification rights.

*Section 3.3. Warranties and Representations of the Guarantors.* Each Guarantor represents and warrants, as applicable, in respect of itself only, on and as of the Closing Date that:

(a) (1) HCC is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCC is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCC is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(2) HCL is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and

-10-

**BB000824**

authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCL is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect.  HCL is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(3)   HCA is a company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority and all necessary licenses and permits (i) to carry on its present business and operations, (ii) to own or lease its Properties, and (iii) to enter into and perform its obligations under the Operative Documents to which HCA is a party except, in the case of any such license or permit, the nonpossession of which would not have a Guarantor Material Adverse Effect. HCA is duly licensed or qualified and is in good standing as a foreign corporation in each jurisdiction wherein such licensing or qualification is necessary in order to perform its obligations under the Operative Documents to which it is a party, except where the failure to be so licensed or qualified would not have a Guarantor Material Adverse Effect.

(4)   The Guarantors are members of an affiliated group of entities.

(5)   All of the outstanding shares of capital stock or similar equity interests of each Subsidiary which are owned by a Guarantor or its Subsidiaries have been validly issued, are fully paid and are nonassessable (except in the case of any Subsidiary of any Guarantor other than the Tenant, where the failure of any such shares to be so validly issued, fully paid and non-assessable would not have Guarantor Material Adverse Effect) and all such shares are owned by such Guarantor or Subsidiary, as the case may be, free and clear of any Lien, except that some or all of such shares of capital stock or similar equity interests may be subject to the Lien of a pledge thereof to one or more Institutional Investors or other financial institutions.

(b)   (1) The Guarantors have delivered to the Note Purchaser copies of the financial statements of the Guarantors and their Subsidiaries listed on Schedule II.  All of said financial statements (including in the each case the related schedules and notes) fairly present in all material respects the consolidated or combined, as the case may be, financial position of each Guarantor and its respective Subsidiaries as of the respective dates specified in such financial statements and the consolidated or combined, as the case may be, results of their operations and cash flows for the respective periods so specified and have been prepared in accordance with GAAP consistently applied throughout the periods involved except as set forth in the notes thereto (subject, in the case of any interim financial statements, to normal year-end adjustments).

(2)   Since January 2, 1997, there has been no change in the condition, financial or otherwise, of HCL and HCA and their consolidated Subsidiaries, on a combined basis, as

-11-

BB000825

shown on the combined balance sheets thereof as of such date except changes, none of which individually or in the aggregate would have a Guarantor Material Adverse Effect.

(3)   No Guarantor, and no Subsidiary of any Guarantor, is in default and no waiver of default is currently in effect, in the payment of any principal or interest on any Indebtedness of the Guarantors or any of their respective Subsidiaries and no event or condition exists with respect to any Indebtedness of the Guarantors or any of their respective Subsidiaries that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment, except for such defaults, events and conditions which would not individually or in the aggregate have a Guarantor Material Adverse Effect.

(c)   The Operative Documents to which the Guarantors are parties have been duly authorized, executed and delivered by each Guarantor and constitute valid and binding obligations of each Guarantor enforceable against each Guarantor in accordance with the respective terms thereof, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(d)   The execution and delivery by the Guarantors of the Operative Documents to which the Guarantors are parties and compliance by the Guarantors with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Guarantors or contravene the provisions of, or constitute a default under, or result in the creation of any Lien upon the Property of any Guarantor under, its respective charter or by-laws or any indenture, mortgage, contract or other agreement or instrument to which any Guarantor is a party or by which it or any of such Guarantor's Property may be bound or affected.

(e)   There are no proceedings pending or (to the Guarantor's knowledge, after due inquiry) threatened, nor (to the Guarantor's knowledge, after due inquiry) is there any existing basis for any such proceedings, against or affecting any Guarantor in any court or before any governmental authority or arbitration board or tribunal which, if adversely determined, would have a Guarantor Material Adverse Effect.  No Guarantor is (to the knowledge of such Guarantor, after due inquiry) in default with respect to any order of any court or governmental authority or arbitration board or tribunal, which default would have a Guarantor Material Adverse Effect.

(f)   No Guarantor is in violation of any term of any charter instrument, by-law or other material agreement or instrument to which it is a party or by which it may be bound, which violation would have a Guarantor Material Adverse Effect.  Each Guarantor is in compliance with all laws, ordinances, governmental rules and regulations to which it is subject, failure to comply with which would have a Guarantor Material Adverse Effect, and has obtained all licenses, permits, franchises and other governmental authorizations necessary to the conduct of its business, except where the failure to have any such license, permit, franchise or authorization would not have a Guarantor Material Adverse Effect.

-12-

BB000826

(g)    The written statements furnished to any Participant by the Guarantors, the Tenant or any Person authorized or employed by the Guarantors or the Tenant as agent, broker, dealer or otherwise in connection with the negotiation of the transactions contemplated by this Agreement, do not, when taken as a whole, contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading.  There is no fact known to the Tenant or any Guarantor which the Guarantors or the Tenant have not disclosed to each Participant in writing which would have a Guarantor Material Adverse Effect.

(h)    The Lease Guaranty is in full force and effect according to its terms and is not in default.

(i)    No approval, consent or withholding of objection on the part of any Australian, Barbados or United States regulatory body, state, Federal or local, which has not been obtained is necessary in connection with the execution, delivery and performance by the Guarantors of the Operative Documents to which the Guarantors are parties or compliance by the Guarantors with any of the provisions of such Operative Documents.

(j)    To the Guarantors' knowledge, after due inquiry, all tax returns and reports required by law to be filed by each Guarantor have been duly filed, and no taxes, assessments, contributions, fees or other governmental charges upon it or any of its assets or income which are due and payable thereon are delinquent, except to the extent that (1) such taxes, assessments, contributions, fees or charges are being contested in good faith and by proper proceedings and against which appropriate reserves are being maintained or (2) the failure to file any such return or pay any such tax, assessment, contribution, fee or charge would not have a Guarantor Material Adverse Effect.

(k)    To the Guarantors' knowledge, after due inquiry, (1) the consummation of the transactions provided for in this Agreement and in the other Operative Documents to which the Guarantors are parties and compliance by the Guarantors with the provisions of the Lease Guaranty and with the provisions of the other Operative Documents to which the Guarantors are parties, will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code.  The representation by the Guarantors in the preceding sentence is made in reliance upon and subject to the accuracy of the representations of the Participants in **Section 3.5(c)** and disclosures pursuant thereto as to the source of the funds used by the Participants to make their respective investments pursuant to this Agreement.  None of the Guarantors nor any ERISA Affiliate thereof has incurred or could reasonably be expected to incur in connection with the withdrawal from any Multiemployer Plan, the termination of a Plan or any other Reportable Event, any liability which would have a Guarantor Material Adverse Effect.

(2)    Each Non-U.S. Pension Plan has been maintained in substantial compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities; none of the Guarantors nor any of their respective Subsidiaries have incurred any obligation in connection with the termination of or withdrawal from any Non-

-13-

**BB000827**

U.S. Pension Plan; and all contributions required to be made with respect to each Non-U.S. Pension Plan have been timely made, except where any such obligation or the nonpayment of any such contribution would not have a Guarantor Material Adverse Effect.

*Section 3.4.    Private Offering.*   (a) The Company warrants and represents to the Tenant, the Guarantors and the Participants that neither the Company nor any Person authorized or employed by the Company as agent, broker, dealer or otherwise in connection with the placement of the Notes, the Beneficial Interest or any similar Security has offered any of the Notes, the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser.

(b)    The Tenant warrants and represents to the Company and the Participants that neither the Tenant nor, except as provided in **Section 3.4(c),** any Person authorized or employed by the Tenant as agent, broker, dealer or otherwise in connection with the placement of the Notes, the Beneficial Interest or any similar Security has offered any of the Notes, the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, except as expressly contemplated by **Section 3.4(c).**

(c)    The Guarantors warrant and represent to the Participants that:

(1)    neither the Guarantors nor any Affiliate of any thereof or Babcock & Brown (the only Person authorized or employed by the Guarantors as agent, broker or otherwise in connection with the offering or sale of the Beneficial Interest or any similar Security) has offered any of the Beneficial Interest or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, other than the Equity Investor and not more than ten other Institutional Investors, each of which was offered the Beneficial Interest at private sale for investment and which the Guarantors or such agent had reasonable grounds to believe, and did believe, and, as to the Equity Investor, after reasonable inquiry does believe, has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Beneficial Interest; and

(2)    neither the Guarantors nor any Affiliate of any thereof or Babcock & Brown (the only Person authorized or employed by the Guarantors as agent, broker, dealer or otherwise in connection with the offering or sale of the Notes or any similar Security) has offered any of the Notes or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser, other than the Note Purchaser and ten other institutional investors, each of which was offered a portion of the Notes at private sale for investment and each of which the Guarantors or such agent had reasonable grounds to believe, and did believe, and, as to the Note Purchaser, after reasonable inquiry does believe, has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Notes.

-14-

**BB000828**

(d)   The Equity Investor warrants and represents to the Tenant and the Note Purchaser that neither the Equity Investor or any Person affiliated therewith nor any Person authorized or employed by the Equity Investor as agent, broker, dealer or otherwise in connection with the placement of the Beneficial Interest, the Notes or any similar Security has offered any of the Beneficial Interest, the Notes or any similar Security for sale to, or solicited offers to buy any thereof from, or otherwise approached or negotiated with respect thereto with, any prospective purchaser.

(e)   The Company, the Equity Investor, the Tenant and the Guarantors each for itself agree that neither it nor anyone acting on its behalf will offer:

(1)   the Beneficial Interest or any part thereof or any similar Security for issue or sale to, or solicit any offer to acquire any of the Beneficial Interest from, anyone so as to bring the issuance and sale of the Beneficial Interest within the provisions of Section 5 of the Securities Act of 1933, as amended, or

(2)   the Notes or any part thereof or any similar Security for issue or sale to, or solicit any offer to acquire any of the Notes from, anyone so as to bring the issuance and sale of the Notes within the provisions of Section 5 of the Securities Act of 1933, as amended.

*Section 3.5.   Representations and Covenants of the Participants; Transfer of Beneficial Interest and Notes.*

(a)   *Representations and Covenants of the Equity Investor.*   The Equity Investor warrants and represents to the Note Purchaser, the Company, the Tenant and the Guarantors that:

(1)   The Equity Investor is a limited liability company duly organized, validly existing and in good standing under the laws of the British Virgin Islands and has the power and authority to carry on its present business and operations, to own or lease its Properties and to enter into and perform its obligations under the Operative Documents to which it is a party.

(2)   The Operative Documents to which the Equity Investor is a party have been duly authorized, executed and delivered by the Equity Investor and constitute legal, valid and binding obligations of the Equity Investor enforceable against the Equity Investor in accordance with their respective terms, except as such terms may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting the rights of creditors generally and except as equitable remedies such as specific performance may be in the discretion of the courts.

(3)   The execution and delivery by the Equity Investor of the Operative Documents to which it is a party and compliance by the Equity Investor with all of the provisions thereof do not and will not contravene any law or any order of any court or governmental authority or agency applicable to or binding on the Equity Investor

BB000829

or contravene the provisions of, or constitute a default under, its charter or by-laws or any indenture, mortgage, contract or any agreement or instrument to which the Equity Investor is a party or by which it or any of its Property may be bound or affected.

(4)   No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery or performance by the Equity Investor of the Operative Documents to which the Equity Investor is a party.

(5)   The Premises are free of Liens and encumbrances of other Persons resulting from claims against the Equity Investor not related to the transactions contemplated by the Operative Documents. Without limiting the foregoing, there are no taxes (including, without limitation, any stamp tax), fees or assessments due, assessed or levied against the Equity Investor by any Australian or United States Federal, state or local governmental or public authority or agency (including any taxing authority) arising out of the acquisition of the Premises as contemplated by this Agreement which are unpaid on and as of the Closing Date.

(6)   The Equity Investor is not a party in interest with respect to any employee benefit plan whose name has been disclosed to the Note Purchaser pursuant to **Section 3.5(c)** and the Securities of the Equity Investor are not employer securities with respect to any such plan.

(7)   The Equity Investor has not assigned or transferred any of its right, title or interest in or to the Beneficial Interest.

(b)   *Purchase for Investment.* Each Participant represents to each other Participant, the Company, the Tenant and the Guarantors that such Participant is purchasing the Interest (as hereinafter defined) to be acquired by it for the account of such Participant for investment and with no present intention of distributing or reselling such Interest or any part thereof, but without prejudice, however, to the right of such Participant at all times to sell or otherwise dispose of all or any part of such Interest under a registration under the Securities Act of 1933, as amended, or under an exemption from such registration available under such Act and otherwise in compliance with all applicable laws (including, without limitation, ERISA); *provided* that the disposition of such Interest shall at all times be within its control, subject, in the case of the Beneficial Interest, to compliance with the provisions of **Section 3.5(e)** and, in the case of the Notes, **Section 3.5(f)**.

The Beneficial Interest and the Notes are sometimes referred to in this **Section 3.5** collectively as the *"Interests"* and individually as an *"Interest"*.

(c)   *Source of Funds.* Each Participant represents that at least one of the following statements is an accurate representation as to the source of funds (a *"Source"*) to be used by such Participant to make its investment pursuant to Section 1:

-16-

**BB000830**

(1)    if such Participant is an insurance company, the Source is an "insurance company general account" as defined in Department of Labor Prohibited Transaction Exemption ("*PTE*") 95-60 (issued July 12, 1995) and there is no employee benefit plan established or maintained by the Tenant or the Equity Investor, treating as a single plan all plans maintained by the same employer or employee organization, with respect to which the amount of the reserves and liabilities of all general account contracts held by or on behalf of such plan(s) exceed ten percent (10%) of the total reserves and liabilities of such general account (exclusive of separate account liabilities) *plus* surplus, as set forth in the NAIC Annual Statement filed with the Note Purchaser's state of domicile; or

(2)    if such Participant is an insurance company, the Source is either (i) an insurance company pooled separate account, within the meaning of PTE 90-1 (issued January 29, 1990), or (ii) a bank collective investment fund, within the meaning of the PTE 91-38 (issued July 12, 1991) and, except as such Participant has disclosed to the Tenant and the Equity Investor in writing pursuant to this paragraph (2), no employee benefit plan or group of plans maintained by the same employer or employee organization beneficially owns more than 10% of all assets allocated to such pooled separate account or collective investment fund; or

(3)    if such Participant is an insurance company, the Source constitutes assets of an "investment fund" (within the meaning of Part V of the QPAM Exemption) managed by a "qualified professional asset manager" or "QPAM" (within the meaning of Part V of the QPAM Exemption), no employee benefit plan's assets that are included in such investment fund, when combined with the assets of all other employee benefit plans established or maintained by the same employer or by an affiliate (within the meaning of Section V(c)(1) of the QPAM Exemption) of such employer or by the same employee organization and managed by such QPAM, exceed 20% of the total client assets managed by such QPAM, the conditions of Part I(c) and (g) of the QPAM Exemption are satisfied, neither the QPAM nor a Person controlling or controlled by the QPAM (applying the definition of "control" in Section V(e) of the QPAM Exemption) owns a 5% or more interest in the Tenant or the Equity Investor and (A) the identity of such QPAM and (B) the names of all employee benefit plans whose assets are included in such investment fund have been disclosed to the Tenant and the Equity Investor in writing pursuant to this paragraph (3); or

(4)    the Source is a "governmental plan" (as defined in Section 3(32) of ERISA); or

(5)    the Source is one or more employee benefit plans, or a separate account or trust fund comprised of one or more employee benefit plans, each of which has been identified to the Tenant and the Equity Investor in writing pursuant to this paragraph (5); or

(6)    the Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA.

**BB000831**

If the Note Purchaser or any subsequent transferee of the Notes indicates that it or such transferee is relying on any representation contained in paragraph (2), (3) or (5) above, the Tenant shall deliver to the Note Purchaser on the date of Closing and on the date of any applicable transfer of the Notes a certificate, which shall either state that (A) it is neither a party in interest nor a "disqualified person" (as defined in Section 4975(e)(2) of the Code), with respect to any plan identified pursuant to paragraphs (2) or (5) above, or (B) with respect to any plan, identified pursuant to paragraph (3) above, neither it nor any "affiliate" (as defined in Section V(c) of the QPAM Exemption) has at such time, and during the immediately preceding one year, exercised the authority to appoint or terminate said QPAM as manager of any plan identified in writing pursuant to paragraph (3) above or to negotiate the terms of said QPAM's management agreement on behalf of any such identified plan. As used in this **Section 3.5**, the terms "employee benefit plan", "governmental plan", "party in interest" and "separate account" shall have the respective meanings assigned to such terms in Section 3 of ERISA.

(d)   *Reaffirmation on the Closing Date.*   The advance of funds by the Equity Investor on the Closing Date shall constitute a reaffirmation by the Equity Investor of its representations and warranties set forth in this **Section 3.5** as of the Closing Date, and the purchase of the Notes by the Note Purchaser on the Closing Date shall constitute reaffirmation by the Note Purchaser of its representations and warranties set forth in this **Section 3.5** as of the Closing Date.

(e)   *Restrictions on Transfer of Equity Investor's Interests.*   The Equity Investor agrees that it will not at any time transfer or assign any of the Beneficial Interest unless (1) the transferee or assignee is organized under the laws of any state of the United States, (2) the transferee or assignee is an "affiliated company" or is acceptable to the Note Purchaser, the Tenant and the Guarantors as evidenced by their respective written consents delivered to the Equity Investor, such consents not to be unreasonably withheld or delayed, (3) the transferee or assignee shall execute and deliver an agreement in form and substance satisfactory to the Note Purchaser, the Tenant and the Guarantors whereby the transferee or assignee agrees to be bound by all of the terms of and to undertake all of the obligations of the Equity Investor under each of the Operative Documents to which it is a party and makes representations of the scope provided for as to the Equity Investor in each of the Operative Documents, and (4) all Australian, Barbados and United States Federal, state and local taxes (including, without limitation, stamp taxes), fees and assessments due or to become due in connection with such transfer or assignment of the Beneficial Interest shall have been paid in full and evidence thereof shall have been delivered to the Note Purchaser, the Tenant and the Guarantors. The term *"affiliated company"* shall mean any company (the *"Parent"*) owning not less than 80% of the Equity Interests of the Equity Investor, any company (the *"Holding Company"*) owning, directly or indirectly, not less than 80% of the Equity Interests of the Parent, and any company not less than 80% of the Equity Interests of which is owned, directly or indirectly, by the Holding Company, the Parent or the Equity Investor. Prior to transferring its Beneficial Interest, the Equity Investor shall give written notice to the Note Purchaser, the Tenant and the Guarantors specifying the name and address of the transferee and such additional information as may be required to demonstrate compliance with the preceding provisions of this **Section 3.5(e)**, accompanied by the opinion of independent

-18-

**BB000832**

counsel for the transferring Equity Investor (at the expense of the transferring Equity Investor or the new Equity Investor) that a registration of the Beneficial Interest under the Securities Act of 1933, as amended, has been performed or, if applicable, no such registration is necessary in connection with such transfer or assignment (the cost of such opinion, together with any out-of-pocket expenses of the Note Purchaser, the Tenant and the Guarantors directly incurred in connection with any such transfer, to be paid by the transferring Equity Investor). Upon any such transfer or assignment of the Beneficial Interest as above provided, the transferee or assignee shall be deemed the "Equity Investor" for all purposes of the Operative Documents and shall be deemed to have made all payments previously made by the transferring or assigning Equity Investor; each reference in the Operative Documents to the Equity Investor shall thereafter be deemed to mean such transferee or assignee; and the transferring or assigning Equity Investor shall be relieved of all obligations and liabilities of the Equity Investor arising subsequent to the date of such transfer or assignment (other than any obligation or liability under any guaranty referred to in clause (iii) above); *provided* that in no event shall any such transfer or assignment waive or release the transferor or assignor from any liability on account of any breach of any representations or warranties, covenants or obligations set forth in this Agreement or for any fraudulent or willful misconduct. Any transfer or assignment of the Beneficial Interest in violation of this **Section 3.5(e)** shall be void and of no effect.

(f) *Restrictions on Transfer of Notes.* Anything contained in this Agreement or any of the other Operative Documents to the contrary notwithstanding, the Note Purchaser may transfer all or any part of the Notes and its rights under and pursuant to the Operative Documents, in whole or in part, to any Person; *provided* that (i) such Person is an Institutional Investor and (ii) such Person is not a Competitor; and *provided, further*, that if the Note Purchaser wishes to transfer to any Person other than an Institutional Investor, it may do so, *provided* that it shall first have obtained the prior written consent of any of the Guarantors, which consent shall not be unreasonably withheld or delayed.

SECTION 4.     CONDITIONS.

*Section 4.1.    Conditions Precedent to Investment by Each Participant.* The obligations of each Participant to make its investment pursuant hereto on the Closing Date shall be subject to the following conditions:

(a) *Execution of Operative Documents.* On or before the Closing Date, the Operative Documents shall have been duly executed and delivered by the parties thereto and shall be in full force and effect, and no default shall exist in the performance by any party thereto of any of its obligations thereunder.

(b) *Recording.* Either (1) the Quitclaim Deed and the Lease (or notices or memoranda thereof) and such other documents as are deemed necessary or appropriate by such Participant shall on the Closing Date have each been recorded or filed for record in such public offices as may be necessary or appropriate in order to protect the rights of the Company thereunder and if such Participant is the Note Purchaser to perfect the right, title and interest of the Note Purchaser in and to the,

BB000833

the Premises, the Lease and the Lease Guaranty, or (2) the transactions contemplated hereunder are to be closed by a so-called "New York-style" closing with the Title Company providing policies of title insurance to the parties dated the Closing Date and in the form required by **Section 4.1(g)**, and all of the foregoing documents shall have been delivered to the Title Company on the day of or prior to the Closing Date.

(c)    *Closing Certificate of Tenant.*  On the Closing Date, such Participant shall have received an Officer's Certificate of the Tenant dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of such Participant to make the investment by such Participant contemplated by **Section 1** on the Closing Date, to the effect that the warranties and representations of the Tenant set forth in **Section 3.2** and **3.4(b)** hereof are true on the Closing Date with the same effect as though made on and as of that date  and that no Lease Default or Lease Event of Default has occurred and is continuing.

(d)    *Closing Certificate of Guarantors.*  On the Closing Date, such Participant shall have received an Officer's Certificate of each Guarantor dated the Closing Date, the truth and accuracy of such shall be a condition to the obligation of such Participant to make the investment of such Participant contemplated by **Section 1** on the Closing Date, to the effect that the warranties and representations of the Guarantors set forth in **Section 3.3** and **3.4(c)** hereof are true on the Closing Date with the same effect as though made on and as of that date and that no Lease Default or Lease Event of Default under the Lease has occurred and is continuing.

(e)    *Survey.*  At least two Business Days prior to the Closing Date, the Company shall have caused a physical survey of the parcel of real estate constituting the Premises, showing the location of the improvements on such parcel of real estate, to be made by a registered civil engineer or surveyor licensed in the Commonwealth of Massachusetts in accordance with the standard detail requirements for land title surveys adopted by the American Land Title Association (*"ALTA"*) (including the items 3, 4, 6, 7 (in its entirety), 8, 9, 10, 11 and 14 (number of stories, and finish floor elevations if the building is in a flood zone) checked on Table A — Optional Survey Responsibilities and Specifications) and the American Congress on Surveying & Mapping, as revised and in effect as of the date hereof, and shall have furnished to such Participant and its special counsel a plat of survey duly certified by such engineer or surveyor which shall show no material encroachments upon such real estate parcel by adjoining buildings or structures and no encroachments on adjoining premises by the buildings or improvements erected thereon.

(f)    *Evidence of Title.*  At least two Business Days prior to the Closing Date, the Company shall have obtained the commitment of First American Title Insurance Company (the *"Title Company"*), to issue policies of mortgage title insurance on a standard ALTA Form Mortgage Title Insurance Policy (Loan Policy-1970 Form, if available, or if the 1970 is unavailable, the 1992 Form) with a Comprehensive Endorsement, Access Endorsement, Endorsement requiring the Title Company to first obtain the Note Purchaser's consent before the Title Company exercises its options

**BB000834**

under paragraph 6(b)(i) of the Conditions and Stipulations sections of the ALTA Policy (if the 1992 form is used), Zoning Endorsement, and Endorsement deleting Item 7 from the Exclusions from Coverage (if the 1992 form is used) and otherwise in form and substance satisfactory to you and your special counsel (*"ALTA Policy"*) in the aggregate amount which will provide for mortgage title insurance in an amount not less than the aggregate principal amount of Notes then and thereafter issued, covering the Premises, and showing good and marketable record title to the Premises to be vested in the Company subject only to:

      (1)    the Liens and encumbrances, if any, permitted by the Mortgage;

      (2)    such exceptions as are standard under an ALTA Policy (but such policy shall not be subject to a standard survey or mechanic's lien exception); and

      (3)    such other exceptions as shall be satisfactory to such Participant and its special counsel; and

agreeing to insure the Note Purchaser, upon the proper execution and recording of the Mortgage, against loss or damage sustained by reason of such Mortgage not being a first and paramount lien upon the title to the Premises, subject only to the exceptions referred to in the foregoing clauses (1) through (3).

      (g)   *Environmental Report.*  At least five Business Days prior to the Closing Date, such Participant and its special counsel shall have received a copy of an environmental assessment of the Premises prepared by Beals & Thomas, Inc., which shall be in form and substance reasonably satisfactory to such Participant and its special counsel.

      (h)   *Appraisal Report.*  At least one Business Day prior to the Closing Date each Participant shall have received from Lynch Murphy Walsh & Partners Incorporated an MAI-approved report dated such date with respect to the fair market value of the Premises which shall be in form and substance reasonably satisfactory to such Participant and its special counsel.

      (i)   *Opinions of Counsel.*  On the Closing Date, such Participant shall have received the favorable written opinions of Riemer & Braunstein, independent Massachusetts counsel for the Tenant and the Guarantors, Arnold Bloch Leibler, independent Australian counsel for HCL, R.H. Maraj, independent Barbados counsel for HCA, and Skadden, Arps, Slate, Meagher & Flom LLP, independent Delaware counsel for the Tenant and the Guarantors substantially in the respective forms set forth in Annex IV hereto.

      (j)   *Engineers' or Architects' Certificate.*  Not less than one Business Day prior to the Closing Date, such Participant and its special counsel shall have received executed copies of a certificate of an engineer or architect employed by the Tenant and

-21-

**BB000835**

licensed to do business in the Commonwealth of Massachusetts, to the effect that the signer has reviewed the Plans of the Premises, and based on such review, (1) the Premises has been completed in accordance with the Plans and (2) no other facilities are or will be necessary to permit the operation and maintenance of the Premises in accordance with good engineering and operational practices.

(k)   *Cost Certificate.*   Not less than one Business Day prior to the Closing Date, such Participant and its special counsel shall have received an Officer's Certificate of the Tenant dated the Closing Date stating in reasonable detail the actual construction cost of the Premises, exclusive of the cost of any Tenant's Trade Property.

(l)   *Insurance Certificate.*   On or before the Closing Date, such Participant and its special counsel shall have received an Officer's Certificate of the Tenant dated the Closing Date accompanied by certificates or other satisfactory evidence of the maintenance of the insurance required pursuant to Section 12 of the Lease.

(m)   *Corporate Existence and Authority of Tenant.*   On the Closing Date, the Participants and their special counsel shall have received, in form and substance reasonably satisfactory to the Participants and their special counsel, such documents and evidence with respect to the Tenant as any Participant may reasonably request in order to establish the existence and good standing of the Tenant, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in this **Section 4.1**.

(n)   *Corporate Existence and Authority of Guarantors.*   On the Closing Date, the Participants and their special counsel shall have received, in form and substance reasonably satisfactory to the Participants and their special counsel, such documents and evidence with respect to each Guarantor as any Participant may reasonably request in order to establish the existence and good standing of the Guarantors, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in this **Section 4.1**.

(o)   *Related Transactions.*   The other Participant shall make the investment contemplated for such other Participant by **Section 1**.

(p)   *Real Property Foreign Investment.*   On the Closing Date, the Developer shall deliver to the Company, the Equity Investor and the Note Purchaser an affidavit in form reasonably satisfactory to the Participants certifying that the Developer is not a "foreign person" for purposes of Section 1445 of the Code.

(q)   *Proceedings Satisfactory.*   All proceedings taken in connection with the transactions contemplated hereby and all documents and papers relating thereto shall be reasonably satisfactory to such Participant and its special counsel, and such

-22-

Participant and such special counsel shall have received copies of such documents and papers as such Participant or such special counsel may reasonably request in connection therewith or as a basis for such special counsel's closing opinion, all in form and substance reasonably satisfactory to such Participant and such special counsel.

*Section 4.2.   Additional Conditions Precedent to Note Purchase.* The obligation of the Note Purchaser to purchase and pay for Notes pursuant hereto on the Closing Date shall be subject to the conditions specified in **Section 4.1** and the following additional conditions:

(a)   *Recording of Mortgage.* Either (1) the Mortgage and the Lease Assignment shall on the Closing Date have been recorded or filed in all public offices as may be necessary or appropriate in order to perfect the Lien and security interest granted by the Mortgage and the Lease Assignment as against creditors of and purchasers from the Company and the Equity Investor or (2) the transactions contemplated hereunder are to be closed by a so-called "New York-style" closing, and the Mortgage and the Lease Assignment shall have been delivered to the Title Company on the day of or prior to the Closing Date.

(b)   *Legal Investment.* The Notes shall on the Closing Date qualify as a legal investment for the Note Purchaser under any laws regulating investments to which it may be subject.

(c)   *Closing Certificate of Company and Company Manager.* (1) On the Closing Date, the Note Purchaser shall have received an Officer's Certificate of the Company dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment by the Note Purchaser contemplated by **Section 1** hereof on the Closing Date, to the effect that the representations and warranties of the Company set forth in **Sections 3.1** and **Section 3.4(a)** hereof are true on the Closing Date with the same effect as though made on and as of that date, and that to the knowledge of the Company, no Mortgage Default or Mortgage Event of Default has occurred and is continuing.

(2)   On the Closing Date, the Note Purchaser shall have received an Officer's Certificate of the Company Manager dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment of the Note Purchaser contemplated by **Section 1** on the Closing Date, in the form attached hereto as Exhibit F.

(d)   *Compliance Certificate.* On the Closing Date, the Note Purchaser and its special counsel shall have received an Officer's Certificate from each of the Guarantors dated the Closing Date, the truth and accuracy of which shall be a condition to the obligation of the Note Purchaser to make the investment of the Note Purchaser contemplated by **Section 1** on the Closing Date, to the effect that after giving effect to the issuance of the Notes, and the transactions contemplated hereby (including, without limitation, the delivery of the Lease Guaranty), the ratio of

**BB000837**

Consolidated Total Indebtedness to Consolidated EBITDA for the immediately preceding four fiscal quarter period does not exceed 5.50 to 1.00.

(e)   *Corporate Existence and Authority of Company, Company Manager, Equity Investor and Equity Investor Manager.* On the Closing Date, the Note Purchaser and its special counsel shall have received, in form and substance reasonably satisfactory to the Note Purchaser and its special counsel, such documents and evidence with respect to the Company, the Company Manager, the Equity Investor and the Equity Investor Manager as the Note Purchaser may reasonably request in order to establish the existence and good standing of the Company, the Company Manager, the Equity Investor and the Equity Investor Manager, the authorization of the transactions contemplated by the Operative Documents, the taking of all corporate proceedings in connection therewith and compliance with the conditions set forth in **Section 4.1.**

(f)   *Opinions of Counsel.* On the Closing Date, the Note Purchaser shall have received the favorable written opinions of Chapman and Cutler, special counsel for the Note Purchaser, and of Goulston & Storrs, independent counsel for the Company, substantially in the respective forms set forth in Annex IV hereto.

(g)   *Reconciliation to U.S. GAAP.* Not less than one Business Day prior to the Closing Date, the Note Purchaser shall have received, in form and substance satisfactory to the Note Purchaser a reconciliation between Australian GAAP and U.S. GAAP with regard to the profit and loss account of the Guarantors for the fiscal year ended July 3, 1997.

(h)   *Funding Instructions.* Not less than one Business Day prior to the Closing Date, the Note Purchaser shall have received written instructions executed by an authorized financial representative of the Company directing the manner of payment of funds and setting forth (1) the name and address of the transferee bank, (2) the transferee bank's ABA number, (3) the account name and number into which the purchase price for the Notes is to be deposited, and (4) the name and telephone number of the account representative responsible for verifying receipt of such funds.

(i)   *Payment of Special Counsel Fees.* On the Closing Date, reasonable fees and expenses of Chapman and Cutler, special counsel to the Note Purchaser in connection with the transactions contemplated hereby, as set forth in an invoice delivered to the Company and the Tenant, shall be paid.

SECTION 5.    SPECIAL RIGHTS OF NOTE PURCHASER.

Notwithstanding any provision to the contrary in this Agreement, the Mortgage or the Notes relating to the manner and place of payment, but, subject always to the Lease Assignment pursuant to which the Tenant agrees on the terms and conditions therein set forth to pay Basic Rent, the Casualty Value Purchase Price, the Make-Whole Amount, if any, and any Additional Rent due and owing to Note Purchaser directly to the Note Purchaser, all amounts payable to the Note Purchaser with respect to any Notes held by the Note Purchaser

BB000838

or a nominee for the Note Purchaser shall be paid by the Company to the Note Purchaser (without any presentment thereof and without any notation of such payment being made thereon) by check, duly mailed, by first class mail, postage prepaid, or delivered to the Note Purchaser at the address for payments for the Note Purchaser appearing beneath its signature at the foot of this Agreement or, if wire transfer to a bank account is designated by the Note Purchaser beneath its signature at the foot of this Agreement or in a written notice from the Note Purchaser to the Company, by wire transfer of immediately available Federal Reserve funds to the bank so designated for credit to the account and marked for attention as so designated, *provided* that such bank has facilities for the receipt of a wire transfer, or in such other manner or to such other address in the United States as may be designated by the Note Purchaser in a written notice from the Note Purchaser to the Company. In the case of any wire transfer, the Company will make such transfer from the office of the Company on each date any payment or prepayment of principal or interest on the Notes is due not later than 10:00 a.m., Chicago, Illinois time, *provided* that funds therefor have been received by the Company in cash or in solvent credits acceptable to it or if not so received promptly upon receipt.

SECTION 6.     COMPANY COVENANTS.

From and after the Closing Date and continuing so long as any amount remains unpaid on any Note, the Company covenants with the Note Purchaser, the Tenant and the Guarantors and their successors and assigns as follows:

*Section 6.1.    Office for Notices.* The Company will keep an office while any of the Notes issued hereunder are outstanding at the notice address set forth herein, where notices, presentations and/or demands to or upon the Company in respect of said Notes or any other Operative Document may be given or made, until such time as the Company shall so notify the holders of the Notes of any change of location of such office.

*Section 6.2.    Maintenance of Existence, Rights.* The Company will at all times preserve its existence and will obtain and maintain, or will cause to be obtained and maintained, in full force and effect all franchises, privileges, rights, licenses and permits and all other consents, approvals and authorizations of any governmental authority necessary for the ownership and efficient operation and maintenance of its business and Property.

*Section 6.3.    Maintenance of Property.* The Company will at all times maintain, preserve and keep, or will cause to be maintained, preserved and kept, its Property and assets (whether owned in fee or a leasehold interest) in good repair and working order and from time to time will make, or will cause to be made, all necessary repairs, replacements, renewals and additions so that at all times the efficiency thereof shall be maintained.

*Section 6.4.    Insurance.* The Company will maintain, or will cause to be maintained, insurance coverage by financially sound and reputable insurers in such forms and amounts and against such risks as are required of it by the terms of Section 2.6 of the Mortgage.

BB000839

*Section 6.5.    Payment of Taxes and Other Charges; Compliance with Laws.*  (a) The Company will promptly pay and discharge or will cause to be paid promptly or discharged all lawful taxes, assessments and governmental charges or levies imposed upon the Company or upon or in respect of all or any part of the Property, assets and business of the Company, all trade accounts payable in accordance with usual and customary business terms, and all claims for work, labor or materials which if unpaid might become a Lien or charge upon any property or assets of the Company, other than Permitted Encumbrances which are not by the terms of the Operative Documents the responsibility of the Company.

(b)    The Company will promptly comply with all laws, ordinances or governmental rules and regulations to which it is subject, including without limitation, the Occupational Safety and Health Act of 1970, as amended, ERISA, the Americans with Disabilities Act of 1990, and all Environmental Laws.

*Section 6.6.    Negative Covenants.*  The Company will not, directly or indirectly:

(a)    engage in any business other than the ownership and operation of the Premises, the leasing of the Premises to the Tenant under the Lease and the financing thereof through the issuance of the Notes as provided in this Agreement and the Mortgage;

(b)    incur, assume, guarantee or otherwise create or be or become liable in respect of any Indebtedness other than the Notes;

(c)    make, or permit to remain outstanding, any investment, loan or advance to, or own or acquire any stock or Securities of, any Person;

(d)    pay or declare any dividend, or make any other distribution if, after giving effect thereto, a Mortgage Default or Mortgage Event of Default would exist or if the making of such dividend or other distribution would adversely affect the ability of the Company to perform its obligations under this Agreement or any other Operative Document to which it is a party;

(e)    create by its acts or suffer to be created or exist any mortgage, security interest, lien, charge or encumbrance of any kind whatsoever upon any part of the Premises or any part or portion thereof or upon any rents, income, revenues, issues and profits thereof, other than the Mortgage and Liens, claims and encumbrances expressly permitted by the terms thereof;

(f)    enter into any lease of the Premises, whether as lessor or as lessee, other than the Lease;

(g)    sell, transfer, exchange or otherwise dispose of any part of the Premises or any part or portion thereof, other than as expressly permitted by the Mortgage;

-26-

**BB000840**

(h)  create, organize or establish any Person, including, without limitation any Subsidiary or partnership; or

(i)  hire any employee.

*Section 6.7.  Mergers and Consolidations.*  The Company will not consolidate with or be a party to a merger with any other Person.

*Section 6.8.  Financial Information and Reports.*  The Company will keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Company, in accordance with GAAP consistently maintained and will furnish to each holder of outstanding Notes in duplicate:

(a)  As soon as available and in any event within 90 days after the close of each fiscal year of the Company, copies of:

(1)  a balance sheet of the Company as of the close of such fiscal year, and

(2)  statements of income, retained earnings and cash flows of the Company for such fiscal year,

in each case setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and certified by the chief financial officer of the Company to the effect that such financial statements have been prepared in accordance with GAAP, are complete and correct and present fairly, in all material respects, the financial condition of the Company;

(b)  Within the period provided in paragraph (a) above, the written statement of the Company, signed by the chief financial officer, stating whether there existed as of the date of such financial statements and whether, to the best of his knowledge, there exists on the date of the certificate any Mortgage Default, Mortgage Event of Default, Lease Default or Lease Event of Default and specifying the nature and period of existence thereof and the action the Company is taking and proposes to take with respect thereto;

(c)  Within five Business Days after becoming aware of the same, the Company shall notify the holders of the Notes in writing of any condemnation proceedings or casualty occurrence to which the Premises has become subject; and

(d)  Such additional information as such holder may reasonably request concerning the Company.

The Company will permit each holder of outstanding Notes (or such Persons as any such holder may designate) to examine all of its books of account, records, reports and other

BB000841

papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, all at such reasonable times and as often as any such holder may reasonably request. Any visitation shall be at the sole expense of the holder of the Notes, unless a Mortgage Default or Mortgage Event of Default shall have occurred and be continuing, in which case, any such visitation shall be at the sole expense of the Company.

*Section 6.9. Repurchase of Notes.* Neither the Company nor any Affiliate of the Company, directly or indirectly, may repurchase or make any offer to repurchase any Notes.

*Section 6.10. Transactions with Affiliates.* The Company will not enter into or be a party to, any transaction or arrangement with any Affiliate (including without limitation, the purchase from, sale to or exchange of property or assets with, or the rendering of any service by or for, any Affiliate), except in the ordinary course of and pursuant to the reasonable requirements of the Company's business and upon fair and reasonable terms no less favorable to the Company than would obtain in a comparable arm's-length transaction with a Person other than an Affiliate.

*Section 6.11. Post Closing Undertaking of the Company.* The Company will, not more than ten days following the Closing Date, cause such amendments and modifications to the organizational documents and instruments of the Company Manager as shall in the opinion of the Note Purchaser be necessary to cause the Company Manager to be a corporation the purpose of which shall be solely to act as the managing member of the Company and another special purpose limited liability company which will own the Property which will be the subject of the financing contemplated by **Section 7.13**.

SECTION 7.     COVENANTS OF THE GUARANTORS.

From and after the Closing Date and continuing so long as any amount remains unpaid on any Note, each Guarantor covenants and agrees severally in the case of **Sections 7.1** through **7.5** and jointly and severally in the case of **Sections 7.6** through **7.14**, in each such case with the Note Purchaser and its successors and assigns as follows:

*Section 7.1. Corporate Existence, Etc.* (a) Such Guarantor will preserve and keep in full force and effect, and will cause each of its Subsidiaries to preserve and keep in full force and effect, its corporate existence and all licenses and permits necessary to the proper conduct of its business, except in the case of any such license or permit or the existence of any such Subsidiary the failure of which to maintain in force and effect would not have a Guarantor Material Adverse Effect and except that the foregoing shall not prevent any transaction permitted by **Section 7.8** or **7.9**.

(b)     The Tenant or its successors will at all times be and remain a Subsidiary of a Guarantor.

*Section 7.2. Insurance.* Such Guarantor will maintain, and will cause each of its Subsidiaries to maintain, insurance coverage by financially sound and reputable insurers and

-28-

**BB000842**

in such forms and amounts and against such risks as are customary for corporations of established reputation engaged in the same or a similar business and owning and operating similar properties.

Section 7.3. Taxes, Claims for Labor and Materials; Compliance with Laws. (a) Such Guarantor will promptly pay and discharge, and will cause each of its Subsidiaries promptly to pay and discharge, all lawful taxes, assessments and governmental charges or levies imposed upon such Guarantor or any such Subsidiary, respectively, or upon or in respect of all or any part of the property or business of such Guarantor or any such Subsidiary, all trade accounts payable in accordance with usual and customary business terms, and all claims for work, labor or materials, which if unpaid might become a Lien upon any property of such Guarantor or any of its Subsidiaries; provided such Guarantor or such Subsidiaries shall not be required to pay any such tax, assessment, charge, levy, account payable or claim if either (1) (i) the validity, applicability or amount thereof is being contested in good faith by appropriate actions or proceedings which will prevent the forfeiture or sale of any property of such Guarantor or such Subsidiary or any material interference with the use thereof by such Guarantor or such Subsidiary, and (ii) such Guarantor or such Subsidiary shall set aside on its respective books, reserves deemed by it to be adequate with respect thereto or (2) the failure to pay any such tax, assessment, charge, levy, account or claim would not have a Guarantor Material Adverse Effect.

(b) Such Guarantor will promptly comply and will cause each of its Subsidiaries to promptly comply with all laws, ordinances or governmental rules and regulations to which it is subject, including, without limitation, the Occupational Safety and Health Act of 1970, as amended, ERISA, the Americans with Disabilities Act of 1990, and all Environmental Laws, the violation of which would have a Guarantor Material Adverse Effect.

Section 7.4. Maintenance, Etc. Such Guarantor will maintain, preserve and keep, and will cause each of its Subsidiaries to maintain, preserve and keep, its Properties which are used or useful in the conduct of its business (whether owned in fee or a leasehold interest) in good repair and working order and from time to time will make all necessary repairs, replacements, renewals and additions so that at all times the efficiency thereof shall be maintained, except where the failure to so maintain, preserve and keep such Properties or make such repairs, replacements, renewals and additions would not have a Guarantor Material Adverse Effect.

Section 7.5. Nature of Business. No Guarantor and no Subsidiary of such Guarantor will engage in any business if, as a result, the general nature of the business, taken on a consolidated basis, which would then be engaged in by such Guarantor and its Subsidiaries would be substantially changed from the general nature of the business engaged in by such Guarantor and its Subsidiaries on the date of this Agreement.

Section 7.6. Limitations on Consolidated Total Debt. The Guarantors will not as at the end of each fiscal quarter permit the ratio of Consolidated Total Indebtedness to Consolidated EBITDA for the immediately preceding four fiscal quarter period ending at such date to exceed 5.50 to 1.00.

-29-

BB000843

*Section 7.7.    Fixed Charges Coverage Ratio.*  The Guarantors will not as at the end of each fiscal quarter permit the ratio of Consolidated EBITDA Available for Fixed Charges for the four consecutive fiscal quarter period ending at such date to Consolidated Fixed Charges for such four consecutive fiscal quarter period to be less than 1.0 to 1.0.

*Section 7.8.    Sale of Assets.*  (a) Subject always to clause (b) of this **Section 7.8**, the Guarantors will not, and will not permit any Subsidiary, to sell, lease, transfer, abandon or otherwise dispose of assets (except assets (including, without limitation, obsolete assets) sold in the ordinary course of business for fair market value as determined by a Guarantor or the affected Subsidiary); *provided* that the foregoing restrictions do not apply to:

(1)    the sale, lease, transfer or other disposition of assets of a Guarantor or a Subsidiary to a Guarantor or a Wholly-owned Subsidiary; or

(2)    the sale or other disposition on an arms-length basis of assets which are obsolete or uneconomic to use; or

(3)    leases, subleases and similar transfers of all or any portion of an asset; *provided* that after giving effect to such transfer such asset remains an asset owned by the applicable Guarantor or Subsidiary in accordance with GAAP; or

(4)    the sale or other disposition of assets for cash or other Property to a Person or Persons other than an Affiliate of any Guarantor if:

(i)    such assets (valued at net book value) do not, together with all other assets of the Guarantors and their Subsidiaries previously disposed of during the same fiscal year pursuant to this clause (4), exceed 15% of Consolidated Total Net Assets determined as of the end of the immediately preceding fiscal year; and

(ii)    immediately after the consummation of the transaction and after giving effect thereto, no Lease Default or Lease Event of Default would exist; *provided, however,* that for purposes of any calculation pursuant to this clause (4), there shall not be included any assets the proceeds of which (net of out-of-pocket expenses and taxes payable in connection with such sale and any Indebtedness which is or will be repaid with such proceeds) were or are applied within twelve months of the sale of such assets to the acquisition of fixed or capital assets or other assets similar to the assets which have been sold or otherwise disposed of and intended to be used in the operation of the business of any Guarantor or any of its Subsidiaries; or

(5)    a transaction expressly permitted by the terms of Section 30.6 of the Lease or **Section 7.9**.

Notwithstanding the foregoing, in the event any Guarantor or Subsidiary proposes to sell, lease, transfer, abandon or otherwise dispose of assets and such assets may not be disposed of

BB000844

within the limitations of clause (a)(1), (a)(2), (a)(3) or (a)(4) of this **Section 7.8** and the Note Purchaser shall withhold its consent to such disposition not otherwise permitted, then and in such event, the Guarantors shall at their option have the right to either (y) purchase (or have another Person purchase) all of the then outstanding Notes and pay interest accrued thereon to the date of purchase, but without premium, or (z) direct the Tenant to purchase the Premises and terminate the Lease pursuant to Section 15 of the Lease and in connection therewith the Company shall concurrently prepay the Notes in full pursuant to Section 5.5 of the Mortgage.

(b)     Anything contained in clause (a) of this **Section 7.8** to the contrary notwithstanding, HCC shall not permit any of the issued and outstanding capital stock of each of its Wholly-owned Subsidiaries as of the Closing Date to be owned by HCL, HCA or any Subsidiary of HCL or HCA other than HCC or any Subsidiary of HCC; *provided* that HCC may request the consent of the Note Purchaser to the disposition of all or any part of the capital stock of any such Wholly-owned Subsidiary within the limitations of **Section 7.8(a)** and such consent by the Note Purchaser shall not be unreasonably withheld or delayed.

*Section 7.9.   Mergers and Consolidations.*  No Guarantor will consolidate with or be a party to a merger with any other Person unless and to the extent (a) after giving effect to such consolidation or merger, the surviving Person shall have a net worth determined in accordance with GAAP equal to or greater than the net worth determined in accordance with GAAP of such Guarantor immediately prior to such consolidation or merger, (b) in the case of a consolidation or merger involving HCC, the surviving corporation shall be organized under the laws of any state of the United States or the District of Columbia, and in the case of a consolidation or merger involving HCL, the surviving corporation shall be organized under the laws of Australia, (c) the due and punctual performance and observance of all of the covenants of such Guarantor in this Agreement and the other Operative Documents to which it is a party are expressly assumed in writing by the surviving corporation, (d) the surviving corporation shall furnish to the Participants an opinion of counsel to the effect that the instrument of assumption has been duly authorized, executed and delivered and constitutes the legal, valid and binding contract and agreement of the surviving corporation enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights generally and by general equitable principles, (e) each of the Guarantors which is not a party to such consolidation or merger shall have acknowledged in writing that the due and punctual performance and observance of all of the covenants of such Guarantor in this Agreement and the other Operative Documents to which it is a party remain legal, valid and binding obligations of such Guarantor and such Guarantor shall furnish to the Participants an opinion of counsel to the effect that such merger or consolidation does not adversely affect the legal, valid and binding nature of such obligations, and (f) (1) immediately prior to such consolidation or merger, no Lease Default or Lease Event of Default exists and (2) immediately after giving effect to such consolidation or merger, (i) no Lease Default or Lease Event of Default would exist and (ii) the ratio on a *pro forma* basis of Consolidated Total Indebtedness (which will include the surviving corporation) to Consolidated EBITDA (which will include the surviving

-31-

**BB000845**

corporation) for the immediately preceding four fiscal quarter period shall not exceed 5.50 to 1.00.

*Section 7.10.   Limitations on Restrictive Agreements.*   The Guarantors will not, and will not permit any of their respective Subsidiaries to, enter into, or suffer to exist, any agreement with any Person which, directly or indirectly, limits the ability of any Subsidiary to (a) pay dividends or make other equity distributions to any Guarantor, (b) prepay any Indebtedness owed to any Guarantor, or (c) transfer any of its Property to any Guarantor, except for any such limitations contained in any agreement in existence on the Closing Date relating to any Indebtedness of any Guarantor or any of their respective Subsidiaries and listed on **Schedule 7.10** attached hereto and renewals or replacements of any such agreements, *provided* that any such renewal or replacement agreement shall not be materially more onerous in respect of the payment of dividends or the making of other equity distributions, the prepayment of any such Indebtedness or the transfer of any such Property than the agreement replaced or renewed; and *provided further* that this **Section 7.10** shall not in any event be deemed or construed to prohibit any anti-assignment clause contained in any lease or other contract.

*Section 7.11.   HCL's Shareholders' Equity.*   HCL will at all times keep and maintain its total shareholders' equity determined in accordance with Australian GAAP at an amount not less than Aust. $100,000,000.

*Section 7.12.   Reports and Rights of Inspection.*   The Guarantors will keep, and will cause each Subsidiary to keep, proper books of record and account in which full and correct entries will be made of all dealings or transactions of, or in relation to, the business and affairs of HCL and its Subsidiaries, and of HCA and its Subsidiaries, in accordance with GAAP consistently applied (except for changes disclosed in the financial statements furnished to the Note Purchaser pursuant to this **Section 7.12** and concurred in by the independent public accountants referred to in **Section 7.12**), and will furnish to the Note Purchaser (in duplicate if so specified below or otherwise requested):

(a)   *Quarterly Statements.*   As soon as available and in any event within 75 days after the end of each quarterly fiscal period (except the last) of each fiscal year, copies of:

(1)   a consolidated balance sheet of HUSH Holdings U.S. Inc. and its Subsidiaries as of the close of such quarterly fiscal period setting forth in comparative form the consolidated figures for the fiscal period then most recently ended,

(2)   a consolidated statement of income of HUSH Holdings U.S. Inc. and its Subsidiaries for such quarterly fiscal period and for the portion of the fiscal year ending with such quarterly fiscal period, in each case setting forth in comparative form the consolidated figures for the corresponding period of the preceding fiscal year, and

**BB000846**

(3)   a consolidated statement of cash flows of HUSH Holdings U.S. Inc. and its Subsidiaries for the portion of the fiscal year ending with such quarterly fiscal period setting forth in comparative form the consolidated figures for the corresponding period of the preceding fiscal year,

all in reasonable detail and certified as complete and correct by an authorized financial officer of HUSH Holdings U.S. Inc.;

(b)   *Semiannual Statements.*   As soon as available and in any event within 90 days after the end of the sixth fiscal month of each fiscal year, copies of:

(1)   a combined balance sheet of HCL, HCA and their Subsidiaries as of the close of such semiannual fiscal period, setting forth in comparative form the combined figures for the fiscal period then most recently ended,

(2)   a combined profit and loss account of HCL, HCA and their Subsidiaries for such semiannual fiscal period and for the portion of the fiscal year ending with such semiannual fiscal period, in each case setting forth in comparative form the combined figures for the corresponding periods of the preceding fiscal year, and

(3)   a combined statement of cash flows of HCL, HCA and their Subsidiaries for the portion of the fiscal year ending with such semiannual fiscal period, setting forth in comparative form the combined figures for the corresponding periods of the preceding fiscal year,

all in reasonable detail and certified as having been prepared in accordance with GAAP by an authorized financial officer of HCL;

(c)   *Annual Statements.*   As soon as available and in any event within 120 days after the close of each fiscal year of HCL and HCA, copies of:

(1)   combined balance sheets of each of HCL and HCA and their respective Subsidiaries as of the close of such fiscal year, and

(2)   combined profit and loss accounts and cash flows of each of HCL and HCA and their respective Subsidiaries for such fiscal year,

in each case setting forth in comparative form the combined figures for the preceding fiscal year, all in reasonable detail and accompanied by a report thereon of a firm of independent public accountants of recognized national standing selected by HCL and HCA to the effect that the combined financial statements present fairly, in all material respects, the combined financial position of each of HCL and HCA and their respective Subsidiaries as of the end of the fiscal year being reported on and the combined results of the operations and cash flows for said year in conformity with GAAP and that the examination of such accountants in connection with such financial statements has been

-33-

BB000847

conducted in accordance with generally accepted auditing standards and included such tests of the accounting records and such other auditing procedures as said accountants deemed necessary in the circumstances;

(d) *Shareholder and Other Reports.* Promptly upon their becoming available, one copy of each financial statement, report, notice or proxy statement sent by either HCL, HCA or HUSH Holdings U.S. Inc. to its creditors or shareholders generally and of each regular or periodic report, and any registration statement or prospectus filed by either HCL or HCA or any Subsidiary with any Australian or Barbados securities exchange or the United States Securities and Exchange Commission or any successor agency of any thereof, and copies of any orders in any proceedings to which HCL or HCA or any of their respective Subsidiaries is a party, issued by any governmental agency, Australian, Barbados or United States Federal or state or otherwise, having jurisdiction over HCL or HCA or any of their respective Subsidiaries, if such order would have a Guarantor Material Adverse Effect;

(e) *Officer's Certificates.* Within the periods provided in paragraphs (b) and (c) above, a certificate of the chief financial officer of HCL stating that such officer has reviewed (or caused to be reviewed) the provisions of this Agreement and setting forth: (1) the information and computations (in sufficient detail) required in order to establish whether HCL and HCA were in compliance with the requirements of **Sections 7.6** through **7.8** and **Section 7.11** at the end of the period covered by the financial statements then being furnished, and (2) whether there existed as of the date of such financial statements and whether, to such officer's knowledge, after due inquiry from the Tenant (except with regard to **Sections 7.6** through **Section 7.8** and **Section 7.11**) there exists on the date of the certificate or existed at any time during the period covered by such financial statements any Lease Default or Lease Event of Default and, if any such condition or event exists on the date of the certificate, specifying the nature and period of existence thereof and the action HCL and HCA are taking and propose to take with respect thereto;

(f) *Australian GAAP Reconciliation.* Within the periods provided in paragraphs (b) and (c) above, a certificate of the Chief Financial Officer of HCL reconciling any change in Australian GAAP adopted by HCL with U.S. GAAP which may have occurred during such period; and

(g) *Requested Information.* With reasonable promptness, such other data and information in respect of any Guarantor or its Subsidiaries as the Note Purchaser may reasonably request.

Without limiting the foregoing, HCL and HCA will permit the Note Purchaser, so long as the Note Purchaser is the holder of any Note, (or such Persons as the Note Purchaser may designate), to visit and inspect for purposes of monitoring the credit, under their guidance, any of the Properties of HCL, HCA or any Subsidiary thereof, to examine all of their books of account, records, reports and other papers, to make copies and extracts therefrom and to so discuss their respective affairs, finances and accounts with their respective officers,

-34-

**BB000848**

employees, and, in the presence of officers of HCL and HCA, independent public accountants (and by this provision HCL and HCA authorize said accountants to so discuss with the Note Purchaser the finances and affairs of HCL and HCA and their Subsidiaries), all at such reasonable times and as often as may be reasonably requested. Any visitation or inspection shall be at the sole expense of the Note Purchaser, unless a Lease Default or Lease Event of Default shall have occurred and be continuing with respect to a default asserted in writing, in which case, any such visitation or inspection shall be at the sole expense of HCL and HCA. HCL and HCA also agree that if either thereof furnishes financial information of the scope and character contemplated by clause (b) of this **Section 7.12** to (1) any of its creditors or (2) shareholders generally more frequently than on a six fiscal month basis, then and in such event HCL or HCA, as the case may be, shall furnish the same such financial information to the Note Purchaser on such more frequent basis to such other creditor or shareholder.

The Note Purchaser agrees with the Tenant and the Guarantors that it will keep confidential in accordance with its internal policies and procedures in effect from time to time any written information with respect to any Guarantor or its Subsidiaries which is furnished pursuant to this Agreement and which is designated by a Guarantor or its Subsidiaries to the Note Purchaser in writing as confidential, *provided* that the Note Purchaser may disclose any such information (1) as has become generally available to the public (other than as a consequence of its actions) or to the Note Purchaser on a non-confidential basis from a source other than any Guarantor or its Subsidiaries or as was shown to the Note Purchaser on a non-confidential basis prior to its disclosure by a Guarantor or its Subsidiaries, (2) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over the Note Purchaser or to the National Association of Insurance Commissioners or similar organizations or their successors, (3) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (4) to the extent that the Note Purchaser reasonably believes it appropriate in order to protect its investment in the Notes or in order to comply with any law, order, regulation or ruling applicable to the Note Purchaser, (5) in accordance with the Note Purchaser's usual and customary procedures relating to confidentiality, to its officers, trustees, employees, auditors or counsel or to rating agencies or another holder of the Notes, (6) to Persons who are parties to similar confidentiality agreements in favor of the Guarantors, or (7) to the prospective transferee in connection with any contemplated transfer of any of the Notes by the Note Purchaser *provided* that such prospective transferee agrees in a customary and usual manner in connection with such transfers for the benefit of the Guarantors to be bound by this paragraph. By its acceptance of a Note, any transferee shall be bound by the terms of this paragraph.

*Section 7.13.   Consummation of Second Transaction.*   The Note Purchaser and the Guarantors agree that they shall use all reasonable commercial efforts to consummate the closing of a second lease financing (the *"Second Financing Transaction"*) of a movie theater property to be acquired by a Subsidiary of a Guarantor for an acquisition price of approximately $5,500,000, pursuant to which a Subsidiary of a Guarantor will be the lessee of such property and The Northwestern Mutual Life Insurance Company (*"NML"*) will be

**BB000849**

the sole debt participant, with the operative documents relating to such financing to be in substantially the same form as the Operative Documents and with the Securities to be purchased by NML to finance 90% of such acquisition price to bear interest at the rate of 9.875% per annum (computed on the basis of a 360-day year of twelve 30-day months) and with such Securities to mature in twenty years from the date of issuance and to have a weighted average life to maturity (calculated in accordance with standard financial practice) of approximately 13 years. Notwithstanding the foregoing, the Note Purchaser shall have no obligation to participate in the second financing transaction if the closing does not occur on or prior to April 1, 1998.

*Section 7.14. Post Closing Undertaking.* The Guarantors will not more than 15 days following the Closing Date deliver to the Note Purchaser a complete and correct list of each of the Guarantors' Subsidiaries, showing as to each Subsidiary, the correct name thereof, the jurisdiction of its incorporation and the percentage of shares of each class of its Capital Stock or similar equity interests outstanding owned by each Guarantor and each other Subsidiary.

SECTION 8.    TENANT'S INDEMNITIES.

The Tenant hereby agrees, whether or not any of the transactions contemplated hereby shall be consummated, to perform and observe, for the benefit of the Participants and their respective successors and assigns, all of the terms and provisions of Sections 6(a) and 8 of the Lease to the full extent and in the same manner and upon the same conditions as if set forth in full herein. The indemnities contained in Sections 6(a) and 8 of the Lease, and the agreements of the Tenant in this **Section 8**, shall survive the termination of this Agreement and the other Operative Documents and shall survive the transfer of any Note or the Beneficial Interest and payment of any or all Notes and extinguishment of the Beneficial Interest.

SECTION 9.    INDEMNITIES OF THE COMPANY AND THE EQUITY INVESTOR.

Each of the Company and the Equity Investor (referred to in this Section as the *"Indemnitors"*) hereby jointly and severally agrees for the benefit of the other Indemnitor, the Tenant, the Guarantors and the Note Purchaser (referred to in this Section as the *"Indemnitees"*) that at all times the Premises shall be free of any Lien arising as a result of claims against any Indemnitor not related to the transactions contemplated by the Operative Documents and to any Indemnitor's interest in the Premises (other than Permitted Encumbrances) and arising as a result of any act or omission on the part of an Indemnitor and that each Indemnitor will at its own cost and expense promptly take such action as may be necessary duly to discharge any such Lien, *provided* that no such Lien need be discharged so long as it is being contested by means of a Permitted Contest. Each Indemnitor further agrees to indemnify and hold harmless the Indemnitees from and against any costs or expenses (including legal fees and expenses) incurred, in each case, as a result of the imposition or enforcement of any such Lien.

BB000850

SECTION 10.   MISCELLANEOUS.

*Section 10.1.   Amendments.* (a) This Agreement may, from time to time and at any time, be amended, supplemented or modified, by an instrument or instruments in writing executed by the Tenant, the Guarantors and the Required Holders (and without the consent of the Company or the Equity Investor), except in the case of any amendment, supplement or modification to **Sections 1, 2, 3.1** through **3.4, 3.5(a)** through **(e), 4, 6** and **9**, in which case such amendment, supplement or modification to **Sections 1, 2, 3.1** through **3.4, 3.5(a)** through **(e), 4, 6** or **9**, as the case may be, shall require the consent of all of the parties hereto. Without limiting the foregoing, the parties hereto acknowledge and agree that the Required Holders in their sole discretion shall have the right to waive any Lease Default or Lease Event of Default pursuant to Section 19(a)(4) of the Lease and to make any decision with respect to the declaration or nondeclaration of a Lease Default or Lease Event of Default pursuant to said Section 19(a)(4) (or waiver thereof) and/or the waiver in any fashion whatsoever of compliance by the Tenant with one or more of the provisions contained in Section 30 of the Lease, in any such case, without the consent or concurrence of the Company or the Equity Investor.

(b)   The Note Purchaser understands and agrees with the Guarantors as long as no Lease Default or Lease Event of Default has occurred and is continuing, it will not enter into any written amendment to the Mortgage without the prior written concurrence of at least one of HCL or HCC, which concurrence shall not be unreasonably withheld or delayed.

*Section 10.2.   Notices.* All communications under this Agreement shall be in writing and shall be personally delivered or sent by first class mail, postage prepaid, or by prepaid courier or express service guaranteeing overnight delivery or by telecopier (with original being promptly sent as otherwise provided above), and shall be deemed to have been given (unless otherwise required by the specific provisions hereof in respect of any matter) when delivered in person or otherwise actually received.

*Section 10.3.   Survival.* All warranties, representations and covenants made by any party herein or in any certificate or other instrument delivered by any party to any other party under this Agreement shall be considered to have been relied upon by such other party (excepting only that the covenants of the Guarantors shall have been deemed and have been exclusively relied upon by the Note Purchaser and not the Company or the Equity Investor) and shall survive the consummation of the transactions contemplated hereby on the Closing Date regardless of any investigation made by such other party or on behalf of such other party.

*Section 10.4.   Successors and Assigns.* This Agreement shall be binding upon and shall inure to the benefit of, and shall be enforceable by, the parties hereto and their respective successors and permitted assigns including each permitted successive holder of the Beneficial Interest and each permitted successive holder of any Note issued and delivered pursuant to this Agreement or the Indenture whether or not an express assignment to any such holder of rights under this Agreement has been made.

**BB000851**

*Section 10.5. Governing Law.* The Note Purchaser, the Equity Investor, the Company, the Tenant, HCC, HCL, and HCA have agreed that the local law of a single state should govern their respective rights and duties under this Agreement and the other Operative Documents, regardless of whether a proceeding to enforce those rights is brought in the courts of another state. The parties hereby agree that their respective rights and duties under this Agreement shall be governed by the internal laws of the Commonwealth of Massachusetts.

Any legal action or proceeding with respect to this Agreement or any document relating thereto shall be brought in the courts of the Commonwealth of Massachusetts or of the United States of America for the Eastern District of Massachusetts and in no other courts, and, by execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of its property generally and unconditionally, the jurisdiction of the aforesaid courts. Each party hereto hereby irrevocably and unconditionally waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens* which it may now or hereafter have to the bringing of any action or proceeding in such respective jurisdiction and waives personal service of any and all process upon it. Each party hereto consents that all such service of process may be made by delivery to it at the address of such party set forth below or, in the case of HCA, HCL, the Company and the Equity Investor, to their agent referred to below at such agent's address set forth below. HCA and HCL hereby irrevocably appoint Hoyts Cinemas Corporation, with an office on the date hereof at One Exeter Plaza, Boston, Massachusetts 02116-2836, as its agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. The Company and the Equity Investor hereby irrevocably appoint Corporation Service Company with an office on the date hereof at 84 State Street, Fifth Floor, Boston, Massachusetts 02109, as their agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. Nothing contained in this **Section 10.5** shall affect the right of any party to this Participation Agreement to serve legal process in any other manner permitted by law or to bring any action or proceeding in the courts of any jurisdiction against any party or to enforce a judgment obtained in the courts of any other jurisdiction.

*Section 10.6. Counterparts.* This Agreement may be executed in any number of counterparts, each executed counterpart constituting an original but all together only one Agreement.

*Section 10.7. Headings and Table of Contents.* The headings of the sections of this Agreement and the Table of Contents are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

*Section 10.8. Conditions to Purchase of Beneficial Interest by Tenant.* Anything to the contrary herein or in the other Operative Documents notwithstanding, the Tenant shall not purchase or otherwise acquire the Beneficial Interest or any part thereof unless, as a condition thereto and simultaneously therewith, the Tenant shall, by agreement or agreements in writing containing covenants substantially equal to the covenants of the Tenant set forth in the Operative Documents (a) expressly assume the Indebtedness evidenced by the

**BB000852**

Notes as the full, recourse obligations of the Tenant, (b) grant to the Note Purchaser a first Lien on and security interest in the Premises and (c) cause the Guarantors to enter into a guaranty of the Notes and the performance by the Tenant of its obligations under such agreement or agreements, all in form and substance reasonably satisfactory to the holders of the Notes and their special counsel in their sole and absolute judgment and at the expense of the Tenant and the Guarantors.

*Section 10.9.   Rent Payment Instructions.*  The parties hereto understand and agree that for administrative convenience and without the effect or result of amending, altering or modifying the terms of the other Operative Documents, including, without limitation, the terms and provisions on which the Lease and the Lease Guaranty have been assigned to the Note Purchaser pursuant to the Lease Assignment and the Guaranty Assignment, it is desirable that the Tenant shall, and the Note Purchaser hereby instructs the Tenant pursuant to the Lease Assignment to, make all payments of Rent as follows:   (a) prior to the occurrence of a Lease Default or Lease Event of Default, pay the entirety of the Basic Rent, the Termination Value Purchase Price, Make-Whole Amount, if any, and all other sums due and owing under the Lease (other than the Percentage Rent, if any) directly to the holders of the Notes and to pay the Percentage Rent, if any, directly to the Company and (b) following the occurrence of a Lease Default or Lease of Event of Default, all Basic Rent and all Additional Rent (including, without limitation, Percentage Rent, if any) shall be paid directly to the holders of the Notes for application in accordance with the terms of the Mortgage. In furtherance of the foregoing, the Tenant understands and agrees that prior to delivery of the Note Purchaser Notice hereinafter referred to, the Tenant shall in any and all events pay the entirety of each installment of Basic Rent and any Termination Value Purchase Price payment and any Additional Rent consisting of the Make Whole Amount, if any, as and when due under the Lease directly to the Note Purchaser in the manner and at the address provided for the Note Purchaser set forth below its signature to this Agreement and prior to the receipt of a notice from the Note Purchaser (the *"Note Purchaser Notice"*) to the effect that a Lease Default or Lease Event of Default has occurred and is continuing, shall pay any Additional Rent consisting of Percentage Rent, if any, to the Company at its address set forth below its signature to this Agreement and that from and after the date of such Note Purchaser Notice, the Tenant shall pay all Rent, including without limitation, Percentage Rent, if any, to the Note Purchaser as herein above provided and by its execution of this Agreement, the Company ratifies, confirms and agrees with the Note Purchaser and the Tenant that the Tenant shall be protected and held harmless from any liability whatsoever to the Company in making as herein provided payments to the Note Purchaser after the date of such Note Purchaser Notice and agrees that the Tenant will not be liable to the Company for making such payments as herein provided without any inquiry whatsoever or for any acts or omissions or any error of judgment or mistake of fact or law of the Tenant in connection therewith.

*Section 10.10.   Certain Rights of Tenant and Guarantor Reserved.*  The Company understands and agrees with the Tenant and the Guarantors that the Tenant and the Guarantors have, provided always that the Tenant is in all material respects in full compliance with the terms and provisions of the Lease and the Guarantors are in full compliance with the terms and provisions of the Lease Guaranty, reserved any rights which

-39-

**BB000853**

they may have against the Company arising as a result of any material misrepresentation by the Company contained in **Section 3.1** of this Agreement or the breach by the Company of any of its covenants, agreements or other obligations under the Operative Documents to the extent of any actual damages suffered as a result thereof by the Tenant or the Guarantors, in each case notwithstanding the terms and provisions of the Lease, but subject always, to full compliance in all material respects by the Tenant with the terms of the Lease and full compliance by the Guarantors with the terms and provisions of the Lease Guaranty. Without limiting the foregoing, the Company agrees that it will satisfy the terms and conditions of Section 3 of the Mortgage upon the terms and conditions therein set forth upon written direction from the Tenant to do so, provided only that no Lease Default or Lease Event of Default shall the have occurred and be continuing.

*Section 10.11. Note Purchaser Consent.* It is understood and agreed by the parties hereto that if the consent of the Note Purchaser to any consent, amendment, waiver or other modification to the terms and provisions of this Agreement or any of the other Operative Documents is given by the Required Holders, then such consent of the Required Holders to such consent, amendment, waiver or other modification, as the case may be, shall be deemed and construed to constitute the consent of the Note Purchaser.

**BB000854**

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be executed and delivered, all as of the date first above written.

TENANT                                          INTERSTATE THEATRES CORPORATION


By: ____/s/ Terence P. Moriarty_____
    Its: _____Treasurer & Secretary_____

c/o Hoyts Cinemas Corporation
One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention:  Chief Financial Officer
Facsimile:  (617) 421-1819

GUARANTOR                                       HOYTS CINEMAS CORPORATION


By: ___/s/ Terence P. Moriarty_____
Its: _____Treasurer & Secretary_____

One Exeter Plaza
Boston, Massachusetts 02116-2836
Attention:  Chief Financial Officer
Facsimile:  (617) 421-1819

GUARANTOR:                                      HOYTS CINEMAS LIMITED


By: ___/s/ Kevin Healy_____
    Its:_____Attorney-In-Fact_____

Level 6
505-523 George Street
Sidney, NSW 2001, GPO Box 110
Australia
Attention:  Chief Financial Officer
Facsimile:  011-61-9-273-7322

-41-

**BB000855**

-42-

GUARANTOR:                          HOYTS CINEMAS AMERICA LIMITED


By: _____/s/ Terence P. Moriarty_____
    Its:_____Attorney-In-Fact_____

c/o Hoyts Cinemas Corporation
One Exeter Plaza
Boston, Massachusetts  02116-2836
Attention:  Chief Financial Officer
Facsimile:  (617) 421-1819

with a copy to:

Hoyts Cinemas Limited
Level 6
505-523 George Street
Sidney, NSW 2001, GPO Box 110
Australia
Attention:  Chief Financial Officer
Facsimile:  011-61-9-273-7322


COMPANY                             WESTBOROUGH SPE LLC

By: BABCOCK & BROWN ADMINISTRATIVE
    SERVICES, INC.


By: _____/s/ F. Jan Blaustein_____
    Its:_____President_____

2 Harrison Street, 6th Floor
San Francisco, California  94105
Attention:  Chief Financial Officer
Facsimile:  (415) 267-1500

-42-

**BB000856**

-43-

EQUITY INVESTOR:                    MIGNONETTE INVESTMENTS LIMITED

For F.M.C. LIMITED CORPORATE DIRECTORS

By: ___/s/ Derek Andrew_____
  Its:_____Director_____
Attention:_Derek Andrew_____
Facsimile:_1-809-494-2704_____

-43-

NOTE PURCHASER

THE NORTHWESTERN MUTUAL LIFE
    INSURANCE COMPANY


By  /s/ Richard A. Strait
Its      Vice President

720 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
Attention: Securities Department
Facsimile: (414) 299-7124

Payments

All payments on or in respect of the Notes to be by bank wire transfer of Federal or other immediately available funds (identifying each payment as "Westborough SPE LLC, 10.25% Senior Secured Notes due November 21, 2017, PPN 95715# AA 0, principal, premium or interest") to:

Bankers Trust Company (ABA #0210-01033)
16 Wall Street
Insurance Unit, 4th Floor
New York, New York 10005

for credit to: The Northwestern Mutual Life
  Insurance Company
Account Number 00-000-027

Notices

All notices and communications to be addressed as first provided above, except notices with respect to payments and written confirmation of each such payment to be addressed, Attention: Securities Operations.

Name of Nominee in which Notes are to be issued: None

Taxpayer I.D. Number: 39-0509570

-44-

BB000858

# EXHIBIT 11

IRS Letter 147C — EIN Confirmation for Westborough SPE LLC (Dec. 23, 2022)

 **IRS** Department of the Treasury
Internal Revenue Service

OGDEN  UT  84201-0038

000424.285966.81865.21656 1 AB 0.491 693

WESTBOROUGH SPE LLC
 A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON  NY  11703

000424

CUT OUT AND RETURN THE VOUCHER BELOW IF YOU HAVE AN INQUIRY OR A RESPONSE.
DO NOT USE IF YOU ARE MAKING A PAYMENT.

---

The IRS address must appear in the window.            Use for inquiries only
                             0457217447                    Letter Number: LTR0147C
     BODCD-                                                Letter Date  : 2022-12-
                                                           Tax Period   : 000000

*943286768*

INTERNAL REVENUE SERVICE                 WESTBOROUGH SPE LLC
                                          A DELAWARE LIMITED LIABILITY CO
                                         % F JAN BLAUSTEIN
OGDEN  UT  84201-0038                    1241 DEER PARK AVE STE 1 NO 1051
                                         NORTH BABYLON  NY  11703

943286768 RW WEST 00 2 000000 670 00000000000

**IRS** Department of the Treasury
Internal Revenue Service

OGDEN  UT  84201-0038

In reply refer to: 0457217447
Dec. 23, 2022   LTR 147C   0
94-3286768   000000 00
                          00005433
                     BODC: SB

WESTBOROUGH SPE LLC
 A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON  NY  11703

000424

       Employer identification number:  94-3286768

Dear Taxpayer:

Thank you for your inquiry dated Dec. 14, 2022.

Your employer identification number (EIN) is 94-3286768. Please keep
this letter in your permanent records. Enter your name and EIN on all
federal business tax returns and on related correspondence.

You can get any of the forms or publications mentioned in this letter
by visiting our website at www.irs.gov/forms-pubs or by calling
800-TAX-FORM (800-829-3676).

If you have questions, you can call us at 800-829-0115.

If you prefer, you can write to us at the address at the top of the
first page of this letter.

When you write, include a copy of this letter, and provide your
telephone number and the hours we can reach you in the spaces below.

Telephone number (   )_____ Hours _____

Keep a copy of this letter for your records.

Thank you for your cooperation.

0457217447
Dec. 23, 2022    LTR 147C    0
94-3286768      000000 00
00005434

WESTBOROUGH SPE LLC
 A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON  NY   11703

Sincerely yours,

Dwayne Wilson
Department Manager, Accounts Mgmt.

Enclosures:
Copy of this letter

IRS Department of the Treasury
Internal Revenue Service

OGDEN  UT  84201-0038

In reply refer to: 0457217447
Dec. 23, 2022    LTR 147C   0
94-3286768    000000 00
                           00005433
                    BODC: SB

WESTBOROUGH SPE LLC
 A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON  NY  11703

000424

          Employer identification number:  94-3286768

          Dear Taxpayer:

          Thank you for your inquiry dated Dec. 14, 2022.

          Your employer identification number (EIN) is 94-3286768. Please keep
          this letter in your permanent records. Enter your name and EIN on all
          federal business tax returns and on related correspondence.

          You can get any of the forms or publications mentioned in this letter
          by visiting our website at www.irs.gov/forms-pubs or by calling
          800-TAX-FORM (800-829-3676).

          If you have questions, you can call us at 800-829-0115.

          If you prefer, you can write to us at the address at the top of the
          first page of this letter.

          When you write, include a copy of this letter, and provide your
          telephone number and the hours we can reach you in the spaces below.

          Telephone number (   )_____  Hours _____

          Keep a copy of this letter for your records.

          Thank you for your cooperation.

0457217447
Dec. 23, 2022   LTR 147C   0
94-3286768   000000 00
00005434

WESTBOROUGH SPE LLC
 A DELAWARE LIMITED LIABILITY CO
% F JAN BLAUSTEIN
1241 DEER PARK AVE STE 1 NO 1051
NORTH BABYLON  NY   11703

Sincerely yours,

Dwayne Wilson
Department Manager, Accounts Mgmt.

Enclosures:
Copy of this letter

# EXHIBIT 12

Massachusetts Land Court Docket Materials — Town of Westborough
v. Westborough SPE, LLC (No. 19 TL 000768)

CERTIFIED MAIL

LAND COURT

3 PEMBERTON SQUARE, 5TH FLOOR

BOSTON MA 02108-1700

LAND COURT
FILED

2020 OCT -2 PM 2: 03



7190 1706 1970 0095 9843

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.

Signatory & Agent for Westborough SPE LLC and Pres.

of Babcock & Brown Adminstrative Services, Inc.

151 E. 31st

Apt. 28B

New York, NY 10016



U.S. POSTAGE ⟫ PITNEY BOWES

ZIP 02108    $ 006.90⁰
02 4W
0000365600 SEP 23 2020





NIXIE        100    DE 1        0009/30/20

RETURN TO SENDER
ATTEMPTED - NOT KNOWN
UNABLE TO FORWARD

BC: 02108170099    *0121-04359-24-03

PATENT NO. 5, 901 903

FORM CML-5.2   Certified Mail Done Fast, Inc.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

1. Article Addressed to:

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

19 TL 000768

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.

Signatory & Agent for Westborough SPE LLC and Pres.

of Babcock & Brown Adminstrative Services, Inc.

151 E. 31st

Apt. 28B

9290 9901 7061 9701 9117 66

2. Article Number (Transfer from service label)

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811 (facsimile) July 2015   7190 1706 1990 0095 9843

Domestic Return Receipt

LAND COURT

3 PEMBERTON SQUARE, 5TH FLOOR

BOSTON MA 02108-1700



CERTIFIED MAIL

BOSTON MA O21

11 JUN 2021 PM 6 L

U.S. POSTAGE PITNEY BOWES

ZIP 02108    $ 006.96
02 4W
0000365600 JUN 11 2021

7190 1706 1970 0098 0878

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.

Signatory & Agent for Westborough SPE LLC and Pres.

of Babcock & Brown Adminstrative Services, Inc.

34 Stern Lane

Atherton, CA 94027



NIXIE    952    0E 1    0000/21/21

RETURN TO SENDER
NO SUCH NUMBER
UNABLE TO FORWARD

NSN    BC: 02108170099    *1821-03136-11-36

PATENT NO. 5, 901 903

FORM CML-5.2   Certified Mail Done Fast, Inc.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)  |  C. Date of Delivery

1. Article Addressed to:

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

19 TL 000768

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E.

Signatory & Agent for Westborough SPE LLC and Pres.

of Babcock & Brown Adminstrative Services, Inc.

34 Stern Lane

Atherton, CA 94027

9290 9901 7061 9701 9339 04

3. Service Type

☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
   (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted
   Delivery
☐ Return Receipt for
   Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation
   Restricted Delivery

2. Article Number (Transfer from service label)

PS Form 3811, (facsimile) July, 2015

Domestic Return Receipt

LAW OFFICE OF

# IRIS A. LEAHY



4 OPEN SQUARE WAY, SUITE 217, HOLYOKE, MA 01040

Phone: (413)322-8318                    Fax: (413) 322-8661

| Iris A. Leahy | Dawn E. Bloom, Of Counsel | Audrey Jones, Legal Assistant |
|---|---|---|
| attyleahy@outlook.com | attybloom@outlook.com | audreyj@gmail.com |

September 20, 2021

Deborah J. Patterson, Recorder
Land Court, 5th Floor
Suffolk County Courthouse
Three Pemberton Square
Boston, MA 02108

Re:   Return of Service by Sheriff
      Town of Westborough v. Westborough SPE, LLC, et al.
      19 TL 000768

Dear Recorder Patterson:

Please find enclosed, a Sheriff's Return of Service in the above-referenced case upon F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent for Westborough SPE LLC and Pres. of Babcock & Brown Administrative Services, Inc.

If you have any questions per this matter, please do not hesitate to contact this office.

Sincerely,

Iris A. Leahy, Esq.

Enclosure

| [SEAL] | | | | |
|---|---|---|---|---|
| **CITATION BY DEPUTY SHERIFF** | DOCKET NUMBER<br><br>19 TL 000768 | **Commonwealth of Massachusetts**<br>**Land Court**<br>**Department of The Trial Court** |  |

## RETURN OF SERVICE
### (for use by person making service on behalf of Plaintiff)

I certify that on ___September 7, 2021 at 11:02 am___ I served a copy of the within Citation, together with a copy of the Complaint in this case, upon the named Defendant in the following manner (see Mass. R. Civ. P. 4 (d)(1)-(5)):

by leaving at the last and usual place of abode of
F. Jan Bluestein a/k/a Jan Blaustein, 34 Storn Lane, Atherton, California, 94027 with a "Limited Assistance Representation (LAR) Document.

Document placed at front gate with knowledge of male who answered electronic intercom

| DATED:<br><br>September 8, 2021 | SIGNATURE:<br><br>X _____ Jeffrey Pin<br>San Mateo County Registered process<br>Server # 180 - |
|---|---|

| DATED: 08/17/2021 | | RECORDER: Deborah J. Patterson | |
|---|---|---|---|
| 058CITDS (06-2021) | www.mass.gov/courts/landcourt | Printed: 08/17/2021 3:10:01 PM | Page 2 of 2 |

[SEAL]

| CITATION BY DEPUTY SHERIFF | DOCKET NUMBER 19 TL 000768 | Commonwealth of Massachusetts Land Court Department of The Trial Court |
|---|---|---|



**CASE NAME:**

Town of Westborough
_____, Plaintiff(s)

v.

Westborough SPE, LLC , et al.
_____, Defendant(s)

**TO THE DEFENDANT:**

F. Jan Bluestein, a/k/a Jan Blaustein Scholes, R.E. Signatory & Agent
for Westborough SPE LLC and Pres. of Babcock & Brown
Adminstrative Services, Inc.
34 Stern Lane
Atherton, CA 94027

**COURT ADDRESS & PHONE NUMBER**

Land Court
Three Pemberton Square
Room 507
Boston, MA 02108

(617)788-7470

The Plaintiff has filed a lawsuit against you in the Land Court.  A copy of the Plaintiff's Complaint filed against you is attached to this Citation.  **To protect your interests, you must respond to this lawsuit in writing by the DEADLINE TO ANSWER: 10/11/2021.**

If you wish to object or defend against this Complaint, you or your attorney must file a written appearance and an answer.  The answer must state clearly and specifically your objection or defense to each part of the Complaint.  You must sign the answer "under oath", which means that you swear or affirm the answer is true.  This appearance and answer must be filed in the Land Court Recorder's Office at the Court Address shown above, or in the office of the Assistant Recorder at the Registry of Deeds where the land is located on or before the deadline.  You must also serve your answer upon the Plaintiff at the service address below on or before the deadline.  If you do not respond, you may lose the chance to tell your side, and the Court may decide the case against you by default and award the Plaintiff everything asked for in the Complaint.

**To the Plaintiff:**

The Court **ORDERS** the Plaintiff to serve a copy of this Citation along with a copy of the Complaint upon the above-named Defendant by deputy sheriff at least fourteen (14) days prior to the deadline to answer.  Plaintiff shall give this Citation and copy of the Complaint to the appropriate deputy sheriff where the Defendant is to be served, and is responsible for paying the sheriff's fee, except in Registration/Confirmation cases.  The deputy sheriff's return of service must be completed on this Citation and then the Citation shall be submitted to the Land Court.

**SO ORDERED.**

**By the Court:**

Attest:

| WITNESS | DATE ISSUED: | RECORDER: Deborah J. Patterson |
|---|---|---|
| Hon. Gordon H. Piper, Chief Justice | 08/17/2021 | _Deborah J. Patterson_ |

**PLAINTIFF'S SERVICE ADDRESS**

Iris Ann Leahy, Esq.
Law Office of Iris A. Leahy
4 Open Square Way
Suite 217
Holyoke  MA  01040
(413)322-8318

| 058CITDS (06-2021) | www.mass.gov/courts/landcourt | Printed:  08/17/2021 3:10:01 PM | Page 1 of 2 |

## AFFIDAVIT OF SERVICE

**State of Maryland**                County of                **Commonwealth Of Massachusetts**
                                                                                    Court

Case Number: 19 TL 000768

Plaintiff:
**Town Of Westborough**

vs.

Defendant:
**F. Jan Bluestein**

For:
Iris Ann Leahy, Esq.
Law Office Of Iris A. Leahy
4 Open Square Way
Suite 217
Holyoke, MA 01040

Received by Are You Being Served?, Inc. on the 26th day of August, 2021 at 12:00 pm to be served on **F. Jan Bluestein a/k/a Jan Blaustein, 34 Stern Lane, Atherton, CA 94027.**

I, Jeffrey Pink, being duly sworn, depose and say that on the **7th day of September, 2021 at 11:02 am, I:**

**SUBSTITUTE** served by delivering a true copy of the **Citation By Deputy Sheriff; Limited Assistance Representation (LAR) Document.** with the date and hour of service endorsed thereon by me, to: **"John Doe"** as **Tenant** at the address of: **34 Stern Lane, Atherton, CA 94027,** the within named person's usual place of **Abode,** who resides therein, who is fifteen (15) years of age or older and informed said person of the contents therein, in compliance with state statutes.

I Certify, Under The Laws Of The State Of California, That The Above Information Is True And Correct Under Penalty Of Perjury.

9-7-2021

_____
**Jeffrey Pink**
180

**Are You Being Served?, Inc.**
1325 Howard Avenue
PMB 507
Burlingame, CA 94010
(650) 348-7378

Our Job Serial Number: AYB-2021001686
Ref: TOWN OF WESTBOROUGH
Service Fee: $90.00

Copyright © 1992-2021 Database Services, Inc. - Process Server's Toolbox V8.2d

# EXHIBIT 13

Deposition Excerpts — Denise Edwards (Mar. 31, 2025)

**Page 1**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

_____

IN RE:  WESTBOROUGH SPE LLC,

      Debtor.


LOLONYON AKOUETE, CLAIMANT,

       Plaintiff,

   v.                        Case No.

JONATHAN GOLDSMITH, CHAPTER 7     23-40709-CJP

TRUSTEE OF WESTBOROUGH SPE LLC,

      Defendant.

_____

               DEPOSITION OF

              DENISE EDWARDS

DATE:          Monday, March 31, 2025

TIME:          1:01 p.m.

LOCATION:     Remote Proceeding

              Wyandanch, NY 11798

REPORTED BY:  Robert Lombardi

**A P P E A R A N C E S**

ON BEHALF OF PLAINTIFF LOLONYON AKOUETE, CLAIMANT:

LOLONYON AKOUETE, PRO SE (by videoconference)


ON BEHALF OF DEFENDANT JONATHAN GOLDSMITH, CHAPTER 7

TRUSTEE OF WESTBOROUGH SPE LLC:

CHRISTINE DEVINE, ESQUIRE (by videoconference)

Nicholson Devine LLC

21 Bishop Allen Drive

Cambridge, MA 02139

christine@nicholsondevine.com

(857) 600-0508


ALSO PRESENT:

Jonathan Goldsmith, Defendant (by

videoconference)

Page 3

I N D E X

EXAMINATION:                                    PAGE

        By Ms. Devine                           9

        By Mr. Akouete                          128

        By Ms. Devine                           157


                    E X H I B I T S

NO.                DESCRIPTION                   PAGE

Exhibit 1     Subpoena of Denise Edwards        13

Exhibit 2     Document Provided by Denise

              Edwards Dated 3/23/2025,

              4 Pages                           30

Exhibit 3     Claim for Abandoned Property

              Submitted to California

              State Controller's Office         57

Exhibit 4     Email Thread "Jan's

              Conservator" 12/21/2022,

              6 pages                           67

Exhibit 5     Hawaii Conservatorship

              Docket, 4 Pages                   76

Exhibit 6     Bill of Sale 11/21/2022,

              2 Pages                           76

Exhibit 7     Email Thread "Westborough

              SPE LLC - New Agreement"

              12/21/2022, 2 Pages               85

Page 4

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | Email Thread "Resignation From Westborough SPE LLC" 3/31/2023, 1 Page | 96 |
| Exhibit 9 | Email Thread "Signed Document from Jan Blaustein Scholes" 6/29/2023, 1 Page | 98 |
| Exhibit 10 | Durable Power of Attorney | 102 |
| Exhibit 11 | Delaware Secretary of State Certificate of Cancellation | 102 |
| Exhibit 12 | Delaware Secretary of State Certificate of Correction | 104 |
| Exhibit 13 | Babcock & Brown Administrative Services Agreement Termination Notice 6/8/2009 | 107 |
| Exhibit 14 | Babcock & Brown Notice of Resignation 4/30/2011 | 109 |
| Exhibit 15 | Affidavit of Peter L. Blaustein 5/3/2023 | 113 |
| Exhibit 16 | Proof of Claim Filed by Denise Edwards 12/19/2023 | 118 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 17 | Email Thread Between Matthew Morris, Lolonyon Akouete and Denise Edwards 12/20/2022, 2 Pages | 133 |
| Exhibit 18 | Text Message from Peter Blaustein, 1 Page, and Email Thread "Westborough SPE, LLC - Introductions," 2 Pages | 138 |
| Exhibit 19 | Attorney Notes from Matthew Morris, Bates SL000488 through SL000495 | 139 |
| Exhibit 20 | Email Thread Between Iris Leahy and Peter Blaustein with Affidavit Draft 3/30/2023 | 144 |
| Exhibit 21 | Email Thread between Iris Leahy and Peter Blaustein Ending 2/21/2023, 4 Pages | 153 |

Page 131

D. EDWARDS

appointed conservatorship, and it

shouldn't be a public" -- I'm dyslexic, so

sorry for my reading -- "it shouldn't be a

public record.  I looked in California but

could not find anything.  We are waiting

for Peter to confirm."

So if you knew that Jan was

under conservatorship, why are you -- why

are we looking for conservatorship

documents on -- in California and in

Arizona where she lives?

A     Right, we should --

Q     No, let me rephrase that.

That's not a question.

A     Right -- able to answer that.

But yeah, right.  We -- we were looking

because we weren't sure that -- you know,

we didn't see anything.  You said it right

there, it should be a public record that

there's a conservatorship for her in

California, in Hawaii, in -- in Hawaii,

and in Arizona.

Q     Okay.  So is it the first time

you're hearing of this conservatorship was

Page 132

D. EDWARDS

in that meeting with Matthew Morris; is that correct?

A     Right.  I believe so.  Yeah.

Q     Okay.  All right.  So and then we've searched conservatorship in California where Jan's home state and then in Arizona where she resides at a nursing home.  Did we find anything?

A     Nothing.  We didn't find anything.

Q     Okay.  Did Julia Royce find one in Hawaii where she lives?

A     I saw the one.  It was attached.

Q     Okay.  Thank you.

A     Yes, it was attached.

MR. AKOUETE:  And I think we're done with this exhibit.  Let's move on to the next exhibit.

THE REPORTER:  Would you like to mark this, Mr. Akouete?

MR. AKOUETE:  Sure.  Yes, please.

THE REPORTER:  Okay.

MR. AKOUETE:  How are you marking it?  This will be the Defendant or Respondent

Page 133

D. EDWARDS

Exhibit 1.

THE REPORTER:  Okay.  You don't want to continue the numbers that we were going?

MR. AKOUETE:  Oh, yeah.  I guess, yeah, we can do the same thing if that's okay with Ms. Devine.

MS. DEVINE:  That's fine.

MR. AKOUETE:  Okay.

THE REPORTER:  Okay.  So this document is Exhibit 17.

(Exhibit 17 was marked for identification.)

MR. AKOUETE:  17.  Okay, thank you.

So the next one -- okay.

BY MR. AKOUETE:

Q    Ms. Edwards, do you remember this text message, who is it from, who is it going to, and what's the conversation?

A    Yeah, that's a conversation between me and Peter.  Well, a little -- almost conversation.  Mostly my conversation, but that's just me reaching out to him.

Page 134

D. EDWARDS

Q    Yeah, why are you reaching out to him?

A    I wanted to check and see if he had any additional questions and that if he was ready if he was going to allow his mother to proceed.  I always ask permission because that's just something that we was taught, so, getting permission from people.

Q    I notice he sent you an email address there.  Did you send him the documents you sent over to you want him to give permission for Jan to sign?

A    No, he didn't want -- he just provided it, his email for me.

Q    So you didn't send him a copy of any of the document you sent over to Jan?

A    No, he didn't want a copy of that.  He just said -- told me to send it to the lady.

Q    Okay.

A    To the notary.

Q    How do you understand his permission?  Was his permission just for

Page 135

D. EDWARDS

this specific document?  Was just his permission just to let you work directly with Jan in recovering the funds?

A    I understood it as just let me work with Jan to recover the funds since he didn't need the documents, he didn't read the documents.  He said just send them directly over to the notary and to his mom, and she would review all of them and then, yeah, sign them.

Q    Did he told you in any of those conversations that he was a court-appointed conservator and that he needed to sign anything that Jan signed?

A    No.

MR. AKOUETE:  Thank you.

Can you scroll down, Ms. Devine, please?  And maybe next, one more, I think the next page.  Okay, thank you.

BY MR. AKOUETE:

Q    Denise, what is this email about?  Can you look and identify who are the sender, receivers, who are part of it, and what is it saying?

Page 136

D. EDWARDS

A     This is a email from Peter to Matt, cc Julia.   And --

Q     Yeah.   And what is it about?

A     They want to see if we can have a meeting with -- with Peter.

Q     And what is Peter offering?

A     Okay.   So "I have meaningfully advanced the case by connecting with Dyann Blaine and the former -- the former leader of Babcock & Brown and have engaged with them to proceed.

"However, we are disappointed with your actions to how my mom signed illegal contract while knowing she had a guardian and conservator.   Most thought I should proceed with you -- without you -- you all.   Your -- your ownership of the LLC is less than tenuous, and this degraded my trust in your operation.

"Given time and my agreement to pay you 10 percent of the cash findings, I'd like to come to an agreement for your continued participation but at a substantial lower percentage that you

Page 137

D. EDWARDS

proposed to me and my mom.  I propose 10

percent of cash and -- of cash, and I

agree to 5 percent of RE received in a

fair payment.

          "If you're willing to engage,

let us -- let me know."

          Okay.  So he wanted to make a

deal.  So all of the -- all this follows

with whatever was happening in regards to

his mother goes out the window, and he

just sort of, you know, I guess he would

get paid.

     Q    So is he reducing your

compensation to 10 percent of their 1.2

million and then 5 percent for the

whatever sale of the property?

     A    Yes.

          MR. AKOUETE:  Okay.  Thank you.

          We can move on to the next exhibit.

          THE REPORTER:  Hold on.  Before we

     move on, so the document before this with

     all the text messages, is that going to be

     a separate exhibit, and then this one will

     be the next one, and then now the next

Page 138

D. EDWARDS

one?

MR. AKOUETE:  I think I put them all in one PDF, so we can consider just one exhibit.

THE REPORTER:  Got you.  So all your documents will be Exhibit 17?  Okay. Noted.

MR. AKOUETE:  Oh, no.  For the first one was 17, so this must be 18; right?

THE REPORTER:  You just told me that you have them all in one thing and you wanted to mark them all the same, though. Do you want to mark them differently?

MR. AKOUETE:  No.  The first one was an email.

THE REPORTER:  Yes.

MR. AKOUETE:  Is an email from me and Julia, and then that's Exhibit 17.  And this one is the text message and then another email from Peter; that's Exhibit 18.

(Exhibit 18 was marked for identification.)

THE REPORTER:  Okay.  So the text and

Page 139

D. EDWARDS

the one we just saw are going to be 18?

MR. AKOUETE:  Correct.

THE REPORTER:  Okay.  Just please be a little more clear about that, Mr. Akouete.

MR. AKOUETE:  Thank you.

So this will be the Exhibit 19.

(Exhibit 19 was marked for identification.)

This is attorney's notes from Attorney Matthew Morris, the attorney that we hired to represent the entity.

BY MR. AKOUETE:

Q    Denise, do you remember during the conversation with Matt he will talk with Peter and Dyann alone without us present?

A    Yes.

Q    Okay.  So these are the notes, his notes that he was taking, and Ms. Devine subpoenaed those notes from Sherin and Lodgen, and this is the --

MR. AKOUETE:  And then if you scroll down, Ms. Devine, if you will scroll down,

Page 140

D. EDWARDS

you will see the Bates number on the right-hand corner of these pages.

MS. DEVINE:  I just want to put my objection to the form of the question on the record.

MR. AKOUETE:  Thank you.  Objection noted.  Can you scroll down to page 7, please?

Okay, thank you.  That's page 7.

BY MR. AKOUETE:

Q    So this is a -- what's the title of this page here?  What's this note about?

A    I guess it's -- there may be holdings.

Q    No, what's the title of the notes?  It has a title and a date.

A    Oh.  "Call with" -- that's not how you spell her last name, but okay -- Dyann.

Q    Who is Dyann Blaine?

A    She was -- she was the person I withdrew the company.  I believe she was an attorney.

Page 141

D. EDWARDS

Q    Okay.

A    And she withdrew Westborough --

Q    So can you please read the -- from the last two -- let me see here -- where it says -- I'm not finding what I'm looking for.

MR. AKOUETE:  Can you please -- Ms. Devine, can you please scroll down a little bit more?  Maybe -- okay.  Maybe it's there.

BY MR. AKOUETE:

Q    Yeah, from where it says "Peter is saying," can you please read those three groups of sentences?

A    Where -- "Peter is saying it seems worth it to give them a small" -- what's that -- "nominal -- a small fee to get rid of them and not have to sue them, E-T, in a small timeline -- in this small timeline.

"Peter is going to connect the CUPD with Dyann Blaine, I guess, since they said she will need -- he said" -- I think -- I don't know what that was

Page 142

D. EDWARDS

supposed to be -- "they will need her, and here's Dyann so that this is really the person you need to talk with for WSPE.

"Peter and Dyann to talk to Lolo to try to negotiate a fee."

Q   Okay.  So this sentence is saying that Peter is saying that it's worth it to just give them a small nuisance fee to get rid of them and not having to sue them, et cetera.

And then that's when Peter called us and make the offer for 10 and 5 percent; right?

MS. DEVINE:  Objection to form.

THE WITNESS:  You're answering the question for me.

BY MR. AKOUETE:

Q   Sorry.  I'm not an attorney.

A   Right.

Q   How does that make you feel to be treated as a nuisance to be given 10 to 5 percent to get rid of you?

A   Well, I just want to say that it didn't make me feel any kind of way

Page 143

D. EDWARDS

because he didn't -- I know that he didn't have any control over anything.  This is a big, long process that we was going through.

You know, and if he wanted to come in and, you know, help pay for stuff, then we could have negotiated whatever had to be negotiated.  You understand?  But I'm not no nuisance.  We -- if we wasn't here, then what -- what would have happened with this company and the money and everything?

No one would have known anything, and the town would have gotten what they wanted, and that's it.  The money would be still sitting over there in the state, so.

Q    So if you haven't revived the company -- are you saying that if you haven't revived the company, all of the money will be lost?

A    Right.  Right.

Q    Okay.

A    Because it had been sitting for

**Page 144**

D. EDWARDS

years.  It said that Babcock & Brown abandoned the company.  When they went to go pay for the taxes or whatever, the company that had rented the -- the movie theater, Babcock & Brown had took off.

So that was it.  That meant that they wasn't going to, even though Jan formed the company through them.

Q    Does that ever happen to you before when you do all the paperwork, you find the claimant, and they trying to go under you and cut you out of the deal?

A    It happens all the time, yeah. People do that.  That happens, but not all the time, you know, not all the time.

MR. AKOUETE:  Okay.  Thank you.

Let's move on to the next exhibit, which will be 20, I believe.

(Exhibit 20 was marked for identification.)

Okay.  So this is the exhibit we obtained a while ago when we subpoenaed the Town of Westborough.  You were not part of this email, but it was an email

Page 145

D. EDWARDS

from Attorney Leahy, the town attorney, to Peter asking him to draft an affidavit for him.

Ms. Devine, would you mind scrolling down to the affidavit?  Yes, thank you.

BY MR. AKOUETE:

Q    So let's take a look at point 6 of the affidavit.  Can you please read that for us, Ms. Edwards?

A    "I consented to the assistance and gave permission for Jan to sign Claim for Abandoned Property."

Q    Okay.  So from your understanding, when Peter consented for you to proceed in getting Jan to sign some document, did he made it clear, or do you understand that that permission was only limited to the signing of the Abandoned Property form and nothing else?

A    No, I thought it was okay because he -- again, he didn't give me any follow-up like he had to sign with her or anything like that, any intention like that.  He said just send her the documents

Page 146

D. EDWARDS

and whatever.

And because we had -- we was moving on -- on also recovering the property, there was no time to keep going back and forth, you know.  So I just assumed, okay, since he's not reading things, not asking us -- saying he needs to sign anything, that meant that Jan could read everything that she was presented, understand it, right?  And then sign off on it.

And she also had a licensed notary there who would also not let her be signing things, you know, without some understanding 'cause if she had questions, the notary would have to contact me or whatever, so.  Yeah.

Q    Okay.  So is it correct to say that your understanding was that the goal is what he's giving permission to, the goal is to retrieve the funds --

A    Yesh.

Q    -- not the manner of the retrieval?

Page 147

D. EDWARDS

A    Right.  The goal was to retrieve the funds, and if you listen -- if you look up about -- if you see about his behaviors afterwards, when he did have a little concern about it, then afterwards, you know, even with this affidavit he had a concern about it.

But then trying to tell us, oh, no, don't worry about that, we'll go ahead and settle for this, this, or this, and y'all can get whatever.  You know, so, yeah --

Q    Okay.  So do you understand his permission to apply to this second agreement, the bill of sale, which is the --

A    Everything.  Every document that she signed that didn't -- that only involved us and not the attorney 'cause the attorney had us going back and forth with her for some stuff, I think the affidavit or something.

You know, so besides that, we did everything else that I had her sign

Page 148

D. EDWARDS

was, like, yeah, let's get this process done so that -- and she wanted to go back to Hawaii anyway.

Q    Okay.  Let's -- can you please read point number 8?

A    Yeah.  "Lolo and Denise were aware Jan lacked capacity and that I was her legal guardian, and they did not involve me in Bill of Sale contract process or seek my consent for her to sign it."

Q    Is that statement accurate, that you were aware that she was incapacitated?

A    Like I said, if incapacitated just -- just means that you can't walk, then I was aware that she couldn't walk without help.  As far as her speech and, you know, talking to me, and memory, and stuff like that, she had no problem with it.

So I was under -- since he gave permission for her to sign the documents to recover the funds, and the property is abandoned property, tax, mortgage, or

Page 149

D. EDWARDS

unclaimed property, bankruptcy, all those things are unclaimed property, so I understood that we needed to move forward to, you know, do what we can.

You know, our mission -- our job is not to Jan or anybody like that, or even to ourselves. Our job is to the person -- or to the person, or company, or person who has lost a loved one to help them recover those funds.

And in the process, we get a service fee for helping them do that, you know.

Q     Thank you.  Can you please read point number 9?

A     "I do not believe the bill of sale contract terms are reasonable."  But I don't either, so.

Q     Yeah.  What are the terms of the bill of sale?

A     I don't know.  I have to be looking at it.

Q     I think Ms. Devine and yourself went over that earlier.  It was to pay

Page 150

D. EDWARDS

$600,000 each end, which is purportedly represented 50 percent of the 1.2 million; is that correct?

A     Yeah, half of that.  The -- yeah.

Q     Okay.  So Jan will get $600,000, which is half, 50 percent; correct?

A     She would have if that bill of sale was legitimate.

Q     Okay.  So can you -- so the point number 9 is saying the term of the bill of sale is -- what is this?  Can you please read it again?

A     "I do not believe the bill of sale contract terms are reasonable."

Q     Okay.

A     "I do not believe Jan is or even was the legal or rightful owner of -- of the LLC."

Q     So Peter doesn't believe that $600,000 to Jan is reasonable?  Is -- does he mean that is too much?  Or does he mean that is too little?

MS. DEVINE:  I'm going to object to

Page 151

D. EDWARDS

the form of the question.

THE WITNESS:  Yeah.  There's no way I could know what he meant.

BY MR. AKOUETE:

Q    From his email trying to reduce the amount of money you're getting, because that bill of sale is saying we shall get 50 percent, and from his email trying to reduce it to 10 to 5 percent, what does he mean by it's not reasonable from your understanding?

A    The only thing is because in this bill of sale, it really only covers the state funds.  And what he's talking about covers state funds and the tax overage, as well.  So he's talking about two things, and this is talking about one thing.

Q    So is your understanding that his statement on this only applied to the 1.2 million?

A    Yeah, for the bill of sale, yeah.  Because I think that was --

Q    So what -- sorry.

Page 152

D. EDWARDS

A    -- what he was talking about.

Q    Will that same principle apply to the sale of the property, too?

A    To the sale?  No, no, wait. Hold on.  I'm mixed up.  It's -- this is a little confusing because in this bill -- in this bill of sale, it feels like we were also -- we were talking about all of the money.

Like -- like the property, so you -- that would have to be cleared by Lolo to make it clear as to is this the price that she was going to get or whatever, if we was only going to split, is that the money for just for the state, or does that include once the property sells for -- once the property sells, as well, because that is a lot of money.

Q    Okay.  Let's move on.  How much is your claim in the bankruptcy court? How much your claim is for?

A    I put up 300 and something thousand, 333, something like that.  I don't have it --

Page 153

D. EDWARDS

Q    Okay.  So if you were assuming that $600,000 was what Jan is going to get and Peter said that it's not reasonable, how is that compared to your claim in the reasonability of it?

A    I don't understand that question.

Q    That's okay.  I don't understand it, either.  Let's move on to the next one.

MR. AKOUETE:  Next exhibit is -- that will be 21, I believe.

(Exhibit 21 was marked for identification.)

And then that will be the last, so it won't take long.

Okay.  This is the -- an email from the town attorney again to Peter, I believe -- yeah, Peter Blaustein, we obtained through discovery a while ago.

Can you please, Ms. Devine, can you please scroll down?  Okay, that's good.

BY MR. AKOUETE:

Q    There are, I believe, six things

Page 154

D. EDWARDS

that the town is prepared to share.  Can

you just boil down what they're trying --

what the town attorney is saying?  I know

it's a lot of reading, but can you just

summarize basically what they're claiming?

What the town is claiming?

A    I mean, I could read it.  You

want me to read it, or what?  Where do you

want me to start from?

Q    Sure.  Maybe just read it for

yourself and just summarize the claim,

what they're claiming, because it will be

a lot of reading.

MR. AKOUETE:  Ms. Devine, you can

pull it up so she can see the entire six

claims.  Yeah.

THE WITNESS:  What, you talking about

on the six questions here?

BY MR. AKOUETE:

Q    Yeah, the points.  There are six

points that the town attorney, Attorney

Leahy, is claiming here.  And he wanted to

make sure that Peter is okay with him

sharing that with the court.  If it's easy

# EXHIBIT 14

Email Correspondence — Lenard B. Zide & Jonathan Goldsmith (Aug. 13–14, 2024)

| | |
|---|---|
| **From:** | Lenard B. Zide <zide@buttersbrazilian.com> |
| **Sent:** | Wednesday, August 14, 2024 7:35 AM |
| **To:** | Jonathan Goldsmith |
| **Subject:** | Re: AI |

In light of Mr. Akoute's election to go MEDIEVAL on all of us, I checked ChatGPT about your (TEE's) ability to distribute uncontested funds.  Although I am CERTAIN you knew the answer anyhow, this was the response I received:

"Yes, a trustee can generally make distributions to creditors from uncontested funds while a dispute over contested funds is still being resolved, but this is subject to the approval of the bankruptcy court and the specifics of the case."

I hope this is helpful.

LZ
**Sent by *Len Zide***


On Aug 13, 2024, at 8:09 AM, Jonathan Goldsmith <jgoldsmith@gkalawfirm.com> wrote:


Good morning Len:
I have now come to the realization (which I should have come to much earlier)  that this guy has no interest in resolving the matter unless he gets a seven-figure settlement- which he will not get!!  I offered him a settlement (subject to approval by the Bankruptcy Court) that would have provided him with many shekels, but that still wasn't enough for him. As such, I have called in some reinforcements, and we will fight the battle and win the war. There is a good possibility that he will get nothing at the end, but clearly will not get the amount that I offered as a settlement. I already have a legal fee escrow so to speak, in the tune of 1.2 million dollars remitted to me from the State of California.
By the way, I believe it is my first generative A1 Bankruptcy proceeding.
We will miss you on the 20th.
All the best,
Jon

**From:** Lenard B. Zide <zide@buttersbrazilian.com>
**Sent:** Tuesday, August 13, 2024 7:24 AM
**To:** Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>
**Subject:** AI

Jon: it became clear to me when I awoke this AM to Lolo's latest missive that this must be your first generative AI Bankruptcy proceeding.  Should I file a Joint Assented To Motion To Establish a Legal Fee Escrow?  Although I will be on vacation on the 20th, I wouldn't miss this upcoming hearing.  Hope you are well.   Len

1