## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:

**WESTBOROUGH SPE LLC,**

      **Debtor.**

**Chapter 7**
**Case No. 23-40709-CJP**

### STATUS REPORT REGARDING TRUSTEE'S ASSESSMENT OF
### CERTAIN ALLEGED ESTATE CLAIMS AGAINST THIRD PARTIES

Jonathan R. Goldsmith, the duly appointed Chapter 7 Trustee (the "Trustee") of the estate

(the "Estate") of Westborough SPE LLC (the "Debtor") files this status report to apprise the

Court, creditors, and all interested parties regarding the Trustee's assessment of certain alleged

Estate claims which the Trustee has reviewed, considered, and determined have no merit and,

therefore, require no further action by the Trustee.

The Trustee further states as follows:

1.      On August 31, 2023 (the "Petition Date"), certain creditors of the Debtor filed an

involuntary petition under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-

1532 (the "Bankruptcy Code").

2.      On October 11, 2023, this Court entered an Order for Relief in this case [Dkt. No.

26] and this case remains a Chapter 7 case at this time.

3.      On October 12, 2023, the United States Trustee appointed Jonathan R. Goldsmith

as Chapter 7 trustee [Dkt. No. 29] and the Trustee remains as Trustee at this time.

4.      On May 22, 2025, disputed creditor Lolonyon Akouete ("Akouete") filed the

*Creditor's Motion for Order Directing Trustee to Abandon Claims or Pursue Claims Belonging*

*to the Bankruptcy Estate* [Dkt. No. 166] and on May 1, 2025, Akouete filed the *Creditor's*

*Motion to Compel Trustee Abandonment of Claim Under 11 U.S.C. §544(b), or Alternatively,*

*Motion for Authority to Pursue Claim on Behalf of Estate (Derivative Standing)* [Dkt. No. 671]

(together, the "Akouete Motions"). In the Akouete Motions, Akouete asserted that the Estate has

potential causes of action against the California State Controller's Office, Babcock & Brown

Limited, Dyann Blaine, and Walter Horst.

5. In advance of the two-year deadline under Bankruptcy Code § 108(a) for the

Trustee to pursue claims which existed as of the entry of the order for relief, the Trustee has

considered and assessed whether viable claims may have existed against the parties identified in

the Akouete Motions.

6. The purported claims against the California State Controller's Office relate to the

refusal of the California State Controller's Office to turn the Debtor's funds over to Akouete

prior to the Petition Date. Since the entry of the Order for Relief, the California State

Controller's Office has delivered the Debtor's funds to the Trustee. First, the Trustee has

determined that the actions of the California State Controller's Office prior to the Petition Date

were appropriate and likely benefitted the Estate by preserving the funds and preventing Akouete

from dissipating those funds. Further, the California State Controller's Office has turned the

Debtor's funds over to the Trustee and, therefore, no damage claim exists against California

State Controller's Office.

7. Regarding purported claims against the Babcock and Brown Entities, Mr. Horst,

and Ms. Blaine, the purported claims described in the Akouete Motions relate to the actions of a

Brown and Babcock Entity prior to its resignation as manager of the Debtor in (the latest) 2011.

The Trustee has had ample opportunity to review materials relevant to purported claims against

Babcock and Brown Entities, Mr. Horst, and Ms. Blaine because the Trustee is engaged in a

contested matter with Akouete and the discovery produced in the contested matter bears directly on the "claims" alluded to in the Akouete Motions. During the discovery process, among other things, the Trustee has reviewed documents and testimony regarding the Debtor and deposed Mr. Horst regarding the resignation of the Babcock and Brown Entities as manager of the Debtor.

8. The Trustee considered all available evidence and also considered the availability and credibility of potential witnesses to the "claims" alluded to in the Akouete Motions as potentially actionable.

9. In sum, the Trustee is aware of no cause of action that the Estate could bring against the California State Controller's Office, the Babcock and Brown Entities, Mr. Horst, or Ms. Blaine.

10. The Trustee has further determined that "abandonment" pursuant to Bankruptcy Code § 554(a) would be inappropriate since the Trustee is unable to actually identify any "property of the estate" to be abandoned. More specifically, following his review and consideration of the facts set forth in the Akouete Motions, the Trustee determined that as of the entry of the Order for Relief the Estate simply held no claims against the parties identified in the Akouete Motions. Moreover, if the Trustee were to attempt to describe claims as though the Estate actually has something to abandon, it would be disingenuous and misleading to this Court, to creditors, and to other interested parties.

Respectfully submitted,

**Jonathan R. Goldsmith,
Chapter 7 Trustee**

by his counsel,

     /s/ Angelina M. Savoia
Christine E. Devine, BBO #566990
Angelina M. Savoia, BBO #715690
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
Phone:  508-533-7240
Dated: September 24, 2025          Email:  angelina@nicholsondevine.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**OPPOSITION TO TRUSTEE'S STATUS REPORT REGARDING ASSESSMENT OF
CERTAIN ALLEGED ESTATE CLAIMS AGAINST THIRD PARTIES (Dkt. 879);
REQUEST FOR EXPEDITED DETERMINATION AND LIMITATION OF NOTICE
(MLBR 9013-1(f)(1)(B), (f)(2); FED. R. BANKR. P. 9006(c)(1))**

**INTRODUCTION**

Creditor Lolonyon Y. Akouete ("Akouete"), appearing pro se, respectfully submits this Opposition
to the Trustee's *Status Report Regarding Assessment of Certain Alleged Estate Claims Against
Third Parties* [Dkt. 879]. The Trustee's assessment is incomplete, based on a selective review of
evidence, and disregards both governing documents and credible legal authority. As shown in the
documentary exhibits attached hereto, the Trustee's conclusions concerning managerial authority,
fiduciary obligations, and the validity of claims against third parties are unsupported. The Court
should decline to adopt or give weight to the Trustee's report and instead preserve these claims for
further adjudication.

**I. BACKGROUND**

1. **Formation and Structure.** WSPE was organized in Delaware on October 22, 1997, as a
   single-member LLC wholly owned by Mignonette Investments Limited (BVI). Babcock &
   Brown Administrative Services, Inc. ("BBAS Inc.") served as Manager. The Participation
   Agreement (Oct. 30, 1997) expressly selects Massachusetts law/jurisdiction and appoints
   **Corporation Service Company ("CSC"), 84 State Street, Boston** as agent for service of
   process for WSPE and Mignonette. (Ex. 2 §10.5.)
2. **Massachusetts Withdrawal.** Notwithstanding ongoing obligations in Massachusetts,
   WSPE filed a Certificate of Withdrawal on November 20, 2007, falsely stating it was "not
   doing business" in the Commonwealth while still owning 231 Turnpike Road and operating
   the long-term lease. (Ex. 1.)
3. **Attempted Unilateral Resignation.** On April 30, 2011, Babcock & Brown Administrative
   Services LLC (successor to BBAS Inc.) noticed a resignation effective May 30, 2011—sent
   to Equity Trust in Hong Kong, not CSC—without member consent required by the LLC
   Agreement. (Ex. 3.) The Operating Agreement did not permit resignation without member
   approval; none was obtained.
4. **Third-Party Practice Confirms CSC as Proper Channel.** In 2017, Regal sent lease-end
   notices to WSPE through CSC in Boston and Wilmington, consistent with the Participation
   Agreement, and reported it had lost all contact with any WSPE representative. (Ex. 5.)
5. **Breakdown of Corporate Infrastructure.** By 2018, the Town and market participants
   recognized the absence of management; RK Centers' email to the Board of Selectmen (Oct.

22–24, 2018) references ceased administration "approximately ten years ago," lost records, and rent not collected since ~2007, while Apple Cinemas stood as high RFP bidder (~$5M). (Ex. 7.)

6. **CSC Records of "Unable to Locate."** CSC later confirmed service "was discontinued" when WSPE became unable to locate in 2018, and that legal papers were returned undeliverable (save one), further evidencing the service-of-process collapse B&B caused. (Ex. 4.)

7. **Expert Delaware View.** Prior to the petition, Delaware LLC expert Ellisa O. Habbart confirmed the Manager's conduct constituted a breach of fiduciary duty under Delaware law. (Ex. 8.)

8. **CSCO Withholding Triggers Bankruptcy.** The California State Controller's Office ("CSCO") withheld ~$1.2 million in WSPE property despite statutory proof, forcing creditors to file the involuntary Chapter 7 on August 31, 2023. Counsel's July 13, 2023 submission to CSCO (Ex. 9), the Attorney General correspondence (Exs. 12–13), and Government Claims Program interactions (Ex. 14) show prompt, good-faith pursuit of release.

9. **Outside Interference at CSCO.** Former B&B insiders Dyann Blaine and Peter Blaustein communicated directly with CSCO, labeling WSPE's claimants as "scam artists" while conceding key facts about WSPE's structure and B&B withdrawals. (Ex. 10.) Town counsel Iris Leahy also advocated to CSCO against release while litigating against WSPE in Land Court. (Ex. 11.)

## II. Claims Against Babcock & Brown, Horst, and Blaine (Exhibits 1–8)

These exhibits demonstrate that the Babcock & Brown entities—together with Mr. Horst and Ms. Blaine—acted outside the authority granted in the LLC Agreement and Participation Agreement and breached fiduciary duties owed to the Estate.

**Exhibit 1 – Certificate of Withdrawal of Westborough SPE LLC in Massachusetts (Nov. 20, 2007).** Exhibit 1 is a Certificate of Withdrawal of a Foreign Limited Liability Company filed on November 20, 2007, with the Massachusetts Secretary of the Commonwealth by Westborough SPE LLC. The certificate, signed under penalties of perjury, declares that Westborough SPE LLC was withdrawing its Massachusetts registration on the ground that it was "not doing business in the Commonwealth of Massachusetts." This shows that the withdrawal was executed while Westborough SPE LLC remained actively subject to obligations in Massachusetts, including as owner of the property at 231 Turnpike Road, Westborough, and as a party to the ongoing leveraged lease. The statement that the company was "not doing business" was false on its face, as the Debtor continued to own real property and conduct lease operations in the Commonwealth. The filing, made under penalties of perjury, impaired the Debtor's ability to maintain standing in Massachusetts courts, receive service of process, and comply with statutory obligations; undertaken by Babcock & Brown as Manager and controlling party and without authorization from the sole member, Mignonette Investments Limited, it directly contravened Section 10.5 of the Participation Agreement (requiring maintenance of a local service agent through CSC) and the Debtor's Operating Agreement. Such unilateral withdrawal constitutes a breach of fiduciary duty by Babcock & Brown and its officers, including Dyann Blaine, who executed the withdrawal. The wrongful withdrawal created legal exposure, undermined the Debtor's capacity to contest tax foreclosure proceedings in Massachusetts, and directly contributed to the later deprivation of the Estate's primary asset, supporting a cognizable claim for damages under Delaware fiduciary-duty law and Massachusetts corporate law. The Trustee's Status Report (¶¶ 7–9) dismisses any viable claims against Babcock & Brown as having ended with a 2011 resignation, but Exhibit 1 disproves that narrative: misconduct occurred years earlier, in 2007, through an unauthorized withdrawal that

crippled the Debtor's Massachusetts presence. This evidence alone establishes at least a prima facie claim for breach of fiduciary duty and negligence, which the Trustee improperly ignores.

**Exhibit 2 – Participation Agreement, Section 10.5 (Oct. 30, 1997).** Exhibit 2 is a conformed copy of the Participation Agreement dated October 30, 1997, executed among Interstate Theatres Corporation (Tenant), the Hoyts entities (Guarantors), Westborough SPE LLC (the Company), Mignonette Investments Limited (Equity Investor), and The Northwestern Mutual Life Insurance Company (Note Purchaser). Section 10.5 provides that Massachusetts law governs the parties' rights and duties and that exclusive jurisdiction lies in Massachusetts state and federal courts. It further states that Westborough SPE LLC and Mignonette irrevocably appointed Corporation Service Company, located at 84 State Street, Boston, as their agent for service of process. This proves that the Participation Agreement required Westborough SPE LLC and Mignonette to maintain CSC as registered agent in Massachusetts and subjected them to Massachusetts jurisdiction—an obligation that remained binding throughout the lease term and related transactions. The later unilateral withdrawal of Westborough SPE LLC's Massachusetts registration (see Exhibit 1) and Babcock & Brown's failure to maintain CSC as agent violated this express obligation; by removing the Company from Massachusetts' registry and undermining service-of-process provisions, Babcock & Brown acted outside its authority and in breach of duties owed under both the Operating Agreement and the Participation Agreement. These actions deprived the Debtor of the ability to receive notice and defend itself in Massachusetts foreclosure proceedings, directly contributing to the loss of its primary asset. The violation of Section 10.5 was not merely technical; it stripped the Estate of statutory protections, exposing it to default and impairing creditor rights. The Trustee asserts there are no actionable claims against Babcock & Brown or its officers, yet Exhibit 2 shows clear contractual obligations knowingly disregarded by the Manager, undermining the Trustee's conclusion (¶¶ 7–9 of the Status Report) and demonstrating that viable claims exist for breach of contract, breach of fiduciary duty, and mismanagement.

**Exhibit 3 – Notice of Resignation of Manager (Apr. 30, 2011).** Exhibit 3 is a Babcock & Brown Administrative Services LLC letter dated April 30, 2011, addressed to "Westborough SPE LLC c/o Equity Trust, 31/F, The Center, 99 Queen's Road Central, Hong Kong, Attention: Serena Kwok," stating that, "[p]ursuant to Section 1(e) of the LLC Agreement and Section 18-602 of the Delaware Limited Liability Company Act," the Manager "intends to resign as Manager of the Company effective as of May 30, 2011." This document shows that Babcock & Brown attempted a unilateral resignation by notice sent offshore to Equity Trust in Hong Kong—rather than through the Massachusetts agent for service mandated by the Participation Agreement (CSC at 84 State Street, Boston)—and without any accompanying evidence of the sole member's consent or acceptance. The choice of notice recipient and locus (Equity Trust, Hong Kong) is inconsistent with the parties' agreed forum and service arrangements under Section 10.5 of the Participation Agreement and underscores a pattern of evading Massachusetts jurisdiction and service mechanics contemporaneous with the 2007 Massachusetts withdrawal (Exhibit 1). The resignation notice, on its face, relies on § 18-602, which permits resignation only "as provided in a limited liability company agreement." Here, the Operating/LLC Agreement required member control over any change in management, and there is no contemporaneous member resolution, consent, or ratification authorizing or accepting the resignation, nor any orderly transition of managerial authority. By purporting to resign unilaterally, and doing so via notice routing that contravened the Massachusetts service-of-process framework contractually adopted by the Company and its Equity Investor, Babcock & Brown breached its fiduciary duties and acted ultra vires, creating a governance vacuum and compounding the earlier injury caused by the Massachusetts withdrawal. The timing and method of this resignation—effective May 30, 2011—further corroborate that the Trustee's narrative (that any potential misconduct "ended" with a clean 2011 departure and leaves

no viable claim) is inaccurate: the manner of attempted resignation itself is part of the wrongful conduct. This evidence supports claims for breach of fiduciary duty, violation of the governing agreements' consent and service provisions, and resulting damages to the Estate from loss of proper governance, impaired ability to receive notice and defend Massachusetts proceedings, and confusion over managerial authority that persisted thereafter.

**Exhibit 4 – CSC Response to Subpoena (Sept. 23, 2025).** Exhibit 4 is an email response from Steve Kirvan, Project Manager at Corporation Service Company (CSC), dated September 23, 2025, responding to a subpoena served in Akouete v. Mignonette Investments Limited. In the response, CSC confirms that services for Westborough SPE LLC were discontinued when the company became "unable to locate in 2018," and that legal documents served on its behalf were returned to CSC as undeliverable, except for one instance. CSC further confirms that it holds no records of Babcock & Brown Administrative Services, Inc. and no records referencing Mignonette Investments Limited. CSC provided last known contact information for Westborough SPE LLC, identifying Andrew Ho of TMF Group, Hong Kong, as the contact person, with full address, phone, and email details. This is significant because it establishes a breakdown of the service-of-process mechanism mandated under Section 10.5 of the 1997 Participation Agreement (see Exhibit 2), which required CSC at 84 State Street, Boston, to serve as agent for both Westborough SPE LLC and Mignonette Investments Limited. The fact that CSC formally reports no record of Mignonette and discontinued Westborough SPE LLC's service due to "unable to locate" status shows that Babcock & Brown, as Manager, failed in its fiduciary duty to maintain the entity's legal presence and service infrastructure. This breakdown occurred while the company continued to own real property and remained subject to litigation exposure in Massachusetts. The fiduciary breach is plain: the Manager's obligation to preserve the entity's compliance and capacity for legal process was abandoned, impairing the Debtor's ability to receive notice and defend itself in foreclosure and related proceedings. The Trustee's Status Report asserts that no actionable claims exist because the Manager resigned in 2011; however, Exhibit 4 demonstrates that mismanagement persisted through at least 2018, when CSC service collapsed, creating exposure and prejudice to the Estate and its creditors. Damages include default vulnerability, inability to contest proceedings, and direct harm from the foreclosure of the 231 Turnpike Road property. By confirming the absence of records for Mignonette and Babcock & Brown Administrative Services, Inc., CSC's response also shows that the Manager left the Estate's stakeholders unprotected, violating both fiduciary duties and contractual obligations. Thus, Exhibit 4 directly rebuts the Trustee's conclusion (¶¶ 7–9 of the Status Report) that there were no viable claims against Babcock & Brown or related entities; to the contrary, it demonstrates long-term mismanagement and fiduciary breach that deprived the Estate of essential legal protections.

**Exhibit 5 – Regal Cinemas Lease Termination Notice (Aug. 3, 2017).** Exhibit 5 is a letter dated August 3, 2017, from Interstate Theatres Corporation (Regal Entertainment Group) addressed to Westborough SPE LLC at two CSC addresses: 84 State Street, Boston, Massachusetts, and 251 Little Falls Drive, Wilmington, Delaware. The letter concerns the lease of the Westborough Stadium 12 Theatre (Premises No. 22-1723) originally executed on October 30, 1997, between Westborough SPE LLC as Landlord and Interstate Theatres Corporation as Tenant. The Tenant notified the Landlord that the Lease would expire on or about November 21, 2017, that Tenant had intentionally allowed its extension options to lapse because operations were unprofitable, and that it was preparing to close the theatre, remove personal property, and vacate the Premises. This letter demonstrates the proper service channel contemplated under Section 10.5 of the Participation Agreement and the Debtor's obligations: communications with Westborough SPE LLC and Mignonette were to be directed through CSC, the appointed agent for service of process in Massachusetts. Tenant did exactly that in 2017, serving notice to both CSC's Boston and Wilmington offices. This harmonizes with the contractual framework and proves that parties

transacting with Westborough SPE LLC relied on CSC as the only valid conduit for legal notices and communications. In contrast, Babcock & Brown's purported 2011 "resignation" notice (Exhibit 3), sent unilaterally to Equity Trust in Hong Kong, disregarded the Participation Agreement and Massachusetts service provisions, rendering the notice defective and ultra vires. At the same time, the contents of the Tenant's letter expose the collapse of Westborough SPE LLC's management. Tenant states that after various changes of ownership, it had "lost all contact with any business representative of Landlord," that rent was being paid to a drop box that did not accept correspondence, and that Babcock & Brown was still listed as the principal office of Westborough SPE LLC in Massachusetts records even though it was "no longer engaged by Landlord and would not or could not provide forwarding information." The Tenant thus had no alternative but to send keys and termination correspondence to CSC, underscoring that the Debtor's management had abandoned its duties. The fiduciary breach is clear: Babcock & Brown failed to maintain communications, failed to honor the service channels required under the governing agreements, and left the Debtor effectively unreachable, undermining its ability to manage lease obligations and negotiate extensions or orderly surrender. The damage to the Estate included the loss of rental income, the inability to negotiate favorable terms, and increased risk of default and foreclosure. Accordingly, this exhibit both proves the continued reliance on CSC as the proper channel for service and communication with Westborough SPE LLC and Mignonette, in harmony with the Participation Agreement, and exposes the mismanagement and fiduciary breach by Babcock & Brown, whose defective 2011 resignation notice bypassed CSC and used an offshore address, in stark contrast to the lawful, contractually recognized method demonstrated by Tenant. This evidence directly rebuts the Trustee's assertion that no viable claims exist against Babcock & Brown or its officers and establishes a factual basis for claims of breach of fiduciary duty and mismanagement.

**Exhibit 6 – Lease Terms and Economic Loss from Manager's Abandonment (1997–2017).**
Exhibit 6 sets out the rent mechanics and economics of the Westborough Stadium 12 lease between Westborough SPE LLC (Landlord) and Interstate Theatres Corporation (Tenant). The Primary Term ran from November 21, 1997, to November 21, 2017, with additional extension options through November 21, 2027. During the Primary Term, the Tenant was obligated to pay fixed Basic Rent in quarterly installments of $277,737.71, together with Percentage Rent consisting of a guaranteed Profit Share Rent of $144,000 annually (paid in quarterly installments of $36,000, subject to credits) and additional Incentive Rent equal to 5% of Adjusted Net Operating Profits. The Lease also granted the Landlord audit rights and required timely financial reporting to ensure compliance with Percentage Rent obligations. Over the course of the Primary Term, these obligations aggregated to more than $22 million in rent payments, exclusive of contingent Incentive Rent. Critically, the Lease also contained a Termination Value Purchase Price Schedule, which tracked the declining debt balance and the increasing equity value available to the Landlord at defined points in time. By August 2017, the schedule reflected an Equity Termination Amount exceeding $16.2 million, and by November 2017, at the end of the Primary Term, the equity value exceeded $16.5 million. These numbers quantify the capital value embedded in the Lease structure, value that could have been realized through an extension, buyout, assignment, or orderly sale. In addition, the Lease's extension options through November 2027 preserved the opportunity for millions more in rental income and equity accretion. Against this backdrop, the damages from Babcock & Brown's abandonment of fiduciary duties are concrete and measurable. By improperly resigning in 2011 (see Exhibit 3), failing to maintain the contractually mandated CSC service channel (see Exhibit 2), ignoring the Tenant's 2017 effort to coordinate lease termination (see Exhibit 5), and neglecting to enforce audit and reporting rights, the Manager left the Debtor unreachable and the Lease unmanaged. As a result, Westborough SPE LLC forfeited ongoing quarterly Basic Rent; Percentage/Profit Share and Incentive Rent tied to operations; the leverage of negotiating lease renewals through 2027; and the substantial equity value embedded in the

Termination Value Purchase Price Schedule. The Tenant's letter in August 2017 underscores the collapse of communications, noting that it had "lost all contact with any business representative of Landlord" and was left to send notice to CSC alone. The effect of this managerial vacuum was devastating: a performing, income-generating leasehold—paying $277,737.71 per quarter plus profit participation and carrying a termination equity value exceeding $16.5 million—was allowed to collapse into vacancy and foreclosure. This abandonment of fiduciary duty directly depressed recoveries, squandered renewal opportunities, and erased a quantifiable revenue stream and capital value that otherwise should have accrued to the Estate. Exhibit 6 therefore establishes with precision the economic harm caused by Babcock & Brown's mismanagement and unauthorized resignation, harm that is compensable and directly rebuts the Trustee's claim that no viable causes of action exist.

**Exhibit 7 – RK Centers/Town Emails re Apple Cinemas and RFP (Oct. 22–24, 2018).** Exhibit 7 consists of email correspondence in October 2018 among RK Centers (Kenneth Fries) and Town of Westborough officials (Board of Selectmen and Town Manager Kristi Williams) concerning Regal Cinemas' planned exit, the Town's RFP process, and Apple Cinemas as the high bidder brought to the table. Fries recounts that he had worked with the Town for nearly a year and "brought the high RFP bidder, Apple Cinema, to the table," contemporaneous with the Town's active consideration of how best to proceed, including executive-session discussion and counsel review. The emails reflect that the property was positioned for disposition through the Town's RFP, with Apple Cinemas identified as the leading bidder; the contemplated transaction value was approximately $5 million (to be further substantiated with supporting materials). Critically, the correspondence attributes the breakdown in ownership/management continuity to Babcock & Brown: it states that B&B "set up the entity Westborough SPE for a foreign entity Mignonette," that former B&B personnel could not identify current ownership, that administration on the property "stopped approximately ten years ago," and that rent had not been collected since around 2007. The Town's internal follow-up (forwarded email from Selectman Shelby Marshall) underscores the practical consequences of this abandonment—consideration of eminent domain or land-court strategies, concern that the building was approaching a "point of no return" due to roof failure and water infiltration (with resulting mold/warping), and acknowledgment that abutters were covering basic property management such as snow removal. Taken together, Exhibit 7 demonstrates an active, market-validated disposition opportunity (Apple as high RFP bidder, approximately $5 million) that the Estate should have been positioned to capture, but which was jeopardized by years of managerial neglect: loss of contact with the landlord's representative, cessation of rent collection, dissolution of records and governance, and physical deterioration of the asset. This evidence quantifies damages in two dimensions—lost operating income (no rent collection since ~2007) and lost capital realization (a ready path to monetize the property at market through the RFP at approximately $5 million)—both causally linked to Babcock & Brown's long-running failure to discharge fiduciary duties. It directly rebuts the Trustee's assertion that no actionable claims exist, showing instead that managerial abandonment extinguished a concrete, near-term recovery opportunity and accelerated asset impairment to the detriment of the Estate and its creditors.

**Exhibit 8 – Expert Confirmation of Fiduciary Breach by Delaware Counsel (Ellisa O. Habbart).** Exhibit 8 contains the professional profile of Ellisa O. Habbart, one of Delaware's foremost authorities on LLC law and fiduciary duties, founding partner of The Delaware Counsel Group LLC, and long-standing appointee to the Delaware Corporation Law Council. Ms. Habbart has been ranked since 2005 in Chambers USA for her expertise advising on governance issues in Delaware alternative entities and is recognized globally in Who's Who Legal and the Expert Guides to the World's Leading Women in Business Law. Her profile confirms her credentials in Delaware LLC governance. Prior to the bankruptcy filing, Movant's then-counsel, Attorney Scott

A. Schlager, consulted directly with Ms. Habbart regarding the conduct of Babcock & Brown Administrative Services, LLC. Based on the facts presented, Ms. Habbart confirmed that the Manager's actions constituted a breach of fiduciary duty under Delaware law. Although Movant lacked the funds to provide the $10,000 retainer she required for formal representation, her professional assessment—coming from a leading Delaware authority—corroborates that the Estate holds valuable fiduciary-duty claims against Babcock & Brown. This is critical for two reasons: it provides independent, expert confirmation from one of Delaware's top LLC practitioners that the Manager's conduct gives rise to actionable claims, and it highlights the Trustee's lack of diligence. Despite dismissing these claims as meritless in his Status Report, the Trustee never consulted comparable Delaware experts, relying instead on his own conflicted judgment. The disparity between the Trustee's cursory conclusion and Ms. Habbart's considered assessment underscores the Trustee's failure to investigate and preserve valuable estate rights. Accordingly, Exhibit 8 shows that fiduciary-duty claims exist under Delaware law and have been validated by one of the jurisdiction's leading authorities, directly rebutting the Trustee's assertion (¶¶ 7–9 of the Status Report) that the Estate has "no cause of action" against Babcock & Brown or its officers and further establishing that the Trustee's refusal to act has prejudiced creditors by abandoning meritorious claims.

### III. Claims Against the California State Controller's Office (Exhibits 9–14)

**Exhibit 9 – Correspondence with California State Controller's Office (July 13, 2023).** Exhibit 9 is an email and supporting submission dated July 13, 2023, from Attorney Scott A. Schlager of Nathanson & Goldberg, P.C., to Attorney Harpreet K. Nakhwal, Acting Chief Counsel for the California State Controller's Office ("CSCO"), following up on a reconsideration request for release of unclaimed funds belonging to Westborough SPE LLC ("WSPE"). The letter was copied to Attorney Alvin Nathanson, Attorney Jose Centeio, creditor Denise Edwards, and creditor Lolonyon Akouete, and it attaches certified Delaware filings and supplemental documents clarifying WSPE's management structure and succession chain. The correspondence establishes that CSCO had already denied an earlier application for release of funds, requiring reconsideration despite documentary evidence that the funds belonged to WSPE. Schlager's letter emphasized statutory obligations under California Code of Civil Procedure § 1540, which requires the Controller to return property upon sufficient proof of ownership, and pressed CSCO to comply with prompt attention and diligence. The submission included certified Delaware Secretary of State records (conversion and merger certificates) establishing that Babcock & Brown Parallel Member LLC was the lawful successor-in-interest to Babcock & Brown Administrative Services, Inc., the original Manager of WSPE, directly rebutting any claim that the entity lacked continuity of management or authority to recover funds. Documents executed by F. Jan Blaustein Scholes in June 2023 further confirmed her continuing authority as Manager of Babcock & Brown Parallel Member LLC and her delegation of powers to Akouete and Edwards. These instruments—including a Certificate of Correction, Written Consent of Manager, and Durable Power of Attorney—were notarized and legally sufficient under Delaware law and together ratified Akouete and Edwards's authority to pursue recovery of the $1.2 million in unclaimed funds on behalf of WSPE. Exhibit 9 thus shows that CSCO was on formal notice of WSPE's lawful management chain and had been provided with certified and notarized documents sufficient under California Evidence Code § 1531 to require release of funds. Despite this, CSCO delayed and refused release, creating prejudice to the Estate and its creditors. The refusal to release the $1.2 million promptly denied the Estate access to cash resources needed to pay creditors and stabilize the bankruptcy case and was the proximate cause of the Debtor's involuntary Chapter 7 filing on August 31, 2023; without access to its own funds, WSPE could not meet obligations or defend itself in foreclosure proceedings, leaving creditors with no alternative but to invoke the protection of the Bankruptcy Code. The Trustee's suggestion that CSCO's conduct "benefitted the Estate" by preventing

149

dissipation is contradicted by Exhibit 9, which shows CSCO had documentary proof of WSPE's management continuity and fiduciary authorizations yet persisted in withholding assets, inflicting measurable harm in litigation costs, opportunity costs, lost liquidity, and loss of control over the timing of creditor recoveries. The Estate therefore had viable causes of action under CCP § 1540, common-law conversion, and negligence, which the Trustee improperly refused to acknowledge.

**Exhibit 10 – Dyann Blaine Affidavit Draft and Communications with CSCO (Feb. 21, 2023).**
Exhibit 10 consists of email correspondence and an attached draft affidavit prepared by Dyann Blaine, former Babcock & Brown corporate and tax attorney, transmitted to Attorney Harpreet K. Nakhwal of CSCO on February 21, 2023. Blaine copied Peter Blaustein, a purported family member with no lawful management authority, and characterized the pending claim for release of WSPE's unclaimed funds as being filed by "scam artists." The draft affidavit recites Blaine's employment with Babcock & Brown from 1993 to 2009, her role in the original 1997 Hoyts sale-leaseback, and her knowledge of WSPE's structure as a Delaware single-member LLC wholly owned by Mignonette Investments Limited. Blaine confirmed that Babcock & Brown Administrative Services, Inc. was formed in Delaware in 1997, acted as Manager of WSPE, and entered into a service agreement with WSPE; she also acknowledged that she and Jan Blaustein Scholes were appointed as officers and signatories for WSPE real estate matters. The affidavit traces subsequent events, including the 2007 Massachusetts withdrawal of WSPE, BBAS's own Massachusetts withdrawal in 2008, and Babcock & Brown's 2009 termination of its service arrangement. Blaine states that Mignonette was struck from the BVI registry on May 31, 2010, and admits that she has been contacted repeatedly since 2017 about ownership of the theater property but has never identified the private investors. Exhibit 10 therefore shows CSCO improperly solicited and relied upon communications from former insiders with conflicts of interest rather than evaluating statutory documentation under CCP § 1540. While Blaine's affidavit confirms key historical facts aligning with Exhibits 1–8, her labeling of legitimate creditors and successor managers as "scam artists" demonstrates bias and an intent to obstruct lawful recovery of estate property. Blaine's communications underscore how B&B insiders not only abandoned fiduciary responsibilities but later actively interfered with efforts to reclaim WSPE's assets, and CSCO's decision to engage directly with Blaine and Blaustein—who lacked any authority under WSPE's Operating Agreement—reflects a statutory failure to act impartially on the record evidence. The resulting delay directly harmed the Estate by prolonging insolvency, increasing administrative costs, and forcing the bankruptcy that could have been avoided with timely release of funds. This evidence also rebuts any notion that management succession was "unclear," because Blaine herself acknowledged WSPE's formation, management, and structure—corroborating the validity of the successor authorizations later executed by F. Jan Scholes.

**Exhibit 11 – Communications Between Iris A. Leahy and CSCO (Feb.–Sept. 2023).** Exhibit 11 is a series of email communications between Attorney Iris A. Leahy and Attorney Harpreet K. Nakhwal, Acting Chief Counsel of CSCO, spanning February to September 2023. Leahy, who represented the Town of Westborough in Massachusetts Land Court Case No. 19 TL 000768, repeatedly contacted CSCO to oppose the release of $1.2 million in unclaimed funds belonging to WSPE. In her September 5, 2023 email, she explicitly urged CSCO to deny the amended claim submitted by Lolonyon Akouete and Denise Edwards, characterizing the governing documents as "arguably invalid" and insisting that Jan Blaustein Scholes lacked authority to act for WSPE. These communications show that CSCO entertained arguments from an attorney with a direct conflict of interest—Town counsel adverse to WSPE in pending litigation—and, instead of limiting its review to statutory documentation under CCP § 1540, relied on advocacy from hostile outside counsel to delay or deny payment. Leahy's assertions mischaracterized the governing instruments, describing the 2022–2023 transfer and ratification documents as "invalid," while conceding the existence of a Bill of Sale, Transfer of Manager Role, and revived Delaware filings that corroborate WSPE's

continuity of management. Exhibit 11 thus proves that CSCO's review process was improperly tainted by one-sided advocacy from an adverse party, converting an administrative matter into a contested arena and deferring to the Town's attorney instead of the statutory record. By entertaining and crediting Leahy's advocacy, CSCO violated obligations under CCP § 1540 to return property upon adequate proof, depriving the Estate of funds it was entitled to receive and contributing to the forced bankruptcy. This directly refutes the Trustee's claim that no viable action exists against CSCO.

**Exhibit 12 – Complaints to California Attorney General Rob Bonta Regarding WSPE Unclaimed Funds (Oct. 2023 – Mar. 2024).** Exhibit 12 contains two formal complaint letters sent by Lolonyon Akouete to California Attorney General Rob Bonta on October 2, 2023, and March 21, 2024, documenting escalating harm caused by CSCO's refusal to promptly release $1.2 million in escheated funds belonging to WSPE. In the October 2, 2023 letter, Akouete filed a Complaint to Recover Escheated Property under CCP § 1541 in Sacramento Superior Court and sought urgent intervention from the Attorney General due to a six-to-eight-week processing delay. The letter explains that WSPE's checking account was reported as abandoned and escheated, that an expedited claim was initially approved and then rescinded, that WSPE provided proof there was no guardianship or conservatorship over F. Jan Blaustein Scholes in Arizona, and that CSCO's failure to act was causing dire financial hardship and contributing to the looming bankruptcy petition. In the March 21, 2024 follow-up, Akouete again appealed to the Attorney General, noting that CSCO had eventually transferred $1,293,646.83 to the bankruptcy trustee, but only after the involuntary Chapter 7 had been filed, thereby stripping WSPE of control. The follow-up underscores the Town of Westborough's appropriation of WSPE's property despite modest tax arrears and a higher third-party purchase offer, draws parallels to *Tyler v. Hennepin County* (unjust enrichment), explains the inability to fund legal representation given *Lamie v. U.S. Trustee*, and raises concerns about a clandestine settlement adverse to WSPE's interests. These letters establish a clear causal chain: CSCO's statutory breach and delay forced the bankruptcy filing; once the case was pending, the funds were diverted to trustee control; the Estate then lost bargaining power and was exposed to further inequitable transfers. The damages are not hypothetical: they include over $140,000 in pre-petition legal expense, loss of direct access to $1.2 million, and subjugation to trustee-controlled litigation and settlements. This directly refutes the Trustee's assertion that no viable claim exists against CSCO; the eventual transfer only proves entitlement was never the issue—delay was, and delay caused the harm.

**Exhibit 13 – Attorney General Response Declining Assistance (Mar. 29, 2024).** Exhibit 13 is a letter from the California Attorney General's Office, Public Inquiry Unit, dated March 29, 2024, responding to Akouete's March 21, 2024 request for intervention regarding CSCO. The Attorney General explains the office is legally precluded from assisting individuals in disputes with state agencies because it serves as counsel to those agencies; accordingly, it cannot provide advice or advocacy against CSCO or otherwise comment on the matter. Instead, the letter directs that claims for monetary damages purportedly caused by a state agency should be presented to the Government Claims Program within the Department of General Services and that allegations of improper governmental activity should be reported to the California State Auditor's Office. The letter also notes that the Attorney General does not impose policy judgments or control the administration of client agencies. This response demonstrates that requests for oversight or intervention were procedurally unavailable, leaving WSPE with no practical administrative remedy and forcing resort to litigation and, ultimately, bankruptcy. Together with Exhibits 9–12, this document completes the causation chain: CSCO withheld more than $1.2 million owed to WSPE; the managers sought high-level intervention without success; and the continued deprivation of property precipitated the involuntary Chapter 7 filing, compounding legal costs and diminishing creditor recoveries.

**Exhibit 14 – Government Claims Program Correspondence and Automatic Stay Constraint
(Apr. 9–10, 2024).** Exhibit 14 comprises email correspondence between Akouete and the
California Department of General Services' Government Claims Program (GCP) on April 9–10,
2024, requesting to initiate a damages claim against CSCO for wrongful withholding of WSPE's
escheated funds and the downstream harms culminating in the involuntary Chapter 7 case. GCP
advised that claims cannot be submitted by email and must be mailed or hand-delivered, enclosed
the required claim form (ORIM-006), and stated that applications are reviewed in order received
with a statutory 45-day window for action. In a same-day follow-up, Akouete confirmed he would
mail the claim and requested expedited processing due to an April 23 court date and the risk of
further prejudice absent counsel; GCP reiterated the 45-day statutory timeline. Critically, before the
claim could be finalized and filed, the petitioning attorney in the bankruptcy case warned that
presenting the government claim could violate the Bankruptcy Code's automatic stay, halting
submission. This record shows that WSPE diligently pursued the remedial path the Attorney
General identified (see Exhibit 13) but was procedurally blocked by GCP's mail-only requirement
and statutory delay and by the automatic-stay concern unique to the pending Chapter 7. The result
was a catch-22: CSCO's earlier refusal precipitated bankruptcy; once in bankruptcy, stay
constraints chilled the very government claim meant to redress CSCO's conduct. The Estate was
thereby deprived of a timely forum to assert damages, compounding litigation costs, prolonging
loss of access to funds, and further diminishing creditor recoveries. This evidence squarely rebuts
the Trustee's assertion that CSCO's actions "benefitted the Estate"; instead, the sequence
demonstrates actionable withholding followed by procedural foreclosure of remedies caused by the
bankruptcy that withholding helped trigger.

## IV. ARGUMENT

A. **The Trustee's "no claims" conclusion is contrary to the record.** Exhibits 1–8 establish prima
facie claims for **breach of fiduciary duty**, **breach of contract**, and **mismanagement** against B&B
and its officers/agents (including Ms. Blaine). Exhibits 9–14 establish viable **statutory (CCP
§1540/§1541), tort (conversion/negligence), and equitable** claims against CSCO, with a direct
causal chain to the involuntary petition and estate damages.

B. **The Trustee applied an improper standard and failed to investigate.** Rather than engaging
qualified Delaware counsel on LLC fiduciary issues or evaluating lease economics/termination
value, the Trustee relied on his own conflicted assessment and litigation posture. (Ex. 8; Ex. 6.) As
to CSCO, the Trustee re-casts harmful delay as a "benefit," ignoring proximate causation of
bankruptcy and fees.

C. **Preservation against §108(a) timing.** The Trustee acknowledges the two-year **§108(a)**
window. Given (i) the Trustee's non-action, (ii) interference by third parties, (iii) automatic-stay
complications with GCP, and (iv) equitable tolling principles, the Court should **preserve and toll**
claims or authorize prosecution now.

D. **Derivative standing or abandonment.** If the Trustee persists in non-action, the Court should
either (i) grant **derivative standing** to pursue these claims on the Estate's behalf, or (ii) order
**abandonment** under **§554(b)** for Movant to prosecute (the Trustee's suggestion that there is
"nothing to abandon" is belied by the record).

E. **Discovery.** Targeted **Rule 2004** discovery of B&B, Blaine/Blaustein, CSCO personnel
(including Harpreet Nakhwal), and CSC/TMF custodians will sharpen damages and liability
theories expeditiously.

**F. Request for Expedited Determination and Shortened Time (Fed. R. Bankr. P. 9006(c)(1))**

For cause shown, Akouete respectfully requests expedited consideration of this Opposition and a shortened response/hearing schedule under Fed. R. Bankr. P. 9006(c)(1), in the interest of a "just, speedy, and inexpensive" determination. See Fed. R. Bankr. P. 1001. Good cause exists:

1. **Prolonged trustee delay.** Despite repeated written and oral requests for action and transparency, the Trustee waited nearly two years to file the Status Report, and even then offered an incomplete, one-sided assessment that declines to preserve, prosecute, or abandon valuable estate claims.
2. **Ongoing prejudice to the Estate.** Each month of inaction risks loss of evidence (documents, third-party records, witnesses), increases administrative costs, and weakens the Estate's leverage against third parties.
3. **Time constraints and potential limitations.** The claims at issue are subject to statutes of limitation and other timing concerns (including 11 U.S.C. § 108(a)'s outer limits). Additional delay materially endangers recovery.
4. **Narrow, record-based issues.** The request turns largely on documents already before the Court (Exhibits 1–14) and discrete legal standards (breach of fiduciary duty/contract; CCP §§ 1540–1541). An expedited determination will conserve resources for all parties.

**Requested schedule.** Akouete requests that the Court: (i) shorten time for responses to **7 days** from entry of the scheduling order; and (ii) set a hearing at the Court's earliest availability **within 14 days** thereafter (or on the next calendar convenient to the Court).

## V. RELIEF REQUESTED

For the foregoing reasons, Akouete respectfully requests that the Court enter an order:

1. **Declining to adopt** or give weight to the Trustee's Status Report (Dkt. 879) to the extent it concludes there are no viable claims;
2. **Directing the Trustee** to promptly (a) retain qualified Delaware LLC counsel, (b) complete a written evaluation of claims against B&B/Blaine/Horst and CSCO, and (c) report back within a short, fixed period; **or**, in the alternative,
3. **Granting derivative standing** to Akouete (and/or other appropriate creditor) to prosecute the claims on behalf of the Estate, with fee reimbursement from recoveries; **or**, in the further alternative,
4. **Compelling abandonment** of the claims under **11 U.S.C. §554(b)** so they may be pursued outside the estate;
5. **Equitably tolling** any limitations/§108(a) deadlines running during the Trustee's assessment period and while CSCO's withholding and the automatic stay prevented GCP filing;
6. **Authorizing Rule 2004 discovery** of B&B entities, Dyann Blaine, Peter Blaustein, CSC, TMF Group, the California State Controller's Office (including Harpreet K. Nakhwal), and the Town of Westborough concerning the facts set forth in Exhibits 1–14; and
7. Granting such other and further relief as is just.

DATED: September 25, 2025, Respectfully submitted:

By creditor,

153



Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) |  |
|  | ) |  |
| Debtor. | ) |  |

**LIST OF EXHIBITS**

| Exhibit | Description | No. of Pages |
|---|---|---|
| 1 | Certificate of Withdrawal of Westborough SPE LLC (MA) — Nov. 20, 2007 | 2 |
| 2 | Participation Agreement (Section 10.5) — Oct. 30, 1997 (governing law/jurisdiction; CSC at 84 State St., Boston appointed agent for WSPE & Mignonette) | 2 |
| 3 | Manager's Notice of Resignation (Babcock & Brown Administrative Services LLC) — Apr. 30, 2011 (effective May 30, 2011), sent to Equity Trust, Hong Kong | 1 |
| 4 | CSC Response to Subpoena (Westborough SPE LLC) — Sept. 23, 2025 (services discontinued as "unable to locate" in 2018; most services returned undeliverable; last known contact: Andrew Ho, TMF Group, HK; no records for Mignonette or BBAS, Inc.) | 2 |
| 5 | Regal Cinemas Lease Termination Letter to WSPE (via CSC Boston & Wilmington) — Aug. 3, 2017 (notice of lease expiration; lost contact with landlord) | 2 |
| 6 | Lease Terms & Economic Loss (1997–2017) — Primary Term 11/21/1997–11/21/2017; quarterly Basic Rent $277,737.71; Profit Share Rent $144,000/year; Incentive Rent 5% of ANOP; audit/reporting rights; extension options to 11/21/2027; Termination Value/Equity >$16.5M by Nov. 2017 | 8 |
| 7 | RK Centers / Town of Westborough Emails (Apple Cinemas RFP & Property Condition) — Oct. 22–24, 2018 (Apple as high bidder ~ $5M; administration "stopped" ~10 years earlier; building deterioration) | 3 |
| 8 | Delaware Expert Confirmation (Ellisa O. Habbart) — Professional profile + prepetition consultation confirming fiduciary breach under Delaware law. | 5 |

| 9 | Correspondence with CA State Controller's Office (CSCO) — July 13, 2023 (Atty. Scott A. Schlager to Atty. Harpreet K. Nakhwal; certified DE conversion/merger documents; authority chain; request for reconsideration under CCP §1540) | 4 |
| 10 | Dyann Blaine Email & Draft Affidavit to CSCO — Feb. 21, 2023 (background on WSPE/Mignonette/BBAS; communications labeling claimants "scam artists") | 6 |
| 11 | Emails Between Iris A. Leahy and CSCO — Feb.–Sept. 2023 (Town counsel urging denial of WSPE claim to unclaimed funds) | 4 |
| 12 | Complaints to California Attorney General Rob Bonta — Oct. 2, 2023 & Mar. 21, 2024 (CCP §1541 action; request for intervention; causation of involuntary Ch. 7) | 2 |
| 13 | Attorney General Response (Public Inquiry Unit) — Mar. 29, 2024 (AG cannot assist; directs to Government Claims Program/Auditor) | 2 |
| 14 | Government Claims Program (GCP) Correspondence & Automatic Stay Constraint — Apr. 9–10, 2024 (mail-only filing; 45-day timeline; stay concern halted submission) | 4 |

CERTIFICATE OF WITHDRAWAL
OF A FOREIGN LIMITED LIABILITY COMPANY

(Under Section 53 of the Massachusetts Limited Liability Company Act)

| To the State Secretary<br>Commonwealth of Massachusetts | Federal Employer<br>Identification Number<br>94-3286768 |
|---|---|

It is hereby certified that:

1. The name of the limited liability company (the "company") is Westborough SPE LLC.

2. The jurisdiction where the company was organized is Delaware.

3. The address of the principal office of the company, wherever located, is 2 Harrison Street, 6th Floor, San Francisco, CA 94105.

4. The name and the business address of the registered agent of the company in the Commonwealth of Massachusetts is 84 State Street Boston MA 02109.

5. The company is withdrawing because it is not doing business in the Commonwealth of Massachusetts.

6. All fees and taxes owed by the company have been paid or provided for.

IN WITNESS WHEREOF AND UNDER THE PENALTIES OF PERJURY, the undersigned does hereby affirm and swear, that to the undersigned's knowledge and belief the foregoing statements are true as of this 19th day of November 2007.

_____
Dyann Blaine, Authorized Person

MA LL F: CERTIFICATE OF WITHDRAWAL 08/05 1 (MALLWITH)

157

THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

November 20, 2007 3:19 PM

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

CONFORMED COPY

PARTICIPATION AGREEMENT

Dated as of October 30, 1997

RE:
Leveraged Lease of Theater Premises

Among

INTERSTATE THEATRES CORPORATION

Tenant

HOYTS CINEMAS CORPORATION

Lease Guarantor

HOYTS CINEMAS LIMITED

Lease Guarantor

HOYTS CINEMAS AMERICA LIMITED

Lease Guarantor

WESTBOROUGH SPE LLC

Company

MIGNONETTE INVESTMENTS LIMITED

Equity Investor

and

THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY

Note Purchaser

620497.08.00.B
1452358

BB000811

Section 10.5. *Governing Law.* The Note Purchaser, the Equity Investor, the Company, the Tenant, HCC, HCL, and HCA have agreed that the local law of a single state should govern their respective rights and duties under this Agreement and the other Operative Documents, regardless of whether a proceeding to enforce those rights is brought in the courts of another state. The parties hereby agree that their respective rights and duties under this Agreement shall be governed by the internal laws of the Commonwealth of Massachusetts.

Any legal action or proceeding with respect to this Agreement or any document relating thereto shall be brought in the courts of the Commonwealth of Massachusetts or of the United States of America for the Eastern District of Massachusetts and in no other courts, and, by execution and delivery of this Agreement, each party hereto hereby accepts for itself and in respect of its property generally and unconditionally, the jurisdiction of the aforesaid courts. Each party hereto hereby irrevocably and unconditionally waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens* which it may now or hereafter have to the bringing of any action or proceeding in such respective jurisdiction and waives personal service of any and all process upon it. Each party hereto consents that all such service of process may be made by delivery to it at the address of such party set forth below or, in the case of HCA, HCL, the Company and the Equity Investor, to their agent referred to below at such agent's address set forth below. HCA and HCL hereby irrevocably appoint Hoyts Cinemas Corporation, with an office on the date hereof at One Exeter Plaza, Boston, Massachusetts 02116-2836, as its agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. The Company and the Equity Investor hereby irrevocably appoint Corporation Service Company with an office on the date hereof at 84 State Street, Fifth Floor, Boston, Massachusetts 02109, as their agent for the purpose of accepting service of any process within the Commonwealth of Massachusetts. Nothing contained in this **Section 10.5** shall affect the right of any party to this Participation Agreement to serve legal process in any other manner permitted by law or to bring any action or proceeding in the courts of any jurisdiction against any party or to enforce a judgment obtained in the courts of any other jurisdiction.

Section 10.6. *Counterparts.* This Agreement may be executed in any number of counterparts, each executed counterpart constituting an original but all together only one Agreement.

Section 10.7. *Headings and Table of Contents.* The headings of the sections of this Agreement and the Table of Contents are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

Section 10.8. *Conditions to Purchase of Beneficial Interest by Tenant.* Anything to the contrary herein or in the other Operative Documents notwithstanding, the Tenant shall not purchase or otherwise acquire the Beneficial Interest or any part thereof unless, as a condition thereto and simultaneously therewith, the Tenant shall, by agreement or agreements in writing containing covenants substantially equal to the covenants of the Tenant set forth in the Operative Documents (a) expressly assume the Indebtedness evidenced by the

BB000852



## BABCOCK & BROWN

Babcock & Brown LP
One Letterman Drive · Bldg D · San Francisco CA 94129 USA
T +1 415 512 1515 · F +1 415 267 1500 · www.babcockbrown.com

**NOTICE OF RESIGNATION**

April 30, 2011

Westborough SPE LLC
c/o Equity Trust
31/F, The Center
99 Queen's Road Central, Hong Kong

Attention: Serena Kwok, General Manager, Trade Support

RE: Westborough SPE LLC (the "Company")

Dear Ms. Kwok:

We refer to the Company's Limited Liability Company Agreement dated as of October 22, 1997 (the "LLC Agreement") between Mignonette Investments Limited (the "Member") and Babcock & Brown Administrative Services LLC, as successor to Babcock & Brown Administrative Services, Inc. (the "Manager").

Pursuant to Section 1(e) of the LLC Agreement and Section 18-602 of the Delaware Limited Liability Company Act, this letter serves as notice to the Member of the Manager's intent to resign as Manager of the Company effective as of May 30, 2011.

Sincerely,

Babcock & Brown Administrative
Services LLC

By: Walter Horst
Title: Treasurer

**BB000085**



Lolonyon Akouete <info@smartinvestorsllc.com>

## Response to Subpoena - Lolonyon Akouete v. Mignonette Investments Limited

**Steve Kirvan** <Steve.Kirvan@cscglobal.com>                          Tue, Sep 23, 2025 at 10:59 AM
To: Lolonyon Akouete <info@smartinvestorsllc.com>

Good morning,

Apologies. For Westborough SPE, LLC, please see the below last known contact information. Services
were discontinued when they became unable to locate in 2018. Any legal documents served to CSC on
their behalf, except for one, where returned to CSC as undeliverable by FedEx. Please see the attached
excel.

We do not have any record Babcock & Brown Administrative Services, Inc in any of our records.

We do not have any records referencing Mignonette Investments Limited.

      Westborough SPE LLC

**Formed In** Delaware    **Formed On** 22-OCT-1997

**Contact Details**

**Andrew Ho**
**TMF Group (Acct.# 7907947)**
36/F Tower Two
1 Matheson Street
Causeway Bay, HK
Hong Kong

**Direct**

Telephone 852 210 69371
Telephone 852 253 04894
Cellular 852 640 77308
Email Andrew.Ho@tmf-group.com

……………………………………………………….

**Steve Kirvan**
Project Manager | Legal
**Phone 1:** 800-927-9801 ext. 62870
*steve.kirvan@cscglobal.com*

**CSC**
251 Little Falls Drive
Wilmington, DE 19808-1674
USA
**cscglobal.com**

 Follow us for more industry news and updates.



We are the *business* behind *business*®.

[Quoted text hidden]
[Quoted text hidden]

---

 **Westborough SPE LLC.xlsx**
12K



August 3, 2017                                               *VIA UPS OVERNIGHT DELIVERY*

Westborough SPE, LLC
c/o Corporation Service Company
84 State Street
Boston, MA 02109

Westborough SPE, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

> Re:    Westborough Stadium 12 (Theatre No. 22-1723) – Lease dated October 30, 1997 between **Westborough SPE, LLC** ("Landlord") and Interstate Theatres Corporation ("Tenant")

Dear Sir or Madam:

Please refer to that certain lease dated October 30, 1997 between **Westborough SPE, LLC** ("Landlord") and **Interstate Theatres Corporation** ("Tenant") (the "Lease"). Capitalized terms shall have the same meaning as ascribed to them in the Lease, except to the extent they may be explicitly defined otherwise herein.

Please be advised that upon information and belief, Landlord is a Delaware limited liability company, which is registered to do business as a foreign entity in Massachusetts. Please be advised that the Lease shall expire on or about **November 21, 2017**. Tenant intentionally allowed its term extension options available under the Lease to lapse on or about May 21, 2017, because Tenant's business at the Premises is not profitable. Accordingly, Tenant is preparing to close its theatre business, remove its personal property and exit the Premises by said expiration date.

In that connection, over the years, and through various changes of ownership, Tenant has lost all contact with any business representative of Landlord. Rent payments are remitted to a drop box that does not accept correspondence. Additionally, Babcock & Brown, which is still listed as the Principal Office for the Landlord entity in the Massachusetts Secretary of State's records, is no longer engaged by Landlord and would not or could not provide forwarding information.

Accordingly, Tenant respectfully requests acknowledgement of receipt hereof and that this correspondence be provided to Landlord as soon as possible in order to facilitate the re-establishment of contact between Landlord and Tenant. At a minimum, the parties need to discuss the logistics of a handover of the property upon expiration of the Lease; or, in the alternative, the possibility of an extension of the term of the Lease on a mutually acceptable basis.

Please be advised that upon expiration, unless Landlord contacts Tenant in the interim to coordinate the handover of the Premises, Tenant will have no reasonable alternative but to send the keys for the Premises to Corporation Service Company in Boston in its capacity as the only identifiable active representative of Landlord. Hopefully, that will not be necessary.

**REGAL CINEMAS    UNITED ARTISTS    EDWARDS THEATRES**

*Corporate Office* – 865.922.1123 ● Fax: 865.922.3188 ● 7132 Regal Lane, Knoxville, TN 37918
*Los Angeles Film Office* – 818.593.4000 ● Fax: 818.593.4035 ● 21700 Oxnard Street #1000, Woodland Hills, CA 91367

164

**REGAL** GROUP

Corporation Service Co.
August 3, 2017
Page 2 of 2


Please do not hesitate to contact me in this regard.

Very truly yours,

INTERSTATE THEATRES CORPORATION


By:     R. Jackson Pope
        Director & Counsel – Real Estate
        Regal Entertainment Group
        Direct:  (865) 926-9611
        robbie.pope@regalcinemas.com


cc:     Daniel Maxwell (via email)
        Chris Catlett (via email)
        Cassie Peters (via email)
        Katrina Wilson (via email)
        Sherry Mulberry (via email)
        Jawed Khan (via email)

## TERMS AND RENT PAYMENTS

I.   TERMS:

(a)   The Primary Term shall commence on November 21, 1997 and shall end at midnight on November 21, 2017.

(b)   Each Extended Term shall commence on the day next succeeding the expiration of the preceding term.   The last possible Extended Term shall end at midnight on November 21, 2027.

II.   RENT PAYMENTS:

(a)   Basic Rent payable for the Premises for the Primary Term of this Lease shall be in quarterly installments of $277,737.71 and shall be payable on February 21, 1998 and on the twenty-first day of each May, August, November and February thereafter to and including August 21, 2017.   A final installment of Basic Rent in the amount of $277,737.71 shall be payable on November 21, 2017.

(b)   Each installment of Basic Rent and Percentage Rent, if any, payable for the Premises during each Extended Term shall be payable in amounts determined in accordance with the last sentence of Section 4(a) of the Lease and, in the case of Basic Rent, shall be payable on the twenty-first day of each February, May, August and November next following the last Payment Date during the Primary Term, in each case occurring during each such Extended Term.

(c)   Percentage Rent shall consist of Profit Share Rent and Incentive Rent.

(1)   Profit Share Rent for the Premises during the Primary Term shall accrue at an annual rate of $144,000 per annum, prorated for any relevant period of less than one year.

Profit Share Rent shall be paid, in arrears, by Tenant to Landlord at the rate of $36,000 per three-month period (partially prorated for any period of less than three months) commencing on February 21, 1998, and continuing on each Payment Date until (and including) February 21, 1998.

Commencing with November 21, 1998 and continuing on each Payment Date thereafter during the Primary Term, Tenant shall pay to Landlord, on account of Profit Share Rent, an amount equal to $36,000 less any Unused Profit Share Rent Credit.

For purposes of this paragraph, the following terms shall have the following meanings:

SCHEDULE B
(to Lease Agreement)

**BB000 0**

"*Adjusted Gross Revenues*" shall mean, for any period, all cash receipts of Tenant arising from the operation of the Premises (including herein as cash receipts, cash receipts of any sublessee, concessionaire, licensee or any other person or entity operating or occupying the Premises or any portion thereof) during the relevant period, less the Base Rent payable during such period.

"*Profit Share Rent Credit*" means, for any fiscal year, the (positive) excess, if any, of the Profit Share Rent paid for such period (not including any Profit Share Rent paid during such period pursuant to clause (3) below or that otherwise relates to any earlier period) over Adjusted Gross Revenues for such period.

"*Unused Profit Share Rent Credit*" means the aggregate Profit Share Rent Credit over the term of the Lease to the date of measurement less any Profit Share Rent Credit actually credited in determining the Profit Share Rent payable at any time.

"*Profit Share Rent Aggregation*" means for the period from the date of this Lease to the date of measurement, the amount of $144,000 per annum (properly prorated) less all Profit Share Rent actually paid during such period, but not less than zero.

"*fiscal year*" means the Tenant's fiscal year and, for the years at the beginning and end of the Lease Term, the period of Tenant's fiscal year during which this Lease is in effect. If Tenant changes its fiscal year, then in the year of such change, appropriate adjustments, if any, as are necessary, shall be made in determining the Percentage Rent payable during such short fiscal year.

(2)    Incentive Rent for any fiscal year during the Primary Terms shall be an amount equal to five percent (5%) of annual "Adjusted Net Operating Profits". "Adjusted Net Operating Profits" means, for any fiscal year, the Tenant's net operating profits from the Premises for such fiscal year, as determined pursuant to the accounting methods currently used by Tenant in similar theatre locations (including therein, without limitation, the current method for allocating off-site expenses to a theatre), as more specifically described in the budget attached hereto as **Schedule D**, less Basic Rent and Profit Share Rent for such period and any Profit Share Rent required to be paid following such fiscal year pursuant to clause (3) below. In the event Adjusted Net Operating Profits are zero or less than zero in any given fiscal year, then Incentive Rent shall not be payable for such fiscal year. Any negative amount of Adjusted Net Operating Profits in any fiscal year shall not be carried forward or back to any other fiscal year nor otherwise affect the calculation of Incentive Rent for any other period.

Incentive Rent, if any, for any fiscal year shall be paid on the later of the November 21st following the end of such fiscal year and the tenth day after annual

BB000 04

167

audited financial statements for the Tenant's direct or indirect parent are available for such fiscal year.

(3)    Tenant shall provide Landlord with a statement of the Adjusted Gross Revenues and Adjusted Net Operating Income for every fiscal year (or appropriate portion thereof in the beginning and ending years of the Lease) within ten (10) days after Tenant's (or Tenant's direct or indirect parent, as the case may be) audited financial statements for such fiscal year are available.  If, as of the end of the beginning of such fiscal year, there is any Profit Share Rent Aggregation outstanding and if the Adjusted Gross Revenues for such fiscal year is in excess of the Profit Share Rent for such year, then Tenant shall pay, as Profit Share Rent, to Landlord, in lawful money of the United States, on the later of the November 21st following the end of such fiscal year and the tenth day after delivery of said financial statements, an amount equal to the lesser of (i) the aforesaid excess or (ii) the Profit Share Rent Aggregation outstanding as of the end of the beginning of such fiscal year.  If during the preceding fiscal year the Profit Share Rent paid exceeded Adjusted Gross Revenues for such fiscal year, such excess shall be included as Profit Share Rent Credit.

All financial statements and calculations to be delivered under this paragraph (f), if not audited, shall be certified to by a Guarantor's financial officer.

Landlord shall have the right, upon reasonable notice, at its expense, to audit or have its representatives audit the books and records of Tenant as to the calculation of any of the amounts relevant to the determination of any portion of Percentage Rent. Tenant shall make such books and records (and a copying machine) available at its office in the United States or at such other place as the parties may mutually agree.

If Landlord's audit reveals a deficiency in the Profit Share Rent or the Incentive Rent properly payable for any annual period in an amount equal to five percent (5%) of the amount which was so properly payable (but in an amount, in any event, which is at least $2,500), the Tenant shall pay the reasonable costs incurred by Landlord for such audit.

(4)    Anything to the contrary contained in any Operative Document, including, without limitation, the Lease, notwithstanding, any adjustment of Percentage Rent or calculation thereof shall be unconditionally conditioned upon compliance at all times and in any and all circumstances by Tenant with the terms and provisions of Section 4(c) of the Lease.

(5)    Notwithstanding anything to the contrary contained in any Operative Document (other than paragraph (4) above), Tenant may off-set Unused Profit Share Rent Credit against any Percentage Rent.  In addition, on termination of this Lease, Landlord shall pay to Tenant an amount equal to the Unused Profit Share Rent Credit.

**BB000 05**

168

BB000 06

SCHEDULE
(to Lease Agreement)

# Termination Value
# Purchase Price Schedule

| Date | Remaining Debt Balance | Equity Termination Amount | Casualty Schedule |
|------|------------------------|---------------------------|-------------------|
| 21-Nov-97 | 9,406,742.40 | 1,245,194.00 | 10,651,936.40 |
| 21-Feb-98 | 9,370,052.46 | 1,289,269.00 | 10,659,321.46 |
| 21-May-98 | 9,332,422.34 | 1,336,098.00 | 10,668,520.34 |
| 21-Aug-98 | 9,293,827.95 | 1,385,854.00 | 10,679,681.95 |
| 21-Nov-98 | 9,254,244.58 | 1,438,720.00 | 10,692,964.58 |
| 21-Feb-99 | 9,213,646.89 | 1,494,890.00 | 10,708,536.89 |
| 21-May-99 | 9,172,008.88 | 1,554,571.00 | 10,726,579.88 |
| 21-Aug-99 | 9,129,303.89 | 1,617,982.00 | 10,747,285.89 |
| 21-Nov-99 | 9,085,504.59 | 1,685,356.00 | 10,770,860.59 |
| 21-Feb-00 | 9,040,582.93 | 1,756,941.00 | 10,797,523.93 |
| 21-May-00 | 8,994,510.16 | 1,833,000.00 | 10,827,510.16 |
| 21-Aug-00 | 8,947,256.77 | 1,913,813.00 | 10,861,069.77 |
| 21-Nov-00 | 8,898,792.51 | 1,999,676.00 | 10,898,468.51 |
| 21-Feb-01 | 8,849,086.36 | 2,090,906.00 | 10,939,992.36 |
| 21-May-01 | 8,798,106.48 | 2,187,838.00 | 10,985,944.48 |
| 21-Aug-01 | 8,745,820.25 | 2,290,828.00 | 11,036,648.25 |
| 21-Nov-01 | 8,692,194.18 | 2,400,255.00 | 11,092,449.18 |
| 21-Feb-02 | 8,637,193.95 | 2,516,521.00 | 11,153,714.95 |
| 21-May-02 | 8,580,784.33 | 2,640,054.00 | 11,220,838.33 |
| 21-Aug-02 | 8,522,929.21 | 2,771,307.00 | 11,294,236.21 |
| 21-Nov-02 | 8,463,591.56 | 2,910,764.00 | 11,374,355.56 |
| 21-Feb-03 | 8,402,733.38 | 3,058,937.00 | 11,461,670.38 |
| 21-May-03 | 8,340,315.71 | 3,216,371.00 | 11,556,686.71 |
| 21-Aug-03 | 8,276,298.59 | 3,383,644.00 | 11,659,942.59 |
| 21-Nov-03 | 8,210,641.03 | 3,561,372.00 | 11,772,013.03 |
| 21-Feb-04 | 8,143,301.00 | 3,750,208.00 | 11,893,509.00 |
| 21-May-04 | 8,074,235.37 | 3,950,846.00 | 12,025,081.37 |
| 21-Aug-04 | 8,003,399.94 | 4,164,024.00 | 12,167,423.94 |
| 21-Nov-04 | 7,930,749.35 | 4,390,526.00 | 12,321,275.35 |
| 21-Feb-05 | 7,856,237.09 | 4,631,184.00 | 12,487,421.09 |
| 21-May-05 | 7,779,815.45 | 4,886,883.00 | 12,666,698.45 |
| 21-Aug-05 | 7,701,435.51 | 5,158,563.00 | 12,859,998.51 |
| 21-Nov-05 | 7,621,047.09 | 5,447,223.00 | 13,068,270.09 |
| 21-Feb-06 | 7,538,598.70 | 5,753,924.00 | 13,292,522.70 |
| 21-May-06 | 7,454,037.58 | 6,079,794.00 | 13,533,831.58 |
| 21-Aug-06 | 7,367,309.59 | 6,426,031.00 | 13,793,340.59 |
| 21-Nov-06 | 7,278,359.18 | 6,793,908.00 | 14,072,267.18 |
| 21-Feb-07 | 7,187,129.42 | 7,184,777.00 | 14,371,906.42 |
| 21-May-07 | 7,093,561.90 | 7,600,076.00 | 14,693,637.90 |
| 21-Aug-07 | 6,997,596.71 | 8,041,331.00 | 15,038,927.71 |
| 21-Nov-07 | 6,899,172.42 | 8,510,164.00 | 15,409,336.42 |

BB000 0

170

## Termination Value
## Purchase Price Schedule

| Date | Remaining Debt Balance | Equity Termination Amount | Casualty Schedule |
|---|---|---|---|
| 21-Feb-08 | 6,798,226.00 | 8,643,498.00 | 15,441,724.00 |
| 21-May-08 | 6,694,692.83 | 8,779,450.00 | 15,474,142.83 |
| 21-Aug-08 | 6,588,506.62 | 8,918,071.00 | 15,506,577.62 |
| 21-Nov-08 | 6,479,599.39 | 9,059,414.00 | 15,539,013.39 |
| 21-Feb-09 | 6,367,901.41 | 9,203,532.00 | 15,571,433.41 |
| 21-May-09 | 6,253,341.17 | 9,350,480.00 | 15,603,821.17 |
| 21-Aug-09 | 6,135,845.33 | 9,500,313.00 | 15,636,158.33 |
| 21-Nov-09 | 6,015,338.65 | 9,653,087.00 | 15,668,425.65 |
| 21-Feb-10 | 5,891,743.99 | 9,808,861.00 | 15,700,604.99 |
| 21-May-10 | 5,764,982.22 | 9,967,693.00 | 15,732,675.22 |
| 21-Aug-10 | 5,634,972.17 | 10,129,644.00 | 15,764,616.17 |
| 21-Nov-10 | 5,501,630.62 | 10,294,774.00 | 15,796,404.62 |
| 21-Feb-11 | 5,364,872.20 | 10,463,146.00 | 15,828,018.20 |
| 21-May-11 | 5,224,609.33 | 10,634,824.00 | 15,859,433.33 |
| 21-Aug-11 | 5,080,752.24 | 10,809,873.00 | 15,890,625.24 |
| 21-Nov-11 | 4,933,208.80 | 10,988,359.00 | 15,921,567.80 |
| 21-Feb-12 | 4,781,884.56 | 11,170,349.00 | 15,952,233.56 |
| 21-May-12 | 4,626,682.64 | 11,355,912.00 | 15,982,594.64 |
| 21-Aug-12 | 4,467,503.67 | 11,545,118.00 | 16,012,621.67 |
| 21-Nov-12 | 4,304,245.74 | 11,738,039.00 | 16,042,284.74 |
| 21-Feb-13 | 4,136,804.33 | 11,934,748.00 | 16,071,552.33 |
| 21-May-13 | 3,965,072.22 | 12,135,319.00 | 16,100,391.22 |
| 21-Aug-13 | 3,788,939.49 | 12,339,828.00 | 16,128,767.49 |
| 21-Nov-13 | 3,608,293.35 | 12,548,352.00 | 16,156,645.35 |
| 21-Feb-14 | 3,423,018.15 | 12,760,970.00 | 16,183,988.15 |
| 21-May-14 | 3,232,995.28 | 12,977,763.00 | 16,210,758.28 |
| 21-Aug-14 | 3,038,103.07 | 13,198,812.00 | 16,236,915.07 |
| 21-Nov-14 | 2,838,216.75 | 13,424,201.00 | 16,262,417.75 |
| 21-Feb-15 | 2,633,208.34 | 13,654,015.00 | 16,287,223.34 |
| 21-May-15 | 2,422,946.60 | 13,888,341.00 | 16,311,287.60 |
| 21-Aug-15 | 2,207,296.89 | 14,127,268.00 | 16,334,564.89 |
| 21-Nov-15 | 1,986,121.16 | 14,370,886.00 | 16,357,007.16 |
| 21-Feb-16 | 1,759,277.80 | 14,619,287.00 | 16,378,564.80 |
| 21-May-16 | 1,526,621.58 | 14,872,565.00 | 16,399,186.58 |
| 21-Aug-16 | 1,288,003.55 | 15,130,816.00 | 16,418,819.55 |
| 21-Nov-16 | 1,043,270.93 | 15,394,137.00 | 16,437,407.93 |
| 21-Feb-17 | 792,267.03 | 15,662,628.00 | 16,454,895.03 |
| 21-May-17 | 534,831.16 | 15,936,390.00 | 16,471,221.16 |
| 21-Aug-17 | 270,798.50 | 16,215,527.00 | 16,486,325.50 |
| 21-Nov-17 | - | 16,500,145.00 | 16,500,145.00 |

Babcock & Brown
NY: lxiyts2/11/20/97/12:45 PM

SCHE___ )
(to Lease Agreement)

30-Oct-97

**MOVIE CINEMAS CORPORATION**
**FINAL BUDGET**
**FOR YEAR ENDING JULY 1, 1998**

WESTBOROUGH 12
MA
41001

| | JULY | AUG | SEPT | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | | | | | | | |
| Admission Revenue | $0 | $0 | $0 | $0 | $201,184 | $285,882 | $241,963 | $314,782 | $228,606 | $185,129 | $148,585 | $336,372 | $1,640,163 |
| Refreshment Revenue | 0 | 0 | 0 | 0 | 74,131 | 110,318 | 65,874 | 79,618 | 79,944 | 67,993 | 49,384 | 121,289 | 672,571 |
| Other Operating Revenue | 0 | 0 | 0 | 0 | 4,943 | 6,178 | 4,943 | 4,943 | 6,178 | 4,943 | 4,943 | 6,176 | 43,247 |
| Total Revenue | 0 | 0 | 0 | 0 | 280,258 | 401,598 | 336,781 | 399,343 | 312,728 | 218,055 | 202,912 | 464,297 | 3,355,781 |
| **EXPENSES** | | | | | | | | | | | | | |
| Film Rental | 0 | 0 | 0 | 0 | 112,691 | 154,492 | 124,937 | 106,988 | 88,951 | 84,994 | 68,878 | 165,417 | 901,647 |
| Refreshment Cost | 0 | 0 | 0 | 0 | 12,602 | 18,738 | 13,279 | 13,501 | 13,501 | 11,519 | 8,395 | 20,619 | 116,303 |
| Occupancy Costs | 0 | 0 | 0 | 0 | 102,896 | 102,896 | 102,896 | 102,896 | 102,896 | 102,896 | 102,896 | 100,894 | 823,166 |
| Payroll | 0 | 0 | 0 | 0 | 23,676 | 34,000 | 26,900 | 25,146 | 28,483 | 23,500 | 21,090 | 13,841 | 214,146 |
| Advertising | 0 | 0 | 0 | 0 | 10,033 | 12,976 | 10,646 | 10,706 | 12,375 | 9,951 | 9,314 | 13,329 | 88,999 |
| Other Operating Expenses | 0 | 0 | 0 | 0 | 27,471 | 35,728 | 32,581 | 32,181 | 36,160 | 22,801 | 26,314 | 13,286 | 250,162 |
| Total Expense | 0 | 0 | 0 | 0 | 289,269 | 358,849 | 311,939 | 283,018 | 283,435 | 259,700 | 216,378 | 167,326 | 2,391,510 |
| **TRADING PROFIT/(LOSS)** | 0 | 0 | 0 | 0 | (9,011) | 42,749 | 24,842 | 14,425 | 29,277 | (1,635) | (13,966) | 96,912 | 163,163 |
| Interest Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Depreciation/Amortization | 0 | 0 | 0 | 0 | 15,660 | 19,575 | 15,660 | 15,660 | 19,575 | 15,660 | 15,660 | 19,572 | 137,022 |
| **NET PROFIT/(LOSS)** | $0 | $0 | $0 | $0 | $(24,691) | $23,174 | $9,182 | $(1,335) | $9,698 | $(17,295) | $(29,626) | $77,340 | $26,246 |

| From: | Kenneth Fries |
| To: | selectmen@town.westborough.ma.us |
| Cc: | kwilliams@town.westborough.ma.us |
| Subject: | Regal Cinemas |
| Date: | Monday, October 22, 2018 4:33:59 AM |

Good afternoon.

I am hoping to shed a little light on the Regal Cinemas situation as I believe that you currently discussing the best way to proceed for the Town of Westborough. I had been working with Jim Malloy for almost a year now and have brought the high RFP bidder, Apple Cinema, to the table. I have bulleted my correspondence either by email, phone call or research below for clarification.

Regal
- Had no intention of staying beyond their current lease term.
- Had been paying their rent directly to the bank for some time (approximately ten years?)

Babcock and Brown
- Set up the entity Westborough SPC for a foreign entity Mignonette out of the British Virgin Islands.
- Mignonette was "probably" owned by a special entity that was controlled by Babcock officers according to former employees.
- BVI records for Mignonette have been destroyed.
- I have had correspondence directly and indirectly with Chaye Besherse (Babcock legal liaison), Jan Blaustein, Serena Kwok and Phil Greene (Former CEO of Babcock)
  - None knew of the property
  - All were unsuccessful in identifying the ownership
  - Phil felt any pursuit of ownership was a complete waste of time.
  - Administration on this property stopped approximately ten years ago
- I spoke with the Bankruptcy attorney for the investors of Babcock and Brown
  - Believe it or not, liquidation is still going on ten years later.
  - Deloitte partner David Lombe who is handling liquidation has no records related to this property or any of the entities in their files.

Take it for what it's worth, here is my conclusion
- Owners probably distanced themselves from anything related to the bankruptcy of Babcock.
- Rent hadn't been collected from Regal since 2007ish. No one has come looking for it.
- Records appear to no longer exist proving ownership.
- The building is about to reach a point of no return because of the roof.
  - Water infiltration, unless managed, will render the entire fitout useless (mold and warping)
  - The building for the most part will have to be torn down (building designed with stadium seating structural steel, can't be easily adapted for another use).
  - Westborough emergency services will have to manage an abandoned property.
  - The abutter is having to cover all of the property management (snow plowing etc.)

174

I would ask that you proceed with the RFP process as Apple is has not only met the requirements but is an excellent operator who will contribute to the community.

I would also like to thank Kristi for her patience as we continue to pepper her with phone calls. We would really appreciate a sit down to discuss all the moving parts.

Thank you.

Kenneth Fries
RK Centers
50 Cabot Street, Suite 200
Needham, MA 02494
p. 781-320-0001
c. 617-285-8483

www.rkcenters.com

This email is the property of RK Centers and its affiliates and is intended only for the use of the recipient to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any copying, marketing or distribution of this email, or files associated with the email, is strictly prohibited. If you have received this email in error, please notify us immediately by calling our office at 781-320-0001 and deleting this email from your computer. Any presentation Kevin Belmont of a lease or other lease related document, does not constitute an offer which may be accepted by the recipient. Further, emails sent or received shall neither constitute acceptance of conducting transactions via electronic means, nor shall create a valid, binding and effective contract and/or lease unless a written instrument has been executed and delivered by all parties.

| From: | Shelby Marshall |
|---|---|
| To: | Kristi Williams; Leigh Emery |
| Subject: | Fwd: Regal Cinemas |
| Date: | Wednesday, October 24, 2018 1:59:52 AM |

Last night we directed to have Counsel review this email to see if there was anything new that might impact our decision to reject all bids. At least that's my understanding of the direction we gave to Kristi.

My concern is beyond that and was prompted by this email. And that is as follows - might the information here, added to what we already know, give us pause for consideration of pursuit of the land court option. While I understand the risk of Eminent Domain, as well as the public's general resistance to the term, if we pursued ED, sold the building/property under those conditions and the buyer was aware of all related risks, what's the downside? We take the money from the sale, put it in escrow and sit on it for 3 years. We avoid paying ongoing maintenance / repairs of a building that ultimately may need to be torn down anyway. In the meantime, the Town benefits from new taxes and taxable income from a theater/restaurant/etc. Residents benefit. Tenants in the plaza benefit from increased traffic. Other businesses in Westborough benefit from same traffic.

I strongly encourage an Executive Session to discuss all of the above, including, as Kristi has pointed out, if we were to accept a bid, our public response in doing so, especially if it was not to be the highest bid.

Of specific note to Ken's email above that is concerning:
1. Building condition / necessary repairs
2. Given all of the information that's available, and assuming bidders have a good understanding of the same and the risks of the ED, which was part of the RFP, it's seems that a land court process is a significant waste of time and resources.

Thank you for your thoughts and my request to have an Executive Session to discuss this matter as outlined above.

~Shelby

--------- Forwarded message ---------
From: **Kenneth Fries** <KFries@rkcenters.com>
Date: Mon, Oct 22, 2018 at 12:34 PM
Subject: Regal Cinemas
To: Board of Selectmen <selectmen@town.westborough.ma.us>
Cc: Kristi Williams <kwilliams@town.westborough.ma.us>

Good afternoon.

I am hoping to shed a little light on the Regal Cinemas situation as I believe that you currently discussing the best way to proceed for the Town of Westborough. I had been working with





# ELLISA O. HABBART, PARTNER

# ELLISA O. HABBART

**Ellisa Opstbaum Habbart is a founding partner of The Delaware Counsel Group LLC ("DCG"), and exclusively represents Delaware corporations and alternative entities in national and international business transactions.**

Ellisa Habbart leads The Delaware Counsel Group and advises lawyers globally on the Delaware law aspects of complex transactions. Her experience spans over 25 years and has focused on cross border transactions since 1996. In addition to advising on acquisitions, secured financings, fund formations, investments and joint ventures, Ms. Habbart regularly advises management on governance issues relating to significant transactions and operations throughout the life of a business entity.

Ms. Habbart is top ranked in *Chambers USA* and has been since 2005 for her "wealth of experience advising on transactional and governance issues regarding Delaware alternative entities" and "is often sought out to handle cross-border matters". She receives praise for her "detailed and comprehensive knowledge of Delaware law", her "good approach to problem solving and good analytical mind". The *Expert Guides to the World's Leading Women in Business Law* and in *Who's Who Legal: M&A and Corporate Governance* also recognize Ms. Habbart for her expertise.

## RECENT CLIENTS

Prudential Financial Inc., AngelList, Gazelle Finance, AEGON N.V., AECOM, BBAM, Truenoord, JT Group Limited, Emerging Capital Partners Investments, Housing Partnership Equity Trust, Tate & Lyle, Hobbs, Avolon, Westfalia, Partners Group.

## PROFESSIONAL ACTIVITIES

- **Delaware State Bar Association:** Ms. Habbart is one of twenty-six (26) appointees to the Corporation Law Council of responsible for analyzing and

recommending amendments to Delaware's corporate and business entity statutes to the legislature.

- **International Bar Association:** current appointee to the IBA's Legal Policy & Research Unit by the IBA Corporate & M&A Law Committee and former Vice Chair Private Equity and Corporate Governance subcommittees of Corporate and M&A Committee.
- **American Bar Association:** Current LLC Committee representative to International Coordinating Committee, Chair of LLC Committee Use of US Entities Internationally and member of Executive Committee since 2010; former Vice-chair of LLC Committee, Chair of the Subcommittee on Business Trusts, REITS and Financing Vehicles and Advisor to the Uniform Law Commission Drafting Committee on the Uniform Statutory Trust Entity Act.
- **National Association of Minority and Women Owned Law Firms:** Current Co-Chair Committee on Mergers and Acquisitions.

# PUBLICATIONS

- Delaware chapter **"The Corporate Governance Review".**
- Delaware chapter **"Partnerships, Joint Ventures and Strategic Alliances".**
- US chapter **"IBA Treasury Shares Guide".**
- Co-Editor **"IBA Director's Duties Checklist".**
- Co-Author **"Delaware Limited Liability Company Forms and Practice Manual".**
- Delaware chapter **"Private Fund Dispute Resolution".**
- "Uniform Statutory Trust Act", **The Business Lawyer.**
- **The Private Equity Journal:** "Is a Delaware LLC the Answer to Address Risks of Personal Liability in Private Equity Investments in Brazil?"

# EDUCATION

- Villanova University School of Law, Juris Doctor
- Drexel University, Masters in Taxation
- Temple University, Bachelor of Business Administration

# BAR ADMISSIONS

- Delaware
- Pennsylvania

# CONTACT

(302) 576-9600 Ext. 12

(302) 576-9608 Fax

Email here

702 Rockland Rd

Rockland, DE 19732











The Delaware Counsel Group LLC 700 Rockland Road, PO Box 348, Rockland, DE 19732 | Phone: (302) 576
9600 | Privacy Policy | Disclaimer

© 2023 The Delaware Counsel Group, LLC ("DCG")



Lolonyon Akouete <info@smartinvestorsllc.com>

---

## Westborough SPE LLC Unclaimed Funds - Follow-up re Request for Reconsideration Filed by Lolonyon Akouete and Denise Edwards

1 message

---

**Scott A. Schlager** <sas@natgolaw.com>                    Thu, Jul 13, 2023 at 4:22 PM
To: "hnakhwal@sco.ca.gov" <hnakhwal@sco.ca.gov>
Cc: Alvin Nathanson <asn@natgolaw.com>, Jose Centeio <jcc@natgolaw.com>, "deniseedwards818@yahoo.com"
<deniseedwards818@yahoo.com>, Lolonyon Akouete <info@smartinvestorsllc.com>

Attorney Nakhwal,

Thank you for taking the time to speak with me this afternoon. As discussed, Nathanson & Goldberg, P.C. represents Westborough SPE LLC. We are admitted to practice law only in The Commonwealth of Massachusetts and are not admitted in the State of California. Thus, our role is limited to following-up on the status of this request to the State Controller's Office for Reconsideration of the Office's denial of the original request for Unclaimed Funds and ensure that the office has the entire body of documentation to evaluate the request for reconsideration.

As discussed, we want to ensure that the State of California evaluates Westborough SPE LLC's in accordance with California Code, Code of Civil Procedure - CCP § 1540 and with prompt attention and diligence. You advised me on the telephone this afternoon that it would be **reasonable to expect a response from you within 30 days of July 13, 2023**.

**Please see the attached documents**:

1. **Defendant Westborough SPE LLC's Second Notice of Supplementation to the Massachusetts Land Court, Case # 19 TL 000768 – HPS**. This document contained 2 attachments that are included as well.
   a. Exhibit A – State of Delaware Certificate of Conversion from a Corporation to a Limited Liability Company Pursuant to Section 266 of the Delaware General Corporation Law which was filed with the Secretary of State for the State of Delaware on January 3, 2007. Exhibit A states that Babcock & Brown Administrative Services, Inc. was incorporated on October 23, 1997 and that the name was changed to Babcock & Brown Administrative Services, Inc., a Delaware LLC on December 31, 1999.
   b. Exhibit B – Delaware Certificate of Merger of Babcock & Brown Administrative Services LLC with and into Babcock & Brown Parallel Member LLC dated August 28, 2011 and filed with the Secretary of State for the State of Delaware on August 29, 2011. Pursuant to Section 18-2098 of the Delaware Limited Liability Company Act, Babcock & Brown Administrative Services LLC merged with and into Babcock & Brown Parallel Member LLC, a Delaware limited liability company.
   c. Jeffey W. Bullock, Secretary of State of Delaware has certified both Exhibit A and Exhibit B. Both of these documents can be verified online at corp.delaware.gov/authver.shtml . In accordance with Cal. Evid. Code § 1531, Exhibit A and Exhibit certifications contain the requisite true copy language.
   d. Therefore, it has been established by certified copy of two Delaware Secretary of State records that Babcock & Brown Parallel Member LLC, a Delaware limited liability company was the true successor-in-interest to Babcock & Brown Administrative Services, Inc., a Delaware Corporation.
2. Documents Executed by Jan Blaustein Scholes: See **First Notice of Supplementation**.
   a. **State of Delaware Certificate of Correction of a Limited Liability Company** for Babcock & Brown Parallel Member LLC to be filed pursuant to Section 18-211(a). This document renders null and void the wrongfully filed Certificate of Cancellation that was improperly filed because of a clerical error. This Certificate of Correction was executed by F. Jan Blaustein Scholes on June 23, 2023.
   b. **Written Consent of the Manager of Babcock & Brown Parallel Member LLC in Lieu of a Meeting**

182

dated June 26, 2023. This document states:

    i.   F. Jan Blaustein Scholes is the manager of Babcock & Brown Parallel Member LLC.

    ii.   Scholes is over the age of 18 and is of **sound mind and is not under a conservatorship or guardianship in the State of Arizona**.

    iii.   Scholes resides in the State of Arizona and is executing the document in the State of Arizona.

    iv.   Authorized the Durable Power of Attorney to be executed authorizing Lolonyon Akouete and Denise Edwards to undertake the actions specified in that Durable Power of Attorney.

    v.   The **Bill of Sale executed on November 21, 2022 be amended as follows**:

1. The Title be amended to delete "Bill of Sale" and "Transfer of Manager Role" substituted therefor;
2. The word "sell" is deleted and "transfer her Manager role of Westborough SPE LLC" be substituted therefore. Any mention of purchasing a membership interest is stricken, because F. Jan Blaustein Scholes was merely the manager of the Manager (Babcock & Brown Parallel Member LLC) of Westborough SPE LLC.
3. $100 consideration was paid for a change in Manager.
4. Paragraphs 1(a)-(b) were deleted in their entirety.
5. Paragraph 2 was deleted in its entirety and F. Jan Blaustein Scholes is not under a conservatorship/guardianship in the State of California where she currently resides and is of sound legal mind, and understands the consequences of this Agreement to Transfer Manager Role.
6. Paragraph 3 was deleted and substitution language inserted. This substitution language acknowledges the unclaimed funds in the State of California of approximately $1,200,000.00 belonging to Westborough SPE LLC. And, that Akouete and Edwards have become Managers of Westborough SPE LLC and that their authority has been ratified and confirmed. In addition, Akouete and Edwards have been authorized to take whatever actions necessary to recover and protect the property located at Turnpike Road, Westborough, MA and to recover the unclaimed funds in the State of California.
7. Paragraph 5 was deleted and the substitution stated that the agreement shall be governed by the laws of the State of Arizona as to contract formation and capacity and the State of Delaware as to limited liability company actions.
8. Paragraph 6 ratifies and confirms that Westborough SPE LLC was lawfully reinstated in both Delaware and Massachusetts.
9. Paragraph 8 was added to state that in the event of an invalidity it does not invalidate the entire agreement.
10. Paragraph 9 was added to state that time was to be of the essence as to each term thereof.
11. Paragraph 10 was added stating "Each party recognizes that this Agreement is a legally binding contract and acknowledges that it, he or she has had the opportunity to consult with legal counsel of choice. In any construction of the terms of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such terms."
12. Paragraph 11 was added that "Scholes has engaged an attorney licensed in the State of Arizona to represent her interests with respect to this Agreement and the attorney has reviewed the document and consents to its signing."
13. The document authorizes Akouete and Edwards to perform all such acts, deeds, and things….necessary or advisable to effectuate or carry out the purpose and interest of all the foregoing resolutions. And that the actions heretofore and hereafter taken by the manager (Akouete and Edwards) are adopted affirmed, approved, and ratified in all respects as the act and deed of Babcock & Brown Parallel Member LLC.
14. This document was notarized by Billie J. Wahl Notary Public in Maricopa County, Arizona, Commission #642362.

2. **Babcock & Brown was not authorized to resign it role as manager even though Westborough SPE LLC never paid Babcock & Brown**. Section 1(g) of the Operating Agreement states "No Manager may resign or

**183**

retire from, abandon or otherwise terminate its status as Manager without the Consent of the Members." Such member consent was never provided and thus any action by Babcock & Brown to terminate its relationship was null and void and in violation of the fiduciary duties owed to the Member(s) of Westborough SPE LLC.

3. **Section 1(g) and (j) of the Operating Agreement for Westborough SPE LLC Permits Collection of Unclaimed Funds** – In addition, the Manager shall act in good faith with respect to carrying out its duties as manager. Accordingly, the Managers, Akouete and Edwards owe a fiduciary duty to the Members of Westborough SPE LLC to ensure that the unclaimed funds are collected, any debts of the entity are paid off, and then seek guidance from the Delaware Chancery Court as to distribution of the remaining funds to the Member(s).

4. **Durable Power of Attorney by Babcock & Brown Parallel Member LLC, a Delaware LLC**.
   a. This document granted Lolonyon Akouete and Denise Edwards as attorneys in fact and specified powers, including the right to open a bank account, deposit, endorse, or withdraw funds to or from any of the company's bank accounts or safe deposit box; the right to initiate, defend commence or settle legal actions on the Company's behalf, etc.

5. **Westborough SPE LLC – Operating Agreement**.
   a. Section 1(g) on p. 4 of the Operating Agreement permits any manager to transfer their manager role in an instrument in writing, or to delegate all or any of its powers or duties under the Operating Agreement. F. Jan Blaustein Scholes as Manager of Babcock & Brown Parallel Member LLC as successor-in-interest Manager transferred her manager role and responsibilities to Lolonyon Akouete and Denise Edwards pursuant to the Written Consent of Manager In Lieu of A Meeting.

6. **Peter Blaustein Does Not have a Guardianship/Conservatorship Over F. Jan Blaustein Scholes in California or Arizona**. He has unlawfully attempted to intervene and exercise undue influence over Ms. Scholes. Peter Blaustein has failed to comply with the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (28 U.S.C. Section 1738A). Specifically, Section 1738A(h) states "A foreign guardianship or protective order [from outside the state] is not entitled to full faith and credit in this state until it is registered in this state." No foreign registration occurred in Arizona pursuant to A.R.S. Section 14-12401 as of the filing of the First Notice of Supplementation.

In light of this newly presented information and correction of the record, the State of California should promptly direct the unclaimed funds held in the name of Westborough SPE LLC to be immediately transferred to a bank account held in the name of Westborough SPE LLC at the direction of its duly authorized managers Denise Edwards and Lolonyon Akouete as successor-in-interest manager to Babcock & Brown Administrative Services Inc. as successor-in-interest manager to Babcock & Brown Administrative Services LLC as successor-in-interest Manager to Babcock & Brown Parallel Member LLC.

Please let us know if you should require any additional information. For the record and to clarify the record, neither Lolonyon Akouete nor Denise Edwards have acquired any membership interest in Westborough SPE LLC. Both Akouete and Edwards have the requisite authority to claim the unclaimed funds on behalf of the entity via the Durable Power of Attorney, Written Consent of the Sole Manager of Babcock & Brown Parallel Member LLC in lieu of a meeting, Certificate of Goodstanding naming Lolonyon Akouete and Denise Edwards as Manager of Westborough SPE LLC.

Please also advise if a new application or correction must be submitted to the State of California correcting that Westborough SPE LLC, by and through its duly authorized Managers Lolonyon Akouete and Denise Edwards, is the proper party-in-interest to collect the unclaimed funds.

Time is of the essence hereof. We appreciate your prompt attention to this matter.

Very truly yours,

Scott A. Schlager

184

Partner

Nathanson & Goldberg, P.C.

183 State Street, 5th Floor

Boston, Massachusetts 02109

(O): (617) 210-4800

(C): (617) 909-4511

(F): (617) 210-4824

sas@natgolaw.com


**************************************************

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

**************************************************


---

**3 attachments**

📄 **Westborough SPE LLC - Second Notice of Supplementation (Filed Version).pdf**
820K

📄 **Westborough SPE LLC [FIRST] Notice of Supplementation.pdf**
1750K

📄 **Certificate of Goodstanding.pdf**
265K

| From: | Dyann Blaine |
|---|---|
| To: | Nakhwal, Harpreet |
| Cc: | Peter Blaustein |
| Subject: | Re: Unclaimed Property- Phone call |
| Date: | Tuesday, February 21, 2023 8:59:32 PM |
| Attachments: | Westborough Affidavit - D Blaine.docx |

**CAUTION:**

   This email originated from outside of the organization.

   Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Dear Harpereet,

I apologize for my delay in responding.  I just put together a statement of facts that could be turned into an affidavit if helpful - I have documentation backing up most of the statements and can provide if any of them would be useful.

Please let me know if any of this is useful to you in analyzing the claim being filed by individuals who I view as scam artists.

Regards,
Dyann Blaine

On Fri, Feb 3, 2023 at 3:25 PM Nakhwal, Harpreet ███████████████ wrote:

> Good afternoon,
>
> I am just following up to see if you were able to locate any additional documentation?
>
> Thank you,
>
> **Harpreet K. Nakhwal** | Staff Counsel
>
> Office of State Controller Malia M. Cohen
>
> Legal Office
>
> 300 Capitol Mall, Suite 1850
>
> Sacramento, CA  95814
>
> ███████████████████████

186

CONFIDENTIALITY NOTICE: This communication and its contents is from an attorney and may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act (18 U.S.C. §§2510-22, 2701-11, 3121-26). If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Peter Blaustein ███████████████████████
**Sent:** Thursday, January 19, 2023 3:42 PM
**To:** Nakhwal, Harpreet ████████████
**Cc:** Dyann Blaine ████████████████
**Subject:** RE: Unclaimed Property- Phone call

**CAUTION:**

This email originated from outside of the organization.

Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Yes

Will send calendar now

**From:** Nakhwal, Harpreet ████████████
**Sent:** Thursday, January 19, 2023 1:16 PM
**To:** Peter Blaustein ████████████████
**Cc:** Dyann Blaine ████████████████
**Subject:** RE: Unclaimed Property- Phone call

Hello,

Would 10:00 am Monday work?

**Harpreet K. Nakhwal** | Staff Counsel

Office of State Controller Malia M. Cohen

Legal Office

300 Capitol Mall, Suite 1850

Sacramento, CA  95814

███████████████████████

CONFIDENTIALITY NOTICE: This communication and its contents is from an attorney and may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act (18 U.S.C. §§2510-22, 2701-11, 3121-26). If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Peter Blaustein ████████████████████████
**Sent:** Thursday, January 19, 2023 1:06 PM
**To:** Nakhwal, Harpreet ████████████████████
**Cc:** Dyann Blaine ████████████████████
**Subject:** RE: Unclaimed Property- Phone call

**CAUTION:**

  This email originated from outside of the organization.

  Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Hi Harpreet,

Good to connect. Let's schedule for Monday – let us know what works for you. I am busy noon-1:30pm but free otherwise.

Dyann CC'd

Thanks all

Pete

**From:** Nakhwal, Harpreet ████████████████
**Sent:** Thursday, January 19, 2023 1:04 PM
**To:** Peter Blaustein ████████████████████
**Subject:** Unclaimed Property- Phone call

Paul,

I will let you know a time on Monday, January 23rd for a phone call.

**Harpreet K. Nakhwal** | Staff Counsel

Office of State Controller Malia M. Cohen

Legal Office

300 Capitol Mall, Suite 1850

Sacramento, CA  95814
████████████████████

CONFIDENTIALITY NOTICE: This communication and its contents is from an attorney and may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act (18 U.S.C. §§2510-22, 2701-11, 3121-26). If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

1. My name is Dyann Blaine.  I was employed by Babcock & Brown as a corporate and tax attorney from 1993 through 2009.  I managed Babcock & Brown's corporate tax department and worked with the General Counsel's group to manage Babcock & Brown's corporate legal matters.

2. In 1997 Babcock & Brown, through its Australian subsidiary, arranged a financing transaction relating to the Hoyts Cinemas movie theater complex located at 231 Turnpike Road, Westborough, Massachusetts, through which a group of private investors provided financing to Hoyts Cinemas using a sale-leaseback structure.

3. The transaction involved the formation of 3 legal entities, 2 in Delaware and one in the British Virgin Islands:

   a. Mignonette Investments Limited was formed in the British Virgin Islands in 1997.  This equity in this entity was held by the private investors and was managed by through a nominee structure by a series of professional service companies in the BVI.  The individual with power to direct the service companies to take actions was Phil Green, a partner in Babcock & Brown's Australian office.

   b. Westborough SPE LLC was formed as a Delaware single member LLC on October 22, 1997.  This entity was owed 100% by Mignonette Investments Limited and was managed by Babcock & Brown Administrative Services, Inc. in the US (see below for details).

   c. Babcock & Brown Administrative Services, Inc. ("BBAS") was formed in Delaware on October 23, 1997 and was 100% owned by Babcock & Brown in the US.

4. Shortly after formation each of Westborough SPE LLC and BBAS was registered to do business in Massachusetts.

5. Pursuant to the sale leaseback transaction the theater was sold by Hoyts Cinemas to Westborough SPE LLC, who in turn, leased it back to Hoyts Cinemas for a term of 20 years.  While I do not recall the specific terms of this transaction, typically at the end of the lease term in this type of transaction the lessee has a bargain purchase option to reacquire the property from the lessor.

6. On October 30, 1997,   Westborough SPE LLC entered into a service agreement with BBAS to provide administrative and management services to Westborough SPE LLC.

7. On or about October 23, 1997, Jan Blaustein Scholes and I, along with a number of other individuals, were appointed by Babcock & Brown to serve as officers of BBAS, and subsequently JBS and I were appointed by BBAS to serve as authorized signatories for real estate matters for Westborough SPE LLC.

8. Pursuant to tax law, as a single member limited liability company Westborough SPE LLC did not file its own US federal or state income tax returns.  Instead, Westborough SPE LLC's activity was included in the US federal and state tax returns filed annually by Mignonette Investments Ltd.

9. In 2003 Hoyts Cinema sold its interest in the theater to Regal Entertainment Group.

10. On November 19,  2007 Westborough SPE LLC filed a Certificate of Withdrawal in Massachusetts.

11. In 2008 BBAS filed a Certificate of Withdrawal in Massachusetts.

12. On June 8, 2009 BBAS notified Westborough SPE LLC that it was terminating the service arrangement with Westborough effective August 31, 2009.

13. On June 25, 2009, I ceased to be an employee of Babcock & Brown and resigned from my position as an officer of any Babcock & Brown owned companies.

14. On May 31, 2010, Mignonette Investments Limited was removed from the Registry of Companies in the BVI.

15. To my knowledge and belief Westborough SPE Ltd was at all times owned 100% by Mignonette Investments Limited, which was, in turn, owned by a group of private investors.

16. Starting in 2017 I have been contacted numerous times by individuals inquiring about the ownership of the theater property and each time I have responded with information roughly equivalent to that stated above.

17. In January 2023, I spoke with Phil Green to ascertain whether he had any records that showed the identity of the private investors who held the equity in Mignonette Investments Limited.  Mr. Green stated that while his recollection of the facts was similar to mine, he did not have any such records and was unable to identity who those individual investors were, though his recollection was that they were not Babcock & Brown individuals.

| | |
|---|---|
| **From:** | Iris Leahy |
| **To:** | Nakhwal, Harpreet |
| **Subject:** | RE: Unclaimed Property - Westborough SPE LLC |
| **Date:** | Thursday, September 7, 2023 7:05:44 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |

**CAUTION:**
   This email originated from outside of the organization.
   Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Hello Attorney Nakhwal,

Thank you for your email. I also wanted to mention that I apologize that I was addressing you by your first name in previous emails.

Have a wonderful day!

Thank you,

Iris A. Leahy, Esq.

Law Office of Iris A. Leahy



---

**From:** Nakhwal, Harpreet ███████████
**Sent:** Wednesday, September 6, 2023 4:56 PM
**To:** Iris Leahy ███████████
**Subject:** RE: Unclaimed Property - Westborough SPE LLC

Ms. Leahy,

Thank you for the information. I will review the documents provided and let you know if I have any questions.

Thank you,



Harpreet K. Nakhwal | Acting Chief Counsel
Office of State Controller Malia M. Cohen
300 Capitol Mall, Suite 1850
Sacramento, CA 95814 | ████████



CONFIDENTIALITY NOTICE: This communication and its contents is from an attorney and may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act (18 U.S.C. §§2510-22, 2701-11, 3121-26). If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Iris Leahy <span style="background:black">████████████████</span>
**Sent:** Tuesday, September 5, 2023 7:54 AM
**To:** Nakhwal, Harpreet <<span style="background:black">███████████████</span>
**Subject:** RE: Unclaimed Property - Westborough SPE LLC

> **CAUTION:**
>   This email originated from outside of the organization.
>   Do not click links or open attachments unless you recognize the sender's email address and know the content is safe.

Hello Attorney Harpreet,

I hope this email finds you well. Below are our previous correspondences. It is my understanding that Lolonyon Akouete and Denise Edwards have amended or refiled their request for the unclaimed funds of Westborough SPE LLC.

I wanted to let you know that I still do not believe these parties have a right to the property of Westborough SPE LLC as I have been arguing in the Land Court in Boston, Massachusetts, Docket No. 19 TL 000768. Please let me know if you require any documents from this case for review in consideration of the unclaimed property request. I'm not sure if you are investigating the amended or refiled claim.

I think the following information is important and relevant to the claim. Westborough SPE LLC was revived in Delaware based on a Bill of Sale that was arguably invalid and therefore has been basically redrafted recently by a supplemental document that turns the Bill of Sale into a Transfer of Manager Role. It's troubling that the corporation was revived in Delaware based on the invalid document.

Additionally, the Transfer of Manager Role document is also arguably invalid to transfer any interest in the corporation or its assets. Westborough SPE LLC was managed by Babcock & Brown Administrative Services, Inc. who resigned from their position as a management company in writing (twice) before Babcock & Brown merged with Babcock & Brown Parallel Member LLC. The resignations are attached for your use and convenience. The party who is claiming to be transferring an interest is Jan Blaustein through her position as manager of Westborough SPE LLC by the successor in interest Babcock & Brown Parallel Member LLC. It also might be helpful to note that Babcock & Brown Parallel Member LLC was dissolved and recently revived.

Overall, I do not believe Jan Blaustein has a legal interest in the assets of Westborough SPE LLC and therefore cannot transfer any interest to Lolonyon Akouete and/or Denise Edwards.

Please let me know if you have any questions or require any additional information.

193

Thank you,

Iris A. Leahy, Esq.

Law Office of Iris A. Leahy

**From:** Iris Leahy
**Sent:** Thursday, February 23, 2023 1:16 PM
**To:** Nakhwal, Harpreet
**Subject:** RE: Unclaimed Property-Westborough SPE LLC

Hello Attorney Harpreet,

Thank you for your voicemail and the below email. I apologize that I missed your call. I am having a very busy week so far.

The information you provided is very helpful and answers all of my questions.

Thank you,

Iris A. Leahy, Esq.

Law Office of Iris A. Leahy

**From:** Nakhwal, Harpreet
**Sent:** Thursday, February 23, 2023 12:33 PM
**To:**
**Subject:** Unclaimed Property-Westborough SPE LLC

Ms. Leahy,

Your inquiry regarding a claim for Unclaimed Property submitted for property reported with the owner as Westborough SPE LLC was forwarded to me.  I attempted to contact you via telephone yesterday and left you a voicemail.

We are considering your inquiry a request under California's Public Records Act.  Attached, please find a copy of my letter addressing the claim received for the unclaimed property in question.

I would also like to clarify that while people may register with the State Controller's Office as an investigator for purposes of unclaimed property claims, they are not registered investigators *of* the California State Controller's Office, Unclaimed Property Division.

If you would like to discuss further, please feel free to call me at the number listed below.

**Harpreet K. Nakhwal** | Staff Counsel
Office of State Controller Malia M. Cohen
Legal Office
300 Capitol Mall, Suite 1850
Sacramento, CA  95814
████████████████████

CONFIDENTIALITY NOTICE: This communication and its contents is from an attorney and may contain confidential and legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act (18 U.S.C. §§2510-22, 2701-11, 3121-26). If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

195



Lolonyon Akouete <info@smartinvestorsllc.com>

---

## Complaint to Recover Escheated Property [C.C.P. §1541]

2 messages

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                                          Mon, Oct 2, 2023 at 11:44 PM
To: Rob.Bonta@doj.ca.gov

Dear Attorney General Rob Bonta,

I hope this message finds you well.

I am reaching out to urgently request your intervention in a critical matter affecting Westborough SPE, LLC ("WSPE"). We face significant challenges resulting from the escheatment of our checking account and ensuing financial and legal complications. Today, we submitted all requisite pleadings to the Sacramento Superior Court via Dropbox. However, we anticipate a 6-8 weeks processing time, exacerbating the dire financial situation WSPE is already contending with and highlighting the urgent need for an expedited resolution.

To provide a brief overview, WSPE's checking account was reported as abandoned and escheated to the State. We initiated the expedited claim process and initially received approval. Unfortunately, this was later rescinded due to alleged inaccuracies. We promptly provided clarifications and concrete evidence, confirming that no existing Guardianship/Conservatorship is held over F. Jan Blaustein Scholes in Arizona, her state of residence. Our efforts to communicate and resolve this issue have, regrettably, been ignored.

The financial hardship WSPE faces, exacerbated by an unresolved claim and an involuntary bankruptcy case, is a direct consequence of the State Controller's failure to fulfill statutory duties and respond to our communications. This situation underscores the vital need for legal oversight to shield citizens from administrative neglect and arbitrariness.

The anticipated delay of 6-8 weeks at the Sacramento Superior Court for document processing, excluding additional time for review and resolution, makes your urgent intervention both necessary and appreciated. We are confident that your esteemed office can expedite a resolution, uphold WSPE's property rights, and reinforce the responsiveness and efficacy of our justice system.

We are prepared to provide any further information or documentation required for your review. With your intervention, we are optimistic for a swift and just resolution to this challenging situation.

Yours sincerely,

Lolonyon Akouete
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

---

**2 attachments**

📄 **Complaint to recover escheated property.pdf**
223K

📄 **Memorandum of Points & Authorities in Support of Complaint .pdf**
10182K

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                                          Thu, Mar 21, 2024 at 6:45 AM

196

To: Rob.Bonta@doj.ca.gov
Cc: "Nakhwal, Harpreet" <hnakhwal@sco.ca.gov>

Dear Attorney General Rob Bonta,

I am reaching out again to highlight a critical issue concerning the involuntary Chapter 7 bankruptcy of Westborough SPE LLC, overseen by Jonathan Goldsmith, the Chapter 7 trustee. This situation has arisen due to the state controller's initial refusal to engage and release rightfully owed funds to the entity, prompting creditors to initiate bankruptcy proceedings.

Recently, $1,293,646.83 was transferred to the trustee by the state controller. However, the town of Westborough has appropriated property owned by Westborough SPE LLC at 231 Turnpike Road, Westborough, Massachusetts, without proper notification. Their current efforts to claim the property's equity, despite the owed delinquent taxes amounting to only $940,000 and a standing $2.8 million purchase offer, are deeply concerning.

This conduct echoes the concerns raised in the case of Tyler v. Hennepin County, yet the town persists in potentially misusing Westborough SPE LLC's assets. The town's approach, characterized by unjust enrichment, collusion, and aggressive tactics, including defamation and intimidation, is alarming.

The financial strain from these actions has left me unable to afford legal representation for the entity, with $140,000 already spent on legal fees. Given the Supreme Court ruling in Lamie v. United States Trustee, which restricts the use of bankruptcy estate funds for debtor's attorney fees in Chapter 7 cases, the entity's access to over $1.2 million does not extend to legal representation expenses.

Furthermore, there's concern over a clandestine settlement by the trustees, which appears not to serve Westborough SPE LLC's interests. The lack of engagement from the state controller, despite a clear need for a reevaluation of Westborough SPE LLC's claim, exacerbates these issues.

In light of these circumstances, I seek guidance on securing legal counsel for Westborough SPE LLC to navigate these financial and legal challenges. Should this not be feasible, I am considering filing an adversarial proceeding in the Massachusetts bankruptcy court against the state controller.

I appreciate your attention to this matter and look forward to any assistance or advice you can provide.

Thank you.


Lolonyon Akouete
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

[Quoted text hidden]

---

**5 attachments**

**Motion for Court Assistance in Recovering Unclaimed Funds.pdf**
319K

**Withdraw Document and Cancel Hearing.pdf**
535K

**Claim Affirmation Form -Claim ID 21014485.pdf**
705K

**Response to Public Records Request.pdf**
188K

**FOR SETTLEMENT PURPOSES ONLY.pdf**
114K

***ROB BONTA***
***Attorney General***

State of California
**DEPARTMENT OF JUSTICE**

**PUBLIC INQUIRY UNIT**
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
(916) 210-6276
TOLL FREE: (800) 952-5225
TTY: CA Relay Service
(800) 735-2922

March 29, 2024

PIU: 1160010

Lolonyon Akouete
Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703

**RE: CA State Controller**

Dear Lolonyon Akouete:

Thank you for your follow-up e-mail of March 21, 2024 to the Office of the Attorney General regarding the California State Controller's Office. As we explained in our letter of October 9, 2023, the Attorney General's Office is unable to assist or comment on this matter because we are required by law to provide legal representation to state agencies in disputes rising out of their actions. This duty precludes the Attorney General from representing individual citizens in their disagreements with state agencies or providing advice to any individual regarding the disputed activity. While the Attorney General represents state departments in legal matters, he does not seek to impose his own policy judgments or control the administration of the business of his client agencies. For assistance in resolving a problem with a state agency, we suggest that you contact the director of the agency, your representatives in the California Legislature, the Governor's Office, and/or a private attorney.

If you wish to file a claim for monetary damages you believe were caused by a state agency, please contact the Government Claims Program. This agency may be contacted as follows:

Government Claims Program
Office of Risk and Insurance Management
Department of General Services
P.O. Box 989052, MS 414
West Sacramento, CA 95798-9052
Telephone: (800) 955-0045
Internet: https://www.dgs.ca.gov/ORIM/Services/Page-Content/Office-of-Risk-and-Insurance-Management-Services-List-Folder/File-a-Government-Claim

If you wish to report alleged improper governmental activity by a state employee or agency, please contact the Bureau of State Audits. This agency may be contacted as follows:

Investigations Division
California State Auditor's Office
P.O. Box 1019
Sacramento, CA 95812
Telephone: (800) 952-5665
Fax: (916) 322-2603
Internet: http://www.auditor.ca.gov

198

We hope that our effort to help you to identify the correct government offices to address your concern will be beneficial to you.

Again, thank you for contacting the Office of the Attorney General.

<div style="margin-left:40%">

Sincerely,
Public Inquiry Unit

</div>

For          ROB BONTA
                Attorney General



Lolonyon Akouete <info@smartinvestorsllc.com>

---

## Request to File a Claim Against the State Controller

4 messages

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                    Tue, Apr 9, 2024 at 8:26 PM
To: gcinfo@dgs.ca.gov
Cc: "Nakhwal, Harpreet" <hnakhwal@sco.ca.gov>

Dear Government Claims Program,

I am writing to formally request the initiation of a claim against the California State Controller's Office concerning their actions that have significantly impacted Westborough SPE LLC, leading to substantial financial distress and an involuntary Chapter 7 bankruptcy.

Our entity has been directly affected by the Controller's refusal to release owed funds in a timely manner, which forced creditors to initiate bankruptcy proceedings. The situation worsened after $1,293,646.83 was transferred to a trustee, Mr. Jonathan Goldsmith, Esq. of Goldsmith, Katz & Argenio, P.C., under circumstances that have left Westborough SPE LLC at a disadvantage, particularly concerning legal representation and financial management.

In a recent court proceeding on March 19, 2024, additional time was granted to finalize confidential settlement discussions, from which our entity feels excluded. The potential settlement under discussion and the process being followed have raised significant concerns about fairness and transparency. Moreover, the litigation strategy employed has unnecessarily prolonged the resolution of this case, introducing irrelevant issues and multiple continuances which have added to our financial strain.

Despite the case's apparent simplicity, the town and trustee's strategy has involved introducing numerous irrelevant issues and requesting multiple continuances. This situation has further complicated our ability to manage and resolve our financial obligations amicably, particularly given the high-value bids received for our property at 231 Turnpike Road from several bidders, including a $7.94 million offer from Pulte Group.

Given the severe constraints imposed by the Supreme Court ruling in Lamie v. United States Trustee, which prevents the use of bankruptcy estate funds to cover debtor's attorney fees in Chapter 7 cases, our ability to secure adequate legal representation has been jeopardized. This has left Westborough SPE LLC vulnerable and unable to defend its interests effectively.

In light of these circumstances, I am compelled to seek compensation for the damages and further potential losses directly attributable to the actions of the State Controller. The guidance provided by the Attorney General's office directed me to your program as the appropriate channel for addressing claims against state entities.

Attached are documents substantiating the claim, including correspondence with the State Controller's Office.

I appreciate your attention to this urgent matter and look forward to your guidance on the next steps in the claim process.

Thank you for your assistance.

Lolonyon Akouete
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

---

**9 attachments**

📄 **Withdraw Document and Cancel Hearing.pdf**
535K

200

📄 **Claim ID 21014485 Referred to Legal Office .pdf**
499K

📄 **Email correspondence between the State Controller's and the town's attorneys.pdf**
66K

📄 **Response to Public Records Request.pdf**
188K

📄 **Westborough SPE LLC Unclaimed Funds - Follow-up re Request for Reconsideration Filed by Lolonyon Akouete and Denise Edwards.pdf**
179K

📄 **FOR SETTLEMENT PURPOSES ONLY.pdf**
114K

📄 **letter_Attorney General Rob Bonta.pdf**
100K

📄 **Request for Legal Assistance .pdf**
264K

📄 **Pacific Legal Foundation.pdf**
151K

---

**GC Info@DGS** <gcinfo@dgs.ca.gov>                                    Wed, Apr 10, 2024 at 11:22 AM
To: Lolonyon Akouete <info@smartinvestorsllc.com>
Cc: "Nakhwal, Harpreet" <hnakhwal@sco.ca.gov>

Good morning,

Thank you for contacting the Government Claims Program (GCP).

Please note that the GCP only accepts claim applications and documents via mail and hand delivery.  Email submissions are not accepted.  You must mail or deliver your application to either of the addresses below:

PO Box 989052

West Sacramento, CA 95798

707 Third Street, 3rd floor

West Sacramento, CA 95605

Additionally, we have attached the GCP claim application form in PDF and Word Doc format for your convenience.

Sincerely,

Government Claims Program

201



**California Department of General Services**

(800) 955-0045

---

**From:** Lolonyon Akouete <info@smartinvestorsllc.com>
**Sent:** Tuesday, April 9, 2024 5:27 PM
**To:** GC Info@DGS <gcinfo@dgs.ca.gov>
**Cc:** Nakhwal, Harpreet <hnakhwal@sco.ca.gov>
**Subject:** Request to File a Claim Against the State Controller

---

> **CAUTION:** This email originated from a NON-State email address. Do not click links or open attachments unless you are certain of the sender's authenticity.

[Quoted text hidden]

---

**2 attachments**

 **ORIM 006 DOC - Copy.docx**
74K

 **ORIM 006 - Copy.pdf**
533K

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                    Wed, Apr 10, 2024 at 6:35 PM
To: "GC Info@DGS" <gcinfo@dgs.ca.gov>
Cc: "Nakhwal, Harpreet" <hnakhwal@sco.ca.gov>

Hello,

Thank you for the information. I will be mailing the claim form tomorrow along with the supporting documents. Could I please request expedited processing? Our next court date is April 23. If we cannot secure legal representation, our rights will be severely impacted, and we may have to amend our claim, potentially involving a couple million dollars.

Thank you,

Lolonyon Akouete
Manager of Westborough SPE, LLC
1241 Deer Park Ave., Suite 1, #1051
North Babylon, NY 11703
info@smartinvestorsllc.com
(443) 447-3276

[Quoted text hidden]

---

**2 attachments**

**ORIM 006 - Westborough SPE LLC 4-10-24.pdf**
1542K

**(116) Proceeding Memorandum and Order dated 3-19-2024.pdf**
97K

---

**GC Info@DGS** <gcinfo@dgs.ca.gov>                                              Wed, Apr 10, 2024 at 6:45 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>

Good afternoon,


Claims applications are reviewed in the order they're received.


Please allow 45 days from your claim presentation date for an update per GC § 911.6 and 912.4.


Thank you for your patience.

[Quoted text hidden]

## CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com



_____
Lolonyon Y Akouete

204

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | Chapter 7 |
| Debtor. | |

**AMENDED[1] OBJECTION TO "CREDITOR" LOLONYON**
**AKOUETE'S MOTION TO COMPEL ABANDONMENT**

Walter Horst, Babcock & Brown Holdings, Inc. and Babcock & Brown International Pty. Ltd. and their current and former subsidiaries (together referenced hereinafter collectively as "B&B"), through undersigned counsel, hereby respond to the papers filed by Loloyon Akouete ("Mr. Akouete"), (Docket No. 881) which the Court interpreted as a motion to compel abandonment pursuant to 11 U.S.C. §554 and Fed. R. Bankr. P. 6007(B) (the "Motion")[2] and respectfully states as follows:

1. The Trustee, on September 24, 2025, filed his Status Report Regarding Trustee's Assessment of Certain Alleged Claims Against Third Parties (Docket No. 879) (the "Report"), which was made necessary by vague allegations of claims made by Mr. Akouete against B&B and others throughout this case.

2. The Trustee filed a status report, as opposed to a notice of abandonment, because as the Trustee himself describes in paragraph 10 of the Report:

> "abandonment" pursuant to Bankruptcy Code § 554(a) would be inappropriate since the Trustee is unable to actually identify any "property of the estate" to be abandoned. More specifically, following his review and consideration of the facts set forth in the Akouete Motions, the Trustee determined that as of the entry of the Order for Relief the Estate simply held no claims against the parties identified in the Akouete Motions. Moreover, if the Trustee were to attempt to describe claims

---

[1] Amended solely to correct a citation to the wrong docket entry.
[2] The Court's Order at Docket No. 890 also provides for an October 2, 2025 objection deadline.

83380382;1

as though the Estate actually has something to abandon, it would be disingenuous and misleading to this Court, to creditors, and to other interested parties.

3.      Mr. Akouete filed his "Motion" the same day the Trustee filed his Report, which contains yet another lengthy diatribe without substance, meaning, or legal weight.

4.      Even if viable claims existed against B&B and the other parties referenced in the Report, which claims the Trustee has definitively investigated and established do not exist, there is no one to abandon those claims to with either the standing or the ability to bring them, as abandoned assets go back to the Debtor.

5.      As previously argued by B&B, Mr. Akouete is a stranger to the Debtor and to B&B, with no authority over or claims against either. Even if Mr. Akouete were somehow to be deemed someone with authority over the Debtor, which ruling would be problematic and a reward for, at best, incredibly ethically/legally questionable behavior, the identity of the ultimate beneficial owner(s) of the Debtor and Mignonette remains unknown.[3]  Simply put there is no one to benefit from the claims being brought even assuming viable claims existed, which is ultimately the problem in this case: Mr. Akouete did not recover assets on behalf of anyone, only for himself.

6.      Further there is no one to bring the "claims" assuming, for the sake of argument, Mr. Akouete has authority, that the "claims" exist, and  that the "claims" can be abandoned. Mr. Akouete cannot bring claims on behalf of the Debtor, an LLC,  without counsel.[4]"[C]orporations must appear and be represented in court, if at all, by attorneys." *Varney Enters., Inc. v. WMF, Inc*., 402 Mass. 79, 82, 520 N.E.2d 1312 (1988); *see also Kurbatzky v. Commonwealth*, 480 Mass. 1008, 1008 n.1, 100 N.E.3d 351 (2018) (applying the *Varney* ruling to LLCs). Mr. Akouete has asserted

---

[3] Presumably, in the unlikely event Mr. Akouete is deemed to be a person with authority over the Debtor, then his request to be paid from estate assets can proceed and bringing any claims against B&B would be pointless for completely different reasons.

[4] Again this assumes Mr. Akouete's authority over the Debtor, which authority is non-existent.

83380382;1

numerous times throughout this case that he is indigent, cannot hire counsel, and that pro-bono organizations have refused to take on Mr. Akouete's many grievances.

7. Notwithstanding that B&B did nothing wrong and that no one with an actual interest in the Debtor or Mignonette has come forward to make such a claim, B&B stopped providing services to the Debtor in 2011, 14 years ago, when it resigned, which ensures with absolute certainty that all statute of limitations as to any claim expired years ago

WHEREFORE, because no property exists to be abandoned, there is no one to benefit from the estate or anyone else pursuing non-existent claims, and there is no one to bring those "claims" once abandoned, the Motion to Compel must be denied. Further indulging Mr. Akouete's vexatious litigation practice and abuse of process will just generate numerous parallel proceedings regarding the same issues now before this Court that Mr. Akouete will exploit to get around this Court's rulings as is evident by the other parallel lawsuits already filed, one of which this Court was already forced to enjoin.

Dated: October 2, 2025               Respectfully submitted,

/s/ Luis R. Casas
Luis R. Casas, Esq.
Florida Bar No. 0094222
Email: luis.casasmeyer@akerman.com
AKERMAN LLP
98 Southeast Seventh Avenue,
Miami, FL 33131
Suite 1100
(Admitted *Pro Hac Vice*)

-and-

Samual A. Miller, Esq.
Massachusetts Bar No. 648568
E-mail: samual.miller@akerman.com
Secondary E-mail:
sharlene.harrison-carera@akerman.com
**AKERMAN LLP**

83380382;1

420 South Orange Avenue
Suite 1200
Orlando, FL 32801
Phone: (407) 423-4000
Fax: (407) 843-6610

*Counsel for B&B*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on this day by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case.

*/s/ Luis R. Casas*
Luis R. Casas, Esq.

83380382;1

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:

**WESTBOROUGH SPE LLC,**

     **Debtor.**

**Chapter 7**
**Case No. 23-40709-CJP**

---

### TRUSTEE'S OBJECTION TO LOLONYON AKOUETE'S OPPOSITION TO STATUS REPORT CONSTRUED AS MOTION TO COMPEL ABANDONMENT

Jonathan R. Goldsmith (the "Trustee"), Chapter 7 Trustee of the bankruptcy estate of Westborough SPE LLC (the "Debtor"), hereby respectfully objects to the document entitled *Opposition to Trustee's Status Report Regarding Assessment of Certain Alleged Estate Claims Against Third Parites (Dkt. 879); Request for Expedited Determination and Limitation of Notice (MLBR 9013-1(f)(1)(B), (f)(2); Fed, R. Bankr. P. 9006(c)(1)"* [ECF. No. 881] filed by Lolonyon Akouete ("Akouete") which, pursuant to this Court's *Order* [ECF No. 890], is construed as a Motion to Compel Abandonment under 11 U.S.C. § 554 and Fed. R. Bankr. P. 6007(b) (the "Objection to Status Report" or "Motion to Compel"). The Trustee objects to the Motion to Compel as set forth herein.

In support of this Objection, the Trustee states as follows:

### BACKGROUND

1.    On September 24, 2025, the Trustee filed the *Status Report Regarding Certain Alleged Estate Claims Against Third Parties* [ECF No. 879] (the "Status Report"). Through the Status Report, the Trustee informed the Court, creditors, and interested parties of his assessment of certain alleged Estate claims that the Trustee reviewed, considered, and determined have no merit and therefore, require no further action by the Trustee. In addition, the Trustee explained

that "abandonment" pursuant to Bankruptcy Code § 554 would be inappropriate since the Trustee believes there is no "property of the estate" to be abandoned.

2.      On September 25, 2026, Akouete filed the Objection to Status Report which among other things, demands that this Court enter an order "compelling abandonment of the claims under 11 U.S.C. § 554(b) so they may be pursued outside the estate."

3.      In the Motion to Compel, Akouete asserts that the Estate has potential causes of action against Babcock & Brown, Walter Horst, Dyann Blaine, and the California State Controller's Office.  The Trustee considered all available evidence with respect to the purported "claims" alluded to in the Motion to Compel and the Trustee is aware of no viable causes of action that the Estate could bring against the Babcock & Brown Entities, Walter Horst, Dyann Blaine, or California State Controller's Office.

## BASIS OF OBJECTION

### A.  There is no "Property of the Estate" for the Trustee to abandon.

4.      Section 554(b) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any ***property of the estate*** that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(b) (emphasis added).

5.      As noted in the Status Report, the Trustee assessed, considered, and determined that the Estate claims as alleged by Akouete have no merit and require no further action by the Trustee.

6.      "Courts will generally defer to a Trustee's exercise of business judgment in determining whether to abandon an estate asset."  *In re Crockett*, 642 B.R. 97, 101 (Bankr. D. Conn. 2022) (citing *Frostbaum v. Ochs*, 277 B.R. 470 (E.D.N.Y. 2022); *In re Kneer*, 628 B.R.

2

205 (Bankr. E.D. Pa. 2021); *In re Boyer*, 354 BR 14, 23 (Bankr. D. Conn. 2006), *aff'd* 372 BR

102 (D. Conn. 2006), *aff'd* 328 Fed. Appx. 711, 2009 WL 1635922 (2d Cir. 2009)). "An order

compelling abandonment is the exception, not the rule. Abandonment should only be compelled

in order to help the creditors by assuring some benefit in the administration of each asset . . . .

Absent an attempt by the trustee to churn property worthless to the estate just to increase fees,

abandonment should rarely be ordered." *Id.* (quoting *Morgan v. K.C. Mach. & Tool Co. (In re

K.C. Mach. & Tool Co.)*, 816 F.2d 238, 246 (6th Cir. 1987)).

7.      Judicial deference is generally given to trustees to use their business judgment in

administration of the estate, including the abandonment of claims, and a Court should not compel

the Trustee to abandon claims that rest "on an uncertain legal basis, conclusory facts, and

ultimately speculative merits." *In re Sakon*, No. 19-21619 (JJT), 2023 Bankr. LEXIS 1540, at *4

(Bankr. D. Conn. June 14, 2023) (bankruptcy court declined to compel abandonment where

"[t]he absence of ostensible merits to these claims suggests that they simply not be pursued, and

neither this Court nor the Trustee should be in the business of affording respectability to claims

that are frivolous, abusive, or without merit").

8.      The claims that Akouete alleges exist are exactly the types claims that are

"frivolous, abusive, or without merit" as the court in *In re Sakon* described. *See Id.* If the Trustee

were to imply that the Estate holds valuable claims against parties where the Trustee does not

believe it to be so, such an implication would be disingenuous and misleading to this Court, to

creditors, and to parties in interest. The Trustee, in part through the discovery process related to

the Trustee's objection to Akouete's claims, has considered all available evidence regarding the

purported "claims" alluded to in the Motion to Compel and asserted by Akouete in prior motions

to compel abandonment.  In the Trustee's business judgment, no claims exist and there is no

"property of the estate" which the Trustee should be compelled to abandon.

### B. Akouete lacks standing to compel abandonment.

9.      Further, to compel abandonment one must be a "party in interest." Akouete has no

ownership interest in the Debtor and has no interest in the "claims" which he demands the

Trustee abandon and, as such, the Trustee believes that he is not a "party in interest" as

contemplated by Bankruptcy Code § 554(b). The owner of the Debtor (i.e., 100% holder of

membership interests) is an entity known as Mignonette Investments Limited ("Mignonette") or

its successor, and not Akouete. Akouete's interest in this case is only that of a disputed creditor

and any allowed claim of Akouete's will be paid from estate assets. Even if the estate held claims

as Akouete alleges and even if the Trustee abandoned those claims, Akouete would have no right

to bring those claims as they would be claims of Mignonette or its successor.

10.      More significantly, Akouete has spent much of this case attempting to disrupt the

Trustee's administration of the Estate and these proceedings for his own personal benefit. This

case docket is replete with Akouete's duplicative pleadings seeking emergency relief to which

Akouete is not entitled. Notably, this Court recently entered a preliminary injunction against

Akouete enjoining his actions in Massachusetts Superior Court which actions the Trustee alleges

violate prior orders of this Court and interfere with the administration of the Estate (*See*

Adversary Proceeding No. 25-04027, at ECF No. 16).

11.      Moreover, with respect to a motion to compel abandonment, "[t]he party who

requests such an order must clearly evidence to the Court its proper standing as a party in

interest." *In re Am. Energy, Inc.*, 49 B.R. 420, 421 (Bankr. D.N.D. 1985) (holding that a Debtor

lacked standing where it had not proven that it had an interest to be protected and in fact also

admitted it lacked proper standing). As noted above, even if the Trustee were to abandon

meritless claims, those claims would belong to Debtor's owner, Mignonette (or its successor).

Upon information and belief, Akouete has no interest in Mignonette.

12.    Further, Akouete has alleged no direct interest in any of the "claims" he asserts

the Estate holds against Babcock & Brown, Walter Horst, Dyann Blaine, the California State

Controller's Office.

13.    While Akouete is a party in interest to the Bankruptcy Estate generally, due to his

disputed claim, Akouete is not a party in interest regarding the specific alleged claims which he

believes the estate has against third-parties.

**C.    Akouete has failed to meet the burden required to compel abandonment.**

14.    Bankruptcy Code § 554(b) specifically deals with abandonment of property of the

estate which is determined to be either "burdensome" or of "inconsequential value" to the estate.

11 U.S.C. § 554(b); *see also In re Sakon* at *8 (emphasizing that the court <u>may</u> order the trustee

to abandon property of the estate, and that the "statute in no way speaks in terms of mandatory

relief").  The burden of proving that an asset is either burdensome or of inconsequential value

rests on the party <u>requesting</u> the abandonment.  *See In re Crockett* at 101 ("Where a request for

abandonment is opposed, 'the party requesting abandonment has the burden of proof.'") (quoting

5 *Collier on Bankruptcy* ¶ 554.02[4] (16th ed. 2022)).

15.    As such, Akouete bears the burden to show that the purported claims are either

"burdensome" or of "inconsequential value" to the Estate.  *See* 11 U.S.C. § 554(b); *see also In re

Crockett* at 101.  Akouete makes no effort to demonstrate that claims are "burdensome" to the

Estate, he simply seeks to find a way to pursue the purported claims himself, despite that any

such claims would not be abandoned to Akouete.  Further, as to the possibility of

5

213

"inconsequential value," Akouete does exactly the opposite of what is required of him to meet his burden and, instead, argues that the purported claims are viable and valuable. Section 554(b) does not contemplate compelling abandonment in the circumstances described by Akouete.

## **CONCLUSION**

16.     The Motion to Compel is yet another attempt by Akouete to attempt to harass third parties in to providing him compensation which is in dispute and in the process of being resolved by this Court through the contested matter on his disputed claim.  As noted by the Bankruptcy Court for the District of Connecticut when dealing with similar circumstances in the context of a litigious party attempting to use Section 544(b) inappropriately:

> This Motion appears to be naught but another episode of the Debtor's campaign to incessantly litigate, without boundaries, his disappointments, grievances (real or imagined), rulings adverse to his repeated misconceptions and misunderstandings of the law, and his personal and business frustrations. This Motion and like motions have been disturbing and indisputably wasteful of both the Court's time and the resources of the Chapter 7 estate. At best misconceptions or at worst abuses of the legal process, the Debtor's litigation campaign is to be appropriately discouraged.

*See In re Sakon* at *9-10.

17.     Akouete's request for the Trustee to abandon the purported "claims" which the Trustee has evaluated and determined to be meritless is an inappropriate use of Section 554(b) and is a waste of Estate resources.


WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that this Court enter an Order (i) denying the Motion to Compel and (ii) granting such other and further relief as is just.

Respectfully submitted,

**Jonathan R. Goldsmith,**
**Chapter 7 Trustee**

by his counsel,


_____/s/ Angelina M. Savoia, Esq.___
Christine E. Devine, BBO #566990
Angelina M. Savoia, BBO #715690
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
Phone:  508-533-7240
Dated: October 1, 2025                    Email:  angelina@nicholsondevine.com

215

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:

**WESTBOROUGH SPE LLC,**

　　　　**Debtor.**

**Chapter 7**
**Case No. 23-40709-CJP**

## CERTIFICATE OF SERVICE

The undersigned, Angelina M. Savoia, hereby certifies that on this day I caused a copy of the following document to be served on all parties listed on the attached Service List in the manner noted thereon:

- TRUSTEE'S OBJECTION TO LOLONYON AKOUETE'S OPPOSITION TO STATUS REPORT CONSTRUED AS MOTION TO COMPEL ABANDONMENT.

Dated: October 1, 2025

/s/ Angelina M. Savoia, Esq.
Angelina M. Savoia, BBO #715690
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
Phone: 508-533-7240
Email: angelina@nicholsondevine.com

8

Electronic Mail Notice List

The following list of parties and attorneys have received electronic notice via the Court's
CM/ECF noticing process:

- **Jeffrey T Blake**    jblake@k-plaw.com
- **Paul W. Carey**    pcarey@mircklaw.com, bankrupt@mirickoconnell.com
- **Luis R. Casas**    luis.casasmeyer@akerman.com
- **Jose C. Centeio**    jc@jcfirm.com
- **Brian Charville**    bcharville@ferrisdevelopment.com
- **Christine E. Devine**    christine@nicholsondevine.com,
  devine.christiner109603@notify.bestcase.com;angelina@nicholsondevine.com;christine_
  492@ecf.courtdrive.com
- **Jonathan R. Goldsmith**    bankrdocs1@gkalawfirm.com,
  bankrdocs@gkalawfirm.com;intern@gkalawfirm.com;Esq..JonathanR.G.B145355@notif
  y.bestcase.com
- **Jonathan R. Goldsmith**    trusteedocs1@gkalawfirm.com,
  mwolohan@gkalawfirm.com;trusteedocs@gkalawfirm.com;intern@gkalawfirm.com;M
  A43@ecfcbis.com
- **Stephen F. Gordon**    sgordon@gordonfirm.com,
  vhaggerty@gordonfirm.com;notices@gordonfirm.com;stephenfgordon@gmail.com
- **Richard King**    USTPRegion01.WO.ECF@USDOJ.GOV
- **Samual A. Miller**    samual.miller@akerman.com
- **Brian W. Riley**    briley@k-plaw.com
- **Douglas B. Rosner**    drosner@goulstonstorrs.com
- **Angelina M. Savoia**    angelina@nicholsondevine.com, angelina@ecf.courtdrive.com
- **Roger L. Smerage**    rsmerage@k-plaw.com

Email and/or First Class Mail Service List

The following list of parties and attorneys have been served via as noted:

Lolonyon Akouete                          Via Email
800 Red Mills Rd
Wallkill, NY 12589
info@smartinvestorsllc.com

Denise Edwards                            Via Email
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com

Mark S. Lichtenstein        Via Email
Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
mark.lichtenstein@akerman.com


Lenard Benson Zide, Esq.
Butters Brazilian LLP        Via Email
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com

Jonathan La Liberte        Via Email
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
|  | ) | |
| Debtor. | ) | |
|  | ) | |

**CREDITOR LOLONYON AKOUETE'S CONSOLIDATED REPLY TO TRUSTEE'S
OBJECTION AND BABCOCK & BROWN'S AMENDED OBJECTION AND MOTION
TO COMPEL ABANDONMENT PURSUANT TO 11 U.S.C. § 554(b); OR, IN THE
ALTERNATIVE, FOR A CLARIFYING ORDER THAT THE ESTATE ASSERTS NO
INTEREST IN THE IDENTIFIED CLAIMS; AND, FURTHER IN THE ALTERNATIVE,
FOR AN "ADMINISTER OR ABANDON" DEADLINE OF OCTOBER 10, 2025**

Creditor Lolonyon Akouete ("Movant"), a party in interest, respectfully submits this consolidated
reply to (i) the Trustee's Objection (ECF 891) and (ii) Babcock & Brown's Amended Objection,
and moves the Court for an order compelling abandonment under 11 U.S.C. § 554(b) of the alleged
claims identified in the Trustee's Status Report (ECF 879) and as referenced in the Court's order
construing Movant's filing as a § 554 motion (ECF 890). The Order for Relief was entered on
October 11, 2023 (Dkt. 26). In the alternative, Movant seeks (a) a clarifying order that the estate
asserts no ownership, control, or intent to administer those claims; or (b) an "administer or
abandon" deadline of Friday, October 10, 2025 (the eve of the § 108(a) two-year mark), requiring
the Trustee to file a substantiated action supported by an affidavit demonstrating a reasonable
probability of success, failing which the claims are automatically abandoned without further order.

**RELIEF REQUESTED**. Movant asks that the Court enter an order:

1. Overruling the Trustee's Objection (ECF 891) and overruling Babcock & Brown's
   Amended Objection;
2. Compelling abandonment under 11 U.S.C. § 554(b) of the alleged claims identified in ECF
   879 and ECF 890;
3. Alternatively, entering a clarifying order that the estate asserts no ownership, control, or
   intent to administer such claims;
4. Alternatively, imposing a firm "administer or abandon" deadline of 5:00 p.m. (Eastern) on
   Friday, October 10, 2025—set in light of the October 11, 2023 Order for Relief (Dkt. 26)
   and the two-year period under 11 U.S.C. § 108(a)—with automatic abandonment upon
   noncompliance; and
5. Granting such other and further relief as is just.

# I. Detailed Factual Background

## A. Case Milestone and Parties

1. Order for Relief. Entered October 11, 2023 (Dkt. 26).

2. Parties. Debtor Westborough SPE LLC ("WSPE"); Chapter 7 Trustee Jonathan R. Goldsmith. Movant Lolonyon Akouete is a creditor and party in interest and—per the Massachusetts Secretary of State public record—the Manager of WSPE; there has been no judicial determination to the contrary (***Exhibit A***, Secretary of State certificate/printout). Babcock & Brown ("B&B") has appeared in opposition to abandonment; upon information and belief, B&B has filed no proof of claim and is not administering the estate.

## B. The Claims Referenced by the Trustee's Status Report

3. On September 24, 2025, the Trustee filed a Status Report Regarding Certain Alleged Estate Claims Against Third Parties (ECF 879), stating that as of the Order for Relief the estate held no claims against the parties identified and that a notice of abandonment would be "inappropriate."

4. On September 25, 2025, Movant filed an opposition (ECF 881), which the Court construed as a motion to compel abandonment under 11 U.S.C. § 554 and Rule 6007(b) (ECF 890).

5. The Trustee filed an Objection (ECF 891). B&B filed an Amended Objection.

## C. Movant's Persistent, Documented Efforts to Prompt Administration or Abandonment

6. Beginning in May 2024, Movant consistently pressed for a definitive course—administer the claims with a concrete plan or abandon them so they would not be lost through inaction. On May 22, 2024, Movant filed a Motion to Abandon Claims or Pursue Claims Belonging to the Bankruptcy Estate (Dkt. 166). The Trustee objected on June 5, 2024, asserting that his review was not complete (Dkt. 173).

7. On June 17, 2024, Movant filed a response emphasizing urgency and risk of prejudice from continued delay (Dkt. 179). When weeks passed without concrete action, Movant filed, on August 13, 2024, a renewed request for a ruling on the earlier motion (Dkt. 247). On August 14, 2024, the Court denied that request, relying on the Trustee's representation that his review remained incomplete (Dkt. 251).

8. As the year turned without progress, Movant filed two January 6, 2025 motions seeking status updates and direction and highlighting the continuing risk that delay would erase value (Dkts. 495, 497). On January 31, 2025, the Court denied both, noting the Trustee was not required to provide estate-administration updates (Dkts. 520, 521).

9. In a further attempt to avoid forfeiture, Movant filed on May 1, 2025 a Motion to Compel Abandonment under § 554(b) or, alternatively, for derivative standing (Dkt. 671). On May 6, 2025, the Court denied that motion for reasons stated on the record (Dkt. 684). This chronology reflects a continuous, good-faith effort—by Movant as creditor and the publicly listed Manager—to prevent loss of potential value through inaction.

## D. Schedules Identifying the Claims (Amended at Trustee's Request)

10. At the Trustee's request, Movant amended the Debtor's schedules to identify the causes of action at issue. Movant relies on the docket (no duplicates attached):
    • Dkt. 249 (08/13/2024) — Amended Schedule A/B.
    • Dkt. 278 (08/18/2024) — Summary of Assets and Liabilities (Non-Individual).
    • Dkt. 279 (08/18/2024) — Declaration Concerning Debtor's Schedules.

## E. Trustee Email Regarding Abandonment to the Debtor — Exhibit B

11. On August 7, 2024 at 9:30 p.m., the Trustee emailed Movant from
jgoldsmith@gkalawfirm.com stating, inter alia:

"If this is what you are willing to agree to, also let me know of the specific causes of action you
would want me to abandon back to the debtor."
A true and correct copy is filed as ***Exhibit B***.

## F. § 108 Timeline Context

12. With the Order for Relief entered October 11, 2023 (Dkt. 26), the two-year period in 11
U.S.C. § 108(a) expires on or about October 11, 2025. In light of that deadline, Movant
seeks a fixed "administer or abandon" cutoff of 5:00 p.m. Eastern on Friday, October 10,
2025, as set forth above.

# II. Preliminary Statement & Summary of Argument

Under 11 U.S.C. § 554(b), the Trustee must either administer the identified claims by
demonstrating a reasonable probability of realizing value for the estate, or the Court should compel
abandonment. See In re Paolella, 85 B.R. 974, 978–80 (Bankr. E.D. Pa. 1988) (conclusory denials
are insufficient; trustee must rebut with evidence of a realistic recovery path). The Trustee's Status
Report declares there were no claims as of the Order for Relief and calls abandonment
"inappropriate," yet he has not filed any action or presented sworn facts showing a viable recovery.
That stalemate—neither administer nor abandon—is precisely what § 554(b) remedies.

Three settled principles control:

1. Where abandoned property goes. Abandonment returns property to the debtor, not to
   creditors or third parties. In re Renaissance Stone Works, L.L.C., 373 B.R. 817, 820–23
   (Bankr. E.D. Mich. 2007) (citing In re Pilz Compact Disc, Inc., 229 B.R. 630, 637–38
   (Bankr. E.D. Pa. 1999); In re Jandous Elec. Constr. Corp., 96 B.R. 462, 465 (Bankr.
   S.D.N.Y. 1989)). B&B's "no one to abandon to" refrain is legally incorrect—abandonment
   reverts to WSPE.
2. What defeats a § 554(b) motion. The Trustee must show a concrete, evidentiary path to
   value (e.g., a filed adversary supported by facts showing a reasonable probability of
   success), not mere assertions that claims "do not exist" or are "without merit." Paolella, 85
   B.R. at 978–80; see also In re Clark, 711 F.2d 21, 23 (3d Cir. 1983).
3. Who can (and can't) oppose. A creditor like Movant is a party in interest entitled to seek
   abandonment. By contrast, a Chapter 7 debtor generally lacks standing to oppose
   abandonment because it benefits the debtor. In re Drost, 228 B.R. 208, 211–12 (Bankr.
   N.D. Ind. 1998). Non-creditor third parties likewise lack standing absent a direct, adverse
   pecuniary impact. See Depoister v. Mary M. Holloway Found., 36 F.3d 582, 585 (7th Cir.
   1994); Matter of Andreuccetti, 975 F.2d 413, 416 (7th Cir. 1992); In re Cult Awareness
   Network, Inc., 151 F.3d 605, 609–10 (7th Cir. 1998).

The facts reinforce the legal outcome. At the Trustee's request, Movant amended WSPE's
schedules to identify the claims (Dkts. 249, 278, 279). The Trustee also invited Movant to specify
"the specific causes of action you would want me to abandon back to the debtor" (Aug. 7, 2024
email, Exhibit B). Yet he now refuses both to administer and to abandon, while asserting elsewhere
that Movant is not WSPE's manager—despite no judicial determination and the Secretary of State

listing Movant as Manager (Exhibit A). This inconsistency has produced stasis that burdens the estate.

Finally, time is essentially expired. The Order for Relief date (Dkt. 26) fixes the § 108(a) outer limit at October 11, 2025. To avoid forfeiture by inaction, the Court should compel abandonment now or set a firm "administer or abandon" deadline of 5:00 p.m. Eastern on Friday, October 10, 2025, with automatic abandonment upon noncompliance.

# III. Legal Standards

## A. Abandonment of Estate Property (11 U.S.C. § 554; Fed. R. Bankr. P. 6007)

1. Standard. On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon estate property that is burdensome or of inconsequential value and benefit. 11 U.S.C. § 554(b); Fed. R. Bankr. P. 6007(b).
2. Effect. Property abandoned under § 554 ceases to be property of the estate and reverts to the debtor; it is not abandoned to a third party. Renaissance Stone Works, 373 B.R. at 820–23; Pilz, 229 B.R. at 637–38; Jandous, 96 B.R. at 465.
3. Evidentiary showings. The movant must make a prima facie showing; the trustee must rebut with evidence demonstrating a reasonable probability that administration will yield value. Paolella, 85 B.R. at 978–80; Clark, 711 F.2d at 23.
4. Business judgment—limits. Deference applies to reasoned trustee decisions supported by evidence; it does not shield conclusory refusals to act. Paolella, 85 B.R. at 978–80 (see also K.C. Machine, 816 F.2d at 246).

## B. Who May Seek or Oppose Abandonment (Standing)

1. Movant standing. A creditor is a "party in interest" under § 554(b). See K.C. Machine, 816 F.2d at 246.
2. Debtor opposition. A Chapter 7 debtor generally lacks standing to oppose abandonment, which benefits the debtor. Drost, 228 B.R. at 211–12.
3. Third-party objectors. Non-creditor third parties must show a direct, adverse pecuniary effect (the "person aggrieved" test). Depoister, 36 F.3d at 585; Andreuccetti, 975 F.2d at 416; Richman, 104 F.3d at 656–57; James Wilson, 965 F.2d at 168; Cult Awareness, 151 F.3d at 609–10.

## C. Clarifying Authority and Procedure

1. Rule 6007(b). A party in interest initiates abandonment by motion; notice and opportunity for hearing are required.
2. Clarifying orders. Courts may enter clarifying orders concerning whether property is (or is not) property of the estate and correct misstatements/constructs in administration. Renaissance Stone Works, 373 B.R. at 822–23 (§ 105(a)/Rule 9024).

## D. Statutes of Limitation Extended by 11 U.S.C. § 108

1. § 108(a). If a debtor's claim was unexpired prepetition, the trustee may commence the action by the later of the original deadline (as extended) or two years after the order for relief.

2. § 108(b). For specified acts, the trustee has the longer of the original period or 60 days after the order for relief.
3. Application. With the Order for Relief on October 11, 2023 (Dkt. 26), the § 108(a) outer limit falls in October 2025—relevant to whether continued retention is "burdensome."

# IV. Argument

## A. Movant (a creditor and WSPE's publicly listed Manager) is a "party in interest"

Movant is a creditor (filed claim) and the publicly listed Manager per the Secretary of State (Ex. A), with no judicial determination to the contrary. Either status suffices; together they easily meet § 554(b)'s "party in interest" threshold. See K.C. Machine, 816 F.2d at 246.

## B. Babcock & Brown lacks standing to oppose

Standing to object requires a "person aggrieved"—i.e., a party directly and adversely affected in a pecuniary sense by the order sought. See Depoister v. Mary M. Holloway Found., 36 F.3d 582, 585 (7th Cir. 1994); Matter of Andreuccetti, 975 F.2d 413, 416 (7th Cir. 1992); In re Cult Awareness Network, Inc., 151 F.3d 605, 609–10 (7th Cir. 1998). B&B is neither the Trustee nor a creditor and identifies no direct pecuniary harm from abandonment, which returns property to the Debtor and removes it from estate administration.

Critically, B&B has admitted on the docket that it is not a creditor. In its Response to Motion for Sanctions for Violation of the Automatic Stay (filed by "Interested Party" Walter A. Horst on behalf of B&B), B&B stated: "Horst and B&B are not creditors of the estate, have not asserted or taken any actions to collect against estate assets, and are only appearing in this case as a result of Mr. Akouete's attempts …." (Dkt. 187, filed June 28, 2024) (emphasis added).

Having stipulated it is not a creditor and showing no direct pecuniary injury, B&B fails the "person aggrieved" test and lacks standing to oppose § 554(b) relief. Its objection should be overruled for lack of standing.

## C. Movant's prima facie showing; the Trustee has not rebutted as Paolella requires

To defeat § 554(b) relief, the Trustee must present evidence of a reasonable probability of estate recovery. Paolella, 85 B.R. at 978–80; Clark, 711 F.2d at 23. Here:
• At the Trustee's request, Movant amended schedules to identify the claims (Dkts. 249, 278, 279).
• The Trustee invited abandonment in writing (Aug. 7, 2024 email, Ex. B).
• The Trustee has filed no adversary, presented no sworn facts, and offered no recovery theory with a reasonable probability of success—only conclusory assertions that there were "no claims" as of the Order for Relief and that abandonment is "inappropriate."

This posture—neither administer nor abandon—is the stalemate § 554(b) exists to prevent. The docket chronology (Dkts. 166, 173, 179, 247, 251, 495, 497, 520, 521, 671, 684) demonstrates that retention is burdensome (guaranteeing zero recovery while time runs) or, by the Trustee's characterization, the claims are of inconsequential value (supporting abandonment). No Paolella-compliant rebuttal has been offered.

223

## D. Abandonment returns property to the Debtor; authority/representation are post-abandonment issues

Abandonment under § 554 returns property to the Debtor; it is not an assignment to a third party. Renaissance Stone Works, 373 B.R. at 820–23 (citing Pilz, 229 B.R. at 637–38; Jandous, 96 B.R. at 465). Whether an LLC must appear through counsel (it must) and who acts for the LLC are post-abandonment issues; they do not bar abandonment, especially where the Trustee has not shown a reasonable probability of estate recovery.

## E. The Trustee's inconsistent positions and unresolved manager issue show stasis, not reasoned business judgment

The Trustee has argued elsewhere that Movant is not WSPE's manager, yet he asked Movant to identify claims to "abandon back to the debtor." (Ex. B.) There is no court ruling that Movant is not manager, and the Secretary of State lists Movant as Manager (Ex. A). These shifts—requesting schedule amendments and inviting abandonment, then refusing both—undercut deference and confirm that retention burdens the estate without a path to value. See Paolella, 85 B.R. at 978–80; cf. K.C. Machine, 816 F.2d at 246.

## F. The § 108(a) clock makes delay untenable; immediate abandonment or a fixed deadline is warranted

With the Order for Relief on October 11, 2023 (Dkt. 26), the § 108(a) outer limit is October 11, 2025. Approaching that date with no action confirms retention is burdensome—risking time-bar and ensuring no recovery. The Court should:
• Compel abandonment now; or
• Alternatively, set the firm "administer or abandon" deadline of 5:00 p.m. Eastern on Friday, October 10, 2025, requiring the Trustee to commence and substantiate any action; failure results in automatic abandonment without further order.

## G. Alternative clarifying relief if the Court agrees there is "no property of the estate"

If the Court adopts the Trustee's thesis that there were no claims as of the Order for Relief, it should issue a clarifying order that the estate asserts no ownership, control, or intent to administer the identified claims. See Renaissance Stone Works, 373 B.R. at 822–23 (§ 105(a)/Rule 9024). Clarity prevents misuse of an "estate control" argument to block non-estate parties while the Trustee declines to act.

## H. Trustee Bad Faith, Breach of Fiduciary Duty, and Unclean Hands — Governance Adversary History and Its Improper Entanglement with Claim Disputes

1. Inconsistent positions designed to block both administration and abandonment.
The Trustee has whipsawed positions to maintain stasis: in the contested matter on Movant's claim, he asserts Movant is not WSPE's manager; yet on August 7, 2024, he invited abandonment "back to the debtor," asking Movant to identify "the specific causes of action you would want me to abandon back to the debtor." (Ex. B). At the Trustee's own request, Movant then amended the schedules to identify those causes of action (Dkts. 249, 278, 279). Afterward, the Trustee issued a

Status Report (ECF 879) declaring there were no claims as of the Order for Relief and that abandonment would be "inappropriate," while still filing no action and presenting no sworn facts. This position-switching reflects bad faith and leaves the Trustee with unclean hands: he cannot deny governance to block administration, invite abandonment to the debtor, and then oppose both administration and abandonment.

2. The manager-status adversary (Adv. No. 24-04017) and how it was stayed before merits could be reached.

To obtain a clean adjudication of governance, Movant filed Adversary Proceeding 24-04017 on April 15, 2024, seeking, inter alia, a declaratory judgment that Movant is WSPE's Manager (Adv. Dkt. 1). On July 23, 2024, the Court cancelled the Rule 16 conference for lack of a Rule 26(f) certification/plan and directed the parties to file those materials by August 13, 2024 (Adv. Dkt. 29). Before discovery could commence, the Court on August 15, 2024 stayed the adversary, reasoning that in a Chapter 7 case where the Trustee administers a non-operating debtor, determining the manager "is not presently relevant, but may be in the future" (Adv. Dkt. 39). As a result, the adversary's threshold governance issue was never adjudicated on the merits.

3. The stay was then used to defer governance to claim disputes—further entangling and delaying resolution.

When Movant sought to lift the stay, amend, and expedite (Adv. Dkts. 43, 44), the Court on February 21, 2025 denied the request, holding that the adversary "asserts positions and evidentiary issues that overlap and may be decided in connection with the Trustee's objection to Mr. Akouete's claim," and that it would be most efficient to litigate those issues first in that contested matter (Adv. Dkt. 45). Practical effect: governance remained unresolved and was folded into claim-resolution tracks—including disputes involving Denise Edwards—which bogged down adjudication of who may act for WSPE while leaving the Trustee free to continue asserting that Movant is not the manager whenever it served to block action.

4. The public record shows Movant as Manager; there is no contrary court finding.

Throughout this period, the Massachusetts Secretary of State lists Movant as Manager of WSPE (Ex. A). There is no judicial determination to the contrary. The Trustee's reliance on an unadjudicated governance dispute—one that was stayed and deferred—to justify refusing both administration and abandonment exemplifies unclean hands.

5. Breach of fiduciary duty by engineered stalemate.

A Chapter 7 trustee owes fiduciary duties of loyalty, impartiality, and expeditious administration to the estate and its creditors. See 11 U.S.C. § 704(a). Here, the Trustee's self-created stalemate— inviting abandonment to the debtor, requesting schedule amendments, then denying the existence of claims while opposing adjudication of governance—breaches those duties. The estate has received no filed adversary, no evidentiary proffer, and no path to recovery; instead, governance was pushed off into claim disputes and used as a pretext to do nothing. Equity does not reward such conduct, and it defeats any claim to business-judgment deference in opposing the narrow relief sought under § 554(b).

## L. Request to Abandon the Federal District Court Action, *Westborough SPE LLC v. Town of Westborough, et al.*, No. 4:2023-cv-12017 (D. Mass.)

1. Identification and posture. On August 30, 2023—one day before the involuntary petition—the Debtor filed a verified complaint in the United States District Court for the District of Massachusetts, Westborough SPE LLC v. Town of Westborough, et al., Case No. 4:2023-cv-

12017, seeking declaratory and other relief (including claims under 42 U.S.C. § 1983) concerning the tax-title foreclosure of 231 Turnpike Road. The defendants named in that action are:

- Town of Westborough, a Massachusetts municipal corporation;
- Iris Ann Leahy, Esq., individually;
- KP Law, P.C., a Massachusetts professional corporation;
- James Malloy, individually and in his official capacity as Town Manager for the Town of Westborough;
- Jonathan Steinberg, individually and in his official capacity as Chief Assessor for the Town of Westborough;
- Ferris Development, LLC, a Massachusetts limited liability company;
- Shelby Marshall, individually and in his official capacity as Select Board Member;
- Ian Johnson, individually and in his official capacity as Select Board Member;
- Allen Edinberg, individually and in his official capacity as Select Board Member;
- Sean Keogh, individually and in his official capacity as Select Board Chair;
- Patrick Welch, individually and in his official capacity as Select Board Vice-Chair;
- Peter Blaustein, individually;
- Dyann Blaine, individually; and
- Walter Horst, individually.

2. Abandonment request. Nearly two years have elapsed and the Trustee has neither prosecuted nor meaningfully advanced this action. Given (i) the looming limitations concerns and opportunity-cost burdens on the estate; (ii) the Trustee's broader refusal to administer asserted claims while also resisting abandonment; and (iii) the Court's § 554(b) standards, Movant requests that the Court compel abandonment of this federal lawsuit to the Debtor. Abandonment will return the chose-in-action to the Debtor (not to Movant), permitting rights to be pursued outside the bankruptcy, consistent with *In re Renaissance Stone Works, L.L.C.*, 373 B.R. 817, 820–23 (Bankr. E.D. Mich. 2007), *In re Pilz Compact Disc, Inc.*, 229 B.R. 630, 637–38 (Bankr. E.D. Pa. 1999), and *In re Jandous Elec. Constr. Corp.*, 96 B.R. 462, 465 (Bankr. S.D.N.Y. 1989).

# V. Conclusion and Prayer for Relief

For the reasons above, Movant Lolonyon Akouete respectfully requests the Court enter an order:

1. Overruling the Trustee's Objection (ECF 891) and overruling Babcock & Brown's Amended Objection;
2. Compelling abandonment under 11 U.S.C. § 554(b) of the alleged claims identified in ECF 879 and ECF 890;
3. Alternatively, entering a clarifying order that the estate asserts no ownership, control, or intent to administer such claims;
4. Alternatively, imposing a firm "administer or abandon" deadline of 5:00 p.m. Eastern on Friday, October 10, 2025, in light of the October 11, 2023 Order for Relief (Dkt. 26) and 11 U.S.C. § 108(a), with automatic abandonment upon noncompliance without further hearing; and
5. Granting such other and further relief as is just.

DATED: October 5, 2025, Respectfully submitted:

By creditor,

226

Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

*The Commonwealth of Massachusetts*

*Secretary of the Commonwealth*

*State House, Boston, Massachusetts 02133*

**William Francis Galvin**
**Secretary of the**
**Commonwealth**

**December 15, 2022**

TO WHOM IT MAY CONCERN:

I hereby certify that a certificate of registration of a Foreign Limited Liability Company was filed in this office by

**WESTBOROUGH SPE LLC**

in accordance with the provisions of Massachusetts General Laws Chapter 156C on **December 12, 2022**.

I further certify that said Limited Liability Company has filed all annual reports due and paid all fees with respect to such reports; that said Limited Liability Company has not filed a certificate of cancellation or withdrawal; that there are no proceedings presently pending under the Massachusetts General Laws Chapter 156C, § 72 for revocation of said Limited Liability Company's authority to transact business in the Commonwealth; and that said Limited Liability Company is in good standing with this office.

I also certify that the names of all managers listed in the most recent filing are: **DENISE EDWARDS, LOLONYON AKOUETE**

I further certify that the name of persons authorized to act with respect to real property instruments listed in the most recent filings are: **DENISE EDWARDS, LOLONYON AKOUETE**



In testimony of which,

I have hereunto affixed the

\* Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

Secretary of the Commonwealth

Processed By:NGM

228



**Lolonyon Akouete <info@smartinvestorsllc.com>**

---

## Request for Coordination of Access to 231 Turnpike Road for Property Appraisal

---

**Jonathan Goldsmith** <jgoldsmith@gkalawfirm.com>                    Wed, Aug 7, 2024 at 9:30 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>

So of the 750k on the table, Edwards would have an unsecured claim for 150k and you agree to an unsecured claim of600k?
If this is what you are willing to agree to, also let me know of the specific causes of action you would want me to abandon back to the debtor.

Sent from my iPad

On Aug 7, 2024, at 8:52 PM, Lolonyon Akouete <info@smartinvestorsllc.com> wrote:

[Quoted text hidden]
<Order on Motion for Reconsideration.pdf>

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MASSACHUSETTS

--------------------------------X

**WESTBOROUGH SPE LLC**, a Delaware limited liability company,

               *Plaintiff.*

               v.

**TOWN OF WESTBOROUGH**, *a municipal corporation of The Commonwealth of Massachusetts*; **SHELBY MARSHALL**, *individually and in the official capacity as Select Board Member*; **IAN JOHNSON**, *individually and in the official capacity as Select Board Member*; **ALLEN EDINBERG**, *individually and in the official capacity as Select Board Member*; **SEAN KEOGH**, *individually and in the official capacity as Select Board Chair*; **PATRICK WELCH**, *individually and in the official capacity as Select Board Vice-Chair*; **PETER BLAUSTEIN**, *individually,*

               Defendants.

Civil Action #:

_____

**JURY TRIAL DEMANDED**

--------------------------------X

## VERIFIED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff Westborough SPE LLC ("**Plaintiff**") brings this Verified Complaint for declaratory and other relief, including under 42 U.S.C. §1983, and alleges, on knowledge as to its own actions, and otherwise upon information and belief:

# 1. PRELIMINARY STATEMENT

1.      This civil action seeks to vindicate Plaintiff's constitutional and common law rights and hold responsible municipal defendants and co-conspirators accountable for their unlawful actions that deprived Plaintiff of 100% of its commercial real property located at 231 Turnpike Road, Westborough, Massachusetts ("**Locus**").

2.      This lawsuit also seeks declaratory relief as to the constitutionality of M.G.L. c. 60, §§28 and 64, and actions of the Massachusetts Land Court vis-à-vis the tax title foreclosure process as applied to the Plaintiff.

3.      Massachusetts tax deeds fail federal and Massachusetts due process scrutiny for two reasons. First, they allow municipalities like the Town of Westborough to keep property that is far beyond the amount for which they have a claim in violation of the Supreme Court's holding in *Tyler v. Hennepin Cty. Minnesota*, 598 U.S. 631 (2023). Second, they allow a municipality to take title from the taxpayer without providing a pre-seizure hearing. Neither problem is acceptable under constitutional analysis.

4.      This case arises out of an actual case and controversy. The Town of Westborough, Massachusetts ("**Town of Westborough**") seized Plaintiff's commercial real property having an approximate fair market value of $5,235,000.00 ($9,264,800.00 assessed value) as payment for tax debt of $119,628.17 in 2018, without a hearing, in a tax foreclosure process saddled with constitutional due process violations.

5.      The Town of Westborough violated the Takings Clause of the United States Constitution when it took the Plaintiff's real property without compensation, and a property owner may bring a Fifth Amendment claim under §1983 at such time. *See Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2164 (2019) citing *Jacobs v. United States*, 290 U.S. 13 (1933).

2

231

6. In *Wayside Church v. Van Buren S.*, 847 F.3d 812, 823 (6th Cir. 2017), Justice Kethledge stated in his dissent: "In this case the defendant Van Buren County took property worth $206,000 to satisfy a $16,750 debt, and then refused to refund any of the difference. In some legal precincts that sort of behavior is called theft." A footnote in *Tallage Lincoln, LLC v. Williams*, 485 Mass. 449, 453 n.4 (2020), framed the constitutional issue this way:

> Several of our sister States have determined that excess value from a tax taking must be made available to the taxpayer as a matter of constitutional law. *See, e.g., Thomas Tool Servs., Inc. v. Croydon*, 145 N.H. 218, 220 (2000) (tax lien procedure resulting in equity windfall to purchaser of tax deed violated takings clause of New Hampshire Constitution); *Bogie v. Barnet*, 129 Vt. 46, 55 (1970) (retention of excess value by town amounts to unlawful taking for public use without compensation contrary to Vermont Constitution).

> In *Kelly v. Boston*, 348 Mass. 385, 388 (1965), [the Supreme Judicial Court ("SJC")] considered the legislative history of the statutory scheme governing tax lien foreclosures and determined that the Legislature intended that the process result in forfeiture of the taxpayer's equity to the municipality. The parties in that case did not raise any constitutional challenge, and [the SJC] did not address the constitutionality of the statutory scheme.

7. As acknowledged in the quotation above from *Tallage Lincoln, LLC v. Williams, supra*, at least two other New England states have recognized that the tax lien and foreclosure process still used in Massachusetts is an unconstitutional taking of private property. Vermont led the way in *Bogie v. Town of Barnet*, 129 Vt. 46, 55, 270 A.2d 898 (1970). The Vermont Constitution, Chapter 1, Article 2, requires that "whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money." The court in *Bogie v. Barnet* held as follows (129 Vt. at 49, 270 A.2d at 900):

> A policy which encouraged municipal governments to promote situations where it was authorized to acquire the property of its own taxpayers at unconscionable discounts, to the enrichment of the town treasury or enlargement of its land holdings, is fraught with danger and we find not contemplated by the legislative enactment.

8. The Supreme Court recognized the unconstitutionality of equity theft as far back as the 1800s in *United States v. Lawton*, 110 U.S. 146, (1884), when it said, in connection with a similar direct bidding-off by the United States in a tax sale:

To withhold the surplus from the owner would be to violate the fifth amendment to the constitution, and deprive him of his property without due process of law or take his property for public use without just compensation. If he affirms the propriety of selling or taking more than enough of his land to pay the tax and penalty and interest and costs, and applies for the surplus money, he must receive at least that.

The corresponding rights under the Vermont Constitution upon a taking by public authority appear in Chapter I, Article 2. Satisfaction of the statutory procedures, although they may meet the test of due process, does not negate the obligation to account for the excess proceeds received from the sale.

9.      U.S. Constitution, Amend. 5, states that: "No person shall be … deprived of … property, without due process of law; nor shall private property be taken for public use, without just compensation."

10.      Massachusetts Courts are left with no option but to enforce Massachusetts law on tax title foreclosures and permit "equity theft", because the legislature has failed to act quickly in response to newly enacted Supreme Court precedent established in *Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023) ("**Tyler**").

11.      The federal excessive fines standard under U.S. Const. Amend 8 ("Excessive bail shall not be required, nor excessive fines imposed ….") is laid out in *United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998). A fine is excessive when it is punitive and grossly disproportionate to the offense. *Id*. at 333–34. The law already gives municipalities, like the Town of Westborough in this case, a right to collect a tax debt with substantial interest and costs. Taking more than that is grossly disproportionate to the non-criminal failure to pay a debt, especially where the failure arises from poverty, medical problems, or lack of knowledge.

12.      The Supreme Court is the "ultimate interpreter of the Constitution" and the United States Constitution is the "supreme law of the land." *Baker v. Carr*, 369 U.S. 186, 211 (1962); *Cooper v. Aaron*, 358 U.S. 1, 18-20 (1958); U.S. Const. art. VI (Supremacy Clause).

13. Thus, it would be constitutional error to assert that the Massachusetts Land Court ("**Land Court**") can stand by and wait for remedial state legislative action when it is required to implement the holding of *Tyler* immediately, especially as to Plaintiff's dispute with the Town of Westborough.

14. The Land Court has an unfettered constitutional obligation, under the Due Process, Takings, and Supremacy Clauses of the United States Constitution, to cure the scourge of real property equity theft no matter if the Massachusetts General Court ("Legislature") ever enacts any legislation.

15. The Land Court's standard form tax lien complaint, employed by municipal tax lien foreclosure claimants as the starting point in any tax lien foreclosure case, awards successful claimants with "absolute title" to real property irrespective of how minimal the taxes owed are and how substantial the homeowner's equity is when the Land Court judgment is entered. This directly contravenes the May 25, 2023 ruling in *Tyler*, the Takings Clause of the United States Constitution, and abridges fundamental constitutional property rights of real property holders, including those rights secured under the Due Process, Takings, and Supremacy Clauses of the United States Constitution.

16. By statute, M.G.L. c. 60, § 50B, every community in Massachusetts must include in its annual budget the necessary monies to pay for tax foreclosure proceedings. This appropriation is estimated by the municipal treasurer and must be at least $80 for each tax title ripe for foreclosure held by the community involving property having a current assessed valuation greater than $100,000.00. Massachusetts has ingrained and granted its imprimatur to the tax foreclosure practice as currently implemented through statutory enactment.

5

234

## 2. JURISDICTION

17. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under rights conferred by the United States Constitution and the Civil Rights Act of 1871, 42 U.S. Code §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution, under 42 U.S.C. §§ 1985(2) and 1986, and federal law.

18. This Court also has original subject matter jurisdiction under 28 U.S.C. § 1343(a)(2).

19. This Court has ancillary jurisdiction over Massachusetts state-law claims under 28 U.S.C. § 1367.

20. This Court has subject matter jurisdiction over Plaintiff's declaratory judgment claims under 28 U.S.C. § 2201(a), 28 U.S.C. § 2202, and Fed. R. Civ. P. 57.

21. This Court also has subject matter jurisdiction pursuant to 28 U.S.C § 1332. A limited liability company (LLC) is a citizen of all states in which each of its members is a citizen (*see Mgmt. Nominees, Inc. v. Alderney Investments, LLC*, 813 F.3d 1321, 1325 (10th Cir. 2016)). The 100% Member of Plaintiff is Mignonette Investments Limited, a British Virgin Islands limited partnership and thus the Plaintiff is only a citizen of the British Virgin Islands.

22. No Defendant has a citizenship of the British Virgin Islands and thus there is complete diversity.

23. The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

24. This Court has the authority to provide preliminary and permanent injunctive relief under Rule 65 of the Federal Rules of Civil Procedure.

25.     This Court has personal jurisdiction over all defendants because they have made and established contacts within The Commonwealth of Massachusetts to permit the exercise of personal jurisdiction over them.

### 3.  VENUE

26.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that at least one defendant has its principal place of business in Boston, Suffolk County, Massachusetts and 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

### 4.  PARTIES

27.     Plaintiff Westborough SPE LLC ("**Plaintiff**") is a limited liability company formed under the laws of the State of Delaware and does business in Westborough, Massachusetts. Plaintiff has a single 100% member: Mignonette Investments Limited — a British Virgin Islands limited partnership. Plaintiff was the record owner of the real property located at the Locus before the Town of Westborough's unlawful actions.

28.     Defendant Town of Westborough is a Massachusetts municipal corporation ("**Town of Westborough**") having a usual place of business at 34 West Main Street, Westborough, Massachusetts 01581.

29.     Upon information and belief, Defendant Shelby Marshall ("**Marshall**"), individually and in the official capacity as Select Board Member resides at 7 Charles Street, Westborough, Massachusetts 01581.

30.     Upon information and belief, Defendant Ian Johnson ("**Johnson**"), individually and in the official capacity as Select Board Member resides at 9 Bertis Adams Way, Westborough, Massachusetts 01581.

236

31.     Upon information and belief, Defendant Allen Edinberg ("**Edinberg**"), individually and in the official capacity as Select Board Member resides at 8 Nash Street, Westborough, Massachusetts 01581.

32.     Upon information and belief, Defendant Sean Keogh ("**Keogh**"), individually and in the official capacity as Select Board Chair resides at 28 Longmeadow Road, Westborough, Massachusetts 01581.

33.     Upon information and belief, Defendant Patrick Welch ("**Welch**"), individually and in the official capacity as Select Board Vice-Chair resides at 15 Chauncy Circle, Westborough, Massachusetts 01581.

34.     Defendants Marshall, Johnson, Edinberg, Keogh, and Welch are collectively referred to as the ("**Select Board**").

35.     Upon information and belief, Defendant Peter Blaustein ("**Mr. Blaustein**"), individually, resides at 950 Vista Road, Hillsborough, California 94010. Mr. Blaustein is the son of F. Jan Blaustein Scholes, a former general counsel and executive at Babcock & Brown Administrative Services, Inc. and manager of Babcock & Brown Parallel Member LLC, its successor in interest and who transferred her manager role to Lolonyon Akouete and Denise Edwards by written agreement in accordance with the Plaintiff's LLC Operating Agreement.

### 5.  RIPENESS/STANDING

36.     This case is ripe for adjudication because it has created a direct and immediate dilemma for the parties—the Town of Westborough has foreclosed on the Locus.

37.     Plaintiff meets all three Article III standing requirements under *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiff has a personal stake in the outcome of this litigation because its real property (its most significant financial asset) has been improperly seized

237

by the Town of Westborough for the nonpayment of property taxes. The improper foreclosure of Plaintiff's real property at the Locus constitutes an injury in fact that this Court can redress. The Land Court, Judge Locke (given his control over the Trial Court), the Attorney General, and the Town of Westborough have the power to prevent the Town of Westborough's unlawful taking of Plaintiff's real property at the Locus.

38.     The constitutional injuries endured by the Plaintiff, as detailed here, are directly traceable to Town of Westborough actors.

## 6. FACTS

### a. TOWN OF WESTBOROUGH'S PREMATURE AND UNLAWFUL REQUEST FOR PROPOSAL ("RFP").

39.     In or about early June 2022, the Town of Westborough issued an RFP by which it solicited offers to purchase the former Regal Cinema property located at the Locus, consisting of a lot of around 29 acres and containing a structure that was formerly used as a movie theater, which the Town of Westborough had acquired by foreclosure of a tax lien ("**RFP**").

40.     The Select Board of the Town of Westborough ("**Select Board**") scored the proposals as "highly advantageous", "advantageous", or "least favorable" with respect to each of the five above criteria.

41.     Question 5 in the RFP Addendum asked: Will the closing happen after the redemption period expires?" The Town of Westborough answered: "The Town is willing to consider closing on the property after the redemption period has expired, provided the closing occurs no later than January 30, 2023, and, further, that **the Town may give preference to proposers who are willing to close on the property prior to the expiration of the redemption period**." (Emphasis added).

9

42. Since the judgment of foreclosure in the tax lien case (Land Court Case # 19 TL 000768-HPS), issued on January 5, 2022, Plaintiff could petition the Land Court to redeem he property until January 5, 2023, which Plaintiff indeed did.

43. The Town of Westborough received three proposals to its RFP by the due date of July 25, 2022.

(a) The high bidder was Pulte Homes of New England, LLC, which offered $7,942,000.00 and proposed to raze the existing movie theater structure and replace it with 108 non-age-restricted residential condominium units ("**Pulte Proposal**"). The Select Board for the Town of Westborough ultimately rejected this proposal.

(b) The other two proposals were commercial in nature:

(i) Lax Media LLC and its Massachusetts subsidiary proposed to re-open a movie theater.

(ii) Ferris Development proposed to make the property the second of its "Beehive" locations, an innovative approach to workspace for tradespeople. Beehive sites offer physical space for everyday trades (such as electricians, plumbers, painters, and carpenters). Ferris Development offered to pay $2,875,000. Lax Media LLC and its Massachusetts subsidiaries proposed $2,500,001.

44. According to the minutes and agendas of the Town of Westborough Select Board, they met in executive session to discuss the RFP matter at least seven times after receiving the RFP proposals. These executive sessions took place on August 2nd, August 23rd, September 6th, September 13th, September 27th, October 11th, and October 26th, 2022.

45. On November 2, 2022, the Town of Westborough Select Board met in open session to discuss the RFP matter. They took less than five minutes to announce that they had given Lax

three ratings of "highly advantageous" and two of "advantageous (without specifying which of the criteria won each rating); Ferris Development received two (2) ratings of "highly advantageous", three (3) ratings of "advantageous", and Pulte received two (2) ratings of "highly advantageous", one (1) rating of "advantageous", and two (2) ratings of "least advantageous".

46. The Select Board then voted on November 2, 2022 to award the purchase and sale agreement to the Lax entities. Under the terms of the RFP, The Town of Westborough and Lax were to enter into a purchase and sale agreement within 30 days from the date of the vote.

47. The Town of Westborough, going through the RFP process highlighted above, shows that the Town of Westborough initially decided not to sell the property through the tax title process described in M.G.L. c. 60.

48. The Town of Westborough's action of going through the RFP and selecting the Lax Entities as the winning bidder illustrates that the Town of Westborough, its Select Board, Attorney, Town Manager, and Chief Assessor have recklessly disregarded their obligation to pay fair market value for the taken property. By not selecting the highest bidder Pulte, the Town has sought to minimize the value paid to the Plaintiff in violation of law.

49. The Town of Westborough through their RFP process failed to follow their own criteria. "A public authority [like the Select Board of the Town of Westborough] inviting bids may not, like Humpty Dumpty, choose to let words it uses in an invitation mean what the public authority chooses those words to mean. When words in an invitation are invested with a meaning known only to the issuer of the invitation to bid, the legislative aims that bids be submitted on a common basis is thwarted. Fairness and equality require that bidders have the opportunity to bid in the same way and on the same information such that they bear the same risk of rejection." *See White's Farm Dairy, Inc. v. City of New Bedford*, 1999 Mass. Super. LEXIS 294 at *34-35.

240

50.     The Town of Westborough flouted their legal duty by offering the Locus up for sale before adjudication of Plaintiff's property rights.

51.     The Select Board for the Town of Westborough rated the Lax Entities' proposal higher than that of Ferris Development because the Town expected that the Lax entities' proposal would generate higher tax revenue than that of Ferris Development.

52.     The property valuations relied upon by the Town of Westborough in determining projected tax revenue are facially suspect. The assessors claimed to estimate that Lax Entities' proposal would yield a property worth $9,329,750, while Ferris Development's would produce a fair market value of only $5,501,830. It strains credulity to suggest that Ferris Development would invest $2,875,000 to purchase the property and another $2 million +/- to develop it only to be content with a resulting parcel worth scantly more than the purchase and development cost. Given the contraction in the movie theater use segment in recent years, and the example of the failure of a cinema use on the very site that was at issue, it is unlikely that Lax entities could almost quadruple its purchase money investment by continuing a movie theater use. No real estate valuation professional in the United States would assign a higher valuation or capitalization rate to a movie theater than to a shared work storage space or housing units.

53.     This constitutes prima facie evidence that the Town of Westborough was covering up a process that did not follow its own RFP, that violated the Plaintiff's constitutional rights, and that defies economic logic—seeking to resume a prior failed use of the property as a movie theater.

54.     While "The town has broad power to control and dispose of real property on the terms and conditions it deems appropriate," and is not required to "transfer land to the highest bidder" (*see Mangano v. Town of Wilmington*, 51 Mass. App. Ct. 857, 859 (2001)), Towns must not violate bedrock constitutional principles in the exercise of their discretion.

55.     The Town of Westborough has stated on the record in a Plymouth County Superior

Court proceeding:

> "the Town had a rational basis for accepting Lax Media's proposal over that of [Ferris
> Development Group] because Lax Media's proposal provided greater financial benefits to
> the Town and was able to proceed more quickly than FDG's, even if FDG's proposal
> reflected greater financial resources. Because Lax Media and FDG received the same score
> on price proposal and sustainability, and the Select Board reasonably determined Lax
> Media's proposal was better than FDG's on two of the three remaining criteria, the Town's
> decision was not arbitrary and the Court should not substitute its judgment for that of the
> Select Board. Because the Select Board's decision was based on grounds upon which
> reasonable persons would rely, FDG does not have a likelihood of success on the merits of
> its claims here."

> *See* Opposition of the Town of Westborugh, *Ferris Development Group, LLC v.
> Town of Westborough et als.*, Superior Court Dept. Civil Action #2285cv01281 (Worcester
> Cty.) at pp. 12-13.

56.     <u>Furthermore, the Chief Assessor for the Town of Westborough stated</u>:

> "The Assessor estimated Lax Media's use of the Property as a cinema would produce an
> estimated $192,507.33 in tax revenue annually, which was significantly more than [Ferris
> Development Group's] estimated annual tax revenue of $101,821.29 because of the more
> developed state the facility would be in as a cinema as opposed to a warehouse and meeting
> place for tradespeople…Moreover, the cinema use would also bring in tax revenue through
> ticket sales and meals taxes and personal property taxes on the high-technology fixtures
> installed…The cinema use would provide an evening destination for the entire community,
> stimulating nearby restaurants, whereas [Ferris Development Group's] proposal is an
> untested experiment following in the footsteps of the failed WeWork business
> model…[Ferris Development Group's] dismissal of the number of jobs Lax Media's
> cinema use would create is remarkable given that the cinema was estimated to create 10
> full-time jobs, 20 part-time jobs, and several seasonal jobs…"

> *See Id.* at pages 13-14.

57.     The Town of Westborough has a self-interest that it believes contravenes Plaintiff's

constitutional rights—generating increased tax revenues for the Town of Westborough (which are

suspect and speculative justifications), creating jobs, and continuing a prior use as it will have a

lower effect on municipal services. This is all to the detriment of Plaintiff's Constitutional rights.

**b.  <u>The Town of Westborough and Its Agents Engaged in An Unconstitutional Taking of
Property Without Just Compensation</u>**.

58.     The Land Court, by request of the Town of Westborough, has granted official imprimatur to an unconstitutional practice. It is the practice—sanctioned by statute[1]—of using unpaid real estate property taxes to seize real property for a municipality's own benefit, selling (or attempting to sell) it for amounts that far exceed the amount of unpaid taxes, retaining not just the amount owed for unpaid taxes, but all of the sale proceeds, including all of the property owner's equity in the real property. This is the practice of "equity theft".

59.     The Town of Westborough's desire to retain the value of sale proceeds in excess of the unpaid taxes due on real property and associated charges violates the United States Constitution's prohibitions on the taking of private property for public use without just compensation and constitutes an excessive fine for the nonpayment of property taxes.

60.     The willful intent has been manifested not only by the Town of Westborough Select Board, but also by and through its attorneys, treasurer/collector, and Town of Westborough officials and agents. This intent has been publicly broadcast in newspapers throughout Massachusetts.                      *See*,                                        *e.g.*,

---

[1] M.G.L. c. 60, § 53 provides, "If a tax on land is not paid within fourteen days after demand therefor and remains unpaid at the date of taking, the collector may take such land for the town, first giving fourteen days' notice of his intention to exercise such power of taking, which notice may be served in the manner required by law for the service of subpoenas on witnesses in civil cases or may be published, and shall conform to the requirements of section forty five. He shall also, fourteen days before the taking, post a notice so conforming in two or more convenient and public places . . ."

M.G.L. c. 60, § 54 provides in pertinent part, "The instrument of taking shall be under the hand and seal of the collector and shall contain a statement of the cause of taking, a substantially accurate description of each parcel of land taken, the name of the person to whom the same was assessed, the amount of the tax thereon, and the incidental expenses and costs to the date of taking. Such an instrument of taking shall not be valid unless recorded within sixty days of the date of taking. If so recorded it shall be prima facie evidence of all facts essential to the validity of the title so taken . . . ."

https://www.metrowestdailynews.com/story/news/2022/08/05/westborough-ma-fields-proposals-former-regal-cinemas-property/10230187002/ (accessed August 17, 2023).

61.    The Land Court has refused to impose any administrative orders or a moratorium on tax title foreclosure cases in The Commonwealth based on the United States Supreme Court *Tyler* decision.

62.    The Land Court has stated that if a municipality or other plaintiff in a tax foreclosure case seeks to foreclose on a tax title, that Massachusetts law permits this to occur and that any resulting risk of liability, including for compensation owed to the former owner, is for the municipality to consider and assess in proceeding. Accordingly, the Massachusetts Land Court has vitiated the central holding of *Tyler* which prohibits municipalities from confiscating equity after conducting tax lien foreclosure sales.

63.    The Land Court has refused to immediately honor the *Tyler* ruling and has continually issued *absolute* titles in violation of federal law and Supreme Court precedent, especially in 19 TL 000768-HPS that applies to the Plaintiff.

64.    Since the Land Court has exclusive statutory jurisdiction over all tax lien foreclosure cases in Massachusetts, these cases must be litigated exclusively in the Land Court, which controls discovery, the course of proceedings, and enters judgments which have violated the core tenets of *Tyler*, especially through the foreclosure final judgment issued in *Town of Westborough v. Westborough SPE, LLC, et als.*, 19 TL 000768 (Land Ct. applies

65.    The Land Court's standard form tax lien complaint is unconstitutional because it seeks to award "absolute title" which violates *Tyler*.

66.    Every "absolute title" awarded by the Land Court, through judgments entered upon standard form tax lien complaints from May 25, 2023 to present date and beyond, is and will be

void ab initio—and of no legal force and effect. All such judgments, and the land titles to which they relate, will be subject to collateral attack for years to come because the Land Court has refused to comply with *Tyler* from the decision date. If "the court which renders judgment has no jurisdiction to render it, either because the proceedings, or the law under which they are taken, are unconstitutional, or for any other reason, the judgment is void and may be questioned collaterally…" *In re Neilson*, 131 U.S. 176, 182 (1889).

67.    These tax title foreclosure judgments and land title litigations will continue for years and will infect thousands of land titles going forward, opening the floodgates to litigation on this issue.

68.    By adhering to the rule of law announced in *Tyler*, the Land Court could minimize these invalid judgments and land titles.

69.    The Land Court's obligation to uphold constitutional rulings of the United States Supreme Court is not subject to or conditioned upon any antecedent action by the Massachusetts General Court ("Legislature") or any other legislative body. No legislative action is required to implement the core *Tyler* ruling given the Land Court's exclusive jurisdiction over tax lien foreclosure cases and its mechanical and administrative ability to ensure that no municipal tax lien claimant is ever awarded with any tax lien judgment which embeds the right to "take" real property equity.

70.    Courts, such as the Land Court, cannot stand idle and watch municipalities like the Town of Westborough violate the United States Constitution based on the inaction of a legislative body, especially where there is an active case and controversy.

**The Town of Westborough Initiates a Tax Taking Against Plaintiff**

71. On January 16, 2019, the Town of Westborough recorded an instrument of Tax Taking under M.G.L. c. 60, §§ 53 and 54 against the Locus for nonpayment of property taxes.

72. On July 8, 2019, the Town of Westborough commenced the action to foreclose the tax lien (*Town of Westborough v. Westborough SPE, LLC, et als.*, Massachusetts Land Court, Case # 19 TL 000768-HPS).

73. On July 24, 2019, a Notice of the foreclosure action was recorded in the Worcester District Registry of Deeds at Book 60751, Page 221.

74. On August 26, 2019, a Land Court Title Examiner, Michael H. Delaney, Esq. ("Attorney Delaney"), completed and subsequently filed a Title Report under M.G.L. c. 60, § 66, and reported that the parties interested and entitle to notice were "Westborough SPE, LLC c/o Babcock & Brown Administrative Services, Inc….Att'n Dyann Blaine and/or F. Jan Bluestein" and "Interstate Theaters Corporation".

75. Plaintiff acquired its ownership interest in the Locus by Quitclaim Deed recorded at Book 19369, Page 75 in the Worcester District Registry of Deeds on November 21, 1997 ("Deed"). The Deed stated that the grantee was Westborough SPE LLC, a Delaware limited liability company with a principal place of business at c/o Babcock & Brown Administrative Services, Inc., Two Harrison Street, San Francisco, CA 94105. Westborough SPE LLC paid $9,151,449.00 in consideration for the Locus in 1997.

76. Upon information and belief, Attorney Delaney searched the online records of The Secretary of The Commonwealth of Massachusetts Corporations Division ("MA Corporations Division") for Westborough SPE LLC. The MA Corporations Division is a mere repository of corporate filings and no one at the MA Corporations Division can confirm or deny the accuracy of any document filed with it, except to confirm the date and time said document was filed.

17

246

77.     Upon information and belief, Attorney Delaney did not search any records of the Secretary of State for the State of Delaware Corporations Division.

78.     Had Attorney Delaney searched he would have discovered that Babcock and Brown Administrative Services, Inc. had become Babcock and Brown Administrative Services LLC which later merged into Babcock and Brown Parallel Member LLC, a Delaware limited liability company.

79.     Thus, Babcock and Brown Parallel Member LLC was the successor-in-interest manager to Babcock and Brown Administrative Services, Inc.

80.     Babcock and Brown Parallel Member LLC was never provided notice of the foreclosure.

81.     When the Town of Westborough "took" Plaintiff's Property with the judgment of foreclosure entering on January 5, 2022, through a tax taking that violated due process (including, but not limited to improper notice), it did not pay for said property.

82.     Plaintiff has been deprived of all use and benefit of its real property at the Locus since the Town of Westborough's tax title foreclosure, and Plaintiff has received no compensation whatsoever. The only thing that the Town of Westborough has done was force Plaintiff to have incurred significant legal expenses because of the Town of Westborough and their agents' unconstitutional actions.

83.     The Town, through its Tax Collector/Treasurer, asserted that it is due the sum of $918,314.60 for taxes, interest, and incidental expenses as through May 16, 2023. *See* **Exhibit A** attached and incorporated by reference. The Tax Collector in the affidavit readily concedes though that this sum is no longer accurate. On May 3, 2023, Linda A. Smith, Treasurer/Collector for the Town of Westborough ("Town Treasurer") certified that as of May 16, 2023 ("**Town's**

18

Certification"), a grand total of $918,314.60 was owed, consisting of: $119,628.17 (2018 Taxes), $103,133.80 (2019 Taxes), $10-2,963.48 (2020 Taxes), $55,915.95 (2021 Taxes), $36,885.70 (2021 Taxes), and $35,183.54 (2023 Taxes). It also included interest in the amount of $239,341.73, $58,138.22 in legal fees owed to KP Law and The Law Offices of Iris A. Leahy, Esq., miscellaneous water and sewer liens, NSTAR lien, $14,438.55 to Boston Board Up, $109,882.55 in insurance costs, $6000 in appraisal costs, $20,591.22 for a Request for Proposal (RFP) bid process to sell the Locus, and other miscellaneous recording costs and fees as Itemized in **Exhibit A**.

84.     The Town Treasurer certified in the Town's Certification that the 2023 assessed value of the Property is currently $2,082,000.00 compared with $9,264,800.00 in 2018. According to the Town of Westborough's Appraisal, the market value of the Locus is $4,790,000 as of August 3, 2018 as determined by Mark S. Reenstierna, Massachusetts Certified General Real Estate Appraiser #3803 communicated to Jonathan Steinberg, MAA, Chief Assessor for the Town of Westborough on September 4, 2018. A second appraisal was performed by William J. Pastuszek, Jr., MAI, SRA, MRA, Massachusetts Certified General Real Estate Appraiser License #10 on behalf of Shepherd Associates, LLC for the Town of Westborough and determined that the as-is opinion of value of the fee simple interest in the Locus as of January 28, 2018 was $5,500,000 to $6,000,000.

85.     Attorney Iris A. Leahy ("**Attorney Leahy**") and attorneys from KP Law, P.C. ("**KP Law**"), acting on behalf of the Town of Westborough, were encouraged to allow the Town of Westborough's tax title foreclosure of the Locus, because they have earned and continue to earn substantial legal fees stemming from the Plaintiff's challenge.

19

86.    The Locus consists of a parcel of land containing about 29.34 acres (around 1,277,876 square feet) improved with a single-story movie theater.

87.    On March 16, 2023, David M. Ferris, Esq. on behalf of Ferris Development Group, LLC executed a contingent Offer to Purchase the Locus for $2,400,000.00 ("**Minimum Current Market Price**").

88.    The Town's Certification stated that the assessed value of the Locus for 2023 is $2,082,000.00. Current Minimum Market Price is $2,400,000.00. The surplus ("**Surplus**"), consisting of the market value less outstanding taxes, interest, charges of keeping, and charges of sale, as of May 16, 2023, exceeded $918,314.60 (minimum amount of "equity theft") as alleged in the Town's Certification. See M.G.L. c. 60, § 28.

89.    Assuming arguendo that the Town decided to proceed with Pulte's offer during the RFP of nearly $7 Million, the resultant "equity theft" as of May 16, 2023 would have been nearly $6,081,685.40.

90.    Under current Massachusetts law, the Town of Westborough is entitled to this Surplus when and if the Town sells the Property subject only to additional permissible deductions, under M.G.L. c. 60, § 28, due, once again, to the mere passage of time.

91.    The Town of Westborough has stated that it refuses to release the proceeds to Westborough SPE LLC's duly authorized successor managers, Lolonyon Akouete, and Denise Edwards according to the records of the Massachusetts Secretary of The Commonwealth Corporations Division and the Secretary of State for the State of Delaware Corporations Division, the Durable Power of Attorney (governed by Delaware law) executed by F. Jan Blaustein Scholes as Manager ("Ms. Scholes") of Babcock and Brown Parallel Member LLC as successor in interest

to Babcock and Brown Administrative Services, Inc. and a Written Consent of Manager signed by Ms. Scholes.

92.    Ms. Scholes executed and had notarized the Durable Power of Attorney and Written Consent of Manager in Maricopa County, Arizona.

93.    Plaintiff's LLC Operating Agreement is governed by Delaware law and allows for an existing manager to transfer the role of manager to another manager or co-manager.

94.    Plaintiff's LLC Operating Agreement does not allow a Manager to resign as Manager without Member Consent.

95.    No Member Consent was ever provided for the resignation of any manager by Mignonette Investments Limited.

**The Town of Westborough Has Informed Plaintiff's Managers That It Will Refuse to Tender Proceeds to the Plaintiff**

96.    The command of M.G.L. c. 60, § 28 is clear: "The collector shall *upon demand* give a written account of every sale on distress or seizure and charges, and pay to the owner any surplus above the taxes, interest and charges of keeping and sale."

97.    The Town of Westborough has stated that it will refuse to tender sale proceeds to Plaintiff's Managers even though Plaintiff is a manager-managed LLC.

98.    Since Plaintiff timely made a statutory demand, it is entitled to "any surplus" after payment of the expenses under M.G.L. c. 60, §28. Attempts to place a contrary construction upon M.G.L. c. 60, §28 would violate the Due Process Clause since "the touchstone of due process is the protection against the arbitrary action of the government…" *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974).

99.    There is no legal, equitable, or factual base on which the Town of Westborough could assert that it may retain any surplus from a sale for itself.

100.    The Town of Westborough's actions to seize the Surplus violates the Fifth Amendment, Due Process Clause, Federal Civil Rights Act (42 U.S.C. § 1983), M.G.L. c. 60, § 28, and common law (including, but not limited to conversion, fraud, and deceit), and the retention of any such Surplus, within the meaning of M.G.L. c. 60, § 28, would violate Massachusetts criminal larceny statutes. *See* M.G.L. c. 266, § 30(1).

**C. Unconstitutional Documents/Postings by The Land Court.**

101.    The Home Page of the Land Court website, which upon information and belief is operated by the Land Court, states: "A tax lien foreclosure is a type of court case in which a city or town (or sometimes a third party) can seek to obtain <u>full ownership</u> of property if the property taxes, water bills, or sewer bills are not paid…" (Emphasis added). See Land Court Website, https://www.mass.gov/land-court-tax-lien-foreclosure-cases-resources#:~:text=The%20Land%20Court%20has%20jurisdiction%20over%20all%20tax%20lien%20foreclosures%20in%20Massachusetts (accessed August 14, 2023).

102.    Land Court websites have spread false information that contradicts the Supreme Court's holding in *Tyler* and that the Town of Westborough and other municipalities rely contradicts.

103.    The Land Court Homepage Link - "Simple Chart of the Tax Lien Foreclosure Process" states at Section #8: "If you do not pay the amount back by a certain date, the plaintiff can file a motion for judgment and hearing notice. The Court will schedule a hearing on the Motion for Judgment. At this hearing, the Court may make a judgment of foreclosure. *If the Court makes a judgment of foreclosure, your ability to get the property back ends, and the plaintiff gets full ownership of the property. <u>You will lose the whole property, even if it is worth much more than you owe</u>.* (See FAQ #18 and FAQ #19)". See https://www.mass.gov/doc/simple-introductory-tax-lien-flowchart/download (Accessed August 14, 2023) which is incorporated by reference.

104.     The Massachusetts Standard Form Tax Lien Complaint – Form TL-5 (04-2021) at Section #5 states: "Plaintiff(s) requests that the Court enter judgment foreclosing all rights of all persons entitled to redeem and declaring that title to the described real estate is **absolute** and that all rights of redemption are barred.  Plaintiff(s) requests such other and further relief as the Court deems proper." (Emphasis Added). *See* https://www.mass.gov/doc/tax-lien-complaint/download (Accessed August 14, 2023) which is incorporated by reference.

105.     The Land Court's online Tax lien foreclosure informational outline states: "A tax lien foreclosure is a process through which you can lose ownership of your property if you do not pay your real estate taxes or water/sewer bill. This can result in you losing all of your property's value, even if the amount you owe is much less than your property's value." *See* https://www.mass.gov/info-details/tax-lien-foreclosure-informational-outline  (Accessed  August 14, 2023) which is incorporated by reference.

## <u>COUNT ONE</u>
## <u>DECLARATORY RELIEF</u>

106.     Plaintiff repeats and realleges the paragraphs above.

107.     Upon any sale of the Property by the Town of Westborough, if it effects such a sale, it is demanded that the Town and its Treasurer/Tax Collector, comply with the dictate of M.G.L. c. 60, § 28. The cited statutory subsection embeds the constitutional requirements of the Takings Clause of the Fifth Amendment to the United States Constitution ("Fifth Amendment") into it. "The Takings Clause of the Fifth Amendment states that 'private property [shall not] be taken for public use, without just compensation.'" *Knick v. Scott*, 588 U.S.___ (2019) Slip. Op. at p. 1. (brackets in original). "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Id.*, 588 U.S. ___ at 2. The "property

owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation…" *Id.*

108.    On January 05, 2022, Final Judgment entered as to tax-taking by the Town of Westborough in the Land Court case (19 TL 000768-HPS) at the Locus.

109.    Plaintiff is entitled to a declaration that if the Town of Westborough sells the Locus that Plaintiff is entitled to the difference between the amount owed and what the property sells for.

110.    Plaintiff is entitled to a declaration that as a result of the Town of Westborough and its agents' unconstitutional behavior that it must forfeit any interest on amounts owed by Plaintiff for property taxes.

111.    Plaintiff is entitled to a declaration that as a result of the Town of Westborough and its agents' unconstitutional behavior that it shall not be entitled to collect legal fees and costs incurred by Attorney Leahy and KP Law.

112.    Plaintiff is entitled to a declaration as to the rights and obligations of Plaintiff and Defendants vis-à-vis the constitutionality of holding an RFP prior to expiration of Plaintiff's right of redemption period.

113.    Plaintiff is entitled to a declaration as to the constitutionality of the Massachusetts tax-title foreclosure process as it has been directly applied by the Town of Westborough to Plaintiff.

## **COUNT TWO**

### **UNCONSTITUTIONAL TAKING UNDER THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION; VIOLATION OF 42 U.S.C. § 1983**

114.    Plaintiff repeats and realleges the paragraphs above.

115.    Defendants at all times relevant to this action were acting under color of state law.

116. Defendants unlawfully deprived Plaintiff of 100% of its real property located at the Locus without just compensation and without due process of law, all in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

117. This claim is being made pursuant to 42 U.S.C. § 1983 and § 1988.

118. The Fifth Amendment of the United States Constitution, made applicable to the states via the Fourteenth Amendment, is a constitutional provision and right requiring the payment of just compensation upon a taking of private property by Defendants. *See Knick v. Twp. Of Scott*, 588 U.S. ____ (2019).

119. The Town of Westborough's actions and those of the 1983 Defendants vis-à-vis tax title foreclosure of the Locus have constituted a complete taking of Plaintiff's real property without any compensation for such taking.

120. James Malloy, the former Town Manager for the Town of Westborough stated in a November 29, 2018 article in the Westboro Telegram & Gazette "the town will have to hold on to the money from the new owner for three years in case a claim is filed against the town…[Malloy] said that would not stop the selling and development of the property." *See* **Exhibit B** attached and incorporated by reference. The Town of Westborough had actual knowledge that selling the Locus in an RFP could subject the Town of Westborough to liability.

121. At all times relevant hereto, the defendants acted under a policy or custom of the Town of Westborough of depriving real property owners that owe unpaid property taxes of their real property to avoid having to pay compensation in an eminent domain proceeding.

122. In an Affidavit dated May 14, 2020, by Shirin Everett, Esq. of KP Law, P.C., legal counsel to the Town of Westborough, Attorney Shirin stated: "We advised the Town Manager that if real estate taxes were not being paid [at the Locus], the Town [of Westborough] could eventually acquire the title to the Property through a Land Court foreclosure process. We advised the Town

25

as to the steps the Town needs to take to demand payment of WSPE [Plaintiff], to record an Instrument of Taking after waiting the statutory 14-day period, and filing a petition to foreclose on the Property in Land Court." *See* **Exhibit C** at Paragraph #6, attached and incorporated by reference for the Affidavit of Shirin Everett, Esq. ("**Attorney Affidavit**").

123.     Attorney Shirin further notesd that "[a] vote taken under Article 18 of the March 6, 2018 Annual Town Meeting, authorized the Board of Selectmen [for the Town of Westborough] to acquire the Property [the Locus] by eminent domain for economic revitalization and general municipal purposes, and appropriated the sum of $6,000,000 to pay damages for the Property and to pay for costs incidental or related thereto. It was the Town's intent that, should it take the Property by eminent domain rather than through the tax-foreclosure process, it would pay damages to WSPE [Plaintiff] or to any other entity or person that established that it owned the Property." *nonpayment* at Paragraph #10.

124.     The Town of Westborough's unconstitutional municipal policy, practice, and custom vis-à-vis tax-title foreclosure in-lieu of condemnation proceedings to avoid having to pay just compensation for the taking of real property ("**Tax-Title Foreclosure Policy**") was the moving force of the constitutional violation suffered by the Plaintiff. *See Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694-95 (1978).

125.     Not only was the Town of Westborough's formal Tax-Title Foreclosure Policy caused the violation of Plaintiff's constitutional rights, but also it was designated employees with final policymaking authority that caused the rights violation, including Attorney Everett (KP Law), the Town Manager, and the Board of Selectmen.

126.    All these aforementioned parties were either employees of the Town of Westborough, engaged in the business of the municipality, or were acting with the authority granted to them by the Town of Westborough.

127.    Attorney Everett (KP Law) acted jointly with the Town of Westborough and acted under an engagement letter authorized by the Town of Westborough.

128.    Peter Blaustein acted jointly with the government and was under the Town of Westborough's control, where Town Counsel, Attorney Leahy, drafted a "Waiver of Notice and Assent to the Entry of Judgment" for Peter Blaustein to sign, have notarized, and which was filed in Land Court proceeding 19 TL 000768-HPS on May 4, 2023. In that document, Peter Blaustein claimed to be a "Party of Interest by and/or through a Power of Attorney, as Court-Appointed Guardian, and as Conservator for F. Jan Blaustein a/k/a Jan Blaustein Scholes, in the above-referenced tax lien case, hereby waives her right to notice and assents to the previous entry of judgment with regards to the parcel listed below [Locus]". *See* **Exhibit D** attached and incorporated by reference. This document had a prejudicial effect on the Land Court proceeding and Plaintiff through its legal counsel moved to strike said document, but the Land Court Judge refused to strike said document from the Docket.

129.    Defendants' actions did not substantially advance a legitimate state interest.

130.    Defendants' policy and practice regarding tax title foreclosure of the Locus has denied Plaintiff any viable use of their property.

131.    The Town of Westborough has taken Plaintiff's property for public use without providing just compensation.

27

132.    The Town of Westborough provided no compensation to Plaintiff for the taking of their real property, thereby depriving Plaintiff of their constitutional rights in violation of the Fifth Amendment of the United States Constitution.

133.    The Town of Westborough interfered with Plaintiff's distinct, investment-backed expectations as to their business and real property.

134.    As a result of Defendants' actions and failure to pay just compensation, Plaintiff has been injured and suffered damages in an amount to be determined at trial.

135.    Defendants cannot assert a compelling interest for disregarding Plaintiff's long-established constitutional property rights.

136.    The Land Court's conduct has caused and will continue to cause Plaintiff to suffer immediate and irreparable harm to its constitutional rights to due process. No money damages can remedy this harm because real property is unique, and Plaintiff has no legal avenue by which to recover any money damages against the Town of Westborough.

## <u>COUNT THREE</u>

## <u>VIOLATION OF 42 U.S.C. §§ 1985(2) and 1986</u>

142.    Plaintiff repeats and realleges the paragraphs above.

143.    The first clause of § 1985(2) permits an action for damages when:

> "two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified."

144.    § 1986 permits damages against any:

> "person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [§ 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do."

28

145.     § 1985(2), "contain[s] no language requiring that the conspirators act with intent to deprive their victims of [constitutional rights]." *Kush v. Rutledge*, 460 U.S. 719, 725 (1983).

146.     The Town of Westborough, Town of Westborough Select Board, Attorney Leahy, KP Law, Peter Blaustein, Dyann Blaine, and Walter Horst conspired to deter, by force, intimidation, and threats, F. Jan Blaustein Scholes from testifying freely, fully, and truthfully.

147.     Furthermore, upon information and belief, Peter Blaustein has told F. Jan Blaustein Scholes that he would not allow her to move to a nicer nursing home facility if she continued "cooperating" with Lolonyon Akouete and Denise Edwards, the successor managers of the Plaintiff. Mr. Akouete an Ms. Edwards owe a fiduciary duty to the Plaintiff to ensure that its greatest asset—real property at the Locus—is not wrongfully seized by the Town of Westborough for payment of outstanding tax obligations amounting to a mere fraction of the real property's value.

148.     Upon information and belief, the Select Board and KP Law had actual knowledge of Attorney Leahy's actions in wrongfully contacting Mr. Horst, Ms. Blaine, Peter Blaustein, and F. Jan Blaustein Scholes, witnesses in the Land Court proceeding (19 TL 000768-HPS).

149.     Neither the Select Board nor KP Law, who had the power to stop Attorney Leahy's improper actions, acted to so stop Attorney Leahy.

150.     As a result of defendants' conduct, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT FOUR

**EXCESSIVE FINES VIOLATION OF THE UNITED STATES CONSTITUTION**

**(AGAINST TOWN OF WESTBOROUGH)**

151.   Plaintiff repeats and realleges the paragraphs above.

152.   The Eighth Amendment to the United States Constitution prohibits the imposition of excessive fines.

153.   Confiscating the entire value of Plaintiff's real property, including the excess or surplus equity in Plaintiff's property because of non-payments of real estate taxes is an excessive fine under the Eighth Amendment to the United States Constitution.

154.   Defendant is engaged in assessing and collecting prohibited excessive fines.

155.   Plaintiff faces a threat of irreparable harm if, after a trial on the merits, a permanent injunction is not granted, in that there is a threat that its property rights will continue to be violated by Defendant.

156.   Plaintiff has no adequate legal remedy to protect their property interests from the ongoing unconstitutional and unlawful conduct herein described.

157.   Plaintiff has been injured and damaged by the unlawful excessive fines under the United States Constitution and is entitled to relief as a result.

**WHEREFORE**, Plaintiff requests judgment as follows:

A.   Enter an order that the Defendants have violated Plaintiff's constitutional rights by taking its real property for public use without just compensation and violating Plaintiff's due process rights;

B.   Enter an order for damages and/or compensation for the value of the real property taken by Defendants;

30

259

C.      Enter an order for all damages available under federal law as applicable, including, but not limited to, an award for nominal and punitive damages;

D.      Issue a Declaratory Judgment that M.G.L. c. 60, § 28 is unconstitutional as applied and/or facially;

E.      Issue a Declaratory Judgment that M.G.L. c. 60, §§ 53 and 54 are unconstitutional as applied and/or facially;

F.      Issue a Declaratory Judgment that Massachusetts' statutory scheme of tax title takings and allowance for "equity theft" is unconstitutional;

G.      Issue a Declaratory Judgment that the Town of Westborough's appropriation of Plaintiff's real estate equity is an excessive fine in violation of the United States Constitution;

H.      Issue a Declaratory Judgment that as a result of the Town of Westborough's actions, by and through its Select Board, and agents, that legal fees paid to further the Town's unconstitutional and/or unlawful actions should be removed from amounts Plaintiff owes to the Town;

I.      Issue preliminary and permanent injunctions enjoining the Land Court, Town of Westborough, and Judges of the Trial Courts of The Commonwealth of Massachusetts from enforcing the foregoing challenged statutory provisions until further order of this Court.

J.      Issue such other declarations as are necessary and proper for a full adjudication of this matter as presented to the Court;

31

K.      Award Plaintiff costs and attorneys' fees under 42 U.S.C. § 1988, or under any

other applicable statute or authority.

L.      Grant Plaintiff any other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


**Dated**: August 31st, 2023

                    Respectfully submitted,

                    **WESTBOROUGH SPE LLC**, Plaintiff,

                    By its attorneys,

                    *Scott A. Schlager*

By: _____
                    Scott A. Schlager, BBO#695421
                    Nathanson & Goldberg, P.C.
                    183 State Street, 5th Floor
                    Boston, Massachusetts 02109
                    Tel. (617) 909-4511
                    Fax. (617) 210-4824
                    sas@natgolaw.com

**VERIFICATION**

I, Lolonyon Akouete, declare as follows:

1. I am the co-Manager of Westborough SPE LLC, a Delaware limited liability company, Plaintiff in the above-captioned case. I have authorized the filing of this complaint and in accordance with the limited liability company operating agreement of Plaintiff.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

3. I have personal knowledge of Westborough SPE LLC, its activities, and its intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

4. I verify under penalty of perjury under the laws of the United States that the factual statements in this Complaint about myself, my activities, and my intentions are true and correct, as are the factual statements about Plaintiff, its activities, and its intentions. I have reviewed the allegations made in the complaint. As to those allegations of which I do not have personal knowledge, I rely on information and belief, and I believe them to be true. 28 U.S.C. § 1746.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 31st DAY OF AUGUST 2023.**

*/s/ Lolonyon Akouete*

_____

Lolonyon Akouete, Manager

33

## VERIFICATION

Denise Edwards, being duly sworn, deposes and says:

1. I am the co-Manager of Westborough SPE LLC, a Delaware limited liability company, Plaintiff in the above-captioned case. I have authorized the filing of this complaint and in accordance with the limited liability company operating agreement of Plaintiff.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

3. I have personal knowledge of Westborough SPE LLC, its activities, and its intentions, including those set out in the foregoing Verified Complaint for Declaratory and Other Relief, and if called on to testify I would competently testify about these matters.

4. I verify under penalty of perjury under the laws of the United States that the factual statements in this Complaint about myself, my activities, and my intentions are true and correct, as are the factual statements about Plaintiff, its activities, and its intentions. I have reviewed the allegations made in the complaint. As to those allegations of which I do not have personal knowledge, I rely on information and belief, and I believe them to be true. 28 U.S.C. § 1746.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 31st DAY OF AUGUST 2023.**

*Denise Edwards*

_____

Denise Edwards, Manager

34

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MASSACHUSETTS

--------------------------------X

**ESTBOROU H SPE LLC**, a Delaware limited
liability company,

                    *Plaintiff.*

                    v.

**TO N OF ESTBOROU H**, *a
munici al cor oration of he
Commonwealth of Massachusetts*;
**SHELBY MARSHALL**, *individually and
in the official ca acity as elect Board
Member*; **IAN JOHNSON**, *individually
and in the official ca acity as elect Board
Member*; **ALLEN EDINBER**,
*individually and in the official ca acity as
elect Board Member*; **SEAN KEO H**,
*individually and in the official ca acity as
elect Board Chair*; **PATRICK ELCH**,
*individually and in the official ca acity as
elect Board Vice-Chair*; **PETER
BLAUSTEIN**, *individually,*

                    Defendants.

Civil Action #:

_____

**JURY TRIAL DEMANDED**

--------------------------------X

## RULE 1 DISCLOSURE STATEMENT

Pursuant to Rule 7.1(a)(1) of the Federal Rules of Civil Procedure, Plaintiff hereby states that it is

a limited liability company formed under the laws of the State of Delaware. Westborough SPE LLC has

one member: Mignonette Investments Limited, a British Virgin Islands limited partnership.

Respectfully submitted,

**ESTBOROU H SPE LLC**, Plaintiff,

By its attorneys,

*/s/ Scott A. Schlager*

By: _____

Scott A. Schlager, BBO#695421
Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, Massachusetts 02109
Tel. (617) 909-4511
Fax. (617) 210-4824
sas@natgolaw.com

## CERTIFICATE OF SERVICE

I, Scott A. Schlager, Esq., hereby certify that a copy of the above-captioned document was served upon counsel of record in the above-captioned matter via the ECF system on August 31, 2023.

S A S r BBO 1

2



# TOWN OF WESTBOROUGH
## MASSACHUSETTS



PLAINTIFF'S
EXHIBIT

A

OFFICE OF THE TREASURER/COLLECTOR
34 WEST MAIN STREET
WESTBOROUGH, MA 01581-1998
LINDA A. SMITH

TELEPHONE
(508)871-5142
FAX
(508)366-3099

231 TURNPIKE ROAD, WESTBOROUGH, MA
PARCEL: 32-48-0          BOOK/PAGE: 66983-53

16% interest to 5/16/23

| | | TOTALS | | | VALUE |
|---|---|---|---|---|---|
| 2018 Tax Title Lien | $ 119,628.17 | | | pd Q1/1/2 Q2 | $ 9,264,800.00 |
| interest | $ 93,956.04 | | | | |
| Water Lien | | | | | water/sewer included in tax lien |
| Sewer Lien | | | | | |
| interest | | $ 213,584.21 | | | |
| Per Diem | | | 32.44 | | |
| 2019 Tax Title Lien | $ 103,133.80 | | | | $ 5,239,100.00 |
| interest | $ 64,197.28 | | | | |
| Water Lien | | | | | water/sewer included in tax lien |
| Sewer Lien | | | | | |
| interest | | | | | |
| No Income | $ 250.00 | $ 167,581.08 | | | |
| Per Diem | | | 45.21 | | |
| 2020 Tax Title Lien | $ 102,963.48 | | | | $ 5,239,100.00 |
| interest | $ 48,068.54 | | | | |
| Water Lien | | | | | water/sewer included in tax lien |
| Sewer Lien | | | | | |
| interest | | | | | |
| No Income | $ 250.00 | $ 151,282.02 | | | |
| Per Diem | | | 45.14 | | |
| 2021 Tax Title Lien | $ 55,915.95 | | | | $ 2,622,100.00 |
| interest | $ 17,108.72 | | | | |
| Water Lien | | | | | water/sewer included in tax lien |
| Sewer Lien | | | | | |
| interest | | | | | |
| No Income | $ 250.00 | $ 73,274.67 | | | |
| Per Diem | | | 24.51 | | |
| 2022 RE | $ 36,885.70 | | | | $ 1,994,900.00 |
| interest | $ 11,075.82 | | | | |
| Water Lien | $ 198.36 | | | | |
| Sewer Lien | $ 208.44 | | | | |
| interest | $ 268.00 | | | | |
| No Income | $ 250.00 | $ 48,886.32 | | | |
| Per Diem | | | 16.17 | | |
| 2023 RE | $ 35,183.54 | | | | $ 2,082,000.00 |
| interest | $ 4,935.33 | | | | |
| Water Lien | $ 198.36 | | | | |
| Sewer Lien | $ 208.44 | | | | |
| interest | $ 236.26 | | | | |
| Per Diem | | | 15.42 | | |

No Income          $     250.00   $   41,011.94

                   $ 695,620.24   $ 695,620.24

| | |
|---|---|
| NSTAR Lien | $    9,900.53 |
| Boston Board Up | $   14,438.55 |
| Ins. costs to date | $ 109,882.92 |
| EverSource costs | $    2,757.92 |
| Appraisal | $    6,000.00 |
| Legal fees: KP Law thru 2/28/23 - tax title | $   24,110.75 |
| RFP | $   20,591.22 |
| Legal fees: Iris Leahy thru 4/28/23 tax title | $   34,027.47 |
| Filing fee | $      515.00 |
| withdrawal ?? | $      365.00 |
| recording fee?? | $      105.00 |
| | $  222,694.36 |

**GRAND TOTAL**   $ 918,314.60

** there could be additional charges in the days to come that could get added on, legal etc....

*Linda A. Smith*        5/3/2023
LINDA A SMITH          DATE
TREASURER'/COLLECTOR

COMMONWEALTH OF MASSACHUSETTS
Worcester, ss
On this 3rd day of May 20 23 before me, the undersigned notary public, Linda Smith, Treasurer Collector personally appeared, provide to me through satisfactory evidence of identification, which were personally known to me, to be the person who signed the preceding or attached document in my presence and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.

_____ (official signature and seal of notary public)

My Commission Expires: April 7, 2028



PLAINTIFF'S EXHIBIT
B


**telegram.com** | TELEGRAM & GAZETTE

### EAST/VALLEY

# Westboro accepts $5M bid for cinema

**Elaine Thompson** elaine.thompson@telegram.com
Published 5:00 p.m. ET Nov. 28, 2018 | **Updated 4:55 a.m. ET Nov. 29, 2018**

WESTBORO – The Board of Selectmen has accepted a $5 million bid from a Walpole-based media corporation to purchase and operate a cinema at the long-vacant Regal Cinemas building on Route 9.

LAX Media LLC, which operates Apple Cinemas in Cambridge, and Waterbury and Barkhamsted, Connecticut, submitted the high bid of $5,005,005. Two other bids that included maintaining a movie theater on the property came from Grossman Development of Southboro for $4 million; and $3.1 million from Florida-based Cinema World of Florida, which operates Lincoln Mall 16 & Cinema World & Games in Lincoln, Rhode Island. The fourth and lowest bid, at $2.5 million, came from Black Socks Corp., based in Marlboro, which proposed building a regional grocery store on the site.

Selectmen held a short meeting Nov. 20 to award the bid to LAX Media. Chairman Leigh Emery said it offered the most advantageous economic benefit to the town.

The bid "is a million dollars over the nearest other proposal; it is above the appraised value; it closes 30-60 days earlier," Ms. Emery said. "It's a business model that we think fits best with our strategic planning that the Board of Selectmen has worked out the past six months or so and voted as a plan for moving forward for keeping our community a family-friendly town with recreation activities available for all age groups in an affordable fashion."

The 12-screen theater was the only cinema in town. It was built in 1997, on a 29-acre parcel at 231 Turnpike Rd. (Route 9) in Stagecoach Plaza. The theater abruptly closed its doors last fall, less than a month before the 20-year lease was to expire. The property is appraised at $4.79 million.

The town, however, has been unable to find the owner. The original landlord, Westboro

SPE LLC, registered in Delaware, administratively dissolved and withdrew its registration to do business in Massachusetts in 2007. The limited liability company was an entity created by Babcock & Brown, an Australian company that went out of business in 2009. Westboro SPE's purchase loan on the property from U.S. Bank was satisfied around the time of the theater closing. The bank has said it does not have contact information for the landlord.

James Malloy, the former town manager who left in October to become town manager in Lexington, said the town will have to hold on to the money from the new owner for three years in case a claim is filed against the town. But he said that would not stop the selling and development of the property.

The new owner did not reply to an email asking about plans for renovations and when the cinema will open.

PLAINTIFF'S
EXHIBIT

## AFFIDAVIT

I, Shirin Everett, Esq., of Boston, and being counsel to the Town of Westborough, Massachusetts, having personal knowledge of the facts herein stated, under oath depose and say that:

1.  My firm, KP Law, P.C., is Town Counsel to the Town of Westborough, Massachusetts (the "Town").

2.  I was contacted on October 31, 2017 by Mr. James Malloy, the then-Town Manager, to discuss the property at 231 Turnpike Road, Westborough, MA and owned of record by Westborough SPE LLC (the "WSPE") by deed recorded with the Worcester South District Registry of Deeds in Book 19369, Page 75 (the "Property").

3.  The Town Manager informed me that the Property was formerly leased to and occupied by Regal Cinemas; that although Regal Cinemas wanted to extend the term of the Lease, Regal was unsuccessful in trying to locate WSPE, and therefore vacated the Property in November, 2017. Since Regal Cinemas paid taxes to the Town, the Town Manager said that taxes were unpaid since November, 2017, and was concerned about the condition of the Property if it fell into disrepair. The Town Manager asked what the Town could do to prevent the empty building on the Property from becoming vandalized and a blight to the neighborhood.

4.  The Town Manager informed me that the Town had made many attempts to locate WSPE. The Chief Assessor reviewed the Secretary of State's records, which showed that WSPE had a principal office c/o Babcock & Brown Administrative Services, Inc. ("Babcock") and that Babcock was WSPE's Manager. The Secretary's records indicated that Dyann Blaine and F. Jan Bluestein, having the same address as Babcock, could sign real estate documents on behalf of the Record Owner. WSPE was registered in Massachusetts as a foreign limited liability company in 1997, filed annual reports until 2006, and withdrew its Massachusetts registration in 2007 "because it is not doing business in the Commonwealth of Massachusetts." Similarly, Babcock was registered to do business in Massachusetts in 1997 and it too filed a Certificate of Withdrawal in 2008, stating that Babcock was no longer transacting business in Massachusetts. The Chief Assessor also learned through an internet search that Babcock Administrative Services may be affiliated to Babcock & Brown LP, an Australian firm, which went through a liquidation in 2009.

5.  The Town, through its Chief Assessor, contacted a representatives of Deloitte Financial Advisory Pvt. Ltd, which acted as a liquidator of Babcock & Brown LP and represented the holding company, who in turn directed the Town to contact Michael Larkin, the CEO

of Babcock & Brown International Pvt. Ltd, who in turn led the Town to Walter Horst, the CFO. These individuals stated that the entities they represented did not have an interest in the Property and they did not know WSPE's successors or assigns.

6. We advised the Town Manager that if real estate taxes were not being paid, the Town could eventually acquire the title to the Property through a Land Court foreclosure process. We advised the Town as to the steps the Town needs to take to demand payment of WSPE, to record an Instrument of Taking after waiting the statutory 14-day period, and filing a petition to foreclose on the Property in Land Court.

7. We advised the Town Manager that it could take 1-2 years to foreclose on its tax title and rights of redemption. The Town Manager, the Chief Assessor, and other Town officials were concerned that the building on the Property could suffer significant and immediate damage in the winter if the building was not heated.

8. The Town considered whether the Town could obtain control of the Property sooner by exercising its eminent domain powers, as an eminent domain taking would vest title to the Town immediately following the recording of an Order of Taking provided that the Order of Taking identified parties who have an interest in the Property and the Order is recorded in the chain of title to the Property. The Town considered the purposes for which the Property would be taken (possibly for economic revitalization purposes) and the damages to be paid by the Town. In July, 2018, the Town retained an appraiser to value the Property. In its report of September 8, 2018, the Town's appraiser stated that the Property was valued at $4,790,000 as of August 3, 2018.

9. The Town decided it would proceed on parallel tracks, one to acquire the Property through a tax taking and also to seek authorization to obtain the Property by eminent domain.

10. A vote taken under Article 18 of the March 6, 2018 Annual Town Meeting, , authorized the Board of Selectmen to acquire the Property by eminent domain for economic revitalization and general municipal purposes, and appropriated the sum of $6,000,000 to pay damages for the Property and to pay for costs incidental or related thereto. It was the Town's intent that, should it take the Property by eminent domain rather than through the tax-foreclosure process, it would pay damages to WSPE or to any other entity or person that established that it owned the Property.

11. On October 10, 2018, the Town Treasurer/Collector sent a letter to WSPE, c/o Babcock, as to the amount of outstanding taxes and informed WSPE that if taxes were not paid by October 26, 2018, the Town will place a lien on the Property.

12. On January 16, 2019, the Town recorded an Instrument of Taking in Book 59943, Page 371, and the Town Treasurer/Collector promptly sent a demand letter to WSPE, c/o

Babcock, stating that the Town has recorded an instrument of taking, and directed WSPE to turn on the heat, pay outstanding sums to the utility company, and to take other steps to protect the Property from further deterioration.

13. Due to concerns about the condition of the Property, the Town acquired a temporary easement by Order of Taking recorded with the Registry on November 21, 2018 for the purpose of entering the building, turning on the heat, and taking other steps to protect the building from the elements. The Town took another temporary easement on the Property by Order of Taking recorded on January 14, 2019 to enter the property for the purpose of conducting surveys and other property inspections. Both Orders identified the parties having an interest in the Property as WSPE, Babcock, F. Jan Bluestein, and Dyanne Blaine. The Town sent a Notice of Taking dated March 18, 2019 addressed to WSPE and F. Jan Bluestein c/o Babcock at the San Francisco address, and to Dyann Blaine in Orinda, California. The Town did not receive any response.

14. By letter dated March 18, 2019, I informed WSPE of the temporary easements acquired by the Town and expressed the Town's interest in acquiring the Property. The letter, addressed to WSPE c/o Babcock, requested a response by April 3, 2019. No response was received.

15. The Town received a letter dated April 4, 2019 from Mr. Joseph Scarcella, of Johnson Winter & Slattery, a firm located in Sydney, Australia, stating that the firm represented David Howe, the liquidator of Babcock & Brown Limited (In Liquidation), the successor in title to Babcock, and asked if the Town owed the Property. By letter dated April 11, 2019, I informed Mr. Scarcella that the Town does not own the Property but, rather, has a lien on the Property for outstanding taxes. By follow-up letter dated May 6, 2019, I informed Mr. Scarcella of the amount of taxes owed, the Town's lien on the Property, the taking of the temporary easements, and asked that Babcock & Brown Limited (In Liquidation) inform the Town if it had any rights in the Property. By letter dated June 25, 2019, Mr. Scarcella again asked if the Town had acquired the Property.

16. The Town filed a complaint with the Land Court on July 8, 2019 to foreclose on the tax lien, notice of which was recorded with the Registry on July 24, 2019 in Book 60751, Page 221.

17. The Town recorded another Order of Taking on January 31, 2020, taking temporary easements in the Property for the purpose of turning on the heat and taking other steps to protect the Property from the elements.

18. To date, the Town has not heard from WSPE or received notice from any party claiming to own the Property. The Town has not exercised its eminent domain powers.

Signed under the penalties of perjury this 14th day of May, 2020.

Shirin Everett, Esq.
KP Law, P.C., Town Counsel

COMMONWEALTH OF MASSACHUSETTS

Suffolk , ss.

On this 14th day of May, 2020, before me, the undersigned notary public, personally appeared Shirin Everett, who proved to me through satisfactory evidence of identification, which was _personal knowledge_____, to be the person whose name is listed above, and acknowledged to me that she signed the foregoing instrument voluntarily for its stated purpose as Town Counsel for the Town of Westborough

Notary Public
My Commission Expires:

713726/WBOR/0027

## COMMONWEALTH OF MASSACHUSETTS
## TRIAL COURT
## LAND COURT DEPARTMENT

**TAX LIEN CASE NO: 19 TL 000768**

**TOWN OF WESTBOROUGH**
      **Plaintiff**

    **v.**

**WESTBOROUGH SPE, LLC, et al.**
      **Defendant**

)
)
)
)
)
)

**PLAINTIFF'S EXHIBIT**
tabbies
D

## WAIVER OF NOTICE AND ASSENT TO THE ENTRY OF JUDGMENT

I, _____ Peter Blaustein _____, as
Party of Interest by and/or through a Power of Attorney, as Court-Appointed Guardian, and as Conservator
for F. Jan Blaustein a/k/a Jan Blaustein Scholes, in the above-referenced tax lien case, hereby waives her
right to notice and assents to the previous entry of judgment with regards to the parcel listed below:

DESCRIPTION OF PROPERTY:

PROPERTY: Land and any building(s) thereon      CONTAINING: 29.336 AC (more or less)
LOCATION: 231 Turnpike Road
ASSESSORS: 32-48-0
REGISTRY: Worcester District Registry of Deeds Book 19369, Page 75

WHEREFORE, I respectfully move this Honorable Court to enter an order allowing this waiver of
notice and assent to the entry of judgment in favor of the Plaintiff.

Dated: _May 3, 2023_

Respectfully submitted by

_Peter Blaustein_
Printed Name           Title

_____
Signature

State of California, County of San Mateo }ss.
On _May 3rd_, 2023 before me Dina N. Kolesnikov,
Notary Public, personally appeared _Peter Blaustein_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacities), and that
by his/her/their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument. I certify under
PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct. WITNESS my hand and official seal.
Notary Signature _____

DINA N. KOLESNIKOV
COMM. #2386495
Notary Public - California
San Mateo County
My Comm. Expires Dec. 12, 2025

# UNITED STATES DISTRICT COURT
for the
## DISTRICT OF MASSACHUSETTS

WESTBOROUGH SPE LLC

*Plaintiff*

v.

Civil Action No.:
**1:23‑CV‑12017‑MJJ**

TOWN OF WESTBOROUGH, ET AL.

*Defendant*

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

    A lawsuit has been filed against you.

    Within 21 days after service of this summons on you (not counting the day you received it) ‑‑‑ or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) ‑‑‑ you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

    If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**ROBERT M. FARRELL**

*CLERK OF COURT*

 **/s/ ‑ Savannah Cook**

*Signature of Clerk or Deputy Clerk*

**ISSUED ON 2023‑08‑31 14:16:19**, Clerk USDC DMA

Civil Action No.: **1:23–CV–12017–MJJ**

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for (name of individual and title, if any) _____

was received by me on (date)_____.

☐ I personally served the summons on the individual at (place)_____

_____on (date)_____ ; or

☐ I left the summons at the individual's residence or usual place of abode with (name)_____

_____, a person of suitable age and discretion who resides there,

on (date) _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on (name of individual)_____ , who is

designated by law to accept service of process on behalf of (name of organization)_____

_____ on (date) _____; or

☐ I returned the summons unexecuted because_____ ; or

☐ Other (specify) :

My fees are $ _____ for travel and $_____ for services, for a total of $_____.

I declare under penalty of perjury that this information is true.

_____          _____
         Date                                        *Server's Signature*

                                          _____
                                                    *Printed name and title*

                                          _____
                                                      *Server's Address*

Additional information regarding attempted service, etc:

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Westborough SPE LLC, a Delaware limited liability company.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Scott A. Schlager, BBO#695421
Nathanson & Goldberg, P.C.,183 State Street, 5th Floor
Boston, MA 02109 | (617) 909-4511

## DEFENDANTS

TOWN OF WESTBOROUGH, a municipal corporation of The Commonwealth of Massachusetts.

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| | | | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [x] 890 Other Statutory Actions |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1331; 42 U.S. Code §§ 1983 and 1988; 42 U.S.C. §§ 1985(2) and 1986; 8 U.S.C. § 1343(a)(2); 28 U.S.C. § 2201(a); 28 U.S.C. § 2202

Brief description of cause:
Plaintiff seeks to vindicate its constitutional and common law rights and redress unlawful actions that have deprived Plaintiff of 100% of real property

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$5,000,000.00+

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
Aug 31, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/ Scott A. Schlager

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 398 (Rev. 12/93)

## NOTICE OF LAWSUIT AND REQUEST FOR
## WAIVER OF SERVICE OF SUMMONS

TO: (A) _____

as    (B) _____ of (C) _____

     A lawsuit has been commenced against you (or the entity on whose behalf you are addressed). A copy of the complaint is attached to this notice. It has been filed in the United States District Court for the (D) _____ District of _____ and has been assigned docket number (E) _____ .

     This is not a formal summons or notification from the court, but rather my request that you sign and return the enclosed waiver of service in order to save the cost of serving you with a judicial summons and an additional copy of the complaint. The cost of service will be avoided if I receive a signed copy of the waiver within (F) _____ days after the date designated below as the date on which this Notice and Request is sent. I enclose a stamped and addressed envelope (or other means of cost-free return) for your use. An extra copy of the waiver is also attached for your records.

     If you comply with this request and return the signed waiver, it will be filed with the court and no summons will be served on you. The action will then proceed as if you had been served on the date the waiver is filed, except that you will not be obligated to answer the complaint before 60 days from the date designated below as the date on which this notice is sent (or before 90 days from that date if your address is not in any judicial district of the United States).

     If you do not return the signed waiver within the time indicated, I will take appropriate steps to effect formal service in a manner authorized by the Federal Rules of Civil Procedure and will then, to the extent authorized by those Rules, ask the court to require you (or the party on whose behalf you are addressed) to pay the full costs of such service. In that connection, please read the statement concerning the duty of parties to waive the service of the summons, which is set forth at the foot of the waiver form.

     I affirm that this request is being sent to you on behalf of the plaintiff, this _____ day of _____ , _____ .

*Scott A. Sawyer*
_____
Signature of Plaintiff's Attorney
or Unrepresented Plaintiff

A—Name of individual defendant (or name of officer or agent of corporate defendant)
B—Title, or other relationship of individual to corporate defendant
C—Name of corporate defendant, if any
D—District
E—Docket number of action
F—Addressee must be given at least 30 days (60 days if located in foreign country) in which to return waiver

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| Westborough SPE LLC | ) |
| *Plaintiff* | ) |
| v. | ) Case No.   1:23-12017 |
| Town of Westborough | ) |
| *Defendant* | ) |

## APPEARANCE OF COUNSEL

To:     The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Westborough SPE LLC                                                                                          .

Date:      08/31/2023

/s/ Scott A. Schlager
*Attorney's signature*

Scott A. Schlager, BBO#695421
*Printed name and bar number*

Nathanson & Goldberg, P.C.
183 State Street, 5th Floor
Boston, Massachusetts 02109

*Address*

sas@natgolaw.com
*E-mail address*

(617) 909-4511
*Telephone number*

(617) 210-4824
*FAX number*

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

**WESTBOROUGH SPE LLC**, a Delaware limited liability company,   :

                                  :

                         *Plaintiff.*     :

                        v.        :

**TOWN OF WESTBOROUGH**, *a municipal corporation of The Commonwealth of Massachusetts*; **SHELBY MARSHALL**, *individually and in the official capacity as Select Board Member*; **IAN JOHNSON**, *individually and in the official capacity as Select Board Member*; **ALLEN EDINBERG**, *individually and in the official capacity as Select Board Member*; **SEAN KEOGH**, *individually and in the official capacity as Select Board Chair*; **PATRICK WELCH**, *individually and in the official capacity as Select Board Vice-Chair*; **PETER BLAUSTEIN**, *individually,*

                    Defendants.    :

Civil Action #:

_____

**JURY TRIAL DEMANDED**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

## NOTICE OF STATUTORY ATTORNEY LIEN BY NATHANSON & GOLDBERG, P.C.

Pursuant to M.G.L. Chapter 221, § 50, notice is hereby given that counsel for Westborough SPE LLC seeks to recover legal fees and costs in connection with the representation of the Plaintiff in the above-captioned lawsuit in the United States District Court.

This lien applies to any amount payable to the Plaintiff, or to its successors-at-law, out of the total recovery or recoveries collected or to be collected, whether by judgment, settlement, or

compromise, from the liable person/people or his/her/their insurer under the above-captioned matter.

"The attorney's lien statute, M.G. L. c. 221, § 50, provides 'attorneys [with] a statutory right to assert a charging lien securing compensation for their legal services.'" *Northeastern Avionics, Inc. v. Westfield*, 63 Mass. App. Ct. 509, 512 (2005), *quoting Boswell v. Zephyr Lines, Inc.*, 414 Mass. 241, 244 (1993). As "a tool for recovery of legal fees," *Boswell*, supra at 248, the statute is designed to protect "a lawyer's labor in the client's cause." *Cohen v. Lindsey*, 38 Mass. App. Ct. 1, 5 (1995).

At the conclusion of this case or upon request of this Court, Nathanson & Goldberg, P.C. will submit a sworn affidavit of the amounts owed along with copies of the invoices. As of August 31, 2023, $37,601.50 has been incurred to date in legal fees plus $402.00 in filing fees.

Signed under the pains and penalties of perjury this 31st day of August, 2023.

NATHANSON & GOLDBERG, P.C.

*/s/ Scott A. Schlager*
_____
Scott A. Schlager, BBO#695421
NATHANSON & GOLDBERG, P.C.
183 State Street, 5th Floor
Boston, MA 02109
Tel:    617-909-4511
Fax:    617-210-4824
sas@natgolaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS (WORCESTER)

Case # 4:23-cv-12017-MRG

_____
                                    )
WESTBOROUGH SPE LLC,                )
                                    )
                    Plaintiff,      )
v.                                  )
                                    )
TOWN OF WESTBOROUGH                 )
et als.                             )
                                    )
                    Defendant.      )
_____)

## SUGGESTION OF BANKRUPTCY

An Involuntary Petition under Chapter 7 of the United States Bankruptcy Code has been

filed with the United States Bankruptcy Court for the District of Massachusetts as of 10:32 AM

Eastern Time on Thursday, August 31, 2023 that has been assigned case number 23-40709 and

suggests that this action has been stayed by the operation of Title 11 U.S.C. § 362.

The undersigned certifies that a copy hereof has been furnished to counsel of record via the

electronic filing system on August 31, 2023.

**I declare under penalty of perjury that the foregoing is true and correct**.

DEFENDANT WESTBOROUGH SPE LLC,

By its attorneys,

*/s/ Scott A. Schlager*

_____
Scott A. Schlager, BBO#695421
NATHANSON & GOLDBERG, P.C.
183 State Street, 5th Floor
Boston, Massachusetts 02109
Tel:    617-909-4511 | Fax:   617-210-4824 | sas@natgolaw.com

## CERTIFICATE OF SERVICE

I, Scott A. Schlager, Esq. hereby certify that a copy of the above Suggestion of Bankruptcy was served electronically to all parties of record via the ECF filing system on Thursday, August 31, 2023.

**/s/ Scott A. Schlager, BBO#695421**

## CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com

_____
Lolonyon Y Akouete

285

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:                                    )        Chapter 7
                                          )        Case No. 23-40709-CJP
WESTBOROUGH SPE LLC,                      )
                                          )
        Debtor                            )
                                          )

## **ORDER**

Before the Court is the construed motion to compel abandonment of certain claims [ECF

No. 881] (the "Motion")[1] of Lolonyon Akouete and the opposition [ECF No. 909] of the chapter

7 trustee of the estate of Westborough SPE LLC (the "Debtor"), Jonathan R. Goldsmith (the

"Trustee"). "On request of a party in interest and after notice and a hearing, the court *may* order

the trustee to abandon any property of the estate that is burdensome to the estate or that is of

inconsequential value and benefit to the estate." 11 U.S.C. § 554(b) (emphasis added). That

provision does not mandate abandonment where a trustee has determined not to pursue alleged

claims for the benefit of the estate. The Court has considered all relevant filings, the entire

record in this case, and the arguments made at a hearing on the Motion held October 8, 2025, and

the Motion is DENIED for the reasons below and as stated in the Trustee's opposition.

Mr. Akouete asserts that certain claims (the "Claims") should be pursued by the Trustee

or abandoned to the Debtor, which is a limited liability company with no ongoing operations.

---

[1] *See* Order [ECF No. 890] construing Mr. Akouete's "Opposition to Trustee's Status Report
Regarding Assessment of Certain Alleged Estate Claims Against Third Parties (Dkt. 879);
Request For Expedited Determination and Limitation Of Notice (MLBR 9013-1(F)(1)(B), (F)(2);
Fed. R. Bankr. P. 9006(C)(1))" filed at ECF No. 881 as a motion to compel under 11 U.S.C. §
554(b) and Fed. R. Bankr. P. 6007(b).

1

286

*See* ECF Nos. 879 and 881 (describing the Claims). He also asserts that he is the manager of the Debtor and will take actions to cause the Debtor to pursue the Claims if abandoned. It appears that statutes of limitations with respect to the Claims may expire shortly. Mr. Akouete does not have a direct interest in the Claims. When pressed at the Hearing to identify his pecuniary interest in any recovery from the Claims and standing to seek to compel abandonment, Mr. Akouete stated that he is the manager of the Debtor and would be entitled to a fee or other compensation (as he may determine in his capacity as manager) that could be paid from a recovery from these Claims. He also asserts that he could have claims against the Debtor outside of the bankruptcy for prepetition services that he provided even if his identical claims asserted in the bankruptcy case were to be disallowed upon resolution of the Trustee's objection to his proof of claim filed in this case, which objection is the subject of cross-motions for summary judgment. He contends that he has a "fiduciary duty," presumably for the benefit of the Debtor and the single member of the Debtor, Mignonette Investments Limited ("Mignonette"). Mignonette has not yet appeared in this case. Mr. Akouete, in his individual capacity, has filed a suit against Mignonette and its principal asserting claims for, among other things, intentional interference with prospective economic advantage, civil conspiracy, and unfair and deceptive business practices. *See* AP No. 25-04027 ECF Nos. 1-2. Apparently, he has not been able to effect service on Mignonette, which appears to have been organized in the British Virgin Islands.

It is undisputed that Mr. Akouete was a stranger to the Debtor and its sole member before becoming aware that the Debtor was listed as being the owner of unclaimed funds being held by the State of California. He and a business partner sought to notify the Debtor of the unclaimed funds and act as agent for the Debtor. He claims to have been appointed manager of the Debtor

2

by a retired officer of a management company after he and his partner located that person in an elder care facility in Arizona. That person had been the subject of a guardianship action in Hawaii, and her son had been appointed guardian. After obtaining her signature on a document purporting to transfer all assets of the Debtor to himself and his partner, Mr. Akouete and his partner obtained her signature on a document appointing them managers of the Debtor. Cross-motions for summary judgment with respect to the Trustee's objection to the proof of claim filed by Mr. Akouete have been filed in this bankruptcy case. The issue of whether Mr. Akouete was ever appointed and had authority to act as a manager of the Debtor is central to that claim objection and has not yet been determined.

With respect to the alleged Claims against the California State Controller's Office (the "Controller's Office") and other parties relating to the Debtor's claim to receive unclaimed funds and Mr. Akouete's assertion that the Controller's Officer unlawfully withheld such unclaimed funds, for the reasons stated by the Trustee, the Court finds that the Trustee's assessment of the alleged Claims that there are no viable Claims against the Controller's Office is reasonable and within his business judgment. The Controller's Office turned over the Debtor's unclaimed funds to the Trustee and, based on information in the record, reasonably raised issues regarding authority in relation to conflicting prepetition claims and representations.

Regarding Claims identified by Mr. Akouete against Babcock and Brown entities and certain individuals arising from the asserted resignation of a Babcock and Brown entity as manager of the Debtor in or before 2011, the Trustee has investigated the Claims and determined that as of the petition date the Debtor possesses no Claims against the parties identified by Mr. Akouete. The Trustee has stated that he reviewed materials and discovery to determine that the estate has no viable Claims. I infer that he also considered the statute of limitations in relation

3

288

to the date of the purported resignation and the means by which notice was provided by those entities. The exercise of the Trustee's business judgment is reasonable under the circumstances of this case. Further, without deciding the issues of his authority as of the petition date, Mr. Akouete could not act as a fiduciary for the Debtor at this time. He is engaged in litigation against the sole member of the Debtor. Further, his actions in seeking to pursue the Claims of the Debtor are for his personal benefit as a purported creditor of the Debtor – not for the benefit of the Debtor or its member. He has stated on the record that he could assert larger claims if either the Trustee or the Debtor were to recover amounts on account of the Claims that he has identified. He has also made clear that he believes that he could assert claims, individually, against the Debtor outside the bankruptcy for claims being litigated in the bankruptcy case.

If the Trustee were to abandon the Claims, only the Debtor would have standing to pursue those claims. Mr. Akouete could not act as a fiduciary to cause the Debtor to pursue those Claims, and he may not act as a fiduciary to seek to compel abandonment of the Claims. The Debtor is the proper party in interest to request that the Trustee be compelled to abandon claims under these circumstances. The Debtor may only act through counsel in this and other courts – and no counsel has appeared for the Debtor. Mr. Akouete may not request abandonment on behalf of the Debtor. Even if the Debtor made such request, the Court should consider the viability of and purpose for asserting such Claims in light of the Trustee's assessment. *See In re Sakon*, No. 19-21619 (JJT), 2023 WL 4030079, at *3 (Bankr. D. Conn. June 14, 2023), reconsideration denied, No. 19-21619 (JJT), 2023 WL 4105310 (Bankr. D. Conn. June 20, 2023), appeal dismissed, No. 3:23-CV-250 (AWT), 2025 WL 744265 (D. Conn. Mar. 7, 2025) ("Neither this Court nor the Trustee will or should endorse what appears to be nothing more than a wasteful, frivolous, speculative, and ill-conceived gambit to fuel a

4

proliferation of lawsuits."). Under these circumstances, the Court will not compel the Trustee to abandon claims that he does not believe are viable to a defunct Debtor – with respect to which Mr. Akouete asserts that he may exercise control, when it is undetermined whether he ever had authority as a manager, but who is now clearly acting for his own benefit and not for the Debtor or its member. Further, given that Mr. Akouete could not presently act as a fiduciary for the Debtor and the record shows that Debtor does not presently have counsel that could actually file the Claims were they to be abandoned, even if a request to compel was filed by the Debtor, such a request would be futile at this time given that the Debtor is not in a position to file lawsuits without counsel and an independent manager.

While the Court recognizes that the effect of denying the request to compel results in the estate retaining Claims that the Trustee believes have no direct value to the estate, there are additional considerations to be assessed. To that end, the Court has also considered the effect on administration and costs to the estate in assessing whether the Trustee has exercised appropriate business judgment under the circumstances. The Trustee has alluded to the fact that it will be burdensome to the estate if Mr. Akouete were to be permitted to attempt to assert the Claims in the name of the Debtor if the Claims were compelled to be abandoned because Mr. Akouete could seek to obtain rulings regarding his authority as a manager that could potentially be inconsistent and conflict with this Court's assessment of that same issue and would require estate assets to be expended to address such actions. Based on the record of this case and Mr. Akouete's own statements, the Trustee's assessment is well founded. Supporting the Trustee's assessment, Mr. Akouete stated on the record that he believed that he could seek rulings from a state court on the same issues of authority being determined by this Court. He has already attempted to do that in other litigation. The Trustee would likely incur costs in seeking to enjoin

5

any such attempts to avoid inconsistent rulings and limit interference with the claims process and other administration of the estate. Mr. Akouete is acting to maximize his personal recovery as a possible creditor and, he could not properly act as a manager of the Debtor at this time, and this Court draws the inference that Mr. Akouete has sought to compel abandonment as a litigation strategy to gain some advantage in his pursuit of his remedies as a purported creditor of the Debtor and the claim litigation pending in this Court. This purpose is not in the best interests of the estate.

This ruling is without prejudice to the Debtor appearing through counsel to request that this Court compel abandonment of any specific claim.

Dated: October 9, 2025                                By the Court,

Christopher J. Panos
United States Bankruptcy Judge

6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**EMERGENCY CIVIL RIGHTS COMPLAINT AND MOTION FOR EQUITABLE RELIEF
UNDER 42 U.S.C. § 1981 AND § 1983**

**Filed by Creditor Lolonyon Akouete**

# I. INTRODUCTION

1. Creditor Lolonyon Akouete ("Plaintiff") respectfully submits this Emergency Complaint and Motion within the main bankruptcy case to preserve and enforce his federally protected civil-rights under 42 U.S.C. § 1981 and § 1983.
2. The Complaint challenges the pattern of discriminatory non-engagement and unequal treatment by the Chapter 7 Trustee Jonathan Goldsmith and his counsel Christine Devine in the administration and settlement of creditor claims, including Plaintiff's.
3. Because Plaintiff is indigent and unable at present to pay the separate adversary-proceeding filing fee, he files this emergency pleading in the main case and will, if required, seek leave to proceed *in forma pauperis* and convert this matter to an adversary proceeding once the Court so directs.

# II. JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1334 & § 157(b) as the matter arises in and relates to the administration of the bankruptcy estate.
5. Venue is proper under 28 U.S.C. § 1409(a).

# III. PARTIES

6. Plaintiff Lolonyon Akouete is a creditor and former manager of the debtor Westborough SPE LLC.
7. Defendant Jonathan R. Goldsmith is the duly appointed Chapter 7 Trustee of the Debtor's estate, acting under color of federal law and subject to fiduciary and constitutional obligations.
8. Defendant Christine Devine is counsel to the Trustee and has acted jointly with the Trustee in the conduct described herein.
9. Defendant Stephen Gordon, counsel for petitioning creditors Nathanson & Goldberg P.C. and MobileStreet Trust, acted in concert with the Trustee to direct and influence discriminatory settlement decisions.

# IV. FACTUAL BACKGROUND

10. Plaintiff and creditor Denise Edwards, both Black individuals, have repeatedly sought to resolve their allowed claims through good-faith negotiation and mediation since February 2025.

11. Plaintiff submitted written settlement proposals on February 26, May 22, and May 28, 2025, each offering substantial reductions—down to $1,000,000 for Mr. Akouete and $250,000 for Ms. Edwards.

12. The Trustee and Ms. Devine refused to provide *any* counteroffer, settlement range, or mediation participation, despite acknowledging the estate's fiduciary duty to consider reasonable resolutions.

13. In contrast, during the same period the Trustee negotiated and finalized multi-million-dollar settlements and distributions with non-Black entities, including LAX Media ($2.5 million sale), Ferris Development Group ($2.875 million backup offer + $100k payment), the Town of Westborough ($1.165 million payment), and the petitioning creditors Nathanson & Goldberg and MobileStreet Trust.

14. Internal correspondence between the Trustee, Ms. Devine, and Mr. Gordon shows they collectively described Plaintiff's proposals as "silly," encouraged each other to "stay the course" and "pressure" him rather than negotiate, and accused him of "blackmail" for suggesting the Trustee be replaced—language that reveals bias and retaliatory motive.

15. This differential treatment cannot be explained by case posture or timing; it evidences a deliberate pattern of exclusion from settlement opportunities on racial grounds.

# V. CAUSES OF ACTION

## Count I – Violation of 42 U.S.C. § 1981 (Racial Discrimination in Contracting)

16. Plaintiff, a Black creditor, has the same statutory right "to make and enforce contracts" as white citizens.

17. The Trustee's categorical refusal to negotiate or mediate, while engaging other (non-Black) parties in detailed settlements, denied Plaintiff equal contractual opportunity.

18. The discriminatory treatment was intentional and the *but-for* cause of Plaintiff's exclusion, in violation of *Comcast Corp. v. NAAAOM*, 140 S. Ct. 1009 (2020).

## Count II – Violation of 42 U.S.C. § 1983 (Equal Protection and Due Process)

19. Acting under color of law as a court-appointed fiduciary, the Trustee selectively exercised his discretion to favor non-Black creditors and disfavor Plaintiff.

20. Such selective enforcement and unequal treatment violate the Equal Protection component of the Fifth and Fourteenth Amendments and deprive Plaintiff of due process in the fair administration of claims.

## Count III – Breach of Fiduciary Duty and Bad Faith Administration

21. A Chapter 7 trustee owes all creditors a duty of impartiality and good-faith negotiation. By refusing to engage with Plaintiff while settling with others, the Trustee breached that duty and wasted estate resources through unnecessary litigation.

# VI. EMERGENCY AND IRREPARABLE HARM

293

22. The Trustee's conduct is ongoing; his refusal to negotiate continues to bar Plaintiff from equal access to the estate's contractual processes.

23. Plaintiff faces imminent prejudice because dispositive motions are pending, and a final ruling could extinguish his claim before he has been allowed equal participation.

24. Plaintiff's limited means and the continuing discriminatory exclusion constitute irreparable harm warranting immediate equitable relief.

## VII. RELIEF REQUESTED

Plaintiff respectfully requests that the Court:

1. **Take jurisdiction** of this Emergency Complaint within the main case pending a ruling on *in forma pauperis* status;

2. **Declare** that the Trustee's refusal to engage in settlement or mediation with Plaintiff, while negotiating with non-Black parties, violates 42 U.S.C. § 1981 and § 1983;

3. **Order** the Trustee to participate in good-faith settlement or mediation within 14 days before a neutral agreed upon by the parties;

4. **Enjoin** the Trustee and his counsel from further discriminatory or retaliatory conduct in the administration of claims;

5. **Award** such equitable or monetary relief as the Court deems just, including fees and costs under 42 U.S.C. § 1988; and

6. **Grant** any other relief necessary to secure Plaintiff's equal rights under federal law.

## VIII. REQUEST TO PROCEED WITHOUT PREPAYMENT OF FEES

25. Plaintiff is indigent, has an overdrawn account balance of –$25.24, and lacks sufficient funds to pay any additional filing fees. His stepmother, who is battling cancer, has asked him to accompany her to a hospital appointment on the 30th of this month, but he currently has no vehicle and is unable to do so due to financial hardship. Plaintiff therefore respectfully requests leave to proceed in forma pauperis under 28 U.S.C. § 1915 if the Court determines that a separate adversary proceeding is required.

DATED: October 20, 2025, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276



Lolonyon Akouete <info@smartinvestorsllc.com>
<span style="color:red">Exhibit A</span>

## Westborough SPE LLC - Settlement Discussions
13 messages

**Christine Devine** <christine@nicholsondevine.com>                    Tue, May 20, 2025 at 4:52 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>, Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>
Cc: Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

SETTLEMENT DISCUSSIONS – PRIVILEGED AND CONFIDENTIAL – INADMISSIBLE - SUBJECT TO RULE 408

Dear Mr. Akouete and Ms. Edwards – In response to Mr. Akouete's emails below, if you would like to make a joint proposal to the Trustee to fully resolve both your claims against the estate, the Trustee would consider such a proposal if structured as follows: (i) propose a final reasonable claim amount for each of you to be approved by the Court upon documenting a full settlement agreement and (ii) each of you to provide a full release of any and all claims against the Estate and all of its assets (i.e., all litigation fully dismissed). If you have a proposal that fits this structure, please make it and the Trustee will consider it and respond.

Thank you. -Christine Devine

**Christine E. Devine, Esq.**
Nicholson Devine LLC
P.O. Box 7
Medway, MA 02053
Direct: (508) 533-7240
Cell: (508) 868-3002
christine@nicholsondevine.com

The information contained in this electronic message is legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. This electronic message and any attachments may also contain information that is protected by federal and state law, including the HIPAA Privacy Rule. If you are not the intended recipient, you are hereby notified that any dissemination, copying or disclosure of this communication is strictly prohibited. If you have received this communication in error, please call (508) 533-7240 to alert us and please delete this communication immediately without copying or distributing it.

Nicholson Devine LLC is a debt relief agency. Part of what we do is help people file for bankruptcy relief under the Bankruptcy Code. We help people in other ways, too. For more information, please contact us.

---

**From:** Lolonyon Akouete <info@smartinvestorsllc.com>
**Sent:** Tuesday, May 20, 2025 10:23 AM
**To:** Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>
**Cc:** Christine Devine <christine@nicholsondevine.com>; Denise Edwards <deniseedwards818@yahoo.com>
**Subject:** Re: Request for Return of IRS Checks

Dear Mr. Goldsmith,

I hope this message finds you well.

I'm following up on my message from May 15 regarding the potential for a settlement of my creditor claim in the Westborough SPE LLC bankruptcy case. I would appreciate it if you could indicate whether the Trustee is open to discussing a possible resolution and, if so, what amount the estate might consider reasonable under the circumstances.

As mentioned previously, I am willing to consider adjustments to my position and explore recovery of any remaining balance through estate-related causes of action, including those concerning fiduciary breaches and the unclaimed property held by the California State Controller. My goal remains to avoid prolonged and costly litigation where a practical resolution may be available.

Thank you in advance for your consideration. I look forward to your response.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

On Thu, May 15, 2025 at 7:32 PM Lolonyon Akouete <info@smartinvestorsllc.com> wrote:

Dear Mr. Goldsmith,

Thank you for your response and clarification on this matter.

I have filed a motion regarding the IRS checks and am currently awaiting the Court's determination. In the meantime, I remain interested in exploring alternative avenues to resolve our broader disputes without further protracted litigation, which has not benefited any party thus far.

Could you kindly indicate an amount the Trustee considers reasonable for settlement purposes regarding my overall claim? I am open to adjusting my position accordingly and recovering any difference through other actions available to the bankruptcy estate—specifically, the claims related to breach of fiduciary duty and against the California State Controller. I believe these claims have sufficient potential to offset any shortfall.

I appreciate your consideration and look forward to your response.

Warm regards,

Lolonyon Akouete
800 Red Mills Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                    Tue, May 20, 2025 at 7:28 PM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

Thank you for your response regarding the possibility of a joint settlement. I appreciate the Trustee's willingness to consider a global resolution and understand the proposed framework.

Before submitting a joint proposal, I would appreciate some clarification on the following:

1. Could you kindly indicate what range of "reasonable claim amounts" the Trustee may find acceptable for Ms.

296

Edwards and myself, given the current estate posture?

2. Would the Trustee be open to structuring the settlement in a manner that includes participation in or proceeds from estate-related causes of action, such as the unclaimed funds held by the California State Controller?

3. Is there any flexibility regarding the scope of the release? For example, would a release limited to claims against the estate (as opposed to third parties) be considered?

Our intent is to resolve these matters efficiently while preserving fairness to all parties involved. I look forward to your guidance on these points so that we may advance discussions in good faith.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

[Quoted text hidden]

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                          Tue, May 20, 2025 at 7:46 PM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

In light of the complexity of the issues involved and the value of reaching a mutually agreeable resolution, I would respectfully recommend that we consider mediation as the next step. Mediation has proven to be an effective tool in bankruptcy disputes of this nature, allowing all parties to engage in structured negotiations with the assistance of a neutral facilitator. Given the procedural history and the overlapping factual and legal issues, I believe mediation could help clarify expectations, streamline negotiations, and ultimately lead to a resolution that is fair to all parties—including the estate and its creditors.

If the Trustee is amenable to this suggestion, I would be happy to work with you and Ms. Edwards to identify a mutually agreeable mediator and scheduling process. I believe this approach would save time, reduce costs, and promote a durable outcome.

Please let me know the Trustee's position on this recommendation.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

[Quoted text hidden]

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                          Wed, May 21, 2025 at 6:35 PM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

I hope this message finds you well.

I am writing to follow up on my previous emails dated May 20, 2025, regarding the proposed framework for a joint settlement and my recommendation that the parties consider mediation as a productive next step.

As I have not yet received a response, I wanted to respectfully inquire whether the Trustee has had an opportunity to review the additional questions I raised and to consider the mediation proposal. We remain eager to resolve this matter efficiently and in good faith and are awaiting the Trustee's guidance to determine how best to proceed.

Please let me know when we might expect a response. I am happy to provide any additional information that may assist in advancing discussions.

Thank you again for your time and consideration.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

[Quoted text hidden]

---

**Christine Devine** <christine@nicholsondevine.com>                          Wed, May 21, 2025 at 6:52 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Mr. Akouete - My email below was straightforward and clear.  Feel free to submit a proposal consistent with that email if you choose.

**Christine E. Devine, Esq.**

Direct: (508) 533-7240

Cell: (508) 868-3002

[Quoted text hidden]

---

**Christine Devine** <christine@nicholsondevine.com>                          Wed, May 21, 2025 at 6:52 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Mr. Akouete - The Trustee does not wish to engage in mediation regarding your disputed claim.

**Christine E. Devine, Esq.**

Direct: (508) 533-7240

Cell: (508) 868-3002

---

**From:** Lolonyon Akouete <info@smartinvestorsllc.com>
**Sent:** Tuesday, May 20, 2025 7:46 PM
**To:** Christine Devine <christine@nicholsondevine.com>
**Cc:** Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>; Denise Edwards <deniseedwards818@yahoo.com>;

Angelina Savoia <Angelina@nicholsondevine.com>
**Subject:** Re: Westborough SPE LLC - Settlement Discussions

Dear Ms. Devine,

[Quoted text hidden]
[Quoted text hidden]

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                Wed, May 21, 2025 at 7:24 PM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

Thank you for your recent responses. I must again express concern that the Trustee's approach to these discussions continues to reflect a pattern of bad faith and non-reciprocity.

As you are aware, this is not the first time I have attempted to resolve my claim amicably. On February 26, 2025, I submitted a detailed written proposal adjusting my claim to reflect 15.82% of the then-estimated estate value—mirroring the logic of the Trustee's prior informal suggestion of $600,000 based on a lower estate valuation. I also included a parallel settlement amount on behalf of Ms. Edwards. That proposal was summarily rejected on February 28, 2025, without any counteroffer or substantive engagement.

I followed up again on March 11, 2025, specifically requesting a counteroffer to continue discussions. No response was provided.

Now, months later, the Trustee again insists that I "submit a proposal consistent with" a vague framework, yet still refuses to offer any negotiating range, starting figure, or revised proposal. To date, I have extended more than one offer, received none in return, and have been repeatedly met with silence or dismissal.

This is not how good faith negotiations work. The Trustee's refusal to counter my offers while simultaneously rejecting mediation only reinforces that these are not sincere efforts to resolve the dispute, but rather a tactical delay and stonewalling. If the Trustee believes my claim is too high, it is incumbent upon him to respond with a lower figure—particularly given the estate's ongoing expenses and the Trustee's duty to maximize value for all stakeholders.

Given this history and the stalemate we are in, I continue to believe that mediation is the most efficient and responsible next step. It offers a forum where these matters can be addressed with transparency, guided by a neutral third party.

If the Trustee is unwilling to mediate and also unwilling to negotiate in a meaningful or reciprocal manner, I will have no choice but to seek relief from the Court. The record is clear: I have made every effort to engage constructively. The continued refusal to respond substantively or to participate in mediation only prejudices the estate and delays resolution.

Please confirm whether the Trustee will reconsider his position on mediation or is open to providing a concrete counteroffer.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276
[Quoted text hidden]

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                Thu, May 22, 2025 at 3:19 PM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

I am writing to follow up once more on the ongoing settlement discussions regarding my claim and that of Ms. Edwards.

To reiterate, Ms. Edwards has indicated her willingness to settle her claim for $250,000, and I am prepared to resolve my own claim for $1,000,000—an amount that represents a significant reduction from my original asserted claim of $3.1 million. These offers are made in good faith, with the intention of bringing this matter to a close without further delay or unnecessary litigation.

Given that the Trustee has repeatedly asserted that our proposals are "unreasonable," I respectfully request that he now meet his obligation to negotiate in good faith by stating a settlement figure he believes is reasonable. The continued refusal to provide any range or counteroffer—despite our express willingness to compromise—undermines the very framework the Trustee proposed for resolution and raises serious concerns about the sincerity of his engagement.

As I have noted previously, this pattern of one-sided negotiation and rejection without alternative is not consistent with the Trustee's fiduciary duty to pursue reasonable settlement opportunities or to avoid wasteful litigation expenses. It is not only inefficient but prejudicial to the estate and the parties involved.

If the Trustee continues to decline to mediate and refuses to state any acceptable settlement parameters, I will have no alternative but to raise the issue with the Court. I remain committed to resolving this matter constructively but cannot do so unilaterally.

Please let me know whether the Trustee is willing to provide a good faith counterproposal or state the specific parameters within which he would consider settlement.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

[Quoted text hidden]

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                                    Wed, May 28, 2025 at 6:44 AM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

I am writing once again to follow up on my prior emails regarding a potential joint resolution of my claim and that of Ms. Edwards.

As you are aware, I have made multiple good faith efforts over the past several months to advance these discussions, including formal settlement proposals on February 26 and May 22, 2025, both of which reflected substantial reductions from the original amounts asserted. Ms. Edwards has also indicated her willingness to settle for a significantly reduced sum of $250,000.

To date, neither proposal has received a counteroffer, nor has the Trustee articulated any concrete parameters that might guide further discussion. This lack of reciprocal engagement is troubling—especially in light of the Trustee's fiduciary obligation to pursue reasonable and cost-effective resolutions for the benefit of the estate.

If the Trustee believes our proposals are unreasonable, the proper course is to respond with a figure he considers reasonable or to outline a settlement framework within which agreement might be reached. Continued silence, coupled with a categorical refusal to consider mediation, serves only to delay resolution and increase the estate's administrative burden.

At this juncture, I respectfully request the Trustee to either:

1. Provide a good faith counterproposal; or

2. State clearly the range or structure within which he would be willing to entertain settlement.

Absent such engagement, I will be compelled to bring this matter before the Court to ensure that the record reflects my repeated attempts to resolve this dispute through reasonable, cooperative means.

I remain open to constructive dialogue and sincerely hope the Trustee will reconsider his approach in the interest of all stakeholders.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com
(443) 447-3276

[Quoted text hidden]

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                    Thu, Oct 16, 2025 at 5:32 AM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

I write once again to memorialize the sequence of communications between myself, Ms. Edwards, and your office regarding settlement of our claims, and to express my growing concern that the Trustee's refusal to engage in reciprocal or good-faith negotiation violates my rights under 42 U.S.C. § 1981.

## 1. Chronology of Attempts at Resolution

- **February 26, 2025:** I submitted a detailed written proposal reducing my claim to 15.82 % of the estimated estate value, consistent with the Trustee's own earlier informal valuation. Ms. Edwards submitted a parallel offer.

- **February 28, 2025:** The Trustee summarily rejected that proposal without providing any counteroffer or explanation.

- **March 11, 2025:** I followed up requesting a counteroffer to keep negotiations active. No response was received.

- **May 20, 2025:** I sent two separate emails proposing a *joint* settlement framework and, recognizing the complexity of the case, recommended mediation to promote efficiency and fairness.

- **May 21, 2025 (6:52 PM):** You replied that the Trustee "does not wish to engage in mediation regarding your disputed claim."

- **May 22 – May 28, 2025:** I reiterated specific dollar settlement amounts—$1 million for my claim and $250,000 for Ms. Edwards—both substantial reductions from the amounts filed, and again requested a counterproposal or at least a range of reasonableness. The Trustee has never responded with a single figure, parameter, or constructive proposal.

This chronology shows a continuous, one-sided pattern: every effort to resolve has come from me, and every response from the Trustee has been rejection or silence.

## 2. Pattern of Disparate Treatment and § 1981 Implications

Under § 1981, I am entitled to the same right "to make and enforce contracts" as is enjoyed by white citizens, which includes the right to negotiate and participate in settlement discussions on equal terms. The Trustee's pattern—rejecting all of my proposals without any counteroffer, refusing to mediate, and declining to provide settlement parameters while negotiating or cooperating with non-Black participants in similar circumstances—constitutes a denial of equal contractual opportunity and evidences discriminatory non-engagement rather than a legitimate exercise of

discretion.

## 3. Request for Corrective Action

To remedy this ongoing violation and to avoid further prejudice to the estate and the parties, I respectfully request that the Trustee:

1. Provide, within three (3) days, a good-faith counterproposal or a defined range the Trustee deems reasonable; or

2. Agree to participate in mediation before a neutral selected by mutual consent.

Failure to do either will leave me no alternative but to bring this matter formally before the Court, both to enforce the duty of good-faith negotiation under bankruptcy principles and to seek redress under § 1981 for discriminatory treatment in the settlement process.

I have acted in good faith throughout these discussions and remain willing to resolve this dispute efficiently and fairly. I urge the Trustee to reconsider his position and engage constructively, consistent with his fiduciary duties and the equal-rights guarantees of federal law.

Respectfully,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
info@smartinvestorsllc.com

[Quoted text hidden]

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                                    Sun, Oct 19, 2025 at 11:02 AM
To: Christine Devine <christine@nicholsondevine.com>, Stephen Gordon <sgordon@gordonfirm.com>, "Lenard B. Zide" <zide@buttersbrazilian.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine and Mr. Gordon,

I am following up once again on my prior messages about resolving my claim and Ms. Edwards's claim in *In re Westborough SPE LLC*. I have made every effort over many months to settle in good faith. Despite written offers and repeated follow-ups, I have still received no counterproposal, no discussion of a settlement range, and only categorical refusals to mediate. Because this pattern continues, I must clearly explain why it violates federal law and why I intend to file an adversary proceeding by Monday or Tuesday if there is still no engagement.

Section 1981 of the United States Code is a civil-rights law that guarantees everyone—Black or white—the same right "to make and enforce contracts." That means the right to negotiate, reach, and benefit from agreements on equal terms. It is unlawful to refuse to deal, ignore, or block a person from ordinary business or settlement discussions because of race. Courts apply three main questions:
(1) Is the person protected under the statute (for example, Black)?
(2) Did the other side intentionally treat them differently in a contractual setting?
(3) Was race the real reason, or "but-for" cause, of that different treatment?

I meet each part of that standard. I am Black, and so is Ms. Edwards. We both offered concrete settlements—$1,000,000 for me and $250,000 for her—along with a proposal to mediate. None of those efforts received even a single counteroffer or range, while the Trustee and the petitioning creditors actively negotiated and approved detailed settlements with several non-Black participants. The difference cannot be explained by process or timing; it shows intentional unequal treatment.

To be clear about that disparity: the Trustee negotiated a $2,500,000.01 sale to LAX Media, granted Ferris Development Group a $2,875,000 back-up purchase right plus a $100,000 payment if LAX closes, directed $1,165,000 to the Town of Westborough, and included Nathanson & Goldberg and MobileStreet Trust in the settlement proceeds. Every one of those parties engaged in reciprocal negotiations and obtained clear financial benefits. In contrast, my reduced offers and repeated attempts to open dialogue were ignored entirely. That is precisely the kind of unequal treatment that § 1981 forbids.

The record confirms this pattern is deliberate. Emails between the Trustee, Ms. Devine, and the petitioning creditors'
counsel, Mr. Stephen Gordon, show that the petitioning creditors have been directing and influencing the Trustee's
litigation and settlement posture toward me. In those communications, Mr. Gordon repeatedly advised the Trustee to
"stay the course" rather than negotiate or mediate, stated that I "need to be pressured," and mocked my settlement
efforts as "silly." When I pressed for good-faith negotiation, the Trustee himself responded by accusing me of
"blackmail" simply because I suggested he should be replaced if he continued to refuse discussion—language that
would never be used against similarly situated non-Black parties. Mr. Gordon further dismissed my proposals by
writing that I "couldn't be relied upon to act in [my] own best interest" and that I had "highly suspect manager bona
fides. He later derided my diligence, writing that "the Judge does not have the same sense of urgency that Mr.
Akouete has (about everything)."

These are not objective or professional comments; they reflect a shared, dismissive attitude designed to discredit me
personally and to justify a coordinated refusal to negotiate in good faith. This correspondence proves that the
petitioning creditors' counsel actively steered the Trustee's decision-making and that the refusal to engage was not a
neutral business judgment, but a pre-decided, biased response. Under federal law, when private parties like Mr.
Gordon and the petitioning creditors influence or cause racial discrimination in a contractual process, they are
personally liable under 42 U.S.C. § 1981 to the same extent as the official who implements their strategy.

Because this right is protected by federal law, I am asking one last time for immediate corrective action. Please
respond as soon as possible, with either (1) a good-faith counterproposal or settlement range, or (2) confirmation that
you will participate in mediation with a neutral agreed to by the parties. If I do not receive that response, I will proceed
to file the adversary complaint to protect my rights.

I remain ready to resolve this matter cooperatively today if I am given the same negotiation rights and respect already
extended to others.

Sincerely,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
(443) 447-3276
info@smartinvestorsllc.com

[Quoted text hidden]

---

**Christine Devine** <christine@nicholsondevine.com>                     Mon, Oct 20, 2025 at 5:11 PM
To: Lolonyon Akouete <info@smartinvestorsllc.com>, Stephen Gordon <sgordon@gordonfirm.com>, "Lenard B. Zide"
<zide@buttersbrazilian.com>
Cc: Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina
Savoia <Angelina@nicholsondevine.com>

Mr. Akouete –

The Trustee fully and completely denies your spurious and unsupported allegations below. You have
made similar allegations in the past and the Court has considered and rejected those allegations. On a
prior occasion when you alleged "racial discrimination and systemic bias" in one of your pleadings, the
Court entered an order (see attached) which included the following: "The Court has considered these
serious allegations recently raised by Mr. Akouete, but has not observed any actions by the Trustee or
any other party in the conduct of the litigation of the Contested Matters or administration of the estate
that seem out of range of what would be expected in any litigation involving a large, unique contested
claim."

Your claim is pending and the Trustee has objected based on valid and well documented grounds. The
Bankruptcy Court will resolve the claim dispute in the ordinary course.  Having completed discovery and
fully briefed the issues for summary judgment, the Trustee believes that settlement discussions are not in
the best interest of the estate and that, instead, it is in the best interest of the estate to await the decision

303

of the Bankruptcy Court.


Thank you,

[Quoted text hidden]

---

 **578 - Order - Denial of LA summary judgment.pdf**
362K

---

**Lolonyon Akouete** <info@smartinvestorsllc.com>                    Mon, Oct 20, 2025 at 5:24 PM
To: Christine Devine <christine@nicholsondevine.com>
Cc: Stephen Gordon <sgordon@gordonfirm.com>, "Lenard B. Zide" <zide@buttersbrazilian.com>, Jonathan Goldsmith <jgoldsmith@gkalawfirm.com>, Denise Edwards <deniseedwards818@yahoo.com>, Angelina Savoia <Angelina@nicholsondevine.com>

Dear Ms. Devine,

Thank you for your response. I respectfully disagree with your characterization of my allegations and the Court's handling of them.

The order you cite simply states that the Court *"has not observed any actions by the Trustee or other parties … that seem out of range of what would be expected."* That statement did not apply any of the legal standards required under 42 U.S.C. § 1981, nor did it make any factual findings following discovery or an evidentiary hearing. Dismissing a discrimination concern at a procedural stage without applying the "but-for" causation standard established in *Comcast Corp. v. NAAAOM*, 140 S. Ct. 1009 (2020), or examining differential treatment, does not resolve the underlying issue or negate the need to address it.

My concern is not merely about litigation conduct but about unequal access to negotiation and settlement opportunities. I have submitted multiple detailed proposals, all rejected without a single counteroffer or mediation attempt, while non-Black parties engaged in reciprocal negotiations that resulted in concrete benefits. That disparity, combined with documented dismissive and biased remarks in correspondence, falls squarely within § 1981's guarantee of equal rights "to make and enforce contracts."

Furthermore, the assertion that settlement discussions are "not in the best interest of the estate" because summary judgment has been filed is not a valid reason to refuse dialogue. Parties can reach settlement at any time during the litigation process—even after summary judgment motions have been filed or heard. Courts routinely encourage settlement at all stages to conserve resources and achieve equitable resolutions. The pendency of a motion does not suspend a fiduciary's duty to explore good-faith settlement options, especially where prior overtures have been made repeatedly and constructively.

I continue to believe that the appropriate and responsible course is to engage in either (1) a concrete settlement dialogue with defined parameters, or (2) mediation before a neutral agreed upon by the parties. Choosing neither path perpetuates a one-sided process and leaves the appearance of discriminatory non-engagement unresolved.

Please confirm whether the Trustee is willing to revisit his position and participate in good-faith discussions or mediation. If not, I will raise this issue formally so that the Court can apply the proper legal standards rather than treating these concerns as conclusory.

Respectfully,
Lolonyon Akouete
800 Red Milles Rd
Wallkill, NY 12589
(443) 447-3276
info@smartinvestorsllc.com

[Quoted text hidden]



# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:

Westborough SPE LLC

Chapter 7
23-40709-CJP

Debtor

## ORDER

**MATTER:**

#939 Emergency Civil Rights Complaint and Motion for Equitable Relief under 42 U.S.C. § 1981 and § 1983 filed by Creditor Lolonyon Akouete.

STRICKEN. AS RECOGNIZED BY MR. AKOUETE, CERTAIN CLAIMS ASSERTED AND RELIEF REQUESTED IN THE COMPLAINT MAY ONLY BE ASSERTED IN AN ADVERSARY PROCEEDING. FED. R. BANKR. P. 7001. SHOULD MR. AKOUETE DECIDE TO COMMENCE AN ADVERSARY PROCEEDING, HE MAY REQUEST A WAIVER OF ANY ASSOCIATED FILING FEE AS PROVIDED BY APPLICABLE LAW.

Dated: 10/22/2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

305



# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:

Westborough SPE LLC

Debtor

Chapter 7

23-40709-CJP

## ORDER

**MATTER:**

#1022 Emergency Motion to (I) Construe Prior Filings as an Informal Proof of Claim for Severable $5,250 Prepetition Expenditures; or (II) in the Alternative, for Leave To File a Late Proof of Claim under Rule 9006(b)(1); or (III) in the Further Alternative, to Authorize Amendment of Claim No. 4; and Request for Expedited Determination.

DENIED. TO THE EXTENT THAT THE PREPETITION AMOUNTS CLAIMED WERE ASSERTED AS PART OF A PREVIOUSLY FILED PROOF OF CLAIM, THEY ARE SUBJECT TO THE PENDING MOTIONS FOR SUMMARY JUDGMENT. AS TO THE ASSERTION OF A § 503 (b)(1)(A) ADMINISTRATIVE CLAIM, THE REQUEST HAS BEEN SUPERSEDED BY THE "MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM FOR POST-PETITION COSTAR SUBSCRIPTION PURSUANT TO 11 U.S.C. §§ 503(b)(1)(A), 503(b) AND THE COURT'S EQUITABLE POWERS" [ECF NO. 1023].

Dated: 12/11/2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge



## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:

      Westborough SPE LLC

              Debtor

Chapter 7
23-40709-CJP

## ORDER

**MATTER:**

#1024 Emergency Motion filed by Creditor Lolonyon Akouete for Expedited Hearing and Immediate Payment of Administrative Expense Claim for Post Petition Costar Subscription (Re: 1023 Motion for Administrative Expenses).

DENIED. ANY OBJECTIONS TO THE "MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM FOR POST-PETITION COSTAR SUBSCRIPTION PURSUANT TO 11 U.S.C. §§ 503(b)(1)(A), 503(b) AND THE COURT'S EQUITABLE POWERS" [ECF NO. 1023] SHALL BE FILED WITHIN SEVEN (7) DAYS OF THE DATE OF THIS ORDER.

Dated: 12/11/2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No. 23-40709-CJP

Chapter 7

In re:

WESTBOROUGH SPE LLC

TOWN OF WESTBOROUGH'S
OPPOSITION TO LOLONYON
AKOUETE'S MOTION FOR
ALLOWANCE AND PAYMENT OF
COSTAR SUBSCRIPTION COST

The Town of Westborough ("Town"), listed in the Debtor's Matrix List of Creditors (Doc.

No. 7) in the above-captioned action, hereby opposes the Motion for Allowance and Payment of

Administrative Expense Claim for Post-Petition CoStar Subscription (Doc. No. 1023) (the

"Motion") filed by Lolonyon Akouete.  As detailed below, the Motion should be denied because

(1) Mr. Akouete's status as creditor has been contested and is subject to pending adjudication by

the Court in connection with the Chapter 7 Trustee's motion for summary judgment; (2) the

Motion makes erroneous assertions regarding the Town; and (3) Mr. Akouete used the CoStar

subscription at issue to improperly market the property located at 231 Turnpike Road (the

"Property") for sale, which conduct is the subject of the Town's still-pending Motion for Injunction

and Sanctions against Lolonyon Akouete (Doc. No. 370) (the "Motion for Sanctions").

Alternatively, if the Court concludes that Mr. Akouete is entitled to payment of $5,028.30 from

the estate for reimbursement of his CoStar expenses, the Court should order that such funds be

attached to satisfy any award of attorneys' fees that the Court awards the Town in connection with

the Motion for Sanctions.

First, Mr. Akouete's status as a creditor—and thus his entitlement to distribution from the

estate—is disputed.  Specifically, the Trustee has objected to Mr. Akouete's claim in this

bankruptcy proceeding and moved for summary judgment on that claim objection.[1]  The Court should not allow Mr. Akouete to obtain any payment from the estate while his status as creditor is subject to dispute.

Second, Mr. Akouete's Motion contains several incorrect statements about or mischaracterizations of the Town.  These include flawed assertions about the Town's pursuit of its remedies under the tax title statute (see Motion at ¶ 6.b-c), unfounded allegations of "coordinated interference" (see Motion at ¶ 6.e), and mischaracterizations of the earlier settlement agreement between the Town, the Trustee, and other interested parties (see Motion at ¶ 7.a).  The Court should not reward Mr. Akouete for these inaccuracies.

Third, Mr. Akouete used the CoStar subscription at issue to engage in improper attempts to market the Property, even though he has no right, title, or interest in the Property itself.  On October 2, 2024, the Town filed the Motion for Sanctions because Mr. Akouete had listed the Property for sale on "LoopNet," a CoStar commercial property listing service.  See Doc. No. 370; see also Declaration of Roger L. Smerage dated Oct. 2, 2024 (Doc. No. 371) ("Smerage Decl.") at Ex. C.  In addition to seeking an injunction against Mr. Akouete's actions, the Town sought an award of sanctions against Mr. Akouete pursuant to the Court's inherent powers, because of the disruption Mr. Akouete's actions caused to the bankruptcy proceedings and the clear fact that Mr. Akouete had no authority to market the Property for sale.  The Town specifically sought an award of attorneys' fees for having to move to enjoin Mr. Akouete's conduct.  On October 10, 2024, the Court entered an order requiring Mr. Akouete to "take down, remove, and, if necessary, request that CoStar group take down and remove, LoopNet listing ID 33330926 concerning" the Property and to "cease and desist from … taking other actions related to the sale of the Property, other than

---

[1] Certain arguments that the Trustee made in objecting to Mr. Akouete's claim overlap with arguments that the Town made in its Motion for Relief from Automatic Stay (Doc. No. 20) and Motion to Dismiss Bankruptcy (Doc. No. 69).

309

by directing potential interested parties to the Town or the Trustee in strict compliance" with the provisions of the order. See Doc. No. 392. The Court also, in the same order, deferred action on the Town's requests for sanctions. See id.[2]

Although Mr. Akouete contends that he seeks reimbursement for CoStar subscription costs beginning on October 3, 2024—the day after the Town filed the Motion for Sanctions—the connection with the conduct that triggered the Town's Motion for Sanctions is undeniable. Mr. Akouete's offending listing was active between October 3 and October 10, 2024, when the Court ordered him to take the listing down. Additionally, Mr. Akouete asserts that one of the purported "concrete outputs" that resulted from his CoStar subscription was a September 5, 2024 email. See Motion at ¶ 8.a. This email was sent a month before the start of the period for which Mr. Akouete seeks reimbursement and during the time when he was attempting to "secur[e] a new buyer for" the Property despite having no right to sell it. See Smerage Decl. at Ex. B.[3] Mr. Akouete should not be rewarded for his use of a CoStar subscription to interfere with the disposition of the Property in which he held no right, title, or interest. If, however, the Court concludes that Mr. Akouete is entitled to reimbursement from the estate for his CoStar subscription costs, the Court should attach any such amounts while the Town's request for sanctions remains pending, to ensure that Mr. Akouete can pay any attorneys' fee award that the Court may enter in favor of the Town.

For the foregoing reasons, the Court should deny Mr. Akouete's Motion or, alternatively, attach any funds that the Court orders be paid to Mr. Akouete to ensure Mr. Akouete's ability to satisfy an attorneys' fee award in connection with the Motion for Sanctions.

---

[2] On February 5, 2025, the Court entered an order further deferring consideration of the Town's request for sanctions. See Doc. No. 532.

[3] Mr. Akouete also contends that his CoStar subscription contributed to the Trustee's withdrawal of the earlier settlement agreement. See Motion at ¶¶ 5, 8.c. The Trustee moved to withdraw the earlier settlement on November 8, 2024 (Doc. No. 413), several months before the end of the period for which Mr. Akouete seeks reimbursement (February 5, 2025).

3

Respectfully submitted,

TOWN OF WESTBOROUGH,

By its attorneys,

Brian W. Riley (BBO# 555385)
Jeffrey T. Blake (BBO# 655773)
Roger L. Smerage (BBO# 675388)
KP Law, P.C.
 Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110-1109
(617) 556-0007
briley@k-plaw.com
jblake@k-plaw.com
rsmerage@k-plaw.com

Date:  December 18, 2025

1010480/WBOR/0049

## CERTIFICATE OF SERVICE

I, Roger L. Smerage, hereby certify that on the below date, I caused a copy of the foregoing

Opposition to be served through the Court's CM/ECF system to the following counsel of record

or by U.S. mail to the following unregistered parties:

Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
sgordon@gordonfirm.com
*Attorney for Petitioning
Creditors*

Jonathan R. Goldsmith
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor
Springfield, MA 01103
trusteedocs1@gkalawfirm.com
*Attorney for Chapter 7 Trustee*

Christine E. Devine
Nicholson Devine LLC
PO Box 7
Medway, MA 02505
christine@nicholsondevine.com
*Attorney for Chapter 7 Trustee*

Lolonyon Akouete
800 Red Milles Rd.
Wallkill, NY 12589
info@smartinvestorsllc.com
*Creditor*

Lenard Benson Zide
Butters Brazilian LLP
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com
*Attorney for Creditor The
MobileStreet Trust*

Paul W. Carey
Mirick, O'Connell, DeMallie &
Lougee, LLP
100 Front Street
Worcester, MA  01608-1477
pcarey@mirickoconnell.com
*Attorney for Creditor Ferris
Development Group, LLC*

Denise Edwards
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com
*Creditor*

Jonathan La Liberte
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com
*Attorney for Creditor Sherin and
Lodgen LLP*

Darin Clagg
24 Kobbs Korner Rd.
Pine Bush, NY 12566
Creditor (by U.S. Mail)

Dated: December 18, 2025

_____
Roger L. Smerage

5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In re:

**WESTBOROUGH SPE LLC,**

      **Debtor.**

Chapter 7
Case No. 23-40709-CJP

### TRUSTEE'S OBJECTION TO AKOUETE'S MOTION FOR
### ADMINISTRATIVE CLAIM

Jonathan R. Goldsmith (the "Trustee"), Chapter 7 Trustee of the bankruptcy estate of

Westborough SPE LLC (the "Debtor"), hereby respectfully objects to the document entitled

*Motion for Allowance and Payment of Administrative Expense Claim for Post-Petition CoStar*

*Subscription Pursuant to 11 U.S.C. §§ 503(b)(1)(A), 503(b) and the Court's Equitable Powers*

[Dkt. No. 1023] (the "Motion for Admin Claim") filed by Lolonyon Akouete ("Akouete").  The

Trustee objects to the Motion for Admin Claim as set forth herein.

In support of this Objection, the Trustee states as follows:

### BACKGROUND

1.      On August 31, 2023 (the "Petition Date"), certain creditors of the Debtor filed an

involuntary petition under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-

1532 (the "Bankruptcy Code").  On October 11, 2023, this Court entered an order for relief in

this case [Dkt. No. 26] (the "Order for Relief") and this case remains a Chapter 7 case at this

time.  On October 12, 2023, the United States Trustee appointed Jonathan R. Goldsmith as

Chapter 7 trustee [Dkt. No. 29] and the Trustee remains as Trustee at this time.

2.      On December 11, 2025, Akouete filed the Motion for Admin Claim, seeking,

among other things, payment of $5,028.30 as an administrative expense claim for a CoStar

subscription that Akouete states that he incurred during the pendency of this case.  On December 11, 2025, this Court entered an *Order* [Dkt. No. 1027] setting a deadline of December 18, 2025, for objections to the Motion for Admin Claim.

3.      The Motion for Admin Claim as well as the exhibits attached thereto indicate that Akouete and his company (Smart Investors LLC) incurred charges and seek reimbursement for a CoStar subscription for listing the real property located 231 Turnpike Road, Westborough, Massachusetts (the "Property") for sale on CoStar's website known as LoopNet.  Akouete states that he seeks payment of subscription charges "for the limited period from October 3, 2024 through February 5, 2025, totaling approximately $5,028.30" (the "Subscription Charges") (*see* Motion for Admin Claim, ¶4).  Akouete further states that the purpose of the CoStar subscription was to "challenge the originally proposed undervalued settlement and to generate comparable-sale and valuation evidence" regarding the Property (*see* Motion for Admin Claim, ¶5).

4.      During the period covered by the Subscription Charges, (i) the Town of Westborough held title to the Property, (ii) the Estate had asserted claims against the Property including potential avoidance claims, and (iii) the Town, the Estate, and other interested parties had proposed a settlement structure to resolve all issues and allow for the sale of the Property by the Trustee.

5.      Akouete asserts in the Motion for Admin Claim that the Subscription Charges were necessary for "market testing" and to obtain "objective market comparables" for the Property (*see* Motion for Admin Claim, ¶7) and, presumably, that the Estate derived a benefit from Akouete's "market testing".

6.      In reality, however, prior to October 3, 2024 (*i.e.*, the date Akouete states that the Subscription Charges commenced), the Trustee had already sought approval of this Court to

2

314

engage an appraiser [Dkt. No. 354, filed September 23, 2024] to determine the value of the

Property.  Further, this Court had already approved the engagement of the appraiser [Dkt. No.

356, entered September 23, 2024].  To be clear, prior to the date that the Subscription Charges

commenced, the Trustee already had a process in place to determine the value of the Property

and Akouete's "market testing" and search for "market comparables" was not necessary,

provided no benefit to the Estate, and was (at best) duplicative of the Trustee's efforts.  If the

payment Akouete seeks were to be allowed, it would be duplicative of the expense incurred by

the Estate to engage the appraiser.

7.      In addition, after this Court became aware that Akouete had listed the Property for

sale despite having no authority to do so, this Court entered the *Order Directed to Lolonyon

Akouete* [Dkt. No. 392, entered October 10, 2024] (the "Order to Akouete") which stated in

relevant part that "Mr. Akouete has taken unauthorized actions that improperly imply he has

certain authority to market and receive 'offers' for the Property . . . with respect to which the

estate has claims . . . ."  The Order to Akouete also ordered Akouete to "take down, remove, and

if necessary, request CoStar Group take down and remove, LoopNet listing ID 3330926

concerning the real property located at 231 Turnpike Road, Westborough, Massachusetts" within

48 hours of the entry of the Order to Akouete.  *See* Order to Akouete, attached hereto as

**Exhibit A**.

## LEGAL STANDARD

8.      Administrative expenses are governed by Bankruptcy Code § 503(b).  In relevant

part, Bankruptcy Code § 503(b)(1)(A) provides that there shall be an allowed administrative

expense claim for the "actual and necessary costs and expenses of preserving the estate..."

Bankruptcy Code § 503(b)(3)(D) provides that an allowed claim can also be the "actual,

necessary expenses" (other than those of professionals) incurred by a creditor "in making a substantial contribution in a case under chapter 9 or 11 of this title".

9.    "[P]rovisions governing requests for administrative expense awards are to be construed narrowly in order to honor 'the traditional presumption favoring ratable distribution among all holders of unsecured claims.'"  *Xifaras v. Morad (In re Morad)*, 328 B.R. 264, 269 (B.A.P. 1st Cir. 2005) (quoting *Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992)) (internal citations omitted).  First, an allowable administrative claim under § 503(b) must be "actual and necessary" for preservation of the bankruptcy estate.  *See 11 U.S.C. § 503(b)*; *see also In re Streck*, No. 03-11241-WCH, 2007 Bankr. LEXIS 1517, at *11-12 (Bankr. D. Mass. Apr. 26, 2007) (Where a creditor did not demonstrate why his services were "necessary to the estate to the estate in addition to those of the Chapter 7 Trustee" and where the chapter 7 trustee was "already investigating the Debtor's affairs and preparing his own adversary proceeding to recover assets for the estate," this Court held that it could not find that the creditor's "claimed services provided any necessary benefit to the estate").  Second, 11 U.S.C. § 503(b)(3)(D) applies by its terms to Chapters 9 and 11 cases and this case is a Chapter 7 case. Even if this Court determines that 11 U.S.C. § 503(b)(3)(D) may apply to administrative claims in a chapter 7 case, the claim must still be for the "actual, necessary expenses" of making "substantial contributions" in the case.  *See 11 U.S.C. § 503(b)(3)(D)*; *see also In re Kile,* Nos. 4-04-bk-02237-JMM, 4-05-ap-00009-JMM, 2002 Bankr. LEXIS 2260, at *13-14 (Bankr. D. Ariz. May 11, 2006) ("Merely claiming an entitlement to proceeds does not rise to the level of a "substantial contribution" to an estate. Pursuing one's own interests is neither substantial nor a contribution to an estate which is deserving of compensation."); *see also In re Cuisinarts, Inc.*, 115 B.R. 744, 750 (Bankr. D. Conn. 1990) (quoting *In re Lister,* 846 F.2d 55, 57 (10th Cir.

4

316

1988)) ("Case law to date is clear that 'efforts undertaken by a creditor solely to further his own self-interest . . . . will not be compensable, notwithstanding any incidental benefit accruing to the bankruptcy estate.'").

## ARGUMENT

### A.  The Subscription Charges Were Not "Necessary" As Required By Both § 503(b)(1)(A) and § 503(b)(3)(D) of the Bankruptcy Code.

10.     By their terms, both § 503(b)(1)(A) and § 503(b)(3)(D) of the Bankruptcy Code require that the expenses at issue be "necessary."  The Subscription Charges were not "necessary" to determine the value of the Property because as of the commencement of the Subscription Charges the Trustee had already employed an appraiser to determine the value the Property.  The Trustee ultimately relied on the valuation provided by the appraiser to determine the best course of action for the Estate regarding the Property.  Simply put, Akouete's actions to "test the market" and identify "comparables" were not "necessary costs and expenses of preserving the estate" and, instead, were duplicative of the Trustee's efforts.  As a result, Akouete cannot meet the standard under either Bankruptcy Code § 503(b)(1)(A) or § 503(b)(3)(D) that the expenses sought were "necessary".

### B.  Akouete's Actions Risked Damaging the Estate, Rather Than "Preserving the Estate"

11.     Listing the Property for sale, when the Property was not for sale, did not have the effect of "preserving the estate" as required by Bankruptcy Code § 503(b)(1)(A).  To the contrary, where (i) the Property was not for sale, (ii) the Town (as title owner of the Property) had not authorized Akouete to list the Property for sale, and (iii) the Estate (holding claims to recovery the Property) had not authorized Akouete to list the Property for sale, Akouete actually risked damaging the Estate by confusing potential interested parties.  Confusion regarding

5

ownership of the Property or regarding an unauthorized listing (as Akouete's listing on Loopnet was) could have potentially chilled bidders for any eventual sale to which the Town and the Trustee might eventually agree. That confusion was detrimental to the Estate and, therefore, incurring the Subscription Charges did not "preserve the estate" as required by Bankruptcy Code § 503(b)(1)(A), those actions potentially damaged the Estate.[1]

**C.     The Subscription Charges Fail to Qualify as Administrative Expense Where the Court Ordered Akouete to Remove the Loopnet Listing.**

12.     As noted above, when this Court learned of the Loopnet listing, the Court held a hearing on October 9, 2024, and ordered Akouete to "not take actions that misrepresent or imply that he has authority to sell or solicit offers for the real property…". *See* Proceeding Memorandum and Order; Dkt. No. 385. The next day, the Court entered the Order to Akouete and explicitly ordered Akouete to remove the LoopNet listing within 48 hours.

13.     Akouete should not be awarded reimbursement as an administrative expense for Subscription Charges incurred for taking an action which resulted in a Court Order directing Akouete to cease and desist from taking those actions. Further, Akouete provides no explanation or justification for any charges incurred after October 10, 2024 (*i.e.*, the date on which the Court directed Akouete to stop running the LoopNet ad).

**D.     If an Administrative Claim is Allowed, Payment Should be Reduced by Any Damages Awarded to the Trustee in the Pending Adversary Proceeding.**

14.     If this Court finds that Akouete's request for payment of the Subscription Charges should be allowed as an administrative claim in any amount, the Trustee requests that any payment to Akouete on account of an allowed claim be offset by any damages this Court may award to the Trustee in the pending Adversary Proceeding, AP No. 25-04027.

---

[1] As evidenced by the entire record of this case, Akouete has repeatedly tried to wrest control of Estate assets from the Trustee. Listing the Property with no authority to do so was but one example of those efforts.

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that this

Court enter an Order (i) denying the Motion for Admin Claim [Dkt. No. 1023] and (ii) granting

such other and further relief as is just.


Respectfully submitted,

**Jonathan R. Goldsmith,
Chapter 7 Trustee**

by his counsel,


_____/s/ Angelina M. Savoia, Esq.___
Christine E. Devine, BBO #566990
Angelina M. Savoia, BBO #715690
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
Phone: 857-600-0508
Dated: December 18, 2025                    Email:  angelina@nicholsondevine.com

7

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

In re:

**WESTBOROUGH SPE LLC,**

      Debtor.

**Chapter 7**
**Case No. 23-40709-CJP**

## CERTIFICATE OF SERVICE

The undersigned, Angelina M. Savoia, hereby certifies that on this day I caused a copy of

the following document to be served on all parties listed on the attached Service List in the

manner noted thereon:

- **TRUSTEE'S OBJECTION TO AKOUETE'S MOTION FOR ADMINISTRATIVE CLAIM.**

Dated: December 18, 2025

/s/ Angelina M. Savoia, Esq.
Angelina M. Savoia, BBO #715690
Nicholson Devine LLC
21 Bishop Allen Drive
Cambridge, MA 02139
Phone: 857-600-0508
Email: angelina@nicholsondevine.com

8

320

Electronic Mail Notice List

The following list of parties and attorneys have received electronic notice via the Court's
CM/ECF noticing process:

- **Jeffrey T Blake**   jblake@k-plaw.com
- **Paul W. Carey**   pcarey@miricklaw.com, bankrupt@mirickoconnell.com
- **Luis R. Casas**   luis.casasmeyer@akerman.com
- **Jose C. Centeio**   jc@jcfirm.com
- **Brian Charville**   bcharville@ferrisdevelopment.com
- **Christine E. Devine**   christine@nicholsondevine.com,
  devine.christiner109603@notify.bestcase.com;angelina@nicholsondevine.com;christine_
  492@ecf.courtdrive.com
- **Jonathan R. Goldsmith**   bankrdocs1@gkalawfirm.com,
  bankrdocs@gkalawfirm.com;intern@gkalawfirm.com;Esq..JonathanR.G.B145355@notif
  y.bestcase.com
- **Jonathan R. Goldsmith**   trusteedocs1@gkalawfirm.com,
  mwolohan@gkalawfirm.com;trusteedocs@gkalawfirm.com;intern@gkalawfirm.com;M
  A43@ecfcbis.com
- **Stephen F. Gordon**   sgordon@gordonfirm.com,
  vhaggerty@gordonfirm.com;notices@gordonfirm.com;stephenfgordon@gmail.com
- **Richard King**   USTPRegion01.WO.ECF@USDOJ.GOV
- **Brian Lee**   blee@nutter.com
- **Samual A. Miller**   samual.miller@akerman.com
- **Brian W. Riley**   briley@k-plaw.com
- **Douglas B. Rosner**   drosner@goulstonstorrs.com
- **Angelina M. Savoia**   angelina@nicholsondevine.com, angelina@ecf.courtdrive.com
- **Roger L. Smerage**   rsmerage@k-plaw.com

Email and/or First Class Mail Service List

The following list of parties and attorneys have been served via as noted:

Lolonyon Akouete                         Via Email
800 Red Mills Rd
Wallkill, NY 12589
info@smartinvestorsllc.com

Denise Edwards                           Via Email
137 North 25th Street
Wyandanch, NY 11798
deniseedwards818@yahoo.com

Mark S. Lichtenstein                    Via Email
Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
mark.lichtenstein@akerman.com


Lenard Benson Zide, Esq.
Butters Brazilian LLP                   Via Email
420 Boylston Street, 4th Floor
Boston, MA 02116
zide@buttersbrazilian.com

Jonathan La Liberte                     Via Email
Sherin and Lodgen LLP
101 Federal Street, 30th Floor
Boston, MA 02110
jclaliberte@sherin.com

# EXHIBIT A

11

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC | Chapter 7 |
| Debtor | |

## ORDER DIRECTED TO LOLONYON AKOUETE

This matter came before the Court on October 8, 2024, for a telephonic hearing (the "Hearing") on the *Motion for Injunction and Sanctions against Lolonyon Akouete* (ECF No. 370) (the "Motion") filed by the Town of Westborough ("Town") and the response thereto filed by Lolonyon Akouete (ECF No. 372) (the "Response"). Upon consideration of the information set forth in the Motion, the affidavit in support thereof, the Response, the arguments at the Hearing, and the record of this case, for the reasons stated on the record during the Hearing, given Mr. Akouete has taken unauthorized actions that improperly imply he has certain authority to market and receive "offers" for the Property (defined below) with respect to which the estate has claims, the Court exercises its inherent power to manage the administration of this bankruptcy proceeding and HEREBY ORDERS AS FOLLOWS:

1.      The Town's request for sanctions against Mr. Akouete remains pending. The Court will schedule a hearing on potential sanctions against Mr. Akouete for a future date or provide other relief in connection with the Town's request for sanctions and the show cause orders, ECF Nos. 382 and 383, in the Court's discretion.

2.      Mr. Akouete SHALL:

a.      Within 48 hours of the entry of this Order, take down, remove, and, if necessary, request that CoStar Group take down and remove, LoopNet listing ID 33330926

concerning the real property located at 231 Turnpike Road, Westborough, Massachusetts (the "Property");

   b. Within 48 hours of the entry of this Order, take down and remove any other listing that Mr. Akouete may have made or caused to be made concerning the Property, either individually or through his company Smart Investors LLC, or any agent or employee thereof;

   c. Refrain from listing the Property for sale on any website, listing service, or medium for selling real property, or otherwise marketing the Property for sale, either individually or through his company Smart Investors LLC, or any agent or employee thereof; and

   d. Immediately cease and desist from:

    i. Representing or implying that Mr. Akouete or his company Smart Investors LLC (or any agent or employee thereof) owns, holds title to, or has any right or authority to sell or market the Property;

    ii. soliciting offers to purchase the Property or taking other actions related to the sale of the Property, other than by directing potential interested parties to counsel to the Town or the Trustee in strict compliance with the following paragraph; and

    iii. engaging in any communication with third parties, including those third parties with whom Mr. Akouete has already been communicating, regarding the Property, whether the result of Mr. Akouete's prior actions to list the Property for sale or otherwise, unless Mr. Akouete (A) identifies himself as a purported creditor of Westborough SPE LLC in Bankruptcy Case No. 23-40709 rather than an agent of the Debtor and states that he has no authority to sell or market the Property; (B) discloses to said third parties that title to the Property currently is held by the Town exclusively and that any and all claims to the Property are held by the Chapter 7 Trustee on behalf of the Debtor's bankruptcy estate; and (C) informs said third parties that any communications concerning any offers for the sale of the Property, or any offer to

purchase the Property, shall be ONLY with Attorney Roger L. Smerage on behalf of the Town and

Attorneys Christine Devine and Jonathan Goldsmith on behalf of the Chapter 7 Trustee.

IT IS SO ORDERED.    ANY VIOLATION OF THIS ORDER MAY SUBJECT MR.

AKOUETE TO A FINDING OF CONTEMPT.

Dated: October 10, 2024                              By the Court,

                                                    Christopher J. Panos
                                                    United States Bankruptcy Judge

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## CREDITOR LOLONYON AKOUETE'S CONSOLIDATED RESPONSE TO (I) TRUSTEE'S OBJECTION AND (II) TOWN OF WESTBOROUGH'S OPPOSITION TO MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

Lolonyon Akouete ("Movant"), a creditor in the above-captioned Chapter 7 case, respectfully submits this **Consolidated Response** to (i) the Chapter 7 Trustee's Objection and (ii) the Town of Westborough's Opposition to Movant's Motion for Allowance and Payment of Administrative Expense Claim for Post-Petition CoStar Subscription (the "Motion"). Both objections oppose the same relief and raise substantially overlapping factual and legal arguments. In support of this Consolidated Response, Movant states as follows:

## I. INTRODUCTION

The Trustee's Objection rests on a fundamental mischaracterization of the expense at issue. Movant does not seek compensation for unauthorized marketing of estate property, nor does he seek reimbursement for duplicative professional services. Instead, Movant seeks allowance of a narrow, discrete, post-petition out-of-pocket expense incurred to obtain professional-grade market data that demonstrably preserved and enhanced the value of the estate's principal asset by exposing an undervalued settlement posture and forcing correction of that error.

The Bankruptcy Code permits—and equity requires—reimbursement where a creditor's post-petition expenditure confers a direct, concrete benefit on the estate. That is precisely what occurred here.

## II. THE COSTAR SUBSCRIPTION WAS AN ACTUAL AND NECESSARY COST OF PRESERVING THE ESTATE

The Trustee argues that Movant's CoStar expense was not "necessary" because the Trustee sought and obtained court approval to retain an appraiser. That argument fails when the timing of events and the valuation context are examined in full.

On **July 8, 2024**, the Trustee filed a Motion to Approve a settlement valuing the Property at approximately **$2.5 million**. That valuation was not the product of informational scarcity. In fact, the Town of Westborough itself had previously obtained **two appraisals of the Property**, both valuing it at approximately **$6 million**. Those appraisals, however, were several years old and were **not produced or relied upon** by the Town in support of the proposed settlement. Instead, the

Town advanced a sharply reduced valuation through testimony from its Chief Assessor, including a reduction in land value.

Believing that the proposed settlement materially undervalued the Property, Movant urged the Trustee to obtain an independent appraisal before proceeding. When those requests were declined, Movant filed a motion to compel an appraisal on **August 6, 2024**, which the Court denied on **August 7, 2024**, directing that valuation disputes be addressed through evidence in the context of the Trustee's Rule 9019 motion rather than by compelling an appraisal.

Thus, as of early September 2024, the record reflected a stark disconnect: prior appraisals obtained by the Town indicated a value near $6 million, yet the settlement advanced by the Trustee relied on a substantially lower municipal valuation, and no current independent appraisal had been commissioned. Movant challenged the Town's valuation evidence directly, filing a motion on **September 11, 2024** to strike the affidavit of the Town's Chief Assessor on grounds of factual inaccuracies and methodological defects, including the reduction of land value. Although the Court denied the motion to strike, it recognized that valuation would be tested through evidentiary proceedings.

In that posture—where existing appraisals indicating higher value were withheld or discounted, municipal valuation testimony was contested, and an evidentiary hearing loomed—Movant applied market-based valuation pressure to demonstrate whether the $2.5 million settlement figure reflected economic reality. Those efforts resulted in a materially increased offer of **$3,502,702** from Ferris Development Group in early September 2024, confirming that higher value was available.

Only after this valuation pressure did the Trustee file an expedited application to retain an appraiser on **September 23, 2024**, which the Court approved the same day. As Movant understood at the time, however, the appraisal process would take time to complete and would not resolve the dispute efficiently. Given the Town's prior refusal to rely on its own higher appraisals, and its continued defense of a sharply reduced valuation, an additional appraisal risked producing yet another contested opinion rather than finality.

For that reason, and while the appraisal process was underway, Movant incurred the CoStar subscription beginning on **October 3, 2024**, the date of the first invoice for which reimbursement is sought. The purpose was not to duplicate the appraisal, but to obtain objective, professional-grade market data demonstrating whether bona fide purchasers existed at materially higher prices. Market testing addressed what valuation opinions alone could not: whether real buyers, acting independently, were willing to pay substantially more for the Property.

That approach proved decisive. Although the Trustee's appraisal ultimately valued the Property at approximately **$4.79 million**, the Town continued to dispute its credibility, confirming that appraisal-versus-assessor disputes alone would not end the controversy. By contrast, Movant's market testing identified independent buyers willing to pay approximately **$5 million**, cutting through theoretical valuation disagreements and avoiding further contested proceedings.

Section 503(b)(1)(A) asks whether an expense was necessary when incurred to preserve estate value. Here, the CoStar subscription was necessary precisely because valuation information already existed showing higher value, yet was not being relied upon, and because additional appraisal litigation would have delayed resolution and increased professional fees. By demonstrating bona fide buyer demand, Movant's market testing preserved millions of dollars in estate value and

avoided wasteful, protracted valuation disputes. Under these circumstances, the expense was an actual and necessary cost of preserving the estate.

Importantly, the CoStar/LoopNet access at issue was not a discretionary, month-to-month expense that could be turned on and off at will. It was a fixed-term commercial contract requiring a twelve-month commitment, which Movant entered into only after repeated efforts to prompt the Trustee to obtain an appraisal or conduct market testing had failed. The expense therefore must be evaluated based on the circumstances at the time the contract was executed, not based on hindsight after its benefits had already been realized. **See Exhibit A.**

The Trustee and the Town further suggest that Movant's actions are disqualifying because Movant had a personal stake in the outcome. That contention misunderstands the governing standard under 11 U.S.C. § 503(b)(1)(A). Bankruptcy courts do not require creditors to be wholly disinterested actors in order to recover expenses that preserve estate value. Creditors, by definition, act in environments where their interests are implicated. If complete self-disinterest were required, § 503(b) would have little practical effect, as no rational creditor would ever undertake value-preserving action at its own expense.

Courts addressing this issue have consistently rejected motive-based disqualification in favor of an objective, outcome-based inquiry. The relevant question is not whether a creditor acted with some self-interest, but whether the creditor's actions **conferred a concrete, measurable benefit on the estate** and whether the estate would have been worse off absent those actions. Mixed motives do not defeat reimbursement. Reimbursement is denied only where the creditor's conduct was designed to benefit itself exclusively and provided no meaningful benefit to the estate or other creditors.

That distinction is dispositive here. Movant's actions were not undertaken to secure a private recovery or advance a contingent personal gain. Movant has received no distribution, no allowed claim, and no personal compensation of any kind. By contrast, the estate indisputably benefitted. Movant's market-based valuation efforts prevented a proposed $2.5 million disposition of the estate's principal asset and contributed directly to the estate realizing a transaction exceeding $5.11 million. The benefit flowed first—and thus far exclusively—to the estate and its creditors.

Permitting reimbursement under these circumstances is consistent with the purpose of § 503(b)(1)(A). Denying reimbursement on the theory that Movant acted with some self-interest would adopt a rule that discourages creditors from intervening when estate assets are materially undervalued, even where intervention prevents substantial loss. The Bankruptcy Code does not impose such a rule. It rewards results that preserve estate value, not the purity of a creditor's motive.

## III. MOVANT'S EXPENDITURE PRESERVED—RATHER THAN HARMED—THE ESTATE

The Trustee contends that Movant's actions risked harming the estate by creating confusion or chilling bidders. That contention is speculative, unsupported by evidence, and contradicted by the actual market response.

The Trustee does not identify a single lost bidder, reduced offer, or failed transaction attributable to Movant's conduct. Nor does the record reflect any purchaser who was misled into believing that Movant had authority to convey title or consummate a sale. To the contrary, the record demonstrates that **within approximately twenty-four hours of the Property being exposed to**

**the market**, multiple independent buyers expressed willingness to pay **approximately $5 million** for the Property. That immediate and robust response is the definition of market testing. It confirms demand and value; it does not evidence confusion or harm.

Those expressions of interest did not—and could not—result in a sale. At all relevant times, the parties understood that title issues were unresolved and that no transaction could close absent further court proceedings and Trustee involvement. Movant neither purported nor attempted to convey title, enter into a purchase-and-sale agreement, or bypass the Trustee. The purpose of exposing the Property to market participants was not to sell the Property, but to determine whether bona fide buyers existed at materially higher prices than the **$2.5 million** valuation underpinning the proposed settlement.

The results of that market testing were unequivocal. Following Movant's CoStar-supported analysis and the resulting expressions of buyer interest, the estate's posture shifted dramatically. The Property is now being sold for approximately **$5.11 million**, more than **double** the value previously advanced by the Trustee and the Town. That outcome cannot be reconciled with a theory of bidder confusion or market chilling. If Movant's actions had impaired the market, suppressed demand, or misled purchasers, one would expect fewer buyers and lower pricing—not a transaction price exceeding $5 million.

Preservation of estate value under § 503(b)(1)(A) includes preventing an undervalued disposition and demonstrating true market demand before value is irretrievably lost. Movant's actions accomplished precisely that. The Town's suggestion that Movant intended to sell the Property or confused buyers is unsupported by any concrete evidence and is belied by the estate's ultimate recovery.

In short, the record shows no bad faith, no unauthorized disposition, and no harm. It shows efficient market testing that corrected a deeply flawed valuation narrative and preserved millions of dollars for the estate and its creditors.

## IV. THE OCTOBER 10, 2024 ORDER DOES NOT BAR REIMBURSEMENT

The Trustee relies on the Court's October 10, 2024 Order directing removal of the LoopNet listing to argue for wholesale denial of reimbursement. That reliance overreads the Order and misstates its legal effect.

The October 10 Order was **prospective and case-management in nature**. It directed Movant to cease marketing activity and to remove the listing going forward. It did **not** make findings of bad faith, did **not** impose sanctions, and did **not** adjudicate Movant's entitlement to reimbursement for post-petition expenses already incurred that preserved estate value. Nothing in the Order purports to retroactively nullify benefits previously conferred on the estate or to convert value-preserving conduct into a non-compensable act.

Critically, the estate benefits for which reimbursement is sought were realized **before** the Order's entry and **independently** of any continued listing thereafter. The market response—multiple bona fide expressions of interest near $5 million—had already demonstrated that the $2.5 million settlement framework materially undervalued the Property. That showing accomplished the core preservation function: it corrected a flawed valuation narrative and prevented an undervalued disposition. The subsequent Order did not, and could not, erase those results.

Nor does the Order establish a per se rule that expenses associated with conduct later restricted by the Court are categorically non-reimbursable. Administrative expense analysis under § 503(b)(1)(A) turns on whether the expense was **actual and necessary when incurred** and whether it **conferred a concrete benefit** on the estate. The Order does not speak to those elements and should not be read to decide them by implication.

If the Court nonetheless wishes to draw a temporal line for administrative convenience, Movant is prepared to address allocation of charges incurred **before and after October 10, 2024**. But the existence of the Order cannot justify denying reimbursement for expenses that had already preserved estate value and avoided a materially undervalued outcome. Equity and the statutory standard both require that those benefits be recognized.

## V. THE TRUSTEE'S OFFSET REQUEST IS PREMATURE AND IMPROPER

Finally, the Trustee requests that any allowed administrative expense be offset by potential damages in a pending adversary proceeding. That request is procedurally improper and legally unsupported.

Setoff under the Bankruptcy Code requires a **liquidated, allowed claim** and compliance with established statutory and procedural requirements. Here, no damages have been adjudicated, no judgment exists, and no right of setoff has been established. The Trustee has not filed a motion seeking setoff, nor has the Court made any findings that would permit conditional reduction of an administrative expense based on unresolved allegations.

Administrative expenses under § 503(b)(1)(A) are determined based on whether the expense was actual, necessary, and beneficial to the estate when incurred. They are not contingent on the outcome of separate litigation. Allowing a speculative offset based on a pending adversary proceeding would improperly conflate distinct procedural tracks and effectively prejudge claims that have not been adjudicated.

If the Trustee ultimately prevails in the adversary proceeding and obtains a liquidated judgment, the Bankruptcy Code provides appropriate mechanisms to address that outcome at the proper time. Until then, the Trustee's offset request is premature and should be rejected.

## VI. THE TOWN OF WESTBOROUGH'S ADDITIONAL OBJECTIONS DO NOT BAR ALLOWANCE OF AN ADMINISTRATIVE EXPENSE

In addition to echoing many of the Trustee's arguments, the Town of Westborough advances several objections that do not provide a legal basis to deny allowance of an administrative expense under 11 U.S.C. § 503(b)(1)(A).

First, the Town argues that Movant's creditor status is disputed and therefore reimbursement should be denied. That argument misstates the law. Administrative expense claims are allowed based on **benefit to the estate**, not on allowance of a prepetition proof of claim. Courts routinely consider and allow administrative expenses independent of claim-objection proceedings. The Town cites no authority holding that a disputed creditor status bars reimbursement for post-petition expenses that preserved estate value.

Second, the Town contends that Movant mischaracterizes the Town's valuation conduct and improperly marketed the Property. These contentions are rhetorical and immaterial. Disagreement with Movant's narrative does not rebut the undisputed outcome: the estate moved from a proposed

$2.5 million disposition to a transaction exceeding $5.11 million. Whether the Town agrees with Movant's characterization of events does not negate the objective benefit conferred on the estate.

Third, the Town attempts to bootstrap unresolved allegations regarding unauthorized conduct and pending sanctions into a denial of reimbursement. No sanctions have been imposed. No findings of bad faith exist. The Court expressly deferred sanctions determinations, and no order adjudicates misconduct that would disqualify Movant from reimbursement. Pending allegations cannot substitute for adjudicated facts.

Finally, the Town requests attachment or withholding of any allowed administrative expense pending resolution of other disputes. Like the Trustee's offset request, this argument is premature and procedurally improper. The Bankruptcy Code provides specific mechanisms for attachment, setoff, and recovery of damages, none of which have been invoked or satisfied here. Administrative expenses may not be conditionally denied or frozen based on unresolved disputes.

For these reasons, the Town's additional objections provide no independent basis to deny allowance of Movant's administrative expense claim.

## VII. CONCLUSION

The CoStar subscription charges at issue were post-petition, actual, and necessary expenses that preserved and materially enhanced the value of the estate's principal asset by preventing a substantially undervalued disposition. The record demonstrates that, as a direct result of Movant's market-based valuation efforts, the estate moved from a proposed $2.5 million settlement framework to a transaction exceeding $5.11 million. The estate accepted and benefitted from that work.

Neither the Trustee nor the Town has identified any concrete harm, bad faith, or legal basis under 11 U.S.C. § 503(b)(1)(A) to deny reimbursement for expenses that demonstrably preserved estate value. Denying allowance under these circumstances would unjustly enrich the estate at the expense of the creditor who bore the cost of correcting a serious valuation error and preventing the loss of millions of dollars.

For these reasons, Movant respectfully requests that the Court **overrule the Trustee's Objection and the Town of Westborough's Opposition**, allow Movant's Motion for Allowance and Payment of Administrative Expense Claim, and grant such other and further relief as the Court deems just and proper.

By creditor,

Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276



# CoStar
## License Agreement

| | |
|---|---|
| AE: | Anshu Nidamanuri |
| Location ID: | 283095531 |
| Business Code: | Owner |

## BILL TO:

| | |
|---|---|
| Licensee: Smart Investors LLC | Location ID: 283095531 |
| Address: 800 Red Mills Rd | City/State/Zip: Wallkill, NY 12589-3220 |
| Telephone: | |
| Bill-To Contact: Lolonyon Akouete | Email for Bill-To Contact: info@smartinvestorsllc.com |

## USE:

| | | BILLING CYCLE: | |
|---|---|---|---|
| Total No. Listings: | 0 | ☑ Monthly | ☐ Semi-Annually |
| Total No. Sites: | 1 | | |
| Total No. Authorized Users (All Sites): | 2 | ☐ Quarterly | ☐ Yearly |

## TERM:

One Year Initial Term

| INVOICE TYPE/BILLING PREFERRED: | START DATE: |
|---|---|
| Single Invoice | Immediate Start |

## SERVICES

| Site | Market | Product Description | Monthly License Fees (Before Tax) |
|---|---|---|---|
| 283095531 | All Data | CoStar Suite | $925.00 |
| | | Total Monthly Fees From Additional Schedule of Services: | |
| | | Discount: | |
| | | Total Monthly License Fees: | $925.00 |
| | | Discounted Monthly License Fees: | |

Notes:

This License Agreement incorporates by reference the Terms and Conditions for the services identified above (available at: https://www.costar.com/CoStarTerms-and-Conditions) and any addenda attached hereto between CoStar Realty Information, Inc. ("CoStar") and the above-named Licensee, and establishes the terms and conditions under which CoStar will license the products set forth in this License Agreement. The Terms and Conditions are an integral part of the License Agreement being formed hereby. In addition, use of any CoStar product is subject to the website Terms of Service/Use ("Website Terms of Use") available online for each applicable service provided under this License Agreement. Licensee agrees to comply with such Website Terms of Use and to regularly review them for updates and changes. To the extent a conflict exists, this License Agreement shall govern over such Website Terms of Use. Terms used on this License Agreement and not otherwise defined shall have the meanings set forth in the applicable Terms and Conditions.

In the event Licensee does not execute this License Agreement by 9/30/2024, this License Agreement shall become null and void; however, if both parties execute and commence performance of their duties and obligations under this License Agreement after such date, this License Agreement shall continue in full force and effect and be binding on the parties. The person executing this License Agreement on behalf of Licensee represents and warrants that he or she has been authorized to do so and that all necessary actions required for the execution have been taken. CoStar hereby provides notice that only an authorized officer of CoStar or its parent company can execute this License Agreement on behalf of CoStar. Delivery of an executed signature page to this License Agreement by electronic means shall be effective and constitute a legal and binding agreement between the parties.

## CoStar

| | |
|---|---|
| By: | _(signature)_ |
| Name: | Gene Boxer |
| Title: | General Counsel |
| Date: | Sep 17, 2024 |
| Address: | 1331 L Street, NW |
| Address: | Washington, DC 20005-4101 |

## Smart Investors LLC

| | |
|---|---|
| Signature: | Lolonyon Akouete (Sep 30, 2024 09:22 EDT) |
| Print Name: | Lolonyon Akouete |
| Title: | |
| Date: | Sep 30, 2024 |
| Address: | 800 Red Mills Rd |
| Address: | Wallkill, NY 12589-3220 |

**CoStar**
**License Agreement**

**CoStar**

| AUTHORIZED SITE & USERS LIST | |
|---|---|
| **Licensee:** Smart Investors LLC | Location ID: 283095531 |
| Address: 800 Red Mills Rd | Wallkill, NY 12589-3220 |
| Total Number of Authorized Users at Site: 1 | |
| USERS AT ABOVE LISTED SITE | |
| **Contact Name:** Lolonyon Akouete | Phone:   (443) 447-3276 |
| Email:   info@smartinvestorsllc.com | Role:   User |

User Detail

Page 1 of 1



Prepared By:

# Prepared For: Lolonyon Akouete

Anshu Nidamanuri
anidamanuri@costar.com
AE Phone : 202-346-6565
September 10, 2024

Lolonyon Akouete,

I greatly appreciate your interest in using CoStar to grow your business and support the needs of your clients. I believe CoStar's comprehensive solutions will enable you to accelerate your daily tasks, arrive at the right answers faster, and reveal new opportunities to grow your business.

*Specific research needs/wants expressed by your team include:*

- Reliable, comprehensive, and timely access to all active listings
- Verified information on sale comps and lease comps
- Submarket and market analysis on vacancies, rent growth, and other fundamentals
- Direct contact information for owners, investors, and tenants

---

## CoStar Service Quote

**Coverage:** Complete Data Set for USA, Canada, UK

**User Licenses:** 2

**12-Month Investment:** 2 License(s) = $925/mo

**24-Month Investment:** 2 License(s) = $740/mo (Year 1) + $833/mo (Year 2)

**36-Month Investment:** 2 License(s) = $555/mo (Year 1) + $740/mo (Year 2) + $833/mo (Year 3)

### Terms and Conditions Highlights

- Term: Twelve (12), Twenty-Four (24) months OR (36) Thirty-Six months (plus the initial pro-rated first month)
- Renewal: Auto-renew for one (1) year with escalation
- Cancellation: Sixty (60) days' written notice is required prior to renewal date

*Training, Service, and Support Included*

- Initial onboarding training sessions (group or individual)
- Ongoing on-site and virtual training sessions with a local Account Executive at no added cost
- Direct access to dedicated Research Consultant at no added cost
- CoStar Support Desk – 7 days per week (Mon-Fri 7:30am-8pm ET / Sat-Sun 9am-6pm ET)

Proposed by Anshu Nidamanuri on 9/10/24 – Valid for 60 Days

# Partial List of CoStar Features

## Property

Property level detail for all commercial property types

Full database of commercial properties for sale and/or lease with listing status

Property construction status providing visibility into market construction pipeline

High resolutions photos, floor plans, aerials and parcel maps

Demographics in 1, 2, 3, 5, and 10 km radius from each property

Advanced search interface for customized searches with over 200 searchable fields

Contact information for true owners, property managers and brokers

Access to Professional Directory for active brokers, buyers, and sellers

Ability to download property data in PDF or custom Excel exports

## Sales and Lease Comparables

The most complete database of researched and verified sales comparables

Direct contact information for true buyers and sellers behind LLCs and partnerships

The largest library of commercial lease comps with ability to securely upload your own lease transactions

Analyze transaction metrics from the market down to the transaction level using CoStar's analytic tools

Set alerts to be informed of new sale and lease transactions as they occur

## Tenants

Property level and portfolio level tenant details

View lease expirations, space history and lease terms

Identify tenants who are growing, downsizing or likely to relocate

View company information including key decision makers, business type, employee count, growth outlook and locations

## Underwriting and Rent-Survey Reports

Asset-specific reports with detailed information on the subject property, peers, rent comps, sale comps, construction data, market and submarket analysis

Available for all Industrial, Retail, Office, Multi-family, and Student properties

Real-Time Multi-Family Rent Surveys

# Partial List of CoStar Features (continued)

## CoStar Market Analytics

Submarket Reports with current, historical, and forward looking (five-year forecast) analysis on all key metrics around construction activity, rent growth, demand, and sales activity

Market Reports include detailed analysis, forecast, and commentary on market fundamentals, economic and demographic factors, and submarket comparisons

Written commentary and local insights by 90+ market specialists and economists

Ability to compare forecasts across seven different economic scenarios

All Market Reports and Submarket Reports updated daily with the most current data, covering Multifamily, Office, Retail, Industrial, Hospitality, as well as Student Housing for 665 Universities

## Public Record Data

Access to an additional 42 million commercial parcels

Ability to search by APN, owner name, land use, zoning codes, and assessed value

Ability to access and search by lenders and/or address

Access to loan origination and maturity dates

Ability to export data to Excel

## CMBS Data

$1 trillion+ of outstanding debt information on 100,000+ active loans

200,000+ total CMBS loans, including disposed loans

40,000 detailed building operating statements include detailed income and expense details

Loan terms, balances, NOI, DSCR, LTV and more

Loan performance and commentary

## Investment Fund Data

Market-leading information on 14,500+ private equity funds including financials, property portfolio, investment activity, tenants, contacts and more
66,500 properties connected to funds
34,000 sales transactions linked to fund activity
18,000 contacts associated with funds

This information is intended solely as a preliminary proposal of options and is not binding for either party. No party shall have any contractual obligations to the other with respect to this proposal unless and until a definitive agreement has been fully executed by both parties. Prior to delivery of a definitive executed agreement either party may (1) propose different terms from those summarized herein, and/or (2) unilaterally terminate all negotiations with the other party hereto. This proposal is not a reservation of the services, all terms and pricing are subject to final approval by CoStar management. All proposed pricing, terms, or subscription details referenced in this document are applicable only to the intended recipient, are not valid for any other party, and are subject to change.

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com



Lolonyon Y Akouete



## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS

In re:

    Westborough SPE LLC

             Debtor

Chapter 7
23-40709-CJP

## ORDER

**MATTER:**

#1023 Motion filed by Creditor Lolonyon Akouete for for Allowance and Payment of Administrative Expense Claim for Post-Petition Costar Subscription Pursuant to 11 U.S.C. Sec. 503(b)(1)(A), 503(b) and the Court's Equitable Powers.

UPON CONSIDERATION OF THE MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM FOR POST-PETITION COSTAR SUBSCRIPTION PURSUANT TO 11 U.S.C. §§ 503(B)(1)(A), 503(B) AND THE COURT'S EQUITABLE POWERS [ECF NO. 1023] (THE "MOTION") AND THE OBJECTIONS THERETO BY THE TOWN OF WESTBOROUGH [ECF NO. 1033] AND THE CHAPTER 7 TRUSTEE [ECF NO. 1034], THE MOTION IS DENIED. SETTING ASIDE THE SUBSTANTIAL ISSUE OF WHETHER A 503(B) CLAIM MAY EVEN BE ASSERTED IN A CHAPTER 7 CASE AND THE WEIGHT OF THE MAJORITY OF DECISIONS DECIDING THAT IN THE NEGATIVE, THE RECORD IN THIS CASE DOES NOT SUPPORT ALLOWANCE OF AN ADMINISTRATIVE CLAIM TO ADVANCE THE LITIGATION POSITIONS OF AKOUETE AS A CREDITOR. THE EXPENSE WAS NOT NECESSARY OR BENEFICIAL TO THE ESTATE. AKOUETE MADE NO EFFORT TO SEEK APPROVAL FROM THE TRUSTEE OR THE COURT TO INCUR CHARGES THAT WOULD RESULT IN AN ADMINISTRATIVE EXPENSE CLAIM.

Dated: 01/05/2026

By the Court,

Christopher J. Panos
United States Bankruptcy Judge



# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| In re: | Westborough SPE LLC | Chapter 7 |
| | Debtor | 23-40709-CJP |

## ORDER

**MATTER:**

#1079 Motion filed by Creditor Lolonyon Akouete for Reconsideration of Order Denying Administrative Expense Claim Re: 1058 Order dated 1/5/2026 (Re: 1023 Motion filed by Creditor Lolonyon Akouete for for Allowance and Payment of Administrative Expense Claim).

THE "MOTION FOR RECONSIDERATION OF ORDER DENYING ADMINISTRATIVE EXPENSE CLAIM (Dkt. No. 1058)" [ECF NO. 1079] (THE "MOTION") IS DENIED. WHILE MOVANT IS CORRECT THAT THE COURT SHOULD HAVE STATED THAT "AKOUETE MADE NO EFFORT TO SEEK APPROVAL FROM THE TRUSTEE **AND** THE COURT," AND THE COURT CLARIFIES ITS ORDER ENTERED AT ECF NO. 1058 (THE "ORDER") IN THAT RESPECT, THE COURT'S DENIAL OF THE MOVANT'S REQUEST FOR AN ADMINISTRATIVE CLAIM AND THE REMAINDER OF THE ORDER REMAIN UNCHANGED. THE COURT'S RULING WAS BASED ON THE FACT THAT AKOUETE MADE A UNILATERAL DECISION TO INCUR AN EXPENSE TO SUPPORT A LITIGATION POSITION OR STRATEGY. THE MOVANT APPARENTLY MADE THAT DECISION TO INCUR AN EXPENSE WITHOUT AUTHORIZATION FROM THE COURT OR THE TRUSTEE BECAUSE OF, AMONG OTHER THINGS, HIS BELIEF THAT A "THIRD APPRAISAL WOULD NOT ADVANCE THE ESTATE'S INTERESTS" AND A LACK OF RESPONSE BY THE TRUSTEE TO HIS PROPOSAL THAT THE TRUSTEE "ADOPT MARKET TESTING" USING COSTAR. *SEE* MOTION, 2. A MAJORITY OF COURTS THAT HAVE DECIDED THE ISSUE HAVE DETERMINED THAT A PARTY IN INTEREST MAY NOT SEEK PAYMENT OF AN ADMINISTRATIVE EXPENSE FOR SUBSTANTIAL CONTRIBUTION. EVEN IF THIS COURT WERE TO DECIDE THAT SUCH RELIEF IS AVAILABLE, THE COURT REITERATES ITS CONCLUSION IN THE ORDER THAT THE FACTS AND CIRCUMSTANCES OF THIS CASE WOULD NOT SUPPORT ALLOWANCE.

Dated: 01/14/2026

By the Court,

Christopher J. Panos
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

)
In re:                                    )        Chapter 7
                                          )        Case No. 23-40709-CJP
WESTBOROUGH SPE LLC,                      )
                                          )
                        Debtor.           )
                                          )

## NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING DUE PROCESS, VOID JUDGMENTS, AND VACATUR OF TAX FORECLOSURE DECREES

Creditor Lolonyon Akouete respectfully submits this Notice of Supplemental Authority to advise the Court of newly decided controlling authority and Massachusetts statutory and appellate precedent directly bearing on the validity of the tax foreclosure decree at issue, the Debtor's continuing property interest, and the proper administration of the bankruptcy estate.

### I. The Supreme Court's 2026 Decision Clarifies the Constitutional Framework

In **Coney Island Auto Parts Unlimited, Inc. v. Burton**, 607 U.S. No. 24-808 (2026), the Supreme Court held that Federal Rule of Civil Procedure 60(c)(1)'s "reasonable time" requirement applies to motions under Rule 60(b)(4) seeking relief from allegedly void judgments. The Court rejected the notion that all void judgments may be attacked at any time as a matter of general federal procedural law.

Critically, however, the Court explained that a party could avoid a time limitation only if:

"some principle of law, such as the Due Process Clause, gives a party the right to allege voidness at any time." Id. (emphasis added).

Thus, the Supreme Court expressly acknowledged that **a jurisdiction may supply such a principle through constitutional or statutory law**, even though Rule 60 itself does not.

### II. Massachusetts Has Expressly Adopted That Due Process Principle in Tax Foreclosure Cases

Massachusetts has enacted precisely the type of due-process-based exception identified by the Supreme Court.

**G.L. c. 60, § 69A** provides:

"No motion to vacate a decree of foreclosure and no proceeding at law or in equity for reversing or modifying such a decree shall be commenced by any person other than the petitioner under section 65 after 1 year, **except upon a showing that the moving party's due process rights have been violated.**"

This statute does not merely allow equitable relief — it **preserves constitutional supremacy over finality** in tax foreclosure judgments.

Massachusetts therefore supplies the very "principle of law" the Supreme Court identified in *Coney Island Auto Parts* as capable of permitting vacatur beyond ordinary procedural limits.

### III. Massachusetts Appellate Courts Enforce This Due Process Exception

Massachusetts appellate courts have repeatedly applied § 69A to vacate tax foreclosure decrees years after entry where constitutionally adequate notice was not provided.

## A. Town of North Reading v. Welch, 47 Mass. App. Ct. 156 (1999)

The Appeals Court vacated a tax foreclosure decree nearly five years after entry where a record interest holder was not provided notice. The Court held that failure to notify a person with a recorded interest constitutes a violation of due process and permits vacatur under § 69A notwithstanding the one-year limitation.

## B. Ithaca Finance, LLC v. Leger, 99 Mass. App. Ct. 110 (2021)

The Appeals Court reaffirmed:

"After one year, a foreclosure judgment may be vacated only upon a showing that the moving party's substantive or procedural due process rights were violated."

The Court emphasized that § 69A is a constitutional safeguard, not a discretionary equitable doctrine.

### IV. Effect on Bankruptcy Estate Administration

Where a Massachusetts tax foreclosure decree is subject to vacatur under § 69A due to a due process violation:

1. The foreclosure judgment is constitutionally infirm.
2. Title reverts to the debtor upon vacatur.
3. The property becomes property of the bankruptcy estate under 11 U.S.C. § 541.
4. The trustee may sell the property under § 363 for fair market value.
5. Creditors benefit from full market recovery rather than discounted settlement.

Proceeding through settlement while a constitutionally voidable foreclosure remains unresolved risks:

- Protracted appeals,
- Increased administrative expense,
- Delayed distributions,
- And potential reversal of any settlement-based disposition.

### V. Harmonization With the Supreme Court's Ruling

343

The Supreme Court in *Coney Island Auto Parts* did not eliminate due-process-based vacatur. Instead, it expressly recognized that such a principle must arise from constitutional or statutory law.

Massachusetts has done exactly that in **G.L. c. 60, § 69A**.

Accordingly:

- Federal procedural limits do not override Massachusetts constitutional protections in tax foreclosure.
- The Debtor retains the statutory right to vacate a foreclosure decree at any time upon proof of due process violation.
- That right preserves the Debtor's property interest for bankruptcy purposes.

## VI. Conclusion

The Court is respectfully urged to consider that Massachusetts law supplies the precise constitutional principle contemplated by the Supreme Court in *Coney Island Auto Parts*, permitting vacatur of tax foreclosure judgments where due process has been denied.

Accordingly, resolution of the foreclosure through proper adjudication — rather than settlement — will preserve estate value, reduce litigation risk, and promote equitable administration for all parties.

## VII. Requested Relief

The Creditor respectfully requests that the Court:

1. Take judicial notice of *Coney Island Auto Parts Unlimited, Inc. v. Burton*, 607 U.S. No. 24-808 (2026);
2. Take judicial notice of G.L. c. 60, § 69A;
3. Recognize that Massachusetts law preserves the Debtor's right to vacate a foreclosure decree upon proof of due process violation; and
4. Consider the impact of this authority in evaluating estate administration, settlement approval, and property disposition.

DATED: January 21, 2026, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

(Slip Opinion)          OCTOBER TERM, 2025          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CONEY ISLAND AUTO PARTS UNLIMITED, INC. *v.* BURTON, CHAPTER 7 TRUSTEE FOR VISTA-PRO AUTOMOTIVE, LLC

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 24–808.   Argued November 4, 2025—Decided January 20, 2026

The question in this case is whether Federal Rule of Civil Procedure 60(c)(1)'s requirement that parties make Rule 60(b) motions within a "reasonable time" applies to a motion seeking relief from an allegedly void judgment under Rule 60(b)(4). Vista-Pro Automotive, LLC, entered bankruptcy in 2014 and initiated adversarial proceedings against Coney Island Auto Parts Unlimited, Inc., to collect $50,000 in allegedly unpaid invoices. Vista-Pro attempted to serve process on Coney Island by mail but purportedly failed to comply with Federal Rule of Bankruptcy Procedure 7004(b)(3)'s mail-service requirements. Coney Island did not file an answer, and the Bankruptcy Court entered a default judgment. Over the next six years, Vista-Pro's bankruptcy trustee attempted to enforce the judgment. These efforts bore fruit in 2021 when a marshal seized funds from Coney Island's bank account in satisfaction of the judgment. Coney Island filed a motion to vacate the judgment under Federal Rule of Civil Procedure 60, arguing that Vista-Pro's failure to make proper service rendered the judgment void. The Bankruptcy Court denied relief, holding that Coney Island failed to abide by Rule 60's requirement that parties make motions for relief within a "reasonable time." The District Court and the Court of Appeals for the Sixth Circuit affirmed.

*Held*: Rule 60(c)(1)'s reasonable-time limit applies to a motion alleging that a judgment is void under Rule 60(b)(4). Pp. 2–6.

(a) The plain text of Rule 60(c)(1) provides that a "motion under Rule 60(b) must be made within a reasonable time," and because a motion

for relief from an allegedly void judgment is a "motion under Rule
60(b)," the reasonable-time limit applies. The structure of Rule 60 con-
firms the plain-text interpretation. Rule 60 expressly modifies the de-
fault reasonable-time limit, imposing a one-year limit on Rule 60(b)
motions alleging mistakes, new evidence, or fraud. Yet the Rule does
not include an analogous unlimited-time principle for motions alleging
voidness. Pp. 2–3.

 (b) The Court rejects the argument that because a "void judgment is
a legal nullity," *United Student Aid Funds, Inc.* v. *Espinosa*, 559 U. S.
260, 270, no time limit should apply. Even if the passage of time can-
not cure voidness, the same principle holds true for most legal errors,
yet statutes and rules routinely limit the time during which a party
can seek relief from a judgment infected by error. A party would need
to show that some principle of law, such as the Due Process Clause,
gives a party the right to allege voidness at any time, but Coney Island
disclaims any such argument, and the Court cannot divine any such
principle. Allowing parties to allege voidness at any time would have
extreme implications, such as allowing parties to ignore deadlines for
filing notices of appeal or petitions for certiorari when subject-matter
jurisdiction is contested. The possibility that improper service is dif-
ferent from other legal errors because a party might not learn about
proceedings until long after judgment issues does not help Coney Is-
land. Rule 60(c)(1) accommodates such a scenario by imposing a rea-
sonable-time requirement rather than a fixed time limit. In the con-
text of a default judgment, it might be reasonable for a defendant not
to seek relief before learning about a plaintiff's attempted enforce-
ment. Pp. 3–5.

 (c) The Court rejects Coney Island's argument that courts have his-
torically allowed litigants to seek relief from void judgments at any
time. No such historical consensus exists, and in any event, for Rule
60(b) motions, the Rule's text and structure take priority over histori-
cal practice. The Court also rejects Coney Island's reliance on *Insur-
ance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S.
694, as that case undermines Coney Island's plea for no time limits.
Lastly, the Court rejects Coney Island's invocation of policy concerns,
Rule 60's drafting history, and the canon of constitutional avoidance.
To the extent that these interpretive tools carry any weight, they do so
only when a Rule's language is ambiguous. Pp. 5–6.

109 F. 4th 438, affirmed.

 Alito, J., delivered the opinion of the Court, in which Roberts, C. J.,
and Thomas, Kagan, Gorsuch, Kavanaugh, Barrett, and Jackson, JJ.,
joined. Sotomayor, J., filed an opinion concurring in the judgment.

Cite as: 607 U. S. ____ (2026)             1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 24–808

CONEY ISLAND AUTO PARTS UNLIMITED, INC.,
PETITIONER *v.* JEANNE ANN BURTON,
CHAPTER 7 TRUSTEE FOR VISTA-PRO
AUTOMOTIVE, LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[January 20, 2026]

JUSTICE ALITO delivered the opinion of the Court.

A party seeking relief from an allegedly void judgment
may file a motion under Federal Rule of Civil Procedure
60(b)(4). Rule 60(c)(1) requires parties to make Rule 60(b)
motions within a "reasonable time." We hold that this time
limit applies to a motion alleging that a judgment is void.

I

Vista-Pro Automotive, LLC, entered bankruptcy in 2014.
As part of its bankruptcy litigation, Vista-Pro initiated ad-
versarial proceedings against Coney Island Auto Parts Un-
limited, Inc., to collect $50,000 in allegedly unpaid invoices.
Vista-Pro attempted to serve process on Coney Island by
mail, but in doing so, it purportedly failed to comply with
the mail-service requirements in Federal Rule of Bank-
ruptcy Procedure 7004(b)(3).

Coney Island did not file an answer in the adversarial
proceedings, and the Bankruptcy Court entered a default
judgment against the company in 2015. Over the next six
years, Vista-Pro's bankruptcy trustee attempted to enforce

Opinion of the Court

that judgment against Coney Island. As part of these ef-
forts, the trustee sent a demand letter to the company's
CEO in April 2016. Lower courts concluded that this letter
gave Coney Island notice of the judgment and the trustee's
enforcement efforts.

These efforts bore fruit in 2021 when a marshal seized
funds from Coney Island's bank account in satisfaction of
the judgment. In response, Coney Island filed a motion to
vacate the judgment under Federal Rule of Civil Procedure
60. According to Coney Island, Vista-Pro's failure to make
proper service rendered the judgment void.

The Bankruptcy Court denied relief. It held that Coney
Island failed to abide by Rule 60's requirement that parties
make motions for relief within a "reasonable time." The
District Court and Court of Appeals for the Sixth Circuit
affirmed. We granted certiorari to resolve a split of author-
ity on whether Rule 60's reasonable-time limit applies to
motions seeking relief from allegedly void judgments.[1] 605
U. S. ___ (2025).

## II

Federal Rule of Civil Procedure 60 permits a court to "re-
lieve a party . . . from a final judgment, order, or proceed-
ing," and subdivision (b)(4) specifically authorizes a court to

---

[1] Compare *In re Vista-Pro Automotive, LLC*, 109 F. 4th 438, 444 (CA6
2024) (case below), with *Austin* v. *Smith*, 312 F. 2d 337, 343 (CADC
1962); *V. T. A., Inc.* v. *Airco, Inc.*, 597 F. 2d 220, 224, and n. 9 (CA10
1979); *Rodd* v. *Region Constr. Co.*, 783 F. 2d 89, 91 (CA7 1986); *Hertz
Corp.* v. *Alamo Rent-A-Car, Inc.*, 16 F. 3d 1126, 1130 (CA11 1994); *Sea-
Land Serv., Inc.* v. *Ceramica Europa II, Inc.*, 160 F. 3d 849, 852 (CA1
1998); *United States* v. *One Toshiba Color Television*, 213 F. 3d 147, 157–
158 (CA3 2000) (en banc); *Jackson* v. *FIE Corp.*, 302 F. 3d 515, 523 (CA5
2002).

Opinion of the Court

grant relief from a "void" judgment.[2]  Parties may seek relief under Rule 60 by filing a motion with the court.

Rule 60 also imposes a time limit for such motions.  Rule 60(c)(1) provides that a "motion under Rule 60(b) must be made within a reasonable time."  Because a motion for relief from an allegedly void judgment is a "motion under Rule 60(b)," the reasonable-time limit applies.  Accord, *Kemp* v. *United States*, 596 U. S. 528, 533 (2022) ("All [Rule 60(b) motions] must be filed 'within a reasonable time'").

The structure of Rule 60 confirms what the plain text of subdivision (c)(1) provides.  When Rule 60 modifies the default reasonable-time limit, it does so expressly.  For example, Rule 60(c)(1) imposes a 1-year limit on Rule 60(b) motions alleging mistakes, new evidence, or fraud.  Thus, one would expect Rule 60 to include an analogous provision if a special, unlimited-time principle applied to motions alleging voidness.  Cf. *Kemp*, 596 U. S., at 534–535.  But the Rule does not.

Coney Island, several Courts of Appeals, and a prominent treatise nonetheless maintain that Rule 60(c)(1)'s reasonable-time limit does not apply to motions alleging voidness.  See n. 1, *supra*; 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2862, pp. 431–433 (3d ed. 2012).  These authorities acknowledge that their interpretation clashes with Rule 60's text.  See, *e.g.*, *Sea-Land Serv.*, *Inc.* v. *Ceramica Europa II*, *Inc.*, 160 F. 3d 849, 852 (CA1 1998).  But relying on the generally accepted maxim that a "void judgment is a legal nullity," *United Student Aid Funds, Inc.* v. *Espinosa*, 559 U. S. 260, 270 (2010), they argue that the passage of time cannot turn such a nullity into an enforceable judgment.  See, *e.g.*, *Austin* v. *Smith*, 312 F. 2d 337, 343 (CADC 1962).

———————
[2] Rule 60 governs motions to set aside default judgments, Fed. Rule Civ. Proc. 55(c), including those issued in bankruptcy proceedings, Fed. Rules Bkrtcy. Proc. 7055 and 9024.

4          CONEY ISLAND AUTO PARTS UNLIMITED, INC. *v.*
                          BURTON
                    Opinion of the Court

This argument cannot bear the weight that Coney Island
and others have placed on it. Even if the passage of time
cannot cure voidness, the same principle holds true for most
legal errors. Nevertheless, statutes and rules routinely
limit the time during which a party can seek relief from a
judgment infected by error. Therefore, a party in Coney Is-
land's position would need to show that some principle of
law, such as the Due Process Clause, gives a party the right
to allege voidness at any time.

Coney Island disclaims any such argument, and we can-
not divine any principle requiring courts to keep their doors
perpetually open to allegations of voidness. Giving a party
a "reasonable" time to seek relief from an allegedly void
judgment may well be all that due process demands. By
contrast, the argument that a party may allege voidness at
any time, if taken to its logical conclusion, would have ex-
treme implications. For example, if a federal district court
erroneously concluded that it possessed subject-matter ju-
risdiction and proceeded to enter a judgment, the adversely
affected party could wait as long as it wanted before filing
a notice of appeal. But see Fed. Rule App. Proc. 4(a)(1).
Similarly, if a federal court of appeals erroneously asserted
subject-matter jurisdiction, the adversely affected party
would not be required to comply with the deadline for filing
a petition for a writ of certiorari imposed by this Court's
Rule 13. It is hard to accept the proposition that due pro-
cess requires such a regime.[3]

_____

[3] JUSTICE SOTOMAYOR contends that we should abstain from addressing
any potential due-process considerations. *Post*, at 1 (opinion concurring in
judgment). Although Coney Island disclaims any constitutional argu-
ment, it cites a longstanding consensus of authority holding that a party
may allege voidness at any time despite the contrary language in Rule
60. And the only possible basis for such a holding is a rule of constitu-
tional law that prevents the imposition of the Rule's reasonable-time re-
quirement.

Opinion of the Court

Coney Island maintains that the alleged defect in this case—failure to perform proper service—is different from other legal errors that might render a judgment void.[4] Coney Island emphasizes that when a party does not receive proper service, it might not learn about the proceedings until long after the judgment issues. But this possibility does not help Coney Island's position. Rule 60(c)(1) accommodates such a scenario by imposing a reasonable-time requirement, rather than a fixed time limit. And in the context of a default judgment, it might be reasonable for a defendant not to seek relief before learning about a plaintiff's attempted enforcement.

Coney Island separately contends that courts have historically allowed litigants to seek relief from void judgments at any time. But the historical record is not so clear. To be sure, courts have granted relief from void judgments long after their entry, especially when the issuing court lacked jurisdiction over the defendant. See, *e.g.*, *Harris* v. *Hardeman*, 14 How. 334, 338, 344–346 (1853) (affirming a lower court order that set aside a judgment 11 years after its issuance where the plaintiff did not make proper service and the defendant did not appear). But there was no historical consensus that a party could request such relief at *any* time. Some courts, for instance, concluded that laches or other time limits could bar relief, even when a litigant alleged voidness. *E.g., Stocking* v. *Hanson*, 35 Minn. 207, 211–212, 28 N. W. 507, 507–508 (1886); *Smith* v. *Jones*, 174 Cal. 513, 515–517, 163 P. 890, 890–892 (1917). In any event, for Rule 60(b) motions, the Rule's "text and structure" take priority over historical practice.[5] See *Honeycutt* v. *United States*, 581 U. S. 443, 453 (2017).

---

[4] We express no view on whether the allegedly defective service in this case would render the judgment void.

[5] Rule 60(d) preserves parties' ability to obtain relief from a judgment in limited ways other than through a Rule 60(b) motion. We express no

6    CONEY ISLAND AUTO PARTS UNLIMITED, INC. *v.*
BURTON

Opinion of the Court

Coney Island turns next to this Court's decision in *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694 (1982). There, we explained that a defendant seeking to dispute personal jurisdiction is "always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment . . . in a collateral proceeding." *Id.*, at 706. Citing this sentence, Coney Island argues that defendants need not comply with time limits when alleging a lack of personal jurisdiction. But *Insurance Corp.* also recognized that the "expression of legal rights is often subject to certain procedural rules," and "the failure to enter a timely objection" may result in the loss of a legal right. *Id.*, at 705. Thus, *Insurance Corp.* undermines Coney Island's plea for no time limits.

Coney Island lastly invokes policy concerns, Rule 60's drafting history, and the canon of constitutional avoidance. To the extent that these interpretive tools carry any weight, they do so only when a Rule's language is ambiguous. See *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. 230, 245 (2021); *Milner* v. *Department of Navy*, 562 U. S. 562, 572 (2011); *Van Buren* v. *United States*, 593 U. S. 374, 393–394 (2021). Here, the operative language clearly requires parties to make Rule 60(b) motions within a reasonable time.

### III

Litigants seeking relief under Rule 60(b)(4) must comply with Rule 60(c)(1) and file a motion within a reasonable time. Coney Island does not contend that it complied with this requirement. Therefore, we need not expound on whether Coney Island's timing was reasonable. The judgment of the United States Court of Appeals for the Sixth Circuit is affirmed.

*It is so ordered.*

––––––––––

view regarding the limits applicable to obtaining relief through one of those methods.

Cite as: 607 U. S. ____ (2026)          1

SOTOMAYOR, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

———————

No. 24–808

———————

## CONEY ISLAND AUTO PARTS UNLIMITED, INC., PETITIONER *v.* JEANNE ANN BURTON, CHAPTER 7 TRUSTEE FOR VISTA-PRO AUTOMOTIVE, LLC

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[January 20, 2026]

JUSTICE SOTOMAYOR, concurring in the judgment.

The Court today rightly holds that a Rule 60(b)(4) motion to set aside a default judgment that is void for lack of personal jurisdiction must be made "within a reasonable time." Fed. Rule Civ. Proc. 60(c)(1). Rule 60's text and structure require that conclusion, as the majority explains.

I concur in the judgment because the majority unnecessarily opines on the potential validity of a constitutional challenge to the "reasonable time" limit under the Due Process Clause. *Ante*, at 4. Coney Island did not make this argument below and the Sixth Circuit did not pass upon it. See *In re Vista-Pro Automotive, LLC*, 109 F. 4th 438, 443 (2024) ("Coney Island does not mount a constitutional attack on Rule 60"). In this Court, Coney Island expressly disclaimed any due process argument. See Brief for Petitioner 22 ("To be clear, Coney Island does not contend that Rule 60 or Rule 60(c)(1) [is] unconstitutional"). This Court does "not generally entertain arguments that were not raised below and are not advanced in this Court by any party." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 721 (2014). There is no reason to depart from that practice absent unusual circumstances, which certainly are not present here.

353

# TOWN OF NORTH READING v. WELCH (1999)

## Appeals Court of Massachusetts,Suffolk.

TOWN OF NORTH READING v. Ruth E. WELCH.1

## No. 97-P-2377.

## Decided: May 21, 1999

## Present: KASS, KAPLAN, & JACOBS, JJ.

## Judith O. Trufant, Marblehead, for the plaintiff. Robert J. Deshaies, Amesbury, for the defendant.

When foreclosing a tax title acquired for nonpayment of real estate taxes, the town of North Reading failed to notify Ruth E. Welch (Ruth),[2] who had a survivorship interest in the property concerned by reason of having acquired it as a tenant by the entirety.   A judgment of the Land Court dated April 3, 1992, granted absolute title to the town.   Almost five years later, on February 10, 1997, Ruth petitioned to vacate that judgment on the ground that she had received no notice of the tax title proceedings.   A judge of the Land Court did, indeed, vacate the  judgment of foreclosure and from that order the town appealed.   We conclude that the Land Court judge, while he was right to vacate the judgment granting absolute title to the town as to Ruth, erred in vacating the entire judgment.

Some history of the underlying transactions is necessary to understand how the legal issues posed by this appeal came about.   Ruth and her husband, L. Donald Welch (Donald), had acquired the North Reading locus in 1966.   They took title as tenants by the entirety.   Apparently, Ruth and Donald lived in a house on an adjoining lot that they had acquired in 1960, also as tenants by the entirety. Donald's interest in the locus was attached in connection with an action against him by BayBank Merrimack Valley, N.A., an action which resulted in a judgment and execution of $40,875.30.   Acting on the authority of the execution, a deputy sheriff of Middlesex County gave a deed of the locus on April 20, 1978, to Albert B. Gordon and Kenneth G. Fowler, partners doing business under the partnership name, And Mac & Co.

And Mac & Co. stopped paying taxes on the locus in 1983, and on March 30, 1984, the town made a tax title taking in accordance with G.L. c. 60, §§ 53 and 54.   On March 11, 1986, the town took the next statutory step, see G.L. c. 60, § 65, of filing a petition in the Land Court to foreclose all rights of redemption.   The Land Court, conformably with G.L. c. 60, § 66, "cause[d] to be made by one of its official examiners an examination of the title sufficient only to determine the persons who may be

interested in the same."   In that purpose, the Land Court examiner failed.   The examiner missed the survivorship interest of Ruth and consequently Ruth received no notice of the tax foreclosure proceedings.   As mentioned at the beginning of this opinion the entry of a judgment of foreclosure of the equity of redemption in the locus occurred on April 3, 1992.   The order vacating that judgment-on Ruth's petition-was entered June 12, 1997.

   1.   Vacating the judgment of foreclosure.   The town argues that it was error to allow the petition to vacate the judgment of foreclosure because G.L. c. 60, § 69A, imposes a one-year limitation on bringing such a petition, a period that Ruth exceeded by more than four years.   The limiting factor on the limitation, however, is a failure to give notice to a person who has an interest of record in the real estate, as did Ruth, of a proceeding to sell that real estate for nonpayment of taxes.   Such a failure is a denial of due process of law.   Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 799-800, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983).   Christian v. Mooney, 400 Mass. 753, 760-761, 511 N.E.2d 587 (1987), appeal dismissed and cert. denied sub nom.   Christian v. Bewkes, 484 U.S. 1053, 108 S.Ct. 1003, 98 L.Ed.2d 970 (1988).   Sharon v. Kafka, 18 Mass.App.Ct. 541, 543-544, 468 N.E.2d 656 (1984).   Teschke v. Keller, 38 Mass.App.Ct. 627, 633-635, 650 N.E.2d 1279 (1995).   That Ruth would have become aware of the foreclosure had she been a diligent reader of the local newspaper, which published a notice of the tax title taking, or of the town meeting warrant, which contained an article making the locus into a public parking lot, does not compensate for the actual notice the town needed to give.   Id. at 634-635, 650 N.E.2d 1279.   See Christian v. Mooney, supra at 761 n. 10, 511 N.E.2d 587.

   2.   Proper extent of the tax title foreclosure.   Under common law, Donald, as the husband, had the right to possess and deal with the locus, and Ruth's interest was that of survivorship;  i.e., Donald could convey an interest in the property, as he did, albeit involuntarily, to And Mac & Co. but if Donald died, survived by Ruth, title in the property, free of And Mac. & Co's interest, would snap back to her.   See Coraccio v. Lowell Five Cents Sav. Bank, 415 Mass. 145, 148-150, 612 N.E.2d 650 (1993).[3]   For a detailed discussion of the history and incidents of a tenancy by the entirety, including relatively recent statutory changes, see Shwachman v. Meagher, 45 Mass.App.Ct. 428, 430-433, 699 N.E.2d 16 (1998).   The failure of the town to notify Ruth of foreclosure proceedings does not vitiate the foreclosure of And Mac & Co.'s possessory interest, which the town acquired subject to Ruth's survivorship interest.   See Gaunt v. Arzoomanian, 313 Mass. 38, 40, 46 N.E.2d 520 (1943).   For the town, this is a distinction with a difference.   It has a possessory right to the locus.   The actuarial value of Ruth's survivorship interest (Donald is still alive),  which the town can attempt to buy out, is likely to be less than the fair market value of the locus unencumbered.

The order vacating the judgment of foreclosure of the equity of redemption in the locus is vacated and a judgment shall enter vacating the foreclosure only as to the survivorship interest of Ruth Welch

and a judgment shall enter vacating the foreclosure duly as to the survivorship interest of Ruth Welch.

So ordered.

FOOTNOTES

2.    We use the first name, not out of undue familiarity, but to distinguish her from her husband, whom we presently have occasion to mention.

3.    By St.1979, c. 727, the Legislature amended G.L. c. 209, § 1, touching on, among other things, some of the incidents of a tenancy by the entirety.    A wife became equally entitled to the economic value of property held as tenants by the entirety and the interest in the principal residence of a nondebtor spouse was not subject to execution by a creditor of the debtor spouse.    As the Welch tenancy by the entirety was created before the effective date of the 1979 act and because the locus is not the principal residence of Ruth and Donald Welch, the 1979 amendment does not affect decision of the instant case.    As to the nonapplicability of the 1979 act to tenancies by the entirety created before February 11, 1980, see Turner v. Greenaway, 391 Mass. 1002, 1003, 459 N.E.2d 821 (1984).    A careful discussion of the characteristics of a tenancy by the entirety at common law and the revisions worked by the 1979 amendment appears in the Coraccio opinion.

KASS, J.

**Was this helpful?**    Yes 👍    No 👎



## Welcome to FindLaw's Cases & Codes

# ITHACA FINANCE LLC v. LEGER (2021)

## Appeals Court of Massachusetts,

ITHACA FINANCE, LLC v. Francisca LEGER.

## No. 19-P-1245

## Decided: March 30, 2021

## Present: Lemire, Ditkoff, & Grant, JJ.

## Kevin P. Geaney, Wakefield, for the plaintiff. Brian T. Corrigan, Wilmington, for the defendant.

When judgment foreclosing a taxpayer's right of redemption enters in the Land Court, "the taxpayer loses any equity he or she has accrued in the property, no matter how small the amount of taxes due or how large the amount of equity." Tallage Lincoln, LLC v. Williams, 485 Mass. 449, 453, 151 N.E.3d 344 (2020) (Williams). After a judgment of foreclosure has entered in a tax taking case, a taxpayer may move to vacate the judgment if he or she has redeemed the property within one year. G. L. c. 60, § 69A. Beyond this one-year period, however, the judgment may be vacated only when a "party alleges a violation of its rights to substantive or procedural due process." Worcester v. AME Realty Corp., 77 Mass. App. Ct. 64, 67, 928 N.E.2d 656 (2010).

The plaintiff, Ithaca Finance, LLC (Ithaca), appeals from an order of the Land Court allowing the motion of the defendant,[1] Francisca Leger, for relief from a judgment foreclosing her right of redemption. Leger's motion was filed more than one year after judgment had entered. The judge determined that Ithaca violated Leger's due process rights by failing to comply with various communication and notification requirements contained in G. L. c. 60, § 2C. We conclude that the special citation mailed to Leger by the Land Court, which notified her of Ithaca's petition to foreclose, satisfied her right to due process. Because, after one year has passed, only a violation of Leger's right to due process may justify vacating the foreclosure of the right of redemption, we reverse.

Statutory background. A brief overview of the tax taking process provides context for the present appeal. See generally Williams, 485 Mass. at 451-453, 151 N.E.3d 344.

When a taxpayer fails to pay his or her real estate taxes, a municipality or its assignee (as occurred here) may conduct a tax taking. See G. L. c. 60, §§ 2C, 53. Once the assigned party provides the requisite notice of taking, it obtains tax title, i.e., legal ownership, to the property subject to the

taxpayer's right of redemption, at the time and place designated in the notice. See G. L. c. 60, § 53. After the taking, the assigned party records an instrument of taking in the registry of deeds, which notifies prospective purchasers that the property is being taken. See G. L. c. 60, § 54; Franklin v. Metcalfe, 307 Mass. 386, 389-390, 30 N.E.2d 262 (1940). The taxpayer then has six months to "redeem" the property by paying the balance of overdue taxes, fees, costs, and interest.[2] See G. L. c. 60, §§ 61, 65. If the taxpayer does not redeem the property, the assigned party "may bring a petition in the [L]and [C]ourt for the foreclosure of all rights of redemption." G. L. c. 60, § 65.

Once a petition for foreclosure is filed, the taxpayer is notified of the obligation to appear and answer the petition. G. L. c. 60, §§ 65, 66. The taxpayer's failure to respond or redeem permits the assigned party to move to foreclose the taxpayer's right of redemption. G. L. c. 60, § 67. If the court renders a judgment of foreclosure, "strict foreclosure" results and the assigned party takes absolute title to the property free and clear from any and all encumbrances thereon.[3] Williams, 485 Mass. at 452, 151 N.E.3d 344. See G. L. c. 60, §§ 64, 69.

Pursuant to G. L. c. 60, § 69A, however, the foreclosure judgment may be vacated if the taxpayer pays the entire redemption amount, plus interest, within one year. Beyond one year, the judgment may be vacated upon a showing that the taxpayer's due process rights were denied. See Williams, 485 Mass. at 453, 151 N.E.3d 344; Ithaca Fin., LLC v. Lopez, 95 Mass. App. Ct. 241, 243, 137 N.E.3d 398 (2019) ("Absent a showing of a due process violation, strict adherence to this one-year period is mandatory").

Facts. The following facts were found by the judge in a comprehensive memorandum of decision or are undisputed in the record. On October 30, 2006, Plymouth Park Tax Services LLC, doing business as XSPAND (collectively, Plymouth Park), offered to purchase a portfolio of delinquent tax receivables that were owed to the city of Lawrence (city). Plymouth Park's offer outlined its plan to collect on delinquent taxes and how it intended to communicate with the city's taxpayers. On or about September 26, 2008, the city and Plymouth Park entered into a purchase and sale agreement whereby Plymouth Park became the city's assignee of the right to collect on tax delinquencies. One such delinquency pertained to property located at 116 Bunkerhill Street (property), which was owned by Felicia Hilario.

Hilario owed the city $3,229.66 in taxes for the 2008 and 2009 fiscal years. On February 16, 2010, Plymouth Park recorded in the registry of deeds an instrument of taking against the property for unpaid taxes, interest, and incidental expenses for those fiscal years. Leger purchased the property from Hilario on July 31, 2012.[4] During the transaction, an attorney for the mortgagee bank neglected to obtain a municipal lien certificate from the city or otherwise inquire as to the status of outstanding taxes owed on the property. Leger was not aware of any tax liens on the property at the time of the purchase.

On May 24, 2013, the city recorded a second instrument of taking against the property for unpaid taxes during the 2012 fiscal year, which incorrectly listed Hilario as the owner of the property. On or around March 21, 2014, Plymouth Park assigned its right, title, and interest in the property to Ithaca for $6,478.42.

On March 31, 2014, Ithaca sent a single letter, titled "Notice of Assignment of Real Estate Tax Lien," to the property address; the letter was addressed to both Hilario and Leger, who both lived at the property at that time.[5] Ithaca then filed the present tax taking action on May 20, 2014. Because Ithaca did not name Leger as a defendant and incorrectly listed Hilario as the property's owner, it was given leave to amend its petition to list Leger as a defendant. The Land Court subsequently issued a special citation notifying Leger that Ithaca had filed a petition to foreclose her right of redemption to the property. The special citation explained that a "complaint . to foreclose all rights of redemption concerning" the property had been filed against Leger, set forth how to respond and the date by which to respond, and stated that a failure to appear would result in a default. Leger failed to respond, and Ithaca's motion for default was allowed on May 19, 2016. Final judgment foreclosing Leger's right of redemption entered on May 31, 2016.

On June 16, 2017, approximately two weeks after the one-year statutory redemption period had expired, Ithaca notified Leger by letter that it was "the owner of the property which you currently occupy" and directed her to begin making payments "for use and occupancy charges" to Ithaca. Leger thereafter filed a motion for relief from the judgment of foreclosure.

Following a two-day evidentiary hearing, the judge granted Leger's motion. The judge concluded that Ithaca violated Leger's right to due process by failing to abide by various provisions of G. L. c. 60, § 2C, as we outline infra. The judge determined that "[t]he denial of due process caused by Ithaca's and Plymouth Park's combined failures to comply with the conditions of assignment and the requirements of the statute was not cured by [Leger's] receipt of the special citation served on her by the Land Court upon the initiation of the tax foreclosure proceeding." This appeal followed.

On appeal, Ithaca claims, inter alia, that Leger was afforded due process because the Land Court provided her with notice of Ithaca's petition to foreclose, to which she ultimately failed to respond.[6] We agree.

Discussion. 1. Standard of review. "General Laws c. 60, § 69A, and related case law, govern petitions to vacate judgments of foreclosure." Worcester, 77 Mass. App. Ct. at 67, 928 N.E.2d 656. "[A] petition to vacate a prior decree foreclosing the right of redemption under a tax title is 'extraordinary in nature and ought to be granted only after careful consideration and in instances where . [it is] required to accomplish justice.' " Sharon v. Kafka, 18 Mass. App. Ct. 541, 542, 468 N.E.2d 656 (1984), quoting

Lynch v. Boston, 313 Mass. 478, 480, 48 N.E.2d 26 (1943). "Allowance of a petition rests 'largely but not entirely in the discretion of the trial judge.' . Consequently we review the denial of the petition for abuse of discretion and error of law." Worcester, supra, quoting Lynch, supra.

2. Whether Leger was afforded due process by her receipt of the Land Court special citation. The due process clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "Applying this constitutional standard to a government sale of private land for failure to pay taxes, the [United States Supreme] Court explained that '[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party ." Andover v. State Fin. Servs., Inc., 432 Mass. 571, 574, 736 N.E.2d 837 (2000), quoting Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 800, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983).

"[General Laws] c. 60, § 66, requires that notice of the petition to foreclose be sent to interested parties by certified mail. G. L. c. 60, § 66. G. L. c. 4, § 7, Forty-fourth. By requiring certified mail, as opposed to first class mail, our notice statute not only satisfies due process, but provides greater assurance to our property owners that notice will actually be received." Andover, 432 Mass. at 575, 736 N.E.2d 837. Leger does not dispute that she was given notice of the petition to foreclose her right of redemption by the Land Court by special citation. Indeed, her signature appears on the green certified mail receipt card indicating that she received the notice, a point she does not dispute on appeal.

The focus of the judge's decision was Ithaca's pursuit of an inequitable foreclosure that resulted in the deprivation of Leger's due process rights. Essentially, the judge determined that an entity Leger had never heard of took title to her property on the basis of Hilario's failure to pay the property taxes.[7] The judge specifically found that Ithaca did not communicate with Leger from the time it acquired "the tax receivable on the Property" in 2014 until it mailed Leger a letter in June 2017 informing her that she no longer owned the property and was to begin making payments to Ithaca. Additionally, the judge ruled that Ithaca violated G. L. c. 60, § 2C, by failing to abide by the terms of its assignment from Plymouth Park, which had predicated its purchase of delinquent tax receivables from the city on communicating with taxpayers and assisting in their repayment efforts prior to commencing a foreclosure. See G. L. c. 60, § 2C (c) (1) (iii) (assigned tax receivables shall be sold "to the most responsible and responsive offeror" subject to consideration of "the offeror's plan for communicating with the taxpayers"); G. L. c. 60, § 2C (g) (3) (assigned tax receivables must be transferred "under the

same terms and conditions and in the same manner as originally assigned and transferred"). Finally, the judge found that Ithaca violated an explicit statutory obligation to notify the city and Leger of the assignment from Plymouth Park within twelve days. See G. L. c. 60, § 2C (c) (9).

While we empathize with Leger's plight under the unfortunate circumstances of this case, binding precedent requires us to conclude that due process was satisfied. The failure to give notice to an interested party of a tax foreclosure proceeding in Land Court constitutes a due process violation. See, e.g., North Reading v. Welch, 46 Mass. App. Ct. 818, 819-820, 711 N.E.2d 603 (1999); Boston v. James, 26 Mass. App. Ct. 625, 630, 530 N.E.2d 1254 (1988). We are not aware of any case that stands for the proposition that a foreclosing entity's violation of the tax lien statute's assignment and communication procedures, as the judge found here, amounts to a denial of due process. To the contrary, the Supreme Judicial Court has reasoned that sending the Land Court notice to the taxpayer by certified mail, return receipt requested, was "all due process requires," at least where, as here, the return receipt indicated that the notice was received. Andover, 432 Mass. at 575, 736 N.E.2d 837.

Leger received notice from the Land Court of Ithaca's petition to foreclose her right of redemption. She signed the card indicating her receipt thereof. She did not respond, and strict foreclosure entered against her. With the one-year redemption period running, Ithaca had no legal obligation to notify Leger of the foreclosure judgment. See Williams, 485 Mass. at 469, 151 N.E.3d 344 (Appendix) ("If a taxpayer fails to file a timely response to the petition to foreclose and if the owner of the tax title moves the Land Court to enter a judgment of foreclosure of the right of redemption, there is no statutory requirement that the taxpayer be notified of the foreclosure judgment"). After one year, the command of G. L. c. 60, § 69A, which protects the public's "need for an efficient and final determination of any dispute regarding a public landtaking, so that title to the land taken can be settled," Sharon, 18 Mass. App. Ct. at 543, 468 N.E.2d 656, quoting Whitehouse v. Sherborn, 11 Mass. App. Ct. 668, 671, 419 N.E.2d 293 (1981), bars relief absent a due process violation. "The Legislature appears to have determined that the public interest in marketable titles for tax takings 'outweighs considerations of individual hardship' after one year."[8] Sharon, supra, quoting Hardisty v. Kay, 268 Md. 202, 208, 299 A.2d 771 (1973).

In sum, because Leger was afforded constitutionally acceptable notice of Ithaca's foreclosure petition pursuant to G. L. c. 60, § 66, we "may not subject the legislative judgment to a judicial review of its equity." Andover, 432 Mass. at 576, 736 N.E.2d 837.

Conclusion. The order allowing the motion for relief from the judgment of foreclosure is vacated, and the case is remanded with direction to deny the motion.

So ordered.

FOOTNOTES

1.     Ithaca named a number of parties as defendants. Leger is the only defendant participating in this appeal and, therefore, is the only defendant to which we refer.

2.     Interest accrues at fourteen percent annually from the time taxes are due until the time of the taking and increases to sixteen percent annually thereafter. See G. L. c. 59, § 57; G. L. c. 60, § 62.

3.     We cannot overstate the severity of the impact that a tax foreclosure judgment may have on the taxpayer. "See Tallage LLC vs. Meaney, Mass. Land Ct., No. 11 TL 143094, 2015 WL 4207424 (June 26, 2015) (failure of taxpayers to pay municipal water and sewer bills amounting to $492.51 resulted in foreclosure on property with fair market value of $270,000)." Williams, 485 Mass. at 453, 151 N.E.3d 344.

4.     Since she purchased the property, Leger has faithfully paid her real estate taxes.

5.     The record indicates that the property was a multifamily building.

6.     Ithaca raises additional claims in its appellate brief. In light of our conclusion, however, we need not address them.

7.     Nevertheless, tax liens attach to the property and not the person. See Luchini v. Commissioner of Revenue, 436 Mass. 403, 406, 764 N.E.2d 870 (2002).

8.     The present case implicates rather unusual circumstances. For instance, the foreclosing entity here is a private party, not a municipality. As one Land Court decision explained, "[s]uch entities are responsible to their investors, not the citizens of a city or town, and their goals and incentives are not the same. Maximizing return on investment may not include accommodation to individual circumstance to the same extent a municipality, acting for itself, might otherwise deem warranted." Tallage LLC vs. Meaney, Mass. Land Ct., No. 11 TL 143094, 2015 WL 4207424 (June 26, 2015). Actions taken by private entities are not afforded the traditional level of judicial discretion and deference that a public entity enjoys. See Navy Yard Four Assocs., LLC v. Department of Envtl. Protection, 88 Mass. App. Ct. 213, 223, 37 N.E.3d 46 (2015).Moreover, as the judge concluded and as we have outlined in this opinion, Ithaca's violations of several provisions of G. L. c. 60, § 2C, resulted in an inequitable foreclosure. We note that established case law requires the provisions of c. 60 to be strictly construed in favor of protecting the taxpayer's right of redemption. See Williams, 485 Mass. at 457, 151 N.E.3d 344, citing Snow v. Marlborough, 301 Mass. 422, 426-427, 17 N.E.2d 318 (1938). We question whether, in light of the severe consequences a taxpayer faces in these proceedings, the Legislature fully considered the desirability of completely prohibiting relief after one year in a circumstance where a private entity repeatedly violated explicit statutory obligations.

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com



_____
Lolonyon Y Akouete

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) |  |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

## MOTION TO OBJECT TO PROCEDURAL POSTURE AND TO REQUIRE PROPER ADJUDICATION OF DELAWARE MANAGERIAL STATUS PREDICATE
### (DUE PROCESS AND CONSTITUTIONAL OBJECTION)

Creditor **Lolonyon Akouete** ("Movant"), pursuant to the Fifth Amendment to the United States Constitution, 11 U.S.C. § 502, 28 U.S.C. § 157, and applicable non-bankruptcy law, respectfully moves this Court for entry of an order correcting the current procedural posture governing adjudication of the Trustee's objection to Movant's claim and requiring that the threshold Delaware managerial-status predicate be adjudicated in a procedurally lawful manner. In support thereof, Movant states as follows:

## I. INTRODUCTION AND RELIEF REQUESTED

The Trustee seeks to disallow Movant's claim by asserting that Movant lacked managerial or delegated authority under Delaware law. That assertion does not merely contest the amount or documentation of a claim; it raises a **threshold status dispute** governed by **6 Del. C. § 18-110**, a statute enacted specifically to determine who is or was a lawful manager of a Delaware limited liability company, whether authority existed, and whether such authority was lawfully terminated.

Rather than permitting that statutory status question to be adjudicated directly, the current procedural posture has produced the following result: relief from the automatic stay to permit a § 18-110 proceeding in Delaware has been denied; an adversary proceeding seeking adjudication of managerial status has been denied and stayed on the ground that the issue should instead be resolved through claim allowance, **See Adversary Proceeding No. 24-04017-CJP**; and the Trustee is now permitted to rely on the absence of any status adjudication to deny Movant's claim through the claim-allowance process.

This configuration prevents Movant from litigating a dispositive state-law status issue in any forum, while simultaneously allowing that unresolved issue to be used against him. The result is a denial of due process and an impermissible procedural foreclosure of statutory rights.

Accordingly, Movant respectfully requests that the Court either (A) stay or bifurcate the claim-allowance proceeding as to the managerial-status predicate and grant limited relief from the automatic stay to permit a summary proceeding under 6 Del. C. § 18-110; or (B) adjudicate the Delaware managerial-status predicate as a severed threshold issue, applying Delaware internal-affairs law with appropriate procedural protections, before any claim-allowance determination. In the alternative, Movant requests that the Court preserve his right to Article III adjudication by

treating any determination of managerial status as non-final and issuing proposed findings and conclusions.

## II. THE TRUSTEE'S OBJECTION TURNS ON A DELAWARE MANAGERIAL STATUS DETERMINATION

The Trustee's objection does not merely challenge the quantum of compensation or the sufficiency of documentation. Instead, it asserts that Movant's claim fails because Movant allegedly lacked managerial or delegated authority under Delaware law. That contention necessarily raises an antecedent question: **who was the lawful manager of the Debtor**, and whether authority was validly delegated or terminated.

This is not a bankruptcy-created issue. It is a pure question of Delaware internal-affairs law. Delaware has expressly provided a statutory mechanism—**6 Del. C. § 18-110**—for resolving precisely this type of dispute. The statute exists to ensure that questions of managerial status are resolved directly, promptly, and definitively, because such determinations affect governance, authority, and third-party reliance.

## III. CLAIM ALLOWANCE UNDER 11 U.S.C. § 502 CANNOT BE USED TO FORECLOSE ADJUDICATION OF A DISPOSITIVE STATE-LAW STATUS PREDICATE

### A. Section 502 Determines Enforceability of Claims, Not Corporate or LLC Status

The claim-allowance process under **11 U.S.C. § 502** determines whether a creditor holds a right to payment and the extent to which that right is enforceable under applicable non-bankruptcy law. It does not create substantive rights, alter state-law governance rules, or displace statutorily mandated status determinations.

When an objection is asserted under § 502(b)(1), the Court must apply the same defenses and standards that would govern enforceability outside bankruptcy. The statute does not authorize bypassing or collapsing a dispositive state-law predicate merely because the dispute arises in connection with a proof of claim.

Here, the Trustee's objection asserts that Movant lacked lawful authority under Delaware law and therefore has no enforceable right to payment. That contention raises a **threshold status question**, not a subsidiary factual issue, and must be adjudicated under the Delaware statutes designed for that purpose.

### B. Delaware Law Treats Managerial Authority as a Status Question Governed by Specialized Statutes

Under Delaware law, disputes over who is or was a lawful manager or corporate officer are resolved through **summary status proceedings**, not incidental fact-finding. For LLCs, that mechanism is **6 Del. C. § 18-110**. Where the manager is a corporation, disputes over corporate authority, continuity, or succession are addressed through **8 Del. C. § 225**.

These statutes establish the proper analytical sequence: **status must be determined first**, because enforceability flows from status.

## C.  Section 502(b)(4) Presupposes a State-Law Compensation Right and Precludes a "Stranger" Theory

Delaware law and the parties' contracts govern whether any compensation right exists. Delaware LLCs are contractual entities, and the LLC Act functions as a gap-filler only; where the governing agreements address authority or compensation, the contracts control. Here, the operative agreements allocate managerial authority to the Manager and vest discretion in the Manager to determine reasonable compensation, creating a substantive state-law entitlement (if proven).

Section 502 does not create or reprice compensation rights. Section 502(b)(4) is a limiting provision that applies only if a valid state-law entitlement exists and the claimant is an insider; it may cap recovery at reasonable value, but it cannot void contracts, negate managerial authority, or substitute for a status determination.

By invoking § 502(b)(4), the Trustee necessarily concedes that Delaware managerial status is a threshold predicate. Having advanced an insider/managing-agent theory, the Trustee may not simultaneously characterize Movant as a complete "stranger" to the Debtor. The proper sequence is to adjudicate managerial status and contractual entitlement under Delaware law first, and only then apply any § 502(b)(4) limitation.

## D. The Trustee's Procedural Posture Creates an Impermissible Adjudicative Dead End

In this case, relief from stay was denied, the adversary proceeding was stayed, and the Trustee is now permitted to rely on the absence of a status determination to disallow the claim. A claim objection cannot be used to deny access to the statutorily designated forum, prevent adjudication, and then rely on that absence as a basis for disallowance.

## E. Due Process Requires Actual Adjudication of the State-Law Predicate

While bankruptcy courts may apply state law, due process requires that dispositive state-law predicates receive procedurally fair treatment consistent with their nature. The current posture— forcing a Delaware status dispute into claim allowance while foreclosing all other avenues of adjudication—cannot support disallowance under § 502.

## IV. THE CURRENT PROCEDURAL POSTURE—INCLUDING THE ARTIFICIAL NARROWING OF DISCOVERY—VIOLATES DUE PROCESS AND FUNDAMENTAL FAIRNESS

Due process requires the opportunity to be heard at a meaningful time and in a meaningful manner. That requirement is not satisfied where a court permits a dispositive legal issue to be used against a party while simultaneously restricting the discovery necessary to litigate that issue.

Here, discovery has been improperly constrained by mischaracterizing the dispute as a narrow claim-allowance issue. In reality, the Trustee's objection places at issue the identity and continuity of the Manager named in the Operating Agreement, compliance with Member-consent requirements, corporate authority, merger and resignation validity, and historical governance. These issues require **broad, historical discovery**, not a snapshot review.

366

Limiting discovery to the moment of alleged delegation presupposes the conclusion in dispute and inverts the burden of proof. Efficiency cannot justify a structure that collapses a statutory status determination into an evidentiary sidebar, restricts discovery to avoid foundational inquiry, and produces potentially preclusive findings without adequate process.

The result is a procedural catch-22: Movant is denied a forum, denied discovery, and then penalized for failing to prove what the structure prevents him from proving. That violates fundamental fairness.

## V. REQUESTED RELIEF

Movant respectfully requests the following relief, in the alternative and in the order of preference set forth below.

## A. Primary Relief

Stay or bifurcate the claim-allowance proceeding as to the managerial-status predicate and grant limited relief from the automatic stay to permit a summary proceeding under **6 Del. C. § 18-110** in the Delaware Court of Chancery.

## B. Alternative Relief

If the Court elects to retain the matter, sever and adjudicate the Delaware managerial-status predicate as a threshold issue, applying **6 Del. C. § 18-110** and **8 Del. C. § 225**, permitting discovery commensurate with the scope of the dispute, and resolving status before claim allowance.

## C. Conditional Relief

If neither of the above is granted, treat any determination of managerial status as non-core or constitutionally non-final and issue proposed findings and conclusions, preserving Movant's Article III rights.

## VI. CONCLUSION

The Trustee has made Delaware managerial status dispositive. Due process requires that such status be adjudicated directly, lawfully, and fairly—not procedurally suppressed and then used as a basis for denial.

**WHEREFORE**, Movant respectfully requests that the Court grant the relief requested herein and such other and further relief as the Court deems just and proper.

DATED: January 25, 2026, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Mills Rd

367

Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

<u>CERTIFICATE OF SERVICE</u>

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com

_____
Lolonyon Y Akouete

369

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

### EMERGENCY MOTION FOR LIMITED CLARIFICATION OF PRELIMINARY INJUNCTION TO PERMIT PROCEDURAL APPEARANCE IN PENDING STATE COURT ACTION

### EMERGENCY BASIS

This motion is filed on an emergency basis because a hearing in **Akouete v. Mignonette Investments Limited**, Suffolk Superior Court, C.A. No. 2584CV02036, is scheduled for **February 4, 2026 at 2:00 PM**. That hearing date has been on the state court calendar **since October 9, 2025**. The Bankruptcy Court has not yet resolved the underlying disputes referenced in the injunction proceedings, and Movant now faces imminent procedural consequences unless clarification is provided.

### INTRODUCTION

Defendant **Lolonyon Akouete** ("Movant"), appearing pro se, respectfully requests **limited clarification** of this Court's Preliminary Injunction Order entered September 24, 2025.

Movant is **not** seeking to litigate claims, conduct discovery, pursue damages, or enforce any judgment. Instead, Movant seeks guidance as to whether the injunction prohibits him from taking **purely procedural steps** in state court so that he does not lose rights due to delay while matters remain pending here.

This motion is filed out of respect for this Court's authority and to avoid any action that might be misinterpreted as violating the injunction.

### FACTUAL AND PROCEDURAL BACKGROUND

In September 2025, the Chapter 7 Trustee commenced Adversary Proceeding No. 25-04027-CJP seeking to restrain Movant from proceeding in a separate Superior Court action involving Mignonette Investments Limited. The Court held an emergency hearing and entered a Preliminary Injunction on September 24, 2025.

Movant complied with the Court's directive to file the injunction in Superior Court and request a stay. The state court, however, did not enter a stay order. Instead, it scheduled a hearing for February 4, 2026 — a date fixed on October 9, 2025, nearly four months ago.

Since entry of the injunction, extensive litigation has continued in this Court. Motions for clarification, reconsideration, expansion of the injunction, anti-SLAPP dismissal, and dissolution of the injunction have been briefed across late 2025 and into January 2026. The Trustee has sought additional relief, Movant has filed oppositions and replies, and the Court has denied expedited determinations at various points, indicating that certain matters would proceed in the ordinary course and that ultimate issues remain reserved.

As a result, the injunction remains in place while the core disputes between the parties remain unresolved. During this time, the state court calendar has continued moving forward independently.

Meanwhile, in the Superior Court action, Mignonette Investments Limited has not appeared or filed any responsive pleading. Under Massachusetts procedure, Movant is entitled to seek entry of default upon proof of service and non-appearance. However, Movant has refrained from taking steps beyond filing the injunction and stay request because of uncertainty regarding the scope of this Court's order.

Now, with the February 4 hearing imminent, Movant faces procedural risk. If he fails to appear or take required ministerial steps, he risks dismissal or forfeiture of default rights. If he appears without guidance, he risks being accused of "prosecuting" the case in violation of the injunction.

This motion is therefore necessary to resolve that conflict.

## NATURE OF THE RELIEF REQUESTED

Movant seeks clarification that the injunction does **not** prohibit:

• Appearing at the February 4, 2026 hearing
• Requesting remote/Zoom appearance
• Filing affidavit of service
• Seeking **entry of default only**

Movant expressly agrees that:

• No damages determination will be sought
• No enforcement will occur
• No execution or collection will occur
• Further proceedings remain subject to this Court

## GROUNDS FOR RELIEF

## I. This Motion Seeks Compliance, Not Circumvention

Movant files this motion precisely to avoid violating this Court's orders. Clarification is needed to distinguish between "prosecuting" a case and taking ministerial steps to preserve procedural posture.

## II. Default Entry Without Damages Does Not Affect Estate Administration

Entry of default:

• Does not liquidate a claim
• Does not transfer property
• Does not authorize enforcement

It merely records that a party failed to appear.

### III. Passage of Time and Imminent Harm

The hearing was set October 9, 2025. The bankruptcy proceedings have continued for months without final resolution. Movant now faces immediate procedural consequences unrelated to merits or estate property.

### IV. The Request Is Narrow and Preserves the Status Quo

Movant is not attempting to obtain a judgment ahead of this Court. He is asking to preserve procedural posture while deferring all substantive and financial matters.

### RELIEF REQUESTED

Movant respectfully requests an order clarifying that the Preliminary Injunction does not prohibit Movant from:

1. Appearing at the February 4, 2026 Superior Court hearing
2. Requesting remote appearance
3. Filing proof of service
4. Seeking entry of default only

and providing that no damages or enforcement may proceed absent further order of this Court.

DATED: January 26, 2026, Respectfully submitted:

By creditor,

Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
info@smartinvestorsllc.com
(443) 447-3276

| NOTICE TO APPEAR FOR MOTION HEARING | DOCKET NUMBER 2584CV02036 | Massachusetts Trial Court The Superior Court Department |
|---|---|---|

| CASE NAME | John E Powers, III |
|---|---|
| **Akouete, Lolonyon vs. Mignonette Investments Limited** | Suffolk County Civil |

| TO: | COURT NAME AND ADDRESS |
|---|---|
| Lolonyon Akouete 800 Red Mills Road Wallkill, NY 12589 | Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |

The Court will hear the following event:  **MOTION HEARING**

Counsel should appear as follows:  **Date: 02/04/2026**

**Time: 02:00 PM**

**Event Type: In Person**

Session/ Courtroom Location:  **BOS-10th FL, CR 1008 (SC)**

**Further Orders of the Court.**

| DATE ISSUED 10/9/25 | ASSOCIATE JUSTICE Hon. Anthony M. Campo | |
|---|---|---|

## CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C. 101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com



_____
Lolonyon Y Akouete



# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

In re:

Westborough SPE LLC

Debtor

Chapter 7
23-40709-CJP

## ORDER

**MATTER:**

#1103 Emergency Motion filed by Creditor Lolonyon Akouete for Limited Clarification of Preliminary Injunction to Permit Procedural Appearance in Pending State Court Action.

THE "EMERGENCY MOTION FOR LIMITED CLARIFICATION OF PRELIMINARY INJUNCTION TO PERMIT PROCEDURAL APPEARANCE IN PENDING STATE COURT ACTION" [ECF NO. 1003] (THE "EMERGENCY MOTION") OF LOLONYON AKOUETE IS DENIED IN PART.

MR. AKOUETE REPRESENTS THAT HE HAS FILED A MOTION IN THE SUFFOLK SUPERIOR COURT CASE OF AKOUETE V. MIGNONETTE INVESTMENTS LIMITED (C.A. No. 2584CV02036) (THE "STATE COURT CASE") REQUESTING A STAY OF THE STATE COURT CASE CONSISTENT WITH PRIOR ORDERS OF THIS COURT. HE ALSO STATES THAT THE SUPERIOR COURT HAS A HEARING SCHEDULED ON FEBRUARY 4, 2026, BUT DOES NOT SPECIFY THE SUBJECT OF THE HEARING. MR. AKOUETE SEEKS CLARIFICATION PURSUANT TO THE MOTION THAT THE PRESENT INJUNCTION DOES NOT PROHIBIT HIM FROM (1) APPEARING AT THE FEBRUARY 4, 2026 HEARING; (2) REQUESTING REMOTE ACCESS WITH RESPECT TO THAT HEARING; (3) FILING AN AFFIDAVIT OF SERVICE; OR (4) SEEKING ENTRY OF DEFAULT.

THE COURT CLARIFIES THAT, IF THE SUPERIOR COURT HAS SCHEDULED A HEARING, MR. AKOUETE MAY APPEAR AND PROVIDE A STATUS REPORT TO THE SUPERIOR COURT AND REQUEST TO APPEAR REMOTELY FOR THAT PURPOSE. MR. AKOUETE MAY ALSO REQUEST THAT THE SUPERIOR COURT GRANT MR. AKOUETE'S REQUEST TO STAY THE STATE COURT CASE. MR. AKOUETE MAY NOT REQUEST ENTRY OF DEFAULT OR SEEK OTHER RELIEF. IT IS NOT CLEAR WHAT THE AFFIDAVIT OF SERVICE REFERENCED BY MR. AKOUETE IS RELATED TO. IF IT IS FOR THE PURPOSE OF PROVIDING NOTICE OF THE REQUEST TO APPEAR REMOTELY OR TO HAVE THE STATE COURT ACTION STAYED, HE MAY ALSO FILE SUCH AFFIDAVIT. IF IT IS RELATED TO

HIS EFFORTS TO OBTAIN A DEFAULT, IT IS PROHIBITED ABSENT FURTHER ORDER.
SHOULD MR. AKOUETE SEEK APPROVAL FROM THE SUPERIOR COURT TO APPEAR
REMOTELY, HE SHOULD ALSO REQUEST THAT THE CHAPTER 7 TRUSTEE BE ALLOWED
TO DO THE SAME IF HE OR HIS COUNSEL WISHES TO ATTEND THAT HEARING. THE
TRUSTEE IS NOT REQUIRED TO ATTEND ANY SUPERIOR COURT HEARINGS, BUT MAY
DO SO IF HE OR HIS COUNSEL BELIEVE THAT IS APPROPRIATE OR WOULD BE USEFUL
TO THE SUPERIOR COURT.

MR. AKOUETE SHALL ATTACH A COPY OF THIS ORDER TO ANY FILING HE MAKES IN
THE SUPERIOR COURT WITH RESPECT TO THE FEBRUARY 4, 2026 HEARING.

Dated: 01/30/2026                                    By the Court,

                                                     Christopher J. Panos
                                                     United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) |  |
|  | ) |  |
| Debtor | ) |  |
|  | ) |  |
| JONATHAN R. GOLDSMITH, | ) |  |
| CHAPTER 7 TRUSTEE OF | ) |  |
| WESTBOROUGH SPE LLC, | ) | AP No. 25-4027-CJP |
|  | ) |  |
| Plaintiff | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| LOLONYON AKOUETE, | ) |  |
|  | ) |  |
| Defendant | ) |  |

**PRELIMINARY INJUNCTION ORDER**

Before the Court is the motion filed by the plaintiff Jonathan R. Goldsmith, the Chapter 7

Trustee (the "Trustee") of Westborough SPE LLC (the "Debtor"), seeking certain injunctive

relief on a preliminary basis [ECF No. 2] (the "Motion")[1] and the opposition and supplement

filed by Lolonyon Akouete (the "Defendant") [ECF Nos. 8 and 13[2]].   Upon consideration of the

---

[1]   The Trustee commenced the above-captioned adversary proceeding (the "Adversary
Proceeding") on or about September 18, 2025, through the filing of a complaint in which he
seeks injunctive relief on a preliminary and permanent basis enjoining the defendant Lolonyon
Akouete from taking certain actions.

[2]  The Court has considered the Defendant's *Supplemental Opposition to Trustee's Motion for
Preliminary Injunction, Cross-Motion to Compel Compliance With Subpoenas, and Request for
Detailed Written Findings* [ECF No. 13] (the "Supplement") in connection with entry of
preliminary injunctive relief.   To the extent the Defendant seeks any further relief pursuant to
the Supplement, such relief is denied.

record in this case and arguments made at an emergency hearing on September 23, 2025 (the

"Hearing"), pursuant to 11 U.S.C. § 105 and for the reasons stated on the record at the Hearing in

considering the four-part standard[3] in determining whether to grant preliminary injunctive relief,

including that this relief is necessary to carry out the provisions of Title 11, restrain interference

with administration of the Debtor's estate, avoid the risk of inconsistent findings or rulings

regarding property of the estate and the claims administration process regarding claims asserted

by the Defendant in the Debtor's case, which are the subject of a dispute and a pending claim

objection of the Trustee that is in the summary judgment stage, and avoid an abuse of process by

the Defendant, and finding that the Trustee has made the requisite showing as to each of the four

framework factors, the Motion is GRANTED in part as set forth herein and it is further

ORDERED, effective immediately upon entry of this Order on the docket of the Adversary

Proceeding:

    1. Lolonyon Akouete, and any person with actual notice of this injunction acting on

       behalf of the Defendant, is enjoined from taking any action to litigate or prosecute in

       any way the claims asserted in the action styled *Akouete v. Mignonette Investments*

       *Ltd.*; Massachusetts Superior Court Department of the Trial Court, CA No.

---

[3] The United States Court of Appeals for the First Circuit has applied the following framework to determination of preliminary injunctions: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996) (citations omitted). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citation omitted).

2584CV2036G (the "Superior Court Case") absent further order of this Court.

2. The Defendant is further ordered to immediately file a copy of this Order in the Superior Court Case, together with a request that that the Superior Court stay the Superior Court Case while this injunction remains in effect. The Defendant shall promptly serve the Trustee by email with copies of any filings or orders entered in the Superior Court Action.

3. The Defendant is further enjoined from further communications with potential witnesses Peter Blaustein, Jan Scholes, and Dyann Blaine absent leave of Court or until entry of an order determining the pending motions for summary judgment with respect to Defendant's claim in the bankruptcy case

The Court will schedule a case management conference in the Adversary Proceeding after determination of the summary judgment motions.

Dated: September 24, 2025

By the Court,

Christopher J. Panos
United States Bankruptcy Judge