UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
In re:                                          )                    Chapter 7
                                                )                    Case No. 23-40709-CJP
WESTBOROUGH SPE LLC,                            )
                                                )
        Debtor                                  )
_____                )

## MEMORANDUM OF DECISION AND ORDER
## REGARDING THE TRUSTEE'S OBJECTIONS TO THE CLAIMS
## FILED BY LOLONYON AKOUETE AND DENISE EDWARDS

Before the Court are cross-motions for summary judgment filed by Jonathan R.

Goldsmith (the "Trustee") [ECF No. 736], chapter 7 trustee of the bankruptcy estate of

Westborough SPE LLC (the "Debtor"), Lolonyon Akouete ("Akouete") [ECF No. 658], and

Denise Edwards ("Edwards") [ECF No. 845], respectively, regarding the Trustee's (1) Objection

to Claim No. 4 of Akouete [ECF No. 462], as supplemented by ECF No. 544 (together, the

"Akouete Claim Objection") and (2) the Objection to Claim No. 5 of Edwards [ECF No. 639]

(the "Edwards Claim Objection," together with the Akouete Claim Objection, collectively, the

"Objections"), which the Court consolidated on a limited basis for the purpose of considering

summary judgment on the issue of managerial authority.  *See* Order [ECF No. 683].  The parties

have filed statements of undisputed material facts, affidavits and supporting evidence,

oppositions, and responses.  I have considered the summary judgment record and the entire

record of the case in reaching my determination.[1]  For the reasons below, I grant the Trustee's

---

[1] The record includes, but is not limited to, the Objections, Akouete's Response to the Trustee's Objection to Claim
No. 4 [ECF No. 469], Akouete's Opposition to the Trustee's Objection to Claim No. 5 [ECF No. 673], Edwards's
Motion Objecting to the Trustee's Objection to Claim No. 5 [ECF No. 678], which has been deemed as her response
to the Edwards Claim Objection, *see* Order [ECF No. 750], the Trustee's Brief in Support of his Motion for
Summary Judgment [ECF No. 737], the Trustee's Statement of Undisputed Material Facts [ECF No. 739], the

summary judgment motion and deny Akouete's and Edwards's respective summary judgment

motions.  As a result, I sustain the Trustee's Objections and disallow the claims of Akouete and

Edwards.

I.    Introduction

This unusual case involves a "ghost ship" business debtor that arrived in bankruptcy by

way of an involuntary petition and that possesses significant assets from recovery of unclaimed

funds and a now settled claim to avoid a tax-lien foreclosure sale of a valuable commercial

property, located at 231 Turnpike Road, Westborough, Massachusetts (the "Property").  There

has been no participation by the Debtor's equity holder during this case.  It also appears that, for

many years prepetition, the Debtor has had no active management or equity holder participation.

The Objections involve claims asserted by Akouete and Edwards in this case, initially strangers

to the Debtor who are asset recovery specialists that discovered and pursued the unclaimed funds

held by the State of California belonging to the Debtor.  Their prepetition actions by which they

attempted to take control of the assets of the Debtor, and then management of the Debtor, are

integral to the question of whether they are entitled to the claims they have asserted.

---

Trustee's Affidavit [ECF No. 740], counsel to the Trustee, Christine Devine's Affidavit [ECF No. 740], Walter A. Horst's Affidavits, [ECF Nos. 742 and 743], Peter L. Blaustein's Affidavit [ECF No. 744], the Trustee's Opposition to Akouete's Motion for Summary Judgment [ECF No. 791], Akouete's Consolidated Opposition to the Trustee's Motion for Summary Judgment [ECF No. 798], Akouete's Affidavits [ECF Nos. 660, 799, and 865], Akouete's Supplemental Reply to the Trustee's Opposition to Akouete's Motion for Summary Judgment [ECF No. 823], the Trustee's Reply to Akouete's Consolidated Opposition [ECF No. 824], Edwards's Statement of Undisputed Material Facts [ECF No. 846], Edwards' Opposition to the Trustee's Motion for Summary Judgment [ECF No. 851], the Trustee's Opposition to Edwards's Motion for Summary Judgment [ECF No. 855], Edwards' Deposition Transcript [ECF No. 861], the Trustee's Reply to Edwards's Opposition [ECF No. 862], Akouete's and Edwards's Joint Supplemental Filing in Support of Summary Judgment [ECF No. 864], the Trustee's Supplement to his Opposition to Edwards's Motion for Summary Judgment [ECF No. 874], and the Trustee's Response to Edwards's Supplemental Filings [ECF No. 931].

Further, as contemplated by this Court's Order at ECF No. 960, notwithstanding that Edwards's filings at ECF Nos. 900, 901, 902, and 903 were stricken, I have also considered evidence in the record cited in the stricken pleadings as part of the summary judgment record.

When Akouete and Edwards were unable to convince the State of California of their authority to recover the unclaimed funds on behalf of the Debtor and were engaged in challenging the tax-lien foreclosure in Massachusetts, facing what one counsel from a law firm that was ultimately a petitioning creditor, described as "extreme hostility" from the Massachusetts Land Court,[2] a counterparty to an agreement with the Debtor and the former counsel to the Debtor (which firm was presumably retained by Akouete and/or Edwards) filed an involuntary bankruptcy petition that was not contested. After an order for relief entered, the Trustee recovered approximately $1.2 million in unclaimed funds from the State of California and obtained approval of a settlement with the municipality that foreclosed on the Debtor's Property. The settlement resulted in a sale of the Debtor's Property by the estate and gross proceeds to the estate of approximately $5.3 million. As will be discussed in detail below, the record manager of the Debtor has asserted that it resigned and ultimately dissolved, leaving the LLC without an active manager, and, while the name of an offshore entity, Mignonette Investments Limited, has been identified as the member of the Debtor, neither that entity nor its principals have appeared in this case.

The bases of the claims asserted by Akouete and Edwards are similar and each rests on the premise that Akouete and Edwards were properly installed as "managers" of the Debtor, although I have also considered whether the record could support an equitable claim for unjust enrichment. Akouete claims the Debtor owes him more than $3 million as a management fee. Edwards calculates her claim based on an 8% "management and asset recovery fee." The Trustee objects to the claims of Akouete and Edwards and asserts that their claims should each be disallowed. He asserts that Akouete and Edwards were never managers of the Debtor and

---

[2] ECF No. 799, Akouete Aff., App. A, Ex. 1, p. 10.

acted improperly in their efforts to take over the Debtor and claim its assets for their own benefit.

The parties have filed cross-motions for summary judgment with respect to the Objections.[3]

## II.    Jurisdiction

The Court has jurisdiction over this case and contested matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b)(1), and the general order of reference of the United States District Court for the District of Massachusetts.  Actions to determine objections to proofs of claim are core proceedings that this Court may determine by final order.  28 U.S.C. § 157(b)(2)(A) and (B).

## III.    Summary Judgment Standard and Burden of Proof

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), as made applicable by Fed. R. Bankr. P. 7056 (; *see also Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 763 (1st Cir. 1994) (explaining "[i]t is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law"). "To establish that it is entitled to summary judgment, a party may show that the adverse party lacks sufficient admissible evidence to meet its burden of proof at trial." *Autism Intervention Specialists, LLC v. Aoude (In re Aoude)*, 638 B.R. 263, 269 (Bankr. D. Mass. 2022 *aff'd sub nom. Autism Intervention Specialists, LLC v. Aoude*, 654 B.R. 41 (D. Mass. 2023) (citing *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Further,

> [a] "principal purpose[ ] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex*, 477 U.S. at 323-24

---

[3] Even if Akouete and Edwards could support their claim that they were acting as "managers" of the Debtor, the Trustee has also objected to any claim for services as exceeding the reasonable value of such services pursuant to 11 U.S.C. § 502(b)(4).  That aspect of the Trustee's Objections is not the subject of the summary judgment motions.

(interpreting prior, but substantively similar, version of Rule 56). "[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim." *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). Alternatively, the moving party may "affirmatively produce evidence that negates an essential element of the non-moving party's claim." *Ocasio-Hernandez v. Fortuno-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (quotations and citation omitted). A non-movant "cannot ward off summary judgment with proffers that depend . . . on arrant speculation, optimistic surmise, or farfetched inference." *Lang v. Wal-Mart Stores East, L.P.*, 813 F.3d 447, 460 (1st Cir. 2016) (internal quotations omitted). An inquiring court is not obliged either "to draw unreasonable inferences or credit bald assertions [or] empty conclusions . . . ." *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007).

*Goldsmith v. Marsh USA, Inc. (In re Glasshouse Tech.)*, No. 14-41352-CJP, 2022 WL 4828087, at *9 (Bankr. D. Mass. Sept. 30, 2022), *aff'd sub nom. In re GlassHouse Techs., Inc.*, 654 B.R. 190 (D. Mass. 2023).Where, as here, cross-motions for summary judgment are filed, the court must evaluate each motion separately, drawing all reasonable inferences in favor of the party opposing the motion. *See Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997). The existence of "some alleged factual dispute" is not sufficient; the dispute must be "genuine" — " the evidence is such that a reasonable jury could return a verdict for the nonmoving party" — and about a "material" fact—one that "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (citations omitted). Regarding submissions at summary judgment, the First Circuit has observed that "[a] court will disregard 'conclusory allegations, improbable inferences, and unsupported speculation' in determining whether a genuine factual dispute exists." *Cherkaoui v. City of Quincy,* 877 F.3d 14, 24 (1st Cir. 2017) (quoting *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009)); *see also Boykin v. Genzyme Therapeutic Prods., LP*, 93 F.4th 56, 60 (1st Cir. 2024) ("To carry [their] burden, the nonmovant cannot simply rely on evidence that is conjectural or problematic, . . . but,

rather, must present definite, competent evidence.") (internal citations and quotations omitted).

Further, although credibility and inferences must be resolved in favor of the non-moving party,

the nonmoving party, must still demonstrate, "through submissions of evidentiary quality, that a

trialworthy issue persists." *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

The filing of a proof of claim and the allowance of such claim are governed by 11 U.S.C.

§§ 501 and 502.  "A proof of claim signed and filed in accordance with [the Federal Rules of

Bankruptcy Procedure] is prima facie evidence of the claim's validity and amount."  Fed. R.

Bankr. P. 3001(f).  "In order to rebut the prima facie evidence a proper proof of claim provides,

the objecting party must produce 'substantial evidence' in opposition to it."  *Am. Express Bank,*

*FSB v. Askenaizer (In re Plourde)*, 418 B.R. 495, 504 (B.A.P. 1st Cir. 2009) (citations omitted)).

If the evidence proffered by the objecting party is substantial, the burden shifts to the claimant to

prove its claim by a preponderance of the evidence.  *See Tracey v. U.S. (In re Tracey)*, 394 B.R.

635, 639 (B.A.P. 1st Cir. 2008) (citation omitted).  As will be discussed in detail below, the

Trustee has proffered substantial evidence in support of the Objection rebutting the presumption,

shifting the burden of proof back to Akouete and Edwards.

IV.    Overview of Material Undisputed Facts in the Summary Judgment Record[4]

I have considered material facts that have not been contested or that have not been

refuted by sufficient evidence in the summary judgment record.  I have made all reasonable

inferences in favor of the party defending summary judgment.  While there is substantial

evidence in the summary judgment record, because Akouete and Edwards are unrepresented

---

[4] In many instances, I have adopted statements of material fact asserted by the Trustee or other parties with citation to the record, but without quotation marks.  I also discuss additional undisputed material facts in the Analysis section below.  Where I have cited to the record, I have intended that the citation serve as an example of evidence on which I have relied, but not to the exclusion of other supportive evidence in the record that I have considered.  I have considered the entire summary judgment record in reaching my decision.  All references to "ECF No." herein are in reference to this Court's ECF docket for the Debtor's chapter 7 case, Case No. 23-40709.

parties and filed pleadings at different times, I have attempted to review evidence in the entire

record for the benefit of the non-moving parties when considering all motions for summary

judgment. For example, while she submitted a Statement of Undisputed Material Facts in

Support of her Motion for Summary Judgment [ECF No. 846] and an Opposition to the Trustee's

Motion for Summary Judgment [ECF No. 851], Edwards did not file a numbered response to the

Trustee's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment

[ECF No. 739] with citation to the record as required by MLBR 7056-1. I have considered the

submissions in support of her motion for summary judgment and other evidence in the summary

judgment record, including filings by Akouete, in determining material undisputed facts as may

relate to the Edwards Claim Objection.

Akouete's summary judgment papers present other types of issues. Akouete filed

affidavits, documents, and deposition transcripts in support of his positions, but at times did not

cite to specific evidence in responding to statements of material fact the Trustee asserted were

not subject to dispute. In his responses to the Trustee's Statements of Undisputed Material Fact,

Akouete frequently stated that the statements were both disputed and undisputed. The "dispute"

was frequently not as to the factual statement, itself, that the Trustee asserted was undisputed and

supported in the record, but rather consisted of argument as to the weight to be given to evidence

or the legal significance of the fact. He often did not cite specific evidence in the record that

raised a substantial dispute as to the stated fact.[5] As will be discussed below, when challenging

---

[5] Akouete's response to the Trustee's Statement of Undisputed Material Fact that "certain creditors filed an involuntary bankruptcy petition" on a specified date is illustrative of many responses that do not rise to the level of an actual supported factual dispute. Akouete responded: "Undisputed in part, disputed in part. It is undisputed that an involuntary petition under Chapter 7 was filed on August 31, 2023. However, the characterization that 'certain creditors' filed the petition omits that only two creditors (Nathanson & Goldberg, P.C. and MobileStreet Trust) initiated the case, which is material to the contested issues. The legitimacy, motivation, and consent surrounding the filing are disputed." ECF No. 798, ¶ 1. Akouete's broad reference to motivations and omissions do not rise to an actual dispute of the statement of material fact that is supported by the record.

asserted statements of undisputed material facts relating to the conversion to an LLC and later

merger of the original corporate manager of the Debtor into a related entity, Akouete admitted

that the public records reflected these corporate actions, but "disputed" the statements because of

his legal position that the corporate actions were not effective because they may have conflicted

with consent requirements in third-party agreements and the record did not contain copies of

necessary internal approvals.  Statements of "dispute" as to a legal interpretation do not

constitute an actual dispute as to a fact.  As such, such underlying "disputed" facts will be

deemed admitted under MLBR 7056-1. *See Chau v. Taing (In re Taing)*, AP No. 20-4048-CJP,

2025 WL 2751029, at \*5, n.13 (Bankr. D. Mass. Sept. 26, 2025) (noting that the current iteration

of MLBR 7056-1 provides that '[f]or purposes of considering whether summary judgment

should enter, the Court may deem material facts of record set forth in the Statement of

Undisputed Facts required by this Rule to be admitted unless expressly controverted by the

statement required to be served by opposing parties with citations to the record'" (quoting

MLBR 7056-1(g)).

I will not repeat this explanation for the many instances Akouete takes this approach, but

it applies to numerous material facts that I recite below where I have determined that a material

fact is not subject to an actual dispute that is supported by evidence cited in the record and

reasonable inferences therefrom.

## A.  Background[6]

On August 31, 2023, two creditors of the Debtor filed an involuntary chapter 7

bankruptcy petition against the Debtor.  On October 11, 2023, this Court entered an order for

relief under chapter 7 regarding the Debtor.  *See* ECF No. 26; *see also* ECF No. 740, Goldsmith

---

[6] This Background section is not intended to provide an exhaustive overview of the lengthy docket of the Debtor's case but highlights certain filings that are relevant to the summary process record.

Aff. ¶ 6.  On October 12, 2023, the United States Trustee appointed the Trustee as the chapter 7

trustee of the Debtor, and the Trustee continues to serve in that capacity.  ECF No. 740,

Goldsmith Aff. ¶ 7.

On February 2, 2024, the Trustee filed a Motion to Compel the California State Controller

to Surrender to the Trustee Property of the Estate [ECF No. 78] (the "Motion to Compel"),

seeking to compel the California Controller to turnover to the Trustee funds from an unclaimed

checking account of the Debtor in the amount of $1,293,646.83 (the "California Unclaimed

Funds").  *See id.* at ¶¶ 8-9.  On February 12, 2024, after receiving the California Unclaimed

Funds, the Trustee withdrew the Motion to Compel.  *See id. at* ¶¶ 10-11.  Akouete "provided the

Trustee with information that assisted in the recovery of the California [Unclaimed] Funds," and

the Trustee concedes that the Trustee's recovery of those funds "was, at least in part, facilitated

by documents or information provided by Lolonyon Akouete." ECF No. 799, App. A, Ex. 4 (p.

27 of 379).

On January 30, 2025, the Trustee filed a Complaint against the Town of Westborough (the

"Town") seeking avoidance of the Town's prepetition municipal foreclosure and recovery of the

Property.  *See* ECF AP 25-4003 No. 1; *see also* ECF No. 740, Goldsmith Aff. ¶ 14.

Alternatively, the Trustee sought an award of damages against the Town based on multiple

theories of damage. *See id*.

After withdrawing a multi-party settlement earlier in the case, *see* ECF Nos. 189-90, 418,

and 470, *see also* ECF No. 740, Goldsmith Aff. ¶¶ 12-13, the Trustee reached another multi-party

settlement that facilitated the sale of the Property and the Court approved the settlement over the

objection of Akouete and authorized the sale of the Property.  *See* Orders at ECF Nos. 1037 and

1038.  As a result of the settlement, the Trustee and Town have filed a notice of stipulated

dismissal with respect to the adversary proceeding.  *See* ECF AP 25-4003 No. 32.

## B.   The Claims

Akouete filed three proofs of claim on this Court's Claims Register as Claim Nos. 4-1, 4-2, and 4-3 (collectively, the "Akouete Claim"), which, as amended, asserts a claim in the amount of $3,146,823.50.  In Claim No. 4-1, Akouete originally asserted an unsecured claim in the amount of $625,297.02 and included an Affidavit of Lolonyon Akouete (the "Akouete Affidavit") and an Exhibit A attached thereto, which is a narrative entitled "Westborough SPE LLC's Manager's Efforts to Recover Assets for the Entity" (the "Claim 4-1 Narrative").  In Claim No. 4-2, Akouete asserted an unsecured claim in the amount of $1,250,594.05.  Claim No. 4-2 was appended to a Motion to Amend Proof of Claim filed by Akouete and included no attachments.  Claim No. 4-3 amends the prior claims filed by Akouete and pursuant to which he asserts an unsecured claim in the amount of $3,146,823.50.  Claim No. 4-3 includes  the following attachments: (1) a narrative titled "Supporting Documentation and Reasoning for Amended Proof of Claim" (the "Claim 4-3 Narrative"); (2) Westborough SPE LLC Limited Liability Agreement dated October 22, 2007 (the "LLC Agreement") signed by Mignonette Investments Limited as Debtor's member and Babcock & Brown Administrative Services, Inc. ("BBAS Inc.")  as manager; (3) a Durable Power of Attorney (the "POA") of Babcock and Brown Parallel Member LLC ("BB Parallel") dated June 26, 2023, and a "Written Consent of the Manager of Babcock and Brown Parallel Member LLC in Lieu of a Meeting" ("Manager Consent") dated June 23, 2023, both purportedly signed by F. Jan Blaustein Scholes ("Scholes"); (4) a Massachusetts Amended Foreign Corporation Certificate dated October 22, 2003, signed by Jan Blaustein Scholes as President and Monique Belkin as Secretary of Babcock & Brown Administrative Services, Inc; and (5) a "Full Year Financial Report" of an unrelated entity

(collectively, the "Claim Attachments"). *See* Claim No. 4-3.

Each of the Akouete proofs of claim state in Box 8 of the form that the basis of the

Akouete Claim is a "Management and Asset Recovery fee." In the Akouete Affidavit, Akouete

asserts that "[h]e is an authorized successor manager of [the Debtor]" and Akouete references the

POA, LLC Agreement, and Manager Consent as the basis for his appointment as manager of the

Debtor. Claim No. 4-1, Akouete Aff. ¶ 1. In the Claim 4-3 Narrative, Akouete asserts the

following:

> Under Section 1(g) of the Westborough SPE LLC Operating
> Agreement, a Manager is expressly permitted to delegate their
> powers of duties to any person or entity through a written
> instrument. This authority was exercised via a Durable Power of
> Attorney by F. Jan Blaustein, granting me managerial authority over
> the Company.

Claim No. 4-3, Part 2, p. 1.

Akouete calculates the amount asserted in Claim No. 4-3 as follows:

> The compensation claim is derived from industry standard practices,
> supported by publicly available reports from Babcock & Brown and
> comparable entities. Based on a **2% annual management fee for a
> 25-year term**, the calculation is as follows:
>
> **Annual Fee**: 2% of $6,293,646.83 = $125,872.94
>
> **25-Year Term**: $125,872.94 x 25 = **$3,146,823.50**

*Id.*, pp. 1-2 (emphasis in original).

Edwards filed a proof of claim [Claim No. 5-1] (the "Edwards Claim"), in which she

asserts an unsecured claim in the amount of $333,491.75 for "Management and Asset Recovery

Fees." The Edwards Claim consists of Official Form 410 for proofs of claim and an affidavit of

Edwards as an attachment to the claim (the "Edwards Affidavit"). In the Edwards Affidavit,

among other things, she states as follows:

> I am a co-manager of Westborough SPE LLC, as per the records of the Massachusetts Secretary of the Commonwealth Corporations Division and the Secretary of the State for the State of Delaware Corporations Division. The Durable Power of Attorney, which is governed by Delaware law, was executed by F. Jan Blaustein Scholes, the Manager of Babcock and Brown Parallel Member LLC. This LLC is a successor of Babcock and Brown Administrative Services, Inc. Scholes has signed a Written Consent of Manager.

Claim No. 5-1, Edwards Aff. ¶ 1.  In the Edwards Affidavit, she also states: "I am entitled to receive 8% of the recovered assets of Westborough SPE LLC as a management and asset recovery fee." *Id.*, ¶ 9.

## C.  The Disputed Appointment Documents

In reviewing the record, evidence could support a finding that F. Jan Blaustein Scholes ("Scholes") signed a Bill of Sale dated November 21, 2022 (the "Bill of Sale") in the stated capacity of "President of the Debtor" that purported to transfer all assets of the Debtor to Akouete and Edwards.  *See, e.g.,* ECF No. 741-4, Ex. D.  There is also evidence in the record that could support a finding that, on or about June 23, 2023, in the stated capacity of manager of BB Parallel, Scholes signed the POA and the Manager Consent, which Akouete and Edwards contend should be read to amend or clarify the Bill of Sale.[7]  *See, e.g.,* Claim 4-1, Part 2, Akouete Aff. ¶ 1; Claim No. 4-3, Part 4; Claim No. 5-1, Edwards Aff. ¶ 1; ECF No. 741-1, Devine Aff. ¶ 12; ECF No. 741-10, Ex. J, Akouete Depo. 22:21-24:17, 124:21-132: 14, Depo. Exs. 3 and 22.  Whether Scholes actually signed the documents and, if so, had mental capacity to do so is the subject of dispute.  The Bill of Sale, POA, and Manager Consent are collectively referred to herein as the "Disputed Appointment Documents."

---

[7] After explaining that he and Edwards did not have access to documents at the time they drafted the Bill of Sale, Akouete asserts that "the POA and Manager Consent should be viewed in context as clarifying instruments that supersede and correct earlier language, not merely as amendments to the 2022 document."  ECF No. 798, ¶ 30.  As will be discussed below, those documents do not do either.  He also characterizes Scholes stated capacity as "President of the Debtor" as a "misnomer." *Id.* at ¶ 33.

In claiming to have been appointed managers of the Debtor by Scholes, Akouete and Edwards rely on a provision of the LLC Agreement that states:

> Any Manager may, from time to time, by an instrument in writing, delegate all or any of its powers or duties hereunder to another Manager, if any, of to an officer, manager, member or partner of any other Manager or to any Member of any other person or entity.

Claim No. 4-3, Part 3, § 1(g).  Initially, Akouete and Edwards contended that in June 2023, BB Parallel was the manager of the Debtor and that Scholes, acting for BB Parallel, appointed them as managers of the Debtor pursuant to the LLC Agreement by the POA and the Manager Consent. *See* Claim 4-1, Part 2, Akouete Aff. ¶ 1; *see also* Claim No. 5-1, Edwards Aff. ¶ 1; ECF No. 741-1, Devine Aff. ¶ 12; 741-10, Ex. J, Akouete Depo. 22:21-24:17, 124:21-132:14, Depo. Exs. 3 and 22.  As will be discussed in detail below, Akouete now asserts in opposing summary judgment that BB Parallel was never a manager of the Debtor and that his and Edwards's authority as managers is actually derived from Scholes acting in 2023 on behalf of the original manager of the Debtor.  *See* ECF No. 798, ¶¶ 27, 59.

**D.  The Debtor and its Manager**

On October 22, 1997, the Debtor was established as a Delaware limited liability company pursuant to the LLC Agreement and BBAS Inc. was designated as its sole manager. *See* ECF No. 739, ¶ 34; *see also* ECF No. 798, ¶ 34.  On October 23, 1997, BBAS Inc. was established as a Delaware corporation. *See* ECF No. 739, ¶ 37; *see also* ECF No. 798, ¶ 37.  On January 3, 2000, BBAS Inc. filed a "Certificate of Conversion" with the Delaware Secretary of State and converted its corporate status to become a limited liability company named Babcock & Brown Administrative Services, LLC ("BBAS LLC").  *See* ECF No. 739, ¶ 38; *see also* ECF No. 798, ¶ 38.  On August 28, 2011, BBAS LLC merged its corporate existence with and into a Delaware entity known as BB Parallel.  *See* ECF No. 739, ¶ 39; *see also* ECF No. 798, ¶ 39.  Upon the

merger of BBAS LLC into BB Parallel, BB Parallel was the surviving entity. *See* ECF No. 739, ¶ 40; *see also* ECF No. 798, ¶ 40. In the more than 7 years after BBAS LLC merged into BB Parallel, numerous Babcock & Brown-related entities had merged with and into BB Parallel. *See* ECF No. 741-3, Ex. C, pp. 3-104. On March 15, 2019, BB Parallel cancelled its corporate existence by filing a Certificate of Cancellation with the State of Delaware. *See* ECF No. 739, ¶ 41; *see also* ECF No. 798, ¶ 41.

On June 30, 2023, Akouete and Edwards caused a Certificate of Correction appearing to have been signed by Scholes (misspelled "Schol" on the Certificate) to be filed with the Delaware Secretary of State that purported to withdraw the 2019 Certificate of Cancellation filed by BB Parallel. ECF No. 741-3, Ex. C, p. 106. On February 15, 2024, BB Parallel filed a further Certificate of Correction with the Delaware Secretary of State declaring the 2023 Certificate "null and void" and stating that it had been "fraudulently filed." ECF No. 741-3, Ex. C, p. 107. The 2024 Certificate of Correction was signed by Walter A. Horst ("Horst"), who is the Chief Financial Officer of Babcock & Brown Holdings, Inc. and Babcock & Brown International Pty. Ltd. and their current and former subsidiaries (collectively, "B&B"). *See id.*; ECF No. 742, Horst Aff. ¶ 1. That Certificate further states that BB Parallel had not authorized the filing with the signature of Scholes and that Scholes had no signing authority. *See* ECF No. 741-3, Ex. C, p. 107.

Prior to the date of its merger into BB Parallel, BBAC LLC (as successor by conversion to BBAC Inc.) had taken actions to resign as Manager of the Debtor. On June 8, 2009, after BBAS LLC was unable to make contact with any representative of the member of the Debtor, BBAS LLC sent the Debtor a Termination Notice, stating its intent to terminate the Administrative Services Agreement between BBAS LLC and the Debtor (the "Termination

Notice"). *See* ECF No. 742, Horst Aff. ¶¶ 5 and 7. The purpose of the Termination Notice was

for BBAS LLC "to resign [its] services" and "to begin the transition processes so [BBAS] could

transfer [its] role to another service provider." ECF No. 741-6, Ex F, Horst. Depo. 14:17-17:2,

Depo. Ex. 4.  On April 30, 2011, BBAS sent to "Westborough SPE c/o Equity Trust" a "Notice of

Resignation."  *Id*. at 20:19-22:16, Depo. Ex. 6.  When BBAS LLC sent the Termination Notice to

the Debtor and the Notice of Resignation to "Westborough SPE c/o Equity Trust," BBAS

understood that those documents fully terminated all of BBAS's obligations to the Debtor.  *Id*. at

22:3-8.  B&B "received no contact from anyone in the ownership chain of Westborough

disputing the resignation." *Id*. at 22:9-16.  Akouete and Edwards do not dispute that the

Termination Notice and Notice of Resignation were sent and offer no evidence with citation to

the record to controvert that B&B considered the notices to effect the resignation of BBAS LLC.

They also offer no substantial evidence that BBAS LLC or any other B&B Entity actually acted

as manager of the Debtor after April 30, 2011.[8]  Akouete disputes the legal effect of the unilateral

termination and resignation, which will be discussed below.  ECF No. 798, ¶¶  52-60.

**E.  Scholes**

Scholes was an attorney who specialized in international and partnership taxation.  At one

time, she was general counsel to B&B and served as an officer of a number of B&B affiliates.

Commencing in 1997 with its formation, she served as an officer of BBAS Inc., the corporate

manager of the Debtor. *See* ECF No. 742, Horst Aff. ¶ 5, Ex. B.  When BBAS Inc converted to

---

[8] Akouete states without citation to the record: "BBAS continued to file documents with the Secretary of the Commonwealth of Massachusetts as late as 2017, including withdrawals of registration and statements asserting that the Debtor had no assets—despite the Debtor owning the 231 Turnpike Road property." ECF No. 798, ¶ 56. While under no obligation to do so, I have reviewed the record to attempt to find documents after April 30, 2011 by which BBAS LLC or BB Parallel purported to act on behalf of the Debtor.  Other than the corrective documents and correspondence consistent with Horst's testimony, I have not found evidence in the record of substance that would raise an actual dispute regarding this fact that could be decided by a factfinder in a way that would be material to this decision.

BBAS LLC, Scholes was an authorized officer of the LLC.  *See* ECF No. 741-2, Ex. B, p. 6.

Scholes retired in 2007 and as of October 1, 2007, resigned her positions with B&B

affiliates, including as President and Vice President of BBAS LLC.  *See* ECF No. 742, Horst Aff.

¶ 6; ECF No. 660, Akouete Aff., Ex. C, pp. 39-41.  After that date, she had no authority to act for

or represent B&B, its affiliates, or any customer of B&B.  *See* ECF No. 742, Horst Aff. ¶ 6.  As

discussed above, after Scholes's retirement, BBAS LLC merged with and into BB Parallel, with

BB Parallel designated as the surviving entity under Delaware law.  Scholes never served as an

officer, manager, director or employee of BB Parallel.  *See id.*[9]

Scholes suffered a stroke in 2004. *See* ECF No. 744, Blaustein Aff. ¶ 2.  Since

September 11, 2014, Scholes's son, Peter Blaustein ("Blaustein"), has been authorized as the

"attorney-in-fact" or "agent" for Scholes pursuant to a Power of Attorney.  *See id.* at ¶ 3. On June

3, 2019, Blaustein was appointed as Scholes's conservator and guardian by the Hawaii Circuit

Court, Third Circuit, Kona Division. *See id.* at ¶ 5; *see also* ECF No. 741, Divine Aff. ¶¶ 8, 9;

ECF No. 741-7, Ex. G, p. 4.  By at least December of 2022, Akouete and Edwards were aware that

Scholes was the subject of a guardianship and lived in assisted living and rehabilitation facility. *See*

ECF No. 741-8, Ex. H, p. 2; ECF No. 846, Edwards Statement, ¶ 1.

On January 4, 2023, Akouete filed a pleading purportedly on the Debtor's behalf in an action

pending before the Massachusetts Land Court, in which he stated that "[i]n 2004, [Scholes] suffered

her first major stroke, which left her physically and mentally incapable of properly executing her

responsibilities as manager and real estate signatory for [the Debtor] to their full extent.

---

[9] Akouete "disputes" these facts by challenging the legal effect of the resignation of Scholes and the admissibility of
the evidence supporting these facts in the record.  As will be discussed below, I have determined that sufficient
unrefuted facts have been established by evidence that could and would be admissible at trial to support determining
that no genuine issue of material fact exists as to the retirement and resignation of Scholes.

Thereafter, [Scholes] reduced her responsibilities and eventually retired from BBAS in 2007."

ECF No. 741-9, Ex. I, p. 3.  Akouete also had notice at least as of February 2023 that B&B and its

affiliated entities took the position that they had resigned as manager of the Debtor many years

before and that BBAS LLC was liquidated shortly after by the 2011 merger with BB Parallel. *See*

ECF No. 742, Horst Aff. ¶ 16; ECF No. 741-5, Ex. E, pp. 2-3; Claim 4-1, Part 2, Claim 4-1

Narrative, ¶ 226.

V.    Analysis

In considering each of the motions for summary judgment, I must determine whether any

genuine issue of material fact exists that would preclude determination by summary judgment of

whether Akouete and Edwards had authority to act as managers on behalf of the Debtor or in any

other capacity, because each of their claims rests on the premise that they were managers entitled

to compensation in amounts that they may determine. Akouete concedes that his claim (which

grew in amount through several amendments from $625,297.02 to $3,146,823.50) is based on his

assertion that he was authorized to act as a manager of the Debtor and to establish his own

compensation.[10]  Edwards stated a slightly different basis for her claim.  She claimed to be owed

---

[11] Akouete testified:

> Q.   Is your claim entirely based on the authority that you received by virtue of
> the Durable Power of Attorney that Scholes executed?
> A.   Well, yeah.  My claim was based on my role as the manager of the entity. That
> managerial authority can be found to be defective or anything.  I may be [found]
> to be a de facto manager, but my claim is based on my right as a manager of the
> entity. It's kind of tricky to say, yes, it's just based on that agreement, but it's not
> totally true, either. My claim is based on my role as manager of the entity because
> I've done managerial duty and I preserved millions of dollars for the entity.
> Q.   Aside from the delegation by virtue of the Power of Attorney through the
> operating agreement, do you have any other contracts between you and
> Westborough SPE that would entitle[] you to compensation?
> A.   No.

ECF No. 799, Akouete Aff., App. A, Ex. 17, Akouete Depo. 134:16-135:16.

$333,491.75 as a percentage of recovery as "a management and asset recovery fee."[11]   Claim No. 5-1.  I will also consider certain alternative theories that could support each of the claims.

### A. Neither Akouete nor Edwards Ever Had Authority to Act As Manager of the Debtor or On Behalf of a Manager of the Debtor.

1. <u>Scholes Had No Authority to Act on Behalf of the Debtor or its Manager at the Time She Executed the Disputed Appointment Documents</u>

The summary judgment record demonstrates that BBAS, Inc. converted to BBAS LLC in 2000 and that BBAS LLC merged with BB Parallel in 2011.  No evidence in the record demonstrates or supports any reasonable inference that Scholes was a manager of BB Parallel or had any authority at any time to act on behalf of BB Parallel. In fact, the record contains uncontroverted statements in affidavits of Walter Horst [ECF Nos. 742 and 743] and deposition testimony of Horst [ECF No. 799, Akouete Aff., App. A, Ex. 12], who was an officer of and consultant for Babcock and Brown Holdings, Inc and Babcock & Brown International Pty. Ltd. and their current and former subsidiaries (collectively, B&B) and who served as the Chief Financial Officer and other officer positions for various B&B entities, that Scholes retired in 2007 and had no authority to act on behalf of any B&B entity after that time.  *See* ECF No. 799, Akouete Aff., App. A, Ex. 12, Horst. Depo. 32:6-33:6; *see also* ECF No. 742, Horst. Aff. ¶¶ 1, 6. This testimony is supported by the records of B&B, which contain a written consent of the sole member of BBAS LLC reciting that Scholes resigned as an officer of that LLC as of October 1, 2007 and a resolution appointing a successor President. *See* ECF No. 660, Akouete Aff., Ex. C, p. 41.

---

[11] While her claim appears to rest on her claimed status as a manager, I also consider below whether the record could support another basis for her claim and Akouete's claim, such as unjust enrichment.  As will be discussed below, both she and Akouete list a litany of largely undeveloped bases for their claims against the estate or possibly third parties in the summary judgment papers that were not asserted in any material way in their proofs of claim.  *See* ECF No. 845, pp. 3-4; *see also* ECF No. 658, pp. 3-4.

Akouete objects to the evidence proffered through Horst.  He asserts that this Court

should not consider certain testimony of Horst as part of the summary judgment record because

he asserts Horst does not have personal knowledge of events prior to 2008 when B&B first

engaged Horst and, as such, does not satisfy the requirements of Fed. R. Civ. P. 56(c)(4).  He also

contends that records produced by B&B have not been properly authenticated.  I have considered

these objections and overrule them.

First, Horst's testimony (including both statements in his affidavits and deposition)

relating to events both before and after 2008 and the status of B&B entities, including whether

Scholes was authorized to act in any capacity for BB Parallel or any other B&B entity would be

admissible as "a reasonable trier of fact could believe the witness had personal knowledge" of

those matters during his engagement in a senior position at B&B.  *See Hilton v. U.S. Bank (In re*

*Hilton)*, 544 B.R. 1, 8 (Bankr. N.D.N.Y. 2016) ("[E]mployees are generally found to have

personal knowledge of, and therefore may testify in relation to, records of their employers that

they reviewed in their official capacities."); *see also Barthelemy v. Air Lines Pilots Ass'n*, 897

F.2d 999, 1018 (9th Cir. 1990) (when considering for summary judgment purposes an affidavit

submitted by the chairman of a company and by its investment banker, the Ninth Circuit noted

that "[their] personal knowledge and competence to testify are reasonably inferred from their

positions and the nature of their participation in the matters to which they swore no abuse of

discretion appears.").

Second, Horst testified that he was designated to testify as a witness in response to

Akouete's subpoena to B&B, that he provided records to B&B's attorneys to be produced in

response to that subpoena, and that he is familiar with the records of those entities.  *See* ECF No.

799, Akouete Aff., App. A, Ex. 12, Horst Depo. 9:4-11, 11:6-12:13.  Akouete had the opportunity

to cross-examine Horst.  In his affidavits, Horst states: "I have reviewed and relied on the

available records of B&B regarding the employment and resignation of Jan Blaustein Scholes []

and regarding anything that took place before 2008, when I first joined B&B." ECF No. 742,

Horst. Aff. ¶ 1; ECF No. 743, Horst. Aff. ¶ 1.  Horst is competent to testify as to the records of

B&B entities, and the Trustee has provided sufficient foundation for the admissibility of

documents produced by B&B through Horst as the designated custodian of the records under Fed

R. Civ. P. 803(6), 807, and 901 and Fed R. Civ. P. 56(c)(4).  While foundational elements for

some testimony or documents could have been more expansively addressed in affidavits or

testimony by Horst, the record is sufficient for this court to consider material facts established by

that testimony or various B&B records under Fed. R. Civ. P. 56(c)(4). "[M]aterial relied on at

summary judgment need not be admissible in the form presented. Rather, so long as the evidence

in question 'will be presented in admissible form at trial,' it may be considered on summary

judgment." *Despins v. Greenwich Land, LLC (In re Kwok)*, Case No. 22-50073 (JAM), Adv. P.

No. 23-05005 (JAM), 2024 WL 3280607, at *5 (Bankr. D. Conn. July 2, 2024), aff'd, No. 3:24-

CV-1185 (KAD), 2025 WL 2625264 (D. Conn. Sept. 11, 2025) (quoting *Smith v. City of New

York*, 697 F. App'x 88, 89 (2d Cir. 2017) (additional citation omitted)). Horst would therefore be

qualified to testify regarding his personal knowledge as a senior level employee of the B&B

entities.  Moreover, records in the possession of B&B regarding Scholes would fall within the

business records exception to hearsay (and possibly other exceptions).  Finally, certain

documents objected to by Akouete were included and referenced by Akouete, himself, in the

summary judgment record, such as the BBAS LLC Member Consent and B&B resignation

notices to be discussed *infra*.  *See* ECF No. 660, Akouete Aff., Ex. C-D, pp. 41, 43-44.  Akouete

may not argue that documentary evidence that he submitted as an exhibit to his own affidavit

should be considered in support of his motion, but excluded from consideration with respect to

the Trustee's cross-motion.

Neither Akouete nor Edwards refute these material facts with evidence in the record.

Instead, Akouete argues that BBAS, Inc. is, in fact, still the Manager of the Debtor and Scholes is

still an officer of BBAS, Inc.[12] Public records, business records of B&B, and the testimony of

Horst establish that BBAS, Inc. converted to an LLC then merged with BB Parallel in 2011, with

BB Parallel being the surviving entity.  Akouete argues that those corporate actions should be

disregarded and have no legal effect because they conflict with the Debtor's LLC Agreement's

restriction on resignation of a manager without consent and other agreements "by implication."

ECF No. 798, ¶¶ 38, 59.  He also notes that there is no evidence that the corporate actions were

authorized by those various entities.  He contends that "such merger was unauthorized,

---

[12] At his deposition, Akouete appeared to recognize the weakness of that position and posited that Scholes was still
an officer of a B&B entity that controlled the manager of the Debtor.  This speculation with no support in the record
does not raise issues of material fact.  Akouete provided this testimony in response to questions regarding the
Disputed Appointment Documents:

> Q.  So, you get your authority to be the manager from this document that was
> signed by Babcock & Brown Parallel Member LLC, correct?
>
> A.  Yes.  And there's more explanation to it, but the gist of it, yes.
>
> Q.  It's Jan Blaustein Scholes that acts as the manager of Babcock & Brown
> Parallel Member LLC, correct?
>
> A.  That might not be correct, but she is the president of the entity that holds
> Babcock & Brown Parallel Member LLC. There might be a little inaccuracy there,
> but in the entire – I mean, the bigger picture, yes. She might not be the manager
> of Babcock & Brown Parallel, but she's the president or the vice president of the
> company that controls Babcock & Brown Parallel Member LLC.
>
> Q.  You believe she might not be the manager of Babcock & Brown Parallel LLC?
>
> A.  I believe that might not be the proper designation of title, but I do believe she
> controlled the entity.

ECF No. 799, Akouete Aff., App. A, Ex. 17 Akouete Depo. 128:8-129:9.

ineffective, and insufficient to displace BBAS Inc. as Manager of Westborough SPE LLC. BBAS

Inc. remains the last duly authorized Manager under governing agreements and law."[13]  *Id.* at ¶

58.  These arguments are speculative, not persuasive, and directly conflict with the evidence in

the summary judgment record and Delaware law.  When BBAS LLC (the successor by

conversion to BBAS, Inc.) merged with BB Parallel, BBAS LLC ceased to exist and any position

held by Scholes in BBAS LLC or BBAS Inc. would have terminated by operation of law.  *See* 6

Del. C. § 18-209(g); *see also P.C. Connection, Inc. v. Synygy Ltd.*, C.A. No. 2020-0869-JTL,

2021 WL 57016, *14-15 (Del. Ch. Jan. 7, 2021).  This would be the legal effect of the merger,

even if Scholes had not resigned in 2007.

    There is no evidence in the record that Scholes was ever an officer or manager of BB

Parallel, thereby ruling out the possibility that Scholes possessed actual authority.  Moreover,

even assuming the corporate transactions that terminated the existence of BBAS Inc. conflicted

with the Debtor's LLC agreement and other agreements, as asserted by Akouete, that does not

nullify the actions taken by those entities under Delaware law or the fact that those entities

ceased to exist and operate.  Akouete cites no relevant authority for his position.[14]  While actions

---

[13] Akouete also references a 2005 Release and Assumption Agreement that identified BBAS Inc as Manager of the Debtor.  *See* ECF No. 798, ¶ 38-¶ 59.  He contends this "undermines" evidence that the conversion and merger occurred and support his theory that BBAS Inc still exists and Scholes was authorized to act on its behalf. He does not cite to the record, and the Court has been unable to locate that referenced document in the record.  Even if that document is as represented, while certainly inconsistent with other evidence in the record, that document alone would not create a factual issue necessary to be tried where "Inc" may have been written instead of LLC and the public records and other evidence in the record overwhelmingly demonstrate that the corporate actions occurred.

[14] Akouete cites 6 Del. Code § 18-602 and states that it "upholds" the requirement in the Debtor's LLC operating agreement that member consent is required for any resignation of a manager "mandating that resignation conform to the LLC agreement."  ECF No. 798, p. 3.  In fact, that statute undercuts Akouete's argument and provides:

> "A manager may resign as a manager of a limited liability company at the time or upon the happening of events specified in a limited liability company agreement and in accordance with the limited liability company agreement. A limited liability company agreement may provide that a manager shall not have the right to resign as a manager of a limited liability company. ***Notwithstanding that a limited liability company agreement provides that a manager does not have the right to resign as a manager of a limited liability company, a manager may resign as a manager of a limited liability company at any time by giving written notice to***

taken in breach of agreements or duties established under agreements could potentially give rise to claims against a breaching party, such actions would not nullify corporate actions that resulted in conversion, dissolution upon merger, and termination of corporate existence of the manager entities. Akouete and Edwards would have no standing to enforce those agreements. Akouete's assertion that the summary judgment record does not demonstrate whether those transactions were internally authorized or whether the member of the Debtor consented to them does not raise a dispute as to a material fact.[15]

Edwards and Akouete have each argued that Scholes had "apparent authority" to act on behalf of the manager of the Debtor in 2022 and 2023. Any assertion that Scholes acted with apparent authority was not sufficiently developed as an argument with citation to the record. More importantly, any such argument is not supported by the record. Akouete and Edwards do not assert that any particular state law would apply to a claim of apparent authority or address any elements of such a claim.

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to

---

*the members and other managers.* If the resignation of a manager violates a limited liability company agreement, in addition to any remedies otherwise available under applicable law, a limited liability company may recover from the resigning manager damages for breach of the limited liability company agreement and offset the damages against the amount otherwise distributable to the resigning manager"

6 Del. Code § 18-602 (emphasis added).

[15] At oral argument, Akouete advanced the theory that, even if Scholes had no authority to sign the Disputed Appointment Documents, those acts were "voidable," not void, and had been ratified or adopted by the Trustee. Setting aside numerous other issues with Akouete's position, including the fact that the entities for which Akouete claims Scholes acted no longer existed under Delaware law, the record does not contain evidence that Trustee took any action to ratify or adopt the Disputed Appointment Documents – in fact the evidence shows that the Trustee has consistently taken the opposite position. Further, the trustee of a bankruptcy estate may not ratify or adopt prepetition corporate action. Further, any compromise or other act by which the Trustee would have given effect to the Disputed Appointment Documents would have required approval by this Court.

act on behalf of the principal and that belief is traceable to the principal's manifestations."
Restatement (Third) of Agency § 2.03 (2006).  Both Arizona and Delaware law place the burden
on a party claiming apparent authority to demonstrate that the principal's conduct creates an
impression that an agent has authority to act on its behalf and that a third party reasonably relied
on the apparent authority of an agent traceable to the principal.  *See, e.g., Miller v. Mason-
McDuffie Co.*, 153 Ariz. 585, 589-90, 739, P.2d 806, 810 (1987) ("[T]ouchstone of apparent
authority is conduct of a principal that allows a third party reasonably to conclude that an agent
is authorized to make certain representations or act in a particular way. . . . In order to hold a
principal liable for an agent's acts on a theory of apparent authority, the third party must show
that his reliance upon the agent's apparent authority was reasonable."); *Anchor Equities, Ltd. v.
Joya*, 160 Ariz. 463, 466, 773 P.2d 1022, 1025 (1989) (affirming that apparent authority is
"created when the principal's conduct leads a third party to reasonably believe that he has
authorized his agent to take actions or make representations in question"); *Finnegan Const. Co.
v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. Super. Ct. 1976) ("[A]pparent authority can never
be derived from the acts of the agent alone"); *Petition of Mulco Products, Inc.*, 123 A.2d 95, 106
(Del. Super. Ct. 1956) ("[T]he third party relying on the apparent authority [must demonstrate
that they did] so rely in good faith and [any reliance] was justified from all the circumstances.");
*Caribbean Sun Airlines Inc. v. Halevi Enterprises LLC,* 339 A.3d 24, 35-36 (Del. 2025) ("A third
party must use ordinary prudence and reasonable diligence in ascertaining the scope of the
agent's authority and will not be permitted to enforce an agreement under a theory of apparent
authority if it ignores facts illustrating the agent's lack of authority.") (internal quotations and
citations omitted).

Here, the record is clear and not subject to material dispute.  Public records demonstrated that BBAS, Inc. no longer existed under Delaware law and had withdrawn its registration in Massachusetts.  Public records did not show Scholes to be a manager or officer of BB Parallel.  Akouete argues that that title documents predating Scholes's resignation in the land records in Massachusetts could provide a basis for a claim of apparent authority.  *See* ECF No. 798, p. 3.  This argument is unavailing and in no way overcomes the substantial weight of contrary information available in and after 2022 to Akouete and Edwards.   In February of 2023, Akouete made contact with Horst who informed Akouete that B&B had resigned as manager of the Debtor and that BB Parallel had liquidated. *See* ECF No. 742, Ex. F, pp. 47-48.  Akouete and Edwards were pursuing Scholes in a care facility to sign documents when they knew that she had retired and was the subject of a guardianship in Hawaii. *See* ECF No. 861, Edwards Depo. 31:13-36:17.

Akouete and Edwards were actively engaged with her guardian (whether or not she had mental capacity at that moment in time).  Akouete and Edwards initiated all contact and actions in an effort to secure remuneration for themselves from monetizing the claims of the Debtor to funds held by California and the property subject to a tax foreclosure.  On this record, even had they developed this argument, Akouete and Edwards could not have reasonably relied on any "apparent authority" of Scholes.  Tellingly, Akouete stated in an email exchange shortly after obtaining Scholes's signature on the flawed Bill of Sale and well prior to Scholes signing the POA and Manger Consent: "I now understand that the Bill of Sale is invalid because Jan is incapacitated. It is a private document, and I guess it will become part of all the other documents that were lost . . . However, we got what we needed to get done: Revive the LLC and take charge of the management." ECF No. 741-8, Ex. H, p. 7.  Akouete went on to state: "Jan is

incapacitated, and Peter is not in a good position to make decisions for the LLC, which they have demonstrated by neglecting the assets of the LLC up to this point." *Id.*

In sum, Akouete and Edwards have not met their burden of proving a fundamental element of their claims by presenting any substantial evidence that could support a finding that Scholes had authority to appoint them as managers of the Debtor in 2022 or 2023.

2. Even if Scholes Had Authority to Act on Behalf of BB Parallel, Neither BB Parallel Nor any other B&B Entity Had Retained Authority to Act for the Debtor.

The record demonstrates that at least as of May 30, 2011, BBAS LLC had "resigned" as Manager of the Debtor.  *See* ECF No. 660, Akouete Aff., Ex. D, p. 44; *see also* ECF No. 741-6, Ex. F, Horst Depo. 20:19-22:16, Ex. 6; ECF No. 799, Akouete Aff., App. A, Ex. 12, Horst Depo. 20:19-22:16  The only conclusion is that the Debtor had no manager as of May 2011, whether as a result of BB Parallel having the right to resign when it had lost contact with the member of the Debtor and it took steps to do that or, as Akouete has argued, BB Parallel was not actually a manager of the Debtor as successor by merger such that the Debtor had no manager.  BB Parallel ceased acting as manager of the Debtor in 2011. The uncontroverted testimony of Horst, who sent the notice of resignation, was that his understanding as CFO of B&B was that the notice of resignation "fully terminated all of Babcock & Brown's obligations to [the Debtor.]"  *Id.* at 22:3-8.  Whether authorized or not, the record is clear that BB Parallel was not, in fact, acting as Manager after 2011. *See* 6 Del. Code § 18-602 (notwithstanding any limitations in an operating agreement, a manager may resign with notice, even though that may give rise to a damage claim).

3. Neither Akouete nor Edwards Were "De Facto" Managers of the Debtor.

Akouete further asserts that he had authority by virtue of acting as *de facto* manager of the Debtor or its manager.  *See* ECF No. 658, p. 3.  Specifically, Akouete argues, "Movant has

acted openly, continuously, and notoriously as manager with the knowledge and acquiescence of the Debtor, its Members, and relevant stakeholders. Such actions, performed in good faith, constitute de facto management authority, entitling Movant to all equitable recognition and compensation." *Id.* He cites no authority supporting that position.[16]

Delaware law recognizes a de facto corporate officer as "one who actually assumes possession of an office under the claim and color of an election or appointment and who is actually discharging the duties of that office, but for some legal reason lacks de jure legal title to that office."[17] *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 48 (Del. 2006). In assessing de facto authority, Delaware courts look to three key elements: "(1) [t]he office must have a de jure existence or at least one recognized by law; (2) [t]he claimant must be in actual possession thereof; and (3) his possession must be held under color of title or authority." *See State ex rel. James v. Deakyne,* 58 A.2d 129, 131 (Del. Sup. Ct. 1948). Delaware law may operate to validate actions taken by persons appointed to positions by entities, impose fiduciary duties on those acting as managers, or support personal jurisdiction based on service of process, but does so to protect third parties in respect of the principal entity. Courts have held that de facto officers and directors have had the authority to take valid corporate action when third parties are affected. *See, e.g., President & Fellows of Harvard Coll. v. Glancy*, No. CIV.A. 18790, 2003 WL 21026784, at *17, n.21 (Del. Ch. Mar. 21, 2003) (quoting 2 Fletcher Cyclopedia of Corporations § 383 (Per-m. Ed. 1998) ("A corporation may act by means of an officer de facto as fully and effectually, as regards the public and third persons, as by an officer

---

[16] Edwards argues that Scholes served as a de facto officer of the Debtor and that, as a de facto officer, her actions, are binding under Delaware law. *See* ECF No. 845, [pp. 2-3/4]. The record shows that Scholes retired and resigned. She also purported to act on behalf of entities with respect to which she never had the color of office. There is no evidence that she had color of office or authority and this unsupported argument does not raise a material issue of fact.

[17] I assume for purposes of this decision that the same principles that Delaware courts have applied to corporations will guide a determination of this issue for a limited liability company.

de jure, in all matters within the scope of the corporate business"); 1 Folk On the Delaware

Corporation Law § 141.5.3 (1996) ("The de facto directors' doctrine will ordinarily validate acts

of a de facto director in dealing with third parties[.]")).

The facts established by this summary judgment record are distinguishable from cases

cited by Edwards and do not support application of any de facto authority doctrine under

Delaware law.  First, no third party was affected as it relates to the claims asserted by Akouete

and Edwards.  Akouete and Edwards seek to establish their authority as managers of the Debtor

to support their own claims.  Further, as discussed elsewhere, neither of them was in actual

possession of any manager position or can claim any color of appointment.  They were complete

strangers to the Debtor, its member, and the B&B entities.  Essentially, after discovering

abandoned assets of the Debtor and unsuccessfully attempting to transfer those assets to

themselves, they initiated and took actions to appoint themselves as managers and now attempt

to claim de facto manager status to benefit themselves.  I will not address whether either

"discharged the duties" of a manager given the complexities of that analysis in light of the

potential conflicts of interest of Akouete and Edwards in seeking to collect and maximize a claim

to compensation or a fee.  Delaware law does not require or permit application of the de facto

authority doctrine on this record.

4. <u>The Disputed Appointment Documents Did Not Appoint Akouete or Edwards to Act on
Behalf of the Debtor or a Manager of the Debtor.</u>

Even if Scholes had authority to act on behalf of the manager of the Debtor and BB

Parallel (or its predecessor entities) remained as manager of the Debtor, the Disputed

Appointment Documents were not effective to appoint either Akouete or Edwards as a manager

of the Debtor or on behalf of the manager of the Debtor.  Akouete and Edwards base their claim

of authority on the Disputed Appointment Documents executed by Scholes.  Scholes executed

the Bill of Sale on November 21, 2022. That document purports to sell the "business" of the

Debtor to the claimants as of that date. Scholes executed the document "as president" of the

Debtor.  The record is clear that at no time was she President of the Debtor.  Further, Scholes was

never a manager of the Debtor. The record demonstrates that at one time she was an officer of

BBAS Inc., which corporation had been designated as the original manager of the Debtor.

Akouete characterizes Scholes's signature on the Bill of Sale as having been executed by

Scholes "as President of the Manager" and states that her authority is derived from the fact that

she was the "President of [BBAS], the original Manager of the Debtor." ECF No. 798, ¶¶ 20-21.

Notably, and to the contrary, the notarial acknowledgment certified that Scholes purported to act

as "President for [the Debtor]." ECF No. 741-4, Ex. D, p. 3.  Akouete explains that: "[t]he

mislabeling in the Bill of Sale has since been addressed and corrected in the June 26, 2023

Manager Consent, which accurately identifies Scholes's role as Manager of BBAS Inc. or its

successor and clarifies the intent of the transaction. Thus, the Bill of Sale should not be construed

as establishing Scholes's authority as 'President of the Debtor,' nor as controlling evidence of

managerial authority under the LLC Agreement." ECF No. 798, ¶ 33.

Akouete further explains:

> [T]he document was drafted and signed prior to the availability of
> discovery, at a time when key facts concerning the structure,
> authority, and legal status of the entities involved were not known.
> The parties to that agreement did not have access to the
> Westborough SPE LLC Operating Agreement or other governing
> documents that were later obtained through formal legal process in
> 2023. Further, the Bill of Sale has since been expressly amended and
> recharacterized by the June 26, 2023 Manager Consent, which
> clarified that the intent of the parties was not to effectuate a sale of
> assets, but to formally delegate managerial authority under Section
> 1(g) of the LLC Agreement. The revised language, adopted by
> written resolution, deleted any references to an asset sale and
> substituted language recognizing a transfer of the manager role—
> not ownership of estate assets. Therefore, the reference in the

original Bill of Sale must be understood in light of its subsequent
amendment, the context in which it was executed, and the legal
limits on any such transaction under bankruptcy and state law.

ECF No. 798, ¶ 32.

Regarding the "subsequent amendment," Akouete refers to two documents in the
summary judgment record asserted to have been signed by Scholes on June 26, 2023. *See* ECF
No. 660, Akouete Aff,. Ex. F, [pp. 69-76/152]. One is the POA, which purports to grant a
durable power of attorney on behalf of BB Parallel to Akouete and Edwards to act in connection
with management and operation of the Debtor "with powers to be exercised jointly with member
or manager of the Grantor [BB Parallel]." The other is the Manager Consent by which Scholes
purports to act as "the [M]anager" of BB Parallel in resolving to approve the POA and resolving
that the Bill of Sale "be amended" to, among other things, delete the terms purporting to sell
assets of the Debtor and replace them with language intended that Scholes "transfer _her_ Manager
role of [the Debtor]" to an undefined "Subsequent Manager" (presumably intended to be
Akouete and/or Edwards) (emphasis added). No actual amendment of the Bill of Sale is in the
summary judgment record.

Even if the record had demonstrated that Scholes had authority to act on behalf of BB
Parallel as manager of the Debtor, without reaching any issues regarding Scholes's mental
competence, the Disputed Appointment Documents cannot be reasonably read to have authorized
Akouete or Edwards to act as, or on behalf of, a manager of the Debtor. First, as to the Manager
Consent, there is no evidence that an actual amendment to the Bill of Sale was executed by
anyone that changed the parties to that agreement from the Debtor to BB Parallel, identified
Akouete or Edwards as the "Subsequent Manager" of BB Parallel, or effected the "transfer [of]
_her_ Manager role of [the Debtor] Westborough SPE LLC" contemplated by the Manager

Consent. ECF No. 660, Akouete Aff., Ex. F, p. 74 (emphasis added).  Had Scholes been authorized to act on behalf of BB Parallel (and assuming she had the mental capacity), at best the Manager Consent can be read to authorize the execution of a further document amending the Bill of Sale.  Scholes was not a manager of the Debtor and could not transfer "her" role.  Perhaps a manager of BB Parallel could have executed a document to appoint a successor manager, assuming that BB Parallel existed and was acting as a manager of the Debtor at that time, but no evidence in the record demonstrates that that happened.  Akouete acknowledges that the evidence demonstrates that Scholes was not a manager of BB Parallel when she signed the Manager Consent.[18]  By extension, under the POA, Akouete and Edwards could only act "jointly with the member or manager of [BB Parallel]."  Given that the purported appointment of a "subsequent manager" was not consummated or effective, there is no evidence in the record that Akouete or Edwards took any action "jointly" with a member or manager of BB Parallel.

---

[18] Akouete testified:

> Q.   The second document that she signed, which is the written consent of the manager of Babcock & Brown Parallel Member LLC, in lieu of a meeting. Is this the second document that Scott Schlager prepared and you and Ms. Edwards delivered to Scholes to sign?
>
> A.  Yes.
>
> Q.  Yes? So, it is the consent. It says that it is "the consent of the manager of Babcock & Brown Parallel Member LLC." The first whereas clause says, "F Jan Blaustein Scholes, is the manager of the company;" is that what that says?
>
> A.  Yes.
>
> Q.  But as we just discussed, you think now that might not be true; is that correct?
>
> A.  Yeah.  That might not be truly accurate, but at that time that's what we know, so, that's what is there.

ECF No. 799, Akouete Aff., App. A, Ex. 17., Akouete Depo. 130:15-131:13.

5.  <u>Whether Scholes had the Mental Capacity to Act Even if She had Corporate Authority
and the B&B Entities had not Resigned, Converted, Merged, or Terminated.</u>

While the record contains substantial evidence from which an inference could be drawn that

Scholes lacked the mental capacity to execute the Disputed Appointment Documents, Akouete

and Edwards dispute that material fact and offer certain facts in the record to support their

argument that this Court should not determine on this summary judgment record that Scholes

lacked mental capacity at the time she signed the Disputes Appointment Documents.  While the

facts in the record suggest that Akouete and Edwards may have pressed forward in a way that

took advantage of Scholes at a time when she had been retired for many years, was residing in a

care facility, was the subject of a guardianship in Hawaii when they had been communicating

with her guardian, because of my rulings above, it is not necessary for me to reach or address

that issue.

## B.  Unjust Enrichment and Other "Additional Grounds" or "Alternative Claims."

Akouete and Edwards mention a number of undeveloped "additional grounds" or

"alternative claims" in their summary judgment pleadings that were not asserted in any material

way in their proofs of claim.  *See* ECF No. 658, pp. 3-4; *see also* ECF No. 845, pp. 3-4.  These

additional grounds may be disallowed and not considered on that basis alone and were not

specifically addressed by the Trustee.  Even though unnecessary, in the event that Akouete or

Edwards had adequately pleaded or argued these additional or alternative grounds, I address

them.

Akouete purports to "reserve[] each of these doctrines . . . irrespective of the Court's

determination regarding Movant's formal managerial authority." *See* ECF No. 658, p. 4.  It is not

clear whether he is purporting to preserve claims against third parties or argue for or against

summary judgment.  I have addressed arguments regarding apparent authority and de facto

management above.  In his motion for summary judgment, Akouete references a "necessity

doctrine and fiduciary duty to prevent corporate waste," estoppel, tortious interference with

contractual relations by third parties, promissory estoppel, and corporate waste and breach of

fiduciary duty. *See id.*, at pp. 3-4.  He cites no authority or support in the record for any of these

claims.  At least one argument asserts that he has claims against third parties, but he does not

reference the Debtor or estate.  Moreover, he does not identify anyone upon whom he relied on

and does not state any basis for a fiduciary duty to be owed to him by the Debtor or any person.

None of these arguments are sufficient to support his motion for summary judgment or create an

issue of material fact to avoid summary judgment in favor of the Trustee.  Akouete does

reference theories of unjust enrichment, constructive trust, and equitable lien that I will address

below in discussing the Edwards claim.

Edwards references in her proof of claim that the basis of her claim is "management and

asset recovery fees."  Claim No. 5-1.  It is unclear whether she asserts a separate basis for asset

recovery fees, but the affidavit attached to the proof of claim focuses on her allegation that she

was appointed a manager of the Debtor.  She does not assert that she had any contract with the

Debtor to perform asset recovery services, but in the description of one of her third-party claims

asserts that she had "a valid compensation agreement with [Scholes] (memorialized in part via

bill of sale and oral assurances."  ECF No. 845, p. 3.  The Bill of Sale cannot be read to be an

agreement for compensation and, as discussed above, Scholes had no actual or apparent authority

to enter into contracts with Edwards or Akouete or bestow on them any authority to act on behalf

of the Debtor.   In her motion for summary judgment, Edwards references "additional grounds"

supporting summary judgment in her favor: (1) breach of fiduciary duty; (2) tortious interference

with contractual relations by third parties; (3) civil conspiracy against third parties; and (4) unjust

enrichment.  Edwards cites no authority or support in the record for any of these claims.  Two of

these "additional grounds" assert that she has claims against third parties, but do not reference

the Debtor or estate.  Edwards does not identify any basis for a fiduciary duty to be owed to her

by the Debtor or any person.  Setting aside "unjust enrichment" for further discussion, none of

these arguments are sufficient to support Edwards's motion for summary judgment or create an

issue of material fact to avoid summary judgment in favor of the Trustee.

Both Akouete and Edwards reference "unjust enrichment" in support of summary

judgment and Akouete "reserves" a claim for a constructive trust or equitable lien against money

or property recovered by the estate.  Akouete does not cite to the record or to any authority and

does not discuss the elements of a claim for a constructive trust or equitable lien.  He does state

that these theories are supported by his efforts to recover assets and "enhancement" of estate

value.  Because Akouete and Edwards did identify two substantial assets/claims held by the

estate that had effectively been abandoned by the Debtor in its "ghost ship" state with no

manager and a disinterested member, I have considered whether any of these equitable remedies

are available to Akouete or Edwards to support their claims.

The record reflects that Akouete and Edwards were strangers to the Debtor and anyone

associated with the Debtor; they located unclaimed funds in the name of the Debtor held by the

State of California as part of their business efforts to identify "high dollar" unclaimed funds and

enter into agreements with owners to assist in recovery of funds.  *See* ECF No. 799, Akouete

Aff., App. A, Ex. 17, Akouete Depo. 14:12-16-4; *see also* ECF No. 861, Edwards Depo. 18:12-

28:14.  After identifying the California Unclaimed Funds through public records, Akouete and

Edwards engaged in "skip tracing" research to identify possible contact persons for the Debtor.

*See id.* at 24:7-21.  They identified Scholes as a person who had been associated with the Debtor

and made contact with her and then her son Peter, her guardian.  *See id.* at 31:7-36:17.  Edwards

testified that she and Akouete were aware that Scholes no longer worked for the Debtor, she was

in a rehabilitation facility, Peter was handling her affairs, and she was the subject of a

guardianship.  *See id.*  Edwards further testified that they sought "permission" from Peter to

"allow [Scholes] to proceed."  *Id.* at 43:14-19.

At this point, Akouete and Edwards undertook extraordinary actions to establish a claim

for a finder's fee . . . or more.  It is unclear why, or even whether, Akouete and Edwards actually

believed that Scholes had authority to act on behalf of the Debtor or a manager of the Debtor.  I

have not reached the issue of whether Scholes was mentally competent to sign any documents.

The record demonstrates that Akouete had little regard for these issues.[19]  It is also unclear why

Peter believed at some point that he could give permission for his mother to purport to act for

entities from which she had retired years before or had never held a position.  Regardless,

Akouete and Edwards aggressively pursued alternative avenues to earn a fee or other

compensation that would be paid by recovery of the Debtor's unclaimed property.

Edwards testified that she was aware that California law required a written contract for

people or entities assisting with asset recovery to claim a fee and such a fee would be limited to

10% for unclaimed funds.  *See* ECF No. 861, Edwards Depo. 22:9-23:24.  This may explain

subsequent events.  First, Akouete and Edwards arranged for Scholes to sign the flawed Bill of

Sale (incorrectly as President of the Debtor) by which they purported to have the Debtor transfer

all of its assets ("business") to ***them*** for a price to be paid to Scholes, ***individually***, equal to

approximately 50% of the funds they hoped to recover from the State of California.  They then

---

[19] As discussed above, in a later email Akouete acknowledged that he understood that Scholes was incapacitated and that the Bill of Sale was invalid.  He cavalierly suggested that the Bill of Sale would become "lost," but noted that he an Edwards "got what we needed to get done: Revive the LLC and take charge of the management." ECF No. 741-8, Ex. H.

attempted to take a different tactic by having Scholes sign the POA and Manager Consent.  At

that time, Akouete and Edwards had also discovered the Debtor's Property that was the subject

of the tax foreclosure, and Akouete had identified that as a possible additional source of recovery

– and potential compensation for Akouete and Edwards.  *See* ECF No. 799, Akouete Aff., App.

A, Ex. 17, Akouete Depo. 11:13-12:13, 24:18-31:12.  Akouete had become aware of what he

understood to be a pending deadline for the Debtor to redeem its Property in Massachusetts.  The

docket of this case and the record show and/or make reference to the large volume of lawsuits,

motion practice, and other activity pursued by Akouete after Scholes signed the Disputed

Appointment Documents.

As discussed above, Scholes had no actual or apparent authority to act for the Debtor or a

manager of the Debtor, and the Disputed Appointment Documents were not effective by their

own terms.  Notwithstanding that, Akouete and Edwards contend that they provided services that

benefitted the Debtor – for which they should be compensated as a matter of equity under a

theory of unjust enrichment – even if their services were not authorized.  Akouete and Edwards

do not state what law should apply to this analysis, but I have considered the law of Delaware,

California, and Massachusetts, each of which recognize unjust enrichment as equitable remedy

grounded in restitution principles.

Under Delaware law, '"[u]njust enrichment is the unjust retention of a benefit to the loss

of another, or the retention of money or property of another against the fundamental principles of

justice or equity and good conscience.' The elements of an equitable claim of unjust enrichment

are: '(1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the

impoverishment; (4) the absence of justification.'" *Wells Fargo Bank, N.A. v. Est. of Malkin*, 278

A.3d 53, 69 (Del. 2022) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).  The

relation between the enrichment and impoverishment must consider the relationship between the

claimant and the entity sought to be charged:

> Although the doctrine of unjust enrichment is one of "substantial
> flexibility," it is axiomatic that there must be some relationship
> between the parties. A showing that the defendant was enriched
> unjustly by the plaintiff who acted *for* the defendant's benefit is
> essential. As one court cogently explained: [T]o recover under a
> theory of quasi contract, a plaintiff must demonstrate that services
> were performed for the defendant resulting in its unjust enrichment.
> It is not enough that the defendant received a benefit from the
> activities of the plaintiff; if the services were performed at the behest
> of someone other than the defendants, the plaintiff must look to that
> person for recovery.

*MetCap Sec. LLC v. Pearl Senior Care, Inc.*, No. CIV.A. 2129-VCN, 2007 WL 1498989, at *6

(Del. Ch. May 16, 2007) (citation omitted) (denying a motion to dismiss a claim for unjust

enrichment where defendant was alleged to have known that plaintiff knew of the services to be

provided for its benefits, relied on those services, and benefitted from those services).  Delaware

law also considers similar claims based on a "quasi contract" theory.  "A person invoking the

doctrine of quasi-contract may recover the reasonable value of his services only if he establishes

that the services were performed with an expectation that the recipient of the benefit would pay

for them, and, further, that the services were performed, absent a promise to pay, under

circumstances which should have put the recipient of the benefit upon notice that the plaintiff

expected to be paid." *Bellanca Corp. v. Bellanca*, 169 A.2d 620, 623 (Del. 1961) (citing 5

Williston on Contracts, § 1575; 8 Am. Jur. Brokers § 159) (evaluating a claim for a commission

for finding a buyer for a manufacturing plant and stating that quasi-contractual relationships are

based on unjust enrichment principles).

Under California Law, the elements of an unjust enrichment claim are: (1) "receipt of a

benefit"; and (2) "unjust retention of the benefit at the expense of another."  *See Prof'l Tax*

*Appeal v. Kennedy-Wilson Holdings, Inc.*, 239 Cal. Rptr. 3d 908, 915 (Cal. Ct. App. 2018) (citing

*Lectrodryer v. Seoulbank*, 91 Cal. Rptr. 2d 881, 883 (Cal. Ct. App. 2000)). California courts have

held that unjust enrichment is not, itself, a cause of action but rather an underlying principle for

quasi-contract claims seeking restitution. *See, e.g., Rutherford Holdings, LLC v. Plaza Del Rey*,

166 Cal. Rptr. 3d 864, 872-73 (Cal. Ct. App. 2014).

Massachusetts courts have required that a party asserting an unjust enrichment claim

"must establish not only that the [opposing party] received a benefit, but also that such a benefit

was unjust, a quality that turns on the reasonable expectations of the parties." *Metro. Life Ins. Co.

v. Cotter*, 464 Mass. 623, 644, 984 N.E.2d 835, 850-51 (2013).  Determining reasonable

expectations of the parties is critical to the analysis because "the injustice of the enrichment or

detriment equates with the defeat of a person's reasonable expectations."  *Liss v. Studeny*, 450

Mass. 473, 479-80, 879 N.E.2d 676, 682 (2008) (citation omitted).  This element is shared in

principle with Delaware and California, in that California law recognizes unjust enrichment as a

quasi-contract claim seeking restitution and Delaware law similarly requires an element of notice

to the recipient of services for a quasi-contract claim or nexus between enrichment and

impoverishment for an unjust enrichment claim.

Here, the Debtor had no expectations or even knowledge that Akouete and Edwards were

providing services.  Their interactions with Scholes and Blaustein did not constitute interactions

with the Debtor, and Akouete and Edwards could have no reasonable expectation of

compensation (as opposed to a desire to secure compensation) as they unilaterally attempted to

impose terms, transfer assets, and assert management rights.  On this record, there is no unjust

enrichment/quasi-contract claim or related claim for constructive trust that can be established

under Delaware, California, or Massachusetts law.  Akouete and Edwards obtained publicly

available information and attempted to establish a basis to earn a fee because they had located

that information, which is their business.  They were unable to locate an authorized

representative of the Debtor, and they took extraordinary actions to advance their economic

interests and attempt to establish a means to collect compensation.  *Cf.* Restatement (Third) of

Restitution and Unjust Enrichment § 30 cmt. c ("If benefits were conferred before a promise of

counter-performance had been obtained, in the context of a prospective exchange that the

recipient was still free to reject, the result is a form of uncompensated enrichment that is neither

unjust nor unjustified. Precontractual performance in such a case rests on a self-interested

calculation by which the anticipated reward to the performing party is the enhanced likelihood of

a future return.")  Under these circumstances, equitable doctrines do not support a claim.

"A private party normally cannot compel another to pay for benefits conferred without

request, no matter how appropriate the transaction or how reasonable the terms of the

compensation demanded, if the effect of payment would be to complete an exchange that – had it

been proposed as a contract – the recipient would have been free to reject." *Id.*, cmt. b.  Edwards

and Akouete knew the risks inherent in the actions that they were taking to establish their

authority or right to a recovery.  There is no evidence in the record that the Debtor's California

Unclaimed Funds were at risk of being lost.  Moreover, while the tax foreclosure process was

proceeding, the Debtor had potential rights and claims if it wished to pursue them even had a

redemption period expired.  One Massachusetts court noted that:

> The rule is that one cannot be held liable on an implied contract to
> pay for that which he declines to permit to be done on his account.
> The exception to the rule is that when the law imposes upon one an
> obligation to do something which he declines to do, and which must
> be done to meet some legal requirement, the law in some cases treats
> performance by another as performance for him, and implies a
> contract on his part to pay for it . . . . [B]ut there is no such obligation

upon one to retain and preserve his property, whether it be live
animals or anything else.

*Keith v. De Bussigney,* 179 Mass. 255, 259-60, 60 N.E. 614, 615 (1901).

The summary judgment record supports the reasonable inference that Edwards and

Akouete acted to forward their own economic interests.  Self-interested, unrequested intervention

under these circumstances does not give rise to a claim of unjust enrichment or restitution.  *See*

Restatement (Third) of Restitution and Unjust Enrichment § 30 cmt. a ("The equities of the

parties are different when the claimant has elected to act in pursuit of his own objectives. When

liability on such a claim would subject the recipient to a forced exchange, imposing a new

money obligation as compensation for benefits that the recipient would have been free to refuse,

restitution is invariably denied."). Further, to the extent the claims of Akouete and Edwards are

characterized as claims for a "finder's fee," it appears that any unjust enrichment claim would be

barred by applicable statutes requiring written contracts to claim a "finder's fee" in connection

with the Debtor's "abandoned" assets.  This may be why each of Akouete and Edwards rely on

their ineffective appointment as managers of the Debtor to seek "compensation."  Both

Massachusetts and California law preclude an unjust enrichment claim where the parties were

required to sign a written contract providing for a finder's fee.  *See State Tax Auditing &*

*Research, Inc. v. Waters Corp.*, Ca. No. 98-2594-B, 2000 WL 782948, at *3 (Mass. Super. Ct.

Apr. 5, 2000) ("[T]he plain language of [Mass. Gen. L. ch. 259, § 7] makes clear that not only

must 'any agreement to pay compensation for services as a finder,' be in writing, but 'contract[s]

implied in fact or in law to pay reasonable compensation,' i.e. to claims based on unjust

enrichment or quantum meruit, are barred."); Mass. Gen. L. ch. 259, § 7 ("Any agreement to pay

compensation for service as a broker or finder . . . shall be void and unenforceable unless such

agreement is in writing, signed by the party to be charged therewith . . . ."); Cal. Civ. Proc. Code

§ 1582 (providing that, to be valid, an agreement to locate, deliver, recover, or assist in the recovery of unclaimed funds must be in writing signed by the owner and provide certain disclosures); *Cf. Vanacore & Assocs., Inc. v. Rosenfeld*, 201 Cal. Rptr. 3d 97, 102, 108-09 (Cal. Ct. App. 2016) (upholding dismissal of unjust enrichment claim where based on an invalid unenforceable contract where no compelling circumstances mandated enforcement of "illegal agreement.").

The Trustee recovered the California Unclaimed Funds.  While Edwards testified, and Akouete has asserted, that in some cases involving probate or other proceedings an asset recovery specialist may be awarded fees in excess of 10% - presumably asserting that Cal. Civ. Proc. Code § 1582 should not apply - that statute directly applies to finder's fee claims involving California unclaimed funds and requires a written agreement with required disclosures.  On this record, neither Akouete nor Edwards could establish a claim under California law for a fee relating to the recovery of the California unclaimed funds.  Similarly, Mass. Gen. L. ch. 259, § 7 applies to "finders" subject to exclusions not applicable to this case and is applicable to a "myriad [of] occupations."  *Bay Colony Mktg. Co. v. Fruit Salad, Inc.*, 41 Mass. App. Ct. 662, 666, 672 N.E.2d 987, 990–91 (1996) (notwithstanding that the Appeals Court of Massachusetts recognized that the argument that the court's "interpretation of § 7 renders it applicable to myriad occupations (e.g., stockbrokers and commodity brokers), and thus that it is unlikely that the Legislature intended that the statute have such broad application" was not an unreasonable theory, the court nonetheless concluded apart from certain "express exceptions, we do not find in the statute any basis for concluding that the Legislature intended to obviate disputes over claimed commissions for services rendered in certain commercial brokerage contexts, but not others").  While it is less clear than the applicability of the California statute that Mass. Gen. L. ch. 259, §

7 would apply to a "finder" that introduces a property owner to information that a tax foreclosure

has occurred, it could be read to do so and would serve the policy goals of that statute.  *See*

*Wallach v. Huang*, Dkt. No. 05-285, 2005 WL 2524398, at *2 (Mass. Super. Ct. Aug. 29, 2005)

("A finder has been defined by Massachusetts courts as one who merely identifies a business

opportunity for another.") (internal quotations and citation omitted).  This provides an additional,

alternative, basis to determine that neither Akouete nor Edwards may assert a claim for unjust

enrichment or other equitable relief.

While I have considered the fact emphasized by Edwards and Akouete that the Debtor

was not taking any action to recover the California Unclaimed Funds or the foreclosed Property

and their assertion that they brought these assets to light and, misguided or not, engaged in

unrequested intervention that has led the Debtor and parties in interest to a recovery in this

bankruptcy case, their actions and any "services" performed by them or at their request were

motivated to secure a portion of the Debtor's unclaimed assets for themselves.

## VI.   Conclusion

After carefully considering the record, no genuine issues of material fact exist, which, if

proven, would permit either Akouete or Edwards to meet their evidentiary burdens, and the

Trustee has put forth evidence that negates essential elements of the claims of those parties. The

Trustee is entitled to summary judgment.  For the reasons stated above, the Trustee's Objection is

sustained and both the Akouete Claim and the Edwards Claim are disallowed.  At oral argument,

Edwards stated that no one would know of the Debtor's abandoned assets and there would be no

bankruptcy absent her and Akouete's efforts.  She remarked that "everyone else" was going to

get paid and that they should be paid something.  Taking a narrow view, there is some truth to the

"but for" statement by Edwards.  Unfortunately, that does not meet the burden imposed on

Akouete and Edwards or provide a basis for this Court to overrule the Trustee's Objections to

their claims.

By the Court,

Dated:  February 17, 2026

_____
Christopher J. Panos
United States Bankruptcy Judge